1
2
3
4
5

**TIFFANY & BOSCO, P.A.**
Richard G. Himelrick, State Bar No. 004738
Seventh Floor Camelback Esplanade II
2525 E. Camelback Road
Phoenix, AZ 85016
Telephone: (602) 255-6000
Email: rgh@tblaw.com
*Liaison Counsel for Plaintiff*

6
7
8
9
10
11

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
Laurence M. Rosen
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Email: pkim@rosenlegal.com
          lrosen@rosenlegal.com
*Counsel for Plaintiff*

12
13
14

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

15
16
17
18
19
20
21
22
23

| Daniel Borteanu, Individually and on Behalf of All Others Similarly Situated, | No. |
| --- | --- |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | <u>CLASS ACTION</u> |
| Nikola Corporation; Trevor R. Milton; Steve Girsky; Steve Shindler; Mark A. Russell; and Kim J. Brady, | (DEMAND FOR JURY TRIAL) |
| Defendants. | |

24
25
26
27
28

Plaintiff Daniel Borteanu ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and

through Plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Nikola Corporation ("Nikola" or the "Company"), as well as media and analyst reports about the Company and Company press releases. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein.

## NATURE OF THE ACTION

1.     Plaintiff brings this securities class action on behalf of persons who purchased the securities of Nikola f/k/a VectoIQ Acquisition Corp. ("VectoIQ") between March 3, 2020 and September 15, 2020, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.     This Court has jurisdiction over each defendant named herein because each defendant has sufficient minimum contacts with this judicial district so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. The Company is also headquartered in this district.

5.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district and the Company is based in this district.

6.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate

telephone communications and the facilities of a national securities exchange. Defendants disseminated the statements alleged to be false and misleading herein into this district, and Defendants solicited purchasers of Nikola securities in this district.

## PARTIES

7.     Plaintiff, as set forth in the accompanying Certification, purchased the Company's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

8.     Defendant Nikola purports to operate as an integrated zero emissions transportation systems provider which designs and manufactures battery-electric and hydrogen-electric vehicles, electric vehicle drivetrains, vehicle components, energy storage systems, and hydrogen fueling station infrastructure. Defendant Nikola is incorporated in Delaware and maintains its principal executive offices at 4141 E Broadway Road, Phoenix, Arizona 85040. The merger of VectoIQ and Nikola closed on June 3, 2020. The Company's shares are listed on NASDAQ under the ticker symbol "NKLA" and formerly traded under the ticker symbol "VTIQ" until the merger in June 2020.

9.     Defendant Trevor R. Milton ("Milton") is the founder of Nikola and currently serves as the Company's Executive Chairman. Defendant Milton has over 100,000 Twitter followers for his account @nikolatrevor and tweets frequently about the Company.

10.     Defendant Steve Girsky ("Girsky") served as the Chief Executive Officer of VectoIQ during the Class Period until the merger in June 2020. Following the merger, Defendant Girsky has served as a Director of Nikola.

11.     Defendant Steve Shindler ("Shindler") served as the Chief Financial Officer of VectoIQ during the Class Period until the merger in June 2020.

12.     Defendant Mark A. Russell ("Russell") has served as the Chief Executive Officer of Nikola since June 2020 and as the President of Nikola since February 2019. Defendant Russell is also a Director of Nikola.

13.    Defendant Kim J. Brady ("Brady") has served as the Chief Financial Officer of Nikola since November 2017.

14.    Defendants Milton, Girsky, Shindler, Russell, and Brady are collectively referred to herein as the "Individual Defendants."

15.    Each of the Individual Defendants:

(a)    directly participated in the management of the Company;

(b)    was directly involved in the day-to-day operations of the Company at the highest levels;

(c)    was privy to confidential proprietary information concerning the Company and its business and operations;

(d)    was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)    was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)    was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)    approved or ratified these statements in violation of the federal securities laws.

16.    The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

17.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

18.    The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements

19.     On March 3, 2020, Nikola issued a press release, attached to VectoIQ's 8-K filing with the SEC the same day, entitled "Nikola Corporation, a Global Leader in Zero Emissions Transportation Solutions, to Be Listed on NASDAQ Through a Merger With VectoIQ" which quoted Defendants Milton and Grisky stating the following, in relevant part, regarding the Company's capabilities:

> Trevor Milton, Founder and CEO of Nikola stated: "***We are on a roll. You couldn't ask for better news for the energy and tech industry.*** The world is transitioning to zero emission platforms and Nikola is the leader for heavy duty vehicles. We believe we have a differentiated business model built on economics, not government subsidies. We now need to double down and speed up the timelines and get to market. We couldn't be happier to have Steve Girsky join our board."

> "***In our two-year quest to find a partner that was a proven technology leader*** and focused on making a global difference, Nikola was the clear winner," said Stephen Girsky, CEO of VectoIQ and former Vice Chairman of General Motors Corporation. "Nikola's vision of a zero-emission future and ***ability to execute were key drivers in our decision***."

(Emphasis added.)

20.     In connection with the merger announcement, Nikola released an investor presentation on March 3, 2020, attached to VectoIQ's 8-K filing with the SEC the same day, which, among other things, included the following slides, which touted Defendant Milton's experience in the clean energy and technology field and the Company's hydrogen production capabilities:

.        .        .

.        .        .

.        .        .

5

## KEY LEADERSHIP








**Trevor Milton**
Nikola
CEO[1]

- Visionary leader with passion for innovation and disruption
- Directs research, development and prototype assembly of the Nikola portfolio
- Holds a controlling interest in the Company
- Prior to Nikola, Trevor was the CEO of dHybrid Systems, LLC, a natural gas storage technology company that was acquired by Worthington Industries, Inc.

**Mark Russell**
Nikola
President[1]

- Over 20 years of experience building and managing companies in the manufacturing industry
- Served as president and COO of Worthington Industries (NYSE:WOR) from 2012-2018
- Previously served as GM of Engineered Aerospace Products at Alcoa, Inc (NYSE:AA)
- Education: BS from Weber State University and JD from Brigham Young University

**Kim Brady**
Nikola
CFO

- Over 20 years of experience in private equity and investment banking
- Served as Sr. Managing Director at SolIc Capital
- Previously served as CFO and GM for various companies in manufacturing, business services, and healthcare
- Education: BS from Brigham Young University and MBA from Northwestern's Kellogg Graduate School of Management

**Steve Girsky**
VectoIQ Acquisition Corp
CEO[1]

- 30 years of experience working with corporate board executives, labor leaders, OEM leaders, suppliers, dealers, and national policy makers
- Institutional investor top-ranked auto analyst for many years
- Former GM Vice Chairman; helped lead GM out of bankruptcy, stabilized its European operations and led overall GM strategy
- Current and former public boards:




1.   Trevor Milton to assume Executive Chairman role, Mark Russell to assume Chief Executive Officer role and Steve Girsky to join Nikola board post-closing

4

## STATION INFRASTRUCTURE AND DEVELOPMENT

Partnered with NEL to develop first-in-kind hydrogen station infrastructure

### NIKOLA DEMO STATION DEVELOPMENT

**Demo Station:** Nikola HQ (Phoenix, AZ)

- **Station Timing:** completed Q1 2019
- **Station Offers:** $H_2$ storage and dispensing
- **Other:** onsite storage 1,000 kg

