Gary Gotto (No. 007401)
**KELLER ROHRBACK LLP**
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Telephone:   (602) 230-6322
Email: ggotto@kellerrohrback.com
*Liaison Counsel for Lead Plaintiffs*

(*Lead Counsel for Lead Plaintiffs and for
the Class appear on the Signature Page*)

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Daniel Borteanu, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>Nikola Corporation; Trevor Milton; Mark A. Russell; Kim J. Brady; Britton M. Worthen; Steve Girsky; and Steven Shindler,<br><br>Defendants. | No. CV-20-01797-PHX-SPL<br>No. CV-20-01819-PHX-DIR (cons.)<br>No. CV-20-02123-PHX-JJT (cons.)<br>No. CV-20-02168-PHX-DLR (cons.)<br>No. CV-20-02237-PHX-DLR (cons.)<br>No. CV-20-02374-PHX-DWL (cons.)<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** |

1

**TABLE OF CONTENTS**

NATURE OF THE ACTION ............................................................................... 1

JURISDICTION AND VENUE.......................................................................... 12

PARTIES ........................................................................................................... 13

SUBSTANTIVE ALLEGATIONS .................................................................... 15

I.      Nikola Background and its Business Combination with VectoIQ ......... 15

II.     Defendants' Stock Ownership and Compensation................................. 18

        A.      Trevor Milton ............................................................................ 18

        B.      Mark Russell ............................................................................. 21

        C.      Kim J. Brady ............................................................................. 22

        D.      Britton Worthen........................................................................ 23

        E.      Stephen J. Girsky...................................................................... 24

        F.      Steven M. Shindler .................................................................... 25

III.    Milton's Control Over Nikola ............................................................... 25

IV.     Milton's Social Media Activity and Fixation with Stock Price ............ 27

V.      Nikola's Scheme to Defraud the Public Using the Nikola One Semi-Truck ........ 31

        A.      Defendants Misled the Public Regarding the Capabilities of the Nikola One
                ............................................................................................... 31

        B.      Nikola Defendants Sought to Market an Incomplete and Inoperable Product
                Through the Nikola One "In Motion" Video ............................... 34

        C.      Nikola Defendants Misstated the Nature of Nikola's Reservations for the
                Nikola One to Suggest They were Firm and Binding ................... 36

VI.     Nikola Defendants Misled Investors Concerning the Company's Hydrogen
        Production, Costs, and Capabilities........................................................ 38

        A.      Background on Nikola's Hydrogen Production Plans ................. 38

        B.      Nikola Defendants' Fraud Concerning Nikola's Hydrogen Production
                Capabilities................................................................................ 39

        C.      Nikola Defendants Fraud Concerning Nikola's Cost to Produce Hydrogen
                ............................................................................................... 40

VII.    Nikola Defendants' Fraud Concerning Nikola's Production of the Badger Pickup
        Truck......................................................................................................... 43

VIII.   Nikola Defendants' Fraud Concerning Nikola's Manufacturing of In-House
        Components............................................................................................... 49

        A.      Nikola Did Not Manufacture Any Components In-House ......... 49

        B.      Nikola's Fictional Game-Changing Battery Technology ........... 52

i

IX.    Nikola Defendants Intentionally Misled the Public about the Total Cost of Ownership ................................................................................................ 57

X.    Nikola's Non-Existent Production of The Nikola Tre BEV ...................... 58

XI.    Nikola's Headquarter Was Never "Off-Grid" Or Contained Any Solar Panels .... 59

XII.    Nikola Never Owned Any Natural Gas Wells ....................................... 59

XIII.    Nikola Defendants Knew Milton was Making False and Misleading Statements On Behalf of Nikola ............................................................. 60

MATERIALLY FALSE AND MISLEADING STATEMENTS ..................................... 62

    A.    Pre-Merger False Statements by the Nikola Defendants ........................... 63

    B.    False and Misleading Statements After The Merger Is Announced But Before Nikola Begins to Publicly Trade on NASDAQ By the Nikola and VectoIQ Defendants ........................................................................... 81

        1.    False and Misleading Statements Related to the Nikola One ............. 81

        2.    VectoIQ Defendants False and Misleading Statements about Nikola's Purely Aspirational Hydrogen Production Capabilities .............................. 85

        3.    VectoIQ Defendants False and Misleading  Statements about the Badger Pickup Truck .......................................................................... 87

    C.    Class Period False and Misleading Statements  by the Nikola Defendants 89

THE TRUTH BEGINS TO EMERGE AS DEFENDANTS  CONTINUE TO MISLEAD INVESTORS ....................................................................................... 117

ADDITIONAL INDICIA OF SCIENTER ..................................................... 126

    D.    Tesla's Production of FCEV/BEV Vehicles and Hydrogen Fuel, Batteries, and Fueling Stations Were Nikola's Core Operations Supporting a Strong Inference of Scienter ................................................................. 127

    E.    Defendants' Statements Themselves Support a Strong Inference of Scienter ........................................................................................... 129

    F.    Defendant Milton's Deletion of His Twitter Account Supports a Strong Inference of Scienter ..................................................................... 130

    G.    Defendants Russel and Brady's SOX Certifications Support a Strong Inference of Scienter ..................................................................... 131

LOSS CAUSATION .............................................................................. 132

    A.    September 10-11, 2020 – First Partial Corrective Disclosure/Materialization of the Risk .................................................................................... 134

    B.    September 14-15, 2020 – Second Partial Corrective Disclosure/Materialization of the Risk .............................................. 136

    C.    September 20-21, 2020 – Third Partial Corrective Disclosure/Materialization of the Risk.............................................. 138

ii

D. September 23, 2020 – Fourth Partial Corrective Disclosure/Materialization of the Risk ............................................................................................... 139

E. September 29, 2020 – Fifth Partial Corrective Disclosure/Materialization of the Risk ............................................................................................... 141

F. October 16, 2020 – Sixth Partial Corrective Disclosure/Materialization of the Risk ............................................................................................... 142

G. November 24-25, 2020 – Seventh Partial Corrective Disclosure/Materialization of the Risk ...................................................... 144

H. November 30 – December 1, 2020 – Eighth Partial Corrective Disclosure/Materialization of the Risk ...................................................... 145

I. December 23-24, 2020 – Ninth Partial Corrective Disclosure/Materialization of the Risk ...................................................... 147

J. February 25-26, 2021 – Tenth Partial Corrective Disclosure/Materialization of the Risk ............................................................... 149

K. July 29, 2021 – August 5, 2021 – Eleventh Corrective Disclosure/Materialization of the Risk ...................................................... 150

CONTROL PERSON ALLEGATIONS ........................................................ 152

APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE ........................................................................................ 154

NO SAFE HARBOR ...................................................................................... 155

PLAINTIFFS' CLASS ACTION ALLEGATIONS ...................................... 157

COUNT I ....................................................................................................... 159

COUNT II ...................................................................................................... 162

COUNT III ..................................................................................................... 164

PRAYER FOR RELIEF ................................................................................. 166

DEMAND FOR TRIAL BY JURY ............................................................... 166

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**NATURE OF THE ACTION**

1.      This is a securities fraud class action brought by Lead Plaintiffs George Mersho, Vincent Chau, Stanley Karcynski (collectively, "Lead Plaintiffs" or "Plaintiffs"), by and through their undersigned counsel. The action charges that the defendants named herein violated 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§ 78j(b), 78t(a) and 78t(b)), and Rule 10b-5 promulgated thereunder by the U.S. Securities and Exchange Commission (the "SEC") (17 C.F.R. § 240.10b-5) (the "Action").

2.      The action is brought on behalf of all investors who purchased the common stock of Nikola, Inc. ("Nikola" or the "Company") during the period June 4, 2020 through February 25, 2021 (the "Class Period").

3.      Lead Plaintiffs' allegations are based upon Lead Counsels' investigation, except as to the allegations pertaining to Lead Plaintiffs, which are based upon their personal knowledge. Lead Counsels' investigation included, among other things, review and analysis of: (i) information publicly disseminated by Nikola, including its public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) public filings and other documents related to VectoIQ; (iii) social media postings, news reports, press releases, analysts' reports and other publicly available documents; (iv) interviews with former employees of Nikola, and other knowledgeable persons; (v) consultations with relevant experts; (vi) pleadings and other court documents related to litigation against Nikola's former Chief Executive Officer ("CEO") and Executive Chairman, Trevor Milton ("Milton"), including documents filed in the civil action by the SEC against Milton (Case No. 1:21-cv-06445 (S.D.N.Y.)) ("SEC Action")[1] and documents filed in the criminal

---

[1] A copy of the SEC Civil Complaint is annexed hereto as Exhibit A.

1

action by the U.S. Department of Justice ("DOJ")[2] against Milton (Case No. 1:21-cr-00478-ER (S.D.N.Y.)) ("DOJ Criminal Action"), which are supported by internal documents and witness testimony gathered in the course of the investigations conducted by the DOJ and SEC; as well as pleadings and other court documents related to the derivative action *Barbara Rhodes v. Trevor Milton, et. al*, No. 2022-023-KSJM (Del. Ch.), which is supported by documents obtained through a books and records request; and (vii) multiple admissions made by certain of the Nikola Defendants (defined below). Lead Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

4.    As alleged herein, this was a brazen and shameless fraud in which Defendants blatantly misrepresented virtually every aspect of Nikola's business. Defendant Milton was Nikola's founder and Executive Chairman before he resigned on September 20, 2020. Milton repeatedly hyped Nikola, and its stock, through a series of false and misleading statements. Milton's scheme was simple and straightforward: "fake it until you make it" and Milton would "make it" when his lock-up agreement expired at the end of 2020, allowing him to dump his billions of dollars' worth of Nikola stock after artificially inflating the stock price.

5.    Milton has been criminally indicted for violating the federal securities laws and the SEC has brought civil charges against him.

6.    In addition to Milton and Nikola itself, this action also charges (i) Nikola CEO Mark A. Russell ("Russell"), (iii) Nikola Chief Financial Officer ("CFO") Kim J. Brady ("Brady"), and (iv) Nikola Chief Legal Officer ("CLO") Britton M. Worthen

---

[2] A copy of the indictment against Milton is annexed hereto as Exhibit B.

2

("Worthen"). These Defendants, along with Milton and Nikola, are referred to as the "Nikola Defendants."

7.      The action also charges Steven J. Girsky ("Girsky") and Steven Shindler ("Shindler"), the former CEO and CFO of VectoIQ, a publicly traded special purpose acquisition company ("SPAC") that merged with Nikola, permitting Nikola's common stock to begin public trading on the NASDAQ on June 4, 2020. VectoIQ itself had no business. As a SPAC, it was formed for the sole purpose of raising capital to merge with a private company in the transportation industry. VectoIQ was required to complete a merger by mid-2020, otherwise it would have to refund all funds to its investors and VectoIQ's founders would miss out on what was likely to be a lucrative payday.

8.      Nikola purports to be a producer of zero emissions vehicles, including FCEVs (hydrogen fuel-cell electric vehicles) and BEVs (battery-electric vehicles).

9.      While Defendants misrepresented numerous aspects of Nikola's operations (as detailed below), the fraud can be broken down into nine categories of misrepresentations: *first*, that Nikola had developed a fully operational "zero-emissions" tractor trailer truck powered by hydrogen fuel cell technology—the Nikola One; *second*, that Nikola had, in hand, over 14,000 purchase orders for its trucks, which represented 2 to 3 years of production and billions in revenue; *third*, that Nikola was producing hydrogen at a fraction of the cost industry experts believed was possible and that Nikola was in the process of establishing a nation-wide network of hydrogen refueling stations, which would produce inexpensive hydrogen for the Nikola One and Nikola's other vehicles to operate on; *fourth*, that the cost of owning and operating Nikola's vehicles was significantly less than the cost of owning and operating a traditional diesel powered vehicle; *fifth*, that Nikola had developed, using its own technology, a fully operational BEV pick-up truck, the

Badger One, for which pre-orders had sold out; *sixth*, that Nikola had developed all of its vehicles' critical components "in-house," including a proprietary "game-changing" electric battery, which exceeded the range of then-existing electric batteries; *seventh*, that commercial "assembly line" production of the Nikola Tre BEV truck had already been completed in Ulm, German; *eighth*, that Nikola's headquarters was completely "off-grid" with solar panels on the roof producing 18 megawatts of energy a day; and *ninth*, that Nikola owned seven natural gas wells that were used as backup to Nikola's solar hydrogen production.

10.     As alleged herein, each of these claims were materially false and misleading when made. Below is a mere summary of the false and misleading representations and omissions of material facts made by Defendants.

11.     *First*, the Nikola One was neither a "zero-emissions" truck nor operational. It was an empty shell. Nevertheless, in late 2016, Nikola staged an event specifically to dupe investors into believing that Nikola had created a ground-breaking, fully functioning zero emissions semi-truck. Then, doubling down on the charade, Nikola created a video in 2018 purporting to show the Nikola One driving down a road under its own power. In reality, Nikola had repeatedly towed the still inoperable Nikola One to the top of a hill and then filmed it as it rolled down the hill to make it appear as if it was operational. According to a Nikola executive, the video did not originally show the vehicle moving at all. However, Milton had demanded the change. Another Nikola employee admitted, "[a]t the time, a number of employees were uncomfortable saying the truck was 'in motion' when they knew it was not driving."[3] Nevertheless, throughout the Class Period, Nikola continued to

---

[3] On November 12, 2020 Nikola's counsel, Kirkland & Ellis, provided a presentation to the United States Attorney's Office for the Southern District to New York regarding the criminal investigation into the conduct herein and this presentation provided some of the results from the Kirkland investigation. This document was publicly filed in the DOJ

display the doctored video on its website and Defendants continued to falsely assert that the Nikola One was operational. For example, on August 18, 2020, Milton stated "*it was totally capable of driving, it had everything in it —power, steering, batteries—everything in it*."[4] Nikola has since admitted in its SEC filings that the Company's statements concerning the Nikola One were false and misleading.

12.    *Second*, Nikola represented that it had 14,000 orders for its various trucks, the majority of which were for the Nikola One, which represented 2 to 3 years of production and billions in expected revenue. As Milton said on June 1, 2020: "[w]e're the only company in the world that is sold out for many, many years . . . It's all based on orders.  I think that's the reason Nikola is worth so much money today." And on July 31, 2020, Milton said the truck orders were "*Not letter of intents, they're actually contracts*. We've got  . . . *Yeah, billions and billions of dollars with the contracts*. So I want to be clear about that 'cause *a lot of people have thought that it's just like, a non-committal thing, it's not. These are like, sign on the dotted line, billions and billions and billions and billions of dollars in orders.*"

13.    These statements were materially false and misleading because 13,200 of the 14,000 orders were, in fact, non-binding and cancellable at any time and for any reason. Moreover, after four years since its purported unveiling, the Nikola One was still completely inoperable and Nikola had no timeline for the production of a hydrogen-powered sleeper truck. These statements misled investors into believing Nikola had billions in expected revenue in the ensuing 2-to-3-year period when, in fact, Nikola, for the most part, did not even have a working product to sell.

---

Criminal Action on December 15, 2021. It is referred to herein as the Nikola "USAO Presentation" and annexed hereto as Exhibit C.

[4] All emphasis in this Complaint is added unless otherwise indicated.

14.     ***Third***, Nikola claimed it had solved the problem of producing hydrogen to power its vehicles. The primary obstacle to powering vehicles with hydrogen is the high cost of hydrogen production. Nikola represented to investors that it was producing hydrogen via electrolysis, a process that uses electricity to split water into hydrogen and oxygen. However, producing hydrogen via electrolysis at cost-effective rate would necessitate Nikola acquiring vast amounts of electricity at a fraction of the then-market prices. On June 4, 2020, after Nikola's stock began publicly trading, Milton proclaimed: "***But what Nikola solved was the cost***—was the economics on the trucking. When we first started, hydrogen was $16 a kilogram. ***We can now produce it*** for well under $4 a kilogram. So we've cut – it's one quarter of the cost now than it was just a few years ago.  And we're now cheaper to operate per mile than diesel."[5]

15.     These statements were patently false because, as Nikola has since admitted in its SEC filings, it has ***never produced any hydrogen at all***, let alone at well under $4 a kilogram.

16.     ***Fourth***, Nikola misrepresented that the total cost of ownership ("TCO") of its vehicles was a fraction of diesel vehicles. For example, on or about July 6, 2020, Milton stated: "***We drove hydrogen down from 16 dollars a kilogram down below four dollars a kilogram now***. So why is that? Well, why is that important? Because ***now, I can provide zero emission to a truck cheaper than diesel***. We've now won the game." He continued, stating that that Nikola's TCO, as compared to diesel, "***we're like 20 to 30 percent sometimes, cheaper. So it's game over, essentially. If you don't own a Nikola truck, you're gonna go bankrupt.***"

---

[5] https://finance.yahoo.com/video/nikola-debuts-nasdaq-plans-compete-150245603.html.

17.     This was false. Nikola never produced any hydrogen, did not drive down any costs and, in fact, the TCO for a diesel truck was still cheaper than the fictional, non-operational, Nikola vehicles.

18.     ***Fifth***, Nikola claimed it had single-handedly developed a FCEV/BEV pick-up truck, the Badger One.  Milton repeatedly told investors that Nikola had built the Badger from the "ground up," using Nikola's in-house components and intellectual property. For example, on February 10, 2020, Nikola issued a press release titled "Nikola Unveils the Nikola Badger Pickup," touting the Badger as the "World's Most Advanced Zero-Emission FCEV/BEV Pickup with an Estimated 600-mile Range." The press release also stated that the Badger "is engineered to deliver 980 ft. lbs. of torque, 906 peak HP and 455 continuous HP," "was designed to handle 0-100 mph launches with minimal loss of performance and to operate on grades up to 40% through advanced software blending of batteries and fuel-cell," and was "engineered to outperform all electric pickup trucks on the market in both continuous towing, HP and range." During the Class Period, Milton repeatedly assured investors that "***we actually build the Nikola Badger from the ground up ourselves, the whole thing*** . . . .," the Badger was "a real truck, comes from a billion-dollar program" and is "legitimate." Then, on June 29, 2020, suggesting overwhelming demand for this ground-breaking vehicle, Milton announced that Nikola had "sold out" of the most expensive reservation packages for the Badger.

19.     These statements were demonstrably false because, like the Nikola One, Nikola never built the Badger. By June and July 2020, months after Nikola announced the completed production of the Badger, Nikola had created nothing more than preliminary renderings of the vehicle. Nikola's Board of Directors were informed, at a meeting on July

23, 2020, that even a prototype of the Badger would not be completed until November 2020 at the earliest.

20.     ***Sixth***, Nikola claimed that all of its vehicles' key components, including inverters and batteries, were created and manufactured "in-house" by Nikola. Indeed, Nikola proclaimed that it had created a "game-changing" battery for its vehicles that was "half the cost and…double the range" of the then-most advanced battery on the market.

21.     These statements were false, which Nikola later admitted in its SEC filings. Defendant Brady as well as Nikola's chief engineer have admitted that Nikola does not develop ***any*** components in-house, including inverters and batteries. In truth, Nikola contracted with a third-party, Romeo Power Technology ("Romeo") to manufacture Nikola's electric batteries. Brady has further admitted that "Nikola is 'years away' from having the battery technology Milton described [and]…The whole statement was an embellishment and fiction at the time…" Defendant Worthen has stated Milton's statements concerning Nikola's "game-changing" battery "were a 'terrible and stupid idea' ***and Worthen told him not to make the statement***." Defendant Russell said: "Romeo was the best option, but Milton badly wanted Nikola to own its battery technology."

22.     ***Seventh***, Nikola claimed that it had not only completed a prototype of its Nikola Tre BEV vehicle and that commercial manufacturing had begun, but that fully-manufactured vehicles were "coming off the assembly line right now in Ulm, Germany."

23.     Nikola has since admitted in its SEC filings that this statement was false. Nikola management has admitted, "[c]haracterization of the trucks as fully built was inaccurate…There was no 'assembly line in Ulm."

24. ***Eighth***, Nikola claimed that it had "the only off-grid headquarters that we know of…[with] 3.5 megawatts of solar up on the roof producing about 18 megawatts of energy a day."

25. As Defendant Brady has since admitted, "[t]his statement is 'completely false.'" Nikola's headquarters did not have any solar panels on its roof. While Nikola had discussed moving to an off-grid headquarters, it had been deemed cost prohibitive. Nikola has since admitted in its SEC filings that these statements were false.

26. ***Ninth***, Nikola claimed that it owned seven natural gas wells that "can pump out millions of gallons of clean natural gas each day" that the Company "[u]sed as backup to solar hydrogen production."

27. This statement was false. As the Company has since admitted, it never at any time owned a single natural gas well.

28. Defendants were motivated by nothing more than unadulterated greed. Milton's aim was to inflate the expectations and stock price of Nikola, utilize the resulting excitement to secure and publicly announce reservations for Nikola's (non-existent) vehicles as well as partnerships with top auto companies, which would further inflate Nikola's share price. As Nikola's single largest shareholder, owning shares valued at as much as $8.5 billion during the Class Period, Milton openly admitted within the Company that he planned to dump his shares as soon as he was contractually permitted to do so—only six months after Nikola went public and before the market could discover that the Company, like the Nikola One, was an empty vessel.

29. The other Nikola Defendants permitted Milton to regularly engage in his self-described "media blitzes" of misinformation because they too were large shareholders who stood to gain millions, if not billions, from Milton's fraud. Defendants have since admitted

9

that they were aware of his false statements to investors, yet they did nothing to stop his conduct or correct his false statements.

30.     Likewise, Nikola's scheme could not have been accomplished without the substantial assistance provided by VectoIQ and its board. As officers and directors of VectoIQ and later directors of Nikola, Girsky and Shindler owned millions of shares of Nikola. As Nikola's stock price soared, they became wealthier and would have cashed out if the fraud was not exposed beginning in September 2020.

31.     Nikola's stock price plummeted as the truth concerning Defendants' fraud came to light. On September 10, 2020, Hindenburg Research ("Hindenburg") published a report entitled, "Nikola: How to Parlay An Ocean of Lies Into a Partnership With the Largest Auto OEM in America" (the "Hindenburg Report" or the "Report").  Having gathered "extensive evidence—including recorded phone calls, text messages, private emails and behind-the-scenes photographs," Hindenburg identified "dozens of false statements by" Milton, which had led Hindenburg to conclude that Nikola "is an intricate fraud built on dozens of lies over the course of . . . Milton's career."  Defendant Milton made these misrepresentations, the Report asserted, to substantially grow the Company and secure partnerships with top auto companies.

32.     On this news, Nikola's stock price dropped $4.80 per share, or 11.33%, to close at $37.57 per share on September 10, 2020.

33.     Nikola's stock price continued to fall, dropping another $5.44 per share, or 14.5%, to close at $32.13 per share on September 11, 2020.

34.     On September 14, 2020, after the market had closed, *Bloomberg* reported that the SEC was investigating Nikola to assess the merits of the Hindenburg Report. On

September 15, 2020, the *Wall Street Journal* reported that the DOJ had joined the SEC's investigation of Nikola.

35.     On this news, Nikola's stock fell another $2.96 per share, closing at $32.83 on September 15, 2020, an 8.27% decline from its previous close on September 14, 2020.

36.     On Sunday September 20, 2020, Nikola announced that Milton had resigned from his position as Executive Chairman and from the Board of Directors.

37.     On this news, Nikola's stock plummeted another $6.60 per share, closing at $27.58 on Monday September 21, 2020, a 19.33% decline from its previous close on Friday September 18, 2020.

38.     Over the ensuing months, auto companies with whom Nikola had secured purchase and partnership agreements based on Milton's fraud began cancelling those agreements as they learned the true state of the Company and did not want to partner with charlatans. Specifically, General Motors pulled out of an agreement to purchase 11% of Nikola, which Milton had hyped and misrepresented to further inflate Nikola's share price. Likewise, a refuse company that had placed an order for Nikola vehicles—which Milton had also touted and misrepresented—cancelled its order. As a result, Nikola's stock price tumbled to $13.75 by December 24, 2020.

39.     On February 25, 2021, after the close of trading, Nikola filed its Form 10-K for the year ended December 31, 2020. In the filing, Nikola admitted that numerous statements made by the Company were "inaccurate in whole or in part, when made."

40.     On this news, Nikola's stock fell another $1.62 per share, closing at $18.10 on February 26, 2021, an 8.22% decline from its previous close on February 25, 2021.

41.     Finally, on July 29, 2021, numerous news outlets reported that Milton had been indicted on three counts of fraud by the U.S. Attorney's Office in Manhattan for

11

making deceptive and false claims to investors regarding "nearly all aspects of the business." The SEC also filed related civil charges.

42.     On this news, Nikola's stock fell another $2.16 per share, closing at $12.03 on July 29, 2021, a 15.22% decline from its previous close on July 28, 2021.

43.     In total, Nikola's stock price plummeted a total of 76% between the date of the Hindenburg Report and the days after Milton's indictment.

44.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiffs and other Class members have suffered significant losses and damages.

**JURISDICTION AND VENUE**

45.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

46.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

47.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Defendants conduct business in this Judicial District, and a significant portion of Defendants' activities took place within this Judicial District.

48.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

49.     Plaintiffs, as set forth in the previously filed certifications (ECF Nos. 28-3), acquired Nikola securities at artificially inflated prices during the Class Period and were damaged upon the revelations of the Company's alleged fraud.

50.     Defendant Nikola is a Delaware corporation with principal executive offices located in Phoenix, Arizona.  The Company purports to operate as an integrated zero-emissions transportation systems provider. Nikola's common stock trades on the NASDAQ under the ticker symbol "NKLA."

51.     Defendant Trevor Milton ("Milton") founded Nikola and served as its CEO until the merger in June 2020, after which he served as its Executive Chairman until he resigned from Nikola on September 20, 2020. Milton served as a director of Nikola during the entire length of his employment with the Company. In addition to the false and misleading statements made by Milton in tweets, podcasts, news interviews identified herein, Milton signed the following documents filed by the SEC which are alleged to contain false and misleading statements, and which omit material facts: March 13, 2020 Form S-4; June 15, 2020 Form S-1and July 17, 2020 Form S-1.

52.     Defendant Mark A. Russell ("Russell") has served as Nikola's CEO and as a director of Nikola since the merger. Russell was personally hired as Nikola's CEO by Milton and has numerous close ties to Milton both personally and financially. Before becoming Nikola's CEO, Russell served as President of Nikola from February 2019 to June 2020 and was also a director of legacy Nikola from July 2019 to the merger in June 2020. Previously, from August 2012 to August 2018, Russell served as President and Chief Operating Officer of Worthington Industries ("Worthington"), a company where Milton was also employed until he left to found Nikola. Russell signed Nikola's June 15, 2020 Form S-1, its July 17, 2020 Form S-1 and its Second Quarter 2020 Form 10-Q, each of

which contained materially false and misleading statements and omitted to disclose material facts.

53.     Defendant Kim J. Brady ("Brady") has served as Nikola's Chief Financial Officer ("CFO") since the merger. Brady served as Nikola's CFO and Treasurer from November 2017 until the merger. Brady was personally hired to be Nikola's CFO by Milton while Nikola was privately held. Brady signed Nikola's June 15, 2020 Form S-1, its July 17, 2020 Form S-1 and its Second Quarter 2020 Form 10-Q, each of which contained materially false and misleading statements and omitted to disclose material facts.

54.     Defendant Britton M. Worthen ("Worthen") has served as Nikola's Chief Legal Officer ("CLO") and Secretary since June 2020, and prior to that served as Nikola's Chief Legal Officer and Secretary from October 2015 to June 2020. Worthen was personally hired to serve as Nikola's Chief Legal Officer by Milton. Worthen signed the September 14, 2020 Form 8-K which contained materially false and misleading statements and omitted to disclose material facts.

55.     Defendants Milton, Russell, Brady, and Worthen are sometimes referred to herein as the "Individual Nikola Defendants" and, with Nikola, the "Nikola Defendants."

56.     Steve Girsky ("Girsky") served as President, CEO, and a director of VectoIQ until the merger between VectoIQ and Nikola. Following the merger, Girsky served as a director of Nikola and as a member of Nikola's Audit Committee and Nominating and Corporate Governance Committee and, in September 2020, became Chairman of Nikola. Girsky signed the S-4, the Proxy, the June 15, 2020 S-1, and the July 17, 2020 S-1.

57.     Defendant Steven Shindler ("Shindler") served as CFO and director of VectoIQ prior to its merger with Nikola. He has served as a Nikola director since September 2020 and serves as the Chair of the Audit Committee. Shindler signed the S-4

14

and the April 6, 2020 Form 8-K on behalf of VectoIQ. The Form 8-K contained materially false and misleading statements as alleged herein.

58.     Defendants Girsky and Shindler are sometimes referred to herein as the "VectoIQ Defendants" and, with the Nikola Individual Defendants, the "Individual Defendants."

59.     The Individual Defendants possessed the power and authority to control the contents of Nikola's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Nikola's SEC filings, press releases and other public statements alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Nikola, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

**SUBSTANTIVE ALLEGATIONS**

**I.     Nikola Background and its Business Combination with VectoIQ**

60.     Milton founded Nikola in 2015 with the primary goals of manufacturing semi-trucks that used alternative fuels with low or zero emissions and building a fueling station infrastructure to support those vehicles. Since approximately 2016, Nikola has

focused on producing FCEV (hydrogen fuel-cell vehicle) Class 8[6] trucks.  Later, Nikola also began to develop Class 8 BEV (battery-electric vehicle) trucks.

61.     Although BEV cars have existed for years, FCEV cars are less common, and FCEV Class 8 trucks have never been commercially deployed.  The lack of commercial deployment of FCEV trucks thus far is largely due to the high barriers to entry, including, among other things, the high cost of dispensable hydrogen compared to traditional fuels, and the high cost of hydrogen dispensing infrastructure, which is uneconomical to build without vehicles to support it.

62.     Milton claimed that Nikola could solve these barriers to entry by, among other things: (i) offering a bundled lease for its trucks that included the cost of hydrogen fuel; (ii) constructing a nationwide network of hydrogen refueling stations around routes of customers who have committed to lease Nikola's trucks; and (iii) obtaining cheap electricity that would enable the Company to produce hydrogen at a fraction of current market rates.

63.     Nikola's business plan required billions of dollars of capital to finance the development and manufacturing of trucks and station infrastructure, which were not expected to generate profits until years in the future.  From 2015 through March 2020, Nikola raised over $500 million through private offerings directed mostly at institutional investors.

64.     In late 2019, Nikola needed cash to fund its operations and it was targeted by VectoIQ as a potential business combination partner. VectoIQ was founded in 2018 and based in Mamaroneck, New York. VectoIQ was a SPAC, which had no operating business of its own and was formed for the sole purpose of raising capital to merge with a private

---

[6] Class 8 trucks are those with a gross vehicle weight rating exceeding 33,000 pounds. Semi-trucks or "18-wheeler" trucks typically are Class 8 vehicles.

company in the transportation industry. By late 2019, VectoIQ was running short on the time required by its governing documents to complete a merger. If the VectoIQ Board failed to find a merger partner by May 18, 2020, it would have to return its investors' money, robbing VectoIQ's founders of what was likely to be a lucrative payday.

65.     In mid-November 2019—and with only six months to go before VectoIQ's May 18, 2020 deadline arrived—investment bankers from Cowen and Company, LLC ("Cowen") proposed Nikola as a potential acquisition target to VectoIQ's management. Cowen was an original investor in VectoIQ having purchased 1,449,000 of the Founders shares in March 2018 before the initial public offering ("IPO"). Cowen also pitched its idea of a VectoIQ-Nikola merger to Nikola's management. Cowen had previously provided financial advisory services to Nikola in connection with an offering of preferred stock in 2018.

