Gary A. Gotto (No. 007401)
**KELLER ROHRBACK LLP**
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Telephone:   (602) 230-6322
Email: ggotto@kellerrohrback.com
*Liaison Counsel for Lead Plaintiffs Nikola Investor Group II and for the Class*

(*Lead Counsel for Lead Plaintiffs Nikola Investor Group II and for the Class appear on the Signature Page*)

## UNITED STATES DISTRICT COURT
### DISTRICT OF ARIZONA

| | |
|---|---|
| Daniel Borteanu, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>Nikola Corporation, et al.,<br><br>Defendants. | No. CV-20-01797-PHX-SPL<br>No. CV-20-01819-PHX-DIR (cons.)<br>No. CV-20-02123-PHX-JJT (cons.)<br>No. CV-20-02168-PHX-DLR (cons.)<br>No. CV-20-02237-PHX-DLR (cons.)<br>No. CV-20-02374-PHX-DWL (cons.)<br><br>**LEAD PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

GLOSSARY OF TERMS ..............................................................................................i

INTRODUCTION..................................................................................................... 1

LEGAL STANDARD................................................................................................ 5

ARGUMENT ........................................................................................................... 5

I.     Statements Made Before the Class Period Are Actionable Especially in an IPO/SPAC Context ................................................................................... 5

II.    Milton Made Countless False and Misleading Statements About Fundamental Aspects of Nikola's Business........................................................................ 8

III.   Well-Pleaded Facts Support an Inference that the Nikola Defendants Engaged in a Scheme to Defraud ............................................................................ 11

IV.   Defendants Are Responsible for the False and Misleading Statements Contained Nikola's SEC Statements ........................................................... 12

      A.    The Proper Context in Which to Read Nikola's SEC Filings Is the Backdrop of Milton and Nikola's Statements Since 2016.............................. 12

      B.    Nikola's Hydrogen Infrastructure ................................................... 13

      C.    The Nikola One.................................................................................. 15

      D.    The Badger ........................................................................................ 17

V.    Lead Plaintiffs' Allegations Establish that Each Defendant Acted with the Requisite Scienter ................................................................................... 17

      A.    Contemporaneous Reports and Communications Demonstrate that Each Defendant Knew Their and Milton's Statements Were False When Made ................................................................................................. 18

      B.    The Core Operations Theory Bolsters Plaintiffs' Specific Scienter Allegations ....................................................................................... 21

      C.    Defendants' Actions in Response to the Hindenburg Report and Subsequent Government Scrutiny Show Scienter ........................... 22

      D.    Defendants' Scheme to Keep Nikola Afloat and Cash in by Taking it Public at an Inflated Price Demonstrates Their Intent..................... 23

VI.    The CAC Readily Satisfies the Pleading Standard for Loss Causation......................24

VII.   Defendants do not Challenge Their Liability as Control Persons Under §20(a)........30

CONCLUSION ............................................................................................................30

GLOSSARY OF TERMS .................................................................................................i

INTRODUCTION........................................................................................................1

LEGAL STANDARD....................................................................................................5

ARGUMENT ..............................................................................................................5

I.     Statements Made Before The Class Period Are Actionable especially In An
       IPO/SPAC Context ...........................................................................................5

II.    Milton Made Countless False and Misleading Statements About Fundamental
       Aspects of Nikola's Business...........................................................................8

III.   Well-Pleaded Facts Support an Inference that the Nikola Defendants Engaged
       in a Scheme to Defraud ..................................................................................11

IV.    Defendants Are Responsible for The False and Misleading Statements
       Contained Nikola's SEC Statements .............................................................12

       A.    The Proper Context in Which to Read Nikola's SEC Filings Is the
             Backdrop of Milton and Nikola's Statements Since 2016..................12

       B.    Nikola's Hydrogen Infrastructure .....................................................13

       C.    The Nikola One ...............................................................................15

       D.    The Badger .....................................................................................17

V.     Lead Plaintiffs' Allegations establish that Each Defendant Acted With the
       REquisite Scienter............................................................................................17

       A.    Contemporaneous Reports and Communications Demonstrate that Each
             Defendant Knew Their and Milton's Statements were False When
             Made ...............................................................................................18

       B.    The Core Operations Theory Bolsters Plaintiffs' Specific Scienter
             Allegations .....................................................................................21

       C.    Defendants' Actions in Response to the Hindenburg Report and
             Subsequent Government Scrutiny Show Scienter ..........................22

D.      Defendants' Scheme to Keep Nikola Afloat and Cash in by Taking it Public at an Inflated Price Demonstrates Their Intent ..................................... 23

VI.     The CAC Readily Satisfies the Pleading Standard for Loss Causation ..................... 24

VII.    Defendants Do Not challenge Their Liability as Control Persons Under §20(**a**) ....... 30

CONCLUSION .................................................................................................................... 30

# GLOSSARY OF TERMS

| Term | Definition |
|---|---|
| ¶ | Paragraph of the CAC (unless otherwise specified) |
| Block Decl. | Declaration of Jeffrey Block in Support of Lead Plaintiff's Omnibus Opposition to Defendants' Motion to Dismiss |
| BEV | Battery Electric Vehicle |
| Brady | Defendant Kim J. Brady, Nikola CFO since November 2017 and formerly also Treasurer from November 2017 to June 2020. |
| CAC | Consolidated Amended Class Action Complaint (ECF No. 95) |
| Defendants | Nikola Corporation, Trevor Milton, Mark A. Russell, Kim J. Brady, Britton M. Worthen, Steven J. Girsky, and Steven M. Shindler. |
| DOJ | United States Department of Justice |
| EV | Electric vehicle |
| FCEV | Hydrogen fuel-cell vehicle |
| Girsky | Defendant Steven J. Girsky, Chairman of Nikola since September 2020, Nikola director since June 2020, and former President and CEO of VectoIQ. |
| GM | General Motors Company |
| Hindenburg Report | The report published on September 10, 2020, by Hindenburg Research, titled "Nikola: How to Parlay An Ociean of Lies Into a Partnership With the Largest Auto OEM in America." |
| IPO | Initial Public Offering |
| Lead Plaintiffs | George Mersho, Vincent Chau, and Stanley Karcynski, the members of the Nikola Investor Group II. |
| Milton | Defendant Trevor Milton, Executive Chairman of Nikola until September 20, |

| | 2020 and formerly CEO of Nikola from its inception to June 2020. |
|---|---|
| Milton Mot. | Defendant Trevor Milton's Motion to Dismiss the Consolidated Amended Class Action Complaint Pursuant to F.R.C.P. 9(b) and 12(b)(6) (ECF No. 112) |
| Nikola | Defendant Nikola Corporation |
| Nikola Defendants | Nikola Corporation, Mark A. Russell, Kim J. Brady, Britton M. Worthen, Steven J. Girsky, and Steven M. Shindler |
| Nikola Defs.' Mot. | Nikola Defendants' Motion to Dismiss Pursuant to Rules 9(b) and 12(b)(6) (ECF No. 111) |
| OEM | Original Equipment Manufacturer |
| Republic | Republic Services, Inc. |
| Russell | Defendant Mark A. Russell, Nikola CEO since June 2020, Nikola director since February 2019, and formerly Nikola President from February 2019 to June 2020. |
| SEC | United States Securities and Exchange Commission |
| Shindler | Defendant Steven M. Shindler, Nikola director since September 2020 and former CFO and director of VectoIQ. |
| SPAC | Special Purpose Acquisition Company—a publicly traded shell company formed for the sole purpose of raising capital to merge with a private company, thereby taking the private company public. |
| VectoIQ | VectoIQ Acquisition Corp., a SPAC that merged with Nikola on June 4, 2020, at which point shares of VectoIQ became publicly traded shares of Nikola. |
| Worthen | Defendant Britton M. Worthen, Nikola Chief Legal Officer and Secretary since October 2015. |

# INTRODUCTION

This securities class action charges all Defendants with falsely inflating the value of Nikola's common stock by misrepresenting material facts about the core of the company's business: its ability to develop a fleet of trucks, FCEV, that would run on hydrogen and be cheaper, and more environmentally friendly, than current diesel trucks.

Nikola went public via a SPAC transaction with VectoIQ. VectoIQ was nearing the end of its 2-year time-period in which it needed to complete a transaction and was highly motivated to bring about its merger with Nikola. VectoIQ's founders stood to reap hundreds of millions of dollars in proceeds from such a merger. In connection with the transaction, VectoIQ issued proxy and other statements designed to persuade its shareholders to vote for the merger. In particular, VectoIQ stated that it's "management and board of directors considered the fact that Nikola has a high volume of fuel cell electric vehicle pre-orders, currently [valued] at over $10 billion" as to why it was recommending the merger. ¶252. It also represented that Nikola was "solving the fleet's concerns as to where to refuel with green hydrogen at competitive pricing to diesel." ¶253. On June 4, 2020, the day Nikola began to publicly trade, Milton declared "what Nikola solved was the cost – was the economics on the trucking. When we first started, hydrogen was $16 a kilogram. ***We can now produce it*** for well under $4 a kilogram." ¶14.

This was a key aspect of the fraud. Nikola has never produced any hydrogen, let alone at an economically feasible price, to operate its FCEV trucks. The key to Nikola's purported billions of dollars of sales backlog was its ability to develop the fuel source for its trucks—at economically rational prices—so that customers would execute on those orders. Touting the billions of dollars in backlog for a product that did not work—because there was no fuel source to power those trucks—rendered those statements materially false and misleading.

Defendants further announced the "fully functioning" Nikola One and Badger vehicles were made completely "in-house." In truth, the Nikola One was a non-operational "pusher" and the Badger was nothing more than a CGI rendering. Nevertheless, Defendants touted the illusory orders for both, as well as the lucrative partnerships secured through these lies.

