**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Daniel Borteanu, et al., | No.  CV-20-01797-PHX-SPL |
| Plaintiffs, | |
| vs. | **ORDER** |
| Nikola Corporation, et al., | |
| Defendants. | |

Before the Court are two Motions to Dismiss (Docs. 111 & 112). The first was filed by Defendant Nikola Corporation ("Nikola") and Defendants Kim J. Brady, Steve Girsky, Mark A. Russell, Steven Shindler, and Britton M. Worthen (the "Individual Defendants"). (Doc. 111). The second was filed by Defendant Trevor Milton. (Doc. 112). Lead Plaintiff Nikola Investor Group II filed an omnibus Response (Doc. 116) addressing both Motions. Defendants filed two Reply briefs (Docs. 117 & 118). Having fully reviewed and considered the parties' briefing,[1] the Court will grant the Motions, for the following

---

[1] The Court has also reviewed and considered Defendants' Notice of Supplemental Authority (Doc. 119), Plaintiff's Response and Notice of Supplemental Authority (Doc. 120), and Defendants' Response to Plaintiff's Notice of Supplemental Authority (Doc. 121). Additionally, the Court has reviewed and considered Plaintiffs' Request for Judicial Notice of Defendant Milton's Criminal Conviction for Securities Fraud (Doc. 123), as well as the relevant Responses filed by Defendants (Docs. 124 & 125). The Court grants the parties' respective Notices of Supplemental Authority and denies Plaintiffs' Request for Judicial Notice.

reasons.[2]

## I.    **BACKGROUND**

This is a private securities class action filed by Nikola Investor Group II ("Plaintiff")—comprised of Vincent Chau, Stanley Karcynski, and George Mersho—against Nikola, several of the company's officers, and the company's founder, former CEO, and former Executive Chairman Trevor Milton. (Doc. 95 at 17–18). Nikola is a publicly traded Delaware corporation with its headquarters in Arizona. (*Id.* at 17). Nikola designs and manufactures electric vehicles and their components. (*Id.* at 19–20). Plaintiff's Consolidated Amended Class Action Complaint (the "Complaint") (Doc. 95) was filed on behalf of all investors who purchased the common stock of Nikola between June 4, 2020 and February 25, 2021 (the "Class Period"). (*Id.* at 5). Plaintiff alleges that Defendants violated §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder by misrepresenting numerous aspects of Nikola's business and operations. (*Id.* at 5–13). Plaintiff alleges that these misrepresentations inflated Nikola's stock value. (*Id.* at 6). Plaintiff alleges that when the falsity of the misrepresentations came to light, Nikola's stock value dropped dramatically, causing significant losses and damages for the plaintiff class members. (*Id.* at 14–16).

The Complaint alleges that "[w]hile Defendants misrepresented numerous aspects of Nikola's operations, the fraud can be broken down into nine categories of misrepresentations." (*Id.* at 7). Plaintiff alleges that Defendants misrepresented:

> 1. that Nikola had developed a fully operational, "zero-emissions" tractor trailer truck powered by hydrogen fuel cell technology—the Nikola One;
>
> 2. that Nikola had, in hand, over 14,000 purchase orders for its trucks, which represented 2 to 3 years of production and billions in revenue;
>
> 3. that Nikola was producing hydrogen at a fraction of the cost

---

[2] Because it would not assist in resolution of the instant issues, the Court finds the pending motions are suitable for decision without oral argument. See LRCiv. 7.2(f); Fed. R. Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

industry experts believed was possible and that Nikola was in the process of establishing a nation-wide network of hydrogen refueling stations, which would produce inexpensive hydrogen for the Nikola One and Nikola's other vehicles to operate on;

4. that the cost of owning and operating Nikola's vehicles was significantly less than the cost of owning and operating a traditional diesel-powered vehicle;

5. that Nikola had developed, using its own technology, a fully operational [battery-electric vehicle] pick-up truck, the Badger One, for which pre-orders had sold out;

6. that Nikola had developed all of its vehicles' critical components "in-house," including a proprietary "game-changing" electric battery, which exceeded the range of then-existing electric batteries;

7. that commercial "assembly-line" production of the Nikola Tre [battery-electric vehicle] truck had already been completed in Ulm, German[y];

8. that Nikola's headquarters was completely "off-grid" with solar panels on the roof producing 18 megawatts of energy a day; and

9. that Nikola owned seven natural gas wells that were used as backup to Nikola's solar hydrogen production.

(*Id.* at 7–8). For each of these categories, the Complaint alleges specific statements made by specific Defendants at varying times. Defendant Milton's alleged misstatements primarily occurred via Twitter and during various interviews he conducted. The Individual Defendants' alleged misstatements primarily occurred in certain SEC filings that they signed. All these alleged misstatements can be imputed to Defendant Nikola. Plaintiff also alleges a scheme to defraud against Defendant Milton and the Individual Defendants.

On April 8, 2022, Defendant Nikola and the Individual Defendants moved to dismiss Plaintiff's Complaint. (Doc. 111). That same day, Defendant Milton filed his own separate Motion to Dismiss in which he adopts the other Defendants' reasoning in part and offers his own separate arguments as to why the Complaint should be dismissed. (Doc. 112). On May 9, 2022, Plaintiff filed single Response addressing both motions to dismiss. (Doc. 116). On June 8, 2022, Defendants filed their Reply briefs (Docs. 117 & 118), with Defendant Milton once again filing his separately from the other Defendants.

## II.   LEGAL STANDARDS

### A. Motions to Dismiss Pursuant to Rule 12(b)(6)

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A court may dismiss a complaint for failure to state a claim under Rule 12(b)(6) for two reasons: (1) lack of a cognizable legal theory, or (2) insufficient facts alleged under a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). A claim is facially plausible when it contains "factual content that allows the court to draw the reasonable inference" that the moving party is liable. *Ashcroft*, 556 U.S. at 678. Factual allegations in the complaint should be assumed true, and a court should then "determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. Facts should be viewed "in the light most favorable to the non-moving party." *Faulkner v. ADT Sec. Servs., Inc.*, 706 F.3d 1017, 1019 (9th Cir. 2013).

### B. Heightened Pleading Standards for Securities Fraud Claims

Securities fraud claims "must satisfy the dual pleading requirements" of Federal Rule of Civil Procedure 9(b) ("Rule 9(b)") and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009). Under Rule 9(b)'s heightened pleading requirement, "a party must state with particularity the circumstances constituting fraud." This requires a pleading to identify "the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false." *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (internal quotation marks and alterations omitted).

Enacted in 1995, the PSLRA imposes more exacting pleading requirements for securities fraud complaints. *Zucco*, 552 F.3d at 990. Under the PSLRA's pleading requirement, a complaint must "plead with particularity both falsity and scienter." *Id.* (citation omitted). "Thus, to properly allege falsity, a securities fraud complaint must now

'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading.'" *Id.* (citing 15 U.S.C. § 78u-4(b)(1)). "To adequately plead scienter, the complaint must now 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Id.* at 991 (citing 15 U.S.C. § 78u–4(b)(2)).

## III. <u>DISCUSSION</u>

Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, "prohibit fraudulent activities in connection with securities transactions." *Lomingkit v. Apollo Educ. Grp. Inc.*, 275 F. Supp. 3d 1139, 1148 (D. Ariz. 2017). Specifically, § 10(b) provides that

> [i]t shall be unlawful for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . ., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b-5 implements § 10(b) by declaring it unlawful:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. The Supreme Court has recognized that § 10(b) creates a private right of action for plaintiffs. *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 318 (2007) (citation omitted) (recognizing that § 10(b) "affords a right of action to purchasers or sellers of securities injured by its violation"). Claims brought under Rule 10b-5(a) and (c) are referred to as "scheme liability" claims and claims brought under Rule 10b-5(b) are referred to as "maker liability" claims. *See Lorenzo v. SEC*, 139 S. Ct. 1094,

1102–03 (2019) (discussing differences between provisions but recognizing "considerable overlap" between them).

To state a claim for securities fraud under Section 10(b) and Rule 10b-5, a plaintiff must demonstrate with particularity "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005)). Defendants assert that Plaintiff failed to adequately plead the first, second, and sixth elements—that is, that Plaintiff has not sufficiently demonstrated a material misrepresentation or omission, scienter, and loss causation.

**A. Material Misrepresentations or Omissions**

To meet the first element, the PSLRA requires plaintiffs to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1); *Tellabs*, 551 U.S. at 313. "Falsity is alleged when a plaintiff points to defendant's statements that directly contradict what the defendant knew at that time." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018) (citation omitted). "Indeed, 'to be misleading, a statement must be capable of objective verification.'" *Id.* (quoting *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017)). "Even if a statement is not false, it may be misleading if it omits material information." *Id.* (citing *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1054 (9th Cir. 2014)). "A plaintiff can establish a material omission by pointing to the defendant's 'silence' despite a 'duty to disclose.'" *Kang v. PayPal Holdings, Inc.*, No. 21-cv-06468, 2022 WL 3155241, at *8 (N.D. Cal. Aug. 8, 2022) (citing *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 (2011)).

Defendants make several arguments as to the first element. First, *all* Defendants contend that Plaintiff impermissibly relies on misrepresentations or omissions that allegedly occurred *before* the Class Period and that such alleged misrepresentations or

omissions are not actionable under the law. (Doc. 111 at 6–8; Doc. 112 at 2 (Defendant Milton joining others in argument)). Second, the Individual Defendants argue that they cannot be held liable for any statements made personally by Defendant Milton or in Nikola's press releases and social media posts because they were not the "makers" of such statements. (Doc. 111 at 8–9). Third, *all* Defendants argue that Nikola's SEC filings did not contain any materially false, misleading, or otherwise actionable statements. (*Id.* at 9–14; Doc. 112 at 2 (Defendant Milton joining others in argument)). Fourth, the Individual Defendants argue that Plaintiff has not sufficiently alleged a scheme for purposes of Plaintiff's scheme liability claim. (Doc. 117 at 5–6). Finally, Defendant Milton argues separately that the statements attributed to him were not misleading when viewed in context or merely constituted statements of opinion, puffery, and optimism. (Doc. 112 at 2–5). He further argues that the omissions attributed to him are not actionable because he had no duty to disclose the allegedly omitted information. (*Id.*). The Court now addresses each of these five arguments in turn.

### 1. Pre-Class Period Statements

The Complaint alleges numerous materially false and misleading statements by Defendants. The earliest allegations date back to July 1, 2016, (*see* Doc. 95 at 67), and continue through February 25, 2021, the end of the Class Period. (*See id.* at 67–129). Defendants assert that Plaintiff's *pre*-Class Period allegations—*i.e.*, those preceding June 4, 2020—are not actionable under the law and that such allegations are "entirely irrelevant and should be dismissed."[3] (Doc. 111 at 6).

The Court declines to dismiss the pre-Class Period allegations, for several reasons. As an initial matter, the Court wholly rejects Defendants' argument that pre-Class Period statements should be dismissed as irrelevant to Plaintiffs' claims. Courts have held just the opposite, finding that pre-class period statements may be relevant to other elements of a securities fraud claim, even if they are not themselves actionable conduct. *See, e.g.*,

---

[3] Defendant Milton joins for purposes of this argument. (*See* Doc. 112 at 2).

*DeMarco v. DepoTech Corp.*, 149 F. Supp. 2d 1212, 1223 (S.D. Cal. 2001) ("However, statements made shortly before the class period may have evidentiary relevance to the issue of scienter and falsity because they may provide insight into what the defendant knew during the class period."); *In re U.S. Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063, 1065, n.1 (N.D. Cal. 2002) (denying motion to strike all pre-class period allegations as "impertinent and immaterial" because such allegations were "material to [the plaintiff's] contention that [the defendants] knew the statements made during the class period were false"); *In re Invision Techs., Inc. Sec. Litig.*, No. C04-03181 MJJ, 2006 WL 538752, at *2, n.1 (N.D. Cal. Jan. 24, 2006) (citation omitted) ("To the extent that these [pre-class period] statements are used to demonstrate the truth or falsity of Class Period statements, they are relevant."). Thus, Plaintiff's pre-Class Period allegations are, at the least, relevant to Plaintiffs' claims and the Court declines to entirely dismiss them from the Complaint.

To the extent that Defendants argue the Complaint's pre-Class Period allegations are not actionable, the Court is also unpersuaded. The Ninth Circuit has never directly addressed the question of whether a defendant may be held liable in a securities fraud action for statements or conduct that occurred outside the Class Period. However, district courts within the Ninth Circuit have found that pre-Class Period statements are *not* actionable, at least in most circumstances. *See, e.g.*, *In re Seagate Tech. II Sec. Litig.*, No. C-89-2493(A)-VRW, 1995 WL 66841, at *4 (N.D. Cal. Feb. 8, 1995) ("In a securities class action lawsuit, liability cannot attach to statements made either before or after the class period."); *DeMarco*, 149 F. Supp. 2d at 1223, n.6 (citation omitted) ("Statements occurring before the class period are not actionable under Section 10(b) or Rule 10b-5.").

That said, Plaintiff makes a compelling argument as to why the general rule should not apply in this case. Plaintiff begins with the assertion that the purpose of defining a class period is not to "limit[] the universe of actionable conduct," but rather to identify and set limits on *who* has standing to bring the action. (Doc. 116 at 11). Plaintiff notes that this distinction is underscored by considering that if each member of the plaintiff class "pursued this action in their *individual* capacities, there would be no class period to limit the universe

8

of actionable statements." (*Id.* at 11–12 (emphasis added)). Plaintiff contends that the distinction is often overlooked because it makes little difference in the typical case:

> In the typical [§] 10(b) case, the class period begins with the first alleged misstatement because "the market price of a security traded in an efficient market reflects all public information." . . . Thus, if a company misspeaks while its shares are already trading publicly, any investor who buys shares thereafter purchases at an inflated price. But anyone who purchased shares prior to the first misstatement was not injured by it. Under those circumstances, the plaintiff begins the class period on the date of the first misstatement because this properly limits "the class of plaintiffs to those ascertainable individuals who have standing to bring the action."

(*Id.* at 12 (internal citations omitted)). In contrast, Plaintiff contends that when a company misspeaks *before* its shares have been offered to the public, investors are not harmed until the company's shares become publicly available. (*Id.*). At that point, the inflation caused by the company's misstatement is "baked into the security price" and investors who purchase shares do so at an inflated price. (*Id.*). Given that the class period is designed to limit the class to those individuals who have standing, the earliest possible date for the class period to begin is the day that the company's shares became publicly available. *See Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 2d 956, 966 (S.D. Cal. 2005) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 228 & n.5 (1988)) ("[I]t is only those plaintiffs who traded in the securities at issue while the fraud could have been affecting those securities' value who can possibly state a claim for damage resulting from the fraud."). Thus, a *per se* rule prohibiting pre-class period statements from being actionable conduct creates a loophole for the company; even though the plaintiffs were harmed by the company's fraudulent inflation of their stock price, the company cannot be held liable for the fraud because it conveniently made that misstatement before the class period.

Plaintiff is not introducing a novel legal theory. Courts have recognized the issue Plaintiff raises, including at least one court in the Ninth Circuit. In *Zelman*, a case relied on by Plaintiff, the Southern District of California held that liability could attach to

misstatements made before the class period. *Zelman*, 376 F. Supp. 2d at 966. In that case, the securities at issue were "equity-linked debt securities"—called "GOALs"—which, unlike common stock, are "defined in redemption value by reference to the value of stock in a company other than the issuer of the debt securities." *Id.* at 961. The GOALs in *Zelman* were linked to the stock value of JDS Uniphase Corporation ("JDSU"). Prior to the GOALs being issued to the public, JDSU fraudulently inflated its stock price by making a series of misstatements. Thus, when the GOALs were finally made available to the public, their price was also inflated. The court rejected the defendant's argument that the pre-class period misstatements were not actionable, using the same general reasoning that Plaintiff asserts in this case. *Id.* at 966 (finding that general rule "does not make sense in an action like this one" given that purpose of defining a class is "to limit the class . . . to those ascertainable individuals who have standing . . . not [to limit] the universe of actionable conduct"); *see also In re Crown Am. Realty Tr. Sec. Litig.*, No. Civ.A. 95-202J, 1997 WL 599299, at *16 (W.D. Pa. Sept. 15, 1997) ("The fact that the statement was made at a time before any of the class members purchased shares would seem to be irrelevant, as it still could have been partly responsible—along with the other alleged misrepresentations—for the injury to investors who purchased their shares over a year later.").