**R&D 8-Ton Station:** R&D Facility (Phoenix, AZ)

- **Station Timing:** begin Q2 2020, complete by Q4 2021
- **Station Offers:** $H_2$ production, storage, and dispensing
- **Other:** (8) 1-ton electrolysers onsite capable of producing 8,000 kgs of hydrogen per day

**AB 8-Ton Pilot Station:** Van Nuys, CA

- **Station Timing:** begin Q4 2020, complete by mid-2022
- **Station Offers:** $H_2$ production, storage, and dispensing
- **Other:** (8) 1-ton electrolysers onsite capable of producing 8,000 kgs of hydrogen per day



Demo Station #1



25

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

21.     On March 6, 2020, VectoIQ filed its yearly report on Form 10-K with the SEC for the quarter ended December 31, 2019 (the "2019 Annual Report"). The 2019 Annual Report was signed by Defendants Girsky and Shindler. Attached to the 2019 Annual Report, via a 10-K/A filed April 15, 2020, were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Girsky and Shindler attesting to the accuracy of the financial statements and the disclosure of all fraud.

22.     The 2019 Annual Report stated that its "Business Combination Criteria" was as follows:

> Consistent with our strategy, we have identified the following general criteria and guidelines that we believe are important in evaluating prospective target businesses and, in evaluating a prospective target business, *we expect to conduct a thorough due diligence review that will encompass, among other things, meetings with incumbent management and employees, document reviews and inspection of facilities, as applicable, as well as a review of financial and other information that will be made available to us*. We intend to use these criteria and guidelines in evaluating acquisition opportunities, but we may decide to enter into our initial business combination with a target business that does not meet these criteria or guidelines.
>
> · Focus on industrial technology, transportation and smart mobility business positioned to benefit from our management team's extensive experience and contacts in these sectors. We believe our strategy leverages our management team's distinctive background and vast network of industry leaders in the target industry.
> · Emphasis on companies that can benefit from a public listing and access to the public capital markets. We will primarily seek a target that we believe will benefit from being publicly traded and will be able to effectively utilize the broader access to capital and the public profile that are associated with being a publicly traded company.
> · *We will target businesses that are market leaders, with established technologies* and attractive financial metrics and/or prospects, where we believe that our industry expertise and relationships can be used to create opportunities for value creation, whether for acquisitions, capital investments in organic growth opportunities or in generating greater operating efficiencies. While this may include business with a history of revenue growth and profitability, we may also target businesses that are

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

underperforming that that we believe can benefit from our expertise and/or technology.

· *We intend to seek target businesses that have established management teams*, but that we believe could benefit from the industry experience and contacts of our management. . . .

These criteria are not intended to be exhaustive. Any evaluation relating to the merits of a particular initial business combination may be based, to the extent relevant, on these general guidelines as well as other considerations, factors and criteria that our management team may deem relevant. *In the event that we decide to enter into our initial business combination with a target business that does not meet the above criteria and guidelines, we will disclose that the target business does not meet the above criteria in our stockholder communications related to our initial business combination, which, would be in the form of proxy solicitation materials or tender offer documents that we would file with the SEC.*

(Emphasis added.)

23.     The 2019 Annual Report also stated the following regarding the "Selection of a Target Business and Structuring of a Business Combination":

*In evaluating a prospective target business, our management may consider a variety of factors, including one or more of the following:*

· *financial condition and results of operation*;
· growth potential;
· brand recognition and potential;
· *experience and skill of management* and availability of additional personnel;
· capital requirements;
· competitive position;
· barriers to entry;
· stage of development of the products, processes or services;
· existing distribution and potential for expansion;
· *degree of current or potential market acceptance of the products, processes or services*;
· *proprietary aspects of products and the extent of intellectual property or other protection for products or formulas*;
· impact of regulation on the business;
· regulatory environment of the industry;
· costs associated with effecting the business combination;

8

*· industry leadership, sustainability of market share and attractiveness of market industries in which a target business participates*; and
· macro competitive dynamics in the industry within which the company competes.

These criteria are not intended to be exhaustive. Any evaluation relating to the merits of a particular business combination will be based, to the extent relevant, on the above factors as well as other considerations deemed relevant by our management in effecting a business combination consistent with our business objective. ***In evaluating a prospective target business, we will conduct an extensive due diligence review which will encompass, among other things, meetings with incumbent management and inspection of facilities, as well as review of financial and other information which is made available to us.*** This due diligence review will be conducted either by our management or by unaffiliated third parties we may engage, although we have no current intention to engage any such third parties.

(Emphasis added.)

24.     On March 13, 2020, VectoIQ filed with the SEC a prospectus on Form S-4 signed by Defendants Milton and Girsky. On April 15, 2020, May 1, 2020, and May 5, 2020, VectoIQ filed revised versions of the prospectus for the merger on Forms S-4/A. On May 8, 2020, VectoIQ issued a Proxy Statement with the SEC on Form 424(b)(3) which was signed by Defendants Milton and Girsky. The Proxy Statement stated the following as "VectoIQ's Board of Directors' Reasons for Approval of the Business Combination":

As described under "The Background of the Business Combination" above, VectoIQ's board of directors, in evaluating the Business Combination, consulted with VectoIQ's management and financial and legal advisors. In reaching its unanimous decision to approve the Business Combination Agreement and the transactions contemplated by the Business Combination Agreement, VectoIQ's board of directors considered a range of factors, including, but not limited to, the factors discussed below. In light of the number and wide variety of factors considered in connection with its evaluation of the combination, VectoIQ's board of directors did not consider it practicable to, and did not attempt to, quantify or otherwise assign relative weights to the specific factors that it considered in reaching its determination and supporting its decision. VectoIQ's board of directors viewed its decision as being based on all of the information available and the factors presented

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

to and considered by it. In addition, individual directors may have given different weight to different factors.

This explanation of VectoIQ's reasons for the combination and all other information presented in this section is forward-looking in nature and, therefore, should be read in light of the factors discussed under the section titled "Cautionary Note Regarding Forward-Looking Statements."

In approving the combination, VectoIQ's board of directors determined not to obtain a fairness opinion. The officers and directors of VectoIQ have substantial experience in evaluating the operating and financial merits of companies from a wide range of industries and concluded that their experience and background, together with experience and sector expertise of Cowen, enabled them to make the necessary analyses and determinations regarding the Business Combination.