66.     Going public through the SPAC route had a key advantage to Nikola and VectoIQ: unlike an IPO, a SPAC reverse merger is not subject to what is commonly referred to as a "quiet period" mandated by the federal securities laws. The purpose of a quiet period is to create a level playing field by ensuring that all investors have access to the same information at the same time, and to prevent executives from taking actions to hype or artificially inflate the company's stock price. The quiet period lasts from the time the company issuing the stock discloses information about the issuance in the registration statement and prospectus that are required to be filed with the SEC until forty days after the new stock begins trading. During the quiet period, the company's executives generally cannot provide any information about the company to anyone beyond what was previously disclosed in the registration statement and prospectus. Because a SPAC reverse merger is not subject to a quiet period, the executives of the private company that is merging with

1   the SPAC are not limited in their ability to speak publicly about their company while the

2   company goes public. As discussed below, this aspect of the merger played right into

3   Defendants' hands.

4          67.    On March 2, 2020, VectoIQ and Nikola entered into a business combination

5   agreement, as well as certain related agreements, pursuant to which Nikola would merge

6   with a subsidiary of VectoIQ and effectively become the surviving, publicly traded entity

7   when the transaction closed. In one related transaction, VectoIQ raised approximately $525

8   million from institutional investors in a private investment in public equity ("PIPE")

9   offering.  Milton participated in the PIPE fund raising and marketing efforts by making

10  presentations at investor meetings.

11         68.    Between March 3, 2020, when the merger was announced, and  June 3, 2020

12  when it was effected, investors could buy and sell VectoIQ stock based on the reasonable

13  anticipation that upon the completion of the merger, an investor's ownership of VectoIQ

14  stock would make them an equity owner of Nikola.  As a result of the merger, Nikola

15  received a net contribution of approximately $594.5 million from VectoIQ, an amount that

16  excluded a $70 million payout to Milton made at the closing of the transaction, according

17  to its filings with the SEC.  The parties consummated the business combination on June 3,

18  2020.  The following day, June 4, 2020, Nikola's stock began trading on the Nasdaq.

19  **II.    Defendants' Stock Ownership and Compensation**

20         **A.    Trevor Milton**

21         69.    Until the merger, Milton served as Nikola's CEO, was Chairman of its Board

22  of Directors, and was its largest stockholder.  On or about March 3, 2020, when Nikola

23  announced it would go public by merging with VectoIQ, Nikola claimed an enterprise

24  value of approximately $3.324 billion, implying that the Nikola stock Milton would hold

25

26                                                      18

upon completion of the Merger, through an entity called M&M Residual, LLC ("M&M"), had a value of approximately $844 million.  Immediately after the Merger, Milton held, through M&M, approximately 91,602,734 shares in Nikola, representing approximately 25.4% of the total ownership of the Company, and he remained the Company's largest stockholder during the Class Period.  On or about June 3, 2020, when the Merger between Nikola and VectorIQ was completed, Nikola shares opened the day trading at approximately $33.69 per share, resulting in a value for Milton's shares of approximately $3,086,096,108.  At opening on or about June 9, 2020, after completion of the merger, when Nikola's stock peaked, the market value of Milton's stock was approximately $8.5 billion.

70.     During the merger negotiations, Milton tried to ensure that he would not be locked up from selling his Nikola stock for any period of time. Generally, one purpose of such a lock-up is to keep management invested in delivering on the business's plan rather than cashing out for short-term gain. Milton and Russel ultimately were required to sign the Registration Rights and Lock-Up Agreement dated June 3, 2020, which had a one-year lock-up. However, the lock-up did not apply to the $70 million cash payment to M&M at the time the merger closed, and it also carved out $70 million in stock that Milton could sell as soon as six months after the merger. And soon after the merger, on July 17, 2020, the lock-up agreement was amended to permit Milton and Russell to (1) sell all of their shares (which they owned through M&M and T&M Residual, LLC ("T&M"), a company co-owned by Milton and Russell, and managed by Russell) beginning on December 1, 2020, only six months after the merger; and (2) transfer up to 16% of their shares as collateral to borrow money to buy more Nikola stock through open-market transactions— stock that Milton and Russell could presumably then turn around and sell at any time

allowing them to get around the lock-up provisions prohibiting sales. During that six-month period, Milton expressed his intention within the Company to sell shares once the lock-up period ended.

71. During fiscal year 2019, Nikola paid Milton $266,000 in salary. During fiscal year 2020, Nikola paid Milton $153,462 in salary, and $159,026,298 in stock awards (valued by aggregate fair value computed as of the grant date), for total compensation of $159,179,760.

72. As of June 3, 2020, following the merger, Milton's compensation was to consist of (1) a salary of $1; (2) an annual "time-vested award" of $6 million worth of restricted stock units ("RSU"), vesting three years after grant, with the first such award based on a stock price of $10 (i.e., 600,000 shares of Nikola common stock); and (3) a "performance award" consisting of up to 4,859,000 shares of RSUs tied directly to Nikola's stock price, and which were earned by achieving certain stock trading milestones for at least twenty consecutive trading days:

| Share Price Milestone | Market Capitalization at Price | Incremental Performance Shares Earned at Share Price Milestone |
|---|---|---|
| Below $25.00 | Below $10 billion | 0 |
| $25.00 | $10 billion | 1,069,000 |
| $40.00 | $16 billion | 1,603,000 |
| $55.00 or above | $22+ billion | 2,187,000 |

The RSU performance award financially rewarded Milton to continue his misconduct after the merger. By pumping up Nikola's stock price above any of the share price milestones for twenty consecutive trading days, he stood to gain potentially tens of millions of dollars' worth of Nikola stock. Based on Milton's misleading statements regarding Nikola's business, and the resulting trading price of Nikola stock between June 3, 2020 and

September 20, 2020, the first performance milestone was reached entitling Milton to 1,069,000 Nikola RSUs.

## B.    Mark Russell

73.    As of June 3, 2020, following the merger, Russell owned 49,774,487 shares of Nikola's common stock. These shares included, inter alia, shares held by Russell individually and shares held by T&M. Russell has sole dispositive power over the shares held by T&M, and Milton has sole voting power over those shares. Given that the price per share of Nikola's common stock at the close of trading on June 3, 2020 was $33.97, immediately after the merger closed, Russell owned approximately $1.7 billion worth of Nikola stock. Pursuant to the lock-up Agreement, Russell was permitted to sell these shares starting on December 1, 2020.

74.    During fiscal year 2019, Nikola paid Russell $250,866 in salary and $6,307,496 in option awards, for total compensation of $6,558,362. During fiscal year 2020, Nikola paid Russell $173,077 in salary, and $159,026,298 in stock awards valued by aggregate fair value computed as of the grant date, for total compensation of $159,199,375.

75.    Since June 3, 2020, following the merger, Russell's compensation has consisted of (1) a salary of $1; (2) an annual "time-vested award" of $6 million worth of RSUs, vesting three years after grant, with the first such award based on a stock price of $10; and (3) a "performance award" consisting of up to 4,859,000 RSUs earned after certain stock price milestones were achieved:

| Share Price Milestone | Market Capitalization at Price | Incremental Performance Shares Earned at Share Price Milestone |
| --- | --- | --- |
| Below $25.00 | Below $10 billion | 0 |
| $25.00 | $10 billion | 1,069,000 |
| $40.00 | $16 billion | 1,603,000 |
| $55.00 or above | $22+ billion | 2,187,000 |

The performance awards were identical to the ones granted to Milton and Russell stood to gain potentially tens of millions of dollars' worth of Nikola shares as a result of Milton pumping up of Nikola's stock price above the price milestones for twenty consecutive trading days. Based on the trading price of Nikola stock between June 3, 2020 and September 20, 2020, resulting from the misleading statements regarding Nikola's business, the first performance milestone was reached and Russell is now entitled to 1,069,000 Nikola RSUs.

### C.    Kim J. Brady

76.    Following the merger, Brady owned 10,275,414 shares of Nikola's common stock. Given that the price per share of Nikola's common stock at the close of trading on June 3, 2020 was $33.97, Brady owned approximately $349 million worth of Nikola stock, at the time of the merger.

77.    During fiscal year 2019, Nikola paid Brady $250,000 in salary and $12,451 in other compensation. During fiscal year 2020, Nikola paid Brady $144,231 in salary, $1,041,139 in bonus, $84,800,710 in stock awards, and $50,566 in other compensation, for total compensation of $86,036,646.

78.    Since the merger, Brady's compensation has consisted of (1) a salary of $1; (2) an annual "time-vested award" of $3.2 million worth of RSUs, vesting three years after grant, with the first such award based on a stock price of $10; and (3) a "performance

22

award" consisting of up to 2,591,000 RSUs earned after certain stock price milestones were achieved:

| Share Price Milestone | Market Capitalization at Price | Incremental Performance Shares Earned at Share Price Milestone |
|---|---|---|
| Below $25.00 | Below $10 billion | 0 |
| $25.00 | $10 billion | 570,000 |
| $40.00 | $16 billion | 855,000 |
| $55.00 or above | $22+ billion | 1,166,000 |

Through Milton's pumping up of Nikola's stock price above any of the share price milestones for twenty consecutive trading days, Brady stood to potentially receive millions of dollars of Nikola stock. Based on the trading price of Nikola stock between June 3, 2020 and September 20, 2020, resulting from the misleading statements regarding Nikola's business, the first performance milestone was reached and Brady is now entitled to 570,000 Nikola RSUs.

79.    On June 3, 2020, in connection with the closing of the merger, Brady received fully vested and exercisable stock options that gave him the right to purchase 10,275,414 shares of Nikola common stock at a price of $1.05.

**D.    Britton Worthen**

80.    During the fiscal year ended December 31, 2020, Worthen received compensation from Nikola consisting of $144,231 in salary and stock awards valued at $79,470,349 (valued by aggregate fair value computed as of the grant date), plus whatever gains Worthen would realize from appreciation in the value of the stock he owned.

81.    Since the merger, Worthen's compensation has consisted of (1) a salary of $1; (2) an annual "time-vested award" of $3 million worth of RSUs, vesting three years after grant, with the first such award based on a stock price of $10; and (3) a "performance

award" consisting of up to 2,428,000 RSUs earned after certain stock price milestones were achieved:

| Share Price Milestone | Market Capitalization at Price | Incremental Performance Shares Earned at Share Price Milestone |
|---|---|---|
| Below $25.00 | Below $10 billion | 0 |
| $25.00 | $10 billion | 534,000 |
| $40.00 | $16 billion | 801,000 |
| $55.00 or above | $22+ billion | 1,093,000 |

Through Milton's pumping up of Nikola's stock price above any of the share price milestones for twenty consecutive trading days, Worthen (by remaining silent) stood to receive millions of dollars of Nikola stock. Based on the trading price of Nikola stock between June 3, 2020 and September 20, 2020, resulting from the misleading statements regarding Nikola's business, the first performance milestone was reached and Worthen is now entitled to 534,00 Nikola RSUs.

82.    On June 3, 2020, in connection with the closing of the merger, Worthen received fully vested and exercisable stock options that gave him the right to purchase 4,603,168 shares of Nikola common stock at a price of $1.05.

### E.    Stephen J. Girsky

83.    As of June 18, 2020, Girsky owned at least 1,754,344 shares of Nikola's common stock,[7] which were previously shares of VectoIQ that Girsky acquired for nominal consideration (approximately $25,000 or less). Given that the price per share of Nikola's common stock at the close of trading on June 18, 2020 was $67.73, Girsky owned

---

[7] The 1,754,344 shares owned by Girsky consisted of (i) 11,449 shares and 1,441 shares underlying warrants owned directly by Girsky; and (ii) 1,561,459 shares and 180,005 shares underlying warrants previously owned, as of June 3, 2020, by VectoIQ, and subsequently transferred to Girsky when VectoIQ dissolved on June 18, 2020.

24

approximately $119 million worth of Nikola stock, for which he had paid only nominal consideration. Pursuant to the lock-up Agreement, Girsky was prohibited from selling these shares for a period of one year.

### F.   Steven M. Shindler

84.    Shindler is compensated under Nikola's non-employee director compensation program. In 2020, his compensation consisted of $134,778 in stock awards.

85.    As of June 18, 2020 (the date VectoIQ Holdings, LLC, the VectoIQ-affiliated sponsor entity in the Merger, dissolved and distributed its holdings to its members), Shindler owned 402,298[8] shares of Nikola's common stock, which he had previously acquired for nominal consideration. Given that the price per share of Nikola's common stock at the close of trading on June 18, 2020 was $67.73, Shindler owned approximately $27 million worth of Nikola stock. Pursuant to the lock-up agreement, Shindler was prohibited from selling these shares for one year.

### III.   Milton's Control Over Nikola

86.    Following the merger, Milton switched roles from CEO to Executive Chairman.  Milton explained on the *Chartcast* podcast that his change in title was a promotion that allowed him to have nearly unfettered control over the company:

> I can assume any role [I] want[] at any time, whenever it needs and all . . . roles report directly up to the executive chairman . . . in other words, the CEO reports directly to me and I have the ability to . . . assume or manage any division, any person . . . anyone inside the company, any given time I need to, because they believe that I have . . . more knowledge and more vision than anyone in the company. And so they wanted to make sure I had no restrictions on that.

---

[8] The 402,298 shares owned by Shindler consisted of (i) 12,889 shares owned directly by Shindler; and (ii) 359,409 shares and 30,000 shares underlying warrants previously owned, as of June 3, 2020, by VectoIQ, and subsequently transferred to Shindler when VectoIQ Holdings LLC dissolved on June 18, 2020.

87.     Retaining control of Nikola was important to Milton.  For example, when a member of Nikola's Board of Directors urged Milton in January 2020 to appoint to Nikola's Board additional independent members with public company experience, Milton responded, in part:

> The most important [sic] is that I fully control the board at all times and have people who work well with my personality....No one sees the future like I do, and if you get too many world class brilliant people on the board, you will end up fighting over everything as they think they are the smartest in the room every time.

88.     Milton also exercised personal control over the hiring of Nikola's executive leadership. For example, Milton personally hired Nikola's CEO Russel, CFO Brady and CLO Worthen.

89.     At all relevant times, Milton was Nikola's primary public spokesman, and he had ultimate control and authority over the company's social media posts and press releases.   Further, Milton often participated in meetings with prospective investors, industry partners, and potential customers.

90.     Milton was a hands-on executive.   He engrossed himself in the details of Nikola's technology and product development process.  He participated in weekly update meetings with senior technical and business leaders.  During these meetings, and regularly at other times, he received updates on Nikola's product development, technology, and commercial activity directly from Nikola's technical leads.  Milton worked with engineers, often huddling with them in front of computer screens to discuss technical matters.

91.     Milton was purportedly so central to Nikola's business that Nikola disclosed in its filings with the SEC in the spring and summer of 2020 the risks associated with its dependence on Milton.  Nikola warned in these filings that it is "highly dependent" on Milton's services, because he is "the source of many, if not most, of the ideas and execution

driving Nikola."   Accordingly, Nikola cautioned that if Milton could not continue employment with the company, it "would be significantly disadvantaged."

92.    Milton viewed and touted himself publicly as a technological expert in several aspects of electric vehicles. During a May 5, 2020 appearance on the *Rise of the Young* podcast, Milton claimed:

> I'm not trying to ever be too confident or – or brag about things, but this is important to help you understand that answer.   There's two people in this world that know EVs better than anyone, and that's Elon [Musk] and myself. There's no one in this world that – I can go into any meeting with Volkswagen, Daimler, Volvo.   You could put 30 PhDs in that room, and I would run circles around every one of them.   Because they only know one thing, that's all they know. . . .   So there's very few people that know the EV industry or the whole entire vehicle like I do or like Elon [Musk] does, so we're probably the top two guys in the world that know this shit, and we know it better than anybody.

**IV.    Milton's Social Media Activity and Fixation with Stock Price**

93.    Because Nikola went public through a SPAC reverse merger there was no quiet period and Defendants could promote Nikola stock without restriction. Defendants capitalized on this aspect of the SPAC route to perpetrate their fraud.

94.    In the months leading up to and after the merger, Milton pursued a deliberate communications strategy with the intent of creating maximum exposure for himself and Nikola to fraudulently induce retail and other investors to purchase Nikola stock by making false and misleading statements about Nikola's products and milestones.  This strategy consisted of a ubiquitous social media presence coupled with frequent podcast and television appearances.

95.    Milton used his personal Twitter account (@nikolatrevor) and personal Instagram account (@lakepowelltrevor) to publish material information about Nikola.  As of September 15, 2020, more than 104,600 users followed Milton on Twitter and more than

27

36,500 users followed Milton on Instagram. On information and belief, among Milton's Twitter followers was Nikola's corporate Twitter account (@nikolamotor).

96.    Milton repeatedly urged investors to follow his social media accounts, claiming he used them to communicate "accurate data" about Nikola in a way that would enable followers to receive information "way faster than you get it anywhere else." Milton's statements on June 30, 2020 during a nationally televised interview on *Fox Business* encapsulate his view of using social media to interact with Nikola's investors:

> Well, I don't think that the market really – this is I think one of the things that many people have missed.  The investors around the world right now are tired; they're tired of like an executive sitting in an office behind his chair, making millions of dollars and, you know, forgetting about the average factory worker or even the consumer.  So, there's unparalleled contact between myself, the executive chairman and the founder of Nikola, and all of our fans.  I mean, you heard in the previous segment about social media, there's a lot of negative in social media, but there's also a lot of positive that you can create with it.  And I took the, uh, I took the decision I wanted to create the positive . . . .  And through this social media experience, where people can actually feel like they're part of it, ***they can talk to you, they can ask you questions, the transparency***, the, the market they're just tired of the older executive that just don't care.  And that's why you see the market evaluation of Nikola do well is because ***finally there's executives out there that they can talk to, that    they can voice their problems, their opinions with and they actually get a response.  Go on my Twitter Nikola Trevor and you'll see .  .  .  you'll literally see answers to probably two thirds of every tweet out  there***.

97.    Milton exponentially increased his social media activity in anticipation of and after Nikola became a public company in mid-2020.  This is illustrated in the following chart that approximates his activity on his personal Twitter account (@nikolatrevor):

| Year | Approximate Number of Tweets (including Replies) Per Year |
|------|-----------------------------------------------------------|
| 2016 | 14 |
| 2017 | 22 |
| 2018 | 52 |
| 2019 | 137 |

28

| 2020 | 2,283 |
|------|-------|
| **TOTAL** | **2,508** |

98.    To further increase investor awareness of Nikola around the time of the merger, Milton embarked on a self-proclaimed "media blitz." As part of this campaign, he participated in over a dozen nationally televised interviews and appearances and dozens of podcast appearances.  Milton was able to do so because Nikola went public by means of a SPAC combination, rather than an IPO, and Milton was therefore not subject to the restrictions of a "quiet period."

99.    Milton's "media blitz" and social media activity was closely connected with his fixation on, and desire to increase and maintain, Nikola's stock price.  Around the time of the merger, Milton became intensely focused on Nikola's stock price.

100.    On days when Nikola's stock price declined, Milton regularly attempted to direct Nikola's senior executives to take actions to stop the price decline.  Senior executives received frantic phone calls or text messages from Milton on such days in which he urged the executives to "do something." Milton also spoke of needing to put out "good news" or some kind of announcement "to get people excited" as a way to counteract price declines or maintain support for the stock price.

101.    Senior Nikola executives and some members of Nikola's Board of Directors impressed upon Milton in the summer of 2020 that volatility in Nikola's stock price was to be expected, and that his focus should instead be on long-term performance.

102.    However, Milton's focus remained on the stock price and his attempts to influence the retail investors who he viewed as driving it. For instance, on or about March 2, 2020, the day before Nikola announced the merger, Milton wrote an email to a member of the Nikola Board stating, "***need to make sure we are getting retail investors on our***

*side*. That is what prevents the stock short selling. This is super important for me." To that end, Milton tracked the daily number of new Robinhood users who held Nikola stock.  On June 8, 2020, Milton shared a tweet with a senior Nikola executive reflecting that over 36,000 new Robinhood users became Nikola stockholders that day.  The senior executive responded, in part, by expressing his amazement at how many calls he received "from retail investors today that have no clue about Nikola, other than their friends told them to buy. A lot of hype out there with retail investors," to which Milton replied: "That's how you build a foundation.  Love it."

103.    In late July 2020, Milton contacted a Nikola senior executive to discuss the possibility of Milton buying shares of Nikola "for the company's health" because Nikola has had "zero news for two weeks and it's important to prevent our stock from losing credibility." Another time, following a short period of stock price decline in August 2020, Milton sent a text message to a different senior Nikola executive requesting to "talk strategy ASAP." Milton went on to say that the "continual stock decline is going to erode any confidence in our stock.  We have to do something . . . . We can't just sit here and watch it collapse."

104.    Milton's focus on the stock price and the other Individual Defendants' refusal to correct and thereby perpetuate Milton's misinformation media blitz was not surprising, as they were personally incentivized to push Nikola's stock price higher.  First, as the Company's largest stockholders, the Individual Defendants stood to benefit financially if they could increase Nikola's stock price and sustain that increase beyond the six-month period following the merger.  During this period, Milton was contractually prohibited, with some exceptions, from transacting in Nikola stock.  Second, Defendants' employment agreement following the merger tilted heavily toward equity. For example, Individual

Defendants' performance awards and RSUs were tied to Nikola's share price.  As Milton wrote in a July 7, 2020 email exchange with one of Nikola's directors regarding a release from his lock-up agreement, the stock had gained "***over 400%" and he made "everyone else millionaires and billionaires.***"  Indeed, by August 14, 2020, Nikola's share price achieved the first share price milestone specified in Milton's, Russell's, Brady's, and Worthen's employment agreements, entitling them to awards of 3,242,000 shares of Nikola stock, which were at the time worth approximately $81 million.

**V.     Nikola's Scheme to Defraud the Public Using the Nikola One Semi-Truck**

       **A.     Defendants Misled the Public Regarding the Capabilities of the Nikola One**

105.    Milton concocted his scheme in 2016 when Nikola unveiled its first semi-truck prototype, the Nikola One ("Nikola One").  In or around June 2016, Milton began to promote an unveiling event for the Nikola One scheduled for December 1-2, 2016.  Nikola invited potential investors, suppliers, and customers to the event, and publicized that it would live-stream the event on its website.

106.    In or about August 2016, however, Milton had pivoted the Nikola One from an original compressed natural gas ("CNG")-powered concept to a hydrogen fuel cell vehicle.  A fuel cell converts hydrogen to electricity.  This fundamental design change ensured that the prototype to be shown at the unveiling event in December would not be operable, as integrating and testing FCEV components would require significant additional time.  A few weeks before the event, Nikola's chief engineer informed Milton that the truck would not be functioning at the unveiling event unless the event was postponed.  Milton made the decision to proceed as scheduled with the knowledge that the vehicle to be unveiled would not be functioning.

107.    Defendants were aware that Milton would attempt to misrepresent the functionality of the inoperable Nikola One. According to Nikola's Chief Engineer, Kevin Lynk, "There was an instruction (potentially from legal) to Nikola employees before the event that they should be careful not to say the vehicle was 'fully functioning,' 'driving,' or an 'H2 vehicle.'"[9]

108.    Nevertheless, in the weeks leading up to the event, Milton represented that the Nikola One would be "working" or "functioning."  For example, on October 16, 2016, in response to a question from a Twitter user about whether the December 1, 2016 event would be a "[d]esign unveiling or a functional prototype," Milton responded, via Nikola's corporate Twitter account, "*functioning.  Fully built truck at event*."

109.    The unveiling event occurred on December 1-2, 2016 and was live-streamed on Nikola's website simultaneously.  On the first evening, Milton hosted an event at which the Nikola One was "unveiled" on a stage in front of a crowd.  Individuals who had made reservations to purchase a Nikola One, potential business partners, and current and potential investors were invited.  In his remarks at the December 1, 2016 event, Milton said, despite full knowledge of facts to the contrary, that the Nikola One "*fully functions and works which is really incredible*." He went on to tell the audience that "you're going to see that this is a real truck, *this is not a pusher*." A video of Milton's presentation was posted on Nikola's YouTube channel, where it remained throughout the Class Period.

110.    The following day, December 2, 2016, Milton recorded an interview with *Roadshow*, a website focused on the auto industry, from inside the Nikola One cab.   A video of the interview was posted to YouTube and was available publicly to investors and prospective investors.  During the interview, Milton stated again that the Nikola one was a

---

[9] USAO Presentation.

"*fully functioning vehicle*."  In the interview, Milton repeated the claim that the Nikola One displayed at the event was fully functioning:

> *This isn't just a pusher like a lot of vehicles that they unveil or just vehicles that don't actually function. . . . This is a fully functioning*, you know, vehicle, which is really incredible.  You can go through, you can, you know, we can change out pretty much everything we want, all the temperatures.  I mean *this is a fully functioning vehicle.  It's not just a not just a pusher*.  It's what they call in the automotive world a vehicle that they just push and it doesn't move. . . .

111.    The Nikola One was not operable at the time, let alone tested and validated.  In the words of one Nikola engineer, the truck was "*not even remotely ready to operate*."  Defendant Brady—as well as Dane Davis (Chief Technical Officer ("CTO")), Kevin Lynk (Chief Engineer), Tony Epperson (Sr. Manager, FP&A), and Vince Caramella (Global Head, Marketing) have since admitted, "[t]he Nikola One unveiled in December 2016 *was not 'fully functional*,'" with Brady expressly admitting it was "*a pusher*."[10]   At the unveiling event:

(a)    the truck had to be towed onto the stage the night prior to the event and all electrical components were powered through a cord running from under the truck to the wall, rather than the truck's battery and the power cords had to be manually disconnected during the event as the stage spun;

(b)    neither the fuel cell nor the hydrogen gas storage tanks had been installed;

(c)    an air line had to be connected to the vehicle to keep the truck's air suspension and air brakes working due to a slow leak in the truck's air supply;

(d)    the gearboxes had not been assembled, and certain parts necessary for assembly of the gear boxes had not arrived;

(e)    Nikola personnel operated the truck's headlights at the event by remote control; and

---

[10] USAO Presentation.

33

(f)    the human-machine interface, which Milton touted, consisted simply of off-the-shelf tablets mounted onto the dashboard set to display images created to have the appearance of infotainment screens, with speedometers, maps, and other information displayed.

112.    According to one engineer, Milton worked on the truck with the engineers, and as a result was aware that the truck had not been driven before the event and could not be driven at the event.  When told by engineers that the truck would not be functioning by the scheduled date of the event, Milton nevertheless decided to proceed as scheduled, and went on to tout the truck as fully functioning – in 2016 and again in 2020 during the Class Period. For example, on August 18, 2020, Milton stated "***it was totally capable of driving, it had everything in it —power, steering, batteries—everything in it***."

**B.**    **Nikola Defendants Sought to Market an Incomplete and Inoperable Product Through the Nikola One "In Motion" Video**

113.    After the December 2016 unveiling event, Nikola did not perform any further work on the Nikola One.  ***The truck was never completed and has never been operable***. Yet, Defendants continued to misrepresent the Nikola One to investors and potential investors through a video posted to the Company's website and its social media accounts.

114.    In or about 2017, a representative of a large multinational corporation approached Nikola and asked to use the Nikola One in a commercial celebrating innovation.  The concept for the video included a shot of the Nikola One coming to a stop in front of a stop sign.

115.    The commercial shoot occurred in or about early 2018.  For the shoot, the non-functioning Nikola One truck was hauled to the shooting location by a "lowboy" semi-truck.  At this time, and more than a year after the unveiling event, the Nikola One still could not run under its own power. It was towed to the top of a hill, the brakes were released, and then the Nikola One was filmed rolling down the hill and braking to a stop in

front of the stop sign.  The truck was towed to the top of the hill and rolled down twice more for additional takes. Additionally, the Nikola One's door, which had been constructed using minivan parts, had to be taped up during the shoot to prevent it from falling off. Moreover, because the Nikola One was untested, unsafe, and inoperable, certain precautions were taken before towing the vehicle to the commercial shoot.  In particular, the turbine—which was designed to run on natural gas—and batteries were entirely removed from the vehicle to mitigate the risk of fire, explosion, or damage.

116.   Milton attended the commercial shoot.  He obtained raw video footage shot that day.  Milton provided the footage to a Nikola digital media employee, who he instructed to create a short clip of a rolling Nikola One for the purpose of posting the clip on social media.  The employee created the clip and showed it to Milton, who directed certain edits to be made.  Milton ultimately approved a final version of the clip, which had been sped up two-to-three times.  This had the effect of making the Nikola One appear to move faster than it was.

117.   On or about January 25, 2018, Milton posted, or directed the posting of, the edited video clip to Nikola's Twitter and Facebook accounts.  At Milton's direction, the digital media employee posted the clip to Nikola's YouTube account.  The video embedded in Nikola's tweet and on its YouTube post shows the Nikola One apparently moving on a road with no incline, seemingly at a high rate of speed on its own power.  The video does not have any narration or text.  The text of the tweet in which the video was embedded states: "Behold, the Nikola One in motion.  Pre-production units to hit fleets in 2019 for testing.  The Nikola Hydrogen Electric trucks will take on any semi-truck and outperform them in every category: weight, acceleration, stopping, safety and features – all with 500-1,000 mile range!" Milton drafted the text of this tweet.  The video posted on YouTube

had similar text accompanying it: "Behold, the 1,000 HP, zero-emission Nikola One semi-truck in motion.  Get ready for the pre-production units to hit fleets next year in 2018 for testing . . . ." The "In Motion" video remained posted on Nikola's corporate Twitter, Facebook, and YouTube accounts, as well as on its website, and was available for viewing by investors andprospective investors until at least September 2020—months into the Class Period.  The video fraudulently gave the impression that the Nikola One was capable of moving under its own power.

118.   According to Stasy Pasterick (VP, Corporate Controller), the video the Company posted did not originally show the vehicle moving at all. However, the plan was changed because Milton really wanted to show the truck in motion. Tony Epperson (Sr. Manager, FP&A) also told Pasterick that there had been internal discussions regarding whether it should be clearly stated when posting the video that the truck was not moving under its own propulsion. According to Tony Heaton (Battery Engineer), "[a]t the time, a number of employees were uncomfortable saying the truck was 'in motion' when they knew it was not driving."[11]

### C.   Nikola Defendants Misstated the Nature of Nikola's Reservations for the Nikola One to Suggest They were Firm and Binding

119.   Beginning in or about May 2016, Nikola began taking reservations for the delivery of its semi-truck, the Nikola One in connection with its announced development. Nikola originally required deposits to make a reservation, ranging from $1 to $1,500.

120.   Milton was personally involved in soliciting reservations from several potential customers.   He communicated to potential customers that the reservations were cancellable for any reason at any time.   For example, on May 9, 2016, as part of his efforts to secure the largest reservation Nikola had received to-date, Milton wrote to a potential

---

[11] USAO Presentation.

customer, "[y]ou have full ability to cancel at any time before the options, color and major deposit is made . . . ." He went on to note to the same reservation holder on three separate occasions that the reservation was cancellable, even going so far to note "you can cancel at any time and get [the deposit] back all the way up to the final order . . . ." Another time, Milton cited the non-binding nature of the reservations in an attempt to convince a potential customer to double the amount of reservations in which the customer was originally interested.  Milton wrote to this party, "[y]ou had asked for 50 trucks that would have been $500 for each deposit.  What I did since it is fully refundable at any time, is put you down for 100 at $250.  You can cancel at anytime any of those."

121.    In April 2018, Nikola refunded all deposits and ceased requiring deposits for reservations of the Nikola One.  Nikola has stated publicly, including in public filings, that it has approximately 14,000 such reservations projected to fill at least 2-3 years of production and representing billions of dollars in future revenue.  As a pre-revenue company, Nikola consistently emphasized to potential investors that its pre-order book, which it characterized as a "backlog of interest," was a sign that the company was primed for profitability in the near future based on interest in its flagship FCEV semi-truck product. The majority of the reservations were made for the Nikola One, which the Company had long since abandoned.  Defendants have pointed to these reservations as demonstrating interest in Nikola's planned semi-trucks.