The recent case of *Farrar v. Workhorse Group, Inc.*, 2021 WL 5768479 (C.D. Cal. Dec. 2, 2021) provides a near-perfect parallel. Workhorse, a manufacturer of electric last mile delivery trucks, "repeatedly referenced their growing backlog [of electric vehicles] as an indicator that they were a strong, growing company." *Id.* at 5. The backlog included an "order" by UPS for 1,060 delivery trucks, but Workhorse knew that it could not produce those vehicles and UPS never requested delivery of those trucks. *Id.* Defendants there, as here, sought dismissal claiming that they fully "disclosed the fact that the backlog orders were subject to conditions and not guaranteed." *Id.* The court disagreed, holding that the defendants' repeated references to their backlog "as an indicator that they were a strong, growing company" was misleading because Workhorse could not even manufacture the vehicles to meet its backlog. *Id.* Here, Nikola would never fulfill its FCEV truck backlog (regardless of its manufacturing capability) without first producing the hydrogen fuel necessary for those trucks to operate.

Milton has been criminally indicted for securities fraud for the very conduct at issue in this civil lawsuit. ¶523 & CAC Ex. A. The SEC brought civil fraud charges against Milton and Nikola, ¶523 & CAC Ex. B, and Nikola quickly settled those charges by agreeing to pay $125 million. The $125 million is but a fraction of investors' full losses.

Investors began to learn the truth when Hindenburg Research published a report, on September 10, 2020 alleging that Nikola was "an intricate fraud built on dozens of lies over the course of … Milton's career." ¶31. Nikola's stock price plummeted in response. All Defendants signed on to a press release that disputed the Hindenburg Report, even though Nikola later admitted that at least nine categories of statements made by both Milton and Nikola—and identified by Hindenburg—"were inaccurate in whole or in part, when made." ¶39. Nikola's stock price plummeted again upon Nikola's *mea culpa* in February 2021

Despite the criminal indictment and admissions that statements were "inaccurate" when made, Defendants seek to have this case dismissed, arguing Lead Plaintiffs fail to state a claim for relief. Defendants essentially claim that while "inaccurate" statements were made, a clever investor could have figured out the truth by divining what was really meant from Nikola's cautionary statements, so they should all be absolved of liability. The federal

securities laws were designed "to protect investors against manipulation of stock prices." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976). Indeed, "the basic purpose behind these laws" was "to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry." *Lorenzo v. Sec. & Exch. Comm'n*, 139 S. Ct. 1094, 1103 (2019). Defendants' defense is built on the concept of *caveat emptor* and should be rejected.

Defendants also argue against a strawman: that Lead Plaintiffs' case is that Nikola was a total sham, and because Nikola still exists, there is no case. This assertion is specious. The issue is whether investors were misled—not whether Nikola is a "real" company.

The CAC charges that all Defendants engaged in a scheme to defraud investors and violated Rule 10b-5(a) and (c). The Individual Defendants do not contest their scheme liability except to claim that (1) pre-class period statements are inactionable; (2) they are not liable for Milton's false statements; and (3) they, themselves, did not make any false statement.

First, the pre-class period statements are actionable because Nikola's stock did not begin to publicly trade until June 4, 2020. No Ninth Circuit court has ever dismissed pre-class period statements as non-actionable where the company's stock was not already publicly trading. Here, Nikola's stock was not yet available for trading when Defendants issued pre-merger false and misleading statements. The Ninth Circuit recently cautioned against allowing defendants to create "loophole[s] large enough to undermine" the securities law by using non-traditional IPOs, observing that if companies could avoid securities law liability by going public through a direct listing rather than an IPO, they "would be incentivized to file overly optimistic registration statements … to increase their share price, knowing that they would face no shareholder liability." *Pirani v. Slack Techs., Inc.*, 13 F.4th 940, 948 (9th Cir. 2021). The same rationale should apply to Nikola's SPAC listing.[1]

Second, under scheme liability, Defendants are liable for the false statements made by

---

[1] The recently unsealed derivative complaints in Delaware Chancery Court support this point. VectoIQ noted the "advantages" to going public via a SPAC vs IPO as "ability to market off of forward projections" and "partial cash liquidity to early investors at close." *See* Block Decl. Ex. A, ¶¶66-67.

1    others in furtherance of the scheme, and Defendants do not seem to contest this.

2          Third, the SEC filings signed by the Individual Defendants contained false and

3    misleading statements, and the Individual Defendants are liable for those statements.

4          The CAC alleges numerous facts supporting each Defendants' scienter including that

5    Russell, Brady and Worthen admit to Milton making false and misleading statements. CAC

6    Ex. C. Plus, the CAC alleges all Defendants' motives to commit securities fraud. The VectoIQ

7    defendants were motivated to carry out the merger, cash in, and receive millions of shares of

8    Nikola common stock. All Defendants reaped millions of shares of Nikola common stock,

9    which they could sell in six-months after the lock-up agreements expired. ¶104. Milton, who

10   was fixated on Nikola's stock price and ensuring that it remained high, ¶¶101-03, pointedly

11   told one of Nikola's directors in an email on July 7, 2020 that Nikola's stock had "gained

12   'over 400%'" and that he made "everyone else millionaires and billionaires." ¶104.

13         Finally, Defendants' catch-all loss causation argument lacks merit. On September 10,

14   2020, Hindenburg released its report contending that Nikola was a fraud. Among other things,

15   Hindenburg alleged Nikola could not produce hydrogen at the claimed $3 or $4/kilogram, or

16   at any price; that Nikola did not design all key components, including inverters, in-house; that

17   the video purporting to show the Nikola One in motion was "an elaborate ruse;" and that

18   "Nikola's much-touted multi-billion order book is filled with fluff." ¶397. Nikola's stock

19   price fell by $4.80 per share on September 10, a 14.5% drop, and fell another $5.44 per share

20   on September 11, a 14.5% drop. ¶¶400-01. Defendants' contention that this was not a

21   corrective disclosure because the information contained in the report was already public is

22   bogus. Defendants disingenuously cite to public filings **made after the end of the class**

23   **period** to support their claim that the information was disclosed **during** the class period. And

24   the few facts Defendants point to that were revealed during the class period did not come

25   close to providing the full picture of the real truth. Thus, loss causation is adequately pled.

26         Finally, the Individual Defendants initially defended Milton and issued a press release,

27   on September 14, 2020, claiming that the Hindenburg Report's allegations were "false and

28   misleading," "false and defamatory," and "designed to provide a false impression to

investors," even though Defendants knew much of what Hindenburg was alleging was true: Nikola did not produce any hydrogen, Nikola did not make its own inverters, Nikola did not design all of its key components, and the Nikola One in motion video was a fake. Indeed, Worthen signed the Form 8-K, which attached the September 14 the press release, despite admitting that it "is not true" that Nikola could produce hydrogen, and "Milton knew it was not true" because Worthen and Milton had "discussed [it] 'a million times.'" ¶137.

## LEGAL STANDARD

To succeed on a claim under Section 10(b) and Rule 10b-5, a plaintiff must prove the following: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014). None of Defendants' challenges to the CAC's allegations of material misrepresentations, scienter, or economic loss carry the day.

## ARGUMENT

### I. STATEMENTS MADE BEFORE THE CLASS PERIOD ARE ACTIONABLE ESPECIALLY IN AN IPO/SPAC CONTEXT

A class period defines the group of investors on whose behalf the action is brought. *Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 2d 956, 966 (S.D. Cal. 2005) (citing 1 NEWBERG ON CLASS ACTIONS §§ 2.3, 6.14 (4th ed. 2002)). But it "is not a device for limiting the universe of actionable conduct, even though, in the standard securities fraud action, the class period also happens to be the same as the period during which defendants' fraud was allegedly alive in the market."[2] *Id.* Defendants' argument that pre-class period statements are inactionable "does not make sense in an action like this one" where shares of Nikola stock did not trade publicly before the June 4, 2020 reverse-merger closed.[3] *Id.* Indeed,

---

[2] "This overlap occurs simply because it is only those plaintiffs who traded in the securities at issue while the fraud could have been affecting those securities' value who can possibly state a claim for damage resulting from the fraud." *Id.* (citing *Basic v. Levinson*, 485 U.S. 224, 228 & n.5 (1988)).

[3] Milton also argues that his pre-class period statements were not made "in connection with" the sale of securities, but statements need only "somehow touch[] upon or ha[ve] some nexus

Footnote continued on next page

1    if Lead Plaintiffs pursued this action in their individual capacities, there would be no class

2    period to limit the universe of actionable statements. To accept Defendants' position is to

3    conclude that seeking class treatment through Rule 23—a procedural device—limits

4    Plaintiffs' substantive rights under the securities laws. This cannot be so.[4]

5        In the typical 10(b) case, the class period begins with the first alleged misstatement

6    because "the market price of a security traded in an efficient market reflects all public

7    information…" *Smilovits v. First Solar, Inc.*, 295 F.R.D. 423, 429 (D. Az. 2013). Thus, if a

8    company misspeaks while its shares are already trading publicly, any investor who buys

9    shares thereafter purchases at an inflated price. But anyone who purchased shares prior to the

10   first misstatement was not injured by it. Under those circumstances, the plaintiff begins the

11   class period on the date of the first misstatement because this properly limits "the class of

12   plaintiffs to those ascertainable individuals who have standing to bring the action." *Zelman*,

13   376 F. Supp. 2d at 966. This observable correlation, however, is not a rule of law generally

14   applicable to all securities class actions. When the first misstatement is made before a security

15   has been offered to the public, the investing public cannot yet be harmed by it. Only once that

16   security becomes publicly traded can investors be harmed by those prior misstatements—

17   whose inflation is baked into the security price—and thus obtain standing.

18       Each of the cases cited by Defendants involved securities that were already trading in

19   a public market when the first misstatements were made.[5] Here, of course, Nikola's stock did

20   _____

21   with *any* securities transaction," *S.E.C. v. Rana Rsch., Inc.*, 8 F.3d 1358, 1362 (9th Cir. 1993)
     (emphasis added), "whether by the plaintiff or by someone else." *Merrill Lynch, Pierce,
     Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 78 (2006), *see also* ¶109 (2016 Nikola One event
22   for private investors); ¶67 (2020 PIPE offering).

23   [3] The de-SPAC merger constituted Nikola's IPO. *See* John Coates, *SPACs, IPOs and Liability
     Risk under the Securities Laws*, U.S. Sec. & Exch. Comm. (2021),
     https://tinyurl.com/6p59cpbe ("[I]t is the de-SPAC . . . in which a private operating company
24   itself 'goes public,' i.e., engages in **its** initial public offering.") (emphasis original).