The Court finds Plaintiff's argument to be compelling and worthy of further consideration later in this litigation.[4] That said, the Court need not decide the issue today. Defendants' Motions can be fully addressed without wading these waters any further. This is partly because many of the pre-Class Period misrepresentations alleged by Plaintiff were

---

[4] To be sure, Defendants make compelling arguments as well. For example, Defendants point out that many of the pre-Class Period misrepresentations alleged by Plaintiff occurred *years* before the Class Period and that such allegations are therefore not material. (Doc. 111 at 7; Doc. 117 at 5; Doc. 118 at 2). This argument likely has merit, at least with respect to some of Plaintiff's allegations. The Court may address both parties' arguments on this issue at a later stage in the case. *See Zelman*, 376 F. Supp. 2d at 966–67 ("Although some such statements may have a stronger connection with [the securities at issue] and the claimed injury than others, the strength of these connections is not an issue to be considered at this stage in the action.").

repeated in some capacity *during* the Class Period, rendering any dismissal of the pre-Class Period misrepresentation rather meaningless to the survival of Plaintiff's claims at this pleading stage. For example, the Complaint alleges that, in 2018, Nikola created and posted a video depicting the Nikola One traveling on an open road. (Doc. 95 at 70). Plaintiff contends that the video "fraudulently gave the impression that the Nikola One was capable of moving under its own power" when it was in fact inoperable. (*Id.* at 40). Even if this allegation were dismissed because it occurred well before the Class Period, Plaintiff's allegation that Defendants misrepresented the Nikola One's ability to drive would remain because the Complaint *also* asserts that Defendants continued to misrepresent the Nikola One as operable *during* the Class Period. (*See* Doc. 95 at 97, 100, 118–19 (alleging similar misrepresentations related to Nikola One in June and August 2020)). The same can be said for many, if not most, of the other pre-Class Period allegations that Defendants seek to dismiss. By the Court's count, at least seven of the "nine categories of misrepresentations" laid out at the beginning of the Complaint, (*see* Doc. 95 at 7–13), are supported by allegations that occurred before *and during* the Class Period.[5]

In sum, the Court declines to dismiss the Complaint's pre-Class Period allegations because (i) doing so would not meaningfully change this Court's ruling on the present Motions to Dismiss; (ii) the parties did not provide, and this Court is itself unaware of, any *binding* authority directly addressing the relevant legal question; (iii) Plaintiff puts forth a plausible argument—supported by at least one Ninth Circuit case—explaining why the circumstances of this case may present an exception to the general rule prohibiting statements outside the class period; and (iv) even if the pre-Class Period allegations are ultimately not *actionable*, they remain *relevant* such that entirely striking them from the

---

[5] The two "categories" that appear to be supported solely by *pre*-Class Period allegations are Defendants' alleged misrepresentations that (i) Nikola's headquarters was completely "off-grid" and (ii) Nikola owned seven natural gas wells. The first is supported by just a single factual allegation from 2019. (Doc. 95 at 63, 73). The second is supported by two alleged statements from 2016. (*Id.* at 63, 67–68).

Complaint would be inappropriate. Again, the Court is not rejecting Defendants' argument at this time. Rather, the Court finds that a definitive ruling on the issue is not necessary to decide the present Motions and that the parties and the Court itself will be in a better position to address the issue at a later stage of this case, such as summary judgment. *See Crown Am. Realty*, 1997 WL 599299, at *16 ("[O]ther courts . . . have permitted such pre-class period claims to go forward, at least at the 12(b)(6) stage.").

## 2. *Individual Defendants' Liability for Statements by Milton and Nikola*

The Individual Defendants argue that they cannot be held liable for any statements made personally by Defendant Milton or in Nikola's press releases and social media posts because they were not the "makers" of the alleged statements. (Doc. 111 at 8). The Supreme Court has held that primary liability under Rule 10b-5(b)—which forbids the "making" of "any untrue statement of a material fact"—can only attach to the *maker* of an alleged misstatement, with "maker" being defined as the person with "ultimate authority over the statement, including its contents and whether and how to communicate it." *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011). Here, there is no dispute that the Individual Defendants were not the "makers" of any statements made by Defendant Milton or in Nikola's press releases and social media posts.

Indeed, Plaintiffs do not dispute this issue, responding that they make no allegation that the Individual Defendants are liable for such statements. (Doc. 116 at 17). Rather, Plaintiffs' argument for the Individual Defendants' primary liability under Rule 10b-5 is based on their alleged participation in a scheme, in violation of Rule 10b-5(a) and (c), and on alleged misstatements made in Nikola's SEC filings for which they *can* be held liable under Rule 10b-5(b) by virtue of their signatures. *See Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061 (9th Cir. 2000) (finding that corporate officials who, acting with scienter, sign SEC filings containing misrepresentations "make" a statement so as to be liable as primary violators under § 10(b)). Thus, the Court's analysis as to whether Plaintiff sufficiently alleges § 10(b) claims against the Individual Defendants is two-part. First, the Court must determine whether Plaintiff alleges any actionable misstatements in the SEC

filings for which the Individual Defendants may be found liable as "makers" of the statements. Second, the Court must determine whether Plaintiff sufficiently alleges the Individual Defendants' participation in a scheme to defraud.

### 3. *Alleged Misrepresentations and Omissions in SEC Filings*

Plaintiff alleges that Nikola—and the Individual Defendants, by virtue of their signatures—made numerous false and misleading statements in documents filed with the SEC. (*See* Doc. 95 at 85–92, 97–99, 109–11, 116–17 & 124–25). Defendants argue that such statements are not actionable because they were not materially false or misleading when viewed in context and because some of the alleged misstatements are protected by the PSLRA safe harbor as "forward-looking" or "immaterial" statements. (Doc. 111 at 9–10). The Court will address each alleged misstatement from the various SEC filings in their appropriate context and determine whether the Court may, at this motion-to-dismiss stage, determine as a matter of law that the statements were *not* misleading.

As an initial matter, both parties are correct that courts must consider the full context in which a statement was made when determining whether the statement is materially false or misleading. *See In re Vaxart, Inc. Sec. Litig.*, 576 F. Supp. 3d 663, 670 (N.D. Cal. 2021) (quoting *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991)) ("Statements are evaluated through a fisheye, not a telescope. Words, after all, cannot be viewed 'in complete isolation' but must instead be 'read in light of all the information then available to the market' to decide if they 'conveyed a false or misleading impression.'"); *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 933 (9th Cir. 1996) ("[W]e must emphasize that the challenged statements must be viewed in context."); *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008) ("[S]tatements literally true on their face may nonetheless be misleading when considered in context."). Thus, in analyzing the alleged misstatements in Nikola's SEC filings, the Court must consider not only the language accompanying the alleged misstatement in the document, but also the broader context in which the alleged misstatements were made, which includes Defendants' *other* alleged misrepresentations which occurred outside the document.

Under the PSLRA's safe harbor provision, liability does not extend to any "forward-looking statement" that is "identified" as such "and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i). "A 'forward-looking statement' is any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions 'underlying or related to' any of these issues." *No. 84 Emp.–Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 936 (9th Cir. 2003) (citing § 78u-5(i)). "However, a person may be held liable if the 'forward-looking statement' is made with 'actual knowledge . . . that the statement was false or misleading.'" *Id.* (citing § 78u-5(c)(1)(B)).

"Whether a statement is misleading and whether adverse facts were adequately disclosed are generally questions that should be left to the trier of fact." *Syntex Corp.*, 95 F.3d at 926 (citing *Fecht v. The Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995)). "[O]nly if the adequacy of the disclosure or the materiality of the statement is 'so obvious that reasonable minds [could] not differ' are these issues 'appropriately resolved as a matter of law.'" *Fecht*, 70 F.3d at 1081 (quoting *Durning v. First Bos. Corp.*, 815 F.2d 1265, 1268 (9th Cir. 1987)).

At issue in the present case are twenty-two statements made in various SEC filings that the Complaint alleges were materially false or misleading:

**March 13, 2020 VectoIQ Prospectus Form S-4 ("March Prospectus")**:

**Statement 1**: "VectoIQ's management and board of directors considered the fact that Nikola has a high volume of fuel cell electric vehicle pre-orders, currently at over $10 billion." (Doc. 95 at 85).

**Statement 2**: "Nikola's business model uniquely supplies both the truck and hydrogen fueling infrastructure, solving the fleet's concerns as to where to refuel with green hydrogen at competitive pricing to diesel." (Doc. 95 at 85–86).

///

14

**April 6, 2020 VectoIQ Form 8-K ("April 8-K")**:

**Statement 3**: Describing Nikola's "reservation book" and indicating that "~7900 trucks" were ordered in 2016 and that a total of "~14,000 reservations" were made for FCEV vehicles by 2018. (Doc. 95 at 88).

**Statement 4**: Listing three "demo stations" related to hydrogen infrastructure plan: (i) completed Phoenix, Arizona "Demo Station" which offers hydrogen "storage and dispensing"; (ii) "R&D 8-Ton Station" which offers hydrogen "production, storage, and dispensing" and scheduled to be "complete by Q4 2021"; (iii) "AB 8-Ton Pilot Station" which offers hydrogen "production, storage, and dispensing" and scheduled to be "complete by mid-2022." (Doc. 95 at 89).

**Statement 5**: Specifying that Badger has: "blended FCEV/BEV" system with range of "600 miles" or "300 miles on BEV alone"; ability to switch between systems "by touch of a button"; "906 HP peak/455 HP continuous"; "980 ft. lbs. of torque"; and "160 kWh flood module lithium-ion battery" and "120 kW fuel cell." (Doc. 95 at 91).

**May 8, 2020 VectorIQ Proxy Statement ("May Proxy")**:

**Statement 6**: "[Nikola] designs and manufactures state-of-the-art battery-electric and hydrogen fuel cell electric vehicles, electric vehicle drivetrains, energy storage systems, and hydrogen fueling stations." (Doc. 95 at 86).

**Statement 7**: Listing Nikola One as a "Zero-Emission Product Offering," estimating its range, and stating that "[p]roduction plans . . . will be announced once we have established a robust refueling infrastructure." (Doc. 95 at 86–87).

**Statement 8**: "[W]e have initiated the development of the hydrogen station infrastructure by completing our first 1,000 kg demo station in the first quarter of 2019 at our corporate headquarters in Phoenix, Arizona. The demo hydrogen station offers hydrogen storage and dispensing and serves as a model for future hydrogen stations.";

Contains graphic showing hydrogen process and then states: "Our initial plan for the station rollout begins with an eight-ton pilot station accessible to the [Anheuser-Busch] brewery in Van Nuys, California. From there, we then plan to build up to 10-12 additional stations in California. These stations will supply fuel for our launch customers in those geographies that have dedicated routes in California. California is offering incentives to build out our hydrogen fueling infrastructure and deploy zero-emissions vehicles, including opportunities for funding along major freeway corridors. We expect to rollout these stations in 2022–23." (Doc. 95 at 90).

**Statement 9**: "Unlike anything on the market, the Badger is designed to target and exceed every electric or fossil fuel pickup in its class." (Doc. 95 at 92).

**June 15, 2020 Form S-1 ("June S-1")**:

**Statement 10**: "*Our core product offering* is centered around our battery-electric vehicle ("BEV") and hydrogen fuel cell electric vehicle ("FCEV") Class 8 semitrucks. *The key differentiator of our business model* is our planned network of hydrogen fueling stations. We are offering a revolutionary bundled lease model, which provides customers with the FCEV truck, hydrogen fuel, and maintenance for a fixed price per mile, locks in fuel demand and significantly de-risks infrastructure development." (Doc. 95 at 97).

**Statement 11**: Listing Nikola One as a "Zero-Emission Product Offering," estimating its range, and stating that "[p]roduction plans . . . will be announced once we have established a robust refueling infrastructure." (Doc. 95 at 97).

**Statement 12**: "Recently we announced the Nikola Badger (the "Badger"), an advanced zero-emission FCEV/BEV hybrid pickup truck. Unlike anything on the market, the Badger is designed to target and exceed every electric or fossil fuel pickup truck in its class." (Doc. 95 at 98).

**Statement 13**: "[W]e have initiated the development of the hydrogen station infrastructure by completing our first 1,000 kg demo station in the first quarter of 2019 at our corporate headquarters in Phoenix, Arizona. The demo hydrogen station offers hydrogen storage and dispensing and serves as a model for future hydrogen stations." (Doc. 95 at 98).

**Statement 14**: "The current backlog of over 14,000 FCEVs non-binding reservations represents more than two years of production and over $10 billion of potential revenue. The FCEV reservation book was frozen in the fall of 2019 in order for Nikola to focus on negotiating with strategic fleet partners for launch." (Doc. 95 at 98–99).

**July 17, 2020 Form S-1 ("July S-1")**:

**Statement 15**: Listing Nikola One as a "Zero-Emission Product Offering," estimating its range, and stating that "[p]roduction plans . . . will be announced once we have established a robust refueling infrastructure." (Doc. 95 at 110).

**Statement 16**: "Recently we announced the Nikola Badger (the "Badger"), an advanced zero-emissions FCEV/BEV hybrid pickup truck. Unlike anything on the market, the Badger is designed to target and exceed every electric or fossil fuel pickup truck in its class." (Doc. 95 at 110).

16

**Statement 17**: "We have initiated the development of the hydrogen station infrastructure by completing our first 1,000 kg demo station in the first quarter of 2019 at our corporate headquarters in Phoenix, Arizona. The demo hydrogen station offers hydrogen storage and dispensing and serves as a model for future hydrogen stations." (Doc. 95 at 110–11).

**Statement 18**: "The current backlog of over 14,000 FCEVs non-binding reservations represents more than two years of production and over $10 billion of potential revenue. The FCEV reservation book was frozen in the fall of 2019 in order for Nikola to focus on negotiating with strategic fleet partners for launch." (Doc. 95 at 111).

**August 4, 2020 Form 10-Q ("August 10-Q")**:

**Statement 19**: "In 2019, we stopped soliciting FCEV reservations"; "[Nikola] considers the reservation list as an indication of potential demand rather than backlog for pending vehicle sales, as customers have not made firm commitments to order and take deliveries of vehicles and may cancel such reservations at any time"; "[W]e expect the size of our committed backlog to be an important indicator of our future performance." (Doc. 95 at 116).

**Statement 20**: "On June 29, 2020, we began accepting non-binding reservations for the Badger." (Doc. 95 at 117).

**September 14, 2020 Form 8-K ("September 8-K")**:

**Statement 21**: "The Nikola One is a real truck that sits in Nikola's showroom. A pusher means a vehicle that was not designed to be moved on its own propulsion system. The Nikola One was, in fact, designed to be powered and driven by its own propulsion."; Describes the functionalities of Nikola One (Doc. 95 at 124).

**Statement 22**: "Nikola described this third-party video on the Company's social media as 'In Motion.' It was never described as 'under its own propulsion' or 'powertrain driven.' Nikola investors who invested during this period, in which the Company was privately held, knew the technical capability of the Nikola One at the time of their investment." (Doc. 95 at 124–25).

These statements can be organized into five general categories: (i) statements referring to Nikola's list or "backlog" of pre-orders/reservations (Statements 1, 3, 14, 18, and 19); (ii) statements referring to Nikola's business model being centered around its FCEV/BEV trucks and hydrogen infrastructure (Statements 2, 6, and 10); (iii) statements referring to

17

Nikola's hydrogen capabilities (Statements 4, 8, 13, and 17); (iv) statements referring to the Nikola Badger, the company's FCEV/BEV hybrid pickup truck (Statements 5, 9, 12, 16, and 20); and (v) statements referring to the Nikola One, the company's FCEV Class 8 semitruck (Statements 7, 11, 15, 21, and 22). The Court will address each of this five categories in turn and determine whether Plaintiff has sufficiently alleged that each statement was materially false or misleading when made.

### a. Statements Referring to Pre-Orders or Reservations

Statements 1, 3, 14, 18, and 19 refer to Nikola's apparent backlog of over 14,000 FCEV reservations. In various filings, Nikola refers to the backlog as representing more than two years of production and over $10 billion in potential revenue. Plaintiff argues that referring to the backlog as a list of "pre-orders" or "reservations" is false or materially misleading because they were not pre-orders or reservations at all, but rather "expressions of interest to purchase products," cancellable at any time. (Doc. 95 at 85). Plaintiff takes issue with the fact that most of the reservations were "for the Nikola One that was no longer in development, and for products, FCEV, for which commercial viability was not achievable at the time." (*Id.*). In other words, Plaintiff argues that "touting this backlog for a product that could not function was misleading" because, until Nikola was able to produce hydrogen at economically feasible prices, "the backlog misrepresented the value of Nikola." (Doc. 116 at 22).

Defendants argue that these statements were not materially false or misleading because they were accompanied by appropriate cautionary language. For example, in a section titled "Risk Factors," the June S-1 and July S-1 acknowledge that "[r]eservations for our trucks are cancellable" and explain that:

> At times we have indicated that if we are able to sell or lease every truck which has been reserved, we would have $10 billion in projected revenues. *Because all of our reservations are cancellable, it is possible that a significant number of customers who submitted reservations for our trucks may cancel those reservations.* . . .
>
> As a result, no assurance can be made that reservations will not be cancelled, or that reservations will ultimately result in the

18

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

> purchase or lease of a vehicle. Any cancellations could harm our financial condition, business, prospects and operating results.
>
> In addition, *the $10 billion in projected revenues is based on a number of assumptions*, including a projected purchase price for our trucks. *If the purchase price of the trucks ends up being different than anticipated, we may not achieve this level of revenues*, even if all of the trucks subject to reservations are sold or leased.