VectoIQ's board of directors considered a number of factors pertaining to the Business Combination as generally supporting its decision to enter into the Business Combination Agreement and the transactions contemplated thereby, including, but not limited to, the following:

• ***Highly Disruptive Technology.  VectoIQ's management and board of directors believe that Nikola is a market disruptor*** in an attractive and growing industry with over 70 patents issued or pending and strong growth prospects within the hydrogen fuel, BEV and FCEV sectors as well as adjacent markets;

• Strategic Partnerships.  VectoIQ's management and board of directors considered Nikola's strategic partnerships with industry leaders, which it believes reduce Nikola's technology and execution risk from truck and hydrogen station development to truck sales and maintenance;

• High Demand for Product.  VectoIQ's management and board of directors considered the fact that Nikola has a high volume of fuel cell electric vehicle pre-orders, currently at over $10 billion, as well as contracts with top tier customers with investment-grade credit ratings;

• Platform Supports Further Growth Initiatives.  VectoIQ's management and board of directors believe that Nikola's business model uniquely supplies both the truck and hydrogen fueling infrastructure, solving the fleets' concerns as to where to refuel with green hydrogen at competitive pricing to diesel;

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

*• **Due Diligence.**  VectoIQ's management and board of directors conducted due diligence examinations of Nikola and discussions with Nikola's management and VectoIQ's financial and legal advisors concerning VectoIQ's due diligence examination of Nikola*;

• Financial Condition.  VectoIQ's board of directors also considered factors such as Nikola's outlook, financial plan and debt structure, as well as valuations and trading of publicly traded companies and valuations of precedent combination and combination targets in similar and adjacent sectors (see "—Certain Nikola Projected Financial Information");

• Attractive Market Valuation of Comparable Companies.  The public trading market valuation of comparable "future transportation" companies (consisting of NIO, Tesla and Virgin Galactic, which we refer to collectively as the "Comparable Future Transportation Companies") have expected 2020 enterprise value/revenue multiples and enterprise value/EBITDA multiples (in each case based on market data as of February 28, 2020) ranging from 3.3x to 650+x (and a median of 4.0x) and up to 29.5x, respectively. The public trading market valuation of comparable fuel cell technology companies (consisting of Ballard, Bloom Energy, Nel and Plug Power, which we refer to collectively as the "Comparable Fuel Cell Technology Companies") have expected 2020 enterprise value/revenue multiples and enterprise value/EBITDA multiples (in each case based on market data as of February 28, 2020) ranging from 1.7x to 14.7x (and a median of 9.5x) and up to 77.3x (and a median of 47.8x), respectively. . . . For example, when applying the median 2020 enterprise value/revenue multiple for the Comparable Fuel Cell Technology Companies of 9.5x to Nikola's 2024 projected revenue, the initial market valuation of the post-Business Combination company implies a 67.6% annual discount rate from December 31, 2024 to June 30, 2020. Since Nikola's business is not expected to achieve scale until 2024, the VectoIQ board of directors believes this present value methodology is the most reasonable method of comparison. Although this analysis is based on the current Nikola projections, the valuation multiples decline each year as a result of the high growth projected for Nikola's business;

*• **Experienced and Proven Management Team.**  VectoIQ's management and board of directors believe that Nikola has a strong management team which is expected to remain with the combined company to seek to execute Nikola's strategic and growth goals*;

(Emphasis added.)

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

25.    The Proxy Statement also stated the following, in pertinent part, regarding Nikola's hydrogen production capabilities and VectoIQ's due diligence:

Q. Who is Nikola?

A. Nikola is a vertically integrated zero-emissions transportation solution provider *that designs and manufactures state-of-the-art battery-electric and hydrogen fuel cell electric vehicles, electric vehicle drivetrains, energy storage systems, and hydrogen fueling stations*. Nikola's core product offering is centered around its battery-electric vehicle ("BEV") and hydrogen fuel cell electric vehicle ("FCEV") Class 8 semi-trucks. The key differentiator of Nikola's business model is its planned network of hydrogen fueling stations. Nikola is offering a revolutionary bundled lease model, which provides customers with the FCEV truck, hydrogen fuel, and maintenance for a fixed price per mile, locks in fuel demand and significantly de-risks infrastructure development. See "Information About Nikola."

*        *        *

*During the week of November 25, 2019, members of the management teams from both companies met at Nikola's' headquarters in Phoenix, Arizona to enable VectoIQ's management to learn more about Nikola's current and planned business.* Throughout the week the management teams also held calls to discuss scheduling for continued due diligence meetings as well as a timeline for a potential combination. During this period, VectoIQ assembled a number of industry experts to advise with respect to vehicle development, electrification, fuel cells, software, connectivity and manufacturing in connection with its due diligence efforts.

During the week of December 2, 2019, representatives of VectoIQ and Nikola held a technical due diligence call and VectoIQ had discussions with industry experts on commercial conditions in the Class 8 Hydrogen and Electrification markets.

*        *        *

*First Test Station Installed at Nikola's Phoenix HQ*

Through our partnership with Nel ASA, a Norwegian hydrogen company ("Nel"), we have initiated the development of the hydrogen station infrastructure *by completing our first 1,000 kg demo station in the first quarter of 2019 at our corporate headquarters in Phoenix, Arizona. The*

*demo hydrogen station offers hydrogen storage and dispensing and serves as a model for future hydrogen stations*.

\*     \*     \*

**1. DESCRIPTION OF BUSINESS AND BASIS OF PRESENTATION**

*Nikola Corporation ("Nikola" or the "Company") is a designer and manufacturer of battery-electric and hydrogen-electric vehicles, electric vehicle drivetrains, vehicle components, energy storage systems, and hydrogen stations.*

The Company is also developing a network of hydrogen fueling stations to meet hydrogen fuel demand for its customers. *Fueling related activities will be conducted through the Company's wholly-owned subsidiary, Nikola Energy.*

(Emphasis added.)

26.    The Proxy Statement stated the following, in pertinent part, regarding Nikola's "in-house" designing, manufacturing, and testing capabilities:

In June 2019, Nikola moved into our state-of-the-art headquarters and R&D facility in Phoenix, Arizona, which consists of more than 150,000 square feet and where *we are capable of designing, building, and testing prototype vehicles in-house*.

(Emphasis added.)

27.    The Proxy Statement touted Defendant Milton's experience and abilities, stating the following as a risk, in pertinent part:

*We are highly dependent on the services of Trevor R. Milton, our Chief Executive Officer.*

We are highly dependent on the services of Trevor R. Milton, Chief Executive Officer, and largest stockholder. *Mr. Milton is the source of many, if not most, of the ideas and execution driving Nikola.* If Mr. Milton were to discontinue his service to us due to death, disability or any other reason, we would be significantly disadvantaged.

(Emphasis added.)

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

28.    On May 15, 2020, Defendant Milton tweeted the following regarding Nikola's capabilities:

> I laugh when articles say Nikola is all talk. 300+ mile battery and 500+ mile fuel cell to be produced by @nikolamoto& @IVECO. ***These are real. Our tech is years ahead.*** Production starts next year & Factory being prepped now in Germany. Watch while others follow the boss. [Emoji and images omitted.]
> https://twitter.com/nikolatrevor/status/1261306736528388098.

(Emphasis added.)

29.    On June 6, 2020, Defendant Milton tweeted the following regarding Nikola's in-house capabilities: "***All the technology, software, controls, E axle, inverters etc we do internally.*** We joint venture with those that know the supply chain and manufacturing like Iveco. ***We outsource autonomy. We outsource hardware production.***"   https://twitter.com/nikolatrevor/status/1269255746434158599. (Emphasis added.)

30.    On July 1, 2020, Defendant Milton tweeted the following regarding Nikola's in-house capabilities:

> We don't make the cells. We make the entire pack like the top guys do. We do have an OEM making our truck but ***all internals are Nikola's IP; batteries, inverters, software, ota, infotainment, controls, etc. We own it all in house. Just not the plant to build the truck***
> https://twitter.com/nikolatrevor/status/1278362710074220544.