122.    Defendant Milton has repeatedly misstated the nature of Nikola's reservations to suggest that the reservations are firm and binding (even after Nikola had abandoned its plans for the Nikola One), giving an exaggerated and inaccurate impression that Nikola had a predictable and committed future stream of revenue.  Nikola was not sold out of any trucks, nor was it building or capable of building the trucks to fulfill orders.

123.    For example, on or about June 1, 2020, in a podcast interview, Milton stated,

We don't build on speculation; we build on orders.  We're very similar to like Airbus or Boeing where we're sold out for many, many years.  We're the only company in the world that is sold out for many, many years . . . It's all based on orders.  I think that's the reason Nikola is worth so much money today.

## VI.    Nikola Defendants Misled Investors Concerning the Company's Hydrogen Production, Costs, and Capabilities

### A.    Background on Nikola's Hydrogen Production Plans

124.    A key aspect of Nikola's business plan is its planned development of hydrogen production and fueling station infrastructure to support its FCEV trucks.  Nikola represented that it planned to construct a network of hundreds of hydrogen fueling stations along trucking routes and to include the cost of hydrogen as part of a bundled lease for its trucks.  Nikola needed to produce, dispense, and store tens of millions of kilograms of hydrogen each year to support the trucks that it projected to put on the road.  To do so, Nikola represented to investors that it intends to produce hydrogen via electrolysis, a process that uses electricity to split water into hydrogen and oxygen.  However, producing Nikola's projected amount of hydrogen via electrolysis would require a massive amount of electricity.  In fact, Nikola has projected that, when its hydrogen station network is fully built out, this network would annually consume approximately 5 percent of all electricity consumed in the U.S. today.  Because the cost of electricity is the most significant cost input for operating the machines that create hydrogen, known as electrolyzers, the profitability of Nikola's business model has been and is highly dependent on Nikola's ability to acquire electricity at a price that would permit Nikola to produce hydrogen cheaply enough to make its leases economically viable to its customers.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

### B.   Nikola Defendants' Fraud Concerning Nikola's Hydrogen Production Capabilities

125.   During the time period that Milton was CEO and Executive Chairman (2015-September 2020), Nikola: (i) never produced a single kilogram of hydrogen, (ii) did not have a station permitted to produce hydrogen, and (iii) did not have any contracts signed with any electricity providers. Instead, during this time, Nikola had only developed internal financial models that included electricity price targets necessary for Nikola to produce hydrogen at a level that would be commercially viable for Nikola to sell its FCEV trucks and ever reach future profitability.

126.   In April 2019, Nikola completed a dispensing-only hydrogen fueling station at its Phoenix, Arizona headquarters plagued with problems because many components of the station were not built to withstand the extreme heat in Phoenix.  The hydrogen used to stock that station was not produced by Nikola but was instead acquired from an outside vendor.  In fact, Milton was informed in December 2018, that the City of Phoenix denied Nikola a permit to install electrolyzers at Nikola's Phoenix headquarters, making it impossible for Nikola to produce hydrogen.

127.   In February 2020, despite being previously informed of the lack of authorization from the City of Phoenix, Milton asked employees to create plans to install electrolyzers at Nikola's headquarters because "this will give us a complete system that works on site we can show investors." Nikola personnel notified Milton via email in March 2020 that installing electrolyzers "will take 5-6 months to get the site permitted for hydrogen production plus another 5-6 months to get the electrical supply and construction completed."  As a result, and as Milton knew, Nikola had to purchase hydrogen from other suppliers for use in testing at its headquarters station.  Further, Milton was aware that

1   Nikola had not standardized the design of its hydrogen station because he had participated

2   in the internal evaluation process for station design.

3           128.   In May 2020, Milton asked an employee on Nikola's hydrogen infrastructure

4   team to accelerate a previously planned purchase order for electrolyzers for Nikola's first

5   five planned stations.  As with certain other corporate actions he directed, Milton appeared

6   principally concerned with investor perception.  As Milton explained to the employee,

7   "[t]his [accelerated purchase order] will give us great news to disclose leading up to the

8   merger." On May 31, 2020, Milton sent an email to Nikola's Board of Directors seeking

9   approval, on one day's notice, of a nearly $31.5 million purchase order for electrolyzers.

10  Milton justified the purchase order, in part, as follows:

11          2nd major point.  IPO.  I am getting ready to go on a ***media blitz*** and the most
            critical item in our business model is that we don't have stations.  I would
12          like to announce this on Monday as huge news.  This will help our stock,
            create much stronger following and base layers of investors and it also will
13          ease the criticism I am going to get going into interviews.  ***I believe our PIPE
            and SPAC will be very happy to hear we are moving on our stations and not
14          delaying***.

15      **C.   Nikola Defendants Fraud Concerning Nikola's Cost to Produce
             Hydrogen**

16          129.   According to Nikola's projections, the price of electricity comprises 75-85

17  percent of the cost of producing hydrogen via electrolysis.  For purposes of its projections,

18  which Nikola disclosed to the public, it assumed it could obtain electricity at an average of

19  $0.035 per kilowatt-hour ("kWh") – a rate significantly cheaper than prevailing industrial

20  rates – based on its expected large consumption of electricity and its goal of obtaining

21  lower-cost renewable electricity during non-peak hours or sourcing it "behind the meter"

22  (i.e., from a source other than the grid).  Nikola disclosed that if it is not able to obtain

23  electricity at a significant discount to prevailing rates, it would not be profitable.

24

25

26                                                40

130.    Both prior to and during the Class Period, Nikola never achieved cost reductions from the standardization of its hydrogen stations or from lower cost electricity. Indeed, the Company has since admitted "Nikola ***has never produced hydrogen***."[12] Instead, the Company had installed only one demonstration station, which at times dispensed, but never produced, hydrogen. Nikola was still evaluating various design and production options for its future stations. ***Nikola had not produced hydrogen anywhere nor had Nikola purchased any energy for producing hydrogen, much less at the reduced prices Defendants claimed during the Class Period***.

131.    On June 9, 2020 Nikola's Global Head of Infrastructure Development forwarded Milton an email from an electrolyzer supplier concerning costs and delivery. This employee sought Milton's input on the delivery schedule for the accelerated purchase order, noting that "we don't have PPA's [Purchase Power Agreements] executed yet to support these electrolyzers."

132.    Milton attended a July 2020 Board of Directors meeting at which Nikola's hydrogen infrastructure team apprised the Board that the company had not yet entered into any PPAs and that rate negotiations with electricity providers were ongoing at the time.  In fact, the only rate agreement that the Company had entered into to-date occurred after Milton left Nikola in September 2020.

133.    Defendants knew, or recklessly disregarded, that Nikola had not entered into any PPAs or other rate agreements with any providers and that it was not producing any hydrogen, they also knew, or recklessly disregarded, that Nikola: (i) had not sourced any "clean" or renewable electricity, (ii) was not acquiring cheaper electricity along freeways by tapping into federal lines, and (iii) was not acquiring electricity at specified rates.

---

[12] USAO Presentation.

134.     Nevertheless, Defendants repeatedly touted to investors that Nikola was producing over 1,000 kg/day of hydrogen at its headquarters and had driven down the price to less than $4/kg because Nikola had found a way to source electricity at a fraction of the then-market price. For example, on June 4, 2020, after Nikola's stock began publicly trading, Milton proclaimed: "***But what Nikola solved was the cost***—was the economics on the trucking. When we first started, hydrogen was $16 a kilogram. ***We can now produce it*** for well under $4 a kilogram. So we've cut – it's one quarter of the cost now than it was just a few years ago.  And we're now cheaper to operate per mile than diesel."[13] In an interview published on or about July 17, 2020, Milton stated: "We are contracting with wind, solar and hydro plants for energy and so far have been able to source plenty of energy under $.04 per kWh. Most of it is much lower in the 2.5 [cents] per kWh range."

135.     As detailed below, Milton's claims that Nikola had driven down or otherwise achieved this cost of production were materially false and misleading because Nikola did not have the ability to produce any hydrogen, much less at the prices that Milton represented. As an initial matter, any claims about Nikola's current cost to produce hydrogen were false simply because Nikola had never produced any hydrogen – a fact Milton knew.  Further, at that time, Nikola did not have any agreements with electricity providers that would have enabled it to produce hydrogen at Milton's claimed cost – a fact Milton also knew.  Given that electricity costs make up 75-85 percent of hydrogen production costs, Milton's claims about Nikola's supposed ability to produce hydrogen at the specified costs – without Nikola having any agreements in place to lock in electricity costs – were false.

---

[13] https://finance.yahoo.com/video/nikola-debuts-nasdaq-plans-compete-150245603.html.

42

136.    The figures that Milton cited as Nikola's current costs were, in reality, Nikola's projections at which future production, if it ever occurred, could conceivably be profitable.  Once again, Milton presented to investors something Nikola hoped to do as something it had already achieved.

137.    Defendant Russell has since acknowledged that any representation that Nikola produces hydrogen "is "***indefensible***.' The headquarters station is for storage and dispensing, not production." Defendant Brady has likewise admitted "It is a 'false statement' that Nikola is producing 1,000 kg/day of hydrogen at headquarters." Defendant Worthen admitted "The statement that Nikola can produce 1,000 kg/day ***is not true***, and ***Milton knew it was not true. We discussed this 'a million times***.' Milton states future plans as if they are a present reality."  Dale Prows (Global Head, Infrastructure Development) has stated "It is '***false***' for Milton to say 'we're down below $3/kg on our hydrogen now.' ***There is no 'our hydrogen'*** – Nikola is not producing any."[14]

**VII.    Nikola Defendants' Fraud Concerning Nikola's Production of the Badger Pickup Truck**

138.    Defendants continued their pattern of touting capabilities of vehicles that, in the case of the Nikola One, did not function, and in the case of the Badger, simply did not exist beyond CGI renderings.

139.    In January 2020, Milton approached other executives at Nikola with a proposal to develop a pickup truck based on an image he tweeted in November 2019 of a rendering of a pickup truck in response to the public announcement by a large electric vehicle manufacturer that it would be producing an electric pickup truck.  Although executives were reluctant to agree to the plan, which they understood to be distracting from and potentially harmful to Nikola's core business plan, Milton insisted on creating a pickup

---

[14] USAO Presentation.

truck line based on, among other things, his perception of the interest the pickup truck had generated on social media.  Milton agreed, however, that Nikola would only move forward with the pickup truck if he found an original equipment manufacturer ("OEM") partner to produce the vehicle.

140.   On February 10, 2020, when Nikola was working toward finalizing and announcing its deal with VectoIQ, Nikola announced in a press release and on social media that it was making a pickup truck called the Badger that would be unveiled at an event in or about late 2020.  The press release titled "Nikola Unveils the Nikola Badger Pickup" touted the Badger as the "World's Most Advanced Zero-Emission FCEV/BEV Pickup with an Estimated 600-mile Range." This press release also stated that the Badger "is engineered to deliver 980 ft. lbs. of torque, 906 peak HP and 455 continuous HP," "was designed to handle 0-100 mph launches with minimal loss of performance and to operate on grades up to 40% through advanced software blending of batteries and fuel-cell," and was "engineered to outperform all electric pickup trucks on the market in both continuous towing, HP and range."[15]

141.   At the time of the announcement, Nikola had not performed any engineering work or design work, other than CGI renderings, and that remained the case for several months.  An OEM engineer, who visited Nikola's offices in February 2020 to conduct diligence in connection with a potential partnership to build the Badger, summed up the Badger's state at the time as "vaporware," which is a term for software or hardware that has not been created and is nothing more than an aspirational concept.

---

[15] Press Release, Nikola Corporation, Nikola Unveils the Nikola Badger Pickup (February 10, 2020), https://nikolamotor.com/press_releases/nikola-unveils-the-nikola-badger-pickup-73#:~:text=PHOENIX%2C%20AZ%20(February%2010%2C,petrol%20pickup%20in%20its%20class. This press release is publicly available online and was available to investors throughout the Class Period.

44

142.    In January, February, and March 2020, Milton sought an OEM partner to develop the Badger.  In the absence of an OEM partner, Milton directed a small group of Nikola employees to build Badger prototypes.  Furthermore, Milton directed that both prototypes be BEV rather than FCEV to make construction of the prototypes easier.  However, because the Nikola employees were focused on other Nikola development projects, the production of Badger prototypes was outsourced, at Milton's direction, to third parties, with one vendor contracted to create the upper body of the vehicles in Europe, and another to build the chassis in Michigan.  The two parts would then be integrated.  Under the terms of these agreements, very little, if any, of Nikola's design, engineering, or intellectual property were to be used in production.  As a result, Nikola purchased several Ford F-150 pickup trucks – a highly popular model to which Milton had claimed his Badger would compare favorably – to use as "donor" or "surrogate" vehicles and used the vehicles' chasses and bodies as the base for constructing the Badger prototypes.  The third-party suppliers used some show car technology for the vehicles, which were not engineered or intended to be used for production.  As of May 2020, the Badger was in early stages of conceptual development.

143.    Nevertheless, as detailed below, Milton repeatedly told investors that the Badger had already been built and was fully functioning. For example, on May 30, 2020, Milton stated on the *JMac Investing* podcast:

> Soon I'll be announcing when we're going to show off the Badger to the whole world.  And this thing is insanity.  It is the most beautiful truck I think the world has ever seen.  ***It's a fully functioning vehicle inside and outside, HVAC, and everything, windows, all of it works***.  I shouldn't say all of it – I'll probably have a couple of pieces that'll break on me, but hey, that's part of the process of building the truck, but ***it's a real real [sic] truck.  It's not just some mock up thing that other people have done.  This is a real, real truck***.

45

144.    Once Nikola's stock was officially publicly traded on June 3, 2020, Milton increased the number of public comments he made about the Badger.  Many of these statements concerning engineering of the Badger and the status of the trucks were false and misleading, giving the impression that the truck's development or engineering was more advanced than it really was.

145.    In order to further inflate the price of Nikola stock, Milton aimed to convince investors not only that the Badger was already a reality but that it was far enough along to justify taking reservations. On June 8, 2020, Milton announced on Twitter that Nikola was going to start taking reservations for the Badger on June 29, 2020.  However, as of June 8, 2020, Nikola only had renderings of the vehicles and concept sketches. Nevertheless, on June 8, 2020, in response to a Twitter user who asked, "when will the first prototype [of the Badger] be produced?," Milton tweeted, "Already."

146.    On June 8, 2020, the morning following the announcement by Milton that Nikola would take reservations for the Badger, Nikola's stock opened at $42 per share, $7 above where it had closed the prior day, and $9 above the price when it went public less than a week prior.  On or about June 9, 2020, Nikola's stock price opened at $93.13 per share.

147.    In early June 2020, a Nikola employee who led the Badger's design informed Milton that one third-party supplier was six to eight weeks from beginning tooling, which means making the tools needed to make the parts of the vehicle that Nikola's subcontractors were fabricating.  At a meeting of Nikola's Board of Directors on July 23, 2020, at which Milton was present, Nikola provided to the Board materials indicating that even the prototypes would not be completed until at least November.

46

148.    In late June 2020, only *after* Milton had publicly announced that the Badger "***will have a drinking fountain in [the] truck using the hydrogen bi product water for the drivers to have nice cold, clean, pure drinking water***," Milton instructed the team working on the Badger to add drinking fountains.  Prior to this, Milton had not discussed the idea of using fuel cell by-product as washer fluid or drinking water. Milton's announcement came as a complete surprise to Nikola's designers, engineers, and marketing personnel. When informed of the tweets, one engineer questioned whether "this [is] a joke," a marketing employee wrote that his "head is fuzzy," and a designer texted, "[u]hhhhh what." The drinking fountains in the prototypes were simply connected to water reservoirs, as there was no fuel cell or system for converting fuel cell by-product to drinking water. Although neither prototype was designed to be operated on hydrogen fuel, Milton directed that they also be fitted with hydrogen fueling ports to make it appear as though they were.

149.    On June 29, 2020, Nikola began taking deposits for the Badger with three differently priced reservation packages.  On the day reservations opened, Nikola received approximately 2,411 preorders.  Nikola received approximately 249 additional orders on June 30, 2020; approximately 87 on July 1, 2020; and approximately 124 on July 2, 2020. On July 2, 2020, without any basis whatsoever, Milton announced that the most expensive reservation for the Badger was sold out. Nikola employees then scrambled to remove the package from the company's website.

150.    As of June and July 2020, Nikola was still working on finalizing engineering plans for the prototypes, at which point Nikola only had renderings of the vehicles and concept sketches.  In August 2020, Nikola began tooling.

151.    During June, July, and August 2020, Milton continued to seek an OEM partner for the Badger.  In August 2020, Nikola, at Milton's direction, entered into an

agreement with General Motors, as an OEM partner, pursuant to which General Motors would produce the Badger.

152.    On September 8, 2020, Nikola and General Motors announced their strategic partnership pursuant to which General Motors would engineer and manufacture the Badger.  The Badger was planned to be built using one of GM's electric vehicle platforms, not using Nikola intellectual property and parts.  General Motors was responsible for all components of the Badger, except for the general aesthetic and potentially infotainment system.  Apart from the infotainment system, there was no plan to use any parts over which Nikola had intellectual property rights.  Milton received documents reflecting the proposed allocation of responsibilities for the Badger between General Motors and Nikola.  These documents showed that nearly all technology and parts on the Badger would be GM's responsibility.  No one at General Motors ever saw the Badger prototypes that Nikola had been working on and they were not part of GM's engineering or development plans.  The two prototype Badgers were little more than show cars and not real consumer vehicles. The Badger prototypes could not be driven on roads because some of the parts of the body were carbon fiber composite and because they had not undergone safety testing.  The Badger prototypes also lacked certain parts, such as airbags and on operable HVAC. Similarly, many of the lights in the interior of the Badger prototypes were not operable and were merely backlit.

153.    The interior and exterior of the body of the Badger, as well as the chassis, were not completed until September or October 2020.  Many of the parts coming from third parties – including, as discussed below, the batteries, inverters, and controls – were also not ready for installation until in or about October 2020.

154.    The prototypes were not finished until about November or December 2020. Nikola never developed a Badger FCEV prototype and little, if any, of Nikola's technology was used on the Badger BEV prototype.  Nikola did not put a billion dollars of semi-truck technology into the Badger.

## VIII.   Nikola Defendants' Fraud Concerning Nikola's Manufacturing of In-House Components

### A.    Nikola Did Not Manufacture Any Components In-House

155.    Semi-trucks like the Nikola One must be constructed from thousands of parts, including motors, batteries, inverters, transmissions, drive shafts, axles, steering components, brakes, the chassis frame, the metal body, lighting, HVAC, and wheels, to name a few.   Most truck and car manufacturers outsource production of many of the parts of a vehicle to third-party vendors.  Some large manufacturers, however, produce some components in-house because it is cheaper due to economies of scale, or because technology is proprietary.

156.    Since at least 2016 and into the Class Period, Milton claimed that Nikola has intellectual property rights over important components of its semi-truck line.  While Milton has stated that Nikola outsources certain parts of the trucks, like tires or windshields, Milton has also repeatedly stated that Nikola makes the most important parts of the semi-trucks "in-house."   Milton has done so, among other reasons, to claim that Nikola has valuable intellectual property, to support his claims that Nikola's trucks outperform competitors, and to differentiate the Company from other electric vehicle manufacturers and startups.  However, to inflate Nikola's stock price, Milton exaggerated Nikola's in-house development of batteries, inverters and other components and falsely stated that the Company made parts in-house when it did not.   Milton also responded strongly to

suggestions that Nikola was solely an "integrator" and perhaps not as valuable as an OEM that designed and manufactured its own key components.

157.    In 2020, Milton repeatedly stated that "all major components" such as batteries and inverters were designed or made by Nikola "in-house."  But what Milton presented to the public about Nikola's in-house design and manufacturing programs, capabilities, and achievements relating to the battery and the inverter, and the true state of those programs, diverged widely.

158.    For example, on or about February 14, 2020, in an interview on *Fox Business*, Milton said: "[W]e're probably one of the only companies in the world that ***does everything ourselves***.  We do our own ***batteries***, we do our own frames, ***we do our own vehicles from the ground up***, our own ***inverters***, our own infotainment, you know, the cool screens.  So ultimately, that ***entire truck from the ground up is designed by Nikola***, and they do cost a lot of money. . . ." On July 5, 2020, Milton tweeted from his personal account: "***All major components are done in house; batteries, inverters, software, controls, infotainment, over the air, etc***."

159.    As Defendant Brady has since admitted, "Nikola ***aspires*** to build components in-house but ***does not do so at present***." Kevin Lynk (Chief Engineer) admitted "***Nikola does not currently develop any components*** on its own." Indeed, on March 27, 2020, Lynk emailed Katherine Beebee (project manager, Truck) regarding responsibility for e-axle components: "FPT is responsible for the mechanical design of the e-axle. Iveco is responsible for the vehicle integration of the e-axle and traction inverters. Nikola is responsible for purchasing the traction inverters and critical e-axle components and we provide support for the system design."

160.     Specifically, Nikola did not design or develop any functioning inverters in-house.  Nikola has used third-party "off the shelf" inverters for all its semi-truck prototypes, and it planned to use third-party inverters for the Nikola Tre vehicle.  And, while Nikola entered into an agreement to develop inverters with a supplier in early 2018, that effort was terminated in the spring 2020 due to a lack of progress.  In preparation for an October 2019 meeting of the Board of Directors, Milton received materials that referred to inverters for the Nikola Tre as "off-the-shelf." And, Milton was directly involved in terminating the inverter co-development effort with a supplier, even requesting a refund from the supplier due to lack of success.

161.     Nikola has since admitted that the Company used third-party inverters for all of its vehicles. According to Lynk, Nikola's Chief Engineer, "***Nikola has used and continues to use off-the-shelf inverters*** for demonstration and early phase prototype vehicles" and inverters "'aren't even in production yet.'" Varoujan Sarkissian (Global Head, Vehicle Electrical and Controls) admitted, "[e]fforts to develop in-house inverters only ramped up in early 2020, and it will take far more development time (perhaps up to ten years) before the in-house inverters could be used in Nikola production vehicles" and "***Milton knew that Nikola was in the early stages of inverter development*** – the company had canceled its contract with ITK for inverter development and was essentially starting over." According to Varoujan Sarkissian, "***There was no complete in-house inverter or software***."

162.     Similarly, Defendant Brady has admitted "***Nikola does not make its own battery in-house***." A May 11, 2020 internal Company document states "Nikola is not developing a battery in house" and "Nikola does not have a clear plan for battery development."

51

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**B.    Nikola's Fictional Game-Changing Battery Technology**

163.    As discussed above, Nikola did not make in-house batteries or an electric powertrain at any time.  Batteries are critical to an electric vehicle's operation because they store energy to run the motors.  Although Nikola partnered with various companies to try to develop proprietary battery technology, these efforts had not been successful, and Nikola has not successfully developed, at any time relevant to the Class Period, any in-house battery technology. Plus, the batteries it planned to use in its semi-trucks were developed and manufactured by third parties.

164.    For BEVs and FCEVs, batteries have three main components: cells, modules, and packs.  Cells are the smallest component.  Cells are contained within modules, and modules are arranged in packs.  The design of these modules and packs can have a significant impact on battery performance and safety.  Cells, which are considered more of a commodity, are typically purchased from one of a few main worldwide suppliers.

165.    Milton was deeply involved in, and led all aspects of, Nikola's battery development projects.  Milton was aware that Nikola could not make the Nikola Tre BEV's batteries in-house and was pursuing a third-party supplier, Romeo, as the only realistic option for supplying the batteries for the Nikola Tre BEV, which Nikola did, in fact, engage to manufacture batteries for the Nikola Tre BEV. Indeed, Nikola does not have the capability to manufacture batteries on its own.  Romeo designed the modules for the batteries that Nikola is using for the Nikola Tre BEV, and Nikola relied on the assistance of Romeo to design the battery pack.

166.    As Defendant Brady has now admitted "Nikola does not make its own battery in-house." According to Defendant Russell, "Romeo was the best option, but Milton badly wanted Nikola to own its battery technology."[16]

---

[16] USAO Presentation.

Case 2:20-cv-01797-SPL   Document 95   Filed 01/24/22   Page 57 of 172

167.   To this end, in May 2019, Milton sent an unsolicited email to a research professor at Drexel University ("Drexel") concerning research on lithium sulfur batteries that the professor was conducting.  A lithium sulfur cell uses different chemistry than a lithium-ion cell,which is the current conventional chemistry for rechargeable battery cells. Milton told the professor that Nikola was "looking at contributing financially and licensing some of your results." Milton stated that Nikola was "doing some programs with a few universities," and then asked if the professor would reveal some details of her research. Over the ensuing week in May 2019, Nikola executed a confidentiality agreement with Drexel and obtained access to the results of certain of the professor's research.  This research was in its early stages.

168.   Milton visited the Drexel professor and, after this visit, directed Nikola in September 2019 to enter into a preliminary term sheet, which contemplated terms of a sponsored research agreement.  Nikola executed a sponsored research agreement with Drexel on October 31, 2019 (the "Sponsored Research Agreement").

169.   Under the Sponsored Research Agreement, Nikola was to provide a modest amount of funding ($250,000 initially) to sponsor the lithium sulfur battery technology research that the professor at Drexel was conducting.  In exchange, any intellectual property developed with Nikola following entry into the agreement would be shared between Nikola and Drexel.  This research pertained to coin size battery cells that were being developed and tested in a controlled lab environment as part of a university research project.  To scale coin-size lab-level cells to even a prototype size would require significant further development with no assurance of comparable performance levels.  From there, developing cells from prototype pouch size cells to commercial grade quality was a further, significant undertaking, with no assurance of utility for commercial applications.

170.    According to Jason Roycht (VP, Technology Development and Strategy), these "[d]ime sized 'coin cells' were in place at the time with Drexel; these are simplistic and nowhere near the complexity of what goes into a pack cell." Tony Heaton (Battery Engineer) stated in late 2020 that "Drexel's work *is still* in the early research and development phase."

171.    Milton was aware that the batteries produced for the Nikola Tre BEV would contain Romeo's modules, because in November 2019, Milton personally signed a multi-million-dollar purchase order for Romeo's modules. However, once the Sponsored Research Agreement was signed, Milton concocted a plan to conceal the reliance on a third-party for batteries and mislead investors just as VectorIQ and Nikola began to discuss the merger.

172.    Between November 1 and 4, 2019 Milton emailed Steve Cook (associate Corporate Counsel, Contracts) regarding an agreement with Romeo for its batteries, stating "we need to make sure we have a clause specifically stating they shall never represent their batteries are on our truck without our written permission. Which we will never give. I don't want the image issue with our investors." Defendant Worthen has admitted that "Milton worked hard to ensure that Romeo could never say that its batteries were in Nikola's trucks. Similarly, Defendant Russell has stated, "Romeo was the best option, but Milton badly wanted Nikola to own its battery technology."[17]

173.    Then, on November 18, 2019, Milton tweeted from his personal account, teasing a significant announcement the following day:"Tomorrow, it all changes.  I finally get to talk about it.  The news everyone has been waiting for.  Diesel trucks are obsolete

---

[17] USAO Presentation.

54

for good.  We solved what no one else could.  It's time for other OEM's [sic] to stop producing diesels immediately.  See press tomorrow #emissionsgameover."

174.    The next day, November 19, 2019, Nikola issued a press release titled "Nikola Corporation to Unveil Game-Changing Battery Cell Technology at Nikola World 2020."  The purpose of the press release was for Nikola to "announce details of its new battery."

175.    In the press release, Nikola made several unqualified claims about the battery technology, which he is quoted describing as "the biggest advancement we have seen in the battery world." Nikola claimed the following in the press release about Nikola's purported "prototype cell":

(a)    "record energy density of 1,100 watt-hours per kg on the material level and 500 watt-hours per kg on the production level";

(b)    "could increase the range of current EV passenger cars from 300 miles up to 600 miles with little or no increase to battery size and weight";

(c)    "technology is also designed to operate in existing vehicle conditions";

(d)    "cycling the cells over 2,000 has shown acceptable end-of-life performance";

(e)    "Nikola's battery electric trucks could now drive 800 miles fully loaded between charges" and "hydrogen-electric fuel cell trucks could surpass 1,000 miles between stops and top off in 15 minutes";

(f)    "World's first free-standing electrode automotive battery"; and

(g)    "40% reduction in weight compared to lithium-ion cells" and "50% material cost reduction per kWh compared to lithium ion batteries."

176.    The same day, Milton took to Twitter, where on his personal account he repeated the substance of the press release, and further misrepresented Nikola's purported "game-changing" achievement.   When a Twitter user asked, "[i]s it actually real though,

55

or is it another Joi Scientific style 'breakthrough,'" Milton replied to the user, "It's real. I've seen it with my own eyes and watched them cycle."

177.    On December 2, 2019, when Milton was asked on the *Shift* podcast to comment on Nikola's November 19, 2019 battery announcement, he stated "our battery beats the Tesla battery in every metric, in every situation, and it's half the cost and it's double the range."

178.    And, on March 12, 2020, Milton stated on the *Transport Topics Roadshow* podcast that "[w]e can – we're double the cycle life of a regular lithium-ion, and we're about half- to one-quarter the cost to produce the lithium-ion and we don't have any of the expensive metals. . . .we should have productionized cells probably by the years end."

179.    Defendant Brady has since admitted "Nikola is 'years away' from having the battery technology Milton described. There's no way he could have known how many miles the trucks could drive between charging. The whole statement was an embellishment and fiction at the time…" Defendant Worthen stated "Nikola did not and still does not have 'commercializable' battery technology. Milton's statement to the contrary were a 'terrible and stupid idea' ***and Worthen told him not to make the statement***." In an early April 2020 battery program update sent to Milton, a Nikola Vice President of Technology wrote that "on the basis of Tre timing alone, the only possible considerations would be [Romeo's] design. . . ."  Moreover, a May 11, 2020 internal company document states "Nikola is not developing a battery in house" and "Nikola does not have a clear plan for battery development."[18]

180.    Nevertheless, Milton continued to deny that Romeo was supplying Nikola's batteries for fear that it would undermine his false narrative about Nikola's design

---

[18] USAO Presentation.

capabilities.  For example, on June 4, 2020, a Twitter user tweeted at Milton expressing concern that he "heard that Romeo … supplies the batteries" to Nikola.  Milton responded: "We do our own batteries at Nikola and have since day 1.  We do however test with everyone and if a supplier builds a better battery we would use them.  That goes for all supplied parts on our vehicle." Similarly, in September 2020, after Nikola had already entered into the battery supply agreement with Romeo, Romeo sought Nikola's permission to identify it as a customer as part of Romeo's road show in connection with a go-public transaction.  Milton opposed the request stating, "*[i]t will leak everywhere and hurt our image*."

## IX.  Nikola Defendants Intentionally Misled the Public about the Total Cost of Ownership

181.    Commercial vehicle buying decisions, particularly for large corporate fleets, are driven, in part, by the total cost of ownership ("TCO"), an analysis of the lifetime cost of a truck, from the acquisition through the operating period.

182.    Prior to March 2019, Nikola touted that the TCO of its FCEV trucks would be up to 20 percent cheaper than diesel trucks.  In March 2019, Nikola's CFO emailed Milton third-party research regarding the TCO of Class 8 semi-trucks.  In his email, the CFO noted that the third-party firm cited TCO for diesel trucks in the "$.85-$.95 range," and that "for our purposes, we will use $.95. . . ."

183.    Also in March 2019, a Nikola financial analyst notified Nikola executives – including Milton – that the TCO cost the company was using for diesel trucks was too high, and that the projected TCO for Nikola would be, at best, on par with diesel.  Finally, in April 2019, Nikola's Head of Business Development sent Milton and other senior executives notes from her discussions with semi-truck fleet representatives who provided

feedback regarding Nikola's TCO.   This executive reported that Nikola's actual and potential customers noted that Nikola's "***costs are high and not at parity with diesel***."