25   [4] Taking Defendants' position at face value, a pharmaceutical company could falsely proclaim
     that it had developed a cure for breast cancer *just one day before its shares first start to trade*
26   through a SPAC reverse-merger or direct listing, go public at a multiple of its actual value,
     and pocket investors' money without any risk of liability. The Ninth Circuit's recent decision
27   in *Slack Techs., Inc.*, 13 F.4th 940 at 948 strongly cautions against such a result.

28   [5] *In re Seagate Tech. II Sec. Litig.*, 1995 WL 66841, at *4 (N.D. Cal. Feb. 8, 1995), *aff'd
     mem.*, 98 F.3d 1346 (9th Cir. 1996) (10(b) claims for securities already in the market); *In re*

Footnote continued on next page

1  not begin to publicly trade until June 4, 2020, so the first date of the alleged class period in

2  this case does not limit the actionable misconduct.[6]

3       By contrast, *Zelman* offers a close analogue to this case. *Zelman* involved an offering

4  of debt securities, called "GOALs," whose value at maturity was linked to the value of JDS

5  Uniphase ("JDSU") stock. 376 F. Supp. 2d at 958. Unbeknownst to investors, JDSU's stock

6  price was inflated by fraud, so the GOALs too were overvalued at issuance. *Id.* at 958-59.

7  Investors, however, could not begin their class period when the first misstatements were made

8  because the misstatements inflating JDSU's stock preceded the GOALs offering. *Id.*

9  Defendants there, as here, argued that this was tough luck for the injured class because pre-

10 class period statements are per se immune from liability. *Id.* at 965. The court disagreed,

11 reasoning that liability could attach to statements made before the class period because the

12 GOALs did not yet exist when the fraud began to affect the value of JDSU stock. *Id.* at 966.

13      *Zwick Partners, LP v. Quorum Health Corp.*, 2018 WL 2933406 (M.D. Tenn. Apr. 19,

14 2018) also involved misstatements prior to an atypical IPO—in that case a spin-off of a new

15 _____

16 *Clearly Canadian Sec. Litig.*, 875 F. Supp. 1410, 1420 (N.D. Cal. 1995) (same); *Hodges v.
   Akeena Solar, Inc.*, 2010 WL 3705345, at *2 (N.D. Cal. May 20, 2010) (same); *Baker v.*
17 *SeaWorld Ent., Inc.*, 423 F. Supp. 3d 878, 892 (S.D. Cal. 2019) (same). In addition to being
   inapplicable, these cases were wrongly decided. Class periods limit the class, not the fraud.

18 [6] It appears no court in the Ninth Circuit has ever applied Defendants' "rule" to preclude
   §10(b) liability for misstatements preceding an IPO. Even when dismissing such statements,
19 courts analyze their falsity just like any other alleged false statement. *See In re Stac Elecs.
   Sec. Litig.*, 89 F.3d 1399, 1410 (9th Cir. 1996); *Terenzini v. GoodRx Holdings, Inc.*, 2022 WL
20 122944, at *5 (C.D. Cal. Jan. 6, 2022); *In re Infonet Servs. Corp. Sec. Litig.*, 310 F. Supp. 2d
   1080, 1092 (C.D. Cal. 2003); *Strassman v. Fresh Choice, Inc.*, 1995 WL 743728, at *8-10
21 (N.D. Cal. Dec. 7, 1995); *In re Surebeam Corp. Sec. Litig.*, 2005 WL 5036360, at *17 (S.D.
   Cal. Jan. 3, 2005). Outside the Ninth Circuit, few cases have found pre-class, pre-IPO
22 statements inactionable. *City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, 713 F.
   Supp. 2d 378 (D. Del. 2010), *aff'd*, 442 F. App'x 672 (3d Cir. 2011) concluded that a security
23 could not have been inflated by statements made long before the IPO in a trade journal, but
   *Horizon* is both factually dissimilar and in tension with Ninth Circuit law that fraud inflates a
24 stock price until corrected. *See In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 789 (9th Cir.
   2020), *cert. denied* 142 S. Ct. 71 (2021). Meanwhile, in *In re Garrett Motion Inc. Sec. Litig.*,
25 2022 WL 976269, at *16 (S.D.N.Y. Mar. 31, 2022), the plaintiffs did not cite any authority
   showing why the general rule should not apply in an IPO situation. Its holding is also in
26 tension with *Pirani* in that it effectively immunized a creative IPO procedure from liability.
   Finally, the Court in *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 643 n.27 (S.D.N.Y.
27 2007) agreed with *Zelman*, but felt that it was bound by Circuit authority. The Second Circuit
   case in question, though, was decided in a non-IPO context and reasoned that "Plaintiffs could
28 have sought to include this statement in the class period but they did not." *In re Int'l Bus.
   Machines Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998).

company. The court similarly recognized that "the alleged misstatements were incorporated into [the new company's] beginning stock price" so that investors "relied upon" them. *Id.* at *7; *see also In re Crown Am. Realty Tr. Sec. Litig.*, 1997 WL 599299, at *16 (W.D. Pa. Sept. 15 1997) ("[T]hat the statement was made at a time before any of the class members purchased shares would seem to be irrelevant, as it still could have been partly responsible—along with the other alleged misrepresentations—for the injury to investors who purchased their shares over a year later."); *Robb v. Fitbit Inc.*, 216 F. Supp. 3d 1017, 1026-28 (N.D. Cal. 2016) ("pre-IPO statements" actionable where class period began on IPO date). Common sense says that pre-merger misstatements could affect Nikola's initial valuation. The Court should decline Defendants' invitation to erroneously hold that pre-IPO statements are per se inactionable when no Ninth Circuit case has ever done so.[7]

And as for Defendants' contention that their pre-class period statements were corrected by pre-offering disclosures, this argument fails because, as discussed below, they were not.[8]

## II.    MILTON MADE COUNTLESS FALSE AND MISLEADING STATEMENTS ABOUT FUNDAMENTAL ASPECTS OF NIKOLA'S BUSINESS

Milton picks a few of the innumerable false statements he is charged with making and claims that these statements are not actionable. His arguments border on the frivolous.

Milton says nothing about his categorically false statement on June 4, 2020: "***But what Nikola solved was the cost***—was the economics on the trucking. When we first started, hydrogen was $16 a kilogram. ***We can now produce it*** for well under $4 a kilogram. So we've cut—it's one quarter of the cost now than it was just a few years ago. And we're now cheaper to operate per mile than diesel." ¶14. Nikola has never produced hydrogen—full stop.

The same day, Milton tweeted, "***We do our own batteries at Nikola and have since***

---

[7] In any event, Defendants' pre-class period statements are undeniably relevant, as they (1) provide the context that renders many of Defendants' class period statements false and misleading and (2) show Defendants' scienter. *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 272 (3d Cir. 2005); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001); *In re U.S. Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063, 1065 n.1 (N.D. Cal. 2002).

[8] As discussed *infra* §(VI), Defendants' "truth-on-the-market" affirmative defense is "intensely fact-specific" and "courts rarely dismiss a complaint on this basis." *In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at *15 (C.D. Cal. Aug. 4, 2014).

*day 1*. We do however test with everyone and if a supplier builds a better battery we would use them. That goes for all supplied parts on our vehicle." ¶279. This was false because Nikola never made its own batteries. On June 6, 2020, Milton tweeted, ***"All the technology, software, controls, E axle, inverters etc. we do internally."*** ¶280. Nikola never made its own inverters.

Milton also makes no mention of his blatant lies that the Nikola One was "fully functioning," "not a pusher" and "totally capable of being driven." ¶¶203-14, 387, 406. He also ignores his July 31, 2020 assertion that Nikola had "ten billion [] in preorder reservations" that were "actual[] contracts" that customers could only "get out if we don't deliver." ¶367.

We agree with Milton that context matters. *See Lomingkit v. Apollo Educ. Grp. Inc.*, 275 F. Supp. 3d 1139, 1149 (D. Ariz. 2017) ("A court evaluates defendants' alleged false statements in the context in which they were made, especially in regard to contemporaneous qualifying or clarifying language."). Just perhaps not the context he offers. Stating that Nikola "outsource[s] autonomy" and "hardware production" in no way corrects the straightforward falsehood that Nikola internally does "[a]ll the technology, software, controls, E axle, inverters etc." *See* Milton Mot. 2-3. Nikola neither owned the intellectual property rights to, nor manufactured those components for its semi-truck line. The CAC, however, offers useful context in the form of background information: Milton had been making false claims about Nikola holding IP rights over the most important components of its semi-truck line since at least 2016. ¶156. Having made such similar false and misleading statements for years, it is more likely that (1) Milton knew his statements on February 14, 2020 and June 6, 2020 were false when made, ¶¶236, 280, and (2) investors found his false statements credible.

Milton's argument that certain of his statements were inactionable puffery or opinion[9] is belied by the examples he highlights. Milton Mot. 2-3. His tweet stating that Nikola had

---

[9] Milton also flouts the Court's Order on page limitations (ECF No. 110) by submitting 8 additional pages of argument in his counsel's declaration (ECF No. 112-1) and 17 additional pages of argument in three appendices (ECF No. 112, at 12-28). These documents should accordingly be stricken. *See Todd v. Tempur-Sealy Int'l, Inc.*, 2016 WL 5746364, at *4 n.3 (N.D. Cal. Sept. 30, 2016); *Bowoto v. Chevron Corp.*, 2006 WL 2455752, at *2 n.4 (N.D. Cal. Aug. 22, 2006). In the alternative, Lead Plaintiffs offer their own appendices rebutting Milton's spurious claims. *See* Block Decl. Ex. C.

1   "solved what no one else could," rendering diesel trucks "obsolete for good," *id.* at 3, included

2   a patently false factual misrepresentation—that Nikola solved what no one else could by

3   developing the "World's first free-standing electrode automotive battery" and with "record

4   energy density." ¶224. The tweet was also hyping a press release (which he had already

5   drafted) to be issued the next day, proclaiming that Nikola had developed a new, "game-

6   changing" battery that could double current EV passenger car range, provide Nikola's BEV

7   trucks with an 800-mile range and FCEV trucks with a 1000-mile range, and significantly

8   reduce weight and cost compared to lithium-ion batteries. *See* ¶¶222-26. Both the tweet and

9   the press release were false. Nikola had never developed a battery, let alone a "game-

10   changing," "free-standing electrode" battery that could achieve the range Milton claimed.