(Doc. 111-1 at 25–26, 312–13 (emphasis added)). In the same paragraphs where the alleged June S-1 and July S-1 misstatements are made, Nikola cautions that the company "does not hold deposits related to the FCEV orderbook" and that "Nikola *believes* a significant portion of the existing backlog will be converted to binding orders, once we have fixed production dates for FCEV trucks." (*Id.* at 95, 382 (emphasis added)). Likewise, in the August 10-Q, Nikola states that it "consider[s] the reservation list as *an indication of potential demand* rather than a product backlog for pending vehicle sales, as customers have not made firm commitments to order and take deliveries of vehicles and may cancel such reservations at any time." (*Id.* at 636 (emphasis added)). The August 10-Q continues, stating that "[a]pproximately twelve months from commercial production in second half of 2023, we plan to require existing and new FCEV reservations to become binding with deposits." (*Id.*).

The Court finds that the above cautionary language does not eliminate the risk that a reasonable investor could have been misled by Nikola's references to the backlog of 14,000 FCEV reservations representing $10 billion in potential revenue. To be sure, the June S-1, July S-1, and August 10-Q appropriately caution that the reservations are non-binding and cancellable at any time. That said, referring to the backlog *at all* is arguably still misleading, given just how speculative those numbers are. *See Farrar v. Workhorse Grp., Inc.*, No. CV 21-02072-CJC (PVCx), 2021 WL 5768479, at *5 (C.D. Cal. Dec. 2, 2021) (finding that plaintiff sufficiently alleged that defendants' "repeated[] reference[s] [to] their growing backlog as an indicator that they were a strong, growing company" were misleading despite defendants' disclosures that backlog orders were cancellable, "subject

to conditions[,] and not guaranteed"). The underlying truth is that Nikola had never produced even a single consumer-ready FCEV truck. Likewise, Nikola remained unable to produce any hydrogen fuel, as its hydrogen infrastructure was entirely undeveloped. Thus, to refer to the backlog as a list of "pre-orders" or "reservations"—or even, as in the August 10-Q, as "an indication of potential demand rather than a product backlog"—is incredibly generous. The sheer size of the figures involved—14,000 vehicles and $10 *billion* in revenue—coupled with Defendant Milton's repeated public assertions that the reservations *were* binding arguably required more forceful cautionary language to adequately temper the risk that investors would be misled. For example, the cautionary statement cited above acknowledges that "the $10 billion in projected revenue *is based on a number of assumptions*," but then only refers to the projected purchase price of the trucks as one such assumption. (Doc. 111-1 at 25–26, 312–13 (emphasis added)). This overlooks other "assumptions" that may have been more pertinent to mention in reasonable proximity to the filings' references to the backlog—namely, that the $10 billion projection is *assuming* that the company will succeed in developing its hydrogen infrastructure to the point where the creation of hydrogen is actually possible and that it is *assuming* that the production of the trucks will follow. *See* 15 U.S.C. § 78u-5(c)(1)(A)(i) (providing safe-harbor protection only where forward-looking statement is "accompanied by *meaningful* cautionary statements *identifying important factors* that could cause actual results to differ materially from those in the forward-looking statement").

The inadequacy of the cautionary language—and the risk that investors could be misled by the statements—is only magnified by the public statements made by Defendant Milton. (*See* Doc. 95 at 84 ("We don't build on speculation; we build on orders" and "We're the only company in the world that is sold out for many, many years . . . It's all based on orders."), at 113 ("[W]e have . . . over ten billion dollars in preorder reservations like [] customers signed ready for us to deliver them trucks" and "[The pre-orders are] not letter of intents, they're actually contracts" and "[A] lot of people have thought that it's just like, a non-committal thing, it's not. These are like, sign on the dotted line, billions and

20

billions and billions and billions of dollars in orders.")). In sum, the Court finds that the cautionary language accompanying Defendants' statements related to the backlog was not sufficient to support a determination, as a matter of law, that Defendants' statements were not misleading. *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008) ("[O]nce defendants chose to tout the company's backlog, they were bound to do so in a manner that wouldn't mislead investors as to what the backlog consisted of. We cannot say, as a matter of law, that defendants fulfilled this duty."). Reasonable minds could differ as to whether Defendants adequately disclosed the truth as it relates to the backlog. Plaintiff has sufficiently alleged that Defendants' statements relating to the backlog—specifically, Statements 1, 3, 14, 18, and 19, as identified above—were misleading when made.

### b.  Statements Referring to Nikola Business Model

Statements 2, 6, and 10 refer to Nikola's business model being centered around their FCEV/BEV trucks and hydrogen infrastructure. Plaintiff alleges that it was materially false and misleading to refer to the FCEV/BEV trucks as "core product offering[s]" and to the hydrogen fueling stations as the "key differentiator of [Nikola's] business model" given that the trucks and hydrogen capabilities were merely concepts far from being realized. (Doc. 95 at 97). Specifically, Plaintiff alleges that Nikola "had not produced any hydrogen, let alone hydrogen at prices which were economically more attractive to, or even equal to, then current alternatives." (*Id.*). Moreover, Nikola "had not begun to effectuate a 'network of hydrogen fueling stations' and . . . its FCEV trucks were [] trucks that were concept vehicles and not actual products ready for offering and/or sale." (*Id.*).

As an initial matter, simply stating that Nikola's "core product offering" and "business model" is centered around their FCEV/BEV trucks and hydrogen fueling infrastructure is not readily false or even misleading on its face. Nikola's primary product *is* their FCEV and BEV trucks, and their unique hydrogen fueling infrastructure *is* central to their business model. The fact that Nikola was still working to bring their trucks and hydrogen infrastructure from conception to reality does not necessarily make it false or misleading for Nikola to state in its SEC filings that such offerings were central to the

company. That said, if the SEC filings entirely failed to mention that the trucks had not yet been commercially produced or that its hydrogen infrastructure was still in its infancy, such statements may nonetheless be misleading. However, as Defendants point out in their Motion, the SEC filings recognize that the company had not yet produced hydrogen and that its vehicles were still in development. (Doc. 111 at 10). For example, the June S-1—which contains the allegedly false and misleading Statement 10—states, in a section titled "Risk Factors," that "[o]ur business model has yet to be tested and any failure to commercialize our strategic plans would have an adverse effect on our operating results and business, harm our reputation and could result in substantial liabilities that exceed our resources." (Doc. 111-1 at 21). The cautionary statements continue, with the June S-1 stating that "[a]ny investment in our company is therefore highly speculative and could result in the loss of your entire investment." (*Id.*). The June S-1 also states that Nikola "intend[s] to derive substantially all of our revenues from the sale and lease of our vehicle platforms, *which are still in the early stages of development*. Due to our bundled lease model for our FCEV trucks, our revenues will also depend on the sale of hydrogen fuel at our planned hydrogen fueling stations which we do not expect to be operational until 2022 or later." (*Id.* (emphasis added)). Later in the June S-1, Nikola states that they "expect to start BEV production . . . in 2022 and FCEV production in 2023." (*Id.* at 62; *see also id.* at 98 (stating Nikola's plans for *future* production of BEV and FCEV trucks)). These are just a few examples of cautionary language and forward-looking statements that readily acknowledge that Nikola's production of both its trucks and its hydrogen infrastructure had not yet commenced and was still in the planning phase.

In sum, the Court finds that reasonable minds could *not* disagree that Defendants' statements relating to the BEV and FCEV trucks and hydrogen infrastructure being central to Nikola's business model were not misleading, particularly given the frequent cautionary language and forward-looking terms used throughout the SEC filings. The Court finds that Plaintiffs failed to sufficiently allege that Statements 2, 6, and 10 were misleading.

///

### c.  Statements Referring to Nikola's Hydrogen Capabilities

Nikola is a company that designs and manufactures electric vehicles and their components. (Doc. 95 at 19–20). Specifically, Nikola is focused on hydrogen-electric vehicles and thus "[a] key aspect of Nikola's business plan is its planned development of hydrogen production and fueling station infrastructure to support its [vehicles]." (*Id.* at 42). Nikola "plan[s] to construct a network of hundreds of hydrogen fueling stations along trucking routes and to include the cost of hydrogen as part of a bundled lease for its trucks." (*Id.*). Thus, central to Nikola's vision is their need "to produce, dispense, and store tens of millions of kilograms of hydrogen each year to support the trucks that it project[s] to put on the road." (*Id.*). "The primary obstacle to powering vehicles with hydrogen is the high cost of hydrogen production." (*Id.* at 10). Nikola has represented that it aims to produce hydrogen via "electrolysis," which is "a process that uses electricity to split water into hydrogen and oxygen." (*Id.*). "However, producing hydrogen via electrolysis at [a] cost-effective rate would necessitate Nikola acquiring vast amounts of electricity at a fraction of the then-market prices." (*Id.*). Plaintiffs allege that, according to Nikola's projections, the company's proposed hydrogen station network "would annually consume approximately 5 percent of all electricity consumed in the [United States] today." (*Id.* at 42). Therefore, "[b]ecause the cost of electricity is the most significant cost input for operating the machines that create hydrogen, known as electrolyzers, the profitability of Nikola's business model has been and is highly dependent on Nikola's ability to acquire electricity at a price that would permit Nikola to produce hydrogen cheaply enough to make its leases economically viable to customers." (*Id.*).

Statements 4, 8, 13, and 17 refer to Nikola's hydrogen capabilities. As noted above, Statement 4 is found in the April 8-K; it identifies three hydrogen "demo stations" that were already completed (the Phoenix "Demo Station") or set to be completed by the end of 2021 (the "R&D 8-Ton Station") or the middle of 2022 (the "AB 8-Ton Pilot Station"). (*Id.* at 89). Statement 4 indicates that the Phoenix Demo Station offers hydrogen "storage and dispensing," while the R&D and AB stations would offer hydrogen "production,

23

storage, and dispensing." (*Id.*). Statement 4 also states that the R&D and AB stations would have eight, one-ton electrolyzers onsite "capable of producing 8,000 kgs of hydrogen per day." (*Id.*). Plaintiffs allege that Statement 4 is false or misleading because, at the time of the April 8-K—in the second quarter of 2020—"not a single electrolyzer had been purchased, no power agreement had been reached to supply it, and Nikola did not own any sort of renewable energy generating ability." (*Id.*). Plaintiffs allege that Defendants *should* have disclosed that "Nikola was not able to employ any electrolyzers at [the Phoenix Demo Station]" and that it "had never produced any hydrogen at all." (*Id.*). The Court finds that Statement 4 was not misleading, as it did not make any assertion that electrolyzers had been purchased or that Nikola had entered into any sort of power agreement. Statement 4 also did not state that Nikola would be able to employ electrolyzers at the Phoenix Demo Station or that the company was actually producing any hydrogen.

Statements 8, 13, and 17—from the May Proxy, June S-1, and July S-1, respectively—are identical and provide the following:

> We have initiated the development of the hydrogen station infrastructure by completing our first 1,000 kg demo station in the first quarter of 2019 at our corporate headquarters in Phoenix, Arizona. The demo hydrogen station offers hydrogen storage and dispensing and serves as a model for future hydrogen stations.

(*Id.* at 90, 98 & 110–11). Plaintiffs allege that calling the Phoenix Demo Station a "demo" or "model for future hydrogen stations" was false and misleading because the Phoenix Demo Station could only store and dispense—but not *produce*—hydrogen, and it is hydrogen *production*, not storage or dispensing, that is "key" to Nikola's business plan. (*Id.* at 90–91, 98 & 111). In other words, Plaintiffs allege that the Phoenix Demo Station was nothing more than a "storage tank with a dispenser" and that it was therefore misleading for Defendants to refer to it as a "demo" or "model." (*Id.* at 91). The truth, according to Plaintiffs, was that Nikola had not yet produced *any* hydrogen and that the company *could not* produce hydrogen, even if it wanted to, because the company had yet to purchase or install any electrolyzers at any location or enter into any power agreement

or purchases of renewable energy generating equipment that would supply sufficient electricity to power the electrolyzers.[6] (*Id.* at 90–91, 98 & 111).

The Court finds that, as a matter of law, the above statements are not materially false or misleading. Statements 8, 13, and 17 do not include any statement that is false or misleading on its face. They state that Nikola has "initiated the development of the hydrogen station infrastructure" by completing the Phoenix Demo Station. (*Id.* at 90, 98 & 110–11). They do *not* state that Nikola has initiated *the production* of hydrogen. They state that the Phoenix Demo Station "offers hydrogen storage and dispensing." (*Id.*). They do *not* state that the Phoenix Demo Station offers hydrogen production. They state that the Phoenix Demo Station "serves as a model for future hydrogen stations." (*Id.*). They do *not* state that the Phoenix Demo Station serves as a model for Nikola's future hydrogen *production* facilities or other production-related infrastructure. It is reasonable to assume that Nikola's proposed network of hydrogen fueling stations will include stations that do not produce their own hydrogen but rather offer hydrogen storage and dispensing only.[7] That said, the Phoenix Demo Station is merely a "model" of one such station and it is not misleading to call it as such.

To the extent that Plaintiffs allege that Nikola's statements are false or misleading because they *omitted* important information—such as the facts that the company (i) had never produced hydrogen, (ii) had not purchased any electrolyzers, and (iii) had not entered

---

[6] The Court notes that Statement 8 *additionally* included a graphic showing the hydrogen process and adds that Nikola's "initial plan for the station rollout" begins with the AB 8-Ton Pilot Station in California and that, "[f]rom there, we then plan to build up to 10–12 additional stations in California." (Doc. 95 at 90). Plaintiff alleges that this part of Statement 8 is false or misleading for the same reasons—namely, that Nikola had not done any meaningful work to bring this about, such as buying an electrolyzer or securing a power agreement to obtain electricity. (*See id.*).

[7] Indeed, the June S-1 and July S-1 imply that such "non-production" and "dispensing-only" stations will exist: "Hydrogen fuel will be produced on-site and at scale, via electrolysis, *or hydrogen fuel produced off-site via electrolysis and shipped to filling location*." (Doc. 111-1 at 92, 379).

into any power agreement or purchases of renewable energy generating equipment to supply electricity for the electrolyzers—the Court is also unpersuaded because the SEC filings contain appropriate cautionary and forward-looking language directly addressing these points and preventing any reasonable investor from being misled. For example, in a section titled "Risk Factors," the June S-1 and July S-1 state that the company's "revenues *will* also depend on the sale of hydrogen fuel at our *planned* hydrogen fueling stations *which we do not expect to be operational until 2022 or later*." (Doc. 111-1 at 21, 308 (emphasis added)). The same section also states that although Nikola "[has] constructed a prototype station," the company has "*very limited experience in the actual provision of our refueling solutions to users*." (*Id.* at 25, 312 (emphasis added)). The June S-1 and July S-1 then devote an entire paragraph to the issue:

> *We may not be able to produce or source the hydrogen needed to establish our planned hydrogen fueling stations.* As a key component of our business model, we *intend* to establish a series of hydrogen fueling stations, and we *intend* to include the cost of hydrogen in the purchase price of our trucks. We *intend* to produce the hydrogen needed for these stations on site through electrolysis. To the extent we are unable to produce the hydrogen, we *may* be unable to establish these fueling stations and severely limit the usefulness of our trucks, or, if we are still able to establish these stations, we *may* be forced to sell hydrogen at a loss in order to maintain our commitments. We *believe* that this hydrogen incentive will be a significant driver for purchases of our trucks, and therefore, the failure to establish and roll out these hydrogen fueling stations in accordance with our expectations would materially adversely affect our business.

(*Id.* at 25, 312 (emphasis added)). These cautionary statements from the "Risk Factors" section directly address any possible misrepresentation that Nikola was already producing hydrogen. *See Provenz v. Miller*, 102 F.3d 1478, 1493 (9th Cir. 1996) (quoting *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1412 (9th Cir. 1994)) ("The cautionary statements must be 'precise' and 'directly address' the defendants' future projections." (alterations and quotations omitted)). Moreover, they are identified as forward-looking statements by virtue of the language used. (*See* Doc. 111-1 at 12, 299 (providing that words such as

"believe," "expect," "intend," "may," "planned," and "will," among others, are "intended to identify forward-looking statements")).

Likewise, the filings do not assert or even imply that Nikola had already purchased electrolyzers. Rather, the June S-1 and July S-1 speak to the hydrogen production process using the future tense, again invoking forward-looking language:

> Hydrogen *will* normally be produced on-site at each station via electrolysis. The electrolysis process occurs by passing electricity through water in an electrolyzer, thus breaking the water molecule into gaseous hydrogen and oxygen. Nikola's base station *is expected to* have a daily production capacity of 8,000 kg and *will* be capable of supporting approximately 210 FCEV trucks per day. Our stations *are designed to be* scalable to up to 40,000 kg per day of production, if needed. The stations *are expected to* contain at least 8 heavy-duty . . . and up to 4 light-duty vehicle, hydrogen fueling dispensers. Nikola also *plans to* install electric fast charging at most of our fueling stations to support BEVs. . . .
>
> Hydrogen fuel *will be* produced on-site and at scale, via electrolysis, or hydrogen fuel produced off-site via electrolysis and shopped to filling location.