(Emphasis added.)

31.    On July 5, 2020, Defendant Milton tweeted the following regarding Nikola's in-house capabilities stating:

> "I'm talking about stuff that has no value; cabs, windows, seats or seat belts or ac units. ***All major components are done in house; batteries, inverters, software, controls,infotainment, over the air, etc, you don't care about the truth you're just out to be a keyboard warrior.***"
> https://twitter.com/nikolatrevor/status/1279673731435159556.

14

(Emphasis added.)

32.     On July 15, 2020, Defendant Milton tweeted a video and the following:

0-60 in under 5 seconds in the #nikolatwo hydrogen semi truck. Damn that was fast! . ***Edited / professional content coming soon for everyone but here's my raw cell phone behind the scene.*** https://twitter.com/nikola trevor/status/1283425947199221761?s=20.

***Yeah, we'll be posting Go Pro video that's being edited, etc .*** Be up soon showing 0-60 camera time, outside view and also side by side against a diesel truck. This is just a teaser shot https://twitter.com/nikolatrevor/status/12834 29144970158080.

***Actually around 5 seconds. That's 10 seconds to hit 60 and slow down. Around that time, exact timing to be shown in the edited videos coming out next month.*** Side by side diesel comparison, etc. https://twitter.com/nikola trevor/status/1283430654395314176.

(Emphasis added.)

33.     On July 22, 2020, Defendant Milton tweeted the following regarding Nikola's Tre model trucks:

We break ground on our factory tomorrow. ***We have 5 units coming off assembly line now in Ulm Germany.*** We will be first to market with 300+ mile BEV. Say something nice, do your research or don't comment. [Emoji omitted.] https://twitter.com/nikolatrevor/status/1285999780473135104/

We are breaking ground on our factory tomorrow bud. ***5 Units coming off assembly lines in Germany for testing*** and we'll be first to market with a 300+ mile BEV. At least be objective. Give props when due. https://twitter.com/nikolatrevor/status/1286008500443701248.

(Emphasis added.)

34.     On August 4, 2020, Nikola filed its quarterly report on Form 10-Q with the SEC for the quarter ended June 30, 2020 (the "2Q20 Report"). The 2Q20 Report was signed by Defendants Russell and Brady. Attached to the 2019 Annual Report were certifications pursuant to SOX signed by Defendants Russell and Brady attesting to the accuracy of the financial statements and the disclosure of all fraud.

15

35.     The 2Q20 Report touted Defendant Milton's experience and abilities, stating the following as a risk, in pertinent part:

> **We are highly dependent on the services of Trevor R. Milton, our Executive Chairman.**
>
> We are highly dependent on the services of Trevor R. Milton, our Executive Chairman, and largest stockholder. **Mr. Milton is the source of many, if not most, of the ideas and execution driving Nikola.** If Mr. Milton were to discontinue his service to us due to death, disability or any other reason, we would be significantly disadvantaged.

(Emphasis added.)

36.     The 2Q20 Report stated the following, in pertinent part, regarding the Company's hydrogen capabilities:

> **Overview**
>
> **We are a vertically integrated zero emissions transportation systems provider that designs and manufactures state of the art battery electric and hydrogen electric vehicles, electric vehicle drivetrains, energy storage systems, and hydrogen fueling stations.** To date, we have been primarily focused on delivering zero emission Class 8 trucks to the commercial transportation sector in the U.S. and in Europe. Our core product offering includes battery electric and hydrogen fuel cell electric trucks and hydrogen fuel.

(Emphasis added).

37.     On August 13, 2020, Defendant Milton tweeted the following regarding Nikola's hydrogen production capabilities: "**We currently make our own green H2 for under $4 / kg**. We are open to others down the road but we have our stations going up and need to focus on completing ours first. Then we can work with others as we expand." https://twitter.com/nikolatrevor/status/1294075433407791104.

38.     The statements referenced in ¶¶ 19-37 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) VectoIQ did not engage in proper due diligence regarding its merger with Nikola; (2) Nikola overstated its "in-house" design, manufacturing, and testing capabilities; (3) Nikola overstated its hydrogen production capabilities; (4) as a result, Nikola overstated its ability to lower the cost of hydrogen fuel; (5) Defendant Milton tweeted a misleading "test" video of the Company's Nikola Two truck; (6), the work experience and background of key Nikola employees, including Defendant Milton, had been overstated and obfuscated; (7) Nikola did not have five Tre trucks completed; and (8) as a result, Defendants' public statements were materially false and/or misleading at all relevant times.

## THE TRUTH EMERGES

39.     On September 10, 2020, before market hours, Hindenburg Research published a report (the "Report") describing, among other things, how: (i) the Company claims to design key components in house, but they appear to simply be buying or licensing them from third-parties; (ii) the Company has not produced hydrogen; (iii) a spokesman for Powercell AB, a hydrogen fuel cell technology company that formerly partnered with Nikola, called Nikola's battery and hydrogen fuel cell claims "hot air"; (iv) Nikola staged a "test" video for its Nikola Two; (v) some of Nikola's team, including Defendant Milton, are not experts and do not have relevant experience; and (vi) Nikola did not have five Tre trucks completed.

40.     The Report alleged that the Company overstated its "in-house" design, manufacturing, and testing capabilities, stating, in pertinent part:

> Trevor claims Nikola designs all key components in house, but *they appear to simply be buying or licensing them from third-parties. One example: we found that Nikola actually buys inverters from a company called Cascadia. In a video showing off its "in-house" inverters, Nikola concealed the Cascadia label with a piece of masking tape.*

*        *        *

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

*Despite regularly claiming to develop almost everything in-house, Nikola quietly outsourced the NZT redesign to a small company called Stellar Strategy LLC* (https://stellarstrategyllc.com/). Stellar is staffed by former executives of Polaris (https://offroad.polaris.com/en-us/), a well-known producer of off-road vehicles who had advised Nikola on the open cabin version.

\*     \*     \*

**Trevor Milton in 2020: We Make All Our Inverters In-House**
**Reality: Nikola Buys Inverters from a Third-Party Supplier. A July Video Shows the Inverter, but the Label of the Manufacturer is <u>Covered with Masking Tape</u>**

After the critical Bloomberg article (https://www.bloomberg.com/news/ articles/2020-06-17/nikola-s-founder-exaggerated-the-capability-of-hisdebu t-truck), it seemed there was an undercurrent of skepticism that Trevor became obsessed with countering.

Nikola had always made claims that its components were developed in-house, dating back to Nikola's first press release (https://nikolamotor.com/ press_releases/nikola-motor-company-formed-to-transform-u-s-transportati on-industry-25) on May 9, 2016:

"The **majority** of the semi-trucks components **are being developed by Nikola**."

\*     \*     \*

*When people would ask skeptically what Nikola had ever actually developed, Trevor would respond with a list of components such as batteries and inverters made in-house.* See examples, here (https://twitter.com/laurisyrjaniemi/status/1269176058768752640), here (https://twitter.com/moonwalk19691/status/1278359414811099136) and here (https://twitter.com/IsaacTaub56/status/1279654385686102016):

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16
17
18

Trevor later attempted to counter skeptics by showing videos of the two prototype trucks that had been built with partner Bosch, suggesting that this somehow disproved the allegation that the earlier truck he built had never been finished.