184.   Milton has also repeatedly misrepresented that Nikola's TCO is significantly less than diesel. For example, in an interview on the *Founder Hour* podcast on or about July 6, 2020, Milton claimed the following regarding Nikola's TCO, as compared to diesel, "***we're like 20 to 30 percent sometimes, cheaper. So it's game over, essentially. If you don't own a Nikola truck, you're gonna go bankrupt.***"

**X.     Nikola's Non-Existent Production of The Nikola Tre BEV**

185.   In July 2020, Nikola had plans to build the Nikola Tre BEV truck. However, just like the Nikola One and the Badger, the Company had not even completed building a prototype. Rather, the company engaged to manufacture the Nikola Tre—Bosch—had not made a single truck. Indeed, the facility that would contain the assembly line for the Tre itself was still under construction.

186.   Nevertheless, on July 17, 2020, Milton stated about the Nikola Tre: "We have the most advanced battery electric truck in the world. We have a truck coming into production right now with 720 kwh the largest battery we know of on a truck anywhere in the world coming into production. We have five of them coming off the assembly line right now in Ulm, Germany."

187.   Nikola has since admitted in its SEC filings that these statements were false. Indeed, Umran Ashraf (Global Head, Vehicle Engineering) has stated "Characterization of the trucks as fully built was inaccurate. Nikola was shipping Tre components to Germany for assembly during July 2020. There was no 'assembly line in Ulm; there was a prototype shop." Vince Carmella (Global Head of Marketing) stated, "[t]his statement was premature. The trucks were being built at this time, but none had been completed."

## XI.    Nikola's Headquarter Was Never "Off-Grid" Or Contained Any Solar Panels

188.    At no point in time has Nikola's headquarters been "off-grid" or contained solar panels. While Nikola had at one time discussed the possibility of moving to an off-grid headquarters, that plan was quickly abandoned because it was deemed cost prohibitive.

189.    Nevertheless, again portraying Nikola as on the cutting edge of technology, Milton asserted in 2019:

> *We have the only off-grid headquarters that we know of, completely off of hydrogen, battery, and solar. We have 3.5 megawatts of solar up on the roof producing about 18 megawatts of energy a day in our headquarters*, and we're storing 10,000 kilograms of hydrogen and using fuel cells as energy backup and batteries as energy sources as well. Our company is truly one of the most innovative companies in the world!

190.    As the Company has since admitted in its SEC filings, this statement was false when made. Defendant Brady has stated, "This assertion is 'completely false.' Nikola had merely discussed moving to an off-grid headquarters, but it was deemed cost prohibitive."

## XII.   Nikola Never Owned Any Natural Gas Wells

191.    As with Nikola's headquarters going "off-grid," Nikola had briefly considered purchasing its own natural gas wells, but the idea never advanced beyond speculation.

192.    Nevertheless, on July 1, 2016, Nikola stated on its corporate website that the Company could guarantee low fuel prices because "Nikola owns the rights to its own natural gas wells along with the Nikola One fleet that transports the natural gas from the wells to the stations. With 7 wells on a single property, Nikola can pump out millions of gallons of clean natural gas each day." And on August 30, 2016, Milton proclaimed that the seven (nonexistent) wells were "[u]sed as backup to solar hydrogen production.!"

193.    Nikola has since admitted in its SEC filings that these statements were false when made. Milton himself has admitted that he once ""looked at a property with seven wells on site, but Nikola never purchased the property or any other natural gas wells."

**XIII.  Nikola Defendants Knew Milton was Making False and Misleading Statements On Behalf of Nikola**

194.    Russel, Brady and Worthen were aware of Milton's misinformation media blitz designed to inflate Nikola's stock price. Many of the false statements were posted to Nikola's corporate website or its corporate Twitter account. Russel, Brady and Worthen were also aware of Milton's habit of using his personal Twitter account (and other social media) for Nikola-related announcements. Moreover, as stated in Milton's criminal indictment and complaints by the DOJ and SEC "Milton repeatedly made false and misleading statements about *core aspects* of Nikola's products, technological advancements, and commercial prospects," which the Defendants as executive officers of the Company knew were false and misleading. The SEC also cited evidence that Milton's misconduct was known to and a concern of the senior executives at the Company for months before and after the merger, including some directors as well as Worthen, who was Nikola's CLO and Secretary to Board. For example, Russel, Brady and Worthen were repeatedly informed that Nikola did not, in fact, manufacture all of its key vehicle components in-house. Similarly, they knew that Nikola had never (and still does not) produce its own hydrogen, much less at the fictitious prices represented by Milton. Indeed, Worthen has since admitted "The statement that Nikola can produce 1,000 kg/day [of hydrogen] *is not true*, and *Milton knew it was not true. We discussed this 'a million times*.'" Similarly, Worthen stated that he knew Milton's statements about Nikola manufacturing its batteries in-house was false and Worthen "*told him not to make the statement*."

195.    In 2019 and 2020, some of Nikola's senior executives were concerned about Milton's apparent efforts on social media to increase Nikola's value and influence potential investors. Some senior executives also became concerned that Milton's public statements were inaccurate, false, and misleading. Despite this, Nikola did not implement formal disclosure controls or procedures for monitoring or reviewing Milton's media interviews and social media activity.

196.    Indeed, the Company's press releases and SEC filings contained statements that both perpetuated and failed to correct the knowingly false statements being made by Milton that caused Nikola's stock price to be artificially inflated.

197.    In or around 2019, Defendant Worthen advised Milton about the legal risks associated with inaccurate tweets, and a senior Nikola executive told Milton that even posts from his personal accounts could be viewed as statements by Nikola itself. Then, in a series of conversations in 2019 and 2020, Russell (who was also on the Board) asked Milton to let Worthen pre-screen any tweets Milton planned to post from Nikola's corporate account. But with only a few exceptions, Milton refused to let Nikola's legal department or anyone else pre-screen his tweets.

198.    Throughout 2020, certain of Nikola's senior executives continued to urge Milton to reduce his social media presence, and to be sure that his posts were accurate, rather than correcting the false statements being made by Milton. Certain senior Nikola executives also asked one of Nikola's directors for assistance in getting Milton to reduce his social media presence. Although the post-merger Nikola Board scheduled a media training run by a third-party provider for all senior executives, it inexplicably did not require Milton to attend (which he did not).

199.    Milton responded to the other executives' concerns about his social media presence by telling them he needed to be on social media to put out good news about Nikola to boost its stock price, clearly telegraphing to them his intention of putting his own (and their own) financial self-interest above telling the truth. Nikola's Board of Directors and its senior executives completely deferred to Milton during his time with the Company. As Milton said in January 2020 when a member of Nikola's Board urged him to appoint independent board members with public company experience:

> **The most important [sic] is that I fully control the board at all times** and have people who work well with my personality . . . . No one sees the future like I do, and if you get too many world class brilliant people on the board, you will end up fighting over everything as they think they are the smartest in the room every time.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

200.    The Class Period begins on June 4, 2020, the day after Nikola issued a press release announcing that the Company had closed its merger with VectoIQ and that the Company would begin publicly trading on the NASDAQ the following day. Prior to that date, however, the Nikola Defendants and the VectoIQ Defendants publicly made numerous false and misleading statements that were reported by major news organizations and remained publicly available to investors during the Class Period. These statements created the false and misleading impression that Nikola was a revolutionary and ground-breaking company, poised to develop FCEV vehicles and BEV pick-up trucks that would revolutionize the transportation industry. To the contrary, Nikola was nothing but a sham and façade created and hyped by Milton and the Defendants. The pre-merger false statements, identified below, caused Nikola common stock to trade at artificially inflated prices beginning on June 4, 2020.

### A.     Pre-Merger False Statements by the Nikola Defendants

201.    On July 1, 2016, Nikola stated on its corporate website that the Company could guarantee low fuel prices because "***Nikola owns the rights to its own natural gas wells*** along with the Nikola One fleet that transports the natural gas from the wells to the stations. ***With 7 wells on a single property, Nikola can pump out millions of gallons of clean natural gas each day.***"

202.    The statement in ¶201 was materially false and misleading because Defendants knew or recklessly disregarded but failed to disclose that Nikola never at any time owned any natural gas wells. As detailed in the USAO Presentation, Milton admitted that he once "looked at a property with seven wells on site, but ***Nikola never purchased the property or any other natural gas wells***." Brady "is unaware of any natural gas wells owned by Nikola." No one else at Nikola interviewed pursuant to an investigation conducted by Nikola's counsel was aware of Nikola ever owning any natural gas wells.

203.    On August 1, 2016, Nikola published a press release to its website, titled *Nikola One Truck Achieves Zero Emissions*, stating that Nikola "has achieved 100% zero emissions on the Nikola One commercial class 8 truck."[19]:

> 'While other companies have recently announced battery-powered semi-trucks, those trucks are restricted to a range of only a couple hundred miles and four to eight hours of charging between stops,' said Founder and CEO Trevor Milton. '***Nikola has engineered the holy grail of the trucking industry. We are not aware of any zero emission truck in the world that can haul 80,000 pounds more than 1,000 miles and do it without stopping.*** The Nikola One requires only 15 minutes of downtime before heading out for the next 1,000 miles.'

This statement remained on Nikola's website during the Class Period.

---

[19] Press Release, Nikola Corporation, Nikola One Truck Achieves Zero Emissions (August 1, 2016), https://nikolamotor.com/press_releases/nikola-one-truck-achieves-zero-emissions-29.

63

204.    The statement referenced in ¶203 was materially false and misleading because Defendants knew or recklessly disregarded but failed to disclose that as of August 1, 2016, the Nikola One was still running on natural gas and thus was not "zero emission." As detailed in the USAO Presentation, Defendant Brady admitted that "As of August 1, 2016, the *Nikola One was running on natural gas and thus was 'not zero emission*.' Milton's statements to the contrary are false." Similarly, Defendant Worthen admitted: "*The assertion that Nikola had 'achieved 100% zero emissions on the Nikola One' by August 1, 2016 is 'just not true.'*"

205.    On August 30, 2016, after someone on Twitter asked about the status of the Company's gas wells, Nikola responded through its corporate Twitter account, "we still have them. Used as backup to solar hydrogen production.! If any production issues arise or systems go down." This statement remained on Nikola's Twitter account and publicly available to investors during the Class Period.

206.    The statement referenced in ¶205 was materially false and misleading for the reasons identified in ¶202.

207.    On October 14, 2016, Defendant Nikola, through its corporate Twitter account, promised to unveil its Nikola One prototype semi-truck to the market at its forthcoming convention, Nikola World 2016.[20] Nikola tweeted: "Only 47 days away from the @nikolamotor ONE electric semi unveiling! Live stream on our website for those not able to attend." The following day, October 15, 2016, in response to a question from a Twitter user about whether the December 1, 2016 event would be a "[d]esign unveiling or a functional prototype," Milton responded, via Nikola's corporate Twitter account,

---

[20]    @nikolamotor, Twitter (Oct. 14, 2016, 10:07 P.M.), https://twitter.com/nikolamotor/status/787112661007732737.

"*functioning. Fully built truck at event*." These statements remained on Nikola's Twitter account and  publicly available to investors throughout the Class Period.

208.   On December 1, 2016, Nikola unveiled its Nikola One prototype semi-truck to the market in a webcast hosted by Milton. The Company posted a video recording of this presentation to its official YouTube channel and its website, where it remained publicly available to investors throughout the Class Period.[21] As of January 2021, this video had been viewed 1,496,419 times. During the unveiling, Milton said that the Nikola One "***fully functions and works which is really incredible***" and went on to tell the audience that "you're going to see that *this is a real truck, this is not a pusher*."

209.   The following day, on December 2, 2016, in an interview with *CNET Road Show*, Milton explained that a "pusher" was a vehicle that does not "actually function" and that the Nikola One was "fully functioning":

> ***This isn't just a pusher, like a lot of vehicles that they unveil are just vehicles that don't actually function. This is a fully functioning, uh, you know, vehicle which is really incredible. . . .***

A video of the interview was posted on YouTube and was available publicly to investors and prospective investors throughout the Class Period. As of August 2020, this video was viewed on YouTube approximately 280,000 times.

210.   On October 10, 2017, Nikola posted an image of its Nikola One prototype to its official Twitter account.[22]  The Nikola One prototype bears a clearly-visible decals reading, "H2" on the right of the front bumper in response to a comment from another Twitter user the same day, Defendant Nikola said: "***It is fully electric but it uses hydrogen***

---

[21] Nikola Motor Company (YouTube), *Nikola Motor Company -  Nikola One Semi Electric Truck Unveiling  –  Official  Video*,  December  1,  2016,  available  at: https://www.youtube.com/watch?v=wLidTCqAAtY (accessed February 10, 2021).

[22] @nikolamotor,  Twitter  (Oct.  19,  2017,  6:03  P.M.), https://twitter.com/nikolamotor/status/917873309357785089.

65

*to give us 3x the range of battery only. We use battery and hydrogen 100% electric drive.*" These statements remained on Nikola's Twitter account and publicly available to investors throughout the Class Period.

211.    The statements referenced in ¶¶207-210 were materially false and misleading because Defendants knew or recklessly disregarded but failed to disclose that the Nikola One was not a "fully functioning" or "fully built" vehicle—it was, in fact, an inoperable "pusher." As detailed in the USAO Presentation, Defendant Brady as well as Dane Davis (CTO), Kevin Lynk (Chief Engineer), Tony Epperson (Sr. Manager, FP&A), Vince Caramella (Global Head, Marketing) each admitted that "The Nikola One unveiled in December 2016 *was **not** 'fully functional*.'" Brady has also admitted, "[t]he Nikola One unveiled in December 2016 *was a pusher*." Lynk also stated, "[t]here was an instruction (potentially from legal) to Nikola employees before the event that they should be careful not to say the vehicle was 'fully functioning,' 'driving,' or an 'H2 vehicle,'" which was clearly ignored by Milton and the Company.

212.    On January 25, 2018, Nikola posted a tweet attaching the "Nikola One in Motion" Video to its official @nikolamotor Twitter account.[23] The video depicted the Company's Nikola One prototype vehicle traveling on an open road in the Arizona desert, including shots which made it appear as though the Nikola One was climbing uphill. The Nikola One prototype bears clearly visible decals reading, "H$_2$" on the left and right of the front bumper. The accompanying post said:

> *Behold the Nikola One in motion.* Pre-production units to hit fleets in 2019 for testing. The Nikola Hydrogen Electric trucks will take on any semi-truck and outperform them in every category; weight, acceleration, stopping, safety and features – all with 500-1,000 mile range!

---

[23]    @nikolamotor, Twitter (Jan. 25, 2018, 12:14 P.M.), https://twitter.com/nikolamotor/status/956576016809340928?lang=en.

This video and other statements remained on Nikola's Twitter account and publicly available to investors throughout the Class Period. It has been viewed 127,800 times, as of December 2021.

213.    Defendant Nikola also posted the "Nikola One In Motion" Video to its official public corporate Facebook account on January 25, 2018 with a similar message to the one on Twitter:

**Nikola Hydrogen Electric Semi in Action**

***Behold, the 1,000 HP, zero emission Nikola semi-truck in motion***. Get ready for the pre-production units to hit fleets in 2019 for testing. The Nikola Hydrogen Electric trucks will take on any semi-truck and outperform them in every category; weight, acceleration, stopping, safety and features - all with 500-1,000 mile range!

This video and statements remained on Nikola's Facebook account and publicly available to investors throughout the Class Period.

214.    In response to questions from a Facebook user about how the Nikola One performed in cold weather that he posted under the "Nikola In Motion" Video, Nikola's official Facebook account stated that the Nikola One was already "designed and tested," had over "1,000 HP," could climb a 7% grade hill, and had over "2,000 ft lbs. of torque." These statements remained on Nikola's Facebook account and publicly available to investors throughout the Class Period.

215.    The statements referenced in ¶¶212-214 were materially false and misleading for the reasons identified in ¶211.  The statements referenced in ¶¶212-214 were materially false and misleading because Defendants knew or recklessly disregarded but failed to disclose that (i) Nikola One was not a "fully functioning" or "fully built" vehicle—it was, in fact, an inoperable "pusher," (ii) it had not been "designed and tested," (iii) it did not have over 1,000 HP, it could not climb a 7% grade hill, or have over 2,000 ft lbs. of torque,

(iv) the truck on the video was rolling down an incline due to gravity rather than under its own power. As detailed in Nikola's USAO Presentation, Caramella admitted "***The video is misleading*** because it leads the viewer to believe the truck is operating under its own power."

216.    On May 3, 2018, Defendant Nikola posted to its official Twitter account, @nikolamotor:

> 800,000,000 miles. 28 Hydrogen Stations. 800 trucks. Beginning 2020 delivery. #emissionsgameover #oneclearwinner

On the same day, May 3, 2018, another user responded in part: "I am 90% sure hydrogen will be a limited market. As it is expensive to maintain and ship it." Defendant Nikola replied:

> ***We actually produce it on site*** and don't ship it. Helps reduce costs dramatically. Good observations though. ***Under the right environment it's very cheap to produce which is how we do it***.

These statements remained on Nikola's Twitter account and publicly available to investors throughout the Class Period.[24]

217.    The statements referenced in ¶216 were materially false and misleading because Defendants knew or recklessly disregarded but failed to disclose that Nikola had never obtained a permit for, let alone constructed, a hydrogen production station, nor had it produced any hydrogen when the statements were made. Although Nikola did complete a storage-and-dispensing-only hydrogen fueling station at its Phoenix, Arizona headquarters in or about April 2019, that station had been plagued with problems because many components of the station were not built to withstand the extreme heat in Phoenix.

---

[24]    @nikolamotor, Twitter (May 3, 2018, 9:00 A.M.), https://twitter.com/nikolamotor/status/992026084626583552.

Moreover, the hydrogen that was used to stock that station was not produced by Nikola but was instead acquired from an outside vendor. Further, at that time Nikola did not have any agreements with electricity providers, let alone clean energy from wind, solar, and hydroelectric facilities directly, or energy at less than $.04 per kWh.  As detailed in Nikola's USAO Presentation, Nikola admitted "Nikola **has never produced** hydrogen," Russell stated that any representation that Nikola could produce hydrogen "is "**indefensible**.' The headquarters station is for storage and dispensing, not production," and Defendant Brady admitted "**It is a 'false statement'** that Nikola is producing 1,000 kg/day of hydrogen at headquarters." Defendant Worthen admitted "The statement that Nikola can produce 1,000 kg/day **is not true**, and **Milton knew it was not true. We discussed this 'a million times**.' Milton states future plans as if they are a present reality." Dale Prows (Global Head, Infrastructure Development) admitted "It is '**false**' for Milton to say 'we're down below $3/kg on our hydrogen now.' **There is no 'our hydrogen' – Nikola is not producing any**."

218.   In a presentation on February 21, 2019, posted to YouTube on April 29, 2019, Defendant Milton claimed:

> **We have the only off-grid headquarters that we know of, completely off of hydrogen, battery, and solar**. **We have 3.5 megawatts of solar up on the roof producing about 18 megawatts of energy a day in our headquarters,** and we're storing 10,000 kilograms of hydrogen and using fuel cells as energy backup and batteries as energy sources as well. Our company is truly one of the most innovative companies in the world!

This video remained on YouTube and publicly available to investors throughout the Class Period.[25]

---

[25] CleanCitiesSac, *2/21 Fuel Cell Vehicle Workshop:  Trevor Milton – Nikola Motor Company,* YouTube (April 29, 2019), https://www.youtube.com/watch?v=a9J8jizLI2s&t=603s.

69

219.    The statement referenced in ¶218 was materially false and misleading because Defendants knew or recklessly disregarded but failed to disclose that Nikola's headquarters did not have solar panels on its roof at this time, and there were still no solar panels on the roof as of November 2020. As detailed in the USAO Presentation, Defendant Brady admitted "**This assertion is 'completely false.'**" Nikola had merely discussed moving to an off-grid headquarters, but it was deemed cost prohibitive." Moreover, the USAO Presentation stated: "Interviewees consistently stated that ***Nikola's headquarters did not have solar panels on its roof at this time, and that there are still no solar panels on the roof***."

220.    On February 28, 2019, Defendant Nikola posted a photograph of its headquarters on it official Twitter account and represented that it was currently generating solar power and producing hydrogen at its headquarters:

> Nikola's new HQ in Phoenix. 150,000 sq. ft. 13 Acres. 300+ employees. ***1,000 kilogram hydrogen production and storage. Zero emissions with up to 3 megawatts of solar and 20 megawatt hour lithium storage***. Of course we did the impossible. It's like engineering the Nikola Two.

This statement remained on Nikola's Twitter account and publicly available to investors throughout the Class Period.[26]

221.    The statement referenced in ¶220 was materially false and misleading for the reasons identified in ¶¶217 and 219.

222.    On November 18, 2019, Milton tweeted from his personal account, teasing a significant announcement the following day: "Tomorrow, it all changes.  I finally get to talk about it.  The news everyone has been waiting for.  Diesel trucks are obsolete for good.

---

[26]    @nikolamotor, Twitter (Feb. 28, 2019, 4:05 P.M.), https://twitter.com/nikolamotor/status/1101226897982218240.

***We solved what no one else could***.  It's time for other OEM's [sic] to stop producing diesels immediately.  See press tomorrow #emissionsgameover." This statement remained on Milton's Twitter account and publicly available to investors during the Class Period.

223.    The next day, November 19, 2019, Nikola issued a press release titled "Nikola Corporation to Unveil Game-Changing Battery Cell Technology at Nikola World 2020." Milton drafted this press release, had ultimate authority over its content, and authorized its distribution. Milton provided a draft of the press release to Nikola's Board of Directors on November 15, 2019, which included Defendants Russell, Brady (Treasurer) and Worthen (Secretary). The purpose of the press release was for Nikola to "announce details of its new *battery*." The November 19, 2019 press release was posted to Nikola's website and, together with the accompanying tweets, remained publicly available to investors throughout the Class Period.[27]

224.    In the press release, the Nikola Defendants made several unqualified claims about the battery technology, which Milton is quoted describing as "the biggest advancement we have seen in the battery world." The Company claimed the following in the press release about what it asserted as *Nikola's* purported "prototype cell":

(a)    "record energy density of 1,100 watt-hours per kg on the material level and 500 watt-hours per kg on the production level";

(b)    "could increase the range of current EV passenger cars from 300 miles up to 600 miles with little or no increase to battery size and weight";

(c)    "technology is also designed to operate in existing vehicle conditions";

---

[27] Press Release, Nikola Corporation, Nikola Unveils the Nikola Badger Pickup (November 19, 2019),        https://nikolamotor.com/press_releases/nikola-corporation-to-unveil-game-changing-battery-cell-technology-at-nikola-world-2020-67.

(d)    "cycling the cells over 2,000 has shown acceptable end-of-life performance";

(e)    "Nikola's battery electric trucks could now drive 800 miles fully loaded between charges" and "hydrogen-electric fuel cell trucks could surpass 1,000 miles between stops and top off in 15 minutes";

(f)    "World's first free-standing electrode automotive battery"; and

(g)    "40% reduction in weight compared to lithium-ion cells" and "50% material cost reduction per kWh compared to lithium ion batteries."

These statements remained on Nikola's website and publicly available to investors during the Class Period.

225.    The same day, Milton took to Twitter, where on his personal account he: (i) quoted the press release, in part, in one tweet, (ii) repeated the same claims as in the press release in another tweet (***"Nikola has developed the most energy dense, safe battery in the world . . . . It would double the range of every electric vehicle and nearly double the range of every fuel cell.*** Making it available even to competitors."), and (iii) in a third tweet, further misrepresented Nikola's purported "game-changing" achievement (***"[y]ou're talking 600+ mile range in a model 3 Tesla. You're talking 50% less cost than Lithium Ion. You're talking mass adoption of zero emission vehicles. Could be worth hundreds of billions if owned by one company but we decided to share it with the competition for greater good."***). When a Twitter user responded to this last tweet asking, "[i]s it actually real though, or is it another Joi Scientific style 'breakthrough,'" Milton replied to the user, ***"It's real. I've seen it with my own eyes and watched them cycle."*** These statements remained on Milton's Twitter account and publicly available to investors during the Class Period.

226.    On or about December 2, 2019, Milton was asked on the *Shift* podcast to comment on Nikola's November 19, 2019 battery announcement having been met with

"some curiosity," and to address skeptics "who might doubt that such a battery exists." Milton responded, in part[28]:

> *Once we got the technology nailed down, we actually have over 2,000 cycles on our battery, which would mean it would be more than a million-mile battery. It would actually – our battery beats the Tesla battery in every metric, in every situation, and it's half the cost and it's double the range.* So, you know, for us, that was an exciting thing to be able to tell the world, and I actually appreciate the critics. I'm totally fine with it; I enjoy it. Because every time I prove them wrong, it drives them absolutely insane and they have to go back and admit they were wrong. For me, that's the funnest part of it.

227.   The statements referenced in ¶¶222-226 were materially false and misleading because Defendants knew or recklessly disregarded but failed to disclose that (i) these attributes were applicable to only *coin size* battery cells that were being developed and tested in a controlled lab environment as part of a university research project, (ii) scaling these coin-size lab-level cells to even a prototype size – which had not been done at the time of the press release – would require over a year of significant further development with was no assurance of comparable performance levels, and (iii) developing the cells from prototype pouch size cells to commercial grade quality was a further, significant undertaking, with no assurance of utility for commercial applications. Moreover, the statements above misled investors that Nikola developed the technology, when Nikola paid $250,000 to license coin-size cell technology created by someone else. As detailed in the USAO Presentation, Jason Roycht (VP, Technology Development and Strategy) stated, "[d]ime sized 'coin cells' were in place at the time with Drexel; these are simplistic and nowhere near the complexity of what goes into a pack cell." Tony Heaton (Battery

---

[28] Shift: A Podcast About Mobility, Nikola Motor's Trevor Milton on electrification, Tesla and a beer delivery (Episode 21) (2019), https://www.autonews.com/shift-podcast-about-mobility/nikola-motors-trevor-milton-electrification-tesla-and-beer-delivery. This episode is currently publicly available and was available to investors throughout the Class Period.

73

Engineer) stated "Drexel's work is still in the early research and development phase, and it was likely too early to publish this statement in November 2019." Brady stated "Nikola is 'years away' from having the battery technology Milton described. There's no way he could have known how many miles the trucks could drive between charging. ***The whole statement was an embellishment and fiction at the time***…" Worthen stated "***Nikola did not and still does not have 'commercializable' battery technology. Milton's statement to the contrary were a 'terrible and stupid idea' and Worthen told him not to make the statement***." Joe Pike (CHRO) stated "This statement felt false and misleading; Milton was essentially saying 'we got it,' before they did."

228.    On December 2, 2019, in a joint event that Nikola hosted with Iveco, which was livestreamed and posted to Iveco's YouTube channel, Defendant Milton told the crowd:

> We're building out the hydrogen station right now globally. ***In America, we've already got the largest hydrogen station in the western hemisphere at our headquarters. Can produce over 1,000 kilograms a day on-site.*** We're planning to expand that up to--up to essentially eight tons which is about 8,000 kilograms a day. ***That will be done in Phoenix, Arizona, the station's already up and operational for pumping right now***.

A video of the event is currently publicly posted online and remained publicly available to investors throughout the Class Period.[29]

229.    During the January 10, 2020 episode of the *Transport Topics Roadshow* podcast, Defendant Milton stated that Nikola was producing hydrogen a "***well below $4 a kilogram***":

> What we did is, we knew that hydrogen was very expensive to produce. ***Up until Nikola came into the market, hydrogen was around $16 a kilogram, U.S. dollars. Now, Nikola's producing it well below $4 a kilogram. We have***

---

[29]   IVECO, NIKOLA & IVECO EVENT, YouTube (December 2, 2019): https://www.youtube.com/watch?v=vGVb9yQ2s4o&t=683s (accessed March 1, 2021).

***driven the costs down times, almost four times…so, 1/4th the cost of normal hydrogen production, Nikola is now at***. . . . For the last four years now, we've been working on the most advanced hydrogen station in the world. It's actually in Phoenix, Arizona, it's larger than any other hydrogen station in the western hemisphere. . . .[30]

230.    On January 23, 2020, Milton tweeted from his personal account: "Hydrogen costs have plummeted through @nikolamotor efforts not other OEM's [sic]. ***Our costs are below $3 per kg.*** Diesel parity is $4/kg. Game is over for diesel. . . ." This statement remained on Milton's Twitter account and publicly available to investors during the Class Period.

231.    The same day, a Twitter user tweeted at Milton asking him to "confirm that is compressed green electrolytic hydrogen at $3/kg, today? How soon will that be available for public purchase, any update on that timeline?" Milton replied "Yes." This statement remained on Milton's Twitter account and publicly available to investors during the Class Period.

232.    The statements referenced in ¶¶228-230 were materially false and misleading for the reasons identified in ¶217.

233.    On February 10, 2020, Nikola announced in a press release and on social media that it was making a pickup truck called the Badger that would be unveiled at an event in or about late 2020.  The press release titled "Nikola Unveils the Nikola Badger Pickup" touted the Badger as the "World's Most Advanced Zero-Emission FCEV/BEV Pickup with an Estimated 600-mile Range." This press release also stated that the Badger "***is engineered*** to deliver 980 ft.  lbs.  of torque, 906 peak HP and 455 continuous HP," "***was designed*** to handle 0-100 mph launches with minimal loss of performance and to

---

[30]    TT    Roadshow,    Meet    Trevor    Milton,    (Episode    4) (2020),https://roadsigns.ttnews.com/roadshow-episode-four/. This episode is currently publicly available online and was available to investors throughout the Class Period.

75

operate on grades up to 40% through advanced software blending of batteries and fuel-cell," and was "***engineered*** to outperform all electric pickup trucks on the market in both continuous towing, HP and range."  These statements remained on Nikola's website and publicly available to investors during the Class Period.

234.    The same day, on February 10, 2020, a Twitter user replied to a tweet from Milton's personal account that promoted the prior day's press release, commenting that "the spec sheet looks ridiculously exaggerated. . . ." Milton responded: "Specs are dead on actually." This statement remained on Milton's Twitter account and publicly available to investors during the Class Period.

235.    The statements referenced in ¶¶233-234 were materially false and misleading because Defendants knew or recklessly disregarded but failed to disclose that at the time of the announcement Nikola had not performed any engineering work or design work on the Badger, other than CGI renderings, and that remained the case for several months. An OEM engineer, who visited Nikola's offices in February 2020 to conduct diligence in connection with a potential partnership to build the Badger, summed up the Badger's state at the time as "vaporware."  It was not until June or July 2020 that third-party suppliers were completing computer-aided design ("CAD") and beginning "tooling" for the Badger. Nikola's Vice President of Technology referred to the Badger in an internal email as "vapor ware" [sic] "with no technical plan." Badger prototypes were not delivered until December 2020.

236.    On or about February 14, 2020, in an interview on *Fox Business*, Milton said: "[W]e're probably one of the only companies in the world that ***does everything ourselves***. ***We do our own batteries***, we do our own frames, ***we do our own vehicles from the ground up***, our own ***inverters***, our own infotainment, you know, the cool screens.  So ultimately,

1    ***that entire truck from the ground up is designed by Nikola***, and they do cost a lot of

2    money. . . ."