11       As for his false statement on September 9, 2020 that the Badger is "all Nikola," this

12   did not become puffery simply because Nikola issued a press release the previous day

13   explaining that GM would manufacture the Badger. Milton misrepresented that the Badger's

14   design and important IP belonged to Nikola, not that Nikola was manufacturing the Badger.

15   Plus, investors were entitled to rely on what Nikola's Chairman categorically stated rather

16   than be left to guess the accuracy of what Milton said or what the press release (issued a day

17   earlier) implied. *In re QuantumScape Sec. Litig.*, 2022 WL 137729, at *11 (N.D. Cal. Jan. 14,

18   2022) ("It is reasonable to think that investors were entitled to rely on the unequivocal

19   representations that" the company's product had overcome fundamental risks and disclosure

20   of other contradictory information does not reduce "the risk of real deception to nil.").

21       Finally, Milton argues that certain of his statements were merely "incomplete," and

22   therefore not actionable. Milton Mot. 4. As an example, he points to one of his statements on

23   June 1, 2020: "We don't build on speculation; we build on orders. We're very similar to like

24   Airbus or Boeing where we're sold out for many, many years. We're the only company in the

25   world that is sold out for many, many years … It's all based on orders. I think that's the reason

26   Nikola is worth so much money today." *Id.* As explained, this was misleading because the

27   vehicles were never built, the orders were illusory, and the backlog was worthless until Nikola

28   actually solved the problem of producing hydrogen at economically rational prices. Claiming

1  Nikola was "worth so much money today" because of an order backlog for a product that was

2  not functional, was materially misleading. *Workhorse Group*, 2021 WL 5768479, at *5.

3  **III.  WELL-PLEADED FACTS SUPPORT AN INFERENCE THAT THE NIKOLA DEFENDANTS ENGAGED IN A SCHEME TO DEFRAUD**

4          Relying upon *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135

5  (2011), the Nikola Defendants[10] argue that they were not the "makers" of Milton's statements

6  under 10b-5(b). But Lead Plaintiffs make no such allegation.[11] Rather, the CAC alleges

7  Milton, Russell, Brady, Worthen, Girsky, and Shindler participated in a scheme under 10b-

8  5(a) and (c). ¶¶551-53. Defendants do not meaningfully argue to the contrary. Indeed, *Lorenzo*

9  *v. SEC*, 139 S. Ct. 1094, 1100 (2019)—which held that a defendant can be liable for another's

10 misstatements if part of a scheme, even if he did not "make" the statement and "the only

11 conduct involved concerns a misstatement"—is conspicuously absent from their briefing. *See*

12 *also In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 709 (9th Cir. 2021).

13         These defendants "engag[ed] in a transaction"—taking Nikola public at an incredibly

14 inflated perceived valuation—which had the purpose and effect of deceiving the market. *Abdo*

15 *v. Fitzsimmons*, 2021 WL 616324, at *11 (N.D. Cal. Feb. 17, 2021); *see infra* §V(D).

16         In *Abdo*, a company's directors "did nothing" to stop an executive from lying to

17 investors. *Id.* at *12. The board's permissive conduct—including signing forms necessary to

18 issue shares while knowing the executive had misstated facts—"contribute[d] to the false

19 impression that [the executive] was somebody whose representations could be trusted, instead

20 of someone who had just directed fraud by the Company…. All of this was going on while

21 the [directors] knew that the Company was … in need of a sudden infusion of cash." *Id.* at

22 *13; *cf. infra* §(V)(D). Here, the Nikola Defendants' participation was essential to the scheme.

23 They created the false impression that Milton could be trusted by repeatedly allowing Milton

24

---

25 [10] Defendant Nikola itself does not challenge its status as a "maker" of Milton's statements.
It would have been futile to try. *E.g. In re Tesla, Inc. Sec. Litig.*, 477 F. Supp. 3d 903, 926

26 (N.D. Cal. 2020) (finding company liable for executive's tweets because "[i]t is beyond
dispute that a corporation can be liable for the fraud committed by its officers"); *see also In*

27 *re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476-78 (9th Cir. 2015).

28 [11] Nor does the CAC allege a breach of a duty to correct prior misstatements, *see* Nikola Defs.'
Mot. 9, it alleges that Defendants' statements furthered Milton's fraud.

---

to "turn right around and make more misrepresentations to investors," ¶¶352, 137; *Abdo*, 2021 WL 616324, at *13,[12] signing SEC filings that both contributed to Milton's false narratives and signaled investors to trust in Milton, ¶91; *Abdo*, 2021 WL 616324, at *15, approving a misleading press release, ¶223, establishing a system that rewarded Milton and the Nikola Defendants for fraud, *e.g.*, ¶72, and denying the Hindenburg Report's allegations, ¶403, which "served to further the scheme through distraction and concealment," *Firstenergy*, 2022 WL 681320, at *6. Without the Nikola Defendants' conduct, the scheme would have unraveled before Nikola could go public at its inflated valuation. *See infra* §V(D).

## IV.  DEFENDANTS ARE RESPONSIBLE FOR THE FALSE AND MISLEADING STATEMENTS CONTAINED NIKOLA'S SEC STATEMENTS

"[A] corporate official … who, acting with scienter, signs a SEC filing containing misrepresentations, 'make[s]' a statement so as to be liable as a primary violator under § 10(b)," even though the officer "did not participate in the drafting of the allegedly false financial statements." *Howard v. Everex Sys.*, Inc., 228 F.3d 1057, 1061 (9th Cir. 2000); *see also Abdo v. Fitzsimmons*, 2018 WL 11220494, at *10 (N.D. Cal. May 22, 2018) (noting "the Ninth Circuit's policy of holding officers responsible for the contents of the documents they sign."). Defendants' arguments to the contrary are nonsense. They spoke via Nikola's SEC filings in ways that furthered Milton's false and misleading statements; in addition to their role in the scheme, they independently made their own misstatements. They are right, however, about one thing: context matters. *See In re Vaxart, Inc. Sec. Litig.*, 2021 WL 6061518, at *4 (N.D. Cal. Dec. 22, 2021) (finding company's statements misleading in the context of an officer's prior statements).

### A.  The Proper Context in Which to Read Nikola's SEC Filings Is the Backdrop of Milton and Nikola's Statements Since 2016

"'[W]hether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact,'" so Lead Plaintiffs' claims may only be dismissed where "the adequacy

---

[12] *See also In re Firsterergy Corp.*, 2022 WL 681320, at *21 (S.D. Ohio Mar. 7, 2022) ("[W]ithholding of current factual information is alleged to have furthered the scheme").

of [Nikola's] disclosures is … 'so obvious that reasonable minds [could] not differ.'" *S.E.C.
v. Todd*, 642 F.3d 1207, 1220-21 (9th Cir. 2011). Defendants have not made such a showing.[13]

The disclosures Defendants point to suffer from the same fatal flaw: they do not refute or otherwise disavow Nikola and Milton's previous false and misleading statements, which provide the context in which any reasonable investor would interpret the disclosures. *See In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 814 (N.D. Ill. 2017) ("[A]n issuer needs to disclose the truth clearly before a lie becomes immaterial."); *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995) (non-contradictory disclosures "not only do not cure, but arguably contribute to the alleged misconception"). Indeed, the disclosures they highlight can reasonably be interpreted to be fully consistent with Nikola and Milton's prior false and misleading statements. *See Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991) ("[N]ot every mixture with the true will neutralize the deceptive. If it would take a financial analyst to spot the tension between the one and the other, whatever is misleading will remain materially so, and liability should follow."). Milton also continued to make false statements *after* each SEC filing at issue. Reasonable minds could easily decide that Nikola's SEC filings failed to adequately disclose that (1) Nikola had no viable plan for producing hydrogen, (2) Nikola had no working hydrogen infrastructure (or even concrete plans to build it), (3) the Nikola One never functioned, and (4) the Badger was mere concept art.

## B.    Nikola's Hydrogen Infrastructure

Underpinning Nikola's plans to sell their FCEV trucks and build out their "planned network of hydrogen fuel cell stations" was the ability to produce hydrogen. Indeed, Nikola described FCEV/BEV sales as a "core product offering" and their "planned network of hydrogen fuel cell stations" as "the key differentiator of our business model." ¶¶301-02.

Yet Nikola had never produced hydrogen. As Nikola admitted to the DOJ, "Nikola has never produced hydrogen," ¶130; "Milton tends to mix up 'we plan to have' with 'we have' when speaking in public," CAC Ex. C, at 38. Russell admitted it was "indefensible" for Milton

---

[13] While falsely (and predictably) accusing Plaintiffs of cherry-picking statements out of context, Nikola Defs.' Mot. 9, they (ironically) do just that to fashion most of their arguments.

1   to have said Nikola "can produce over 1,000 kilograms a day on site." ¶¶137, 228. Brady

2   admitted this was a "false statement" and Worthen said it was "not true." ¶137.

3   Defendants' arguments that these statements in the June 15, 2020 S-1 are not

4   misleading and otherwise protected as forward-looking statements lack merit.[14] Nikola Defs.'

5   Mot. 10. Before Nikola could sell its core products, its FCEV trucks, it needed to produce the

6   power source for them to operate. And before it could build out its network of hydrogen

7   fueling stations, it had to be able to produce hydrogen fuel. "Planned," even in a vacuum,

8   suggests some identifiable, executable plan. But that plan was dependent on, and had to wait

9   for, Nikola's ability to produce hydrogen. And these statements must be read in the context

10  of Milton's prior and contemporaneous claims that all the major engineering and economic

11  challenges of those stations had been solved, and hydrogen had been produced by Nikola. *See*

12  *QuantumScape*, 2022 WL 137729, at *11 (investors misled where company "falsely stated it

13  was ready for commercialization" of solid-state batteries when, in fact, its testing had not

14  established it could actually produce a working battery).