(*Id.* at 92, 379 (emphasis added)). To the extent the filings directly address the purchase of electrolyzers, they state that "Nikola has partnered with Nel for the buildout of Nikola's hydrogen stations. Nel directly manufactures the most advanced hydrogen station components, *including the electrolyzers*." (*Id.* at 97, 384 (emphasis added)). The filings later elaborate on the partnership with Nel, stating that, "[o]n June 28, 2018, Legacy Nikola entered into the Supply Agreement for electrolyzers with Nel . . . whereby Nikola *agreed to purchase electrolyzers from Nel*." (*Id.* at 110, 397 (emphasis added)). Given these disclosures, the Court finds that no reasonable investor could be misled into believing that Nikola already purchased or otherwise possessed electrolyzers or that they were already using such electrolyzers to produce hydrogen.

Finally, as to Nikola's purchase or acquisition of energy, the filings do not assert or imply that Nikola had entered into any power agreement or purchase of renewable energy generating equipment. Rather, the June S-1 and July S-1 specifically warn—as a "Risk

Factor"—that the company's "inability to cost-effectively source the energy requirements to conduct electrolysis at our fueling stations may impact the profitability of our bundled leases by making our hydrogen uneconomical compared to other vehicle fuel sources." (*Id.* at 25, 312). Moreover, the filings explain that "[o]ver time, we *intend* to support each fueling station with 100% zero-emission power, if feasible," and also that Nikola "*expect[s]* to enter into a long-term [power purchase agreement] with these renewable energy providers whenever practical." (*Id.* at 94, 381). Again, these disclosures make clear that Nikola had not yet entered into any power purchase agreement or otherwise solved the issues it faced in purchasing and acquiring energy to power the production of hydrogen.

In analyzing the statements related to Nikola's hydrogen capabilities, the Court has also considered the misstatements allegedly made by Defendant Milton in the public sphere throughout the relevant time period. The Court recognizes that, on *numerous* occasions between 2018 and 2020, Defendant Milton allegedly made materially false or misleading statements that Nikola was already producing hydrogen, that it was doing so at a fraction of the industry cost, that its Phoenix Demo Station could produce hydrogen, that Nikola was already sourcing its energy from non-renewable sources, and other misstatements related to Nikola's hydrogen capabilities. (*See, e.g.*, Doc. 95 at 72, 74, 78–79, 83–84, 93–96, 99–100, 103–04, 107–08, 112–15). However, this Court's review of Nikola's SEC filings failed to reveal comparable misstatements, as explained above. Moreover, Defendant Milton's allegedly false and misleading statements do not, on their own, render Nikola's SEC filings false or misleading. First, the two could be mutually exclusive; it is conceivable that while Defendant Milton was making exaggerated claims and misstatements to the public and to the media, the company itself was providing truthful and fully disclosing statements to the SEC. Second, Plaintiffs do not offer, and this Court is itself unaware of, any caselaw or other legal authority providing that a company—or its officers—has a duty to correct the misstatements of one of its officers in its SEC filings. To the contrary, Defendants offer caselaw providing that such a duty to correct does not exist at all in the securities context. *See In re Yahoo! Inc. Sec. Litig.*, 611 Fed. Appx. 387,

389 (9th Cir. 2015) ("Neither the Supreme Court nor the Ninth Circuit has recognized a duty to correct."); *Oaktree Principal Fund V, LP v. Warburg Pincus LLC*, No. CV 15-8574 PSG (MRWx), 2017 WL 3187688, at *8 (C.D. Cal. Jan. 17, 2017) ("Federal securities law imposes no liability, however, when a person fails to correct a misstatement or misimpression created by another 'statement maker.' . . . Rather, speakers are only liable for failing to correct their own omissions."). In the absence of any such duty, Plaintiff cannot allege that the Individual Defendants made any material omission by failing to directly address Defendant Milton's public misstatements in the SEC filings. *See Kang*, 2022 WL 3155241, at *8 ("A plaintiff can establish a material omission by pointing to the defendant's 'silence' despite a 'duty to disclose.'").

In sum, the Court finds that, as a matter of law, the SEC filing statements regarding the company's hydrogen capabilities—were *not* materially false or misleading. Given the frequent cautionary and forward-looking language, reasonable minds could *not* disagree that such statements were fully disclosing and not misleading. Thus, Plaintiffs failed to allege that Statements 4, 8, 13, and 17 were materially false or misleading.

### d.  Statements Referring to Nikola Badger

Statements 5, 9, 12, 16, and 20 refer to the Nikola Badger, the company's concept for a FCEV/BEV hybrid pickup truck. Statement 5 is from the April 8-K and states various specifications for the Badger. (Doc. 95 at 91). Specifically, Statement 5 provides that the Badger "[o]perates on [a] blended FCEV/BEV system," but that it could be switched to a "BEV only" system by the "touch of a button." (*Id.*). It also states that the blended FCEV/BEV system has a range of "600 miles" and the BEV-only system has a range of "300 miles." (*Id.*). Additionally, Statement 5 provides that the Badger has "980 ft. lbs. of torque," a "906 HP peak/455 HP continuous" engine, a "160 kWh flood module lithium-ion battery" and a "120 kW fuel cell." (*Id.*). Statements 9, 12, and 16—from the May Proxy, June S-1, and July S-1, respectively—are identical and provide the following:

> Recently we announced the Nikola Badger (the "Badger"), an advanced zero-emission FCEV/BEV hybrid pickup truck. Unlike anything on the market, the Badger is designed to target

and exceed every electric or fossil fuel pickup in its class.

(*Id.* at 92, 98, 110). Finally, Statement 20 is from the August 10-Q and states that "[o]n June 29, 2020, [Nikola] began accepting non-binding reservations for the Badger . . . on [its] website." (*Id.* at 117).

Plaintiff alleges that the above statements are materially false or misleading because they imply that the Badger was a functioning vehicle design when, in truth, the Badger "was nothing more than a computer rendering of a non-existent truck." (Doc. 116 at 23). According to Plaintiff, the SEC filings fail to disclose that the Badger was "mere concept art," that "no engineering work had been done for the Badger," and that Nikola had not even created a prototype for the vehicle. (*Id.*). In their Motion, Defendants argue that Plaintiff's allegations overlook the following sentence that was included in the May Proxy, the June S-1, and the July S-1:

> At this time, Nikola is focused on the production of its Class 8 heavy-duty vehicles and *does not expect to develop production plans* for the Badger unless we enter into a strategic partnership with an established OEM.

(Doc. 111 at 11 (emphasis in original) (citing Doc. 111-1 at 91)). Defendants argue that this disclosure from the company—that Nikola "does not expect to develop production plans for the Badger unless [it] enter[s] into a strategic [OEM] partnership"—was sufficient to eliminate any risk that investors could be misled that the Badger was a functioning vehicle design. Thus, whether Defendants' statements related to the Badger are misleading turns on whether Nikola's admission that it had not yet developed production plans for the vehicle adequately disclosed adverse facts that negated any risk of misleading investors.

The Court cannot find that, as a matter of law, Defendants' statements related to the Badger were not materially misleading. In the April 8-K, Defendants' listing of the Badger's specifications implies that the vehicle was more than just a computer-generated concept because it indicates that Nikola had, at the least, produced a working prototype of the Badger and that the company had been able to test the vehicle's range, horsepower, torque, and other capabilities. Likewise, Defendants' inclusion of the Badger in a section

titled "Our Zero-Emission Product Offerings" in the May Proxy, the June S-1, and the July S-1—and their August 10-Q statement that Nikola had begun accepting reservations for the vehicle in June 2020—implies that the Badger was further along in its development than merely existing as a concept on a computer program. This is particularly true when one considers the *other* vehicles listed in the same section—such as the Nikola Two and the Nikola Tre—for which the company *had* created working prototypes. (*See* Doc. 116 at 21 ("Nikola ostensibly had working prototypes of the Nikola Two and Nikola Tre by June 2020.")). Further, Defendant Milton's public statements only further muddied the waters, as he claimed on multiple occasions that the Badger was "a fully functioning vehicle inside and outside" and that it was a "real truck[,] . . . not just some mock up thing that other people have done." (Doc. 95 at 84; *see also* Doc. 95 at 79–80, 83–84, 93, 96, 100–03, 106–07, 112, 120–21). Given this context, the Court cannot find that merely disclosing that no "production plans" existed for the Badger was sufficient to disclose that the Badger was merely a concept and thereby refute the misleading nature of Defendants' statements in the SEC filings. Thus, Plaintiff has sufficiently alleged that Statements 5, 9, 12, 16, and 20—relating to the Badger—were materially false or misleading when made.

### e. Statements Referring to Nikola One

Statements 7, 11, 15, 21, and 22 refer to the Nikola One, the company's FCEV Class 8 semitruck. Statements 7, 11, and 15—from the May Proxy, the June S-1, and the July S-1, respectively—are identical. Each lists the Nikola One under the section titled "Zero-Emission Product Offerings" and states:

> The Nikola One (Class 8 sleeper cab) and Nikola Two (Class 8 day cab) are Nikola's FCEV trucks that are primarily designed for medium and long-haul applications. The FCEV trucks allow Nikola to address the longer-term opportunity by combining Nikola's fuel cell technology and a network of hydrogen stations across the U.S. . . .

> Nikola's FCEVs have an estimated range of up to 400 to 750 miles, designed to address the medium and long-haul market. . . .

> The Nikola Two will be marketed in the North American

1
2

market, with initial production expected in the first quarter of 2023. *Production plans for the Nikola One will be announced once we have established a robust refueling infrastructure*.

3   (Doc. 111-1 at 90–91, 377–78 (emphasis added)). For each, Plaintiff alleges that it was

4   misleading to refer to the Nikola One alongside the Nikola Two as one of the company's

5   "Zero-Emission Product Offerings" because the Nikola One was never developed into a

6   functional prototype and the company had abandoned its production. (Doc. 116 at 21). In

7   their Motion, Defendants argue that the June S-1 and July S-1 "made very clear throughout

8   that Nikola was not yet producing any vehicles at all" and that its vehicle platforms were

9   "still in the early stages of development." (Doc. 111 at 11). Moreover, Defendants argue

10  that the June S-1 and July S-1 made it clear that "[p]roduction plans for the Nikola One

11  [would] be announced once we have established a robust refueling infrastructure." (*Id.*). In

12  sum, Defendants argue that the inclusion of the Nikola One in the company's product

13  offerings was not misleading because the filings did not state or otherwise imply that the

14  Nikola One was anything more than it was—a yet-to-be-produced vehicle that was "still in

15  the early stages of development." (*Id.*).

16          Despite the June S-1's and July S-1's recognition that Nikola was not yet producing

17  any vehicles at all, the Court finds that Defendants' inclusion of the Nikola One in the

18  company's "Zero-Emission Product Offerings" may have been misleading to investors. As

19  discussed above with respect to the Badger, the inclusion of the Nikola One alongside the

20  Nikola Two and Nikola Tre may have given the impression that the Nikola One was further

21  along in its development than it was. Plaintiff alleges that, after the December 2016

22  unveiling event, Nikola *completely abandoned* the Nikola One as a potential product of the

23  company. (Doc. 95 at 38, 97). No functioning prototype of the Nikola One was ever

24  created. (*Id.* at 37, 97, 110). In contrast, by the time the June S-1 and July S-1 were issued,

25  Nikola had apparently produced fully functioning prototypes for the Nikola Two and

26  Nikola Tre. (*See* Doc. 116 at 21). Additionally, the company had specific timelines for

27  when "significant deliveries" of the Nikola Two and Nikola Tre were to begin. (Doc. 111-

28  1 at 20). In sum, the Nikola One—like the Badger—was little more than a concept at the

time the May Proxy, the June S-1, and the July S-1 were issued. As with the Badger, the Court cannot conclude that Defendants' inclusion of the Nikola One in their list of "Zero-Emission Product Offerings" did not, as a matter of law, mislead investors. Reasonable minds could disagree as to whether Nikola adequately disclosed the true progress of the company's development of the Nikola One by merely stating that "[p]roduction plans . . . [would] be announced once [the company has] established a robust refueling infrastructure." (Doc. 111-1 at 91, 378). Thus, Plaintiff has sufficiently alleged that Statements 7, 11, and 15 were materially false or misleading when made.

Statements 21 and 22 were made in the September 8-K, which was issued in response to the Hindenburg Report. Statement 21 refuted the Hindenburg Report's contention that the Nikola One was not a real truck but rather a "pusher":

> The Nikola One is a real truck that sits in Nikola's showroom. A pusher means a vehicle that was not designed to be moved by its own propulsion system. The Nikola One was, in fact, designed to be powered and driven by its own propulsion.
>
> Here are the facts: [(i)] Gearbox was functional and bench tested prior to installation[; (ii)] Batteries were functional[; (iii)] Inverters functioned and powered the motors on a bench test prior to the show[; (iv)] Power steering, Suspension, Infotainment, Air Disc Brakes, High Voltage, and Air Systems were all functional.

*See* Press Release, Nikola, "Nikola Sets the Record Straight on False and Misleading Short Seller Report" (September 14, 2020), https://www.sec.gov/Archives/edgar/data/1731289/ 000173128920000046/pressreleaseissuedbyni.htm (hereinafter "Press Release, Nikola"). Plaintiff alleges that it was misleading to state that the Nikola One was a "real truck" and that it was not a "pusher" because the vehicle's "systems were powered via an electrical outlet in the floor" and it "has never moved under its own power, at the demonstration show or after." (Doc. 95 at 124). Plaintiff alleges that it was materially false and misleading for Defendants to fail to disclose that the Nikola One was *not* a fully functioning or fully built vehicle and that it had *not* been designed or tested. (*Id.* at 70). Plaintiff additionally points to admissions by Defendant Brady and other Nikola officials that the Nikola One

was "not fully functional" and that it "*was* a pusher." (*Id.* (emphasis added)).

In their Motion, Defendants argue that Statement 21 was not false or misleading because it fully explained which parts of the Nikola One *were* functional. (Doc. 111 at 13). Moreover, Defendants point out that Plaintiff's argument overlooks the following sentences, which immediately follow Statement 21:

> As Nikola pivoted to the next generation of trucks, it ultimately decided *not* to invest additional resources into completing the process to make the Nikola One drive on its own propulsion. After pivoting, Nikola produced prototypes for the Nikola Two, which *are* self-propelled and have been frequently demonstrated. . . .
>
> The Nikola One was an incredibly successful *proof of concept*, and everything the Company learned from that experience has underpinned the successful development of its next generation of trucks.

*See* Press Release, Nikola (emphasis added). Thus, Defendants argue that the September 8-K "made clear the Nikola One never moved under its own power." (Doc. 111 at 14).

The Court agrees with Defendants that the sentences omitted by Plaintiff negate any risk that Statement 21 was materially false or misleading. They are "precise" and "directly address" the issue of whether the Nikola One was fully functioning by making it clear that the vehicle was *not* able to "drive on its own propulsion" and that it was merely a "proof of concept." *See Provenz*, 102 F.3d at 1493. The omitted sentences reduce the parties' disagreement to a semantic argument over the words "real truck" and "pusher." Although it is true that Statement 21 asserts that the Nikola One was a real truck and rejects the contention that the Nikola One was a pusher, what is important is what the Statement says about the vehicle's ability to move on its own. To that extent, Statement 21 is clear that the Nikola One was *unable* to do so. Whether or not the vehicle was a "real truck" or a "pusher" is less important, and—even if Statement 21 is false or misleading in that regard—it is unlikely that Statement 21 misled investors as to the Nikola One's capabilities given its unambiguous disclosure that the vehicle was unable to move on its own. The Court finds that no reasonable disagreement exists as to whether Statement 21 was fully disclosing and

misleading and that Plaintiff has failed to allege that Statement 21 was an actionable misstatement by Defendants.

Statement 22 refutes the Hindenburg Report's contention that Nikola's 2017 promotional video for the Nikola One misrepresented the capabilities of the vehicle by showing the vehicle rolling down a hill:

> Hindenburg seeks to portray Nikola as misrepresenting the capabilities of the Nikola One prototype in a 2017 video produced by a third party, as "simply filmed rolling down a big hill." Nikola never stated its truck was driving under its own propulsion in the video, although the truck was designed to do just that (as described in previous point). The truck was showcased and filmed by a third party for a commercial. *Nikola described this third-party video on the Company's social media as "In Motion." It was never described as "under its own propulsion" or "powertrain driven." Nikola investors who invested during this period, in which the Company was privately held, knew the technical capability of the Nikola One at the time of their investment.*

*See* Press Release, Nikola (emphasis added). Plaintiff alleges that the italicized portion of the above statement is materially false and misleading because the Nikola One was "repeatedly" advertised as a "functional product" by Defendants Nikola and Milton. (Doc. 95 at 125). Thus, Plaintiff alleges that Statement 22 is misleading to the extent it denies that Defendants ever described the vehicle as "under its own propulsion" or "powertrain driven" and to the extent it contends that investors "knew the capability of the Nikola One at the time of their investment." *See* Press Release, Nikola.