19
20
21
22

In one such video, on July 14th, 2020 (https://www.youtube.com/watch?v= 7C2LDmkEmP0), Trevor walks viewers through the Powertrain for the Nikola Two. At the 29:30 (https://youtu.be/7C2LDmkEmP0?t=1770) mark Trevor begins describing the in-house inverters and how other OEMs are asking to use Nikola's proprietary inverter tech:

23
24
25
26
27

"We do all the e-axle design in house. All the gears, the gear reductions. The thermal the cooling. Even the controls that go with it. **And, also, the inverters as well. All inverters on the Nikola truck are probably some of the most advanced software systems that I know of anywhere in the automotive world.** Why do I know that? It's because other OEMs are asking us to use it."

28

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

1

2     At the 7:02 mark (https://youtu.be/7C2LDmkEmP0?t=422), we can see the

3    inverters up close. There is a relatively inconspicuous green piece of masking

4    tape on the component:

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20



21

22

23

24

25

26 .    .     .

27 .    .     .

28 .    .     .

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Here it is up close:



*The inverter is not proprietary to Nikola. Cascadia Motion, a small company in Portland, offers such inverters off the shelf* (https://cascadiamotion.com/images/catalog/DataSheets/RM300.pdf).   The tape is covering the label which would normally show the product description and other specifications that make clear who built the component:

21





We texted a sales engineer for Cascadia and asked if the model was available to the public or if it was a customer specific model, and they confirmed that it was for sale to the public.

***This follows the same pattern. Nikola has regularly used off-the-shelf products from third parties, while claiming to have vast internal proprietary technology and to "design" all the products itself. It then partners with companies that actually have the components Nikola claimed to have already developed internally.***

(Emphasis added.)

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

41.   The Report alleged that the Company overstated its hydrogen production capabilities and its ability to cost costs of hydrogen fuel, stating, in pertinent part:

> *A spokesman for Volvo spin-off Powercell AB, a hydrogen fuel cell technology company that formerly partnered with Nikola, called Nikola's battery and hydrogen fuel cell claims "hot air"*. . . .

> Inexpensive hydrogen is fundamental to the success of Nikola's business model. Trevor has claimed in a presentation to hundreds of people and in multiple interviews to have succeeded at cutting the cost of hydrogen by ~81% compared to peers and to *already be producing hydrogen*. **Nikola has not produced hydrogen at this price or at any price** as he later admitted when pressed by media.

> Trevor has appointed his brother, Travis, as "Director of Hydrogen Production/Infrastructure" to oversee this critical part of the business. Travis's prior experience looks to have largely consisted of pouring concrete driveways and doing subcontractor work on home renovations in Hawaii.

> *        *        *

> **2020: Trevor Claimed Nikola Produces Hydrogen for Under $3/kg, ~81% Cheaper Than the Rest of The World, Representing a Major Breakthrough**

> The high cost of hydrogen, among other issues, has prevented it from becoming a mainstream fuel source for alternative energy vehicles. The high price tag results from both the cost to isolate hydrogen and the cost of building production facilities/transmission.

> Low-cost hydrogen production is critical to Nikola's financial viability, as Nikola's hydrogen long haul truck sales would rely on a working network of hydrogen stations. Nikola's much anticipated fuel cell pickup truck's existence also hinges (https://insideevs.com/news/435512/trevor-miltonnikola-badgers-details-sales-operation/) on a hydrogen station roll out.

> *        *        *

> In an August 2020 interview (https://www.youtube.com/watch?v=nbrgQj4x lbk) with Fox Business News, when asked about hydrogen, Trevor says:

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

"We saw an opportunity to bring the cost of hydrogen down going zero-emission and putting it on parity with diesel, and it's the first time in history that's been able to be done, **so it went from about $16/kg and we are down now below $4/kg**. And there's a lot of reasons for that, but the main one is standardization of a hydrogen station worldwide has allowed us to drive that cost down dramatically. **We tell people we're an energy technology** company that happens to build really cool vehicles."

In another interview on July 17, 2020, on the TeslaCharts podcast, Trevor claimed Nikola has been able to "chop the cost of hydrogen from $16/kg down to – we're down below $3/kg on our hydrogen now."[1] [11:34 (https://feeds.buzzsprout.com/758369/4605602-episode-35-trevormilton?play=true)]. This would mark an astonishing 81.25% reduction in the cost of hydrogen.

When challenged again about Nikola's hydrogen production cost by the TeslaCharts podcast host [25:00 (https://feeds.buzzsprout.com/758369/4605602-episode-35-trevor-milton?play=true)], Trevor repeats the question, compliments the host on asking the question, claims he has "so much experience" with answering the question, says he "knows the stuff better than anyone he has ever encountered" and says he has spent "7 years" driving the cost of hydrogen down.

But he then admits that many of the "changes" in the hydrogen world he has seen are "not so much on the technology side" and that Nikola has "seen maybe a 5% or 10% increase in efficiency across the board" in hydrogen technology. But that's "not what changes the world," Trevor says.

After providing an anecdote about his father, and offering some other sidetrack discussion, **he then admits that Nikola's entire answer to bringing down the cost was to simply standardize a hydrogen station**. "The standardization of the hydrogen station was the most important aspect," Trevor says.

Such standardization would clearly bring costs down, but Nikola already claimed to have accomplished the feat without having a single *production* facility of its own.

**When Pressed on the Subject in July 2020, Trevor Acknowledged Nikola Produces No Hydrogen at All. The Claims Made at Nikola World and In Multiple Interviews Were, Once Again, Completely Fictitious**

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

In a subsequent interview on July, 2020 (https://www.linkedin.com/pulse/
interview-trevor-milton-founder-executive-chairman-nikolameckmann/?
trackingId=nIXxnt4u0GFFIunPZCD9Uw%3D%3D), when pressed about
hydrogen production, Trevor acknowledged producing no hydrogen at all:

Trevor:
**"The station is designed to store and pump about 1,000 kg's per day.
Electrolyzers are going in now and should be operational with zero
emission solar production by Nikola World 2020. We have 2.5
megawatts of solar going up now at the facility. The station functions
now, but we do not sell it to the public.**"

Interviewer:
**"OK, so for the record: You're currently producing no hydrogen** but
you're planning to produce 1 metric ton/day using 100% solar energy by the
end of the year? What are you going to use it for by then?"

Trevor:
**"The permitting process of producing hydrogen takes much longer than
storing and pumping it. We spent the last year building the largest
hydrogen station in the western world in Phoenix, AZ at our HQ. Now
we will spend the next 5 months installing the hydrogen production
(Electrolyzers, Power Electronics, Thermal, Etc.) into that station."**

We found the admission to be unsurprising when we learned who was in
charge of Nikola's efforts to develop and roll out its supposedly
revolutionary hydrogen production capabilities.

(Emphasis added.)

42.    The Report alleged that the Company overstated its key employee's
expertise and experience, stating, in pertinent part:

**Nikola's Director of Hydrogen Production/Infrastructure Is Trevor
Milton's Little Brother, Who Worked Paving Driveways in Hawaii Prior
To Joining at Nikola**

Given the complicated nature of hydrogen, we wanted to look closer into the
resumes of who Nikola has put in charge of such a critical and dangerous
aspect of their business.