3         237.   The statements referenced in ¶236 were materially false and misleading

4    because Defendants knew or recklessly disregarded but failed to disclose that Nikola did

5    not and does not design, develop or produce its components such as batteries, inverters or

6    e-axle. Nikola has used third-party "off the shelf" inverters for all its semi-truck prototypes,

7    and it planned to use third-party inverters for the Nikola Tre. While Nikola entered into an

8    agreement to develop inverters with a supplier in early 2018, that effort was terminated in

9    the spring 2020 due to a lack of progress. For an October 2019 meeting of the Board of

10   Directors, Milton received materials that referred to inverters for the Nikola Tre as "off-

11   the-shelf." And, he was directly involved in terminating the inverter co-development effort

12   with a supplier, even requesting a refund from the supplier due to lack of success. As

13   detailed in the USAO Presentation, Brady has admitted, "Nikola ***aspires*** to build

14   components in-house but ***does not do so at present***" and "Nikola does not make its own

15   battery in-house." Kevin Lynk (Chief Engineer) admitted "***Nikola does not currently***

16   ***develop any components*** on its own" and "Nikola has used and continues to use off-the-

17   shelf inverters for demonstration and early phase prototype vehicles" and " 'aren't even in

18   production yet.'" Varoujan Sarkissian (Global Head, Vehicle Electrical and Controls)

19   admitted "[e]fforts to develop in-house inverters only ramped up in early 2020, and it will

20   take far more development time (perhaps up to ten years) before the in-house inverters

21   could be used in Nikola production vehicles" and "Milton knew that Nikola was in the

22   early stages of inverter development – the company had canceled its contract with ITK for

23   inverter development and was essentially starting over." According to Varoujan Sarkissian,

24   "[t]here was no complete in-house inverter or software." Umran Ashraf (Global Head,

25

26                                                77

Vehicle Engineering) stated "Virtually all of the batteries for vehicles are built with partners…(Samsung provides the cell, Romeo makes the module, Nikola builds and owns the pack)." Russell stated "Romeo was the best option, but Milton badly wanted Nikola to own its battery technology." Between November 1 and 4, 2019 Milton emailed Steve Cook (associate Corporate Counsel, Contracts) regarding an agreement with Romeo for its batteries, stating "we need to make sure we have a clause specifically stating they shall never represent their batteries are on our truck without our written permission. Which we will never give. I don't want he image issue with our investors." Britton Worthen (CLO) admitted that "Milton worked hard to ensure that Romeo could never say that its batteries were in Nikola's trucks.   Moreover, a May 11, 2020 internal company document states "Nikola is not developing a battery in house" and "Nikola does not have a clear plan for battery development." On March 27, 2020, Kevin Lynk emailed Katherine Beebee (project manager, Truck) regarding responsibility for e-axle components: "FPT is responsible for the mechanical design of the e-axle. Iveco is responsible for the vehicle integration of the e-axle and traction inverters. Nikola is responsible for purchasing the traction inverters and critical e-axle components and we provide support for the system design."

238.   On or about March 12, 2020, Milton stated on the *Transport Topics Roadshow* podcast that "[w]e can – we're double the cycle life of a regular lithium-ion, and we're about half- to one-quarter the cost to produce the lithium-ion and we don't have any of the expensive metals . . . we should have productionized cells probably by the years end."[31]

---

[31] TransportTopics, Roadshow:  Episode Four Meet Trevor Milton, YouTube (Mar. 12, 2020),   https://www.youtube.com/watch?v=ZJWINC1aGLk.  This episode is currently publicly available and was available to investors throughout the Class Period.

239.    The statements referenced in ¶238 were materially false and misleading for the reasons identified in ¶227.

240.    On or about March 12, 2020, Milton stated on the *Transport Topics Roadshow* podcast:

> Up until Nikola came in the market, hydrogen was around $16 a kilogram, U.S. dollars. ***Now Nikola is producing it well below $4 a kilogram. We have driven the cost down times almost four times.*** That's how – you know, one-fourth the cost of normal hydrogen production, Nikola is now at.

241.    The statements referenced in ¶240 were materially false and misleading for the reasons identified in ¶217.

242.    On or about April 20, 2020, Milton stated on the *Truck Show Podcast*, referring to the Badger:

> ***We built the thing to be a true vehicle," it is based on a "billion dollars of knowledge" from Nikola's semi-truck program, the "truck can go 700 miles in a real environment," and it can "whoop a Ford F-150 . . . whoop a Silverado . . . whoop a Dodge Ram.***[32]

243.    On or about April 20, 2020, Milton stated on the *Truck Show Podcast*:

> ***We spent a billion dollars essentially on our hydrogen program . . . with our semi-truck and we're the leaders in hydrogen technology around the world. . . . We took that billion dollars in knowledge and put it into this pickup truck.***

244.    The statements referenced in ¶¶242-243 were materially false and misleading for the reasons identified in ¶235. Moreover, these statements were materially false and misleading because Defendants knew or recklessly disregarded but failed to disclose that Nikola had not put a billion dollars of semi-truck technology into the Badger.

---

[32] The Truck Show Podcast, Plugging In With Nikola CEO Trevor Milton (Episode 118) (2020), https://truckshowpodcast.libsyn.com/ep-118-plugging-in-with-nikola-ceo-trevor-milton. This episode is currently publicly available online and was available to investors throughout the Class Period.

245.   On May 30, 2020, Milton tweeted from his personal account in response to a user's question about "where the electricity comes from." Milton stated:

> *Wind solar and hydro for most. That's all we really touch is non carbon energy. Creating it on site under contracts give us 3 or 4 cents per kWh clean energy making hydrogen very competitive and cheaper than diesel.*

246.   The statements referenced in ¶245 were materially false and misleading for the reasons identified in ¶217.

247.   On or about June 1, 2020, Milton stated on the *JMac Investing* podcast:

> Soon I'll be announcing when we're going to show off the Badger to the whole world. And this thing is insanity. It is the most beautiful truck I think the world has ever seen. *It's a fully functioning vehicle inside and outside, HVAC, and everything, windows, all of it works. I shouldn't say all of it – I'll probably have a couple of pieces that'll break on me, but hey, that's part of the process of building the truck, but it's a real real [sic] truck. It's not just some mockup thing that other people have done. This is a real, real truck.*

248.   The statements referenced in ¶247 were materially false and misleading for the reasons identified in ¶235.

249.   On or about June 1, 2020, in an interview on *The Casey Adams Show* podcast, Milton stated,

> *We don't build on speculation; we build on orders*.  We're very similar to like Airbus or Boeing where *we're sold out for many, many years*.  *We're the only company in the world that is sold out for many, many years . . . It's all based on orders.*  I think that's the reason Nikola is worth so much money today.[33]

250.   The statements referenced in ¶249 were materially false and misleading because Defendants failed to disclose, as admitted in the USAO Presentation: (i) all the reservations except for an 800-truck order were non-binding, fully cancellable indications

---

[33]   https://anchor.fm/caseyadams/episodes/Trevor-Milton---Billionaire-CEO-of-Nikola-Motor--Creating-Hydrogen-Powered-Trucks-edl5er.  This episode is currently publicly available online and was available to investors throughout the Class Period.

of interest, (ii) anyone could make a "reservation" through Nikola's website, (iii) of the approximately 20 "reservations" made through Nikola's website, the "Nikola has contracts with five customers. No other documentation exists," (iv) Nikola made no attempts to contact each reservation-holder to determine the legitimacy of individual reservations, and (v) over 35% of Nikola's reservations (5,000 trucks valued at approximately $3.5 billion) were by U.S. Xpress, which had only $1.3 million in cash on hand and Nikola internally recognized it was "doubtful" that US Xpress planned to the 5,00 vehicles as a bulk order.

**B.      False and Misleading Statements After The Merger Is Announced But Before Nikola Begins to Publicly Trade on NASDAQ By the Nikola and VectoIQ Defendants**

**1.      False and Misleading Statements Related to the Nikola One**

251.    On March 13, 2020, VectoIQ filed a prospectus on Form S-4 with the SEC signed by Milton, Girsky, and Shindler. The S-4 contained materially false and misleading statements and omitted to disclose material facts necessary to make the statements made therein not misleading.

252.    As justification for the merger, the S-4 represented that "VectoIQ's management and board of directors considered the fact that Nikola has a high volume of fuel cell electric vehicle pre-orders, currently at over $10 billion." This statement was false and materially misleading as these were not "pre-order" but expressions of interest to purchase products, the majority of which was for the Nikola One that was no longer in development, and for products, FCEV, for which commercial viability was not achievable at the time.

253.    The S-4 further represented that "Nikola's business model uniquely supplies both the truck and hydrogen fueling infrastructure, *solving the fleet's concerns* as to where to refuel with green hydrogen *at competitive pricing to diesel."* This statement was

81

materially false and misleading when made. First, Nikola had no infrastructure in place, or developed, that would allow trucks of fleets to refuel. Second, Nikola had never been able to produce any hydrogen at all, let alone at prices close to allowing Nikola to be competitive to diesel prices. It was therefore materially misleading to represent that Nikola had "solv[ed]" this "concern" and could produce hydrogen "at competitive pricing to diesel."

254.    The S-4 represented that "VectoIQ's management and board of directors conducted due diligence examinations of Nikola and discussions with Nikola's management."

255.    In connection with the merger, VectoIQ issued a proxy statement, filed with the SEC on May 8, 2020 (the "Proxy") which contained false and misleading statements. Defendants Milton and Girsky signed the Proxy.

256.    The Proxy represented that Nikola "designs and manufactures state-of-the-art battery-electric and hydrogen fuel cell electric vehicles, electric vehicle drivetrains, energy storage systems, and hydrogen fueling stations." This was false and misleading as Nikola did not "manufacture" BEV or FCEV vehicles and did not manufacture "fueling stations." Instead, these were concepts and ideas of Nikola's.

257.    The Proxy lists the Nikola One as a "Zero-Emission product offering." The Nikola One is listed in the same sentence as the Nikola Two as:

> "Nikola's FCEV trucks that are primarily designed for medium and long-haul applications. The FCEV trucks allow Nikola to address the longer-term opportunity by combining Nikola's fuel cell technology and a network of hydrogen stations across the US.
>
> FCEVs use fuel cells on-board to convert hydrogen into electricity to power the electric motors which transmit power to the wheels. The fuel cell generates electricity through a chemical reaction, supplied from on-board tanks, and oxygen from the atmosphere. A much smaller battery (compared to our BEV) provides supplemental power to the drivetrain, and stores energy recovered during regenerative braking. The voltage and charge of the battery

are maintained through a combination of power supplied from the fuel cell and energy captured through regenerative braking.

Nikola's FCEVs have an estimated range of 400 – 700 miles, designed to address the medium and long-haul market. Our FCEVs will be leased to customers via a bundled lease where customers receive an FCEV truck, hydrogen fuel, and maintenance based on a fix rate per mile, for 700 thousand miles, or 7 years (whichever comes first.)

…

The Nikola Two will be marketed in the North American market, with initial production expected in the first quarter of 2023.

Production plans for the Nikola One will be announced once we have established a robust refueling infrastructure."[34]

258.    These statements were false or misleading when made and omitted to reveal material facts necessary to not make them misleading. The Nikola One was at no time a functioning FCEV. It was never a viable product offering from Nikola. To date, the Nikola One is still not capable of moving under its own power and no development or production work has been done to make it so. After an abortive announcement and fraudulent video discussed in Sections V.A and V.B above, the Nikola One was abandoned by Nikola and not pursued after 2016. Despite the fact the Nikola was never capable of moving under its own power, the fraudulent video of a non-functioning Nikola One remained on Nikola's website until September 2020.

259.    The claims in the Proxy regarding the Nikola One are material because investors reading the statements would reasonably conclude the Nikola One was a product offering from Nikola. A reasonable investor would think from the Proxy and the video being posted on Nikola's website that Nikola had a truck that could drive. Having a functional product offering bears directly on the value of Nikola Motors, and the then prospective business combination with VectoIQ.

---

[34] *See* The Proxy at p. 148.

260.    On April 6, 2020, VectoIQ filed an SEC Form 8-K that contained an investor presentation to be used by then current VectorIQ investors in evaluating the business combination with Nikola (the "April 6 8-K"). The April 6 8-K was signed by Defendant Shindler. The April 6 8-K contains numerous statements that are both false and misleading. These statements concern the Nikola One, the Badger Light Truck, and Nikola's purported Hydrogen production and fueling infrastructure.

261.    The April 6 8-K describes Nikola's reservation book. It includes "~7900" trucks ordered in 2016[35]. In 2016, Nikola's only announced product was the Nikola One. As discussed above, and in Section V.A and V.B the Nikola One was, at no time, a functional product offering with a plan for production. The April 6 8-K lists a total of "~14,000" reservations for FCEV vehicles. This includes those ~7900 for the inoperable and abandoned Nikola One. At least half of the total number of reservations used by Nikola to market itself to investors published by VectoIQ in the April 6 8-K are for a product that does not exist.  The 14,000 reservations were also expressions of interest from potential customers and not orders. The April 6 8-K omitted to reveal that the 14,000 reservations were not actual orders but expressions of interest in products that were either abandoned in the case of the Nikola One, or products that were not yet operational and ready for commercial sale.  This statement is also materially misleading as it purports to represent reservations to sell product worth "$10B" as of April 6 8-K.[36]

---

[35] *See* April 6 8-K at p. 40.

[36] *See Id.* at p. 9.

## 2. VectoIQ Defendants False and Misleading Statements about Nikola's Purely Aspirational Hydrogen Production Capabilities

262.     VectoIQ made numerous false and misleading statements about Nikola's hydrogen production capabilities in several different public filings. In each circumstance, VectoIQ and then Nikola created an impression in the minds of a reasonable investor starkly at odds with the reality of Nikola's non-existent pipe-dream masquerading as a hydrogen fueling program.

263.     The April 6 8-K presented a wholly unrealistic and deceptive picture of the state of Nikola's hydrogen production abilities while attempting to convince investors to support the business combination. On Page 26, the April 6 8-K lists the "Demo Station" in Phoenix AZ, which it claimed was capable of storing and dispensing hydrogen. Below that, April 6 8-K identifies an "R&D 8-Ton Station" which Nikola claimed was going to "begin in Q2 2020" and that "Station Offers H2 *Production*, storage, and dispensing" in addition to "(8) 1-ton electrolysers (sic) onsite capable of producing 8,000 kgs of hydrogen per day." At the time of the April 6 8-K, it was in the second quarter of 2020 Nikola and not a single electrolyzer had been purchased, no power agreement had been reached to supply it, and Nikola did not own any sort of renewable energy generating ability. These statements omitted to reveal the material facts that Nikola was not able to employ any electrolyzers at its Phoenix headquarters, had never produced any hydrogen at all, let alone that its stations could produce 8,000 kgs of hydrogen per day.

264.     The April 6 8-K also lists an "AB 8-Ton station" with identical statistics to the fictional "R&D 8-Ton Station" except for this station "begin[ing] Q4 2020." As with the R&D station, no work had been done for any of the capability the 8-K described using the present tense, to include the fact that no land had been purchased or leased to sight the station.

265.    The Proxy also contains false and misleading statements regarding the capability of Nikola's hydrogen capabilities. The Proxy claimed:

"we have initiated the development of the hydrogen station infrastructure by completing our first 1,000 kg demo station in the first quarter of 2019 at our corporate headquarters in Phoenix, Arizona. The demo hydrogen station offers hydrogen storage and dispensing and serves as a model for future hydrogen stations."

266.    It also contained the following graphic:



"Our initial plan for the station rollout begins with an eight-ton pilot station accessible to the AB brewery in Van Nuys, California. From there, we then plan to build up to 10-12 additional stations in California. These stations will supply fuel for our launch customers in those geographies that have dedicated routes in California. California is offering incentives to build out our hydrogen fueling infrastructure and deploy zero-emissions vehicles, including opportunities for funding along major freeway corridors. We expect to rollout these stations in 2022-2023."

267.    As with the April 6 8-K, no work had been done to bring any of this about. The graphic describing the process by which stations would work does not describe the process by which Nikola's self-described "model" in its Phoenix HQ functioned.  Nikola had no plan or ability to generate electricity from renewable energy, it had no agreements or plans to purchase that energy, if it could produce or purchase that energy, it had no electrolyzers to turn that energy into hydrogen.

268.    The Phoenix Demo plant could store and dispense hydrogen, but the key to the business case for Nikola's planned hydrogen infrastructure – the generation or purchase of electricity and the conversion of that into hydrogen at scale – would be impossible at the

Phoenix "Demo" plant. Without the generation or purchase of electricity and its conversion to hydrogen, there is no model or example. Calling a storage tank with a dispenser a "demo" for what Nikola purported to be building towards was deceptive and misleading.

269.   These statements were materially misleading because they portray the stations as currently having the capabilities as described. Nikola repeatedly stressed the importance of a hydrogen fueling station network to its business model. Whether any element of that key business model had been "demonstrated" or "completed" as the Proxy and April 6 8-K represents, was materially misleading. The statements also omitted to reveal the material facts that Nikola had not produced any hydrogen to date, and none of its stations had produced any hydrogen to date.

### 3.   VectoIQ Defendants False and Misleading Statements about the Badger Pickup Truck

270.   In the April 6 8-K, VectoIQ makes several claims about the capability of the Badger Pickup Truck, a product offering that at that point did not exist as anything other than concept art.

271.   The Badger Pickup Truck is described in the April 6 8-K as having a "blended FCEV/BEV" system with a range of "600 miles" or a "300 mile" range on just the BEV. The April 6 8-K further claimed the Badger could switch between an FCEV/BEV and BEV only system "only by touch of button." Nikola further claimed that truck had "980 ft. lbs. of torque", "906 HP" engine, a "160kWh flood module lithium ion battery" and a "120 kW fuel cell."[37] These statements were materially false and misleading when made and omitted to state material facts. The Badger was a concept vehicle and, as such, there was no basis to state what mileage range this concept vehicle could achieve.

―――――――――――――
[37] April 6 8-K at p. 15.

87

272.    VectoIQ also made similarly false and misleading statements regarding the Badger in the Proxy. On page 149 of the Proxy, it states: "Unlike anything on the market, the Badger is designed to target and exceed every electric or fossil fuel pickup in its class."

273.    In fact, as was known at the time, the Badger pickup truck did not exist aside from a computer generated rendering of a pickup truck created by a Nikola employee before the Badger's announcement in February 10, 2020.[38] A prototype of the Badger would not be delivered to Nikola from a third party OEM until December of 2020.[39] All statistics used to market the Badger to investors in the April 6 8-K and summarized later in the Proxy consisted of nothing but modeling based on assumptions given to Nikola engineers by Milton.[40]

274.    These statements were materially misleading because an investor would consider it relevant to the value of Nikola if the Company had a product that had been built, engineered or even properly modelled. VectoIQ's representations that Nikola had developed and was ready to sell the Badger was false. It also omitted to reveal the material fact that the Badger was nothing more than a prototype in development.

275.    On or about June 3, 2020, Milton tweeted out a link to a podcast interview, during which he claimed that Nikola did its ***"own powertrains, battery, battery management systems, controls . . in-house."***

276.    The statement referenced in ¶275 was materially false and misleading for the reasons identified in ¶237.

---

[38] *See* SEC Complaint at ¶89.

[39] *See Id.* at ¶94-95.

[40] *Id*. at ¶95.

**C.    Class Period False and Misleading Statements
        by the Nikola Defendants**

277.    In a June 4, 2020 interview with *Yahoo! Finance*, which remained publicly available to investors during the Class Period, Milton told investors:

> *But what Nikola solved was the cost-- was the economics on the trucking. When we first started, hydrogen was $16 a kilogram. We can now produce it for well under $4 a kilogram. So we've cut – it's one quarter of the cost now than it was just a few years ago.   And we're now cheaper to operate per mile than diesel.*[41]

278.    The statement referenced in ¶277 was materially false and misleading for the reasons identified in ¶217.

279.    On the same day, June 4, 2020, in a tweet Milton represented "*We do our own batteries at Nikola and have since day 1*. We do however test with everyone and if a supplier builds a better battery we would use them. That goes for all supplied parts on our vehicle."

280.    On or about June 6, 2020, Milton tweeted, "*All the technology, software, controls, E axle, inverters etc. we do internally.*"

281.    The statements referenced in ¶¶279-280 were materially false and misleading for the reasons identified in ¶237.

282.    On or about June 8, 2020, Milton announced on Twitter that Nikola was going to start taking reservations for the Badger on June 29, 2020.

283.    On June 8, 2020, in response to a Twitter user who asked, "when will the first prototype [of the Badger] be produced?," Milton tweeted, "Already."

284.    The statements referenced in ¶¶282-283 were materially false and misleading for the reasons identified in ¶¶235 and 244. Moreover, Milton's announcement that Nikola

---

[41] Alexis Christoforous, Brian Sozzi, *Nikola debuts on Nasdaq, how it plans to compete with other electric truck makers,* Yahoo! Finance, June 4, 2020, https://finance.yahoo.com/video/nikola-debuts-nasdaq-plans-compete-150245603.html.

was going to start taking reservations for the Badger on June 29, 2020, furthered the false impression created by Defendants other misrepresentations that the vehicle had already been produced when it was nothing more than a concept sketch.

285.    On June 8, 2020, Nikola's stock price increased $37.30 per share, or 103.7%, above its closing price of $35.97 per share on June 7, 2020.

286.    Milton and Nikola's senior executives gloated about the money they were making from investors as a result of their fraudulent statements concerning the Badger. On June 8, 2020, Milton shared a tweet with a senior Nikola executive reflecting that over 36,000 new Robinhood users became Nikola stockholders that day.  The senior executive responded, in part, by expressing his amazement at how many calls he received "from retail investors today that have no clue about Nikola, other than their friends told them to buy. A lot of hype out there with retail investors," to which Milton replied: "That's how you build a foundation.  Love it."

287.    On June 9, 2020, Milton replied on his personal Twitter account to another user, who appeared to have been citing a source projecting dispensed hydrogen to be priced at $6.00 to $8.50 per kilogram by 2025, "*[w]e are already under $4 working on $3*."

288.    On June 9, 2020, Milton tweeted from his personal account: "We source energy directly with either wind farms, solar or hydro electricity.  Once we broker a 20 year agreement, we feed it into the federal lines, pay some small fees, then take it out on location. This ensures the energy is clean and we don't pay post meter rates."

289.    On June 9, 2020, Milton also tweeted from his personal account: "I am the biggest supporter of BEV and FCEV.  We take all energy behind the meter which allows us to get below $.04 per kWh and guaranteed clean energy. Once you go post meter, you

can't control the energy, you get 50% dirty energy. I am trying to help and educate. Not hurt BEV."

290.    Again, on June 9, 2020, Milton tweeted from his personal account: "Yes, we have stations going up in Canada and they use clean energy for our hydrogen. Solar, Wind and Hydro give us under $4 per kg hydrogen."

291.    The statements referenced in ¶¶287-290 were materially false and misleading for the reasons identified in ¶217.

292.    On June 9, 2020, Nikola's stock price increased another $6.46 per share, or 8.82%, above its closing price of $73.27 per share on June 8, 2020.

293.    On June 10, 2020, Milton tweeted from his personal account:

> I love both BEV & Hydrogen. Here's the breakdown to combat all the lies. A loaded truck w/full weight & average weather conditions. ***H2 is now under $4 per kg and working on sub $3 per kg.*** . . . 15 min full [sic] time & 10,000 lbs lighter . . . . Before anyone goes and slams me about cost of hydrogen, we don't produce it in the city, ***we do it behind the meter at about $.04 / kWh on PPP clean energy.*** That's why hydrogen makes sense for long haul. You're not fighting utilities and rates.

294.    The statement referenced in ¶293 was materially false and misleading for the reasons identified in ¶217.

295.    On June 10, 2020, Milton tweeted from his personal account in reply to a user who asked, "[w]ondering if I could get your thoughts on how you intend to lower the cost/kg of hydrogen?" Milton responded: "***We are now below $4 per kg which is the lowest in the world. We started at $16 and now we are at $4. We plan on reducing that again***. The key is to order tons of equipment, scale it and buy clean energy cheap."

296.    In an interview on the *Autoline After Hours* podcast on or about June 11, 2020, Milton had the following exchange with the host:

> MILTON: And we just ordered $30 million worth of equipment two days – or three days ago for our electrolyzer. ***So, it's – all it takes is***

1

*just electricity, clean energy from hydro, wind, or solar. And we can produce it all 24 hours of the day, never paying peak rates, never buying dirty energy, all zero emission. So, if you really love zero emissions* –

2

3

HOST: *You make it on site?*

4

MILTON: *We do. We make it on site*.

5

HOST: You make it on site at the station?

6

MILTON: Yes. And that's why it's so – this is – you know, people don't get Nikola . . . we have the largest hydrogen station in the western world at our headquarters. So, we've already proven it . . . . *Now we're down two, three bucks a kilogram and it's pretty awesome*."

7

8

9       297.    The statements referenced in ¶¶295-296 were materially false and misleading

10   for the reasons identified in ¶217.

11       298.    On or about June 11, 2020, Milton stated in an appearance on Cheddar News:

12   "We've made it very clear that we don't want to build this [Badger] on our own. *So we*

13   *developed all the tech*. *We've built the whole truck*, and now what we want to do is partner

14   with a big OEM."

15       299.    The statement referenced in ¶298 was materially false and misleading for the

16   reasons identified in ¶¶235, 237 and 244.  Moreover, this statement was materially false

17   and misleading because Defendants knew or recklessly disregarded but failed to disclose

18   that Nikola never developed a Badger FCEV prototype, and little, if any, of Nikola's

19   technology was used on the Badger BEV prototype. Nikola retained two third-party

20   suppliers to build the BEV prototype using "donor" vehicles manufactured by another

21   OEM. The upper body was built by a supplier in Europe, while the chassis was built by a

22   supplier in Michigan, and then the two parts were integrated.

23

24

25

26

300.   On June 15, 2020 Nikola filed a Form S-1 with the SEC to sell 76.39 million shares of common stock to the public (the "June 2020 S-1"). The June 2020 S-1 was signed by defendants Milton, Girsky, Russell, and Brady.

301.   In the June 2020 S-1 Nikola touted the importance of both their future FCEV/BEV sales and hydrogen technology and infrastructure as "*core*" to the Company's ongoing success and a "*key differentiator*":

> *Our core product offering* is centered around our battery-electric vehicle ("BEV") and hydrogen fuel cell electric vehicle ("FCEV") Class 8 semi-trucks. *The key differentiator of our business model* is our planned network of hydrogen fueling stations. We are offering a revolutionary bundled lease model, which provides customers with the FCEV truck, hydrogen fuel, and maintenance for a fixed price per mile, locks in fuel demand and significantly de-risks infrastructure development.

302.   This statement was materially false and misleading when made and omitted to reveal material facts. Nikola had not produced any hydrogen, let alone hydrogen at prices which were economically more attractive to, or even equal to, then current alternatives. Nikola had not begun to effectuate a "network of hydrogen fueling stations" and the leases offered for its FCEV trucks were for trucks that were concept vehicles and not actual products ready for offering and/or sale.

303.   At pages 76 - 77, the June 2020 S-1 references the Nikola One as one of the Company's "product offerings." It also lists the capabilities of the Nikola One and Nikola Two in the same descriptive paragraph, claiming "Nikola's FCEVs have an estimated range of up to 400 to 750 miles, designed to address the medium and long-haul market." These statements were false and misleading when made and omitted to disclose the material fact that the Nikola One was abandoned as a potential product by the Company and it was a non-functioning and non-operational truck. It was materially misleading to estimate the mileage range of concept vehicles that were not yet in production and commercially tested.

304.    At page 77, the June 2020 S-1 states "[r]ecently we announced the Nikola Badger . . . an advanced zero-emission FCEV/BEV hybrid pickup truck. Unlike anything on the market, the Badger *is designed* to target and exceed every electric or fossil fuel pickup truck in its class." This statement was false and misleading as it represents that the Badger was an existing product and, discussed in the present tense, its design, to exceed other trucks in its class. In fact, the Badger was nothing more than a concept of a vehicle with aspirations to "exceed every electric or fossil fuel pickup truck in its class." The June 2020 S-1 omitted to reveal that the Badger was a concept vehicle at the time.

305.    At page 78, the June 2020 S-1 repeats some of the claims made previously in the Proxy and April 6 8-K, discussed fully in ¶¶255-274 regarding the dispensing station at Nikola's Phoenix headquarters serving as "a model for future hydrogen stations". These statements are false and for the same resasons as they were in the Proxy, and April 6 8-K. The Phoenix HQ dispensing station was not and could not serve as a "model" for Nikola's hydrogen station for the simple reason that it was never designed for and cannot produce hydrogen. Nikola at this point had still yet to produce any hydrogen, install any electrolyzers, or enter into power agreements or purchases of renewable energy generating equipment that would supply sufficient electricity if they had electrolyzers installed to create hydrogen. The use of cheap electricity to create hydrogen at scale was – as Nikola repeatedly emphasized – a key to their business plan. The Phoenix HQ dispensing platform could not and did not serve as a meaningful "model" of the hydrogen infrastructure Nikola repeatedly described.

306.    At page 81 of the June 2020 S-1, Nikola stated, "The current backlog of over 14,000 FCEVs non-binding reservations represents more than two years of production and over $10 billion of potential revenue. The FCEV reservation book was frozen in the fall of

2019 in order for Nikola to focus on negotiating with strategic fleet partners for launch." This statement was materially false and misleading for the reasons stated in ¶¶ 251-261.

307.    As further noted in ¶¶251-261 the use of the 14,000 FCEV backlog figure remains false and misleading. Earlier uses of the 14,000 reservations figure in the April 6 8-K and Proxy included the "~7900" reservations made in 2016 for the Nikola One. Any reference to a reservation for the Nikola One as an indication of demand is false and misleading because the Nikola One did not exist and has never existed as a product for sale. Demand for a non-existent product is not demand at all, potential or otherwise. There is no indication from the S-1 the 14,000-reservation figure used here removed any of the previously counted reservations from the Nikola One. As it is the same number used in the April 6 8-K and Proxy, and no communication or filing from Nikola indicated a new reservation or change in the reservation list since the April 6 8-K and Proxy, a reasonable investor would assume it described the same reservations.

308.    In a June 18, 2020 article in the Irish Times titled *Nikola Motor Takes a Big-Money Punt on the Hydrogen Future*, Milton is quoted as follows: "***We can now produce hydrogen for between $2 and $4 a kilogram. We're now cheaper than diesel to operate per-mile*** and we're almost at parity with a battery electric per-mile, and ultimately that's game over for diesel."

309.    On June 21, 2020, a Twitter user asked Milton, "can you please explain how Nikola is achieving cheap power along freeways? And how will you still achieve cheap power for stations inner city? This is more of the game changer for nikola [sic] in my opinion. Thanks." Milton responded: "***Freeway allows you 20 year PPP without paying high fees to transport through utilities. It is nearly 5x cheaper to produce h2 on freeways, where hydrogen excels***."

310.    On June 21, 2020, Milton published on LinkedIn an article he wrote titled *Trevor Milton: Hydrogen vs Battery Electric-Why Nikola is the Leader-Reality Sets In*, in which he wrote:

> Most hydrogen that Nikola makes is on the freeway . . . . Nikola uses energy transmitted on the federal transmission lines before we enter the utility. We buy this clean energy directly from Wind, Solar and Hydro facilities directly. This allows us to get sub $.04/kwh 20-year agreements on the freeways.

311.    The statements referenced in ¶¶308-310 were materially false and misleading for the reasons identified in ¶¶217. In addition, because Nikola was not capable of producing any hydrogen, much less at the prices represented by Milton, Nikola's TCO was not "cheaper than diesel to operate."

312.    On or about June 25, 2020, Milton tweeted from his personal account that the Badger uses "most all of it for our windshield washer fluid and . . . a little bit for clean, pure, drinking water." Several minutes later, Milton tweeted, ***"Yes you heard that right, we will have a drinking fountain in our truck using the hydrogen bi product water for the drivers to have nice cold, clean, pure drinking water."***

313.    The statement referenced in ¶312 was materially false and misleading for the reasons identified in ¶235. Moreover, this statement was materially false or misleading because Defendants knew or recklessly disregarded but failed to disclose that at that point, Milton had not discussed with Nikola's engineers the idea of using fuel cell by-product as washer fluid or drinking water, and several days later attempted to determine if it was even possible by searching on the internet, "can you drink water from a fuel cell?"