15  For example, six days before the June 15, 2020 S-1, Milton claimed on Twitter that

16  "we have stations going up in Canada and they use clean energy for our hydrogen. Solar,

17  Wind, and Hydro gives us under $4 per kg hydrogen." ¶290. This followed weeks of

18  interviews and podcast appearances leading up to Nikola's listing on the Nasdaq in which

19  Milton repeatedly said Nikola was already producing hydrogen at under $4 per kg. ¶¶262-69,

20  277-99. The June 15, 2020 S-1's phrase "planned network of hydrogen fueling stations" does

21  nothing to correct the public record. A reasonable investor reading the S-1 would conclude

22  the "planned" network was being planned on these terms (i.e., that Nikola had built hydrogen

23  fueling stations and had a plan to continue building more). It was not.

24  Defendants also incorrectly argue that cautionary language—such as, "[t]o the extent

25  we are unable to produce the hydrogen, we may be unable to establish these fueling

26  stations"—renders statements about hydrogen production and hydrogen fueling stations

27

28  ---
    [14] Defendants rehash these same arguments in defending their statements on hydrogen and
    hydrogen infrastructure made in the July 17, 2020 S-1. Nikola Defs.' Mot. 12.

forward looking and inactionable. Nikola Defs.' Mot. 10. To be adequate, cautionary language must "discredit the [allegedly misleading statements] so obviously that the risk of real deception drops to nil." *Virginia Bankshares*, 501 U.S. at 1097. It must be "precise" and "directly address" the alleged misrepresentations. *Provenz v. Miller*, 102 F.3d 1478, 1493 (9th Cir. 1996).[15]

Here, cautioning that if Nikola was "unable to produce the hydrogen" it might not be able to build its network of fueling stations misses the mark as this disclosure did not "caution" investors that Nikola had not yet produced any hydrogen and did not correct Milton's public barrage of statements that Nikola had solved the problem and could produce hydrogen at below $4 per kilogram. *QuantumScape*, 2022 WL 137729, at *12 (cautioning investors that company "may encounter substantial delays in the design of its solid-state battery cells, which could prevent it from commercializing any products" failed to adequately warn investors that company "in fact did not (allegedly) have a battery that would function as promised").

## C.    The Nikola One

Nikola Defendants argue that listing the Nikola One in the June 15, 2020 S-1 as a product offering was not false or misleading because Nikola was clear that it was not yet producing any vehicles and noted that no production plans for the Nikola One existed. Nikola Defs.' Mot. 11. These arguments miss the point as they misrepresented Nikola's product offering (i.e., Nikola One was a "[c]lass 8 sleeper cab" with "an estimated range of up to 400-750 miles," ¶¶303, 356). Nikola ostensibly had working prototypes of the Nikola Two and Nikola Tre by June 2020—something that could be replicated for large scale manufacturing. But Nikola never finished a working prototype of the Nikola One and, in fact, stopped work on it after the December 2016 reveal of what was effectively a truck shell emblazoned with "H2." ¶¶111, 303, 356. The Nikola One was not a product that Nikola could offer to anyone, so it was misleading to suggest it was part of the product line-up.

---

[15] *See also, In re Nuvelo, Inc., Sec. Litig.*, 2008 WL 5114325, at *16 (N.D. Cal. Dec. 4, 2008) (holding that cautionary language must "precise[ly]" and "directly" address the statements); *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 882 (N.D. Cal. 2004) (equating the bespeaks caution doctrine and PSLRA safe harbor and citing *Provenz's* standard).

The Nikola Defendants also contend that their statements in the September 14, 2020 8-K disputing the Hindenburg Report's assertion that the Nikola One was a "pusher" were neither false nor misleading. Nikola Defs.' Mot. 13. Defendants suggest that it was accurate for Nikola to state the Nikola One "is a real truck that sits in Nikola's showroom," ¶406—not a "pusher"—because eight components of the Nikola One (none of which were a hydrogen fuel cell or motor) had been tested and were functional. Defendant Brady, however, apparently disagrees, as he admitted that the "Nikola One unveiled in December 2016 … was 'a pusher.'" ¶111. Nikola also admitted in its 2020 Form 10-K that it was "inaccurate" to claim that the Nikola One was "a fully functioning vehicle." ¶430.

As for Defendants' statements about having an order backlog of 14,000 FCEV trucks worth approximately $10 billion in potential revenue (which they made in the April 6, 2020 8-K and Proxy, June 15, 2020 S-1, July 17, 2020 S-1, and August 4, 2020 10-Q), Defendants contend that no reasonable investor could have been misled because the June S-1 said these reservations were for the Nikola Two, not the Nikola One, and said that the reservations were cancellable. Nikola Defs.' Mot. 11. Again, touting this backlog for a product that could not function was misleading. Until Nikola "solved the problem" of producing hydrogen, and producing it at economically feasible prices, the backlog misrepresented the value of Nikola. Here, there is no dispute that most of Nikola's purported billions of dollars in backlog—which Milton repeatedly (and in close proximity to the issuance of these SEC filings) claimed was made up of binding contracts worth billions of dollars, ¶¶249, 367, 377—were for its FCEV trucks, for which Nikola was still unable to produce any hydrogen fuel. Even if Nikola could build the FCEV trucks, the fact that there was no hydrogen to power them rendered the repeated references to the billions of dollars of orders materially misleading. *See Workhorse Group*, 2021 WL 5768479, at *5 (holding that "[d]efendants repeatedly referenc[ing] their growing backlog as an indicator that they were a strong growing company" was misleading where company was unable to manufacture the vehicles to meet its backlog). Nikola emphasized that it considered the "size of the committed backlog to be an important indicator of our future performance," suggesting that investors should treat the 14,000 FCEV "orders"

to reflect something other than trivial expressions of interest. ¶380.

### D.     The Badger

The Badger was nothing more than a computer rendering of a non-existent truck. So Nikola's disclosure that it "do[es] not expect to develop production plans for the Badger unless we enter into a strategic partnership with an established OEM" does nothing to inform investors that the Badger did not exist. Nikola Defs.' Mot. 11. Indeed, Defendant's statements about the Badger must be read in the context of Milton's statements about the Badger. On June 11, 2020, only 4 days before Nikola issued the June S-1, Milton claimed, "So we developed all the tech. **We've built the whole truck**, and now what we want to do is partner with a big OEM." ¶298. This followed claims from Milton on June 8, 2020, where Milton claimed Nikola had produced a functioning Badger prototype. ¶¶282-83. Thus, Nikola's description of the state of the Badger in the June S-1 aligned perfectly with Milton's own description of plans for the Badger. It provides no contextualization or cautionary language to convey that the Badger was mere concept art, no engineering work had been done for the Badger, and there was no prototype of the Badger. In fact, the only place where Defendants describe the Badger as a mere "concept design" is in bracketed text that their counsel disingenuously inserted into the CAC's recitation of a false statement in the June S-1. *See* Nikola Defs.' Mot. 11 ("Plaintiffs also allege the June S-1 falsely stated that 'the Badger *[Nikola's pickup truck concept design]* is designed to target and exceed every electric or fossil fuel pickup truck in its class.'"). The qualification about the Badger in italics above does not exist in the S-1 itself. It was inserted by counsel.

## V.     LEAD PLAINTIFFS' ALLEGATIONS ESTABLISH THAT EACH DEFENDANT ACTED WITH THE REQUISITE SCIENTER

"A defendant is liable under Section 10(b) and Rule 10b-5 when he acts with scienter, a 'mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness.'" *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 619 (9th Cir. 2017). For pleading scienter, "we must consider 'whether the total of plaintiffs' allegations, even though individually lacking, are sufficient to

create a strong inference that defendants acted with deliberate or conscious recklessness." The inference of "scienter need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). Rather, an inference of scienter is sufficient if a reasonable person would deem it "at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. If the inferences are in "equipoise," the complaint survives. *Id*. at 331.

### A.   Contemporaneous Reports and Communications Demonstrate that Each Defendant Knew Their and Milton's Statements were False When Made

"The most direct way to show both that a statement was false when made and that the party making the statement knew that it was false is via contemporaneous reports or data, available to the party, which contradict the statement." *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004).[16]

---

[16] Allegations from the recently unsealed derivative actions involving Nikola support scienter, and, if the Court does not find the CAC's allegations suffient to support scienter, Lead Plaintiffs respectfully requests leave to amend. For example, in an email chain beginning February 29, 2020, Girsky and other directors supported Milton's objective of obtaining a following of retail investors and shared Richard Branson's media strategy in advance of the Virgin Galactic IPO as an example of how to do it. Russell, Brady, and Worthen attended an April 9, 2020 Board meeting where a presentation warned that Nikola was unable to develop hydrogen infrastructure and did not expect to have any physical infrastructure built or operational until after September 30, 2020 (the target date for completing the initial blueprints, contract, and charging standard for Nikola's fueling stations). Block Decl. Ex. A. ¶¶132, 154. That same Board presentation also noted that Nikola's target date for a production-ready Nikola Tre truck was September 30, 2020, but that Nikola was experiencing delays. *Id.* ¶154(d). Russell, Brady, Worthen, and Girsky attended a July 23, 2020 Board meeting that included a presentation stating Nikola had abandoned its plans to use its own battery for the Nikola Tre and, as of June 9, 2020, had planned to use a battery manufactured by third-party suppliers Kreisel or Borg Warner. Block Decl. Ex. A., ¶154, 161. The same Board presentation also stated that the Nikola Tre assembly line was still being built, and Nikola was at risk of producing "ZERO trucks" by the end of 2021. *Id.* ¶¶154(e), 159. Russell, Brady, Worthen, Girsky, and Shindler attended an October 28, 2020 Board meeting in which the presentation featured a slide stating that "Nikola Plan Starts with On-Site vs. Hub Production. A Network Combining Both Production Models Is Likely." Block Decl. Ex. A., ¶154(a). Accordingly, almost a month after Milton had resigned from the Company, Nikola still had not decided how it was going to produce hydrogen. Moreover, the presentation made clear that the Company has yet to "build out a fullscale commercial [hydrogen] station." *Id.* The

Footnote continued on next page

---

***Milton.*** The CAC is so littered with specific instances of Milton being told or acknowledging information directly contrary to what he said publicly that it is not possible to list them all here. *See, e.g.*, ¶¶126-27, 131-32, 139, 147, 172. His fellow officers and Defendants admit that he made false statements. *See* CAC Ex. C. But Milton's scienter is also shown by the nature of his false statements, and his role as an incredibly hands-on CEO. *See Oracle*, 380 F.3d at 1234 ("It is reasonable to infer that the Oracle executives' detail-oriented management style led them to become aware of the allegedly improper revenue recognition of such significant magnitude…."). Indeed, he repeatedly lied and misrepresented fundamental pieces of Nikola's business, including the state of its fleet of FCEV trucks and that it was producing hydrogen. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1001 (9th Cir. 2009) ("Where the defendants 'must have known' about the falsity of the information they were providing to the public because the falsity of the information was obvious from the operations of the company, the defendants' awareness of the information's falsity can be assumed."). Milton's contrary arguments are disingenuous. Milton Mot. 5-7.