Contrary to Plaintiff's argument, careful reading of Statement 22 reveals that Defendants were not denying that the company or Defendant Milton ever misrepresented the Nikola One as a "functional product." Rather, Statement 22 makes the comparably unremarkable assertion that the company never described *the 2017 video* as showing the Nikola One "under its own propulsion" or "powertrain drive." Statement 22 asserts that the video was instead described on Nikola's social media as showing the Nikola One "In Motion." The Court has no reason to believe this assertion is false or misleading—it may very well be true that Nikola chose its words carefully in describing the video on its social

media, and Plaintiff does not offer any argument to the contrary. This is not to say that this manner of describing the video—or the video itself—was not misleading. Indeed, the video showed the Nikola One rolling down a hill, creating a strong implication that it was operating under its own power. Likewise, Nikola's description of the video as "In Motion" conveniently avoided disclosing whether the vehicle was driving itself. However, the issue is whether Plaintiff has sufficiently alleged that Statement 22 in the September 8-K was materially false or misleading, *not* whether the video or Nikola's social media description of the video was materially false or misleading. To this end, Plaintiff has failed to allege that Statement 22 was stating anything other than the truth—*i.e.*, that Nikola never stated *in the video* that the Nikola One was driving under its own propulsion and that Nikola's social media only described the video as "In Motion" and not as "under its own propulsion" or "powertrain driven." Thus, the Court finds that Plaintiff has failed to sufficiently allege that Statement 22 was an actionable, materially false or misleading statement.

Having analyzed all misstatements alleged by Plaintiff, the Court concludes that Plaintiff sufficiently alleged that Statements 1, 3, 5, 7, 9, 11, 12, 14–16, and 18–20 were materially false or misleading when made. That said, Plaintiff *failed* to sufficiently allege that Statements 2, 4, 6, 8, 10, 13, 17, and 21–22 were materially false or misleading and these Statements are dismissed from the Complaint to the extent Plaintiff relies on them as a basis for Defendants' liability under Rule 10b-5(b).

Additionally, the Court notes that the only SEC filing that Defendant Worthen signed was the September 8-K. (Doc. 95 at 18). This Court's dismissal of Statements 21 and 22 means that Plaintiff has failed to allege that the September 8-K contained any misrepresentations for which Defendant Worthen could be held liable. Moreover, as explained in the following subsection, the Court finds that Plaintiff has failed to allege a scheme liability claim against any of the Individual Defendants—including Defendant Worthen. Given these findings, Defendant Worthen is dismissed from the action entirely.

///

///

36

1

### 4. *Scheme Liability Under Rule 10b-5(a) and (c)*

2          Setting aside the alleged misstatements in the SEC filings, the Court turns to

3   Plaintiff's *other* basis for the Individual Defendants' primary liability under § 10(b)—that

4   is, Plaintiff's claim that the Individual Defendants and Defendant Milton[8] participated in a

5   fraudulent scheme in violation of Rule 10b-5(a) and (c).

6          Whereas Rule 10b-5(b) imposes liability against only those who "*make* any untrue

7   statement of a material fact," subsections (a) and (c) make it unlawful "to employ any

8   device, scheme, or artifice to defraud" or "to engage in any act, practice, or course of

9   business which operates or would operate as a fraud or deceit upon any person." *See*

10  15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5(a)–(c); *see also In re Robinhood Ord. Flow*

11  *Litig.*, No. 4:20-cv-9328-YGR, 2022 WL 9765563, at *5 (N.D. Cal. Oct. 13, 2022) (citation

12  omitted) ("Misrepresentations and omissions tend to fall under Rule 10b-5(b) and

13  manipulative [or deceptive] conduct and acts tend to fall under Rule 10b-5(a) or (c).").

14  Under subsection (a), a "device" is defined as "that which is devised, or formed by design";

15  a "scheme" is a "project, plan, or program of something to be done"; and an "artifice" is

16

17          _____

          [8] Plaintiff also brings the scheme liability claim against Defendant Milton. (*See* Doc.

18  95 at 166 (asserting Count II against "All Defendants")). The Court in this subsection does

19  not dismiss the scheme liability claim against Defendant Milton for failure to meet the first
    element. This is because Defendant Milton did not make any meaningful argument as to

20  Plaintiff's scheme liability claim. In his Motion, Defendant Milton merely argues that
    "Plaintiffs' failure to plead a Rule [10b-5(b)] claim also necessitates dismissal of their

21  scheme liability claims under Rules 10b-5(a) and (c)." (Doc. 112 at 8). Defendant Milton

22  then cites to *Fischler Kapel Holdings, LLC v. Flavor Producers, LLC*, No. 2:19-cv-10309-
    ODW (GJSx), 2020 WL 6939887, at *10 (C.D. Cal. Nov. 25, 2020). (*Id.*).

23          Defendant Milton's one-sentence argument is based on a total misreading of

24  *Fischler*. That case says nothing at all about a plaintiff needing to sufficiently plead their
    Rule 10b-5(b) claim in order to sustain their scheme liability claim under subsections (a)

25  and (c). Rather, the claims may be independent of one another, and the dismissal of a
    plaintiff's subsection (b) claim does not "necessitate[] dismissal" of their subsection (a)

26  and (c) claim. *See, e.g.*, *Lorenzo*, 139 S. Ct. at 1100–02 (recognizing that "considerable

27  overlap" exists among the subsections but finding that the plaintiff may be liable under
    subsections (a) and (c) even if his conduct "[fell] outside subsection (b) of the Rule").

28

"an artful stratagem or trick." *Lorenzo*, 139 S. Ct. at 1101 (quotations and alterations omitted) (citation omitted). Under subsection (c), the terms "act" and "practice" are "similarly expansive"; an act is defined as "a doing" or a "thing done" and a practice is defined as an "action" or "deed." *Id.* (citation omitted). Together, subsections (a) and (c) "capture a wide range of conduct." *Id.*

The first element of a scheme liability claim requires a plaintiff to sufficiently allege that the defendant "use[d] or employ[ed] any manipulative or deceptive device or contrivance."[9] *Simpson v. AOL Time Warner, Inc.*, 452 F.3d 1040, 1047 (9th Cir. 2006) (citing *Dura Pharms.*, 544 U.S. at 341–42), *vacated on other grounds*, 519 F.3d 1041 (9th Cir. 2008). In other words, Plaintiff must allege facts sufficient to show that Defendants "committed a deceptive or manipulative act in furtherance of the alleged scheme." *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1192 (D. Or. 2015) (citations omitted). If, as here, more than one defendant is alleged to have participated, the plaintiff much allege that *each defendant* committed their own deceptive act in furtherance of the scheme. *See Cooper v. Pickett*, 137 F.3d 616, 624 (9th Cir. 1997) (emphasis added) ("*Central Bank* does not preclude liability based on allegations that a group of defendants acted together to violate the securities laws, *as long as* each defendant committed a manipulative or deceptive act in furtherance of the scheme."); *see also Simpson*, 452 F.3d at 1050 ("[W]hen determining whether a defendant is a 'primary violator,' the conduct *of each defendant* . . . must be viewed *alone* for whether it had the purpose and effect of creating a false appearance of fact in furtherance of an overall scheme to defraud.").

In *Simpson*, the Ninth Circuit considered the type of conduct that "constitutes a manipulative or deceptive act in furtherance of a scheme to defraud sufficient to render the defendant a 'primary violator' of § 10(b)":

---

[9] The remaining five elements of a claim under subsections (a) and (c) are identical to the elements required for a claim under subsection (b): scienter, a connection with the purchase or sale of a security, reliance, economic loss, and loss causation. *See Simpson*, 452 F.3d at 1047 (citing *Dura Pharms.*, 544 U.S. at 341–42).

> We agree . . . that engaging in a transaction, the principal purpose and effect of which is to create the false appearance of fact, constitutes a "deceptive act." Participation in a fraudulent transaction by itself, however, is insufficient to qualify the defendant as a "primary violator" if the deceptive nature of the transaction or scheme was not an intended result, at least in part, of the defendant's own conduct.

> We hold that to be liable as a primary violator of § 10(b) for participation in a "scheme to defraud," the defendant must have engaged in conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme. It is not enough that a *transaction* in which a defendant was involved had a deceptive purpose and effect; the defendant's *own conduct* contributing to the transaction or overall scheme must have had a deceptive purpose and effect.

*Simpson*, 452 F.3d at 1048 (emphasis in original). In distinguishing the "purpose and effect" test from the element of scienter, the Ninth Circuit explained that the former is focused on examining "whether the challenged conduct of the defendant had a principal purpose, and not just an accidental effect, of creating a false appearance as part of a deceptive transaction or fraudulent scheme." *Id.* at 1048, n.5. In contrast, the scienter element "ensures a culpable state of mind," that is, that the defendant acted consciously or with deliberate recklessness. *Id.* "Unlike the scienter requirement, the 'purpose and effect' test is focused on differentiating conduct that may form the basis of a primary violation under § 10(b) from mere aiding and abetting activity that the Supreme Court has held does not constitute a primary violation." *Id.* "A defendant may intend to deceive the public by substantially assisting another's misconduct as part of a scheme to defraud, but fail to perform personally any action that created a false appearance as part of this scheme." *Id.* "The scienter requirement, therefore, will not in all cases distinguish aiding and abetting from primary liability." *Id.*

In analyzing the pleading sufficiency of a plaintiff's scheme liability claim, courts recognize that "the exact mechanism of the scheme is likely to be unknown to the plaintiff[]," at least at the motion-to-dismiss stage. *Galena*, 117 F. Supp. 3d at 1193 (quotations omitted) (quoting *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F.Supp.2d 549, 580 (S.D. Tex. 2002)) (other citations omitted). Thus, a plaintiff need not

plead facts that reveal the scheme's particular mechanisms; rather, "allegations of the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants are sufficient for alleging participation." *Id.* (quoting *Enron*, 235 F. Supp. 2d at 580). That said, the plaintiff must make such allegations with particularity in accordance with Rule 9(b). *See id.* (citations omitted) ("Although not subject to the PSLRA pleading requirements, the conduct underlying claims for scheme liability must be alleged with particularity under Rule 9(b)."); *see also In re Parmalat Sec. Litig.*, 414 F. Supp. 2d 428, 432 (S.D.N.Y. 2006) ("[To satisfy Rule 9(b) particularity, a plaintiff must specify] what [deceptive] acts were performed, which defendants performed them, when the [deceptive] acts were performed and what effect the scheme had on the securities at issue.").

Broadly, Plaintiff here alleges a scheme to artificially inflate Nikola's stock price. Plaintiff argues that the Individual Defendants participated in the scheme by engaging in the following conduct:

> (i) "creat[ing] the false impression that Milton could be trusted by repeatedly allowing" him to make misrepresentations;
>
> (ii) "signing SEC filings that both contributed to Milton's false narratives and signaled investors to trust in Milton";
>
> (iii) "approving a misleading press release";
>
> (iv) "establishing a system that rewarded Milton and the [Individual] Defendants for fraud"; and
>
> (v) denying the Hindenburg Report's allegations."

(Doc. 116 at 17–18). In essence, Plaintiff alleges that the Individual Defendants stood to benefit from Nikola's increased stock value that resulted from Defendant Milton's repeated misstatements and that they therefore schemed to aid his efforts by not stopping or publicly correcting Defendant Milton's misrepresentations and by signing SEC filings that contained their own misleading statements. The conduct alleged by Plaintiff is unaccompanied by any factual allegations related to the conduct's principal purpose and effect. It also is not individualized. Thus, the Court finds that Plaintiff failed to allege that each Individual Defendant committed a deceptive act in furtherance of an alleged scheme.

First, with respect to Plaintiff's allegation that the Individual Defendants "created the false impression that Milton could be trusted by repeatedly allowing" him to make misrepresentations, there are no facts to suggest that *the purpose* of the Individual Defendants' collective[10] decision to not stop or correct Defendant Milton's misrepresentations was to create a false appearance of fact and thereby further the scheme of inflating Nikola's stock price. Plaintiff alleges that the purpose of not stopping or correcting Defendant Milton was to "create[] the false impression that Milton could be trusted" by investors. (Doc. 116 at 17–18). This allegation, however, is entirely conclusory and unsupported by any factual allegations. Plaintiff alleges no specific agreement among the Individual Defendants to boost Defendant Milton's credibility to the public or to otherwise permit him to continue making misrepresentations. Plaintiff alleges no specific statements or other conduct, by *any* of the Individual Defendants, indicating that they approved of Defendant Milton's misrepresentations or that they wished to see them continue. If anything, the facts alleged by Plaintiff indicate just the opposite—that at least some of the Individual Defendants *opposed* Defendant Milton's repeated misrepresentations. For example, Defendant Worthen called Defendant Milton's misrepresentation related to Nikola's battery technology "a terrible and stupid idea" and apparently "told [Defendant Milton] not to make the statement." (Doc. 95 at 60). As another example, Defendant Russell apparently asked Defendant Milton to allow Defendant Worthen to "pre-screen any tweets [he] planned to post from Nikola's corporate account" in an apparent effort to prevent further misrepresentations. (*Id.* at 65).

Moreover, Plaintiff fails to offer any caselaw or other legal authority providing that

---

[10] In addition, Plaintiff cannot state a scheme liability claim by merely alleging that the Individual Defendants *collectively* allowed Defendant Milton to keep making misrepresentations. Rather, Plaintiff must allege facts that show how Defendant Russell, Brady, Worthen, Girsky, and Shindler *each individually* allowed Defendant Milton to continue making misrepresentations. *See Simpson*, 452 F.3d at 1050 ("[W]hen determining whether a defendant is a 'primary violator,' the conduct of *each* defendant . . . must be viewed *alone* for whether [it meets the purpose-and-effect test].").

a scheme to defraud is alleged by showing that certain defendants failed to correct or otherwise take action against the false or misleading statements of another. As noted above, courts have held that such a duty to correct does not exist in the first place. *See Yahoo! Inc.*, 611 Fed. Appx. at 389; *Oaktree*, 2017 WL 3187688, at *8. If the Individual Defendants had no legal duty to correct Defendant Milton's misrepresentations, the fact that they did not do so—without any other additional allegations of conduct—cannot be sufficient to show that they were participating in a fraudulent scheme. Rather, Plaintiff must allege some other facts—aside from the Individual Defendants' collective silence and general inaction—that would show the existence of "a device, scheme, or artifice to defraud."

As for the SEC filings, Plaintiff again fails to allege any facts that, taken as true, would indicate that the Individual Defendants signed SEC filings containing possible misrepresentations for *the purpose* of contributing to Defendant Milton's false narratives. As discussed extensively above, it is true that some of the statements made in Nikola's SEC filings may have been materially false or misleading when made. Specifically, the filings may have misrepresented Nikola's value by referring to the backlog as a list of "pre-orders" or "reservations" when it contained only cancellable expressions of interest for products that were not fully developed or available for purchase. *See supra* pt. III, sec. (A)(3)(a). Likewise, Nikola's SEC filings may have misrepresented that the Badger and Nikola One were functioning, production-ready vehicle designs when, in truth, they were still only concepts. *See supra* pt. III, sec. (A)(3)(d)–(e). It is *also* true that Defendant Milton is alleged to have made numerous misrepresentations about these very same topics. (*See* Doc. 95 at 41–42, 84, 113, 115–16 (alleged misrepresentations regarding backlog); at 36–39, 67–71, 100–01, 118–19 (alleged misrepresentations regarding Nikola One); at 49–51, 79–80, 83–84, 93, 96, 101–03, 106–07, 112, 120–21 (alleged misrepresentations regarding Badger)). Thus, Plaintiff's allegation that the Individual Defendants contributed to Defendant Milton's narrative by signing the SEC filings is at least conceivable. In this way, Plaintiff has alleged at least some factual evidence that the Individual Defendants "engaged in conduct that had the . . . *effect* of creating a false appearance of fact in furtherance of the

1   scheme." *Simpson*, 452 F.3d at 1048 (emphasis added).

2         However, the fact that the SEC filings may have contained misrepresentations that
3   may have contributed to Defendant Milton's narrative—and certainly did nothing to
4   *correct* Defendant Milton's alleged misrepresentations—says nothing about *the purpose*
5   behind the Individual Defendants' decision to sign those filings. After all, corporate
6   officials sign SEC filings on a regular basis. The fact that a particular filing contains
7   statements that might be misleading says nothing about whether such misrepresentations
8   were made with the purpose of furthering a broader scheme. *See id.* at 1050 (citation
9   omitted) ("Conduct that is consistent with the defendants' normal course of business would
10  not typically be considered to have the purpose and effect of creating a
11  misrepresentation."). Plaintiff alleges that the Individual Defendants were *aware* that
12  Defendant Milton's statements—and their own SEC filing misrepresentations—were false
13  or misleading. Even assuming this to be true, however, such allegations are insufficient to
14  demonstrate that the Individual Defendants engaged in conduct that had the purpose of
15  furthering the scheme. *See id.* (citations omitted) (emphasis added) ("Participation in a
16  legitimate transaction, which does not have a deceptive purpose or effect, would not allow
17  for a primary violation *even if the defendant knew or intended* that another party would
18  manipulate the transaction to effectuate a fraud."). At best, Plaintiff has alleged that the
19  Individual Defendants' conduct in signing the SEC filings may have aided and abetted
20  Defendant Milton's fraud. But this too is not enough to state a claim for their own primary
21  liability under Rule 10b-5(a) and (c). *See In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472,
22  505 (S.D.N.Y. 2005) (emphasis added) ("At worst, the banks designed and entered into the
23  transactions *knowing or even intending that* Parmalat or its auditors would misrepresent
24  the nature of the arrangements. That is, they substantially assisted fraud with culpable
25  knowledge—in other words, they *aided and abetted* it.").