25

We expected to find that Nikola had hired a world-renowned scientist to lead its revolutionary hydrogen efforts. Instead, it appears Nikola has appointed Trevor Milton's little brother, Travis, as the Director of Hydrogen Production/Infrastructure. Travis has held his title at Nikola for over 5 years, beginning January 2015, according to his LinkedIn (https://www.linkedin.com/in/travis-milton-4b968153/). [Image omitted.]

Interestingly, he seems to have landed in this crucial position the same month he finished his last job, where his LinkedIn lists him as "President" of "Self-Employed" in Maui, Hawaii. . . .

Eventually, we found a website (http://www.ericnewman.com/TravisMilton.htm) that highlighted Travis' work pouring concrete and building a barn as a subcontractor in Maui. [Image omitted.]

**"Mr. Milton poured two long and challenging driveways** (one driveway was the world's steepest), and extensive walkways with elaborate embossed Hawaiian leaves," the website says. . . .

We're not sure how this work prepped Travis for a key role in solving one of the world's greatest scientific challenges, but he appears to have been handsomely rewarded for his discoveries.

Trevor has given Travis, along with other family members of Trevor and select early employees, **stock worth over $110 million as of this writing.** [Pg. 116 (https://www.sec.gov/Archives/edgar/data/1731289/000104746920 004261/a2242128z424b3.htm)] One source we spoke with, who previously worked with Travis, described him as not having a formal role and as someone Trevor "kept around" if they "needed someone to hold a rope, or something like that" while they were working on vehicles.

**Nikola's Head of Infrastructure Development, In Charge Of "Leading Development" Of Nikola's 700+ Hydrogen Station Network, Is the Former CEO And General Manager of a Golf Club In Idaho**

Also central to the company's hydrogen station initiative is Nikola's "Head of Infrastructure Development".

Once again, we might anticipate that the rollout of Nikola's coast-to-coast hydrogen production network would be managed by an individual with an extensive background in both science as well as large infrastructure developments.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

For this task, the company chose Dale Prows, who is described at the 13:20 (https://www.youtube.com/watch?v=LbNopvpSbzU&feature=youtu.be&t= 798) mark in a video produced for investors ahead of the company going public, as "one of our hydrogen experts."

Prows joined Nikola after spending almost 4 years as CEO and General Manager at a residential golf course in Idaho. [Images omitted.]

**Prows, along with Travis Milton, are apparently going to spearhead building the world's first network of 700 hydrogen production and fueling stations.**

**Trevor: "We've Assembled One of the Best Teams in the World"**
**Nikola's Chief Engineer: A Background Largely in Software Development and Pinball Machine Repair**

**Trevor regularly touts bringing in top talent** (https://youtu.be/ol110JwBQA A?t=33) **from all over the world.** Key to that team is Nikola's Chief Engineer, Kevin Lynk (https://www.linkedin.com/in/klynk/).

Trevor credits Kevin with designing all of the company's e-axle, a complex task for one vehicle let alone Nikola's proposed suite of vehicles. At 8:43 (https://youtu.be/heHZYqlLRdE?t=523) in the following video, Trevor details all the elements of Nikola's e-axle's as developed by Lynk:

**"All the e-axles at Nikola were developed by Kevin… (These include) rotor, stator, cooling, thermal, gears, and sometimes inverters."**

(Note that the e-axles appear to be mostly developed by Bosch (https://www .reuters.com/article/us-autos-bosch/bosch-partners-with-startupnikola-on-electric-long-haul-truck-idUSKCN1BU1TO)).) We reviewed Kevin's biography on LinkedIn and found that prior to Nikola, he worked for 7 months designing oilfield products using CAD software, 3.5 years in software development, and prior to that spent 9 months repairing pinball machines.

(Emphasis added.)

43.    The Report alleged that the Company published a misleading video of its Nikola Two prototype, stating, in pertinent part:

**July 2020: Nikola Posts Video of Nikola Two Going "0-60 in Under 5 Seconds"**
**Reality: The Vehicle Was Already Rolling When the Video Started and it Still Took Over 10 Seconds**

Following the Nikola One "demonstration", the company was successful in raising capital and bringing on a number of legitimate partners. Automotive supply heavyweight Bosch agreed to work with Nikola in September 2017 (https://nikolamotor.com/press_releases/nikola-motorcompany-and-bosch-develop-the-commercial-vehicle-powertrain-of-the-future-35), and, by all reports, (https://www.boschpresse.de/pressportal/de/en/commercial-vehicle-innovation-enabler-bosch-brings-advanced-solutions-to-the-new-nikola-two-truck-187968.html) largely built its Nikola Two prototype trucks.

In a tweet (https://twitter.com/nikolatrevor/status/1283425947199221761?s=20), *Trevor posted a video claiming to showcase the Nikola Two prototype's acceleration capabilities*[.] [Image omitted.]

The video begins with the truck already rolling. By just using a basic stopwatch, we can see that it takes over 10 seconds between the start and Trevor exclaiming "there it is" on the video. *The speedometer is not visible, and we obviously have no ability to see what is actually powering the truck.* [Click here to see the video, with a stopwatch (https://youtu.be/rSiWPNe2llU)]

In response to questions about the veracity of the video (1 (https://twitter.com/nikolatrevor/status/1283429144970158080?s=20), 2 (https://twitter.com/nikolatrevor/status/1283449179776245761?s=20)), *Trevor promised that professional video would soon follow, but we have seen no such update.*

(Emphasis added.)

44.    The Report alleged that Defendant Milton "has established an undeniable track record of taking from others and claiming technology as his own. He has quietly used off-the-shelf products from third-parties while loudly claiming to have vast proprietary technology[,]" describing his time with Nikola and stating the following, in pertinent part, about his experience before Nikola:

*. . . Trevor Milton is as "key man" as it gets. Per Nikola's filings:*
*"Mr. Milton is the source of many, if not most, of the ideas and execution*
*driving Nikola"* [Pg. 45 (https://www.sec.gov/ix? doc=/Archives/edgar/
data/1731289/000173128920000012/nkla-20200630.htm)].

*In Trevor's post-Q2 CNBC interview, he said he let Nikola's CEO*
*and CFO handle the earnings call because he "wanted them to feel*
*like they have a voice in the company".* (Aug 5 CNBC, 3:34
(https://www.youtube.com/watch?v=OPhN8saJkAI))

*       *       *

Our work for this report involved speaking with multiple whistleblowers,
business partners, and former employees as well as reviewing extensive
internal documentation from Trevor's ventures leading up to Nikola,
including emails, text messages, recorded conversations and behind-the-
scenes photographs.

Based on our findings, we believe Nikola is an intricate fraud built on dozens
of lies over the course of its founder Trevor Milton's career, which he has
parlayed into a $20 billion cloud of smoke and partnerships with some of the
top auto companies in the world.