314.    On or about June 26, 2020, Milton stated in an interview on CNBC's *Fast Money* regarding the Nikola One: "I mean, the answer was is ***every part of that truck was functional***. We just didn't feel safe driving it at that time. That was our first truck what,

96

four or five years ago. ***It was all operable***, but it wasn't really that safe, like it could've killed someone in the audience."

315.    The statement referenced in ¶314 was materially false and misleading for the reasons identified in ¶¶211 and 215  .

316.    On June 29, 2020, in an interview on the *Raging Bull* podcast, Milton stated regarding the Badger: "So together we literally built the most badass pickup truck the world had ever seen, and it's the reason why Nikola is on the front page of almost every news organization out there around the world right now."

317.    The statement referenced in ¶316 was materially false and misleading for the reasons identified in ¶235.

318.    During the same *Raging Bull* podcast, Milton stated:

> ***So when we built all this technology, we had billions of dollars spent on the electrification platforms for our big trucks***. I know I could take that money, all that technology that's been built, and port it over to the most advanced pickup truck in the world. . . . Now, we're going to use an existing OEM to build our Nikola Badgers. ***So we own all the tech. So all the cool stuff you guys want, the design, the inside, the connectivity with your phone . . . all the e-axles or, you know the electric motors, the batteries, the controls, all that's done by Nikola.*** . . .

319.    The statement referenced in ¶318 was materially false and misleading for the reasons identified in ¶¶235, 237 and 244.

320.    On the same June 29, 2020 *Raging Bull* podcast, Milton was asked, "who is the manufacturer of the battery?" Milton replied:

> The battery is actually done by Nikola. ***We own all the tech and we're building all the batteries in-house***. So ***it's all owned by Nikola***, but it will be done at a big plant. We're going to build a plant next to ours that will essentially build all the batteries for all of our applications. But we use other people's cells. So we use, like, LG, Samsung, Panasonic. We use their cells, but the rest of the entire battery is all our tech, like the cooling, the thermal, the structural, the battery management system, the software; all that's all Nikola.

321.   The statement referenced in ¶320 was materially false and misleading for the reasons identified in ¶237. Moreover, this statement is materially false and misleading because Defendants failed to disclose that Nikola used a third-party supplier to manufacture batteries for its first production vehicle, the Nikola Tre BEV, and Nikola does not have the capability to manufacture these batteries on its own.  The supplier designed the modules for the batteries that Nikola is using for the Nikola Tre BEV, and Nikola relied on the assistance of the supplier to design the battery pack.

322.   On July 1, 2020, Milton tweeted from his personal account in response to a user who questioned "how are you able to get the [Badger] truck ready in 4 months." Milton replied: "Exactly, which means it's not fake. **Truck is real**. It's going to be fun releasing teaser videos leading up to #nikolaworld2020 of the #nikolabadger."

323.   The statement referenced in ¶322 was materially false and misleading for the reasons identified in ¶235.

324.   On July 1, 2020, Milton tweeted from his personal account in response to a comment from a Twitter user who asserted that Nikola did not make its batteries: "We don't make the cells. **We make the entire pack** like the top guys do. **We do have an OEM making our truck** but **all internals are Nikola's IP; batteries, inverters, software, ota, infotainment, controls, etc. We own it all in-house**. Just not the plant to build the truck."

325.   The statement referenced in ¶324 was materially false and misleading for the reasons identified in ¶237. Milton's statement "[w]e do have an OEM making our truck" is also materially false and misleading because Defendants knew or recklessly disregarded but failed to disclose that as of the date of the statement Nikola had not engaged any OEM to produce the Badger.

326.   On July 2, 2020, Milton announced that the most expensive Badger reservation package was sold out.

327.   The statement referenced in ¶326 was materially false and misleading for the reasons identified in ¶¶235, 244 and 284.

328.   On July 5, 2020, Milton tweeted from his personal account: "*All major components are done in house; batteries, inverters, software, controls, infotainment, over the air, etc*. you don't care about the truth you're just out to be a keyboard warrior."

329.   The statement referenced in ¶328 was materially false and misleading for the reasons identified in ¶237.

330.   On or about July 6, 2020, Milton stated on the *Founder Hour* podcast: "*We drove hydrogen down from 16 dollars a kilogram down below four dollars a kilogram now*. So why is that? Well, why is that important? Because *now, I can provide zero emission to a truck cheaper than diesel*. We've now won the game."

331.   The statement referenced in ¶330 was materially false and misleading for the reasons identified in ¶217. In addition, because Nikola was not capable of producing any hydrogen, much less at the prices represented by Milton, Nikola's TCO was not "cheaper than diesel."

332.   In the July 6, 2020 *Founder Hour* podcast, Milton also claimed that Nikola's TCO, as compared to diesel, "*we're like 20 to 30 percent sometimes, cheaper. So it's game over, essentially. If you don't own a Nikola truck, you're gonna go bankrupt.*"

333.   The statement referenced in ¶332 was materially false and misleading because Defendants failed to disclose Nikola's TCO was not significantly cheaper than diesel. In March 2019, a Nikola financial analyst notified Nikola executives – including Milton – that the TCO cost the company was using for diesel trucks was too high, and that

the projected TCO for Nikola would be, at best, on par with diesel. Finally, in April 2019, Nikola's Head of Business Development sent Milton and other senior executives notes from her discussions with semi-truck fleet representatives who provided feedback regarding Nikola's TCO. This executive reported that Nikola's actual and potential customers noted that Nikola's "costs are high and not at parity with diesel."

334.    On or about July 14, 2020, the Observer.com posted on YouTube a video of an interview with Milton. Milton stated in this interview: "We build all of our hydrogen through clean energy directly from the energy source. So we go contract with like wind farms or solar farms or whatever. And with that, what we do, is *we take that energy and we produce hydrogen 24 hours a day with it. And then we can produce that very cheap like you know like $2, $3 a kilogram. We're under $4 a kilogram for hydrogen*. . . ."

335.    The statement referenced in ¶334 was materially false and misleading for the reasons identified in ¶217.

336.    On July 14, 2020, Milton stated the following on an Instagram Live video posted on his personal Instagram account:

> One difference of us compared to everyone is we're the – really the only group out there that does full dielectric fluid submersion batteries. I'm gonna walk out here and show you that in a second. So what does that mean? That means our batteries are actually completely immersed into fluid. Now, watch our competitors follow us on that one, too.

> Why? Because you can cool and heat your batteries much faster, much more efficiently, and you're also able to stop thermal propagation, something that other people cannot do. So, pretty cool.

337.    In the same video, Milton further stated:

> So this is to everyone who's questioning what we do. Alright, so first of all, *who makes our batteries? Who makes Nikola's batteries? Nikola does*. Do we make the cells? No, we do not. We

buy the cells from either people like Samsung, LG, Panasonic, or other groups.

. . .

***We do however, make everything in our battery. All the cooling, the thermal, the battery management system, the software, the hardware, everything except for the cell***. So let that clear up any of the lies and the, the fake lies out there about how Nikola doesn't do shit, it's quite interesting. You could not build a truck like this if you don't pretty much do everything. . . .

338.   The statements referenced in ¶336-337 were materially false and misleading for the reasons identified in ¶237. Moreover, the statements regarding a submerged battery technology were materially false or misleading because Defendants knew or recklessly disregarded but failed to disclose that these batteries were only being used in two prototypes and had severe functional limitations and associated safety issues, leading investors and prospective investors to believe that these batteries were viable when, in fact, they were not. Specifically, the third-party supplier who helped Nikola develop the batteries mandated that they could only be run on a vehicle with a state-of-charge limitation of 30 percent, due to safety test failures. Milton knew or was reckless in not knowing that his statements about the submerged batteries were misleading as he learned, at least as of February 2019 or sooner, about the batteries' functional limitations and safety issues first-hand from the third-party supplier. In an email sent on February 5, 2019, Milton wrote, "I will agree to one of two of those [restrictions] but it can not (sic) be my financial penalty as a result of your lack of [] not delivering what was promised. . . . These are test packs, not production. . . . We do not accept your demands on these batteries with exception to the state of charge on vehicle." Further, the statement that Nikola made "everything" in their battery was false and misleading because Nikola had not successfully developed battery technology internally, and the batteries it planned to use in its semi-trucks were developed and manufactured by third parties.

339.   In the same July 14, 2020 Instagram Live video, Milton also stated:

> We charge cost per mile, that's it. Everything all in, service, warranty, maintenance, the entire thing, including the hydrogen fuel, it's under a dollar a mile and, and in some area – it depends on how many miles you drive a year. That can range much cheaper than that, all the way up to about a dollar a mile. It depends on – that is, um, that is – that's it how would – that's how it's built out and that's much – ***it's 20 to 30 percent less than diesel***.

340.   The statement referenced in ¶339 was materially false and misleading for the reasons identified in ¶333.

341.   In the same July 14, 2020 Instagram Live video, Milton stated that Nikola does "***all the e-axle design in-house***, all the gears, the gear reductions, the thermal, the cooling, even the controls that go with it, and ***also the inverters*** as well." Milton further stated, "[A]ll' inverters on the Nikola truck are probably some of the most advanced software systems that . . I know of anywhere in the automotive world. Why do I know that? It's because ***other OEMs are asking us to use it***. . . ."

342.   The statement referenced in ¶341 was materially false and misleading for the reasons identified in ¶237. Moreover, Milton's statements that "other OEMs are asking us to use [Nikola's inverters] was materially false and misleading because Defendants knew or recklessly disregarded but failed to disclose that no OEM had ever made such a request. As detailed in the USAO Presentation, Brady admitted "Milton's assertion that other OEMs have asked to use Nikola's in-house inverters is '***complete fiction***.'" Varoujan Sarkissian stated, "[i]t is not true that OEMs asked to use Nikola's in-house inverter. There was no complete in-house inverter or software for OEMs to ask for at the time of Trevor's statement."

343.   In the same July 14, 2020 Instagram Live video, Milton stated that the Badger was "a real truck, comes from a billion-dollar program," and is "legitimate."  Milton then asked rhetorically, in an apparent reference to the criticism he was receiving on social

media, "[w]hy do I not show the Badger right now?" Answering his own question, Milton stated, "[b]ecause I don't have to. And why else? Because it's marketing. So go get a degree in marketing, learn what it's like, even negative press brings great press. With every hater comes great followers and great investors."

344.    The statement referenced in ¶343 was materially false and misleading for the reasons identified in ¶¶235 and 244.

345.    In an interview with Jessica Meckmann published on LinkedIn on or about July 17, 2020, Milton stated: "We are contracting with wind, solar and hydro plants for energy and so far have been able to source plenty of energy under $.04 per kWh. Most of it is much lower in the 2.5 [cents] per kWh range."

346.    In an interview on the *Chartcast* podcast recorded on or about July 17, 2020 and published by the podcast on or about July 19, 2020, Milton stated that Nikola has been able to "chop the cost of hydrogen from $16 per kilogram down to – *we're down below $3 per kilogram on our hydrogen right now*. . . ."

347.    The statements referenced in ¶¶345-346 were materially false and misleading for the reasons identified in ¶217.

348.    On the same *Chartcast* podcast recorded on or about July 17, 2020 and published by the podcast on or about July 19, 2020, Milton claimed:

> So the energy on the freeway, we, we, *we tap directly into the main federal transmission lines and we contract directly with groups* . . . an example would be like, you know, um, would be like a Tennessee Valley Authority. . . . *So out on the freeways where the federal transmission lines are, and we can tap in, and we've, we've already preplanned all these, these locations where they can go. Um, and we're gobbling up the best locations right now*.

Milton further claimed that "[w]e only look at areas where we can get this energy for sub, you know, sub three or four cents a kilowatt hour, guaranteed 24 hours a day. And we've been able to do that in almost every one of our major locations that we're going up, and

103

we're gobbling up those locations." Milton also asserted that "we have exact costs for our customers" and "every contract we've been doing right now has been to where we get very good discounts, if not free for a lot of energy, you're talking about, you know, *$2 a kilogram*, buck, buck 50, buck 80."

349.    In that *Chartcast* podcast recorded on or about July 17, 2020 and published by the podcast on or about July 19, 2020, Milton also stated, among other things, that when Nikola first started, hydrogen production stations "were going to be 50 to 60 million," but now Nikola is "down to, you know, 14, 14 million bucks" due to the "standardization of a hydrogen station."

350.    On the same *Chartcast* podcast recorded on or about July 17, 2020 and published by the podcast on or about July 19, 2020, Milton stated that Nikola has been able to "*chop the cost of hydrogen from $16 per kilogram down to – we're down below $3 per kilogram* on our hydrogen right now: and that "*the standardization of the hydrogen station was the most important aspect*" of cost-saving."

351.    In the same *Chartcast* podcast on or about July 17, 2020, which was published by the podcast on or about July 19, 2020, Milton stated: "You have essentially 30, you know, you're almost, you, *you're 25, 30% less than a diesel engine to operate*, um, which is game over for diesel."

352.    The statements referenced in ¶¶348-351 were materially false and misleading for the reasons identified in ¶¶217 and 333.  These statements were also materially false and misleading because Defendants knew or recklessly disregarded but failed to disclose that Nikola had not achieved the cost reductions from the standardization of its hydrogen stations. Moreover, on July 20, 2020, Elizabeth Fretheim (Global Head, Business Development) emailed Defendants Russell, Brady and Worthen as well as Pablo Koziner

and the communications teams, acknowledging that Milton's statements that Nikola's "cost of hydrogen below $3/kg" was an "inaccuracy[y]."

353.    In the same *Chartcast* podcast on or about July 17, 2020, which was published by the podcast on or about July 19, 2020, Milton stated about the Nikola Tre: "We have the most advanced battery electric truck in the world. We have a truck coming into production right now with 720 kwh the largest battery we know of on a truck anywhere in the world coming into production. ***We have five of them coming off the assembly line right now in Ulm, Germany***. They'll enter production end of next year-ish, somewhere around there."

354.    The statement referenced in ¶353 was materially false and misleading because Defendants knew or recklessly disregarded but failed to disclose that Bosch, the company manufacturing the trucks, had not yet made any trucks. Indeed, the assembly line was not in fact operable and the facility was still under construction. As detailed in the USAO Presentation, Umran Ashraf (Global Head, Vehicle Engineering) stated, "[c]haracterization of the trucks as fully built was inaccurate. Nikola was shipping Tre components to Germany for assembly during July 2020. There was no 'assembly line in Ulm; there was a prototype shop." Vince Carmella (Global Head of Marketing) stated, "[t]his statement was premature. The trucks were being bult at this time, but none had been completed."

355.    On July 17, 2020, Nikola filed a form SEC Form S-1 in conjunction with a secondary public offering of common stock, consisting of 249,843,711 shares (the "July 2020 S-1"). The July 2020 S-1 was signed by defendants Milton, Girsky, Russell, and Brady.

356.    At pages 76 and 77 of the July 2020 S-1, under the heading "Nikola One and Two—Class 8 FCEV Trucks," Nikola stated, "The Nikola One (Class 8 sleeper cab) and Nikola Two (Class 8 day cab) are Nikola's FCEV trucks that are primarily designed for medium and long-haul applications….Nikola's FCEVs have an estimated range of up to 400 to 750 miles, designed to address the medium and long-haul market…. Production plans for the Nikola One will be announced once we have established a robust refueling infrastructure." This statement was materially false and misleading because it spoke of the Nikola Two and Nikola One on the same terms, as though both are fully designed, fully functional vehicles, and the Nikola One is simply awaiting an established refueling infrastructure to enter production. For the reasons explained in Sections V.A and V.B above, the Nikola One was a never-finished, never functional prototype whose development had  been shelved after its unveiling in December 2016.

357.    Also at page 77 of the July 2020 S-1, Nikola stated, "Recently we announced the Nikola Badger (the 'Badger'), an advanced zero-emission FCEV/BEV hybrid pickup truck. Unlike anything on the market, the Badger is designed to target and exceed every electric or fossil fuel pickup in its class." This statement was materially false and misleading because, as explained in Section V.II above, the Badger was little more than concept art in June 2020. The Badger was not then designed to do anything, let alone "exceed every electric or fossil fuel pickup in its class." There was no completed prototype for the vehicle.

358.    At page 78 of the July 2020 S-1, under the header, "First Test Station Installed at Nikola's  Phoenix HQ," Nikola stated, "[W]e have initiated the development of the hydrogen station infrastructure by completing our first 1,000 kg demo station in the first quarter of 2019 at our corporate headquarters in Phoenix, Arizona. The demo hydrogen

station offers hydrogen storage and dispensing and serves as a model for future hydrogen stations." This statement was materially false and misleading because the station built at the Company's corporate headquarters was riddled with design problems, as explained in Section VI above, and making it entirely unsuitable as a "model for future hydrogen stations." The Phoenix HQ dispensing station was not and could not serve as a "model" for Nikola's hydrogen station for the simple reason that it was never designed for and cannot produce hydrogen. Nikola at this point, as with the June 2020 S-1, had yet to produce any hydrogen, install any electrolyzers, or enter into power agreements or purchases of renewable energy generating equipment that would supply sufficient electricity if they had electrolyzers installed to create hydrogen. The use of below-utility-cost electricity to create hydrogen at scale was – as Nikola continued to emphasize – a key to their business plan. The Phoenix HQ dispensing platform could not and did not serve as a meaningful "model" of the hydrogen infrastructure Nikola repeatedly described.

359.    At page 81 of the July 2020 S-1, Nikola stated, "The current backlog of over 14,000 FCEVs non-binding reservations represents more than two years of production and over $10 billion of potential revenue. The FCEV reservation book was frozen in the fall of 2019 in order for Nikola to focus on negotiating with strategic fleet partners for launch." This statement was materially false and misleading for the reasons stated in ¶¶251-261.

360.    As further noted in ¶¶251-261 the use of the 14,000 FCEV backlog figure remains false and misleading. Earlier uses of the 14,000 reservations figure in the April 6 8-K and Proxy included the "~7900" reservations made in 2016 for the Nikola One. Any reference to a reservation for the Nikola One as an indication of demand is false and misleading because the Nikola One did not exist and has never existed as a product for sale. Demand for a non-existent product is not demand at all, potential or otherwise. There

is no indication from the S-1 the 14,000-reservation figure used here removed any of the previously counted reservations from the Nikola One. As it is the same number used in the April 6 8-,K Proxy, and June 15, 2020 S-1 and no communication or filing from Nikola indicated a new reservation or change in the reservation list since the April 6 8-K, Proxy, and June 15, 2020 S-1 a reasonable investor would assume it described the same reservations.

361.  On or about July 19, 2020, Milton stated on the *Jimmy Rex Show* podcast: "So we . . . had been working on it [the Badger] for a while. I decided to put my teams on it. We got it done."

362.  The statement referenced in ¶361 was materially false and misleading for the reasons identified in ¶¶235 and 244.

363.  On July 20, 2020, Nikola's stock price increased $10.39 per share, or 7.02%, above its closing price of $48.84 per share on the prior trading day, July 17, 2020.

364.  In late July 2020, when Nikola's stock price began to decline Milton contacted a Nikola senior executive to discuss the possibility of Milton buying shares of Nikola "for the company's health" because Nikola has had "zero news for two weeks and it's important to prevent our stock from losing credibility." Shortly thereafter, Milton began another "media blitz" to inflate Nikola's stock price.

365.  In an interview on the *This Week in Startups* podcast on or about July 31, 2020, Milton claimed that "what we did is *we've been able to drive hydrogen to under $4 a kilogram, we're about $3 a kilogram on hydrogen now.*" When asked by the host how Nikola got "from 14 to 3 – is there some special sauce there," Milton replied, "[y]eah, very simple. It's all about – *it's about standardization*. . . . So in America right now, there's no two hydrogen stations that were actually developed on the same platform, they're all

engineered from the ground up separately . . . . So we, we developed the first ever standard hydrogen station that can be produced in the thousands."

366.    The statement referenced in ¶365 was materially false and misleading for the reasons identified in ¶¶217 and 352.

367.    On or about July 31, 2020, Milton had the following exchange on the *This Week in Startups* podcast regarding Nikola's truck reservations:

> MILTON: Our margins are gigantic, and ***we have ten billion doll – ten – over ten billion dollars in preorder reservations like, like customers signed ready for us to deliver them trucks*** and it's –
>
> HOST: Letters of intent.
>
> MILTON: – it's just a great.
>
> HOST: – these are people who want to have -- what -- and why do those trucks – why do those shippers want to switch off diesel? Is it because of – they have goals in terms of greenhouse gases or is it they see this as the future and they wanna invest in it or is it cost?
>
> MILTON: No, real quick, I wanna correct something. ***Not letter of intents, they're actually contracts***. We've got –
>
> HOST: Contracts, got it.
>
> MILTON: ***Yeah, billions and billions of dollars with the contracts***. So I want to be clear about that 'cause ***a lot of people have thought that it's just like, a non-committal thing, it's not. These are like, sign on the dotted line, billions and billions and billions and billions of dollars in orders.*** Now, we have to deliver, and they can get out if we don't deliver, but that's how it is with any contract you do in life, like –
>
> HOST: Right.

368.    The statements referenced in ¶367 were materially false and misleading for the reasons identified in ¶250.

369.    On or about July 31, 2020, when asked on the *This Week in Startups* podcast, "[y]ou do make your own battery packs," Milton replied, "***we do make our own battery***

*packs, that's the key, that's the key element because of the cost.*"   Milton then went on to say that the "*battery pack is 30 percent of your vehicle's cost, or 40. So it's one of the most important things to actually bring in-house. And so we do make our own battery packs. The whole truck is our design, is our, is our build, but another manufacturer's gonna actually be spitting it out on their assembly line*." When the host then asked Milton if he "is gonna be in the battery business, you are gonna build battery packs," Milton replied that "[y]ou'll never make it as an OEM if you don't build your own battery. That's the most critical part." Milton also stated during the same podcast: "*the tech is ours. So the battery – like, all the important stuff like software, batteries, or, or eAxle designs, it just means we use someone else to, to build them in the thousands for us, but we own all the tech.*"

370.   The statements referenced in ¶369 were materially false and misleading for the reasons identified in ¶237.

371.   In an interview on the *Stockcast* podcast on or about July 31, 2020, Milton stated that "diesel's dead in the trucking world. And why is that? Because trucking operates on eight percent margins, somewhere around there. So, if you're eight percent less than diesel, it's already game over and so that's why it's so great. *We're almost 20 to 30 percent less than diesel right now and we're working on, you know, if we can get really good, if we can get down to two dollars a kilogram.*"

372.   The statements referenced in ¶371 were materially false and misleading for the reasons identified in ¶¶217 and 333.

373.   In an interview on the *Barron's Roundtable* show on Fox Business on or about August 1, 2020, Milton was asked by the anchor: "right now hydrogen, which powers

those cells is about four times as expensive as diesel. Why do you like fuel cells and how can you make this actually work?" Milton responded:

> Yeah, that's, uh, that was a big problem we tackled. That's why we came into the market. We saw an opportunity to bring the cost of hydrogen down going zero emission and **putting it on parity or lower than diesel**. And that's the first time in history that's been able to be done. So it went from about $16 a kilogram*, we're down now below $4 a kilogram and there's lots of reasons for that. But the main one is standardization of a hydrogen station worldwide has allowed us to drive that cost down dramatically*.

374.    On August 3, 2020, a Twitter user asked Milton to share how he reduced the price of hydrogen in a way that was "more technical than standardized stations." Milton replied: "Essentially, *$.04 kWh equals under $4 per kg. We are already locking in much lower than $.04 per kWh* on our stations going in as they are on freeways with 20 year PPA. That along with other things I mentioned get us below that."

375.    The statements referenced in ¶¶373-374 were materially false and misleading for the reasons identified in ¶¶217, 350 and 352.

376.    On August 3, 2020, Nikola's stock price increased $6.49 per share, or 21.63%, above its closing price of $30.00 per share on the prior trading day, July 31, 2020, which was an increase of $7.43 per share, or 25.56%, above its closing price of $$29.06 per share on July 30, 2020.

377.    Milton further clouded the true nature of the reservations by touting that the Company's production facilities were "sold out" for many years.  For example, in an interview on *Cheddar News* on or about August 5, 2020, in response to a question about how the pandemic impacted Nikola's order list, Milton claimed:

> Actually, as a matter of fact, you seen them increase. And I think they're – which is really strange. At first I thought, oh, man, I wonder what this is going to do to – to – you know, to the – to everything. I had no idea. I don't think anyone knew, right? And the orders actually came in – they've come in bigger and stronger, and *we've had to turn a lot of people away. So for*

111

*our hydrogen truck, we – we essentially have to pick and choose who we can work with because we're sold out for so many years*.

378.   The statements referenced in ¶377 were materially false and misleading for the reasons identified in ¶¶250 and 284.

379.   On August 4, 2020 Nikola filed its first Form 10-Q as a public company with the SEC for the period ending June 30, 2020 ("Q2 2020"). The Form 10-Q contained false and misleading statements and omitted to disclose material facts.

380.   With regard to orders for its FECV trucks, i.e., the Nikola One, Nikola represented that it "[i]n 2019, we stopped soliciting FCEV reservations." It continued that it "consider[s] the reservation list as an indication of potential demand rather than backlog for pending vehicle sales, as customers have not made firm commitments to order and take deliveries of vehicles and may cancel such reservations at any time." Q2 2020 at 37. Earlier in the Q2 2020, however, Nikola represented that "we expect the size of our committed backlog to be an important indicator of our future performance." *Id* at 26.

381.   Nikola's efforts to inform investors that its FCEV reservations were merely indications of potential demand were materially misleading. First, Nikola omitted to reveal that it did not have a working FCEV vehicle and that it had no ability to create hydrogen, much less on a commercially viable scale. This representation also directly conflicts with Milton's representations, just days earlier, where he said "these are actual contracts" and that "[t]hese are like, sign on the dotted line, billions and billions and billions and billions of dollars in orders." Second, Nikola misled investors by claiming its "backlog" was an important indicator of our future performance when, in fact, Nikola did not have the ability to create its FCEV model because of its inability to produce hydrogen at a cost effective price.

382.   The Q2 2020 also represented that "[o]n June 29, 2020 we began accepting non-binding reservations for the Badger . . ." This was materially misleading as the Badger was merely a concept vehicle at the time and "accepting reservations" implied that Nikola had a real product to sell when all it had was a concept of a product.

383.   Following a short period of stock price decline in August 2020, Milton sent a text message to a senior Nikola executive requesting to "talk strategy ASAP." Milton went on to say that the "continual stock decline is going to erode any confidence in our stock.  We have to do something . . . . We can't just sit here and watch it collapse."

384.   On August 10, 2020, Nikola announced that it had entered into an agreement with Republic Services ("Republic"), a publicly traded waste collection company, for an order of 2,500 to 5,000 trucks. On the same day, Milton tweeted from his personal account a link to Nikola's press release announcing the order and claimed that it was the *"[l]argest class 8 zero emission order in the industry 2,500 guaranteed."* In another tweet that same day from his personal account, Milton promoted his upcoming appearance on CNBC's *Fast Money* to discuss "the 2,500 – 5,000 (1-2 billion dollar) **binding** truck order!" Then, when he appeared on *Fast Money* on or about August 10, 2020, Milton again stated that the "contract" was *"worth about, between 1 and 2 billion dollars, um, they have the right – or they're obligated to buy up to 2,500 of these electric trash trucks, and they have the option to go up to 5,000."* Milton later referred to the billion plus dollar value of the Republic order in tweets from his personal account on August 16, 2020 and the *TD Ameritrade Network* interview on August 19, 2020, in which he referred to the order as "a couple-billion-dollar contract."

385.   The statements referenced in ¶384 that the order for 2,500 trucks was "guaranteed" and binding and that Republic was "obligated" to purchase at least 2,500

113

trucks for over $1 billion were false and misleading because they failed to disclose that under the terms of the agreement, which Milton personally negotiated, for Republic to incur any obligation, a series of conditions would have to be met, not all of which were even under Nikola's control.  Among the conditions was a requirement for Nikola to achieve multiple development milestones before Republic was obligated to order any trucks.  If Nikola did not meet the requirements for the initial phase, Republic had the right to terminate the agreement.  Moreover, if the parties could not agree on essential terms (including price, service and parts network, warranties, training program, and more), Republic had the ability to terminate the agreement anytime on 30 days' notice.  Finally, even if Nikola could meet all of those obligations, Republic still had the right to cancel its orders without liability or penalty as long as the delivery date was 120 days out.  Moreover, the agreement did not have a price term.  Rather, the agreement provided that the parties would negotiate the price later.  For this reason, Republic specifically made a request to Milton that Nikola not include any reference to price or value of the transaction in any press release announcing the transaction. Accordingly, it was false and misleading for Milton to describe this highly contingent and cancellable order as guaranteed, without any qualification. Milton knew or was reckless in not knowing these terms because he personally negotiated them.

386.   On August 10, 2020, Nikola's stock price increased $8.09 per share, or 22.03%, above its closing price of $36.72 per share on the prior trading day, August 7, 2020.

387.   On or about August 18, 2020, Nikola hosted a group of social-media influencers and content creators, including Tesla Joy, Lauren Kalo, and Sean Mitchell to Nikola's headquarters for a guided tour and Q&A with Milton. The tour and interview were

recorded by several of the participants, and recordings were subsequently posted publicly to YouTube, where they remained available to investors during the Class Period. On the recordings, Milton made several statements, including that the Nikola One was a "drivable truck"[42]:

> *[In 2016] we never put it under propulsion, but it was totally capable of driving, it had everything in it —power, steering, batteries—everything in it*, the e-axles, you know, in it. So, you know, this entire thing was designed to, uh… and the group that actually designed all of our e-axles with us in this vehicle was a group that Borg Warner eventually ended up buying…2016 is when we unveiled it. *So, this was totally capable of being driven*. We pulled all the parts out, displayed them to the public, and we got—I think you guys may have seen it, got hit with an article and said that the truck was a… was a lie and not really drivable truck. And there's some disgruntled employee that was feeding them fake stuff, um… guy named Jonathan, unfortunately…it was really hard for us because, like, no, *it's totally drivable*, we just didn't do it for safety.

388.    The statements referenced in ¶387 were materially false and misleading for the reasons identified in ¶¶211 and 215.

389.    In a YouTube video posted on or about August 24, 2020 on the Tesla Joy YouTube Channel, Milton stated: "So the things that we do insource is *all of our controls, all of our inverters . . . . All of that is actually done in-house in Nikola*. . . . . But what we do not do is manufacture those in mass production. *So we design and engineer them. . . . Same thing with our inverter. We designed our own inverter.* We actually have full prototypes here."

390.    The statements referenced in ¶389 were materially false and misleading for the reasons identified in ¶237.

---

[42] Ty Kara, *HUGE NIKOLA TOUR OF FACTORY (Trevor Milton meets the people of Tesla Twitter*, YouTube (August 19, 2020), https://www.youtube.com/watch?v=MXU8UVANDJU (accessed February 21, 2021). Note that this video depicts clips from a series of videos originally posted by invitee Lauren Kalo to her Twitter account on August 18-19, 2020. Ms. Kalo appears to have subsequently deleted her entire Twitter history prior to September 22, 2020 — approximately the same time that Defendant Milton deleted his personal Twitter and Instagram accounts.

115

391.    On September 8, 2020, Nikola and General Motors announced their strategic partnership pursuant to which General Motors would engineer and manufacture the Badger as well as make a $2 billion investment in Nikola exchange for an 11% stake in the Company.

392.    On September 8-9, 2020, Milton stated on Twitter that Nikola had "designed the Badger from a clean sheet," "built the [B]adger from the ground up," and that General Motors would "use Nikola's design, and engineer it to fit on the existing General Motors modular EV platform."