***Russell, Brady, and Worthen.*** In 2019, Worthen advised Milton about the legal risks of lying on Twitter. ¶197. And in a series of conversations in 2019 and 2020, Russell asked Milton to let Worthen pre-screen any tweets Milton planned to post from Nikola's corporate account." ¶197; *see Ferris v. Wynn Resorts Ltd.*, 2021 WL 3216462, at *15 (D. Nev. July 28, 2021) (allegations that an officer told the chairman to cease misbehavior demonstrated he was "aware of information contradicting" statements denying the chairman's behavior).

On May 31, 2020, Milton emailed the Board (including Russell, Brady, and Worthen) seeking approval of a nearly $31.5 million purchase order for electrolyzers:

> 2nd major point. IPO. I am getting ready to go on a media blitz and the most critical item in our business model is that we don't have stations. I would like to announce this on Monday as huge news. This will help our stock, create much stronger following and base layers of investors and it also will ease the criticism I am going to get going into interviews. I believe our PIPE and SPAC will be very happy to hear we are moving on our stations…

slides from the presentation stated that the Company planned to "[c]ommence construction on first 8-ton station in 2021 to validate technology and fueling." *Id.*

¶128. On July 20, 2020, Nikola's Global Head of Business Development emailed Russell, Brady, and Worthen acknowledging that Milton's statement that Nikola's "cost of hydrogen below $3/kg" was an "inaccuracy." ¶352. In Nikola's DOJ presentation, Russell admitted that it was "indefensible" for anyone to say Nikola produces hydrogen; "[t]he headquarters station is for storage and dispensing not production." ¶137. Brady admitted that "it is a false statement" to say Nikola was producing hydrogen. ¶137. And Worthen admitted that it "is not true" Nikola could produce hydrogen "and Milton knew it was not true" because they "discussed this a 'million times.'" ¶137.

Brady texted Russell on January 1, 2020 about a presentation Milton gave: "Spoke with Umran[17] for a few minutes this afternoon. He said Trevor's battery presentation was full of misrepresentation." CAC Ex. C, at 58. In the DOJ presentation, Russell said, "Romeo was the best option, but Milton badly wanted Nikola to own its battery technology," Brady said, "Nikola is years away from having the battery technology described," and Worthen said, "Milton worked hard to ensure that Romeo could never say that its batteries were in Nikola's trucks," but "Nikola did not and still does not have a commercializable battery." ¶¶172, 179. Worthen also told Milton not to make statements to the contrary. ¶179.

Brady emailed Milton in March 2019 with third party research regarding TCO of Class 8 semi-trucks, noting TCO for diesel trucks was in the "$.85-$.95 range," and that "for our purposes, we will use $.95…." ¶182. In March 2019, a Nikola analyst told Nikola executives the Company was using too high of a TCO for diesel trucks and the projected TCO for Nikola would be, at best, on par with diesel. ¶183. In April 2019, Elizabeth Fretheim sent senior executives notes from her discussions with semi-truck fleet representatives, including feedback that Nikola's "costs are high and not at parity with diesel." ¶183.

To the DOJ, Brady admitted that "Nikola aspires to build components in-house but does not do so at present." ¶159. He also conceded that Milton's statement about having an off-grid headquarters "is completely false. Nikola had merely discussed moving to an off-grid headquarters, but it was deemed cost prohibitive." ¶190.

---

[17] Nikola's Global Head of Vehicle Engineering.

***Girsky and Shindler.*** Girsky, as CEO of VectoIQ, and Shindler, as CFO of VectoIQ, said that they and other VectoIQ executives "conducted due diligence examinations of Nikola and discussions with Nikola's management" before consummating the reverse merger. ¶254. So they either did the due diligence represented and knowingly made false statements in the SEC filings, or lied about having conducted diligence and was reckless in signing the SEC filings containing false statements. *Vaxart*, 2021 WL 6061518, at *6 ("It strains credulity to think the company would have acted without ensuring that [its business partner] could actually produce [what] it claimed."); *Bond v. Clover Health Investments, Corp.*, 2022 WL 602432, at *2 (M.D. Tenn. Feb. 28, 2022) (finding it "implausible" that SPAC sponsors' diligence would not have "involved a matter core to [its] business model"). Indeed, an OEM engineer who visited Nikola's offices in February 2020 (around the same time that VectoIQ supposedly did diligence) to conduct diligence in connection with a potential partnership to build the Badger, summed up the Badger's state at the time as "vaporware." ¶¶141, 235. In short, Nikola did not produce hydrogen, making VectoIQ's claim—signed off on by Girsky—that Nikola was "solving the fleet's concerns as to where to refuel with green hydrogen at competitive pricing to diesel," ¶253, false and misleading. VectoIQ's statement, also signed off on by Girsky, that "Nikola has a high volume of fuel cell electric vehicle pre-orders, currently [valued] at over $10 billion," ¶252, was also false and misleading when made.

## B. The Core Operations Theory Bolsters Plaintiffs' Specific Scienter Allegations

"Allegations regarding management's role in a corporate structure and the importance of the corporate information about which management made false or misleading statements may also create a strong inference of scienter when made in conjunction with detailed and specific allegations about management's exposure to factual information within the company." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008). The Court may also impute scienter to individual defendants where "a company's public statements [are] so important and so dramatically false that they would create a strong inference that at least some corporate officials knew of the falsity upon publication." *Oregon Pub. Emps. Ret. Fund v.*

*Apollo Grp. Inc.*, 774 F.3d 598, 607-08 (9th Cir. 2014); *see also Alphabet*, 1 F.4th at 706 (considering "a senior executive's role in a company," with the "importance of the information," may make it "absurd to suggest that management was without knowledge").

Nikola was a pre-revenue company, and its business model relied entirely upon its ability to manufacture FCEV and BEV semi-trucks, produce hydrogen economically, and construct a network of hydrogen fueling stations to support a fleet of leased FCEV trucks. Nikola had accomplished none of these threshold objectives at any time during the Class Period, yet Defendants repeatedly made false and misleading statements to the contrary. There can be no dispute that any person conducting due diligence on Nikola, or an executive at the company, did not know that Nikola had not yet produced any hydrogen or at prices which made it economically more attractive than diesel. Indeed, the hydrogen station at Nikola's headquarters was simply a storage facility unable to produce hydrogen. Ex. C at 37-38. The Individual Defendants either knew, or recklessly disregarded, that Nikola could not execute on its business plan until it could produce hydrogen, which it had not yet done.

Defendants also held positions and tenure that would suggest they knew the statements at issue were false and misleading. Russell was Nikola's President and Director from February 2019 to June 2020 and has been Nikola's CEO and Director since June 2020. ¶52. He was personally hired by Milton and has close personal and financial ties to him. *Id.* Brady was Nikola's Treasurer from November 2017 to June 2020 and has been Nikola's CFO since November 2017. ¶53. Brady was also personally hired by Milton. *Id.* Worthen has been Nikola's CLO and Secretary since October 2015 and was personally hired by Milton. ¶54. Girsky was CEO and Director of VectoIQ, has been one of Nikola's directors since June 2020, and has been Chairman since September 2020. ¶56. Shindler was CFO and Director of VectoIQ and has been a director of Nikola since September 2020.

### C. Defendants' Actions in Response to the Hindenburg Report and Subsequent Government Scrutiny Show Scienter

On September 14, 2020, Milton, Russell, Brady, Worthen, and Girsky signed off on Nikola's response to the Hindenburg Report, which made additional false and misleading

statements in an attempt to disprove the allegations in the Hindenburg Report. ¶¶403-04. Nikola also filed a form 8-K with the SEC, signed by Worthen, which made many of the same false and misleading claims. ¶¶405-09. The internal investigation conducted by K&E demonstrated that Defendants already knew they, Milton, and Nikola had repeatedly made materially false and misleading statements, but Defendants never corrected the record.

On July 29, 2021, the SEC filed a complaint against Nikola. *See* CAC Ex. A. Nikola settled the SEC's claims—which are nearly identical to the claims alleged here—less than five months later, on December 21, 2021. Nikola agreed to cease and desist from future violations of the securities laws, pay a $125 million penalty, and continue cooperation with the SEC's ongoing litigation and investigation against Milton.[18] The speed with which Nikola settled the SEC complaint—agreeing to a significant monetary penalty and concessions— contributes to a finding that Defendants acted with scienter. *FirstEnergy*, 2022 WL 681320, at *20; *In re Tesla*, 477 F. Supp. 3d at 930.

### D. Defendants' Scheme to Keep Nikola Afloat and Cash in by Taking it Public at an Inflated Price Demonstrates Their Intent

In late 2019, Nikola was running out of money and struggling to raise the necessary funds from traditional investors. ¶¶63-64. VectoIQ was, at the same time, faced with an impending dissolution, having until May 18, 2020 to find a merger partner or return investors' money. ¶65. Cowen—an original investor in VectoIQ which had previously provided financial services to Nikola—proposed Nikola as an acquisition target and introduced the two boards in mid-November 2019. *Id.* VectoIQ pitched the Legacy Nikola Board on the advantages of a SPAC compared to an IPO, including (1) the ability to sell investors on forward-looking projections, (2) early investors' ability to receive partial cash. *Id.*

With a concrete path towards Nikola becoming a publicly traded company, Defendants could finally take advantage of the most significant part of their compensation: shares of Nikola stock and future awarded RSUs. ¶¶73-85. Tapping into those RSUs alone would result in a windfall for Defendants—a combined $81 million for Milton, Russell, Brady, and

---

[18] *Nikola Corporation to Pay $125 Million to Resolve Fraud Charges*, SEC.gov (Dec. 21, 2021), https://www.sec.gov/news/press-release/2021-267.