26        Plaintiff also alleges that Defendants Russell, Brady, and Worthen participated in
27  the scheme by "approving a misleading press release." (Doc. 116 at 18). Plaintiff is
28  referring to a November 19, 2019 press release titled "Nikola Corporation to Unveil Game-

Changing Battery Cell Technology at Nikola World 2020," which allegedly included "several unqualified claims about [Nikola's] battery technology." (Doc. 95 at 75). This alleged conduct is insufficient to meet the purpose-and-effect test for scheme liability. As an initial matter, the Court notes that the Complaint is inconsistent with Plaintiff's Response argument. Specifically, Plaintiff's Response indicates that Defendants Russell, Brady, and Worthen "approv[ed]" the press release. (Doc. 116 at 18). The Complaint, however, alleges that it was Defendant Milton who drafted the press release, had ultimate authority over its content, and *authorized its distribution*. (Doc. 95 at 75). As for the Individual Defendants' involvement, the Complaint alleges only that they were "provided a draft of the press release" four days before it was posted publicly. (*Id.*). Regardless, even assuming, *arguendo*, that Defendants Russell, Brady, and Worthen did "approve" the press release, this fact again demonstrates little more than potential aiding and abetting activity, the exact sort of activity that the purpose-and-effect test is designed to differentiate from actionable conduct. *See Simpson*, 452 F.3d at 1048, n.5 ("[T]he 'purpose and effect' test is focused on differentiating conduct that may form the basis of a primary violation . . . from mere aiding and abetting activity that the Supreme Court has held does not constitute a primary violation. A defendant may intend to deceive the public by substantially assisting another's misconduct as part of a scheme to defraud, but fail to perform personally any action that created a false appearance as part of this scheme.").

Next, Plaintiff alleges that the Individual Defendants participated in the alleged scheme by "establishing a system that rewarded Milton and [themselves] for fraud." (Doc. 116 at 18). Plaintiff is referring to the compensation and stock-ownership structure that was in place at Nikola. Under that system, Defendant Milton and the Individual Defendants each owned substantial shares in the company and stood to gain millions of dollars in the event that the company's stock value increased. (Doc. 95 at 22–29). This system offers a plausible motive for Defendants to participate in a scheme to inflate the company's stock value. That said, Plaintiff fails to make any factual allegations related to *how* the system was established, *who* established it, or *why* it was structured the way it was. Without

pleading such facts, Plaintiff's allegation that Defendants "establish[ed] a system that rewarded [them] for fraud" is entirely conclusory. The system *may* have been established as part of Defendants' fraudulent scheme. Without additional allegations, however, it is just as or even more likely that the system was chosen for some other non-fraudulent reason. Plaintiff's allegations related to Nikola's compensation and stock-ownership structure merely explain the system that was in place; they do *not* show that the Individual Defendants established the system with fraud in mind or that they otherwise engaged in conduct that had the principal purpose and effect of furthering the alleged scheme.

Finally, Plaintiff alleges that the Individual Defendants participated in the alleged scheme by "denying the Hindenburg Report's allegations." (Doc. 116 at 18). Plaintiff appears to be referring to a September 14, 2020 press release by Nikola in which the company "unequivocally denied the allegations in the Hindenburg Report, asserting that the allegations themselves were 'false and misleading,' 'false and defamatory,' and 'designed to provide a false impression to investors and to negatively manipulate the market in order to financially benefit short sellers, including Hindenburg itself.'" (Doc. 95 at 123). As an initial matter, Plaintiff does not identify—in the Complaint or in the Response—*who* among the Individual Defendants issued or is otherwise responsible for the September 14, 2020 press release. To the extent Plaintiff is referring to the September 8-K—which attaches the allegedly misleading press release as an exhibit (*see* Doc. 111-2 at 12)—this allegation would only implicate Defendant Worthen, as he is the only person alleged to have signed the September 8-K. (Doc. 95 at 17–18). Nonetheless, the allegation that Defendant Worthen denied the Hindenburg Report's findings in the press release attached to the September 8-K is insufficient to meet the purpose-and-effect test. Plaintiff alleges no facts indicating that Defendant Worthen made the denials for *the purpose* of furthering the scheme to defraud. It is not inherently unreasonable for a company acting in the regular course of business to respond to or even deny allegations made in a short-seller report, especially where those allegations could have an impact on the company's value. Likewise, Plaintiff alleges no facts indicating that Defendant Worthen's denials had *the*

*effect* of creating a false appearance of fact in furtherance of the scheme. After all, the Court found above that Plaintiff failed to allege that the September 8-K contained any materially misleading or false statements. *See supra* pt. III, sec. (A)(3)(e).

In sum, the Court finds that Plaintiff has failed to allege with particularity that *each* Individual Defendant committed a deceptive act in furtherance of the alleged scheme. At best, Plaintiff has pleaded facts indicating that the Individual Defendants' *collective* conduct—*i.e.*, opting against meaningful action to stop or correct Defendant Milton's misrepresentations and signing SEC filings with possibly misleading statements—may have aided and abetted Defendant Milton's alleged scheme. Plaintiff has not, however, pleaded facts showing that such conduct had the "principal purpose and effect" of creating a false appearance of fact in furtherance of the scheme; nor has Plaintiff done so on a Defendant-by-Defendant basis. Therefore, the Court finds that Plaintiff has failed to state a claim under Rule 10b-5(a) and (c) against the Individual Defendants and that dismissal of the claim is appropriate. As noted above, however, the Court here is only analyzing the first element of Plaintiff's scheme liability claim with respect to the Individual Defendants. Therefore, this holding has no bearing on Plaintiff's scheme liability claim to the extent Plaintiff brings that claim against Defendant Milton. *See supra* note 8.

### 5. Defendant Milton's Separate Arguments

In his separate Motion, Defendant Milton argues that the alleged misstatements and omissions that Plaintiff attributes to him are not actionable. First, he argues that some of the statements are not misleading when viewed in context. Second, he argues that other statements were merely non-actionable statements of opinion, puffery, and optimism. Finally, he argues that Plaintiff's allegations of omission are not actionable because he had no duty to disclose the allegedly omitted information. (*See* Doc. 112 at 2–5).

The Court is unpersuaded. Plaintiff sufficiently alleges numerous misstatements that are actionable. Plaintiff alleges that on June 6, 2020, Defendant Milton tweeted, "All the technology, software, controls, E axle, inverters etc. we do internally." (Doc. 95 at 93). Plaintiff alleges that this was misleading and false because Nikola "did not and does not

design, develop or produce its components such as batteries, inverters or e-axle." (*Id.* at 81). Defendant Milton points out that Plaintiff omits the rest of the tweet, which stated: "We joint venture with those that know the supply chain and manufacturing like Iveco. We outsource autonomy. We outsource hardware production." (Doc. 112 at 3). Defendant Milton argues that this additional context renders the tweet not misleading. It does not. At best, the additional context discloses that *some* of Nikola's production is outsourced, such as its hardware and its "autonomy." Even if this is true, the additional context does nothing to correct the alleged falsehood that Nikola produces technology and software—which is presumably distinct from "hardware" and "autonomy"—*internally*. The additional context provided by Defendant Milton may, at most, create an issue of fact as to the statement's overall falsity, but it certainly does not permit this Court to find, as a matter of law, that the statement was not misleading. *See Fecht*, 70 F.3d at 1081 (noting that whether a statement is misleading should generally be left to the trier of fact).

Moreover, Defendant Milton overlooks *other* context that must also be considered—namely, that he is alleged to have made numerous other misstatements on this very same issue. Defendant Milton cannot pick and choose what context is relevant. *See Convergent Techs.*, 948 F.2d at 512 (noting that statements must be "read in light of *all* the information then available to the market"). As just one example, Plaintiff alleges that on June 3, 2020, Defendant Milton claimed that Nikola did its "own powertrains, battery, battery management systems, controls . . . in house." (Doc. 95 at 92). Defendant Milton offers context for this alleged misstatement too, asserting that Nikola's public filings made it clear that the company "relied on third party suppliers for the provision and development of many of the key components and materials used in our vehicles." (Doc. 112 at 13). This context is also unpersuasive. Nikola may have disclosed that the development of "many" of their components were outsourced, but this does not identify *which* components were outsourced. Thus, Defendant Milton's claim that "powertrains, battery, battery management systems, [and] controls" were developed or produced "in house" may still have been misleading if any of those components were among those that the company was

referring to in its public filing as being outsourced.

Defendant Milton's argument that some of the alleged misstatements were merely statements of opinion, puffery, and optimism is also unpersuasive. As an example, Defendant Milton refers to a tweet he posted on November 18, 2019: "Tomorrow, it all changes. I finally get to talk about it. The news everyone has been waiting for. Diesel trucks are obsolete for good. We solved what no one else could. It's time for other OEM's to stop producing diesels immediately. See press tomorrow #emissionsgameover." (Doc. 95 at 74–75). The tweet was referring to an announcement released by Nikola the next day which touted the company's new battery technology. (*Id.* at 75–76). Plaintiff argues that the tweet was misleading because it implied that the company had finally "solved" the battery challenge when, in truth, the company was nowhere near having the battery technology described in the press release. (*Id.* at 77–78). Defendant Milton argues this statement was mere puffery and that he was simply seeking to promote Nikola and its products. (Doc. 112 at 4). He argues that the market "clearly knew" that the battery was "years from production." (*Id.*). The Court is unpersuaded. Statements are mere "puffery" if they are "generalized, vague and unspecific assertions." *Glen Holly Ent., Inc. v. Tektronix, Inc.*, 352 F.3d 367, 379 (9th Cir. 2003). If they are capable of objective verification, however, they cannot be dismissed as puffery and may be considered misleading. *Retail Wholesale*, 845 F.3d at 1275 (citing *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014)). Defendant Milton's statement that "[w]e solved what no one else could" is *specific* and creates the clear implication that the company had *solved* the challenge of creating the battery technology. The statement can be objectively verified as well; Nikola had either solved the battery technology challenge, or it hadn't. The Court cannot, as a matter of law, find that the statement was not materially misleading or false. Once again, Defendant Milton has, at best, created a factual dispute on the issue.

Defendant Milton's final argument is that some of his alleged misstatements were merely incomplete statements and that he cannot be held liable for not fully disclosing all the relevant facts where he had no duty to do so. (Doc. 112 at 5). As an example, Defendant

Milton refers to his June 1, 2020 statement that "[w]e don't build on speculation; we build on orders." (Doc. 95 at 84). Plaintiff alleges this statement was misleading because it implied that the "orders" which made up Nikola's backlog were actual reservations for the company's vehicles and failed to disclose that the backlog was, in truth, made up of non-binding "expressions of interest," cancellable at any time. (*Id.* at 84–85). Defendant Milton argues that he "had no obligation to add paragraphs of detailed disclaimers and specifications about the orders including that they were cancellable and not guaranteed." (Doc. 112 at 5). He also argues that Nikola's SEC filings fully disclosed the allegedly omitted information. The Court is unpersuaded. Defendant's argument omits the rest of the statement, which included language that was even *more* misleading as it relates to Nikola's backlog: "We don't build on speculation; we build on orders. *We're very similar to like Airbus or Boeing where we're sold out for many, many years. We're the only company in the world that is sold out for many, many years. . . . It's all based on orders. I think that's the reason Nikola is worth so much money today.*" (Doc. 95 at 84 (emphasis added)). The Court has already found that Plaintiff sufficiently pleaded that the SEC filings contained statements related to the backlog that were misleading when made, *despite* those filings containing disclosures that the "reservations" were fully cancelable. *See supra* pt. III, sec. (A)(3)(a). Defendant Milton's June 1, 2020 statement, in comparison, lacks any such disclosure at all and is therefore even *more* misleading in nature.

The Court finds that Plaintiff has sufficiently alleged numerous actionable misstatements made by Defendant Milton. Having rejected all three of Defendant Milton's arguments in his Motion to Dismiss, the Court need not analyze the falsity of *every* misstatement he is alleged to have made or otherwise address *all* the issues raised by the appendices attached to his Motion. *See Feyko v. Yuhe Int'l., Inc.*, No. CV 11-05511 DDP (PJWX), 2013 WL 816409, at *4 n.2 (C.D. Cal. Mar. 5, 2013) ("The Court is under no obligation to evaluate every misrepresentation that was made in the [Complaint], because Plaintiff can survive a motion to dismiss by alleging a single material misrepresentation."); *Cunha v. Hansen Nat. Corp.*, No. EDCV 08-1249-GW(JCx), 2011 WL 8993148, at *4

(C.D. Cal. May 12, 2011) ("Indeed, while a thorough assessment in that regard *might* result in some winnowing of the scope of discovery going forward, it would *significantly* delay a final resolution of the instant motion because of the scope of the analysis it would require, and the end-result might not be a significant 'partial dismissal' at all, let alone one that would involve issues that obviously could not be cured by further amendment.").

To conclude Section (A), the Court has considered the arguments of both parties with respect to the first element. The Court finds that Plaintiff has sufficiently alleged that the Individual Defendants and Defendant Nikola made material misstatements in the SEC filings, though it finds that some of the statements alleged in this regard are not actionable and dismissed. The Court also finds that Plaintiff has sufficiently alleged that Defendant Milton made materially misleading or false statements. Finally, the Court dismisses Plaintiff's scheme liability claim against the Individual Defendants because Plaintiff failed to allege that they engaged in any conduct in furtherance of a fraudulent scheme. Plaintiff's scheme liability claim against Defendant Milton, however, survives.

**B.  Scienter [11]**

The PSLRA requires a plaintiff to "state with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A) (emphasis added). For securities fraud claims, the "required state of mind" is scienter, "a mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 619 (9th Cir. 2017) (quoting *Schueneman v. Arena Pharm.,*

---

[11] Defendants do not dispute scienter with respect to Defendant Nikola. (*See* Doc. 111 at 14 (arguing that Plaintiff failed to adequately allege scienter as to the Individual Defendants, but not as to Defendant Nikola)). Presumably, this is due to Plaintiff's particularly strong allegations of scienter with respect to Defendant Milton. Defendant Milton was an officer of Nikola, and courts generally recognize that a corporate officer's scienter is imputed to the corporation. *See In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 474–79 (9th Cir. 2015) (discussing imputation of scienter from officer to corporation). Here, Defendant Milton's scienter can therefore be imputed to Defendant Nikola and the Court need not address Defendant Nikola's scienter any further.

*Inc.*, 840 F.3d 698, 705 (9th Cir. 2016)). The Ninth Circuit defines "deliberate recklessness" as a form of intentional misconduct that is an "*extreme* departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it." *Zucco*, 552 F.3d at 991 (citations omitted) (emphasis added).

The PSLRA's "strong inference" standard requires that the "inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. Facts merely showing "a *motive* to commit fraud and *opportunity to do so* provide some reasonable inference of intent, but are not sufficient to establish a strong inference of deliberate recklessness." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012) (emphasis added). The scienter inquiry is "inherently comparative," and the Court must "compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive . . . if the malicious inference is at least as compelling as any opposing innocent inference." *N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011) (citations omitted).

### 1. *Scienter of Individual Defendants* [12]

Having dismissed the scheme liability claim against the Individual Defendants, the Court need not consider whether Plaintiff has sufficiently alleged scienter for that claim. As to Plaintiff's maker liability claim against the Individual Defendants, the Court's scienter inquiry is narrowed by its dismissal of the SEC filing statements referring to Nikola's business model being centered around their FCEV/BEV trucks and its hydrogen infrastructure, (*see supra* pt. III, sec. (A)(3)(b)), and those statements referring to Nikola's

---

[12] As noted above, all claims against Defendant Worthen have been dismissed. (*See supra* pt. III, sec. (A)(3)(e) (explaining Defendant Worthen's dismissal from the action because Plaintiff failed to allege any misstatements in the September 8-K—the only filing signed by Defendant Worthen—and Plaintiff failed to allege a scheme liability claim against the Individual Defendants). Thus, the Court's scienter analysis is only focused on Defendants Russell, Brady, Girsky, Shindler, and Milton.

hydrogen capabilities (*see supra* pt. III, sec. (A)(3)(c)). The Court need only address scienter for the SEC filing misstatements that the Court has identified as actionable—*i.e.*, certain statements referring to (i) Nikola's backlog of reservations; (ii) the Nikola Badger; and (iii) the Nikola One. *See supra* pt. III, sec. (A)(3)(a), (d)–(e).