**Part I: Trevor Milton's Career Path Leading Up to Nikola**
**November 2009: Trevor Milton Launches dHybrid, Inc. with a Partner,**
**Kicking off his EV Trucking Journey. It Ended in Litigation With**
**Allegations of Misappropriation and False Promises**

After dropping out of college (https://twitter.com/nikolatrevor/status/12841
89340516540416?s=20), Trevor Milton started an alarm sales company in
Utah called St. George Security and Alarm. He eventually exited the business
for $300,000. Our interview with its buyer indicated that Trevor
overpromised, resulting in a total loss for the initial acquirer. We also
interviewed Trevor's "50/50" business partner who indicated he was led to
believe the exit was much smaller, saying he ultimately received only
$100,000 for his "50%". Following the alarm business exit, Trevor launched
an online classified ads website that sold used cars, called uPillar.com, which
eventually failed. (For more on both of these early businesses, see the
Appendix at the end of this report.)

Following those two early pursuits, Trevor's initial foray into alternative
energy vehicles was a company called dHybrid, Inc. Trevor joined forces
with an engineer named Mike Shrout who had developed compressed natural

gas (CNG) conversion technology for diesel engines. Shrout was to bring the technical expertise to the venture while Trevor would bring his business experience.

**It Got Off to a Good Start: dHybrid Entered into Agreement with Major Trucking Company Swift to Convert Up to 800 Trucks, a Contract Valued at 16 Million**

\*        \*        \*

**Swift Later Sued, Alleging the Company Delivered Only 5 Trucks That Didn't Work and That dHybrid's Officers Misappropriated Capital for Personal Use**

\*        \*        \*

**In the Lead-Up to the Lawsuit, Trevor Reached out to New Investors Claiming the Swift Contract Was Worth 250-300 Million**
**Reality: We Have the Contract. It Was Only 16 Million**

\*        \*        \*

**Following the Swift Litigation, dHybrid Sought a Buyout But the Deal Ended in More Litigation, With the Buyer Alleging dHybrid Made Numerous Misrepresentations About its Capabilities**

\*        \*        \*

**2012: With dHybrid Mired in Litigation, Trevor Started a New Company With his Dad, Choosing a Very Similar Name, dHybrid Systems**
**Trevor Then Falsely Claimed to Prospective Partners That 'dHybrid' Had Been in Operation for Years**

\*        \*        \*

**2014: dHybrid *Systems* Was Then Acquired by Worthington—A Successful Exit…For Trevor**
**We Learned from a Former Employee (In a Recorded Call) That dHybrid Concealed Potentially Fatal Product Issues from Worthington In Order to Get the Deal Done**

\*        \*        \*

30

*December 2015: Worthington Promptly Wrote Down the Value of dHybrid Assets*

(Emphasis added.)

45. The Report also alleged that the Company did not have five Tre trucks coming off of the assembly line in Ulm, Germany.

46. On this news, shares of Nikola fell $10.24, or 24%, over the next two trading days, to close at $32.13 per share on September 11, 2020, on unusually heavy trading volume, damaging investors.

47. On September 14, 2020, after market hours, *Bloomberg* published an article entitled "SEC Examining Nikola Over Short Seller's Fraud Allegations" which announced the SEC examination of Nikola stemming from the Report.

48. On this news, securities of Nikola declined in after-hours trading, further damaging investors.

49. On September 15, 2020, before trading hours, Hindenburg Research published another report (the "Second Report"), focused on Nikola's responses and non-responses to the Report, entitled "We View Nikola's Response As a Tacit Admission of Securities Fraud[.]"

50. The Second Report stated the following, in relevant part, regarding the Company's in-house design and manufacturing capabilities:

**Our Report: Trevor Claimed On Video That Nikola's Inverters Were Developed In House And That OEMs Were Asking To Use Them. In The Same Video He Is Showcasing An Inverter Manufactured By Cascadia With Masking Tape Covering Its Label.**

**Nikola's Response: Admits This is True, Then Deflects by Vaguely Stating That the Company Has Been "Working on Its Own Inverters For Quite Some Time"**

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

In our report, we pointed out that Trevor, on video, claimed that Nikola made its own inverters in-house, along with all the e-axle design and other key components.

In the same video, Trevor shows off an inverter that we discovered is actually manufactured by Cascadia, with a piece of masking tape on the label that concealed who really made it.

***The company once again admitted the claims in our report to be true, and walked back its claims that these inverters were Nikola's proprietary intellectual property by vaguely stating that it is "working on" its own inverter:***

"Nikola has been designing, engineering and working on its own inverters for quite some time."

***The company's CEO, Mark Russell, further walked back the company's claims to have vast proprietary technology when pressed by reporters from the Financial Times on Friday:***

"Asked about Mr. Milton's claim to have all the 'core' technology for its vehicles, Mr. Russell **described the company as an 'integrator', stitching together the many elements of its vehicles from a complex supply chain.**"

***Russell's admission clearly corroborates our own findings, and directly contradicts Trevor's repeated claims of Nikola having vast proprietary intellectual property.***

The company's response on Monday morning declared that "at no time did Nikola state that the inverter on the prototype truck shown in the video was the Company's." But of course it ignores the fact that there is video proof, narrated by Milton himself:

"We do all the e-axle design in house. All the gears, the gear reductions. The thermal the cooling. Even the controls that go with it. **And, also, the inverters as well. All inverters on the Nikola truck are probably some of the most advanced software systems that I know of anywhere in the automotive world. Why do I know that? It's because other OEMs are asking us to use it.**"

Why would OEMs be asking to use an inverter that hadn't even been developed? Furthermore, Trevor actually points to the supposed "in-house" inverter in question in the video:

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS



Pictured: Trevor Milton's finger, while he narrates a "Behind the Scenes" video, pointing at a Cascadia Inverter with masking tape over its label, about 15 minutes before proclaiming Nikola makes all its own inverters.

***Once again, the company admitted our findings were correct.***

Now, rather than defending its previous false claims to have developed revolutionary proprietary technology for use in its vehicles and prototypes, Nikola now vaguely claims to be working on it.

(Emphasis added.)

51.     The Second Report stated the following, in pertinent part, regarding the Company's hydrogen production capabilities:

**Nikola's Response Confirmed That None of this Happened: "Nikola Continues to Believe that its Planned Hydrogen Station Network…Will Provide Key Competitive Advantages."**

\*       \*       \*

***As acknowledged by the company's statement Monday, it has no hydrogen network, and simply hopes to have one in the future.*** This once again strikes us as a tacit admission of securities fraud.

(Emphasis added.)

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

52.     The Second Report stated the following, in pertinent part, regarding key Nikola employee's work experience:

**Our Report: Why Would Trevor Appoint His Brother As "Director of Hydrogen Production/Infrastructure" Given He Had No Apparent Experience in Hydrogen Technology?**

**Nikola's Response: Travis Milton Ran A Construction Business**

In our report, we noted that Trevor Milton appointed his younger brother Travis to a position that required scientific expertise. . . .

The company responded on Monday by claiming that Travis is qualified for this high-level scientific position because he previously worked in construction:

"Travis Milton previously owned and operated his own construction company preparing him for hydrogen station infrastructure and buildouts."

When faced with the same question, in a since-deleted Instagram rant addressing the question (we have a copy), Trevor stated:

"Why do you give a shit? Go start your own company—hire your own employees!"