393.    On September 9, 2020, one day after Nikola and General Motors announced a strategic partnership pursuant to which General Motors would engineer and manufacture the Badger, Milton engaged on his personal Twitter account with a user who commented that the Badger is "[n]ot Nikola, but a General Motors Badger. The unveiling at Nikola World will not even be the truck being sold, only the dream of what could have been. . . ." Milton replied: "***Actually it is the truck being sold. It's all Nikola. Sharing parts has nothing to do with who's [sic] truck it is. . . .***"

394.    On September 9, 2020, Milton stated on the *TD Ameritrade Network*: "So this is how it works, ***we actually build the Nikola Badger from the ground up ourselves, the whole thing*** . . . ." In response to a question about "what's the important IP that's coming from you guys," Milton stated:

> Yeah, the battery supply from the sale comes from GM, the cells and the module. ***The rest of the vehicle, like the over-air updating, the software, the controls, the infotainment, the design of the vehicle, the cab, the interior of the cab, even the, even the driver profile, we've been all the way down to suspension, that all comes from Nikola***, with some support of GM's integration team, but GM's gonna handle the, they've already built a multi-billion dollar platform for their electric truck platform, so we've, ***we've took our technology and our existing Badger, we overlaid it on theirs***, used what we could, implemented theirs, and then we built the rest around, um, around

116

ours. So ***it's probably 70 percent Nikola 30 percent GM when it comes to, um, the parts that are really important to us*** . . . .

395.   The statements referenced in ¶¶391-394 were materially false and misleading for the reasons identified in ¶¶235, 237 244 and 284. Further, the statements that the versions of the Badger that General Motors had agreed to build would be "70 percent Nikola" were materially false and misleading because Defendants knew or recklessly disregarded but failed to disclose that General Motors planned to use nearly all of its own parts and components to build the Badger, except for the general aesthetic and potentially the infotainment system. With the possible exception of the infotainment system, there was no plan to use any parts over which Nikola had intellectual property rights. No one at General Motors ever saw the Badger prototypes that Nikola had been working on and they were not part of GM's engineering or development plans.

396.   On September 8, 2020, Nikola's stock price increased $14.50 per share, or 40.79%, above its closing price of $35.55 per share on the prior trading day, September 4, 2020.

## THE TRUTH BEGINS TO EMERGE AS DEFENDANTS CONTINUE TO MISLEAD INVESTORS

397.   On September 10, 2020, Hindenburg published the Hindenburg Report entitled, "Nikola: How to Parlay An Ocean of Lies Into a Partnership With the Largest Auto OEM in America."  Asserting that it had gathered "extensive evidence—including recorded phone calls, text messages, private emails and behind-the-scenes photographs," Hindenburg represented that it had identified "dozens of false statements by" Milton, which had led Hindenburg to conclude that Nikola "is an intricate fraud built on dozen of lies over the course of . . . Milton's career."  For example, the Report alleged, *inter alia*:

> We reveal how, in the face of growing skepticism over the functionality of its truck, Nikola staged a video called "Nikola One in Motion" which showed

the semi-truck cruising on a road at a high rate of speed. Our investigation of the site and text messages from a former employee reveal that the video was an elaborate ruse—Nikola had the truck towed to the top of a hill on a remote stretch of road and simply filmed it rolling down the hill.

In October 2019, Nikola announced it would revolutionize the battery industry. This was to be done through a pending acquisition, but the deal fell through when Nikola realized (a) the technology was vaporware and (b) the President of the battery company had been indicted months earlier over allegations that he conned NASA by using his expense account to procure numerous prostitutes.

. . .

Inexpensive hydrogen is fundamental to the success of Nikola's business model. Trevor has claimed in a presentation to hundreds of people and in multiple interviews to have succeeded at cutting the cost of hydrogen by ~81% compared to peers and to already be producing hydrogen. Nikola has not produced hydrogen at this price or at any price as he later admitted when pressed by media.

. . .

Trevor claims Nikola designs all key components in house, but they appear to simply be buying or licensing them from third-parties. One example: we found that Nikola actually buys inverters from a company called Cascadia. In a video showing off its "in-house" inverters, Nikola concealed the Cascadia label with a piece of masking tape.

. . .

Nikola's much-touted multi-billion dollar order book is filled with fluff. U.S. Xpress reportedly accounts for a third of its reservations, representing ~$3.5 billion in orders. U.S. Xpress had only $1.3 million in cash on hand last quarter.

. . .

Trevor has ensured he is not going down with the ship.  He cashed out $70 million around the IPO and amended his share lock-up from 1-year to 180 days. If he is fired, his equity awards immediately vest and he is entitled to collect $20 million over two years. Milton has laid the groundwork to extract hundreds of millions from Nikola years before ever delivering on his promises.

Defendant Milton made these misrepresentations, the Report suggested, to substantially grow the Company and secure partnerships with top auto companies.

118

398.    The Report was written by Hindenburg Research.  Hindenburg Research is an investment research firm founded in 2017 by Nate Anderson, CFA, CAIA specializing in forensic financial research.[43]

399.    In connection with creating its forensic Report, Hindenburg "gathered extensive [public and non-public] evidence—including recorded phone calls, text messages, private emails and behind-the-scenes photographs—detailing dozens of false statements by Nikola Founder Trevor Milton." Hindenburg spoke with multiple whistleblowers, business partners and former employees of Nikola as well as reviewed extensive internal documentation from Milton's ventures leading up to Nikola. The Report states, "[t]o the best of our ability and belief, all information contained herein is accurate and reliable…"

400.    On this news, Nikola's stock price fell $4.80 per share, or 11.33%, to close at $37.57 per share on September 10, 2020.

401.    On September 11, 2020, Nikola's stock price continued to fall, falling $5.44 per share, or 14.5%, to close at $32.13 per share on September 11, 2020.

402.    Various analysts (including those from S3 Analytics, Deutsche Bank Research, and RBC Capital Markets) issued reports attributing Nikola's stock price decline to the information revealed in the Hindenburg Report.

403.    On September 14, 2020, before the market opened, Nikola unequivocally denied the allegations in the Hindenburg Report, asserting that the allegations themselves were "false and misleading," "false and defamatory," and "designed to provide a false impression to investors and to negatively manipulate the market in order to financially benefit short sellers, including Hindenburg itself."

---

[43] Hindenburg Research, About Us, https://hindenburgresearch.com/about-us/ (last visited January 12, 2021).

404.   The statements referenced in ¶403 were materially false and misleading for the reasons identified in ¶¶202, 204, 211, 215, 217, 219, 227, 235, 237, 244, 250, 252, 284 and 333.  The Company has since admitted that many of the allegations in the Hindenburg Report were true.

405.   Also on September 14, 2020, Nikola filed form 8-K with the SEC ("the September 14 8-K"). The September 14 8-K was signed by Defendant Worthen.

406.   In the September 14 8-K, Nikola again claimed "The Nikola One is a real truck that sits in Nikola's showroom." Nikola went further to claim that the Nikola One is not a "pusher" as alleged in the Hindenburg Report, because a "pusher means a vehicle not designed to be moved on its own propulsion system." Nikola goes on to describe the functionality of the Nikola One:

**Gearbox** was functional and bench tested prior to installation.
**Batteries** were functional.
**Inverters** functioned and powered the motors on a bench test prior to the show.
Power steering, Suspension, Infotainment, Air Disc Brakes, High Voltage, and Air Systems were all functional.

407.   The statements referenced in ¶405 were materially false and misleading for the reasons identified in ¶¶211 and 215. As described in Sections V.A and V.B, the Nikola One's systems were powered via an electrical outlet in the floor that was plugged in for the entirety of its demonstration, and the only source of electrical power in what Nikola insisted on calling a vehicle. The Nikola One has never moved under its own power, at the demonstration show or after.

408.   The September 14 8-K also claims:

Nikola described this third-party video on the Company's social media as "In Motion." It was never described as "under its own propulsion" or "powertrain driven." Nikola investors who invested during this period, in

120

1

which the Company was privately held, knew the technical capability of the Nikola One at the time of their investment.

2

3

409.    As described in Sections V.A and V.B and ¶¶211 and 215, Nikola repeatedly

4

described the capabilities and status in false or misleading terms to investors before and

5

during the Class Period. The Nikola One was advertised to investors by Milton repeatedly and as a functional product in SEC filing as recently as July 17, 2020 S-1.

6

7

410.    On Nikola's fierce denials of any wrongdoing, Nikola's stock price increased

8

$3.66 per share, closing at $35.79 on September 14, 2020, an 11.39% increase from its previous close on September 11, 2020.

9

10

411.    On September 14, 2020, after the market had closed, *Bloomberg* reported

11

that the SEC was investigating Nikola in connection with the allegations in the Hindenburg Report.

12

13

412.    In response to Nikola's denials, on September 15, 2020, Hindenburg

14

Research issued a 25-page rebuttal report, which argued that Nikola had "debunked nothing" and had "either confirmed or sidestepped virtually everything we wrote about,

15

and in some cases raised new unanswered questions."

16

17

413.    Also, on September 15, 2020, during intra-day trading, the *Wall Street Journal* reported that the DOJ had joined the SEC's investigation of Nikola.

18

19

414.    On this news, Nikola's stock fell another $2.96 per share, closing at $32.83 on September 15, 2020, an 8.27% decline from its previous close on September 14, 2020.

20

21

415.    On Sunday September 20, 2020, Nikola announced that Milton had resigned from his position as Executive Chairman and from the Board of Directors.

22

23

416.    On this news, Nikola's stock fell another $6.60 per share, closing at $27.58

24

on Monday September 21, 2020, a 19.33% decline from its previous close on Friday September 18, 2020.

25

26

121

417.    On September 23, 2020, *The Wall Street Journal* and *Dow Jones Newswires* reported that talks between Nikola and several potential partners, including British Petroleum ("BP") to build hydrogen-refueling stations stalled "following allegations the company had misled investors."

418.    On this news, Nikola's stock fell another $7.36 per share, closing at $21.15 on September 23, 2020, a 25.82% decline from its previous close on September 22, 2020.

419.    On September 29, 2020, *Reuters* reported that General Motors and Nikola would not finalize their deal to jointly build electric pickup trucks and hydrogen fuel cell tractor-trailers by the previously announced target date of September 30, with General Motors stating that it was "continuing our discussions with Nikola." And CNBC reported "General Motors and Nikola are not expected to finalize a $2 billion deal scheduled to close before Wednesday after allegations of fraud and sexual abuse surfaced against the embattled start-up's founder and former executive chairman, Trevor Milton, according to two people familiar with the negotiations."

420.    On this news, Nikola's stock fell another $1.42 per share, closing at $17.88 on September 29, 2020, a 7.36% decline from its previous close on September 28, 2020.

421.    On October 16, 2020, various news organizations reported that Nikola's new CEO, Defendant Russell, stated in an interview that Nikola had a plan in place to go it alone if deal talks with General Motors fall through and downplayed the role of Badger in the company's business.

422.    On this news, Nikola's stock fell another $3.75 per share, closing at $19.55 on October 16, 2020, a 16.12% decline from its previous close on October 15, 2020. *Fortune* reported "Nikola shares sank as much as 16% in Friday trading after the electric-

truck startup's chief executive officer said he sees a path for his company even if it can't come to terms with General Motors on a proposed strategic partnership."

423.   On November 13, 2020, Nikola gave a presentation to General Motors concerning the "Phase I" investigation conducted by the Company following the Hindenburg Report and the investigations launched by various government entities. The presentation included admissions that Milton had made numerous false and misleading statements concerning Nikola.

424.   On November 24, 2020, after the market closed, Nikola CEO Russell appeared on CNBC's "Mad Money" and did not reassure investors that the partnership with General Motors would still go through.

425.   On this news, Nikola's stock fell another $4.26 per share, closing at $30.24 on November 25, 2020, a 12.35% decline from its previous close on November 24, 2020. CNBC reported "Shares of embattled electric vehicle start-up Nikola Corp. fell by as much as 17.4% during trading Wednesday [11/25] morning after CEO Mark Russell failed to reassure investors that the company's $2 billion deal with General Motors would still go through."

426.   On November 30, 2020, Nikola announced that the deal announced on September 8, 2020 with General Motors (in which General Motors would engineer and build the Nikola Badger and make a $2 billion investment in exchange for an 11% stake in Nikola) had fallen through and that the companies had instead signed a much smaller, scaled-back, agreement in which General Motors would only supply its Hydrotec fuel-cell system for certain of Nikola's vehicles and take no ownership interest in Nikola. As a result, Nikola also announced that it was scrapping the Badger vehicle.

427.    On this news, Nikola's stock fell another $7.52 per share, closing at $20.41 on November 30, 2020, a 26.92% decline from its previous close on Friday November 27, 2020. Nikola stock continued to decline another $3.04, closing at $17.37 on December 1, 2020, a 14.89% decline from its previous close on November 30, 2020, for a two-day decline of $10.56 per share, a 37.80% decline from its close on Friday November 27, 2020. Headlines stating: "Nikola Shr Slides 27% after GM Scraps Investment Plan," "GM pulls pin on electric ute," Nikola tumbles after GM drops equity tie…," "GM abandons plan to take equity stake in Nikola" made clear that the deal fell apart because of Defendants' fraud. As *The New York Times* reported: "Nikola…had made a big splash on Wall Street, announced a broad alliance with General Motors in September that promised to give the company critical technology, financial support and credibility with investors. But the news was quickly overtaken by claims that Nikola had exaggerated tis capabilities, and the firm's founder resigned. Investors were left to wonder whether Nikola was indeed an automotive innovator and whether G.M. had made an embarrassing mistake in associating with the start-up."

428.    On December 23, 2020, various news organizations reported that Republic had canceled its order for 2,500 battery-powered electric trucks, which had been announced in August 2020.

429.    On this news, Nikola's stock fell another $1.80 per share, closing at $15.03 on December 23, 2020, a 10.70% decline from its previous close on December 22, 2020. Nikola's stock declined another $1.28 per share, closing at $13.75 on December 24, 2020, an 8.52% drop from its close on December 23, 2020, for a two-day decline of $3.08 per share, an 18.30% decline from its close on December 22, 2020. CNBC reported "Nikola shares slide after deal ends for electric garbage trucks with Republic Services" and *Fortune*

reported "It doesn't take much reading between those lines to infer that Nikola may have overpromised what it was capable of. That would align with the company's track record."

430. On February 25, 2021, after the close of trading, Nikola filed its Form 10-K for the year ended December 31, 2020. In the filing, Nikola admitted that the following statements Milton made that were highlighted in the report released by the financial research firm were "inaccurate in whole or in part, when made:"

      (a)    in July 2016, the Company stated that it owned rights to natural gas wells, and in August 2016 that the wells were used as a backup to solar hydrogen production;

      (b)    in August 2016, Milton and the Company stated that the Company had engineered a zero emissions truck;

      (c)    in December 2016, Milton stated that the Nikola One was a fully functioning vehicle;

      (d)    that an October 2017 video released by the Company gave the impression the Nikola One was driven;

      (e)    in April 2019, Milton stated that solar panels on the roof of the Company's headquarters produce approximately 18 megawatts of energy per day;

      (f)    in December 2019 and July 2020, Milton stated that the Company "can produce" over 1,000 kg of hydrogen at the Company's demo stations and that the Company was "down below" $3/kg at that time;

      (g)    in July 2020, Milton stated that "all major components are done in house"; he made similar statements in June 2020;

      (h)    in July 2020, Milton stated that the inverter software was the most advanced in the world and that other OEMs had asked to use it; and

      (i)    in July 2020, Milton stated that five trucks were "coming off the assembly line" in Ulm, Germany.

431. On this news, Nikola's stock fell another $1.62 per share, closing at $18.10 on February 26, 2021, an 8.22% decline from its previous close on February 25, 2021.

125

432.    On July 29, 2021, numerous news outlets reported that Milton had been indicted on three counts of fraud by the U.S. Attorney's Office in Manhattan for making deceptive and false claims to investors regarding "nearly all aspects of the business." The indictment said that, from November 2019 to September 2020, Milton schemed to defraud investors into buying Nikola shares through statements about the Company's product and technology development. The SEC also filed related civil charges. In response to the indictment, Milton stated that they were "false allegations."

433.    On this news, Nikola's stock fell another $2.16 per share, closing at $12.03 on July 29, 2021, a 15.22% decline from its previous close on July 28, 2021. Nikola's stock continued to steadily decline another $1.88 per share, or 15.62%, over the next several days to close at $10.15 per share on August 5, 2021, as investors absorbed the lengthy and detailed indictment and SEC complaint, which totaled over 100 pages.

434.    In total, Nikola stock plummeted a total of 76% during the time period between the date of the Hindenburg Report and the days after Milton's indictment.

435.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## ADDITIONAL INDICIA OF SCIENTER

436.    Defendants Russell, Brady, Worthen, Girsky and Shindler were active and culpable participants in the fraud, as evidenced by their knowing and reckless issuance and/or ultimate authority over Nikola's and Milton's materially false or misleading statements and omissions. Defendants Russell, Brady, Worthen, Girsky and Shindler acted with scienter in that they knew or recklessly disregarded that the public statements more specifically set forth above were materially false or misleading when made, and knowingly

1    or recklessly participated or acquiesced in the issuance or dissemination of such statements

2    as primary violators of the federal securities laws. Russell, Brady, Worthen, Girsky and

3    Shindler knew Milton was making materially false and misleading statements and failed to

4    correct those statements in any of the filings made with the SEC during the Class Period.

5    In addition to the numerous allegations above setting forth Defendants' knowledge or

6    reckless disregard of the Company's claims about: the Nikola One; the existence of

7    purchase orders for its non-existent products; Nikola's hydrogen production capabilities

8    and network; the supposed cost of owning and operating the Nikola One compared to a

9    traditional diesel powered truck; Nikola's development of the Badger One using its own

10   technology and pre-orders for the truck; Nikola's development of its own proprietary

11   electric battery, Defendants' scienter is further evidenced by the following facts.

12
     **D.    Tesla's Production of FCEV/BEV Vehicles and Hydrogen Fuel,
            Batteries, and Fueling Stations Were Nikola's Core Operations
13          Supporting a Strong Inference of Scienter**

14          437.    The Individual Defendants' knowledge (*i.e.* scienter) of Nikola's inability to

15   produce or manufacture many of its primary, revenue-generating products can be inferred

16   because these facts were critical to Nikola's core operations.  For example, in the June

17   2020 S-1, Nikola touted the importance of both their future FCEV/BEV sales and hydrogen

18   technology and infrastructure as "***core***" to the Company's ongoing success and a "***key***

19   ***differentiator***":

20          ***Our core product offering*** is centered around our battery-electric vehicle
            ("BEV") and hydrogen fuel cell electric vehicle ("FCEV") Class 8 semi-
21          trucks. ***The key differentiator of our business model*** is our planned network
            of hydrogen fueling stations. We are offering a revolutionary bundled lease
22          model, which provides customers with the FCEV truck, hydrogen fuel, and
            maintenance for a fixed price per mile, locks in fuel demand and significantly
23          de-risks infrastructure development.

24

25

26                                           127

438.     Similarly, in a press release on June 3, 2020, the day before the beginning of the Class Period, Nikola claimed that sales of its purportedly technologically advanced products would generate billions in revenues in the future thereby serving as a critical source of income for the Company and its shareholders. Specifically, the June 3, 2020 press release noted "***pre-orders represent more than $10 billion in potential revenue***" and that "***Nikola's hydrogen network anticipated to cover North America; set to become the largest hydrogen network in the world***."

439.     It was thus critical for Defendants to ensure that the Company's "core product"—vehicles that were supposed to generate "$10 billion in potential revenue"— and "key differentiator"—hydrogen products that would "cover North America and become the largest hydrogen network in the world"— were actually real and operable products. It would be absurd to suggest that Defendants simply did not know about the fact that the FCEV/BEV and hydrogen technology and infrastructure they were touting to the market were in fact non-operable and that the commercial prospects (and revenues) potentially generated from those products were not grounded in reality.

440.     Because Nikola knew that it faced severe adverse consequences if its "core" vehicle and "key differentiator" hydrogen products did not operate or generate the revenues they promised to investors the operability and viability of those products were vital to Nikola's continued operational success.

441.     Defendants repeated false and misleading statements about those products therefore concerned a core operation of Nikola financial services business.  Accordingly, knowledge that Nikola's products were not operational or capable of generating the revenues or sale touted by the Company can be imputed to Defendants Russell, Brady, Worthen, Girsky and Shindler.

1

**E.      Defendants' Statements Themselves Support a Strong Inference of Scienter**

2

442.    As discussed above, prior to and during the Class Period, in addition to

3

speaking at length about the technology and components underlying Nikola's FCEV/BEV

4

products and hydrogen fuel, batteries, and infrastructure, Defendants also made detailed

5

statements that included mathematical and scientific quantifications about the capabilities

6

of their supposedly operable vehicles and purportedly viable hydrogen products.

7

443.    These statements, and others like them, provide a strong inference that

8

Defendants knew they were misleading the market.  At all points prior to and during the

9

Class Period, Defendants had an informational advantage over the market as they were the

10

ones involved with the production of Nikola's FCEV/BEV and hydrogen products.

11

Accordingly, Defendants knew that either their statements were false and/or misleading

12

when made, or were reckless in not knowing, because unlike investors, they had access to

13

internal information relating to Nikola's product and indeed knew that they could not

14

achieve the quantifiable metrics they touted because, in reality, they were not operable at

15

the time to the extent touted to the market.

16

444.    For example, prior to and during the Class Period, Defendants quantified the

17

capabilities of its products in real terms stating, for example:

18

- *"Nikola's battery electric trucks could now drive 800 miles fully loaded between charges"* and *"hydrogen-electric fuel cell trucks could surpass 1,000 miles between stops and top off in 15 minutes*

19

20

- *We have 3.5 megawatts of solar up on the roof producing about 18 megawatts of energy a day in our headquarters . . .*

21

22

- Nikola's new HQ in Phoenix. 150,000 sq. ft. 13 Acres. 300+ employees. *1,000 kilogram hydrogen production and storage. Zero emissions with up to 3 megawatts of solar and 20 megawatt hour lithium storage*.

23

24

25

26

- (*"[y]ou're talking 600+ mile range in a model 3 Tesla. You're talking 50% less cost than Lithium Ion. You're talking mass adoption of zero emission vehicles. Could be worth hundreds of billions if owned by one company but we decided to share it with the competition for greater good."*).

  ...

  *"It's real. I've seen it with my own eyes and watched them cycle."*

- *Once we got the technology nailed down, we actually have over 2,000 cycles on our battery, which would mean it would be more than a million-mile battery. It would actually – our battery beats the Tesla battery in every metric, in every situation, and it's half the cost and it's double the range.*

- *But what Nikola solved was the cost-- was the economics on the trucking. When we first started, hydrogen was $16 a kilogram. We can now produce it for well under $4 a kilogram. So we've cut – it's one quarter of the cost now than it was just a few years ago.  And we're now cheaper to operate per mile than diesel.*

- *So we own all the tech. So all the cool stuff you guys want, the design, the inside, the connectivity with your phone . . . all the e-axles or, you know the electric motors, the batteries, the controls, all that's done by Nikola. . .*

445.    These statements and others like them which touted concrete, quantifiable performance metrics, when in fact such performance either could not be met or did not even exist demonstrate that Defendants were aware of the Company's inability to manufacture the products it touted to the market or were reckless in not becoming aware of such process prior to speaking publicly to investors about the products.

**F.    Defendant Milton's Deletion of His Twitter Account Supports a Strong Inference of Scienter**

446.    On or about September 23, 2020, less than two weeks after the publication of the Hindenburg Report and announcement of investigations by the SEC and DOJ, Defendant Milton deleted his personal Twitter account.

447. Milton's deletion of his Twitter account following the announcement of multiple federal investigations into statements he made on that account further supports an inference of scienter. Dozens of Milton's false and misleading statements were published on his Twitter account. His sudden deletion of his entire account in the wake of accusations of wrongdoing and federal investigations, after being an avid user of Twitter, suggests that Milton deleted the account in an attempt to destroy evidence of his fraud.

**G.    Defendants Russel and Brady's SOX Certifications Support a Strong Inference of Scienter**

448. Finally, accompanying Nikola's Form 10-Q filed with the SEC on August 4, 2020, which contained materially false and misleading statements, Defendants Russell and Brady executed certifications, respectively, pursuant to Sarbanes-Oxley Act of 2002 ("SOX") Section 302 attesting to the accuracy of the filing and its contents and the disclosure of all fraud. Specifically, the certifications required that Defendants Russell and Brady attest to the fact that "th[e] report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by th[e] report."

449. Defendants Russell and Brady also executed certifications pursuant to SOX Section 906, which accompanied the August 4, 2020 10-Q, attesting that the "[t]he information contained in the [reports] fairly presents, in all material respects, the financial condition and results of operations of the Company."

450. By signing these certifications, Defendants Russell and Brady evidenced their access (and purported review of) Nikola's operations as well as the materially false and misleading statements set forth above.  However, based on the allegations set forth above, it is apparent that such a review would have uncovered the fact that many of the

131

Company's claims about their FCEV/BEV vehicles and hydrogen technology and production capabilities were false.

451.    Had Defendants Russell and Brady actually conducted the assessments and evaluations required by SOX, they would have discovered Nikola's misrepresentations and omissions regarding their FCEV/BEV and hydrogen capabilities.    Accordingly, Defendants Russell and Brady, knew, or at the very least, were severely reckless in not knowing of the facts which rendered their public statements materially false and misleading.

## LOSS CAUSATION

452.    Prior to and during the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Nikola and operated as a fraud or deceit on Class Period purchasers of Nikola common stock by failing to disclose and misrepresenting the adverse facts detailed herein.

453.    Class members unknowingly and in reliance upon Defendants' materially false or misleading statements and/or omissions (prior to and during the Class Period) purchased Nikola common stock at artificially inflated prices.    But for Defendants' misrepresentations, omissions, and fraudulent scheme, Lead Plaintiffs and other Class members would not have purchased Nikola common stock at the artificially inflated prices at which it traded during the Class Period.

454.    The truth regarding Defendants' fraud was revealed in a series of corrective disclosures and/or materializations of concealed risk that occurred between September 9, 2020 and July 29, 2021.    During this time, the price of Nikola common stock fell precipitously as the artificial inflation caused by Defendants' unlawful conduct exited Nikola common stock.    It was not until the corrective disclosure and/or materialization of

concealed risk on July 29, 2021 that the full truth was known to the market, such that there was no longer any artificial inflation in the price of Nikola common stock attributable to the fraud.

455.    The decline in the price of Nikola common stock during this period is directly attributable to the market absorbing information that corrected and/or reflected the materialization of risks concealed by the Defendants' material misrepresentations or omissions prior to and during the Class Period.

456.    As a result of their purchases of Nikola common stock during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss (*i.e.*, damages) under the federal securities laws.  Defendants' materially false and misleading statements had the intended effect and caused Nikola common stock to trade at artificially inflated levels throughout the Class Period and, in certain instances, caused inflation in Nikola's stock price.

457.    By concealing from investors the adverse facts detailed herein, Defendants presented a false and misleading picture of Nikola's business.  As the truth about the Company and the extent of the fraud was revealed to the market, the price of Nikola common stock fell significantly.  This decline removed the inflation from the price of Nikola common stock, causing real economic loss to investors who had purchased Nikola common stock during the Class Period.

458.    Moreover, the market for Nikola common stock was open, well-developed, and efficient at all relevant times.  As a result of Defendants' misstatements and material omissions, as alleged herein, Nikola common stock traded at artificially inflated prices. Lead Plaintiffs and other Class members purchased Nikola common stock relying upon the

integrity of the market relating to Nikola common stock and suffered economic losses as a result thereof.

**A.    September 10-11, 2020 – First Partial Corrective Disclosure/Materialization of the Risk**

459.    On September 10, 2020, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions prior to and during the Class Period were partially revealed and/or materialized when Hindenburg published the Hindenburg Report. Asserting that it had gathered "extensive evidence—including recorded phone calls, text messages, private emails and behind-the-scenes photographs," Hindenburg represented that it had identified "dozens of false statements by" Milton, which had led Hindenburg to conclude that Nikola "is an intricate fraud built on dozen of lies over the course of . . . Milton's career."   Defendant Milton made these misrepresentations, the Report suggested, to substantially grow the Company and secure partnerships with top auto companies.

460.    This news was widely reported to the market.  For example, on September 10, 2020 Reuters published a news article discussing the Hindenburg Report and noting that Hindenburg had "gathered enough evidence to show that Milton made false statements to form partnerships with large automakers."   Similarly, the same day MarketWatch published an article covering the Hindenburg Report and the "intricate fraud" alleged therein and quoted a Nikola spokesperson downplaying the contents of the report stating "Nikola has been vetted by some of the world's most credible companies and investors" and "[w]e are on a path to success and will not waver based on a report filled with misleading information attempting to manipulate our stock."

461.    The September 10, 2020 publication of the Hindenburg Report, and the related news coverage reporting on Nikola's representations about its production

134

capabilities, products, technological advancements, and commercial prospects, was a foreseeable consequence of, and within the zone of the risk concealed by, the Defendants' misrepresentations and omissions.

462.    Moreover, the September 10, 2020 disclosures revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market.  The publication of the Hindenburg Report and accompanying reports revealed the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions touting the Company's production capabilities, products, technological advancements, and commercial prospects as Defendants claimed.  Instead, the event and accompanying reports revealed that Nikola was not able to produce many of the products it claimed to manufacture and lacked the financial prospects it touted to investors.

463.    As a direct and proximate result of this corrective disclosure and/or materialization of the foreseeable risks concealed by Defendants' fraud, the price of Nikola common stock declined $4.80 per share, or 11.33%, to close at $37.57 per share on September 10, 2020.

464.    On September 11, 2020, Nikola's stock price continued to fall in response to the news, falling another $5.44 per share, or 14.5%, to close at $32.13 per share on September 11, 2020.

465.    The decline in Nikola's common stock price on September 10, 2020 and September 11, 2020 were a direct result of the nature and extent of Defendants' prior misstatements and omissions being revealed to investors.  The timing and magnitude of the Nikola common stock price decline evidences the impact Defendants' statements had on the Company's stock price during the Class Period and negate any inference that the loss

suffered by Lead Plaintiffs and other Class members was caused by changed market conditions or macroeconomic, industry, or Company-specific factors unrelated to Defendants' fraudulent conduct.

466.    On September 14, 2020, before the market opened, Nikola issued a statement that unequivocally denied the allegations in the Hindenburg Report, asserting that the allegations themselves were "false and misleading," "false and defamatory," and "designed to provide a false impression to investors and to negatively manipulate the market in order to financially benefit short sellers, including Hindenburg itself."

467.    On Nikola's fierce denials of any wrongdoing, Nikola's stock price increased $3.66 per share, closing at $35.79 on September 14, 2020, an 11.39% increase from its previous close on September 11, 2020.

**B.    September 14-15, 2020 – Second Partial Corrective Disclosure/Materialization of the Risk**

468.    On September 14, 2020, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions prior to and during the Class Period were partially revealed and/or materialized when, after the market had closed, *Bloomberg* reported that the SEC was investigating Nikola in connection with the allegations in the Hindenburg Report.

469.    The next day, on September 15, 2020, during intra-day trading, the Wall Street Journal reported that the DOJ had joined the SEC's investigation of Nikola.  Also, during the trading day, CNBC published an article noting explaining that the "SEC and DOJ are reportedly looking into the merits of a short seller's claims that electric vehicle manufacturer Nikola misled investors."

470.   The same day, Hindenburg issued also a 25-page rebuttal report, which argued that Nikola had "debunked nothing" and had "either confirmed or sidestepped virtually everything we wrote about, and in some cases raised new unanswered questions."

471.   The *Bloomberg* article, Hindenburg rebuttal report and the related news coverage reporting on SEC and DOJ investigations into Nikola's false representations to investors, was a foreseeable consequence of, and within the zone of the risk concealed by, the Defendants' misrepresentations and omissions.

472.   Moreover, the September 14-15, 2020 disclosures revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market.  The *Bloomberg* article, Hindenburg rebuttal report and related news reports revealed the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions touting the Company's production capabilities, products, technological advancements, and commercial prospects as Defendants claimed.  Instead, the *Bloomberg* article, Hindenburg rebuttal report and accompanying reports revealed that Nikola was not able to produce many of the products it claimed to manufacture and lacked the financial prospects it touted to investors.