1  Worthen at just the first milestone. ¶104. And the milestones for awarding RSUs to

2  Defendants were solely based on the share price of Nikola common stock. ¶¶72, 75, 78, 80.

3  In exchange for their shares of VectoIQ stock (for which they had paid nominal sums of

4  money), Girsky and Shindler received over 1.7 million and nearly 400,000 shares,

5  respectively, of Nikola common stock at close of the merger. ¶¶83, 84.

6          Milton became singularly focused on increasing Nikola's stock price. ¶¶93-104. The

7  Nikola Defendants knew of most (if not all) of the many lies Milton told about Nikola. *See*

8  *supra* §(V)(A). Indeed, their internal acknowledgment of Milton's problematic use of social

9  media underscore their knowledge. *See, e.g.*, ¶¶101, 137, 194-95, 197-98. But they

10 consciously—and conspicuously—took no meaningful action to reel him in or correct the

11 record. *See, e.g.*, ¶¶195, 198. Indeed, they signed SEC filings that served only to perpetuate

12 Milton's fraud by ensuring their and the Company's statements did not substantively

13 contradict what Milton had said. ¶196. Their SEC filings also emphasized Milton's singular

14 importance to Nikola: Nikola was "highly dependent" on Milton's services because he was

15 "the source of many, if not most, of the ideas and execution driving Nikola." ¶91.

16         Defendants' knowledge, combined with (1) their decision to proceed with the SPAC

17 reverse merger and (2) their failure to establish controls over Milton's ability to speak to

18 investors, is enough to demonstrate their liability as primary violators of Rules 10b-5(a) and

19 (c). *Cf. Abdo*, 2021 WL 616324, at *11-13 (holding that directors who "did nothing to

20 establish controls over [the CEO] with respect to his efforts to sell securities to investors" and

21 "signed off on deals" to issue new shares while (1) aware that the CEO and senior

22 management had lied to the investors that had been pitched on those new shares and (2)

23 knowing that the company was "in a desperate financial situation and was in need of a sudden

24 infusion of cash" could be held liable under Rule 10b-5(a) and (c)).

25 **VI.    THE CAC READILY SATISFIES THE PLEADING STANDARD FOR LOSS
          CAUSATION**

26

27         "The Ninth Circuit has recently clarified that…loss causation is a fact-intensive inquiry

28 better suited for determination at trial than at the pleading stage." *Zamir v. Bridgepoint Educ.,*

*Inc.*, 274 F. Supp. 3d 1057, 1073 (S.D. Cal. 2017). "To establish loss causation in a fraud-on-the-market case, the plaintiff must show that after purchasing her shares and before selling, the following occurred: (1) 'the truth became known,' and (2) the revelation caused the fraud-induced inflation in the stock's price to be reduced or eliminated." *In re BofI Holding*, 977 F.3d at 789. One way a plaintiff can meet the first element is to identify a "corrective disclosure." *Id.* at 790. "A corrective disclosure can … come from any source, including knowledgeable third parties such whistleblowers, analysts, or investigative reporters. [It] need not reveal the full scope of the defendant's fraud in one fell swoop; the true facts concealed by the defendant's misstatements may be revealed over time through a series of partial disclosures [and it] 'need not precisely mirror the earlier misrepresentation.' It is enough if the disclosure reveals new facts that, taken as true, render some aspect of the defendant's prior statements false or misleading." *Id.* (citations omitted). A plaintiff also must show that the corrective disclosure "caused the company's stock price to decline and the inflation attributable to the misstatements to dissipate." *Id.* at 791.

To adequately plead loss causation a plaintiff needs "to provide enough factual content to give the defendant 'some indication of the loss and the causal connection that the plaintiff has in mind.' That effort 'should not prove burdensome.'" *Id.* at 794.

Here, the CAC clearly provides Defendants with notice of Lead Plaintiffs' loss causation theory. ¶¶459-528. It identifies each day on which Nikola's stock price declined, why it declined, and how the disclosure corrected prior misinformation. Nikola's stock began to plummet after publication of the Hindenburg Report, falling from its closing price of $42.37 per share on September 9, 2020 to close at $32.13 per share on September 11, 2020, a 24% decline in 2 days. At this stage, Lead Plaintiffs have provided Defendants with notice of their loss causation theory. Publication of so-called "short reports" can and frequently do support loss causation. *E.g.*, *QuantumScape*, 2022 WL 137729, at *18 (stock price decline following short reports adequately establishes loss causation); *Clover Health*, 2022 WL 602432, at *18 (where significant stock drop followed Hindenburg report, market was behaving "in a way that would not make sense if the Report had lacked credibility"); *Garcia v. J2 Glob.*, 2021

WL 1558331, at *22 (C.D. Cal. Mar. 5, 2021) (finding that reports written by Hindenburg Research and Cintron Research were corrective because "[t]hey were authored by two named firms" who "spent considerable time and effort" preparing the reports and stated that "[t]o the best of our ability and belief, all information contained herein is accurate and reliable…").[19]

The Nikola Defendants contend the Hindenburg Report cannot establish loss causation because the information from it was "already publicly available." Not so. Defendants disingenuously cite filings made **six months to a year after** the publication of the Hindenburg Report to claim the information was publicly disclosed. *See* Laufer Decl. Exs. 10 and 12 (Nikola's SEC filings dated February 25, **2021** and August 3, **2021**).

The only public disclosures Defendants cite that pre-date the Hindenburg Report concern the capabilities of the Nikola One and the production of the Nikola Tre. While the June 17, 2020 *Bloomberg* article stated Milton had exaggerated the "capabilities" of the Nikola One," Nikola Defs.' Mot. 20, the Hindenburg Report revealed that the Nikola One was a complete sham, consisting largely of frame rails with wheels mounted on a suspension. Moreover, before the Hindenburg Report, Milton forcefully denied the even more modest reports in the *Bloomberg* article and continued to lie to investors, stating that "every part of that truck was functional," it "was totally capable of being driven" and certain parts were merely removed for safety reasons. ¶¶314, 387. Hindenburg revealed that this was a lie.

As for the production of the Nikola Tre, while page 85 of Nikola's June 15, 2020 Form S-1 (Laufer Decl. Ex. 1) stated that Nikola *planned* to start production in Ulm, Germany in 2021, Milton told investors a month later, on July 19, 2020, that they were already "coming off the assembly line right now in Ulm, Germany." ¶353. The Hindenburg Report revealed that Bosch denied Milton's claim and that the trucks would not enter production until 2022.

Also, the Defendants originally claimed that the Hindenburg Report itself was "false and misleading," "false and defamatory," and "designed to provide a false impression to

---

[19] The Ninth Circuit in *In re BofI* rejected a per se rule that uncorroborated allegations, even those made by persons with self-interested "motivations," cannot serve as corrective disclosures, at least where stock drops show that "the market regarded [such] allegations as credible". 977 F.3d at 792, 795.

1   investors," ¶466. Yet they subsequently admitted that many of the statements identified in the

2   Hindenburg Report "were inaccurate in whole or in part, when made." ¶39. It is disingenuous

3   for Defendants to claim that on the one hand, the Hindenburg Report did not disclose any new

4   information but, on the other hand, admit that it identified prior statements which were

5   "inaccurate in whole or in part, *when made.*" Their assertion that the report would be taken

6   "with a grain of salt" should be rejected, particularly where they have admitted to its accuracy.

7       Moreover, the Nikola Defendants' contention that the information revealed in the

8   Hindenburg Report was "already public" raises an "intensely fact-specific" truth-on-the-

9   market defense. *In re Amgen*, 2014 WL 12585809, at *15. "[C]ourts rarely dismiss a

10  complaint on this basis" and "a good company of courts, including … the Supreme Court of

11  the United States, hold fast to the position that proof of such a defense is generally limited to

12  later phases in the litigation, such as summary judgment or trial."[20] *Id.* To prevail, "Defendants

13  must show that the information was transmitted to the public with a degree of intensity and

14  credibility sufficient to effectively counterbalance any misleading impression created by the

15  alleged [misstatements]." *In re Snap Inc. Sec. Litig.*, 2018 WL 2972528, at *7 (C.D. Cal. June

16  7, 2018) (internal quotations omitted). Defendants point to no such information. The vague

17  excerpts they cherry pick from over a thousand pages of documents attached to their Motion

18  did not contradict their specific misstatements.