As an initial matter, the fact that the Individual Defendants signed the SEC filings containing allegedly misleading or false statements is not enough, on its own, to infer scienter. Although their signatures do provide a necessary link between the Individual Defendants and the alleged misrepresentations, they do not give rise to a strong inference of scienter without *additional* factual allegations showing that each of the Individual Defendants knew the SEC filings contained the misrepresentations alleged. *See Wojtunik v. Kealy*, 394 F. Supp. 2d 1149, 1165 (D. Ariz. 2005) ("[The defendant's] signature on an SEC-required corporate document is not enough, in and of itself, to sufficiently plead a securities fraud claim against that [defendant]."); *In re Hansen Nat. Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1159 (C.D. Cal. 2007) (citations omitted) ("[I]f [it] were true [that the Individual Defendants' signatures on various public filings gave rise to a strong inference of scienter], 'scienter would be established in every case where there was an accounting error or auditing mistake made by a publicly traded company, thereby eviscerating the pleading requirements for scienter set forth in the PSLRA.'"); *In re Downey Sec. Litig.*, No. CV 08-3261-JFW (RZx), 2009 WL 2767670, at *9 (C.D. Cal. Aug. 21, 2009) (citations omitted) (emphasis added) ("Without allegations that each of the Individual Defendants that signed various Downey public filings *knew* those public filings contained misstatements, the Individual Defendants' signatures on those public filings alone does not give rise to a strong inference of scienter.").

That said, the signatures remain important to the analysis because, as noted above, a defendant may only be held primarily liable under § 10(b) for statements contained in SEC filings that they signed. *See Howard*, 228 F.3d at 1061. Here, Defendants Russell and Brady signed the June S-1, July S-1, and August 10-Q, which contained alleged misrepresentations concerning Nikola's backlog of reservations and the company's Nikola

One and Badger vehicles. (Doc. 95 at 17–18). Defendant Girsky signed the March Prospectus, May Proxy, June S-1, and July S-1, which contained alleged misrepresentations concerning Nikola's backlog of reservations and the company's Nikola One and Badger vehicles. (*Id.* at 18). Defendant Shindler signed only the March Prospectus and April 8-K, which contained alleged misrepresentations concerning Nikola's backlog of reservations and the Badger. (*Id.* at 18–19). Thus, the question is whether Plaintiff has alleged sufficient facts to strongly infer that Defendants Russell, Brady, and Girsky each individually acted with the requisite intent to mislead the public with respect to Nikola's backlog of reservations and to the company's Nikola One and Badger vehicles. The question with respect to Defendant Shindler is the same, except that the Court need not consider scienter as it relates to any misrepresentations about the Nikola One.

Aside from their signatures, Plaintiff alleges that the Individual Defendants had a motive and opportunity to commit fraud. Plaintiff alleges that the Individual Defendants "stood to gain millions, if not billions" from misrepresenting the company, given their ownership of significant amounts of Nikola stock. (Doc. 95 at 13, 26–29, 34). Although Plaintiff's allegations of motive and opportunity do provide at least a reasonable inference of intent, they are not sufficient to establish a *strong* inference of scienter. *See VeriFone*, 704 F.3d at 701. Plaintiff also alleges that the Individual Defendants' September 2020 response to the Hindenburg Report and the "speed with which Nikola settled the SEC complaint" contribute to a finding of scienter. (Doc. 116 at 28–29). The Court does not agree. As found above, Plaintiff has failed to allege that the September 8-K and its accompanying press release contained materially misleading or false statements. The fact that the Individual Defendants may have issued a non-misleading response to the Hindenburg Report does not speak to their scienter at all. And although courts generally recognize that SEC settlements may sometimes be relevant to scienter, the SEC settlement was between *Nikola* and the SEC—not between any of the Individual Defendants and the SEC—and thus has little bearing on the Individual Defendants' scienter

The only allegation—with respect to *any* of Defendants Russell, Brady, Girsky, or

Shindler—that speaks to their knowledge related to the specific misrepresentations at issue is Plaintiff's allegations regarding Defendant Brady's knowledge of the Nikola One. Borrowing from Nikola's November 2020 presentation to the United States Attorney's Office for the Southern District of New York, Plaintiff alleges that Defendant Brady has since admitted that "[a]s of August 1, 2016, the Nikola One was running on natural gas and thus was 'not zero emissions' [and that] Milton's statements to the contrary are false." (Doc. 95 at 68). Plaintiff alleges that Defendant Brady has further admitted that "the Nikola One unveiled in December 2016 was not fully functional" and that it was "a pusher." (*Id.* at 37, 70). These allegations are at least some evidence that Defendant Brady was aware— at least by November 2020—of the progress that had taken place in the Nikola One's development during the latter half of 2016. This allegation cannot, however, give rise to a *strong* inference of scienter because it does not speak to Defendant Brady's knowledge of the Nikola One or his state of mind with respect to the SEC filings during the relevant time period of June, July, and August of 2020 (when he signed the SEC filings containing alleged misstatements about the Nikola One). Moreover, the fact that Defendant Brady *now* admits that the Nikola One was not fully functional in August and December 2016 says nothing about whether he intended to deceive the public by signing SEC filings in the summer of 2020 which listed the Nikola One alongside Nikola's other "product offerings."

Plaintiff's other scienter allegations—at least with respect to Defendants Russell and Brady—primarily revolve around their knowledge that Defendant Milton was repeatedly misrepresenting the company. For example, Plaintiff alleges that Russell and Worthen sought to pre-screen Milton's tweets to prevent further misrepresentations (Doc. 95 at 65), that they received emails acknowledging Milton's misrepresentations (*Id.* at 108– 09), that they received an email from Milton himself indicating his intent to pursue a "media blitz" to boost the company's stock value (*Id.* at 13, 33–34, 44, 64), and that they acknowledged during a DOJ presentation that it was "indefensible" and a "false statement" for Milton to state that Nikola was producing hydrogen (*Id.* at 47, 64, 73, 82). Plaintiff alleges other facts indicating that Russell and Brady knew the truth behind Milton's

misrepresentations concerning Nikola's battery technology (*Id.* at 12, 55–56, 58, 60, 75, 78), the total cost of ownership of Nikola trucks as compared to diesel (*Id.* at 61–62), Nikola's production of components "in-house" (*Id.* at 12, 54–55, 64, 81, 106), Nikola having a totally "off-grid" headquarters (*Id.* at 13, 63, 74), and Nikola purchasing natural gas wells (*Id.* at 67). Collectively, these allegations show that Brady and Russell had knowledge related to topics such as Nikola's hydrogen capabilities, its battery technology, its lack of in-house production of components, and whether its headquarters was off grid. Had the scheme liability claim survived, such allegations may have been helpful in proving Brady and Russell's knowledge of and participation in a scheme to defraud that was headed by Milton. They do not, however, speak to Brady or Russell's actual knowledge related to Nikola's backlog of reservations or to their knowledge of the Nikola One or Badger. Thus, these allegations say *nothing* about Brady's or Russell's state of mind with respect to the misrepresentations Plaintiff seeks to hold them liable for making.

Plaintiff's scienter allegations with respect to Defendants Girsky and Shindler are even more sparse. Unlike with Russell and Brady, Plaintiff does not even allege any facts showing that Girsky or Shindler were aware of or received any communications relating to Milton's misrepresentations, let alone facts related to their knowledge of the true nature of Nikola's backlog or its production of the Nikola One or Badger. Rather, Plaintiff's scienter allegations with respect to Girsky and Shindler revolve around the fact that, prior to the merger, they "conducted due diligence examinations" of Nikola and had discussions with the company's management in their capacities as VectoIQ officials. (Doc. 116 at 27). Plaintiff alleges that their due diligence occurred around the same time that an OEM engineer visited Nikola's offices and summed up the Badger's state as "vaporware." (*Id.*). Plaintiff's scienter theory is that Defendants Girsky and Shindler either "did the due diligence represented"—and thereby learned the truth behind Nikola's backlog and the company's Nikola One and Badger vehicles—"and knowingly made false statements" anyway, *or* they "lied about having conducted diligence and [were] reckless in signing the SEC filings containing false statements." (*Id.*). Plaintiff's allegation that Defendants

Girsky and Shindler conducted due diligence examinations of Nikola is helpful because it shows a specific instance in which they were likely exposed to information concerning Nikola's backlog or the company's progress in developing the Nikola One or Badger. That said, the allegations offer no specific, individualized details as to how the due diligence was conducted or to the level of involvement Girsky and Shindler had in the process. The Court cannot find that the allegation of due diligence—without any additional detail—is sufficient to create a *strong* inference that Defendants Girsky and Shindler intended to deceive or defraud the public when they signed the SEC filings.

All told, Plaintiff fails to allege any facts indicating that any of the Individual Defendants acted with an intent to deceive or defraud or with deliberate recklessness when they issued the allegedly misleading and false statements in the SEC filings. Specifically, the Complaint contains no facts indicating that Defendants Russell, Brady, Girsky, or Shindler touted Nikola's backlog of 14,000 FCEV reservations and $10 billion in potential revenue with the intent of misleading the investing public as to the value of the company. As discussed above, the SEC filings *did* contain cautionary language disclosing that the reservations were cancellable and that the projected revenue was based on assumptions. Although the Court did not find this language sufficient to entirely eliminate the risk that an investor could be misled, it at least shows an attempt by Defendants to be fully disclosing and truthful with their discussions of the backlog. The cautionary language therefore prevents the alleged misrepresentations concerning the backlog from being "so dramatically false" as to create a strong inference of scienter on their own, without any additional facts. *See Or. Pub. Emps.*, 774 F.3d at 607–08 (recognizing that some public statements may be "so important and so dramatically false" that strong inference of scienter can be imputed to corporate officials by mere existence of statement alone).

Likewise, the Complaint contains no facts indicating that Defendants Russell, Brady, Girsky, or Shindler included the Badger or the Nikola One in their list of product offerings or touted the Badger's specifications with the intent of misleading the public that the vehicles were fully developed and functioning designs. As with the backlog

misrepresentation, the SEC filings at least acknowledged that the company "[did] not expect to develop production plans for the Badger" until they entered a partnership with an OEM. Although the Court did not find this language sufficient to entirely eliminate the risk that an investor could be misled, it again shows Defendants at least acknowledging that the Badger was not a fully developed, ready-for-market product. The statements concerning the Badger were more misleading than outright falsities, and the Court cannot infer—from the language of the alleged misstatements alone—the requisite scienter. Likewise, although the SEC filings failed to explicitly mention that the Nikola One had been abandoned as a product and that no functional prototype had ever been developed, the Court cannot conclude that these omissions made the filings' statements about the Nikola One so dramatically false as to impute scienter. In sum, the Complaint lacks specific, individualized facts showing that the Individual Defendants signed off on the various SEC filings with the requisite intent of misleading the public as to Nikola's backlog or as to the company's vehicles, the Badger and the Nikola One.

Plaintiff alternatively relies on the "core operations" theory to support scienter against the Individual Defendants. This theory "relies on the principle that 'corporate officers have knowledge of the critical core operation of their companies.'" *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014) (citation omitted). In *South Ferry*, the Ninth Circuit explained that in some cases "[a]llegations regarding management's role in a corporate structure and the importance of the corporate information about which management made false or misleading statements may also create a strong inference of scienter when made in conjunction with detailed and specific allegations about management's exposure to factual information within the company." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 787 (9th Cir. 2008). In other words, under the core operations theory, a plaintiff's failure to allege specific facts raising an inference of scienter can be overcome if the plaintiff alternatively alleges specific facts about the defendant's role in the corporation and exposure to factual information as a result. The Ninth Circuit concluded that "allegations regarding management's role in a company may

be relevant and help to satisfy the PSLRA scienter requirement in three circumstances":

> First, the allegations may be used in any form along with other allegations that, when read together, raise an inference of scienter that is cogent and compelling, thus strong in light of other explanations. . . . This view takes such allegations into account when evaluating all circumstances together.
>
> Second, such allegations may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information. . . .
>
> Finally, such allegations may conceivably satisfy the PSLRA standard in a more bare form, without accompanying particularized allegations, in rare circumstances where the nature of the relevant fact is of such prominence that it would be "absurd" to suggest that management was without knowledge of the matter.

*S. Ferry*, 542 F.3d at 785–86. Here, Plaintiff does provide some minimal allegations regarding each of the Individual Defendants' roles in the company. Specifically, the Complaint alleges the positions Defendants Russell, Brady, Girsky, and Shindler held within the company, both before and during the Class Period. (Doc. 95 at 17–19). It does not, however, allege any other facts relevant to the core operations theory, such as what information they were typically privy to, the extent of their day-to-day oversight over the companies' operations, or the specific duties and responsibilities they had.

The first circumstance would seem to be applicable here, given that it permits allegations "in any form" as it relates to the Individual Defendants' role at Nikola. *See S. Ferry*, 542 F.3d at 785. As noted above, Plaintiff's allegations in this regard are minimal, as they only provide the positions each Individual Defendant held at Nikola but fail to provide any other information. For such minimal allegations to suffice, they would need to satisfy the scienter standard when "read together" with Plaintiff's *other* scienter allegations. As discussed extensively above, however, Plaintiff failed to allege any other individualized scienter allegations that could be "read together" with Plaintiff's minimal management-related allegations. Therefore, the first circumstance does not apply.

The second circumstance is also inapplicable because it requires the management-

related allegations to be so "particular" that they "suggest that [the defendant] had actual access to the disputed information." *See S. Ferry*, 542 F.3d at 786. Here, Plaintiff's management-related allegations only state the Individual Defendants' respective positions at Nikola and are not so particular that they would suggest that the Individual Defendants had actual access to the disputed information.

Finally, the third circumstance permits management-related allegations to be in "a more bare form" and does not necessarily require any "accompanying particularized allegations" of scienter. *See S. Ferry*, 542 F.3d at 786. However, for the third circumstance to apply, the "nature of the relevant fact" must be "of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." Here, it is not unreasonable to imagine that the Individual Defendants signed the SEC filings thinking that the cautionary language they included was sufficient to prevent the statements from being false or misleading because, as noted above, the misstatements at issue were more misleading than outright falsities. Moreover, the Court cannot draw any conclusions as to *the extent* of the Individual Defendants' knowledge of the relevant issues. While it is reasonable to imagine that the Individual Defendants were generally aware of the backlog's existence and of the fact that it contained cancellable orders, the Court does not have any way of inferring how extensive their knowledge of the backlog was. Likewise, while it is reasonable to imagine that the Individual Defendants were aware of the company's product offerings and the stage of development that each product was in, the Court does not have any way of inferring that the Individual Defendants were *so involved* in the company's product development that they *must* have known that merely including the Badger and the Nikola One in their list of product offerings was likely to mislead. Thus, the third circumstance does not apply, and Plaintiff has failed to show that the core operations theory sufficiently supports their scienter allegations against the Individual Defendants.

At best, Plaintiff has demonstrated that the Individual Defendants may have been negligent or even reckless in signing the SEC filings without ensuring that they disclosed all the relevant facts necessary to prevent any possible misstatements about the backlog,

the Badger, and the Nikola One. But mere recklessness or negligence does not satisfy the scienter standard. Plaintiff has not alleged any facts that would indicate this conduct by the Individual Defendants was done with the intent to deceive or defraud the investing public. The Court finds it far more likely, based on the facts alleged by Plaintiff, that the Individual Defendants were simply careless in failing to disclose the relevant facts more comprehensively. Plaintiff has failed to allege scienter with respect to the maker liability claim against the Individual Defendants.

### 2. Scienter of Defendant Milton

In his separate Motion, Defendant Milton argues that Plaintiff failed to adequately allege scienter against him. (Doc. 112 at 5–8). The Court does not agree. Plaintiff alleges *numerous* particularized facts that—independently and when viewed collectively—create a strong inference that Defendant Milton acted with the requisite intent to defraud or mislead when he made the misstatements alleged.

For example, Plaintiff alleges that Defendant Milton misrepresented the Nikola One by making statements that the vehicle was functional and capable of moving under its own power when, in truth, it could not. Plaintiff makes several factual allegations to prove that Defendant Milton made these statements with the requisite scienter. First, Plaintiff alleges that Defendant Milton was a "hands-on executive" who "engrossed himself in the details of Nikola's technology and product development process." (Doc. 95 at 30). Plaintiff alleges that Defendant Milton "participated in weekly update meetings" during which he "received updates on Nikola's product development, technology, and commercial activity directly from Nikola's technical leads." (*Id.*). Additionally, Plaintiff alleges that Defendant Milton regularly worked with the company's engineers, as he was often seen huddling by the computers with them and even working on the Nikola One itself. (*Id.* at 30, 38). These facts create an inference that Defendant Milton would have been consistently aware of the Nikola One's progress, *i.e.*, he would have known that the Nikola One could not operate on its own at all relevant times. Second, Plaintiff alleges that it was Defendant Milton himself who ordered a change of plans to show the Nikola One "in motion" in the 2018

video, after the video originally did not show the vehicle moving at all. (*Id.* at 40). Likewise, it was Defendant Milton who ordered an August 2016 design change of the Nikola One, a change that Plaintiff alleges "ensured that the prototype . . . would not be operable [at the December 2016 event]." (*Id.*). These factual allegations, as well as others not mentioned here, create a *strong* inference that Defendant Milton was keenly aware of the Nikola One's capabilities at all relevant times and that he therefore knew the misleading nature of his statements about the vehicle.[13]

Similarly, Plaintiff alleges that Defendant Milton made misleading statements about the company's backlog by representing the reservations as being firm and binding when they were, in truth, fully cancellable expressions of interest. As to scienter, Plaintiff alleges that Defendant Milton was "personally involved in soliciting reservations from several potential customers" and that he "communicated to potential customers that the reservations were cancellable for any reason at any time." (*Id.* at 40). Plaintiff goes even further and alleges specific excerpts taken from Defendant Milton's correspondence with these potential customers. (*Id.* at 40–41). Such factual allegations are more than sufficient to infer that Defendant Milton had knowledge of the true nature of the backlog.