Our questions to the company concerned Travis' contributions to Nikola's claimed hydrogen breakthroughs, and his experience with the significant technical and scientific challenges of hydrogen production, storage and delivery.  Those questions remain completely unanswered.

53.     The Second Report stated the following, in relevant part, regarding the Company's potential five Tre trucks:

**Bloomberg Corroborates: The Assembly Line Isn't Finished**
**Nikola's Response Tacks A Year and A Half Onto Trevor's Publicly Disclosed "Right Now" Achievement, Saying It Doesn't Expect the Tre Until Q4 2021**

***Our research highlighted statements made by Trevor in July 2020 that 5 Nikola Tre trucks were coming off an assembly line in Germany. We***

*showed in our report that none of the trucks had been completed and that the assembly line itself had not been completed.*

*Bloomberg has since confirmed our work*, writing:

"**Those statements were a mischaracterization of Nikola and Iveco's progress in Ulm**, according to two people familiar with the matter. **The assembly line is still under construction and not yet operational or building prototypes**, the people said. There are prototypes being built by hand in a workshop, one of the people said."

. . . In its response on Monday morning, Nikola stated:

"five trucks are currently being built and commissioned in Ulm, Germany, and are pre-production builds"

*This confirmed our original report*, including comments quoted by a Bosch spokesman, indicating the trucks were still not completed and had not rolled off an assembly line in July. Nikola then stated that it expects the Tre to be "ready for production and available to customers by the fourth quarter of 2021."

*We view this, once again, as an admission that Trevor's statement to investors in July was patently false. Not only were completed trucks not rolling off an assembly line, but an assembly line hadn't even been constructed. The trucks remain uncompleted.*

(Emphasis added.)

54.     The Second Report listed 43 questions that Hindenburg raised in its Report that Nikola has not responded to. These include the following regarding key Nikola employee's wok experience, Nikola's hydrogen production and pricing capabilities, and the Nikola Two video:

6. You appointed your brother Travis as "Director of Hydrogen Production/Infrastructure". What experience does he have in hydrogen research and production?"

Nikola's response: NONE

*          *          *

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

24. You claimed in an interview to have succeeded at cutting the cost of hydrogen by ~81% from peers, stating "we're down below $3/kg on our hydrogen now". How much hydrogen has Nikola produced at this price, if any?

Nikola's response: NONE

\*    \*    \*

26. Why did you post a video saying the Nikola Two had gone from 0-60mph in under 5 seconds when anyone with a stopwatch can see that it took at least 10 seconds?

Nikola's response: NONE

27. Following the 0-60 video you promised to post a professional version of the video, saying it was just being edited. But you never did. Why? Does the Nikola Two have as much power as you've claimed it has?

Nikola's response: NONE

55.    On this news, securities of Nikola declined in pre-market trading, further damaging investors.

56.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

57.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who purchased publicly traded Nikola securities on the NASDAQ during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Nikola and its subsidiaries, members of the Individual Defendants' immediate families and their legal representatives, heirs,

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

successors or assigns and any entity in which Defendants have or had a controlling interest.

58.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Nikola securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

59.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

60.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

61.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a)      whether the Exchange Act was violated by Defendants' acts as alleged herein;

b)      whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition and business of the Company;

c)      whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d)      whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

e)      whether Defendants acted knowingly or recklessly in issuing false filings;

f)       whether the prices of Nikola securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

g)       whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

62.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

63.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a)       Nikola shares met the requirements for listing, and were listed and actively traded on the NASDAQ, an efficient market;

b)       As a public issuer, the Company filed periodic public reports;

c)       Nikola regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

d)       Nikola's securities were liquid and traded with moderate to heavy volume during the Class Period; and

e)       The Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

64.     Based on the foregoing, the market for Nikola securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the securities, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

65.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I
### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder Against All Defendants

66.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

67.     This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

68.      During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

69.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Nikola securities during the Class Period.

39

70.     Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of Nikola's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

71.     Individual Defendants, who are or were the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Nikola personnel to members of the investing public, including Plaintiff and the Class.

72.     As a result of the foregoing, the market price of Nikola securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Nikola securities during the Class Period in purchasing Nikola securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

73.     Had Plaintiff and the other members of the Class been aware that the market price of Nikola's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Nikola's securities at the artificially inflated prices that they did, or at all.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

74.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

75.     By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Nikola's securities during the Class Period.

**COUNT II**
**Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

76.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

77.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of Nikola's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's false financial statements.

78.     As officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Nikola's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

79.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Nikola disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of

41

Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Nikola securities.

80.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)     declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)     awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)     awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: September 15, 2020


**TIFFANY & BOSCO, P.A.**

By: */s/ Richard G. Himelrick*
        Richard G. Himelrick
        Seventh Floor Camelback Esplanade II
        2525 E. Camelback Road
        Phoenix, AZ 85016
        *Liaison Counsel for Plaintiff*

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
Laurence M. Rosen
275 Madison Avenue, 40th Floor
New York, NY 10016
*Counsel for Plaintiff*

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that on September 15, 2020, the attached document was electronically transmitted to the Clerk of the Court using the CM/ECF System which will send notification of such filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

*/s/ Shelley Boettge*
Shelley Boettge

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

# Certification and Authorization of Named Plaintiff Pursuant to Federal Securities Laws

The individual or institution listed below (the "Plaintiff") authorizes and, upon execution of the accompanying retainer agreement by The Rosen Law Firm P.A., retains The Rosen Law Firm P.A. to file an action under the federal securities laws to recover damages and to seek other relief against Nikola Corporation. The Rosen Law Firm P.A. will prosecute the action on a contingent fee basis and will advance all costs and expenses. The Nikola Corporation. Retention Agreement provided to the Plaintiff is incorporated by reference, upon execution by The Rosen Law Firm P.A.



| | |
|---|---|
| First name: | DANIEL |
| Middle initial: | |
| Last name: | BORTEANU |
| Address: | Redacted |
| City: | |
| State: | |
| Zip: | |
| Country: | |
| Facsimile: | |
| Phone: | |
| Email: | |

Plaintiff certifies that:

1. Plaintiff has reviewed the complaint and authorized its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff represents and warrants that he/she/it is fully authorized to enter into and execute this certification.

5. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

6. Plaintiff has made no transaction(s) during the Class Period in the debt or equity securities that are the subject of this action except those set forth below:

Acquisitions:

| Type of Security | Buy Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock | 09/08/2020 | 180 | 54.16 |
| Common Stock | 09/09/2020 | 100 | 46.12 |

Sales:

| Type of Security | Sale Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock | 09/10/2020 | 280 | 39.81 |

**Certification for DANIEL BORTEANU (cont.)**

7.  I have not served as a representative party on behalf of a class under the federal
    securities laws during the last three years, except if detailed below.

    BORTEANU

I declare under penalty of perjury, under the laws of the
United States, that the information entered is accurate:          YES

By clicking on the button below, I intend to sign and execute
this agreement and retain the Rosen Law Firm, P.A. to
proceed on Plaintiff's behalf, on a contingent fee basis.        YES

Signed pursuant to California Civil Code Section 1633.1, et seq. - and the Uniform
Electronic Transactions Act as adopted by the various states and territories of the
United States.

Date of signing: 09/15/2020