473.   As a direct and proximate result of this corrective disclosure and/or materialization of the foreseeable risks concealed by Defendants' fraud, the price of Nikola common stock declined by $2.96 per share, closing at $32.83 on September 15, 2020, an 8.27% decline from its previous close on September 14, 2020.

474.   The decline in Nikola's common stock price on September 15, 2020 was a direct result of the nature and extent of Defendants' prior misstatements and omissions being revealed to investors.  The timing and magnitude of the Nikola common stock price decline evidences the impact Defendants' statements had on the Company's stock price

during the Class Period and negate any inference that the loss suffered by Lead Plaintiffs and other Class members was caused by changed market conditions or macroeconomic, industry, or Company-specific factors unrelated to Defendants' fraudulent conduct.

### C. September 20-21, 2020 – Third Partial Corrective Disclosure/Materialization of the Risk

475.    On Sunday September 20, 2020, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions prior to and during the Class Period were partially revealed and/or materialized when Nikola announced that Defendant Milton had resigned from his position as Executive Chairman and from the Board of Directors.

476.    The news of Milton's retirement was widely reported to the market.  For example, on September 21, 2021 during intra-day trading, Barron's published an article entitled "Nikola Founder Trevor Milton Is Out. Wall Street Tries to Make Sense of the Chaos" which explained that the resignation caused analysts to lower their price targets stating "[n]ow Wall Street is weighing in. Some price targets are coming down, but no one has cut their stock rating."

477.    The September 20, 2020 resignation, and the related news coverage was a foreseeable consequence of and within the zone of the risk concealed by Defendants' misrepresentations and omissions.

478.    Moreover, the September 20, 2020 disclosures revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market.  Milton's resignation and accompanying reports revealed the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions touting the Company's production capabilities, products, technological advancements, and commercial prospects as Defendants claimed.  Instead,

138

the event and accompanying reports revealed that Nikola was not able to produce many of the products it claimed to manufacture and lacked the financial prospects it touted to investors.

479.   As a direct and proximate result of this corrective disclosure and/or materialization of the foreseeable risks concealed by Defendants' fraud, the price of Nikola common stock declined by $6.60 per share, closing at $27.58 on Monday September 21, 2020, an 19.33% decline from its previous close on Friday September 18, 2020.

480.   The decline in Nikola's common stock price on September 21, 2020 was a direct result of the nature and extent of Defendants' prior misstatements and omissions being revealed to investors.  The timing and magnitude of the Nikola common stock price decline evidences the impact Defendants' statements had on the Company's stock price during the Class Period and negate any inference that the loss suffered by Lead Plaintiffs and other Class members was caused by changed market conditions or macroeconomic, industry, or Company-specific factors unrelated to Defendants' fraudulent conduct.

### D.   September 23, 2020 – Fourth Partial Corrective Disclosure/Materialization of the Risk

481.   On September 23, 2020, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions prior to and during the Class Period were partially revealed and/or materialized when *The Wall Street Journal* and *Dow Jones Newswires* reported that talks between Nikola and several potential energy partners, including BP to build hydrogen-refueling stations stalled "following allegations the company had misled investors."

482.   These reports were widely distributed by the financial news media.  For example, during the trading day on September 23, 2020, Markets Insider issued an article entitled "Nikola fell 22% on Wednesday amid a report from *The Wall Street Journal* that

potential partnership talks have been put on hold after weeks of controversy" which detailed the stalled talks between energy companies and Nikola.

483.    The September 23, 2020 reports of the stalled discussions with energy companies and the related news coverage was a foreseeable consequence of and within the zone of the risk concealed by Defendants' misrepresentations and omissions.

484.    Moreover, the September 23, 2020 disclosures revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market.  The reports of the stalled discussions and accompanying reports revealed the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions touting the Company's production capabilities, products, technological advancements, and commercial prospects as Defendants claimed.  Instead, the event and accompanying reports revealed that Nikola was not able to produce many of the products it claimed to manufacture and lacked the financial prospects it touted to investors.

485.    As a direct and proximate result of this corrective disclosure and/or materialization of the foreseeable risks concealed by Defendants' fraud, the price of Nikola common stock declined by $7.36 per share, closing at $21.15 on September 23, 2020, a 25.82% decline from its previous close on September 22, 2020.

486.    The decline in Nikola's common stock price on September 23, 2020 was a direct result of the nature and extent of Defendants' prior misstatements and omissions being revealed to investors.  The timing and magnitude of the Nikola common stock price decline evidences the impact Defendants' statements had on the Company's stock price during the Class Period and negate any inference that the loss suffered by Lead Plaintiffs

1  and other Class members was caused by changed market conditions or macroeconomic,
2  industry, or Company-specific factors unrelated to Defendants' fraudulent conduct.

3  **E.  September 29, 2020 – Fifth Partial Corrective Disclosure/Materialization of the Risk**

487.   On September 29, 2020, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions prior to and during the Class Period were partially revealed and/or materialized when *Reuters* reported that General Motors and Nikola would not finalize their deal to jointly build electric pickup trucks and hydrogen fuel cell tractor-trailers by the previously announced target date of September 30, with General Motors stating that it was "continuing our discussions with Nikola."

488.   These reports were widely distributed by the financial news media.  For example, CNBC reported "General Motors and Nikola are not expected to finalize a $2 billion deal scheduled to close before Wednesday after allegations of fraud and sexual abuse surfaced against the embattled start-up's founder and former executive chairman, Trevor Milton, according to two people familiar with the negotiations."

489.   The September 29, 2020 reports of the stalled discussions with General Motors and the related news coverage was a foreseeable consequence of and within the zone of the risk concealed by Defendants' misrepresentations and omissions.

490.   Moreover, the September 29, 2020 disclosures revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market.  The reports of the stalled discussions and accompanying reports revealed the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions touting the Company's production capabilities, products, technological advancements, and commercial prospects as

141

Defendants claimed.  Instead, the event and accompanying reports revealed that Nikola was not able to produce many of the products it claimed to manufacture and lacked the financial prospects it touted to investors.

491.   As a direct and proximate result of this corrective disclosure and/or materialization of the foreseeable risks concealed by Defendants' fraud, the price of Nikola common stock declined by $1.42 per share, closing at $17.88 on September 29, 2020, a 7.36% decline from its previous close on September 28, 2020.

492.   The decline in Nikola's common stock price on September 29, 2020 was a direct result of the nature and extent of Defendants' prior misstatements and omissions being revealed to investors.  The timing and magnitude of the Nikola common stock price decline evidences the impact Defendants' statements had on the Company's stock price during the Class Period and negate any inference that the loss suffered by Lead Plaintiffs and other Class members was caused by changed market conditions or macroeconomic, industry, or Company-specific factors unrelated to Defendants' fraudulent conduct.

**F.    October 16, 2020 – Sixth Partial Corrective Disclosure/Materialization of the Risk**

493.   On October 16, 2020 the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions prior to and during the Class Period were partially revealed and/or materialized when various news organizations reported that Nikola's new CEO, Mark Russell, stated in an interview that Nikola had a plan in place to go it alone if deal talks with General Motors fall through and downplayed the role of the Badger pickup in the Company's business.

494.   These reports were widely distributed by financial news outlets.  For instance, The Street published an article during the trading day detailing the revelation that Nikola's partnership with General Motors might result in Nikola having to manufacture

the truck on its own.  Specifically, the article stated that "Nikola . . . shares fell Friday after the electric truck maker's CEO Mark Russell told Bloomberg the company won't waver if it can't finalize a strategic partnership with General Motors."  Likewise, *Fortune* reported "Nikola shares sank as much as 16% in Friday trading after the electric-truck startup's chief executive officer said he sees a path for his company even if it can't come to terms with General Motors on a proposed strategic partnership."

495.    The October 16, 2021 announcement about General Motors, and the related news coverage reporting on Nikola's representations about its production capabilities, products, technological advancements, and commercial prospects, was a foreseeable consequence of, and within the zone of the risk concealed by Defendants' misrepresentations and omissions.

496.    Moreover, the October 16, 2020 disclosures revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market. The announcement of the rocky General Motors partnership and accompanying reports revealed the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions touting the Company's production capabilities, products, technological advancements, and commercial prospects as Defendants claimed.  Instead, the event and accompanying reports revealed that Nikola was not able to produce many of the products it claimed to manufacture and lacked the financial prospects it touted to investors.

497.    As a direct and proximate result of this corrective disclosure and/or materialization of the foreseeable risks concealed by Defendants' fraud, the price of Nikola common stock declined by $3.75 per share, closing at $19.55 on October 16, 2020, a 16.12% decline from its previous close on October 15, 2020.

498.    The decline in Nikola's common stock price on October 16, 2020 was a direct result of the nature and extent of Defendants' prior misstatements and omissions being revealed to investors.  The timing and magnitude of the Nikola common stock price decline evidences the impact Defendants' statements had on the Company's stock price during the Class Period and negate any inference that the loss suffered by Lead Plaintiffs and other Class members was caused by changed market conditions or macroeconomic, industry, or Company-specific factors unrelated to Defendants' fraudulent conduct.

**G.    November 24-25, 2020 – Seventh Partial Corrective Disclosure/Materialization of the Risk**

499.    On November 24, 2020 the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions prior to and during the Class Period were partially revealed and/or materialized when, after the market closed, Defendant Russell appeared on CNBC's "Mad Money" and did not reassure investors that the partnership with General Motors would still go.

500.    These reports were widely distributed within the U.S. through certain U.S. based news publications and social media posts. For instance, CNBC reported "Shares of embattled electric vehicle start-up Nikola Corp. fell by as much as 17.4% during trading Wednesday morning after Defendant Russell failed to reassure investors that the company's $2 billion deal with General Motors would still go through."

501.    The November 24, 2020 interview about the General Motors partnership, and the related news coverage was a foreseeable consequence of, and within the zone of the risk concealed by Defendants' misrepresentations and omissions.

502.    Moreover, the November 24, 2020 disclosures revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market.  The interview about the prospects of the

144

General Motors partnership and accompanying reports revealed the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions touting the Company's production capabilities, products, technological advancements, and commercial prospects as Defendants claimed. Instead, the event and accompanying reports revealed that Nikola was not able to produce many of the products it claimed to manufacture and lacked the financial prospects it touted to investors.

503.    As a direct and proximate result of this corrective disclosure and/or materialization of the foreseeable risks concealed by Defendants' fraud, the price of Nikola common stock declined by $4.26 per share, closing at $30.24 on November 25, 2020, a 12.35% decline from its previous close on November 24, 2020.

504.    The decline in Nikola's common stock price on November 25, 2020 was a direct result of the nature and extent of Defendants' prior misstatements and omissions being revealed to investors. The timing and magnitude of the Nikola common stock price decline evidences the impact Defendants' statements had on the Company's stock price during the Class Period and negate any inference that the loss suffered by Lead Plaintiffs and other Class members was caused by changed market conditions or macroeconomic, industry, or Company-specific factors unrelated to Defendants' fraudulent conduct.

**H.    November 30 – December 1, 2020 – Eighth Partial Corrective Disclosure/Materialization of the Risk**

505.    On November 30, 2020 the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions prior to and during the Class Period were partially revealed and/or materialized when Nikola announced that the General Motors deal had fallen through and that the companies had instead signed a much smaller, scaled-back, agreement and take no ownership interest in Nikola. As a result, Nikola also announced that it was scrapping the Badger pickup.

506.    These reports were widely distributed through certain news publications.  For example, *The New York Times* reported: "Nikola…had made a big splash on Wall Street, announced a broad alliance with General Motors in September that promised to give the company critical technology, financial support and credibility with investors. But the news was quickly overtaken by claims that Nikola had exaggerated tis capabilities, and the firm's founder resigned. Investors were left to wonder whether Nikola was indeed an automotive innovator and whether G.M. had made an embarrassing mistake in associating with the start-up."

507.    The November 30, 2020 announcement of the failed General Motors deal and the related news coverage was a foreseeable consequence of, and within the zone of the risk concealed by Defendants' misrepresentations and omissions.

508.    Moreover, the November 30, 2020 disclosures revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market.  The announcement of the failed General Motors deal and accompanying reports revealed the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions touting the Company's production capabilities, products, technological advancements, and commercial prospects as Defendants claimed.  Instead, the event and accompanying reports revealed that Nikola was not able to produce many of the products it claimed to manufacture and lacked the financial prospects it touted to investors.

509.    As a direct and proximate result of this corrective disclosure and/or materialization of the foreseeable risks concealed by Defendants' fraud, the price of Nikola common stock declined by $7.52 per share, closing at $20.41 on November 30, 2020, a 26.92% decline from its previous close on Friday November 27, 2020. Nikola stock

continued to decline another $3.04, closing at $17.37 on December 1, 2020, a 14.89% decline from its previous close on November 30, 2020, for a two-day decline of $10.56 per share, a 37.80% decline from its close on Friday November 27, 2020.

510.    The decline in Nikola's common stock price on November 30, 2020 and December 1, 2020 was a direct result of the nature and extent of Defendants' prior misstatements and omissions being revealed to investors.  The timing and magnitude of the Nikola common stock price decline evidences the impact Defendants' statements had on the Company's stock price during the Class Period and negate any inference that the loss suffered by Lead Plaintiffs and other Class members was caused by changed market conditions or macroeconomic, industry, or Company-specific factors unrelated to Defendants' fraudulent conduct.

## I.    December 23-24, 2020 – Ninth Partial Corrective Disclosure/Materialization of the Risk

511.    On December 23, 2021 the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions prior to and during the Class Period were partially revealed and/or materialized when news organizations reported that waste hauler Republic Services had canceled its order for 2,500 battery-powered electric trucks from Nikola which had been announced in August 2020.

512.    These reports were widely distributed through certain news publications.  For instance, CNBC reported "Nikola shares slide after deal ends for electric garbage trucks with Republic Services" and *Fortune* reported "It doesn't take much reading between those lines to infer that Nikola may have overpromised what it was capable of. That would align with the company's track record."

513.    The December 23, 2020 reports about the Republic Services cancelled order for 2,500 trucks was a foreseeable consequence of, and within the zone of the risk concealed by Defendants' misrepresentations and omissions.

514.    Moreover, the December 23, 2020 disclosures revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market. The Republic Services announcement and accompanying reports revealed the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions touting the Company's production capabilities, products, technological advancements, and commercial prospects as Defendants claimed.  Instead, the event and accompanying reports revealed that Nikola was not able to produce many of the products it claimed to manufacture and lacked the financial prospects it touted to investors.

515.    As a direct and proximate result of this corrective disclosure and/or materialization of the foreseeable risks concealed by Defendants' fraud, the price of Nikola common stock declined by $1.80 per share, closing at $15.03 on December 23, 2020, a 10.70% decline from its previous close on December 22, 2020. Nikola's stock declined another $1.28 per share, closing at $13.75 on December 24, 2020, an 8.52% drop from its close on December 23, 2020, for a two-day decline of $3.08 per share, an 18.30% decline from its close on December 22, 2020.

516.    The decline in Nikola's common stock price on December 23, 2020 and December 24, 2020 was a direct result of the nature and extent of Defendants' prior misstatements and omissions being revealed to investors.  The timing and magnitude of the Nikola common stock price decline evidences the impact Defendants' statements had on the Company's stock price during the Class Period and negate any inference that the loss

suffered by Lead Plaintiffs and other Class members was caused by changed market conditions or macroeconomic, industry, or Company-specific factors unrelated to Defendants' fraudulent conduct.

**J.     February 25-26, 2021 – Tenth Partial Corrective Disclosure/Materialization of the Risk**

517.    On February 25, 2021 the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions prior to and during the Class Period were partially revealed and/or materialized when, after the close of trading, Nikola filed its Form 10-K for the year ended December 31, 2020. In the filing, Nikola admitted that the following statements Milton made that were highlighted in the report released by the financial research firm were "inaccurate in whole or in part, when made."

518.    This news was widely reported to the market.  For example, on February 25, 2021 CNBC published an article entitled "Nikola admits ousted chairman misled investors as legal costs mount" went on to explain "Milton left Nikola in September following fraud claims by short seller Hindenburg Research that prompted federal inquiries. Milton and the company previously denied many of the claims in the report"

519.    The February 25, 2021 disclosure of the false and misleading nature of Defendants' statements, and the related news coverage reporting on Nikola's misrepresentations about its production capabilities, products, technological advancements, and commercial prospects, was a foreseeable consequence of, and within the zone of the risk concealed by Defendants' misrepresentations and omissions.

520.    Moreover, the February 25, 2021 disclosures revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market.   Nikola's disclosure of the false and

misleading nature of Defendants' statements and accompanying reports revealed the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions touting the Company's production capabilities, products, technological advancements, and commercial prospects as Defendants claimed. Instead, the event and accompanying reports revealed that Nikola was not able to produce many of the products it claimed to manufacture and lacked the financial prospects it touted to investors.

521.   As a direct and proximate result of this corrective disclosure and/or materialization of the foreseeable risks concealed by Defendants' fraud, the price of Nikola common stock declined by $1.62 per share, closing at $18.10 on February 26, 2021, an 8.22% decline from its previous close on February 25, 2021.

522.   The decline in Nikola's common stock price on February 26, 2021 was a direct result of the nature and extent of Defendants' prior misstatements and omissions being revealed to investors. The timing and magnitude of the Nikola common stock price decline evidences the impact Defendants' statements had on the Company's stock price during the Class Period and negate any inference that the loss suffered by Lead Plaintiffs and other Class members was caused by changed market conditions or macroeconomic, industry, or Company-specific factors unrelated to Defendants' fraudulent conduct.

**K.    July 29, 2021 – August 5, 2021 – Eleventh Corrective Disclosure/Materialization of the Risk**

523.   On July 29, 2021 the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions prior to and during the Class Period were finally revealed and/or materialized when numerous news outlets reported that Defendant Milton had been indicted on three counts of fraud by the U.S. Attorney's Office in Manhattan for making deceptive and false claims to investors regarding "nearly all aspects of the business." The indictment said that, from November

2019 to September 2020, Milton schemed to defraud investors into buying Nikola shares through statements about the Company's product and technology development. The SEC also filed related civil charges. In response to the indictment, Milton stated that they were "false allegations."

524.    This news was widely reported to the market  For example, on July 29, 2021 the New York Times published an article entitled Nikola Founder Is Charged With Fraud in Rebuke to Wall Street which discussed the DOJ and SEC filings and noting "[t]he twin legal filings are the biggest lightning bolts that prosecutors and securities regulators have delivered to the supercharged market for the investment vehicles known as special-purpose acquisition companies, which regulators and some investors have argued are rife with potential problems."

525.    The July 29, 2021 announcement of the indictment and the related news coverage reporting on Nikola's representations about its production capabilities, products, technological advancements, and commercial prospects, was a foreseeable consequence of, and within the zone of the risk concealed by Defendants' misrepresentations and omissions.

526.    Moreover, the July 29, 2021 disclosures revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market.  The indictment and accompanying reports revealed the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions touting the Company's production capabilities, products, technological advancements, and commercial prospects as Defendants claimed.  Instead, the event and accompanying reports revealed that Nikola was not able to produce many of the products it claimed to manufacture and lacked the financial prospects it touted to investors.

527.   As a direct and proximate result of this corrective disclosure and/or materialization of the foreseeable risks concealed by Defendants' fraud, the price of Nikola common stock declined by $2.16 per share, closing at $12.03 on July 29, 2021, a 15.22% decline from its previous close on July 28, 2021. Nikola's stock continued to steadily decline another $1.88 per share, or 15.62%, over the next several days to close at $10.15 per share on August 5, 2021, as investors absorbed the lengthy and detailed indictment and SEC complaint, which totaled over 100 pages.

528.   The decline in Nikola's common stock price on July 29 through August 5, 2021 was a direct result of the nature and extent of Defendants' prior misstatements and omissions being revealed to investors.  The timing and magnitude of the Nikola common stock price decline evidences the impact Defendants' statements had on the Company's stock price during the Class Period and negate any inference that the loss suffered by Lead Plaintiffs and other Class members was caused by changed market conditions or macroeconomic, industry, or Company-specific factors unrelated to Defendants' fraudulent conduct.

**CONTROL PERSON ALLEGATIONS**

529.   The Individual Defendants, by virtue of their high-level and controlling positions at Nikola, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information about the Company, its business, operations, internal controls, growth, financial statements, and financial condition as alleged herein. As set forth below, the materially misstated information conveyed to the public was the result of the collective actions of these individuals.

530.    Defendants Milton, Russell, Brady, and Worthen as senior executive officers of Nikola—a publicly-held company whose common stock were, and are, traded on the NASDAQ, and governed by the federal securities law—each had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, internal controls, growth, financial statements, and financial condition, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Nikola's publicly traded common stock would be based on accurate information.  The Individual Defendants each violated these requirements and obligations during the Class Period.

531.    Defendants Milton, Russell, Brady, and Worthen, because of their positions of control and authority as senior executive officers of Nikola, were able to and did control the content of Nikola's SEC filings, press releases, and other public statements issued by or on behalf of Nikola during the Class Period.  Each would have been provided with copies of the statements made in the SEC filings at issue in this action before they were issued to the public and would have had the ability to prevent their issuance or cause them to be corrected.  Accordingly, the Individual Defendants are responsible for the accuracy of the public statements alleged herein.

532.    The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Nikola common stock by disseminating materially false and misleading information and concealing and omitting material adverse facts.  The scheme deceived the investing public regarding Nikola's business, operations, and management, and the intrinsic value of Nikola's common stock, and caused Lead Plaintiffs and members of the Class to purchase Nikola common stock at artificially inflated prices.

1

**APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE**

2

533.   To the extent that Lead Plaintiffs allege that Defendants made affirmative

3   misstatements, Lead Plaintiffs will rely upon the presumption of reliance established by

4   the fraud-on-the-market doctrine in that, among other things:

5

6   (a)   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

7   (b)   the omissions and misrepresentations were material;

8   (c)   the Company's securities traded in an efficient market;

9   (d)   the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

10

11   (e)   Lead Plaintiffs and other members of the Class purchased Nikola's securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts;

12

13

14   (f)   Nikola's common stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

15

16   (g)   as a regulated issuer, Nikola filed periodic public reports with the SEC and the NASDAQ;

17

18   (h)   Nikola regularly communicated with public investors via established market communication mechanisms, including regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

19

20

21   (i)   Nikola was followed by numerous securities analysts employed by major brokerage firms including, but not limited to, Cowen, Loop Capital, and Colliers Securities and other financial, tech and automotive websites all of which wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace.

22

23

24

25

26                                          154

534.    As a result of the foregoing, the market for Nikola's securities promptly digested current information regarding Nikola from publicly available sources and reflected such information in Nikola's securities price(s).  Under these circumstances, all persons and entities who or which purchased or otherwise acquired Nikola's common stock during the Class Period suffered similar injuries through their purchase of Nikola at artificially inflated prices and thus, the presumption of reliance applies.

535.    The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Nikola common stock.

536.    Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiffs and other members of the Class purchased shares of Nikola's common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

537.    To the extent that the Defendants concealed or improperly failed to disclose material facts with respect to Nikola's business, Lead Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## NO SAFE HARBOR

538.    The statutory safe harbor provided by the PSLRA for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements alleged in this pleading.  First, many of the statements alleged to be false and misleading relate to historical facts or existing conditions.  Second, to the extent any of the allegedly false and misleading statements may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made.

155

Third, any purported forward-looking statements were not accompanied by meaningful cautionary language because the risks that Defendants warned of had already come to pass.

539.   To the extent any statements alleged to be false and misleading may be construed to discuss future intent, they are mixed statements of present or historical facts and future intent and are not entitled to PSLRA safe-harbor protection—at least with respect to the part of the statement that refers to the present.

540.   In addition, the PSLRA imposes an additional burden on oral forward-looking statements, requiring Defendants to include a cautionary statement that the particular oral statement is a forward-looking statement, and that "actual results might differ materially from those projected in the forward-looking statement." 15 U.S.C. § 78u-5(c)(2)(A)(i)-(ii).  Defendants failed to both identify certain oral statements as forward-looking and include the cautionary language required by the PSLRA.

541.   Furthermore, Defendants did not accompany their statements with meaningful cautionary language identifying important factors that could cause actual results to differ materially from any results projected.  To the extent Defendants included any cautionary language, that language was not meaningful because any potential risks identified by Defendants had already passed or manifested.  As detailed herein, Defendants failed to disclose to the market that, throughout the Class Period, Nikola was over-collecting its customer's personal information without their consent, in violation of multiple Chinese regulations.

542.   In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking

statement was materially false or misleading, or the forward-looking statement was authorized or approved by an executive officer of Nikola who knew that the statement was false when made.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

543.   Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Nikola securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of Nikola during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Nikola's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

544.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Nikola securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Lead Plaintiffs at this time and can be ascertained only through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Nikola or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

545.   Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

546.   Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

547.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Nikola;

- whether the Individual Defendants caused Nikola to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Nikola securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

548.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of

158

the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

549.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

550.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

551.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Lead Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Nikola securities; and (iii) cause Lead Plaintiffs and other members of the Class to purchase or otherwise acquire Nikola securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

552.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Nikola securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Nikola's finances and business prospects.

553.    By virtue of their positions at Nikola and VectoIQ, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Lead Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

554.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Nikola, the Individual Defendants had knowledge of the details of Nikola's internal affairs.

555.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of

the statements of Nikola.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Nikola's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Nikola securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Nikola's business and financial condition which were concealed by Defendants, Lead Plaintiffs and the other members of the Class purchased or otherwise acquired Nikola securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

556.   During the Class Period, Nikola securities were traded on an active and efficient market. Lead Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Nikola securities at prices artificially inflated by Defendants' wrongful conduct.  Had Lead Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Lead Plaintiffs and the Class, the true value of Nikola securities was substantially lower than the prices paid by Lead Plaintiffs and the other members of the Class.  The market price of Nikola securities declined sharply upon public disclosure of the facts alleged herein to the injury of Lead Plaintiffs and Class members.

557.   By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

558.   As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II
### (Violations of Section 10(b) of the Exchange Act And Rule 10b-5(a) and (c) Against All Defendants)

559.   Lead Plaintiffs repeat and re-allege every allegation set forth above as if fully set forth herein.

560.   This Count is brought solely and exclusively under the provisions of Rule 10b-5(a) and (c). Accordingly, Lead Plaintiffs need not allege in this Court nor prove in this case that any of the Defendants made any misrepresentations or omissions of material fact for which they may also be liable under Rule 10b-5(b) and/or any other provisions of law.

561.   During the Class Period, Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Lead Plaintiffs and the Class; (ii) artificially inflate the price of Nikola common stock; and (iii) cause Lead Plaintiffs to purchase Nikola common stock at artificially inflated prices.

562.   In furtherance of this unlawful plan, scheme and course of conduct, Defendants employed devices, schemes and artifices to defraud, and knowingly and/or

recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Lead Plaintiffs and the Class in connection with their purchases of Nikola common stock, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

563. Defendants' fraudulent devices, schemes, artifices and deceptive acts, practices, and course of business included the knowing and/or reckless suppression and concealment of the Company's scheme to defraud investors concerning, among other things, (i) that Nikola had developed a fully operational "zero-emissions" tractor trailer truck powered by hydrogen fuel cell technology—the Nikola One; (ii) that Nikola had, in hand, over 14,000 purchase orders for its trucks, which represented 2 to 3 years of production and billions in revenue; (iii) that Nikola was producing hydrogen at a fraction of the cost industry experts believed was possible and that Nikola was in the process of establishing a nation-wide network of hydrogen refueling stations, which would produce inexpensive hydrogen for the Nikola One and Nikola's other vehicles to operate on; (iv) that the cost of owning and operating Nikola's vehicles was significantly less than the cost of owning and operating a traditional diesel powered vehicle; (v) that Nikola had developed, using its own technology, a fully operational BEV pick-up truck, the Badger One, pre-order for which had sold out; (vi) that Nikola had developed all of its vehicles' critical components "in-house," including a proprietary "game-changing" electric battery, which exceeded the range of then-existing electric batteries; (vii) that commercial "assembly line" production of the Nikola Tre BEV truck had already been completed in Ulm, German; (viii) that Nikola's headquarters was completely "off-grid" with solar panels on the roof producing 18 megawatts of energy a day; and (ix) that Nikola owned seven natural gas wells that were used as backup to Nikola's solar hydrogen production.;

564.   Despite the numerous representations that were made to the market—and ample opportunity to supplement, alter, or correct such misrepresentations—Defendants failed to do so thereby concealing the Company's scheme to defraud from investors.

565.   Lead Plaintiffs and the Class reasonably relied upon the integrity of the market in which Nikola's common stock traded.

566.   During the Class Period, Lead Plaintiffs and the Class were unaware of Defendants' fraudulent scheme and unlawful course of conduct and/or the impact of the fraudulent scheme.  Had Lead Plaintiffs and the Class known the true extent of Defendants' unlawful scheme and unlawful course of conduct, they would not have purchased Nikola's common stock, or if they had, would not have done so at the artificially inflated prices paid for such securities.

567.   As a direct and proximate result of Defendants' scheme to defraud and such unlawful course of conduct, Lead Plaintiffs and the Class suffered damages in connection with their purchases of Nikola common stock during the Class Period.

568.   By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder and are liable to Lead Plaintiffs and the Class for damages suffered in connection with their purchases of Nikola common stock during the Class Period.

### COUNT III
### (Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)

569.   Lead Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

570.   During the Class Period, the Individual Defendants participated in the operation and management of Nikola, and conducted and participated, directly and

indirectly, in the conduct of Nikola's business affairs.  Because of their senior positions, they knew the adverse non-public information about Nikola's misstatement of income and expenses and false financial statements.

571.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Nikola's financial condition and results of operations, and to correct promptly any public statements issued by Nikola which had become materially false or misleading.

572.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Nikola disseminated in the marketplace during the Class Period concerning Nikola's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Nikola to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Nikola within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Nikola securities.

573.    Each of the Individual Defendants, therefore, acted as a controlling person of Nikola.  By reason of their senior management positions and/or being directors of Nikola, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Nikola to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Nikola and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiffs and the other members of the Class complain.

574.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Nikola.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiffs demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiffs as the Class representative;

B.     Requiring Defendants to pay damages sustained by Lead Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Lead Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Lead Plaintiffs hereby demand a trial by jury.


Dated:  January 24, 2022                          Respectfully submitted,

POMERANTZ LLP

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
(admitted *pro hac vice*)
Michael J. Wernke
(admitted *pro hac vice*)
Veronica Montenegro
(admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100

Facsimile: (212) 661-8665
jalieberman@pomlaw.com
mjwernke@pomlaw.com
vvmontenegro@pomlaw.com

**BLOCK & LEVITON LLP**
Jeffrey C. Block (admitted *pro hac vice*)
Jacob A. Walker (admitted *pro hac vice*)
Michael Gaines (admitted *pro hac vice*)
260 Franklin Street, Suite 1860
Boston, MA 02110
Telephone: (617) 398-5600
Facsimile: (617) 507-6020
jeff@blockleviton.com
jake@blockleviton.com
michael@blockleviton.com

*Counsel for Lead Plaintiffs and Co-Lead
Counsel for the Class*

**LABATON SUCHAROW LLP**
James W. Johnson (admitted *pro hac vice*)
Michael H. Rogers (admitted *pro hac
vice*)
David J. Schwartz (admitted *pro hac vice*)
James T. Christie (admitted *pro hac vice*)
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
jjohnson@labaton.com
mrogers@labaton.com
dschwartz@labaton.com
jchristie@labaton.com

*Additional Counsel for Lead Plaintiffs*

**KELLER ROHRBACK LLP**
Gary Gotto (No. 007401)
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Telephone: (602) 230-6322
ggotto@kellerrohrback.com

*Liaison Counsel for Lead Plaintiffs*

167

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26