19      ***Subsequent stock declines were also caused by Defendants' fraud.***[21] As the Ninth

20  Circuit made clear in *BofI*, a corrective disclosure "need not reveal the full scope of the

21

22  [20] The Ninth Circuit has even held "[a] disclosure based on publicly available information
23  can, in certain circumstances, constitute a corrective disclosure." *BofI*, 977 F.3d at 795; *see
    also In re Apollo Grp., Inc. Sec. Litig.*, 2010 WL 5927988, at *1 (9th Cir. June 23, 2010)
24  (finding publicly available information could serve as a corrective disclosure by "providing
    additional or more authoritative … information that deflated the stock price"); *In re Gilead
25  Scis. Sec. Litig.,* 536 F.3d 1049, 1058 (9th Cir. 2008) (later disclosure corrective when public
    initially "failed to appreciate [the] significance" of negative information); *Hanon v.
26  Dataproducts Corp.,* 976 F.2d 497, 503 (9th Cir. 1992) (what market understands depends on
    "intensity and credibility" of information).
27  [21] Defendants cannot deny the accuracy of the Hindenburg Report, as they did, then use it as
    the basis for a truth-on-the-market defense, as they do now for subsequent events. *Snap*, 2018
28  WL 2972528, at *7 (defense unavailable where defendants "misleadingly reassured
    investors").

defendant's fraud in one fell swoop; the true facts concealed by the defendant's misstatements may be revealed over time through a series of partial disclosures." 977 F.3d at 790; *see Di Donato v. Insys Therapeutics Inc.*, 2017 WL 3268797, at \*19 (D. Ariz. Aug. 1, 2017) ("assum[ing]" subsequent disclosures to be "sufficiently novel" because allegations are presumed "true unless contradicted by something of which the Court has taken notice").[22]

The disclosure of Milton's resignation can support loss causation.[23] *See e.g., Maverick Fund, L.D.C. v. First Solar, Inc.,* 2018 WL 6181241, at \*8-10 (D. Ariz. Nov. 27, 2018) (finding loss causation adequately alleged when stock drops followed resignations of CEO and CFO, who were alleged to be instrumental in the company's business).[24]

The dissolution of the GM Partnership, cancellation of the Republic Services orders and stalled talks with BP also establish loss causation. "After allegations of fraud," ¶488, it was reported through disclosures on September 29, October 16, November 24 and November 30, 2020 that GM delayed and then cancelled its deal with Nikola that Milton widely touted

---

[22] *See also Hefler v. Wells Fargo & Co.*, 2018 WL 1070116, at \*11 (N.D. Cal. Feb. 27, 2018) (settlements with government entities, press release stating the company would change practices, DOJ subpoena, and Congressional hearing were "sufficient to plead a claim" where "stock experienced a statistically significant drop after each of these disclosures."); *Tesla*, 477 F. Supp. 3d at 913-17 (SEC investigation, subsequent announcement of SEC subpoena, and various statements by defendants walking back prior misstatements each caused investor losses); *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1045-46 (N.D. Cal. 2016) (risk materialized where seven disclosures over nearly two years caused stock price to "steadily decline[]" even though five of the disclosures "did not 'reveal[] to the market the pertinent truth that was previously concealed'").

[23] Defendants assert that such an announcement can never be a corrective disclosure unless accompanied by an express statement of wrongdoing (a proposition unsupported by the caselaw they cite). Nikola Defs.' Mot. 22. A Court recently recognized the moral hazard of Defendants' proposition in rejecting a similar "categorical rule whereby companies may announce the fact of a whistleblower letter (the accuracy of which is later confirmed), but not its contents, and avoid liability." *See In re Mattel, Inc. Sec. Litig.*, 2021 WL 1259405, at \*11 (C.D. Cal. Jan. 26, 2021).

[24] *See also Rabkin v. Lion Biotechs., Inc.,* 2018 WL 905862, at \*13-18 (N.D. Cal. Feb. 15, 2018) (finding that the totality of alleged partial disclosures which included announcement of resignations of CEOs for "personal reasons" sufficiently pleaded loss causation); *Mauss v. NuVasive, Inc.,* 2016 WL 3681831, at \*11-12 (S.D. Cal. July 12, 2016) (disclosure of resignation of CEO resulting in further decline in stock price adequately pleaded loss causation); *Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*, 964 F. Supp. 2d 1128, 1146 (N.D. Cal. 2013) (finding loss causation adequately pled where CEO's resignation amid misconduct allegations preceded stock drop, giving rise to plausible inference that market treated resignation as disclosure of fraud).

(and misrepresented) on September 8, 2020, causing Nikola's stock price to decline 7.36%, 16.12%, 12.35% and 37.80%, respectively. ¶¶487-510. On December 23, 2020, Republic Services canceled its order for 2,500 trucks that Milton touted in August 2020 because Nikola "overpromised what it was capable of," causing Nikola's stock price to decline another 18.30%. ¶¶511-16. Stock price declines following revelations that previously announced deals were secured as part of Defendants' fraudulent scheme, had been dissolved because the partners learned of the underlying fraud support loss causation because "the risk that caused the loss was within the zone of risk concealed" by the fraudulent scheme. *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1120 (9th Cir. 2013); *see also In re Charles Schwab Corp., Sec. Litig.,* 257 F.R.D. 534, 547 (N.D. Cal. 2009) (finding loss causation where plaintiffs alleged that the "subject" of the statements caused their losses).

The filing of the 2020 10-K, with its admissions, supports loss causation as these are "more authoritative" disclosures than short reports that can "deflate the stock price." *In re Apollo Grp.*, 2010 WL 5927988, at *1; *c.f. Graves v. AECOM*, 2017 WL 5502774, at *11-12 (C.D. Cal. June 19, 2017) (company's own disclosures were "more authoritative" than short report because "[t]he investing public justifiably places heavy reliance on the statements and opinions of corporate insiders.").

The DOJ and SEC actions can establish loss causation. Under *Lloyd v. CVB Fin. Corp.*, the "announcement of an investigation can form the basis for a viable loss causation theory if the complaint also alleges a subsequent corrective disclosure by the defendant." 811 F.3d 1200, 1203 (9th Cir. 2016); *see also See Rabkin,* 2018 WL 905862, at *13-18 (finding that disclosure of enforcement actions, which followed prior disclosure of an SEC subpoena, constitutes a corrective disclosure for purposes of loss causation).[25]

Finally, Defendants' argument that none of the disclosures following the Hindenburg Report establish loss causation because the Ninth Circuit has not accepted the "materialization of the risk" theory fails. Contrary to Defendants' suggestions, district courts widely recognize

---

[25] *Insys*, 2017 WL 3268797, at *21, upon which Defendants rely, is inapposite because the plaintiff there failed to identify how the alleged indictment related at all to plaintiffs' allegations.

that the case Defendants rely on, *Nuveen*, "discussed the materialization approach with apparent approval". *Mauss v. Nuvavsive, Inc.*, 2015 WL 10857519, at *15 (S.D. Cal. Aug. 28, 2015); *see also In re Amgen*, 2014 WL 12585809, at *20. *Nuveen,* 730 F.3d at 1120 ("Disclosure of the fraud is not a sine qua non of loss causation."). Subsequent to *Nuveen*, the Ninth Circuit resolved the tension in the caselaw that Defendants exploit, holding in *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750 (9th Cir. 2018) that the loss causation "inquiry requires no more than the familiar test for proximate cause" and that "[r]evelation of fraud in the marketplace is simply one of the 'infinite variety' of causation theories a plaintiff might allege to satisfy proximate cause." *Id.* at 753. Defendants conspicuously fail to cite this binding authority and rely on a line of caselaw that *Mineworkers* displaced. *See, e.g. Insys*, 2017 WL 3268797, at *16 n.4 (assuming revelation of fraud required).[26] Defendants do not meaningfully challenge that any of the events taking place after the Hindenburg Report were proximately caused by their fraud, yet this is all that is required.

## VII.  DEFENDANTS DO NOT CHALLENGE THEIR LIABILITY AS CONTROL PERSONS UNDER §20(a)

When a primary violation of §10(b) is shown, "Section 20 holds a 'control person' jointly liable with a 'primary violator.'" *In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at *14 (N.D. Cal. Nov. 4, 2020). If the Court finds a 10(b) violation adequately pled with respect to Defendant Nikola, it should also sustain the unchallenged 20(a) claims. *See In re Questcor Sec. Litig.*, 2013 WL 5486762, at *24 (C.D. Cal. Oct. 1, 2013); *cf. Graves v. Arpaio*, 623 F.3d 1043, 1048 (9th Cir. 2010) ("[A]rguments raised for the first time in … reply … are waived.").

## CONCLUSION

For all these reasons, Defendants' motions to dismiss should be denied.

---

[26] By contrast, cases decided since *Mineworkers* recognize that non-disclosure events can cause investor losses where the events are causally connected to the fraud. *E.g. In re WageWorks, Inc., Sec. Litig.*, 2020 WL 2896547, at *6, *8 (N.D. Cal. June 1, 2020); *Karinski v. Stamps.com, Inc.*, 2020 WL 281716, at *17-18 (C.D. Cal. Jan. 17, 2020), *order clarified*, 472 F. Supp. 3d 747 (C.D. Cal. 2020).

1   May 9, 2022                              Respectfully submitted,

2                                            **KELLER ROHRBACK LLP**

3                                     By:    /s/ Gary A. Gotto
                                             Gary A. Gotto (No. 007401)
4                                            3101 North Central Avenue, Suite 1400
                                             Phoenix, AZ 85012
5                                            Telephone:   (602) 230-6322
                                             ggotto@kellerrohrback.com
6
                                             *Liaison Counsel for Lead Plaintiffs*
7                                            *Nikola Investor Group II and for the Class*

8                                            **POMERANTZ LLP**
                                             Jeremy A. Lieberman (*pro hac vice*)
9                                            Michael J. Wernke (*pro hac vice*)
                                             Veronica Montenegro (*pro hac vice*)
10                                           600 Third Avenue, 20th Floor
                                             New York, NY 10016
11                                           Telephone:   (212) 661-1100
                                             Facsimile:   (212) 661-8665
12                                           jalieberman@pomlaw.com
                                             mjwernke@pomlaw.com
13
                                             **BLOCK & LEVITON LLP**
14                                           Jeffrey C. Block (*pro hac vice*)
                                             Jacob A. Walker (*pro hac vice*)
15                                           Michael Gaines (*pro hac vice*)
                                             260 Franklin Street, Suite 1860
16                                           Boston, MA 02110
                                             Telephone:   (617) 398-5600
17                                           Facsimile:   (617) 507-6020
                                             jeff@blockleviton.com
18                                           jake@blockleviton.com
                                             michael@blockleviton.com
19
                                             *Counsel for Lead Plaintiffs Nikola Investor*
20                                           *Group II and Co-Lead Counsel for the Class*

21                                           **LABATON SUCHAROW LLP**
                                             James W. Johnson (*pro hac vice*)
22                                           Michael H. Rogers (*pro hac vice*)
                                             David J. Schwartz (*pro hac vice*)
23                                           James T. Christie (*pro hac vice*)
                                             140 Broadway
24                                           New York, NY 10005
                                             Telephone:   (212) 907-0700
25                                           Facsimile:   (212) 818-0477
                                             jjohnson@labaton.com
26                                           mrogers@labaton.com
                                             dschwartz@labaton.com
27                                           jchristie@labaton.com

28

---

1

*Additional Counsel for Lead Plaintiffs*
*Nikola Investor Group II*

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28