The Court need not go through every alleged misstatement and identify every related allegation of scienter. Suffice to say that Plaintiff alleges *numerous* factual details showing that Defendant Milton had specific knowledge of—and direct access to—information that contradicted the misstatements he was allegedly making to the public. *See Dearborn Heights*, 856 F.3d at 620 ("[P]articularized allegations that defendants had 'actual access to the disputed information' may raise a strong inference of scienter."). This demonstrates that he understood the false and misleading nature of the statements he was making. Even if such allegations were still not enough, however, Plaintiff *also* alleges

---

[13] Many of these same allegations—namely, that Defendant Milton was a "hands-on" executive who worked closely with Nikola's engineers and product development teams—*also* support a finding of scienter as to Defendant Milton's alleged misstatements about the Badger being a "fully functioning vehicle" and a "real truck." (Doc. 95 at 84).

admissions from other Nikola officials and employees who specifically acknowledge that Defendant Milton's statements were false. For example, Defendant Worthen stated that "[t]he statement that Nikola can produce 1,000 kg/day [of hydrogen] is not true, *and Milton knew it was not true. We discussed this a million times*." (Doc. 95 at 47). Likewise, Plaintiff alleges that another Nikola employee stated that "it [was] false for Milton to say [that Nikola's cost of producing hydrogen was] down below $3/kg." (*Id.*). Defendant Brady stated that "Nikola is years away from having the battery technology Milton described. . . . The whole statement was an embellishment and fiction at the time." (*Id.* at 78). Defendant Worthen stated that "Milton's statement[s that Nikola has 'commercializable' battery technology] were a terrible and stupid idea and [I] told him not to make the statement." (*Id.*). These factual allegations further strengthen the inference of scienter.

Plaintiff also alleges that Defendant Milton was "advised [] about the legal risks associated with inaccurate tweets" and warned that "posts from his personal accounts could be viewed as statements by Nikola itself." (*Id.* at 65). Plaintiff even alleges that, at one point, Defendant Russell asked Defendant Milton if he would allow Defendant Worthen to pre-screen his tweets before he posted them. (*Id.*). Plaintiff alleges that "[t]hroughout 2020, certain of Nikola's senior executives continued to urge Milton to reduce his social media presence, and to be sure that his posts were accurate." (*Id.*). These factual allegations further strengthen the inference of scienter because they show that Defendant Milton was made aware, on multiple occasions, that his statements were causing issues because of their misleading nature. Thus, even if Defendant Milton were somehow *not* aware of the falsity or misleading nature of his own statements—contrary, of course, to what the above-discussed facts strongly suggest—he was made aware of such falsity through the conversations Plaintiff alleges that he had with Nikola officers and executives.

The Court also finds that Plaintiff's detailed allegations related to Defendant Milton's position and role within the company support a finding of scienter. Unlike with the Individual Defendants above, Plaintiff goes *much* further than merely stating Defendant Milton's job title with Nikola. Plaintiff alleges that Defendant Milton had "unfettered

control" over the company and that he could "assume any role [he] want[ed] at any time." (*Id.* at 29). As already mentioned, Plaintiff alleges that Defendant Milton was a "hands-on executive" who was heavily involved in the details of the company. (*Id.* at 30). Plaintiff alleges several specific instances in which Defendant Milton received emails and other communications about relevant issues from others within the company. Plaintiff's allegations show that Defendant Milton was constantly kept up to date on most aspects of the company. These factual allegations further support a finding of scienter because they speak to Defendant Milton's level of knowledge of the topics he spoke about to the public. *See In re Daou Sys., Inc.*, 411 F.3d 1006, 1022 (9th Cir. 2005).

Finally, the Court finds that Plaintiff's allegations with respect to Defendant Milton's motive and opportunity to commit fraud contribute, if only minimally, to an inference of scienter in this case. *See VeriFone*, 704 F.3d at 701 (recognizing that motive to commit fraud and opportunity to do so *can* provide "some reasonable inference of intent" even if they are insufficient to establish the requisite *strong* inference). Plaintiff's allegations related to motive and opportunity are supported by factual details relating to Defendant Milton's compensation and stock ownership (Doc. 95 at 22–25), his "fixation" with Nikola's stock price (*Id.* at 31–35), his self-proclaimed "media blitzes" (*Id.* at 13, 33, 44), his attempts to direct senior executives to "take action" or "do something" to stop stock price declines (*Id.* at 33), and his frequent need to put out "good news" or make "some kind of announcement 'to get people excited'" as a way to counteract price declines (*Id.*). It bears repeating, however, that such allegations related to motive and opportunity have minimal weight in the scienter analysis.

In sum, the Court finds that Plaintiff has sufficiently pleaded scienter with respect to Defendant Milton. The Court reaches this conclusion based on Plaintiff's detailed, particularized factual allegations showing Defendant Milton's knowledge of the relevant facts, the statements of Defendant Milton's fellow Nikola officers and employees, the allegations of Nikola officials warning Defendant Milton about his misrepresentations on multiple occasions, the allegations related to Defendant Milton's role within the company,

and—to a minimal extent—on the allegations related to Defendant Milton's motives and opportunities to commit fraud. The factual allegations related to Defendant Milton's clear knowledge of relevant facts may, on their own, be sufficient to create a strong inference of scienter. Even if they are not, however, a strong inference of scienter *certainly* exists when all the above allegations are viewed collectively.

As a final point, Defendant Milton's arguments *against* a finding of scienter are unpersuasive. Defendant first takes issue with any scienter finding based on motive, on his compensation, on speculation that he planned to "dump billions of dollars' worth of stock," or on his purported deletion of his Twitter account. (Doc. 112 at 6–7). As seen above, however, this Court's finding of scienter is based almost entirely on Plaintiff's *numerous* factual allegations speaking directly to what Defendant Milton knew, when he knew it, and how such knowledge contradicted the statements he was making. In this analysis, the Court did *not* consider Defendant Milton's deletion of his Twitter account or any speculation that he planned to dump stock, and while the Court did note Defendant Milton's alleged motives and compensation, the Court was careful to weigh such considerations lightly in its conclusion. Even without those allegations, Plaintiff sufficiently pleads scienter. Finally, Defendant Milton offers additional arguments that appear to be focused on a few specific alleged misstatements, though it is not entirely clear. (*Id.* at 7–8). Regardless, these arguments do not meaningfully change the Court's overall scienter analysis. To the extent Defendant Milton wishes to assert such arguments aimed at specific misstatements in an effort to narrow Plaintiff's case against him, Defendant Milton will have additional opportunities—such as summary judgment—to do so.

### C. Loss Causation

Having dismissed Plaintiff's claims against the Individual Defendants, the Court only addresses the element of loss causation as it relates to Defendant Milton. Defendant Milton does not make his own arguments and instead relies on the arguments made by the other Defendants in their Motion. (*See* Doc. 112 at 2; Doc. 118 at 6).

"To prove loss causation, [a plaintiff] must demonstrate a causal connection

between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the [plaintiff]." *Or. Pub. Emps.*, 774 F.3d at 608 (quotations omitted) (quoting *Ambassador Hotel Co., Ltd. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1027 (9th Cir. 1999)). In analyzing this element, "the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016). "To establish loss causation in a fraud-on-the-market case, the plaintiff must show that after purchasing her shares and before selling, the following occurred: (1) the truth became known, and (2) the revelation caused the fraud-induced inflation in the stock's price to be reduced or eliminated." *In re Bofl Holding, Inc. Sec. Litig.*, 977 F.3d 781, 789 (9th Cir. 2020) (citations omitted). "At the pleading stage, the plaintiff's task is to allege with particularity facts 'plausibly suggesting' that both showings can be made." *Id.* at 791 (citations omitted). Although particularity is required, "the effort should not prove burdensome, for even under Rule 9(b) the plaintiff's allegations will suffice so long as they give the defendant notice of [the] plaintiff's loss causation theory and provide the court some assurance that the theory has a basis in fact." *Id.* at 794. (citations omitted).

"The most common way for plaintiffs to prove that 'the truth became known' is to identify one or more corrective disclosures." *Id.* at 790 (citations omitted). "A corrective disclosure occurs when 'information correcting the misstatement or omission that is the basis for the action is disseminated to the market.'" *Id.* (quoting 15 U.S.C. § 78u-4(e)(1)). "[A] corrective disclosure need not consist of an admission of fraud by the defendant or a formal finding of fraud by a government agency." *Id.* (citation omitted). Instead, it can come from "any source, including knowledgeable third parties such as whistleblowers, analysts, or investigative reporters." *Id.* (citations omitted). A corrective disclosure also does not need to "reveal the full scope of defendant's fraud in one fell swoop; the true facts concealed by the defendant's misstatements may be revealed over time through a series of partial disclosures." *Id.* (citations omitted). That said, the critical feature of a corrective disclosure is that it reveals new information to the market that was not previously publicly

available. *Id.* at 794 ("A corrective disclosure [] must by definition reveal new information to the market that has not yet been incorporated into the price.").

Here, the Complaint alleges that "[t]he truth regarding Defendants' fraud was revealed in a series of corrective disclosures . . . that occurred between September 9, 2020 and July 29, 2021." (Doc. 95 at 136). It then lists eleven events from that time frame, alleging that each represents a partial corrective disclosure that revealed some truth to the market and that each was immediately followed by a stock price decline. (*Id.* at 138–56). The first corrective disclosure was a short-seller report published in September 2020 by Hindenburg (the "Hindenburg Report"). The remaining ten corrective disclosures consist of (i) media reports of governmental investigations against Nikola, (ii) the announcement of Defendant Milton's resignation, (iii) media reports of Nikola's stalled talks with energy partners such as BP, (iv) four successive news reports regarding the dissolution of Nikola's partnership with GM, (v) media reports of Republic Services' decision to cancel its order for 2,500 vehicles from Nikola, (vi) Nikola filing its Form 10-K, and (vii) media reports of Defendant Milton's indictment and SEC civil charges. (*Id.*).

Defendants argue that the Hindenburg Report fails to demonstrate loss causation because it merely "repackaged" already-public information and therefore did not reveal anything new. (Doc. 111 at 19–21). Plaintiff disputes this, arguing that Defendants only cite to prior public disclosures that failed to reveal the *entire* truth behind Defendants' alleged misrepresentations or that failed to reveal the truth behind other alleged misrepresentations altogether. (Doc. 116 at 31–32).

However, even if the Hindenburg Report *was* entirely based on publicly available information, it would not necessarily be precluded from being a corrective disclosure. In *Bofl*, the Ninth Circuit recognized that corrective disclosures can be based on publicly available information, but only if the plaintiff "plead[s] with particularity facts plausibly explaining why the information was not yet reflected in the company's stock price." *Bofl*, 977 F.3d at 794. The Ninth Circuit interpreted this requirement to mean that, "[f]or pleading purposes, the shareholders need[] to allege particular facts plausibly suggesting

that other market participants *had not* done the same analysis, rather than *could not*." *Id.* (emphasis in original). Here, Plaintiff fails to allege any particularized facts explaining why the information revealed by the Hindenburg Report was not yet reflected in Nikola's stock price or otherwise suggesting that other market participants had not done the same analysis. Of course, Plaintiff's failure to meet this standard does not necessarily preclude the Hindenburg Report from being a corrective disclosure, so long as Plaintiff is correct in their *primary* argument that the Hindenburg Report revealed at least some "new" truth that was concealed behind Defendant Milton's misrepresentations.[14] That said, Plaintiff's failure to meet this standard *does* reveal a more pressing issue with respect to Plaintiff's loss causation allegations—an issue that this Court finds detrimental to Plaintiff's loss causation theory altogether. Not only did Plaintiff fail to allege any particularized facts as to why the information in the Hindenburg Report was not yet reflected in Nikola's stock price, Plaintiff also failed to allege sufficiently particularized facts as it relates to their loss causation theory altogether.

Although the particularity requirement usually is not overly burdensome with respect to the loss causation element, a plaintiff must still "plausibly allege a causal connection between the defendant's misstatements and the plaintiff's economic loss, and to succeed in doing so the plaintiff will always need to provide enough factual content to give the defendant 'some indication of the loss and the causal connection that the plaintiff has in mind.'" *Id.* (quoting *Dura Pharms.*, 544 U.S. at 347). Plaintiff has failed to plausibly allege such a causal connection because Plaintiff fails to identify the specific misstatements or omissions that each alleged corrective disclosure revealed the truth for. Instead, Plaintiff repeats the *exact same* generalized allegation for all eleven corrective disclosures:

> [The corrective disclosure] revealed the relevant truth concealed and/or obscured by Defendants' *prior misstatements*

---

[14] Moreover, *Bofl* recognized *other* factors that should be considered in determining whether a disclosure based on publicly available information can constitute a corrective disclosure: the complexity of the data, the data's relationship to the alleged misstatements, and the effort needed to locate and analyze such data. *Bofl*, 977 F.3d at 795.

*and omissions touting the Company's production capabilities, products, technological advancements, and commercial prospects* as Defendants claimed. Instead [the corrective disclosure] revealed that Nikola was not able to produce many of the products it claimed to manufacture and lacked the financial prospects it touted to investors.

(Doc. 95 at 139, 141, 142–43, 144, 145–46, 147, 149, 150, 152, 153–54, 155 (emphasis added)). This generalized allegation entirely prevents the Court from conducting a meaningful loss causation analysis. Plaintiff's Complaint alleges *many* misstatements and omissions by Defendant Milton, and *all* of them relate to Nikola's "production capabilities, products, technological advancements, and commercial prospects." (*Id.*). The truth concealed behind each of these misstatements and omissions was presumably revealed to the public at different times and by different sources, and each time a particular truth was unveiled, Nikola's stock price presumably dropped and the Plaintiff Class Members suffered distinct economic losses. Plaintiff's entirely conclusory and generalized allegation leaves the Court unable to trace any particular loss "back to the very facts about which [Defendants] lied." *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) (citations and quotations omitted); *see also Or. Pub. Emps.*, 774 F.3d at 608 ("The Plaintiffs do not specify which of the Defendants' statements were made untrue by the GAO report. As a result, the Plaintiffs have not adequately alleged that there was a causal connection between the public information contained in the GAO Report and subsequent market activity."). The Court finds that Plaintiff has failed to sufficiently allege loss causation because—by not specifying which misstatements or omissions were implicated in each alleged corrective disclosure—Plaintiff failed to plausibly allege a causal connection between Defendant Milton's alleged misrepresentations and the injuries suffered by Plaintiff.

## IV.   CONCLUSION

In conclusion, the Court finds that Plaintiff failed to adequately allege any § 10(b)/Rule 10b-5 claim against Defendants for the reasons explained above. This leaves only Plaintiff's claim for control person liability under § 20(a) (Count III). To state a

§ 20(a) claim against individual defendants, a plaintiff must allege "a primary violation of federal securities law." *No. 84-Emp.*, 320 F.3d at 945. Here, Plaintiff has failed to do so. Thus, Plaintiff's § 20(a) claim against the Individual Defendants and Defendant Milton is dismissed. *See Or. Pub. Emps.*, 774 F.3d at 610 ("We hold that the Plaintiffs cannot establish control person liability because they have not adequately alleged violations of [§] 10(b) and Rule 10b-5.").

Leave to amend a deficient complaint should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). When dismissing for failure to state a claim, "a district court should grant leave to amend . . . unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (quotations omitted). Other factors to be considered include undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendment, or undue prejudice to the opposing party. *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). The Court finds that none of these factors are present and that leave to amend is appropriate.

Accordingly,

**IT IS ORDERED** that Defendants' Notice of Supplemental Authority (Doc. 119) and Lead Plaintiffs' Notice of Supplemental Authority (Doc. 120) are **granted**. The Court has fully considered the supplemental authority noticed by both parties.

**IT IS FURTHER ORDERED** that Lead Plaintiffs' Request for Judicial Notice (Doc. 123) is **denied**.

**IT IS FURTHER ORDERED** that the Motion to Dismiss (Doc. 111) filed by Defendants Nikola Corporation, Mark A. Russell, Kim J. Brady, Britton M. Worthen, Steve Girsky, and Steven Shindler is **granted**.

**IT IS FURTHER ORDERED** that the Motion to Dismiss (Doc. 112) filed by Defendant Trevor R. Milton is **granted**.

///

///

69

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**IT IS FURTHER ORDERED** that Lead Plaintiff's Consolidated Amended Class Action Complaint (Doc. 95) is **dismissed with leave to amend**. If Lead Plaintiff chooses to do so, Lead Plaintiff shall have until **no later than April 3, 2023** to file an Amended Complaint consistent with this Order.

Dated this 1st day of February, 2023.

Honorable Steven P. Logan
United States District Judge