1  Gary Gotto (No. 007401)
2  **KELLER ROHRBACK LLP**
   3101 North Central Avenue, Suite 1400
3  Phoenix, AZ 85012
   Telephone:   (602) 230-6322
4  Email:  ggotto@kellerrohrback.com
   *Liaison Counsel for Lead Plaintiffs*
5
   (*Lead Counsel for Lead Plaintiffs and for
6  the Class appear on the Signature Page*)

7

8

9              **UNITED STATES DISTRICT COURT**
                    **DISTRICT OF ARIZONA**
10

11  Daniel Borteanu, Individually and on        No. CV-20-01797-PHX-SPL
    Behalf of All Others Similarly Situated,    No. CV-20-01819-PHX-DIR (cons.)
12                                               No. CV-20-02123-PHX-JJT (cons.)
                    Plaintiff,                   No. CV-20-02168-PHX-DLR (cons.)
13                                               No. CV-20-02237-PHX-DLR (cons.)
           v.                                    No. CV-20-02374-PHX-DWL (cons.)
14
    Nikola Corporation; Trevor Milton; Mark     **SECOND CONSOLIDATED**
15  A. Russell; Kim J. Brady; Britton M.        **AMENDED CLASS ACTION**
    Worthen; Steve Girsky; Steven Shindler;     **COMPLAINT**
16  and Jeffrey Ubben,

17                  Defendants.

18

19

20

21

22

23

24

25

26

# TABLE OF CONTENTS

Nature of the Action ..................................................................................................... 1

Overview of the Scheme .............................................................................................. 4

Jurisdiction and Venue ............................................................................................... 14

Parties ......................................................................................................................... 14

Substantive Allegations and Factual Background....................................................... 18

I.      Nikola and its Business Combination with VectoIQ ......................................... 18

II.     Defendants' Stock Ownership and Compensation ............................................. 21

        A.      Trevor Milton ......................................................................................... 21

        B.      Mark Russell ........................................................................................... 23

        C.      Kim J. Brady ........................................................................................... 25

        D.      Britton Worthen....................................................................................... 26

        E.      Stephen J. Girsky ..................................................................................... 27

        F.      Steven M. Shindler ................................................................................. 27

        G.      Jeffrey W. Ubben .................................................................................... 28

III.    Milton's Control Over Nikola .......................................................................... 28

IV.     Milton's Social Media Activity and Fixation with Stock Price ........................ 30

V.      Nikola Defendants Knew Milton was Making False and Misleading Statements On Behalf of Nikola ........................................................................ 34

Defendants' Materially False and Misleading Statements Caused Damage to Investors ..................................................................................................................... 38

I.      Defendants Misled Investors Regarding the Nikola One Semi-Truck................... 38

        A.      Defendants Misled the Public Regarding the Capabilities of the Nikola One ............................................................................................... 38

        B.      Nikola Defendants Sought to Boost Nikola's Appeal by Misleading the Public About the Functionality of its Incomplete and Inoperable Product Through the Nikola One "In Motion" Video ................................................ 41

        C.      Materially False and Misleading Statements About the Nikola One .......... 44

                1.      Pre-Merger False Statements Concerning the Nikola One ............. 44

                2.      False and Misleading Statements After The Merger Is Announced But Before Nikola Begins to Publicly Trade on NASDAQ By the Nikola and VectoIQ Defendants ....................................................... 50

                3.      Class Period False and Misleading Statements  by the Nikola Defendants.......................................................................................... 52

i

D.    Defendants' False and Misleading Statements Concerning the Nikola One Caused Investor Losses ................................................................. 57

II.   Defendants Misled Investors Regarding the Nature of Nikola's Purported Backlog of Reservations ......................................................................... 65

A.    Defendants Suggested Nikola's Reservations Were Worth Billions When They were Mere Expressions of Interest in a Product the Company Had Never Developed and Had Abandoned ...................................... 65

B.    Defendants' False and Misleading Statements Concerning Demand for the Nikola One ............................................................................. 67

     1.    Pre-Merger False Statements Concerning the Purported Backlog of Orders ......................................................................... 67

     2.    False and Misleading Statements After The Merger Is Announced But Before Nikola Begins to Publicly Trade on NASDAQ By the Nikola and VectoIQ Defendants ............................................ 67

     3.    False and Misleading Statements Concerning the Purported Backlog of Orders During the Class Period ............................... 72

C.    Defendants False and Misleading Statements Concerning the Purported Backlog of Orders Caused Investor Losses ................................... 75

III.   Defendants Misled Investors Regarding the Company's Hydrogen Production, Dispensing, Readiness, Costs, and Capabilities .......................................... 80

A.    Background on Nikola's Hydrogen Production and Dispensing Plans ...... 80

B.    Nikola Defendants' Fraud Concerning Nikola's Hydrogen Production and Dispensing Capabilities .......................................................... 82

C.    Nikola Defendants Fraud Concerning Nikola's Cost to Produce Hydrogen ............................................................................... 84

D.    False Statements Regarding Hydrogen Capabilities, Infrastructure, and Costs ............................................................................... 94

     1.    Pre-Merger False Statements Regarding Hydrogen Capabilities, Infrastructure, and Costs ................................................... 94

     2.    Class Period False and Misleading Statements Regarding Hydrogen Capabilities, Infrastructure, and Costs ......................... 115

E.    Defendants' False and Misleading Statements Regarding Hydrogen Production, Dispensing, and Infrastructure Caused Investor Losses........ 133

IV.   Defendants Misled Investors Regarding the Badger ............................................. 148

A.    Nikola Did Not Produce the Badger, its Purported Pickup Truck ............ 148

B.    False and Misleading Statements Regarding the Badger ......................... 154

     1.    Pre-Merger False and Misleading Statements Regarding the Badger ....................................................................... 154

2.  Class Period False and Misleading Statements Regarding the Badger ................................................................................. 157

C.  Defendants' False and Misleading Statements About the Badger Caused Investor Losses ........................................................ 164

V.  Defendants Misled Investors Regarding Nikola's Manufacturing of In-House Components ............................................................. 171

A.  Nikola Did Not Manufacture Any Components In-House ...................... 171

B.  Nikola's Fictional Game-Changing Battery Technology ........................ 174

C.  False and Misleading Statements About In-House Vehicle Components and Proprietary Battery Technology ............................................ 180

1.  Pre-Merger False and Misleading Statements Regarding In-House Vehicle Components and Proprietary Battery Technology ........... 180

2.  Class Period False and Misleading Statements Regarding In-House Vehicle Components and Proprietary Battery Technology ........... 187

D.  Defendants' False and Misleading Statements About In-House Vehicle Components and Proprietary Battery Technology Caused Investor Losses ................................................................................. 194

VI.  Defendants Misled Investors Regarding the Total Cost of Ownership of Nikola's Trucks Relative to Diesel .................................................. 206

A.  False and Misleading Statements Regarding the Total Cost of Ownership ................................................................................. 207

1.  Pre-Merger False Statements Regarding Total Cost of Ownership ................................................................................. 207

2.  Class Period False and Misleading Statements Regarding Total Cost of Ownership ................................................................. 209

B.  Defendants' False and Misleading Statements Regarding Total Cost of Ownership Caused Investor Losses ........................................ 210

VII.  Defendants Misled Investors Regarding The Nikola Tre and BEV Truck Orders ....................................................................................... 214

A.  Nikola Was Not Producing Any BEV Trucks .......................................... 214

B.  False and Misleading Statements About the Nikola Tre and BEV Truck Orders ............................................................................. 216

C.  Defendants' False and Misleading Statements About the Nikola Tre and BEV Truck Orders Caused Investor Losses ................................ 219

VIII.  Defendants Misled Investors Regarding Nikola's Supposedly "Off-Grid" Headquarters .............................................................................. 224

A.  False Statements Regarding Nikola's "Off-Grid" Headquarters .............. 225

IX.  Defendants Misled Investors Regarding Nikola's Ownership of Natural Gas Wells .................................................................................. 227

iii

     A.    False Statements Regarding Natural Gas Wells......................................... 227

     B.    Defendants' Materially False and Misleading Statements Regarding Natural Gas Wells Caused Investor Losses ............................................................ 228

The Individual Defendants Employed Devices, Schemes, and Artifices to Defraud Investors Pursuant To 10b-5(a) and (c) ............................................................................ 229

I.     The Individual Defendants Established a System that Rewarded Their Fraud.... 230

II.    The Individual Defendants Leveraged Milton's Misleading Promotional Style to Target Retail Investors ................................................................................... 234

III.   The Individual Defendants Engaged in Deceptive Acts Including Disseminating and Making False and Misleading Statements in Support of the Scheme ........... 245

IV.   The Individual Defendants Signed Misleading SEC Filings in Support of the Scheme ................................................................................................................ 257

V.    The Individual Defendants Deflected and Suppressed Concerns about Milton's Misstatements ...................................................................................... 259

VI.   The Individual Defendants Attempted to Discredit the Hindenburg Report – Until It Became Clear That Milton's Continued Involvement With Nikola Threatened Their Stock's Value .......................................................................................... 266

Additional Indicia of Scienter ................................................................................... 271

     A.    Nikola's Production of FCEV/BEV Vehicles and Hydrogen Fuel, Batteries, and Fueling Stations Were Nikola's Core Operations Supporting a Strong Inference of Scienter ....................................................................... 272

     B.    Defendants' Statements Themselves Support a Strong Inference of Scienter .......................................................................................................... 273

     C.    Defendant Milton's Deletion of His Twitter Account Supports a Strong Inference of Scienter .................................................................................... 275

     D.    Defendants Russell and Brady's SOX Certifications Support a Strong Inference of Scienter .................................................................................... 275

Control Person Allegations ......................................................................................... 277

Applicability Of Presumption Of Reliance: Fraud-On-The-Market Doctrine ............... 281

No Safe Harbor ............................................................................................................. 283

Plaintiffs' Class Action Allegations .............................................................................. 284

Count I .......................................................................................................................... 286

Count II......................................................................................................................... 290

Count III ....................................................................................................................... 292

Prayer For Relief .......................................................................................................... 293

Demand For Trial By Jury ............................................................................................ 294

iv

**NATURE OF THE ACTION**

1.      This is a securities fraud class action brought by Lead Plaintiffs George Mersho, Vincent Chau, Stanley Karcynski[1] (collectively, "Lead Plaintiffs" or "Plaintiffs"), by and through their undersigned counsel. The action charges that the defendants named herein violated 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§ 78j(b), 78t(a) and 78t(b)), and Rule 10b-5 promulgated thereunder by the U.S. Securities and Exchange Commission (the "SEC") (17 C.F.R. § 240.10b-5) (the "Action").

2.      The Action is brought on behalf of all investors who purchased the common stock of Nikola, Inc. ("Nikola" or the "Company") during the period June 4, 2020 through February 25, 2021 (the "Class Period").

3.      Lead Plaintiffs' allegations are based upon Lead Counsels' investigation, except as to the allegations pertaining to Lead Plaintiffs, which are based upon their personal knowledge. Lead Counsels' investigation included, among other things, review and analysis of: (i) information publicly disseminated by Nikola, including its public filings with the SEC; (ii) public filings and other documents related to VectoIQ, a publicly traded special purpose acquisition company ("SPAC") that merged with Nikola, permitting Nikola's common stock to begin public trading on the NASDAQ on June 4, 2020; (iii) social media postings, news reports, press releases, analysts' reports and other publicly available documents; (iv) interviews with former employees of Nikola, and other knowledgeable persons; (v) consultations with relevant experts; (vi) pleadings and other court documents related to litigation against Nikola's former Chief Executive Officer

---

[1] Mr. Karcynski recently passed away. *See* ECF No. 127 (Notice). On March 31, 2023, the Estate of Mr. Karcynski filed a motion requesting the Court substitute the Estate of Stanley Karcynski in place of the deceased Mr. Karcynski. *See* ECF No. 128.

("CEO") and Executive Chairman, Trevor Milton ("Milton"), including documents filed in the civil action by the SEC against Milton (Case No. 1:21-cv-06445 (S.D.N.Y.)) ("SEC Action")[2] and documents and trial testimony submitted as evidence in the criminal action by the U.S. Department of Justice ("DOJ")[3] against Milton (Case No. 1:21-cr-00478-ER (S.D.N.Y.)) ("DOJ Criminal Action"), which, on October 14, 2022, resulted in Milton's conviction on one count of securities fraud and two counts of wire fraud; as well as pleadings and other court documents related to the derivative actions *Barbara Rhodes v. Trevor Milton, et. al*, No. 2022-023-KSJM (Del. Ch.), and *Michelle Brown et. al v. Trevor Milton et. al,* No. 2022-0223 (Del. Ch.), which were supported by documents obtained through a books and records request; and (vii) multiple admissions made by Defendants. Lead Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

4.       Defendants engaged in a brazen and shameless fraud, misrepresenting key aspect of Nikola's business. Milton was Nikola's founder and Executive Chairman before he resigned on September 20, 2020. Milton repeatedly hyped Nikola and its stock through a series of false and misleading statements. Milton's scheme was simple and straightforward: "fake it until you make it" and Milton would "make it" when his lock-up agreement expired at the end of 2020, allowing him to dump his billions of dollars' worth of Nikola stock after artificially inflating the stock price.

5.       Milton has been criminally convicted by a jury of his peers for violating Section 10(b) of the Exchange Act in connection with making many of the statements identified herein. Additionally, the SEC brought civil charges against both Nikola and

---

[2] A copy of the SEC Civil Complaint is annexed hereto as Exhibit A.

[3] A copy of the original indictment against Milton is annexed hereto as Exhibit B. A copy of the superseding indictment against Milton is annexed hereto as Exhibit C.

Milton for the same scheme to defraud investors alleged in the criminal action. The SEC's complaint against Nikola resulted in the Company agreeing to pay $125 million to settle charges that it defrauded investors by misleading them about its products, technical achievements, and commercial prospects. The SEC's civil enforcement action against Milton was stayed pending the resolution of the criminal action and is likely to resume following entry of judgment against Milton later this year.

6.      In addition to Milton and Nikola itself, this action also charges (i) Nikola CEO Mark A. Russell ("Russell"), (ii) Nikola Chief Financial Officer ("CFO") Kim J. Brady ("Brady"), and (iii) Nikola Chief Legal Officer ("CLO") Britton M. Worthen ("Worthen") with violating securities laws. Testimony and documentary evidence introduced in the course of Milton's criminal trial provides evidence that Russell, Brady, and Worthen made false and misleading statements individually and were willing participants in the scheme to defraud investors.

7.      The action also charges Steven J. Girsky ("Girsky") and Steven Shindler ("Shindler"), the former CEO and CFO, respectively, of VectoIQ, with violating the securities laws. VectoIQ itself had no business. As a SPAC, it was formed for the sole purpose of raising capital to merge with a private company in the transportation industry. VectoIQ was required to complete a merger by mid-2020, otherwise it would have to refund all funds to its investors and its founders would miss out on what was likely to be a lucrative payday.

8.      Finally, the action charges Jeffrey Ubben ("Ubben"), a member of Nikola's Board of Directors from September 2019 until February 24, 2022, for his false and misleading statements and participation in the scheme to defraud investors as alleged herein.

**OVERVIEW OF THE SCHEME**

9.     Nikola purports to simultaneously be (i) a producer of zero emissions vehicles, including hydrogen fuel-cell electric vehicles ("FCEVs") and battery-electric vehicles ("BEVs"), and (ii) a provider of hydrogen fuel for FCEVs.

10.     While Defendants misrepresented numerous aspects of Nikola's operations (as detailed below), the fraud can be broken down into nine categories of misrepresentations: *first*, that Nikola had developed a fully operational "zero-emissions" tractor trailer truck powered by hydrogen fuel cell technology—the Nikola One; *second*, that Nikola had, in hand, over 14,000 purchase orders for its trucks, which represented 2 to 3 years of production and billions in revenue; *third*, that Nikola was producing hydrogen at a fraction of the cost industry experts believed was possible and that Nikola was in the process of establishing a nation-wide network of hydrogen refueling stations, which could reliably dispense and produce inexpensive hydrogen for the Nikola One and Nikola's other vehicles to operate on; *fourth*, that Nikola had developed, using its own technology, a fully operational pick-up truck called the Badger, for which pre-orders had sold out; *fifth*, that Nikola had developed all of its vehicles' critical components "in-house," including a proprietary "game-changing" electric battery, which exceeded the range of then-existing electric batteries; *sixth*, that the cost of owning and operating Nikola's vehicles was significantly less than the cost of owning and operating a traditional diesel powered vehicle; *seventh*, that commercial "assembly line" production of the Nikola Tre BEV truck had already been completed in Ulm, German, and that Nikola had binding orders in hand for its BEV trucks; *eighth*, that Nikola's headquarters was completely "off-grid" with solar panels on the roof producing 18 megawatts of energy a day; and *ninth*, that Nikola owned seven natural gas wells that were used as backup to Nikola's solar hydrogen production.

11.     As alleged herein, each of these claims were materially false and misleading when made. Below is a mere summary of the false and misleading representations and omissions of material facts made by Defendants.

12.     ***First***, the Nikola One was neither a "zero-emissions" truck nor operational. It was an empty shell. Nevertheless, in late 2016, Nikola staged an event specifically to dupe investors into believing that Nikola had created a ground-breaking, fully functioning zero emissions semi-truck. Then, doubling down on the charade, Nikola created a video in 2018 purporting to show the Nikola One driving down a road under its own power. In reality, Nikola had repeatedly towed the still inoperable Nikola One to the top of a hill and then filmed it as it rolled down the hill to make it appear as if it was operational. According to a Nikola executive, the video did not originally show the vehicle moving at all. However, Milton had demanded the change. Another Nikola employee admitted, "[a]t the time, a number of employees were uncomfortable saying the truck was 'in motion' when they knew it was not driving."[4] Nevertheless, throughout the Class Period, Nikola continued to display the doctored video on its website and Defendants continued to falsely assert that the Nikola One was operational. For example, on August 18, 2020, Milton stated "***it was totally capable of driving, it had everything in it —power, steering, batteries—everything in it***."[5] Nikola has since admitted in its SEC filings that the Company's statements concerning the Nikola One were false and misleading.

---

[4] On November 12, 2020, Nikola's counsel, Kirkland & Ellis, provided a presentation to the United States Attorney's Office for the Southern District to New York regarding the criminal investigation into the conduct herein. This presentation provided some of the results from Kirkland's internal investigation. This document was publicly filed in the DOJ Criminal Action on December 15, 2021. It is referred to herein as the Nikola "USAO Presentation" and annexed hereto as Exhibit D.

[5] All emphasis in this Complaint is added unless otherwise indicated.

13.     ***Second***, Nikola represented that it had 14,000 orders for its various trucks, the majority of which were for the Nikola One, which represented 2 to 3 years of production and billions in expected revenue. As Milton said on June 1, 2020: "[w]e're the only company in the world that is sold out for many, many years . . . It's all based on orders. I think that's the reason Nikola is worth so much money today." And on July 31, 2020, Milton said the truck orders were "***Not letter of intents, they're actually contracts***. We've got . . . ***Yeah, billions and billions of dollars with the contracts***. So I want to be clear about that 'cause ***a lot of people have thought that it's just like, a non-committal thing, it's not. These are like, sign on the dotted line, billions and billions and billions and billions of dollars in orders.***"

14.     These statements were materially false and misleading because 13,200 of the 14,000 orders were, in fact, non-binding and could be cancelled at any time and for any reason. Moreover, after four years since its purported unveiling, the Nikola One was still completely inoperable and Nikola had no timeline for the production of a hydrogen-powered sleeper truck. These statements misled investors into believing Nikola had billions in expected revenue in the ensuing 2-to-3-year period when, in fact, Nikola, for the most part, did not even have a working product to sell.

15.     ***Third***, Nikola claimed it had solved the problems of producing and reliably dispensing hydrogen to power its vehicles. The primary obstacle to powering vehicles with hydrogen is the high cost of hydrogen production. Nikola represented to investors that it was producing hydrogen via electrolysis, a process that uses electricity to split water into hydrogen and oxygen. However, producing hydrogen via electrolysis at a cost-effective rate would necessitate Nikola acquiring vast amounts of electricity at a fraction of the then-market prices. On June 4, 2020, after Nikola's stock began trading publicly, Milton

proclaimed: "*But what Nikola solved was the cost*—was the economics on the trucking. When we first started, hydrogen was $16 a kilogram. *We can now produce it* for well under $4 a kilogram. So we've cut – it's one quarter of the cost now than it was just a few years ago.  And we're now cheaper to operate per mile than diesel."[6] Nikola has since admitted in its SEC filings that it has *never produced any hydrogen at all*, let alone at well under $4 a kilogram.

16.    Nikola also claimed that it could refuel its trucks with Hydrogen in 15 minutes, the same amount of time it took to fuel a traditional diesel semi-truck, and that its demonstration station at the Company's Phoenix, Arizona headquarters would serve as a "model" for future stations. In reality, Nikola's "demo station" was plagued with operational challenges the company had not overcome, and as a result was only able to dispense hydrogen a dismal 21% of the time. When it could pump hydrogen, the station took 45-80, not 15, minutes to fuel a truck.

17.    In fact, as a result of the problems it was experiencing with obtaining electricity at feasible rates and with dispensing gaseous hydrogen, Nikola secretly began considering a dramatic pivot in its business model by no later than March 2020. Under the new proposal, hydrogen would be produced and liquefied at a central "hub" location before being shipped to dispensing-only stations, rather than being produced onsite at Nikola's stations. If put into action, this new model would require billions in additional capital expenditures ("CapEx") and would fundamentally change how and what kind of stations Nikola had to construct. Yet Defendants continued throughout the summer of 2020 to represent to investors that Nikola had already begun to build its dispensing stations. By

---

[6] Yahoo Finance, *Nikola debuts on Nasdaq, how it plans to to compete with other electric truck makers* (June 4, 2020), available at: https://finance.yahoo.com/video/nikola-debuts-nasdaq-plans-compete-150245603.html.

7

October 2020, Nikola's Board was still being informed that Nikola had not yet settled on a model for supplying its stations with hydrogen.

18.     **Fourth**, Nikola claimed it had single-handedly developed a FCEV/BEV pick-up truck, the Badger.  Milton repeatedly told investors that Nikola had built the Badger from the "ground up" using Nikola's in-house components and intellectual property. For example, on February 10, 2020, Nikola issued a press release titled "Nikola Unveils the Nikola Badger Pickup," touting the Badger as the "World's Most Advanced Zero-Emission FCEV/BEV Pickup with an Estimated 600-mile Range." The press release also stated that the Badger "is engineered to deliver 980 ft. lbs. of torque, 906 peak HP and 455 continuous HP," "was designed to handle 0-100 mph launches with minimal loss of performance and to operate on grades up to 40% through advanced software blending of batteries and fuel-cell," and was "engineered to outperform all electric pickup trucks on the market in both continuous towing, HP and range." During the Class Period, Milton repeatedly assured investors that "***we actually build the Nikola Badger from the ground up ourselves, the whole thing*** . . . .," the Badger was "a real truck, comes from a billion-dollar program" and is "legitimate." Then, on June 29, 2020, suggesting overwhelming demand for this ground-breaking vehicle, Milton announced that Nikola had "sold out" of the most expensive reservation packages for the Badger.

19.     These statements were demonstrably false because, like the Nikola One, Nikola never built the Badger. By June and July 2020, months after Nikola announced the completed production of the Badger, Nikola had created nothing more than preliminary renderings of the vehicle. Nikola's Board of Directors were informed, at a meeting on July 23, 2020, that even a prototype of the Badger would not be completed until November 2020 at the earliest.

8

20.     **Fifth**, Nikola claimed that all of its vehicles' key components, including inverters and batteries, were created and manufactured "in-house" by Nikola. Indeed, Nikola proclaimed that it had created a "game-changing" battery for its vehicles that was "half the cost and . . . double the range" of the then-most advanced battery on the market.

21.     These statements were false, which Nikola later admitted in its SEC filings. Defendant Brady as well as Nikola's chief engineer have admitted that Nikola does not develop **any** components in-house, including inverters and batteries. In truth, Nikola contracted with a third-party, Romeo Power Technology ("Romeo") to manufacture Nikola's electric batteries. Brady has further admitted that "Nikola is 'years away' from having the battery technology Milton described [and] . . . [t]he whole statement was an embellishment and fiction at the time . . . ." Defendant Worthen has stated Milton's statements concerning Nikola's "game-changing" battery "were a 'terrible and stupid idea' **and Worthen told him not to make the statement**." Defendant Russell said: "Romeo was the best option, but Milton badly wanted Nikola to own its battery technology."

22.     **Sixth**, Nikola misrepresented that the total cost of ownership ("TCO") of its vehicles was a fraction of diesel vehicles. For example, on or about July 6, 2020, Milton stated: "**We drove hydrogen down from 16 dollars a kilogram down below four dollars a kilogram now**. So why is that? Well, why is that important? Because **now, I can provide zero emission to a truck cheaper than diesel**. We've now won the game." He continued, stating that Nikola's TCO, as compared to diesel, "**we're like 20 to 30 percent sometimes, cheaper. So it's game over, essentially. If you don't own a Nikola truck, you're gonna go bankrupt.**"

9

23.    This was false. Nikola never produced any hydrogen, did not drive down any costs and, in fact, the TCO for a diesel truck was still cheaper than the fictional, non-operational, Nikola vehicles.

24.    **Seventh**, Nikola claimed that it had not only completed a prototype of its Nikola Tre BEV vehicle and that commercial manufacturing had begun, but that fully-manufactured vehicles were "coming off the assembly line right now in Ulm, Germany."

25.    Nikola has since admitted in its SEC filings that this statement was false. Nikola management has admitted, "[c]haracterization of the trucks as fully built was inaccurate . . . . There was no 'assembly line in Ulm."

26.    **Eighth**, Nikola claimed that it had "the only off-grid headquarters that we know of . . . [with] 3.5 megawatts of solar up on the roof producing about 18 megawatts of energy a day."

27.    As Defendant Brady has since admitted, "[t]his statement is 'completely false.'" Nikola's headquarters did not have any solar panels on its roof. While Nikola had discussed moving to an off-grid headquarters, it had been deemed cost prohibitive. Nikola has since admitted in its SEC filings that these statements were false.

28.    **Ninth**, Nikola claimed that it owned seven natural gas wells that "can pump out millions of gallons of clean natural gas each day" that the Company "[u]sed as backup to solar hydrogen production."

29.    This statement was false. As the Company has since admitted, it never at any time owned a single natural gas well.

30.    Defendants were motivated by greed. Milton's aim was to inflate the expectations and stock price of Nikola, utilize the resulting excitement to secure and publicly announce reservations for Nikola's (non-existent) vehicles as well as partnerships

10

with top auto companies, which would further inflate Nikola's share price. As Nikola's single largest shareholder, owning shares valued at as much as $8.5 billion during the Class Period, Milton openly admitted within the Company that he planned to dump his shares as soon as he was contractually permitted to do so—only six months after Nikola went public and before the market could discover that the Company, like the Nikola One, was an empty vessel.

31.     The other Nikola Defendants encouraged Milton to utilize social media to directly and repeatedly engage with retail investors. Despite knowing of his propensity to lie, they championed his self-described "media blitzes" of misinformation because (1) Nikola was in dire need of additional investors bring its many products to market, and (2) the other Individual Defendants were large shareholders who stood to gain millions, if not billions, from Milton's fraud. Defendants have since admitted that they were aware of his false statements to investors, yet they took no meaningful action to stop his conduct or correct his false statements. Plus, more importantly, Nikola's SEC filings contained material misstatements. Given the other Individual Defendants' knowledge that Milton was misleading investors, it was critically important for Nikola's SEC filings to be accurate given the misinformation being put into the market by Milton. The danger of misleading investors by issuing SEC filings with inaccurate information was so obvious that the Individual Defendants must have been aware of it.

32.     Likewise, Nikola's scheme could not have been accomplished without the substantial assistance provided by VectoIQ and its board. As officers and directors of VectoIQ and later directors of Nikola, Girsky and Shindler owned millions of shares of Nikola. As Nikola's stock price soared, they became wealthier and would have cashed out if the fraud was not exposed beginning in September 2020.

33.    Accordingly, in addition to their liability as makers of false statements and control persons, each of the Individual Defendants is liable for knowingly and/or recklessly engaging in acts and courses of business in furtherance of a scheme to defraud investors and artificially inflate the price of Nikola common stock.

34.    Nikola's stock price plummeted as the truth concerning Defendants' fraud came to light. On September 10, 2020, Hindenburg Research ("Hindenburg") published a report entitled, "Nikola: How to Parlay An Ocean of Lies Into a Partnership With the Largest Auto OEM in America" (the "Hindenburg Report" or the "Report").  Having gathered "extensive evidence—including recorded phone calls, text messages, private emails and behind-the-scenes photographs," Hindenburg identified "dozens of false statements by" Milton, which had led Hindenburg to conclude that Nikola "is an intricate fraud built on dozens of lies over the course of . . . Milton's career."  Defendant Milton made these misrepresentations, the Report asserted, to substantially grow the Company and secure partnerships with top auto companies.

35.    On this news, Nikola's stock price dropped $4.80 per share, or 11.33%, to close at $37.57 per share on September 10, 2020.

36.    Nikola's stock price continued to fall, dropping another $5.44 per share, or 14.5%, to close at $32.13 per share on September 11, 2020.

37.    On September 14, 2020, after the market had closed, *Bloomberg* reported that the SEC was investigating Nikola to assess the merits of the Hindenburg Report. On September 15, 2020, the *Wall Street Journal* reported that the DOJ had joined the SEC's investigation of Nikola.

38.    On this news, Nikola's stock fell another $2.96 per share, closing at $32.83 on September 15, 2020, an 8.27% decline from its previous close on September 14, 2020.

39.     On Sunday September 20, 2020, Nikola announced that Milton had resigned from his position as Executive Chairman and from the Board of Directors.

40.     On this news, Nikola's stock plummeted another $6.60 per share, closing at $27.58 on Monday September 21, 2020, a 19.33% decline from its previous close on Friday September 18, 2020.

41.     Over the ensuing months, auto companies with whom Nikola had secured purchase and partnership agreements based on Defendants' fraud began cancelling those agreements as they learned the true state of the Company and did not want to partner with charlatans. Specifically, General Motors pulled out of an agreement to purchase 11% of Nikola, which Milton had hyped and misrepresented to further inflate Nikola's share price. Likewise, a refuse company that had placed an order for Nikola vehicles—which Milton had also touted and misrepresented—cancelled its order. As a result, Nikola's stock price tumbled to $13.75 by December 24, 2020.

42.     On February 25, 2021, after the close of trading, Nikola filed its Form 10-K for the year ended December 31, 2020. In the filing, Nikola admitted that numerous statements made by the Company were "inaccurate in whole or in part, when made."

43.     On this news, Nikola's stock fell another $1.62 per share, closing at $18.10 on February 26, 2021, an 8.22% decline from its previous close on February 25, 2021.

44.     Finally, on July 29, 2021, numerous news outlets reported that Milton had been indicted on three counts of fraud by the U.S. Attorney's Office in Manhattan for making deceptive and false claims to investors regarding "nearly all aspects of the business." The SEC also filed related civil charges.

45.     On this news, Nikola's stock fell another $2.16 per share, closing at $12.03 on July 29, 2021, a 15.22% decline from its previous close on July 28, 2021.

13

46.     In total, Nikola's stock price plummeted a total of 76% between the date of the Hindenburg Report and the days after Milton's indictment.

47.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

48.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

49.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

50.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Defendants conduct business in this Judicial District, and a significant portion of Defendants' activities took place within this Judicial District.

51.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

52.     Plaintiffs, as set forth in the previously filed certifications (ECF Nos. 28-3), acquired Nikola securities at artificially inflated prices during the Class Period and were damaged upon the revelations of the Company's alleged fraud.

53.     Defendant Nikola is a Delaware corporation with principal executive offices located in Phoenix, Arizona.  The Company purports to operate as an integrated zero-emissions transportation systems provider. Nikola's common stock trades on the NASDAQ under the ticker symbol "NKLA."

54.     Defendant Trevor Milton ("Milton") founded Nikola and served as its CEO until the merger in June 2020, after which he served as its Executive Chairman until he resigned from Nikola on September 20, 2020. Milton served as a director of Nikola during the entire length of his employment with the Company. In addition to the false and misleading statements Milton made in tweets, podcasts, and news interviews identified herein, Milton signed the following documents filed by the SEC which are alleged to contain false and misleading statements, and which omit material facts: Nikola's March 13, 2020 Form S-4; its June 15, 2020 Form S-1; and its July 17, 2020 Form S-1.

55.     Defendant Mark A. Russell ("Russell") has served as Nikola's CEO and as a director of Nikola since the merger. After becoming Nikola's CEO, Russell ran the Company's day-to-day operations. Russell was personally hired as Nikola's CEO by Milton and has numerous close ties to Milton both personally and financially. Before becoming Nikola's CEO, Russell served as President of Nikola from February 2019 to June 2020 and was also a director of legacy Nikola from July 2019 to the merger in June 2020. Previously, from August 2012 to August 2018, Russell served as President and Chief Operating Officer of Worthington Industries ("Worthington"), a company where Milton was also employed until he left to found Nikola. During Russell's tenure, Worthington acquired dHybrid Systems, Milton's former diesel conversion company, in 2014. Russell signed Nikola's June 15, 2020 Form S-1, its July 17, 2020 Form S-1 and its Second Quarter

2020 Form 10-Q, each of which contained materially false and misleading statements and omitted to disclose material facts.

56.     Defendant Kim J. Brady ("Brady") has served as Nikola's CFO since the merger. Brady served as Nikola's CFO and Treasurer from November 2017 until the merger. Brady was personally hired to be Nikola's CFO by Milton while Nikola was privately held. Brady signed Nikola's June 15, 2020 Form S-1, its July 17, 2020 Form S-1 and its Second Quarter 2020 Form 10-Q, each of which contained materially false and misleading statements and omitted to disclose material facts.

57.     Defendant Britton M. Worthen ("Worthen") has served as Nikola's CLO and Secretary since June 2020, and prior to that served as Nikola's CLO and Secretary from October 2015 to June 2020. Worthen was personally hired to serve as Nikola's CLO by Milton. Worthen signed the September 14, 2020 Form 8-K which contained materially false and misleading statements and omitted to disclose material facts.

58.     Defendants Milton, Russell, Brady, and Worthen are sometimes referred to herein as the "Individual Nikola Defendants" and, with Nikola, the "Nikola Defendants."

59.     Defendant Jeffrey W. Ubben ("Ubben") joined Nikola's Board of Directors in September 2019 and remained on the Board following the merger until February 24, 2022. Ubben became a member of Nikola's Nominating and Corporate Governance Committee in June 2020. He signed the June 15, 2020 S-1 and the July 17, 2020 S-1. Ubben was compensated under Nikola's non-employee director compensation program.

60.     Steve Girsky ("Girsky") served as President, CEO, and a director of VectoIQ until the merger between VectoIQ and Nikola. Following the merger, Girsky served as a director of Nikola and as a member of Nikola's Audit Committee and Nominating and

16

Corporate Governance Committee and, in September 2020, became Chairman of Nikola. Girsky signed the S-4, the Proxy, the June 15, 2020 S-1, and the July 17, 2020 S-1.

61.    Defendant Steven Shindler ("Shindler") served as CFO and director of VectoIQ prior to its merger with Nikola. He has served as a Nikola director since September 2020 and serves as the Chair of the Audit Committee. Shindler signed the S-4 and the April 6, 2020 Form 8-K on behalf of VectoIQ. The Form 8-K contained materially false and misleading statements as alleged herein.

62.    Defendants Girsky and Shindler are sometimes referred to herein as the "VectoIQ Defendants" and, together with Ubben and the Individual Nikola Defendants, the "Individual Defendants."

63.    The Individual Defendants possessed the power and authority to control the contents of Nikola's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Nikola's SEC filings, press releases and other public statements alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Nikola, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS AND FACTUAL BACKGROUND

### I.   Nikola and its Business Combination with VectoIQ

64.   Milton founded Nikola in 2015 with the primary goals of manufacturing semi-trucks that used alternative fuels with low or zero emissions and building a fueling station infrastructure to support those vehicles.   Since approximately 2016, Nikola has focused on producing FCEV (hydrogen fuel-cell vehicle) Class 8[7] trucks.   Later, Nikola also began to develop Class 8 BEV (battery-electric vehicle) trucks.

65.   Although BEV cars have existed for years, FCEV cars are less common, and FCEV Class 8 trucks have never been commercially deployed.   The lack of commercial deployment of FCEV trucks thus far is largely due to the high barriers to entry, including, among other things, the high cost of dispensable hydrogen compared to traditional fuels and the high cost of hydrogen dispensing infrastructure, which is uneconomical to build without vehicles to support it.

66.   Defendants claimed that Nikola could overcome these barriers to entry by, among other things: (i) offering a bundled lease for its trucks that included the cost of hydrogen fuel; (ii) constructing a nationwide network of hydrogen refueling stations around routes of customers who have committed to lease Nikola's trucks; and (iii) obtaining cheap electricity that would enable the Company to produce hydrogen at a fraction of current market rates.

67.   Nikola's business plan required billions of dollars of capital to finance the development and manufacturing of trucks and station infrastructure, which were not expected to generate profits until years in the future. From 2015 through March 2020,

---

[7] Class 8 trucks are those with a gross vehicle weight rating exceeding 33,000 pounds. Semi-trucks or "18-wheeler" trucks typically are Class 8 vehicles.

Nikola raised over $500 million through private offerings directed mostly at institutional investors.

68.    In late 2019, Nikola needed cash to fund its operations and it was targeted by VectoIQ as a potential business combination partner. VectoIQ was founded in 2018 and based in Mamaroneck, New York. VectoIQ was a SPAC, which had no operating business of its own and was formed for the sole purpose of raising capital to merge with a private company in the transportation industry. By late 2019, VectoIQ was running short on the time required by its governing documents to complete a merger. If the VectoIQ Board failed to find a merger partner by May 18, 2020, it would have to return its investors' money, robbing VectoIQ's founders of what was likely to be a lucrative payday.

69.    In mid-November 2019—and with only six months to go before VectoIQ's May 18, 2020 deadline arrived—investment bankers from Cowen and Company, LLC ("Cowen") proposed Nikola as a potential acquisition target to VectoIQ's management. Cowen was an original investor in VectoIQ, having purchased 1,449,000 of the Founders shares in March 2018 before the initial public offering ("IPO"). Cowen also pitched its idea of a VectoIQ-Nikola merger to Nikola's management. Cowen had previously provided financial advisory services to Nikola in connection with an offering of preferred stock in 2018.

70.    Going public through the SPAC route had a key advantage to Nikola and VectoIQ: unlike an IPO, a SPAC reverse merger is not subject to what is commonly referred to as a "quiet period" mandated by the federal securities laws. During the quiet period, the company's executives generally cannot provide any information about the company to anyone beyond what was previously disclosed in the registration statement and prospectus. The purpose of a quiet period is to create a level playing field by ensuring that

all investors have access to the same information at the same time, and to prevent executives from taking actions to hype or artificially inflate the company's stock price. The quiet period lasts from the time the company issuing the stock discloses information about the issuance in the registration statement and prospectus that are required to be filed with the SEC until forty days after the new stock begins trading. Because a SPAC reverse merger is not subject to a quiet period, the executives of the private company that is merging with the SPAC are not limited in their ability to speak publicly about their company while the company goes public. As discussed below, this aspect of the merger, which VectoIQ emphasized as a key advantage in its sales pitch to Nikola, played right into Defendants' hands.

71.     On March 2, 2020, VectoIQ and Nikola entered into a business combination agreement, along with certain related agreements, pursuant to which Nikola would merge with a subsidiary of VectoIQ and effectively become the surviving, publicly traded entity when the transaction closed. In one related transaction, VectoIQ raised approximately $525 million from institutional investors in a private investment in public equity ("PIPE") offering. Milton participated in the PIPE fund raising and marketing efforts by making presentations at investor meetings.

72.     Inclusive Capital Partners Spring Master Fund, L.P. ("Spring Master Fund"), an entity founded by Ubben in 2018, purchased 809,936 shares of Nikola Series D preferred shares for approximately $15 million and five million shares of Nikola in the PIPE offering which helped close the merger with VectoIQ. As of June 3, 2020, following the Merger, Ubben directly or indirectly owned 20,362,024 Nikola common shares, representing approximately 5.6% of Nikola's outstanding common stock.

73.     Between March 3, 2020, when the merger was announced, and June 3, 2020, when it was effected, investors could buy and sell VectoIQ stock based on the reasonable anticipation that upon the completion of the merger, an investor's ownership of VectoIQ stock would make them an equity owner of Nikola. As a result of the merger, Nikola received a net contribution of approximately $594.5 million from VectoIQ, an amount that excluded a $70 million payout to Milton made at the closing of the transaction, according to its filings with the SEC.  The parties consummated the business combination on June 3, 2020. The following day, June 4, 2020, Nikola's stock began trading on the Nasdaq.

## II.     Defendants' Stock Ownership and Compensation

### A.     Trevor Milton

74.     Until the merger, Milton served as Nikola's CEO, was Chairman of its Board of Directors, and was its largest stockholder. On or about March 3, 2020, when Nikola announced it would go public by merging with VectoIQ, Nikola claimed an enterprise value of approximately $3.324 billion, implying that the Nikola stock Milton would hold upon completion of the Merger, through an entity called M&M Residual, LLC ("M&M"), had a value of approximately $844 million.  Immediately after the Merger, Milton held, through M&M, approximately 91,602,734 shares in Nikola, representing approximately 25.4% of the total ownership of the Company, and he remained the Company's largest stockholder during the Class Period.  On or about June 3, 2020, when the Merger between Nikola and VectorIQ was completed, Nikola shares opened the day trading at approximately $33.69 per share, resulting in a value for Milton's shares of approximately $3,086,096,108.  At opening on or about June 9, 2020, after completion of the merger, when Nikola's stock peaked, the market value of Milton's stock was approximately $8.5 billion.

75.     During the merger negotiations, Milton tried to ensure that he would not be locked up from selling his Nikola stock for any period of time. Generally, one purpose of such a lock-up is to keep management invested in delivering on the business's plan rather than cashing out for short-term gain. Milton and Russel ultimately were required to sign the Registration Rights and Lock-Up Agreement dated June 3, 2020 ("Lock-Up Agreement"), which had a one-year lock-up. However, the lock-up did not apply to the $70 million cash payment to M&M at the time the merger closed, and it also carved out $70 million in stock that Milton could sell as soon as six months after the merger. And soon after the merger, on July 17, 2020, the Lock-Up Agreement was amended to permit Milton and Russell to (1) sell all of their shares (which they owned through M&M and T&M Residual, LLC ("T&M"), a company co-owned by Milton and Russell, and managed by Russell) beginning on December 1, 2020, only six months after the merger; and (2) transfer up to 16% of their shares as collateral to borrow money to buy more Nikola stock through open-market transactions—stock that Milton and Russell could presumably then turn around and sell at any time allowing them to get around the lock-up provisions prohibiting sales.  During that six-month period, Milton expressed his intention within the Company to sell shares once the lock-up period ended.

76.     During fiscal year 2019, Nikola paid Milton $266,000 in salary. During fiscal year 2020, Nikola paid Milton $153,462 in salary, and $159,026,298 in stock awards (valued by aggregate fair value computed as of the grant date), for total compensation of $159,179,760.

77.     As of June 3, 2020, following the merger, Milton's compensation was to consist of (1) a salary of $1; (2) an annual "time-vested award" of $6 million worth of restricted stock units ("RSU"), vesting three years after grant, with the first such award

based on a stock price of $10 (i.e., 600,000 shares of Nikola common stock); and (3) a "performance award" consisting of up to 4,859,000 shares of RSUs tied directly to Nikola's stock price, and which were earned by achieving certain stock trading milestones for at least twenty consecutive trading days:

| Share Price Milestone | Market Capitalization at Price | Incremental Performance Shares Earned at Share Price Milestone |
|---|---|---|
| Below $25.00 | Below $10 billion | 0 |
| $25.00 | $10 billion | 1,069,000 |
| $40.00 | $16 billion | 1,603,000 |
| $55.00 or above | $22+ billion | 2,187,000 |

The RSU performance award financially rewarded Milton to continue his misconduct after the merger. By pumping up Nikola's stock price above any of the share price milestones for twenty consecutive trading days, he stood to gain potentially tens of millions of dollars' worth of Nikola stock. Based on Milton's misleading statements regarding Nikola's business, and the resulting trading price of Nikola stock between June 3, 2020 and September 20, 2020, the first performance milestone was reached entitling Milton to 1,069,000 Nikola RSUs.

### B.    Mark Russell

78.    As of June 3, 2020, following the merger, Russell owned 49,774,487 shares of Nikola's common stock. These shares included, inter alia, shares held by Russell individually and shares held by T&M. Russell has sole dispositive power over the shares held by T&M, and Milton has sole voting power over those shares. Given that the price per share of Nikola's common stock at the close of trading on June 3, 2020 was $33.97, Russell owned approximately $1.7 billion worth of Nikola stock immediately after the merger

closed. Pursuant to the Lock-Up Agreement, Russell was permitted to sell these shares starting on December 1, 2020.

79.   During fiscal year 2019, Nikola paid Russell $250,866 in salary and $6,307,496 in option awards, for total compensation of $6,558,362. During fiscal year 2020, Nikola paid Russell $173,077 in salary, and $159,026,298 in stock awards valued by aggregate fair value computed as of the grant date, for total compensation of $159,199,375.

80.   Since June 3, 2020, following the merger, Russell's compensation has consisted of (1) a salary of $1; (2) an annual "time-vested award" of $6 million worth of RSUs, vesting three years after grant, with the first such award based on a stock price of $10; and (3) a "performance award" consisting of up to 4,859,000 RSUs earned after certain stock price milestones were achieved:

| Share Price Milestone | Market Capitalization at Price | Incremental Performance Shares Earned at Share Price Milestone |
|---|---|---|
| Below $25.00 | Below $10 billion | 0 |
| $25.00 | $10 billion | 1,069,000 |
| $40.00 | $16 billion | 1,603,000 |
| $55.00 or above | $22+ billion | 2,187,000 |

The performance awards were identical to the ones granted to Milton and Russell stood to gain potentially tens of millions of dollars' worth of Nikola shares as a result of Milton pumping up of Nikola's stock price above the price milestones for twenty consecutive trading days. Based on the trading price of Nikola stock between June 3, 2020 and September 20, 2020, resulting from the misleading statements regarding Nikola's business, the first performance milestone was reached and Russell is now entitled to 1,069,000 Nikola RSUs.

C.    **Kim J. Brady**

81.    Following the merger, Brady owned 10,275,414 shares of Nikola's common stock. Given that the price per share of Nikola's common stock at the close of trading on June 3, 2020 was $33.97, Brady owned approximately $349 million worth of Nikola stock at the time of the merger.

82.    During fiscal year 2019, Nikola paid Brady $250,000 in salary and $12,451 in other compensation. During fiscal year 2020, Nikola paid Brady $144,231 in salary, $1,041,139 in bonus, $84,800,710 in stock awards, and $50,566 in other compensation, for total compensation of $86,036,646.

83.    Since the merger, Brady's compensation has consisted of (1) a salary of $1; (2) an annual "time-vested award" of $3.2 million worth of RSUs, vesting three years after grant, with the first such award based on a stock price of $10; and (3) a "performance award" consisting of up to 2,591,000 RSUs earned after certain stock price milestones were achieved:

| Share Price Milestone | Market Capitalization at Price | Incremental Performance Shares Earned at Share Price Milestone |
|---|---|---|
| Below $25.00 | Below $10 billion | 0 |
| $25.00 | $10 billion | 570,000 |
| $40.00 | $16 billion | 855,000 |
| $55.00 or above | $22+ billion | 1,166,000 |

Through Milton's pumping up of Nikola's stock price above any of the share price milestones for twenty consecutive trading days, Brady stood to potentially receive millions of dollars of Nikola stock. Based on the trading price of Nikola stock between June 3, 2020 and September 20, 2020, resulting from the misleading statements regarding Nikola's

business, the first performance milestone was reached and Brady is now entitled to 570,000 Nikola RSUs.

84.    On June 3, 2020, in connection with the closing of the merger, Brady received fully vested and exercisable stock options that gave him the right to purchase 10,275,414 shares of Nikola common stock at a price of $1.05.

**D.    Britton Worthen**

85.    During the fiscal year ended December 31, 2020, Worthen received compensation from Nikola consisting of $144,231 in salary and stock awards valued at $79,470,349 (valued by aggregate fair value computed as of the grant date), plus whatever gains Worthen would realize from appreciation in the value of the stock he owned.

86.    Since the merger, Worthen's compensation has consisted of (1) a salary of $1; (2) an annual "time-vested award" of $3 million worth of RSUs, vesting three years after grant, with the first such award based on a stock price of $10; and (3) a "performance award" consisting of up to 2,428,000 RSUs earned after certain stock price milestones were achieved:

| Share Price Milestone | Market Capitalization at Price | Incremental Performance Shares Earned at Share Price Milestone |
|---|---|---|
| Below $25.00 | Below $10 billion | 0 |
| $25.00 | $10 billion | 534,000 |
| $40.00 | $16 billion | 801,000 |
| $55.00 or above | $22+ billion | 1,093,000 |

Through Milton's pumping up of Nikola's stock price above any of the share price milestones for twenty consecutive trading days, Worthen (by remaining silent) stood to receive millions of dollars of Nikola stock. Based on the trading price of Nikola stock between June 3, 2020 and September 20, 2020, resulting from the misleading statements

26

regarding Nikola's business, the first performance milestone was reached and Worthen is now entitled to 534,00 Nikola RSUs.

87.     On June 3, 2020, in connection with the closing of the merger, Worthen received fully vested and exercisable stock options that gave him the right to purchase 4,603,168 shares of Nikola common stock at a price of $1.05.

### E.     Stephen J. Girsky

88.     As of June 18, 2020, Girsky owned at least 1,754,344 shares of Nikola's common stock,[8] which were previously shares of VectoIQ that Girsky acquired for nominal consideration (approximately $25,000 or less). Given that the price per share of Nikola's common stock at the close of trading on June 18, 2020 was $67.73, Girsky owned approximately $119 million worth of Nikola stock, for which he had paid only nominal consideration. Pursuant to the Lock-Up Agreement, Girsky was prohibited from selling these shares for a period of one year.

### F.     Steven M. Shindler

89.     Shindler is compensated under Nikola's non-employee director compensation program. In 2020, his compensation consisted of $134,778 in stock awards.

90.     As of June 18, 2020 (the date VectoIQ Holdings, LLC, the VectoIQ-affiliated sponsor entity in the Merger, dissolved and distributed its holdings to its members), Shindler owned 402,298[9] shares of Nikola's common stock, which he had previously

---

[8] The 1,754,344 shares owned by Girsky consisted of (i) 11,449 shares and 1,441 shares underlying warrants owned directly by Girsky; and (ii) 1,561,459 shares and 180,005 shares underlying warrants previously owned, as of June 3, 2020, by VectoIQ, and subsequently transferred to Girsky when VectoIQ dissolved on June 18, 2020.

[9] The 402,298 shares owned by Shindler consisted of (i) 12,889 shares owned directly by Shindler; and (ii) 359,409 shares and 30,000 shares underlying warrants previously owned, as of June 3, 2020, by VectoIQ, and subsequently transferred to Shindler when VectoIQ Holdings LLC dissolved on June 18, 2020.

27

acquired for nominal consideration. Given that the price per share of Nikola's common stock at the close of trading on June 18, 2020 was $67.73, Shindler owned approximately $27 million worth of Nikola stock. Pursuant to the lock-up agreement, Shindler was prohibited from selling these shares for one year.

G.   **Jeffrey W. Ubben**

91.    Ubben is the founder and managing partner of Inclusive Capital Partners, L.P., a financial services company founded in 2020. He also founded ValueAct Capital Management, L.P. in 2000, where he was employed until 2020. In 2018, Ubben founded Spring Master Fund, formerly known as ValueAct Spring Master Fund, L.P., and served as portfolio manager. Spring Master Fund purchased 809,936 shares of Nikola Series D preferred shares for approximately $15 million. Spring Master Fund also purchased 5 million shares of VectoIQ Common Stock in the PIPE offering that helped close the Nikola-VectoIQ merger at $10 per share, for a total price of $50 million. At the time the merger was completed in June 2020, Ubben directly or indirectly owned 20,362,024 Nikola common shares, representing approximately 5.6% of Nikola's outstanding common stock and worth approximately $691 million on June 3, 2020. In 2020, his compensation as a member of Nikola's Board consisted of $713,370 in stock awards. When Nikola's share price shot up to $42.69 on August 11, 2020, Ubben sold 1.4 million Nikola shares for a total of $59,766,000 in violation of the Lock-up Agreement that prohibited sales within 180 days of the merger.

**III.    Milton's Control Over Nikola**

92.    Following the merger, Milton switched roles from CEO to Executive Chairman.  Milton explained on the *Chartcast* podcast that his change in title was a promotion that allowed him to have nearly unfettered control over the company:

I can assume any role [I] want[] at any time, whenever it needs and all . . . roles report directly up to the executive chairman . . . in other words, the CEO reports directly to me and I have the ability to . . . assume or manage any division, any person . . . anyone inside the company, any given time I need to, because they believe that I have . . . more knowledge and more vision than anyone in the company. And so they wanted to make sure I had no restrictions on that.

93.     Retaining control of Nikola was important to Milton. For example, when a member of Nikola's Board of Directors urged Milton in January 2020 to appoint to Nikola's Board additional independent members with public company experience, Milton responded, in part:

The most important [sic] is that I fully control the board at all times and have people who work well with my personality . . . . No one sees the future like I do, and if you get too many world class brilliant people on the board, you will end up fighting over everything as they think they are the smartest in the room every time.

94.     Milton also exercised personal control over the hiring of Nikola's executive leadership. For example, Milton personally hired Nikola's CEO Russell, CFO Brady and CLO Worthen.

95.     At all relevant times, Milton acted as Nikola's primary public spokesman, and he frequently exercised control over the company's social media posts and press releases, although Nikola's marketing team also took direction from Russell, Brady, and Worthen. Further, Milton often participated in meetings with prospective investors, industry partners, and potential customers.

96.     Milton was a hands-on executive. He engrossed himself in the details of Nikola's technology and product development process. He participated in weekly update meetings with senior technical and business leaders. During these meetings, and regularly at other times, he received updates on Nikola's product development, technology, and

commercial activity directly from Nikola's technical leads. Milton worked with engineers, often huddling with them in front of computer screens to discuss technical matters.

97.     Milton was purportedly so central to Nikola's business that Nikola disclosed in its filings with the SEC in the spring and summer of 2020 the risks associated with its dependence on Milton.  Nikola warned in these filings that it is "highly dependent" on Milton's services, because he is "the source of many, if not most, of the ideas and execution driving Nikola." Accordingly, Nikola cautioned that if Milton could not continue employment with the company, it "would be significantly disadvantaged."

98.     Milton viewed and touted himself publicly as a technological expert in several aspects of electric vehicles. During a May 5, 2020 appearance on the *Rise of the Young* podcast, Milton claimed:

> I'm not trying to ever be too confident or – or brag about things, but this is important to help you understand that answer.   There's two people in this world that know EVs better than anyone, and that's Elon [Musk] and myself. There's no one in this world that – I can go into any meeting with Volkswagen, Daimler, Volvo.   You could put 30 PhDs in that room, and I would run circles around every one of them.   Because they only know one thing, that's all they know. . . .  So there's very few people that know the EV industry or the whole entire vehicle like I do or like Elon [Musk] does, so we're probably the top two guys in the world that know this shit, and we know it better than anybody.

## IV.   Milton's Social Media Activity and Fixation with Stock Price

99.     Because Nikola went public through a SPAC reverse merger there was no quiet period and Defendants could promote Nikola stock without restriction. Defendants capitalized on this aspect of the SPAC route to perpetrate their fraud.

100.    In the months leading up to and after the merger, Defendants pursued a deliberate communications strategy with the intent of creating maximum exposure for Milton and Nikola to fraudulently induce retail and other investors to purchase Nikola stock by making false and misleading statements about Nikola's products and achievements.

This strategy consisted of a ubiquitous social media presence coupled with frequent podcast and television appearances.

101.    Milton used his personal Twitter account (@nikolatrevor) and personal Instagram account (@lakepowelltrevor) to publish material information about Nikola.  As of September 15, 2020, more than 104,600 users followed Milton on Twitter and more than 36,500 users followed Milton on Instagram. On information and belief, among Milton's Twitter followers was Nikola's corporate Twitter account (@nikolamotor).

102.    Milton repeatedly urged investors to follow his social media accounts, claiming he used them to communicate "accurate data" about Nikola in a way that would enable followers to receive information "way faster than you get it anywhere else." Milton's statements on June 30, 2020 during a nationally televised interview on *Fox Business* encapsulate his view of using social media to interact with Nikola's investors:

> Well, I don't think that the market really – this is I think one of the things that many people have missed.  The investors around the world right now are tired; they're tired of like an executive sitting in an office behind his chair, making millions of dollars and, you know, forgetting about the average factory worker or even the consumer.  So, there's unparalleled contact between myself, the executive chairman and the founder of Nikola, and all of our fans.  I mean, you heard in the previous segment about social media, there's a lot of negative in social media, but there's also a lot of positive that you can create with it.  And I took the, uh, I took the decision I wanted to create the positive . . . .  And through this social media experience, where people can actually feel like they're part of it, ***they can talk to you, they can ask you questions, the transparency***, the, the market they're just tired of the older executive that just don't care.  And that's why you see the market evaluation of Nikola do well is because ***finally there's executives out there that they can talk to, that they can voice their problems, their opinions with and they actually get a response.  Go on my Twitter Nikola Trevor and you'll see . . .  you'll literally see answers to probably two thirds of every tweet out there***.

103.    Milton exponentially increased his social media activity in anticipation of and after Nikola became a public company in mid-2020.  This is illustrated in the following chart that approximates his activity on his personal Twitter account (@nikolatrevor):

31

| Year | Approximate Number of Tweets (including Replies) Per Year |
|------|-----------------------------------------------------------|
| 2016 | 14 |
| 2017 | 22 |
| 2018 | 52 |
| 2019 | 137 |
| 2020 | 2,283 |
| **TOTAL** | **2,508** |

104.   To further increase investor awareness of Nikola around the time of the merger, Milton embarked on a self-proclaimed "media blitz" with Defendants' acquiescence. As part of this campaign, he participated in over a dozen nationally televised interviews and appearances and dozens of podcast appearances. Milton was able to do so because Nikola went public by means of a SPAC combination, rather than an IPO, and Milton was therefore not subject to the restrictions of a "quiet period."

105.   Milton's "media blitz" and social media activity were closely connected with his fixation on, and desire to increase and maintain, Nikola's stock price.  Around the time of the merger, Milton became intensely focused on Nikola's stock price.

106.   On days when Nikola's stock price declined, Milton regularly attempted to direct Nikola's senior executives to take actions to stop the price decline.  Senior executives received frantic phone calls or text messages from Milton on such days in which he urged the executives to "do something." Milton also spoke of needing to put out "good news" or some kind of announcement "to get people excited" as a way to counteract price declines or maintain support for the stock price.

107.    Senior Nikola executives and some members of Nikola's Board of Directors impressed upon Milton in the summer of 2020 that volatility in Nikola's stock price was to be expected, and that his focus should instead be on long-term performance.

108.    However, Milton's focus remained on the stock price and his attempts to influence the retail investors whom he and the other Defendants viewed as driving it. For instance, on or about March 2, 2020, the day before Nikola announced the merger, Milton wrote an email to a member of the Nikola Board stating, "***need to make sure we are getting retail investors on our side***. That is what prevents the stock short selling. This is super important for me." To that end, Milton tracked the daily number of new Robinhood users who held Nikola stock.  On June 8, 2020, Milton shared a tweet with a senior Nikola executive reflecting that over 36,000 new Robinhood users became Nikola stockholders that day.  The senior executive responded, in part, by expressing his amazement at how many calls he received "from retail investors today that have no clue about Nikola, other than their friends told them to buy.  A lot of hype out there with retail investors," to which Milton replied: "That's how you build a foundation.  Love it."

109.    In late July 2020, Milton contacted a Nikola senior executive to discuss the possibility of Milton buying shares of Nikola "for the company's health" because Nikola has had "zero news for two weeks and it's important to prevent our stock from losing credibility." Another time, following a short period of stock price decline in August 2020, Milton sent a text message to a different senior Nikola executive requesting to "talk strategy ASAP." Milton went on to say that the "continual stock decline is going to erode any confidence in our stock.  We have to do something . . . . We can't just sit here and watch it collapse."

110.   Milton's focus on the stock price and the other Individual Defendants' encouragement of Milton's misinformation media blitz was not surprising, as they were personally incentivized to push Nikola's stock price higher. First, as the Company's largest stockholders, the Individual Defendants stood to benefit financially if they could increase Nikola's stock price and sustain that increase beyond the six-month period following the merger. During this period, Milton was contractually prohibited, with some exceptions, from transacting in Nikola stock. Second, Defendants' compensation plans following the merger tilted heavily toward equity. For example, Individual Defendants' performance awards and RSUs were tied to Nikola's share price.  As Milton wrote in a July 7, 2020 email exchange with one of Nikola's directors justifying a release from his lock-up agreement, the stock had gained "***over 400%" and he made "everyone else millionaires and billionaires.***" Indeed, by August 14, 2020, Nikola's share price achieved the first share price milestone specified in Milton's, Russell's, Brady's, and Worthen's employment agreements, entitling them to awards of 3,242,000 shares of Nikola stock, which were at the time worth approximately $81 million.

**V.    Nikola Defendants Knew Milton was Making False and Misleading Statements On Behalf of Nikola**

111.   Russel, Brady and Worthen, Girsky, and Ubben knew of Milton's misinformation "media blitz" designed to inflate Nikola's stock price, as Milton stated in an email that he intended to go on a "media blitz" when Nikola became public and asked Russell, Brady, Girsky, and Ubben to approve an unnecessary, rushed purchase order of electrolyzers in late May 2020 to allow him to do so as soon as Nikola began trading publicly (Defendants approved the order).

112.   Many of the false statements described herein were posted to Nikola's corporate website or its corporate Twitter account or other social media platforms, which

Nikola's marketing team could delete with approval from Milton, Russell, Brady, or Worthen. Russell, Brady and Worthen were also aware of Milton's habit of using his personal Twitter account (and other social media) for Nikola-related announcements and were aware that analysts and retail investors relied on these postings as accurate sources of information. Moreover, as stated in Milton's criminal indictment and complaints by the DOJ and SEC "Milton repeatedly made false and misleading statements about *core aspects* of Nikola's products, technological advancements, and commercial prospects," which the Individual Defendants as executive officers of the Company knew were false and misleading. The SEC also cited evidence that Milton's misconduct was known to the senior executives at the Company for months before and after the merger, including some directors as well as Worthen, who was Nikola's CLO and Secretary to the Board. For example, Russel, Brady and Worthen were repeatedly informed that Nikola did not, in fact, manufacture all of its key vehicle components in-house. Similarly, they knew that Nikola had never (and still does not) produce its own hydrogen, much less at the fictitious prices represented by Milton. Indeed, Worthen has since admitted "The statement that Nikola can produce 1,000 kg/day [of hydrogen] *is not true*, and ***Milton knew it was not true. We discussed this 'a million times*.'"** Also evidencing his state of mind, Worthen stated that he knew Milton's statements about Nikola manufacturing its batteries in-house were false and Worthen has claimed that he "***told him not to make the statement*.**" Notwithstanding Worthen's admissions that he knew Milton was misleading investors about Nikola's hydrogen production and in-house technology, Worthen signed a September 14, 2020 press release denouncing the Hindenburg Report as "false and misleading" when Worthen knew the Hindenburg Report's assertions that Nikola could not produce its own hydrogen were accurate.

113.    In 2019 and 2020, some of Nikola's senior executives were uneasy about Milton's outright lies on social media. Senior executives were aware that Milton's public statements were inaccurate, false, and misleading. Despite this, Nikola did not implement formal disclosure controls or procedures for monitoring or reviewing Milton's media interviews and social media activity.

114.    Indeed, the Company's press releases and SEC filings contained material misstatements and included statements that both perpetuated and failed to correct the knowingly false statements being made by Milton that caused Nikola's stock price to be artificially inflated.

115.    In or around 2019, Defendant Worthen advised Milton about the legal risks associated with inaccurate tweets, and a senior Nikola executive told Milton that even posts from his personal accounts could be viewed as statements by Nikola itself. Then, in a series of conversations in 2019 and 2020, Russell (who was also on the Board) asked Milton to let Worthen pre-screen any tweets Milton planned to post from Nikola's corporate account. But with only a few exceptions, no one in the Company's legal department or elsewhere at Nikola ever pre-screened Milton's tweets.

116.    Nonetheless, Russell, Worthen, and Brady could have instructed Nikola's marketing team to take down false information from Nikola's social media. As described more fully in ¶¶804-811, on July 19, 2020, a high-level Nikola officer who reported directly to Russell requested that Nikola's marketing team remove references on Nikola's social media to a podcast interview Milton gave which was rife with misleading statements. The marketing team informed Nikola's Head of Business Development, Elizabeth Fretheim, that they needed executive approval to remove the postings, so  Fretheim contacted Russell, Brady, and Worthen. Russell assured Fretheim that the executives would follow-up.

However, they never instructed the marketing team to remove the postings. At Milton's criminal trial, Russell conceded in his testimony that "we should have taken it down."

117.    Throughout 2020, Russell, Brady, Worthen, and Girsky, aware that Milton was posting an excessive volume of false statements, asked Milton to tone down his social media presence, but did nothing to protect investors from his false statements and when called upon to set the record straight, deflected questions about Milton's statements. For example, when an analyst on an August 4, 2020 earnings call told Russell and Brady that he had been "trying to follow Trevor on his various social media outlets about the timing and cadence of" news about the company's products and partnerships and asked them to clarify, Worthen uncharacteristically jumped in to answer—the only analyst question he answered on the call—and deflected from Milton's social media postings by vaguely stating that more news would be released over the coming months. Certain senior Nikola executives also asked one of Nikola's directors for assistance in getting Milton to reduce his social media presence. Although the post-merger Nikola Board scheduled a media training run by a third-party provider for all senior executives, it did not require Milton to attend (which he did not).

118.    Milton told the other executives that he needed to be on social media to put out good news about Nikola to boost its stock price, clearly telegraphing to them his intention of putting his own (and their own) financial self-interest above telling the truth. Nikola's Board of Directors and its senior executives completely deferred to Milton during his time with the Company. As Milton said in January 2020 when a member of Nikola's Board urged him to appoint independent board members with public company experience:

> ***The most important [sic] is that I fully control the board at all times*** and have people who work well with my personality . . . . No one sees the future like I do, and if you get too many world class brilliant people on the board,

you will end up fighting over everything as they think they are the smartest in the room every time.

**DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS CAUSED DAMAGE TO INVESTORS**

I.     **Defendants Misled Investors Regarding the Nikola One Semi-Truck**

    A.     **Defendants Misled the Public Regarding the Capabilities of the Nikola One**

119.   In 2016, Nikola unveiled its first semi-truck prototype, the Nikola One.  In or around June 2016, Milton began to promote an unveiling event for the Nikola One scheduled for December 1-2, 2016. Nikola invited potential investors, suppliers, and customers to the event, and publicized that it would live-stream the event on its website.

120.   During the construction of the Nikola One prototype, Defendant Russell, then an employee of one of Nikola's early-stage investors, informed Defendant Milton that he was concerned about the cost of the truck because of the cost of the turbine that ran on compressed natural gas ("CNG"). During Milton's criminal trial, Russell testified that he informed Milton that he did not think the planned turbine was going to work, that a functional turbine would be too expensive, and that he would not recommend that his current employer invest any further in Nikola. After not hearing from Milton for "some period of time," Russell learned that Milton would be altering the plans for the Nikola One. In or about August 2016, however, Milton abruptly pivoted and began claiming that the Nikola One would rely on a hydrogen fuel cell rather than a turbine using CNG.[10]

121.   A fuel cell converts hydrogen to electricity.  This fundamental design change ensured that the prototype to be shown at the unveiling event in December 2016 would not be operable, as integrating and testing FCEV components would require significant

---

[10] Transcript of *United States v. Milton*, No. 21-cr-00478 (S.D.N.Y. 2022) ("Milton Tr.") at 969-970:10-2, ECF No. 224.

additional time. A few weeks before the event, Nikola's chief engineer informed Milton that the truck would not be functioning at the unveiling event unless the event was postponed. Milton made the decision to proceed as scheduled with the knowledge that the vehicle to be unveiled would not be functioning.

122.    Russell was aware that Milton would attempt to misrepresent the functionality of the inoperable Nikola One. According to Nikola's Chief Engineer, Kevin Lynk, "There was an instruction (potentially from legal) to Nikola employees before the event that they should be careful not to say the vehicle was 'fully functioning,' 'driving,' or an 'H2 vehicle.'"[11]

123.    Nevertheless, in the weeks leading up to the event, Milton represented that the Nikola One would be "working" or "functioning." For example, on October 16, 2016, in response to a question from a Twitter user about whether the December 1, 2016 event would be a "[d]esign unveiling or a functional prototype," Milton responded, via Nikola's corporate Twitter account, "*functioning.  Fully built truck at event*."

124.    The unveiling event occurred on December 1-2, 2016 and was live-streamed on Nikola's website simultaneously. On the first evening, Milton hosted an event at which the Nikola One was "unveiled" on a stage in front of a crowd. Individuals who had made reservations to purchase a Nikola One, potential business partners, and current and potential investors were invited. In his remarks at the December 1, 2016 event, Milton said, despite full knowledge of facts to the contrary, that the Nikola One "*fully functions and works which is really incredible*." He went on to tell the audience that "you're going to see that this is a real truck, *this is not a pusher*." A video of Milton's presentation was posted on Nikola's YouTube channel, where it remained throughout the Class Period.

---

[11] USAO Presentation.

125.   The following day, December 2, 2016, Milton recorded an interview with *Roadshow*, a website focused on the auto industry, from inside the Nikola One cab.  A video of the interview was posted to YouTube and was available publicly to investors and prospective investors.  During the interview, Milton stated again that the Nikola one was a "***fully functioning vehicle***."  In the interview, Milton repeated the claim that the Nikola One displayed at the event was fully functioning:

> This isn't just a pusher like a lot of vehicles that they unveil or just vehicles that don't actually function . . . .  This is a fully functioning, you know, vehicle, which is really incredible.  You can go through, you can, you know, we can change out pretty much everything we want, all the temperatures.  I mean this is a fully functioning vehicle.  It's not just a not just a pusher.  It's what they call in the automotive world a vehicle that they just push and it doesn't move . . . .

126.   The Nikola One was not operable at the time, let alone tested and validated. In the words of one Nikola engineer, the truck was "***not even remotely ready to operate***." Defendant Brady—as well as Dane Davis (Chief Technical Officer ("CTO")), Kevin Lynk (Chief Engineer), Tony Epperson (Sr. Manager, FP&A), and Vince Caramella (Global Head, Marketing) have since admitted, "[t]he Nikola One unveiled in December 2016 ***was not 'fully functional*,*'" with Brady expressly admitting it was "***a pusher***."[12]   At the unveiling event:

> (a)   the truck had to be towed onto the stage the night prior to the event and all electrical components were powered through a cord running from under the truck to the wall, rather than the truck's battery and the power cords had to be manually disconnected during the event as the stage spun;
>
> (b)   neither the fuel cell nor the hydrogen gas storage tanks had been installed;

---

[12] USAO Presentation.

(c)   an air line had to be connected to the vehicle to keep the truck's air suspension and air brakes working due to a slow leak in the truck's air supply;

(d)   the gearboxes had not been assembled, and certain parts necessary for assembly of the gear boxes had not arrived;

(e)   Nikola personnel operated the truck's headlights at the event by remote control; and

(f)   the human-machine interface, which Milton touted, consisted simply of off-the-shelf tablets mounted onto the dashboard set to display images created to have the appearance of infotainment screens, with speedometers, maps, and other information displayed.

127.   According to one engineer, Milton was regularly updated on the development of the truck by Nikola's engineers, and as a result was aware that the truck had not been driven before the event and could not be driven at the event.  When told by engineers that the truck would not be functioning by the scheduled date of the event, Milton nevertheless decided to proceed as scheduled, and went on to tout the truck as fully functioning—in 2016 and again in 2020 during the Class Period. For example, on August 18, 2020, Milton stated "*it was totally capable of driving, it had everything in it —power, steering, batteries—everything in it*."

**B.    Nikola Defendants Sought to Boost Nikola's Appeal by Misleading the Public About the Functionality of its Incomplete and Inoperable Product Through the Nikola One "In Motion" Video**

128.   After the December 2016 unveiling event, Nikola did not perform any further work on the Nikola One.  The truck was never completed and has never been operable. Yet Defendants continued to misrepresent the Nikola One to investors and potential investors through a video posted to the Company's website and its social media accounts.

129.   In or about 2017, a representative of Phillips, a large multinational corporation, approached Nikola and asked to use the Nikola One in a commercial

41

1    celebrating innovation.  The concept for the video included a shot of the Nikola One
2    coming to a stop in front of a stop sign.

3         130.   The commercial shoot occurred in or about early 2018.  For the shoot, the
4    non-functioning Nikola One truck was hauled to the shooting location by a "lowboy" semi-
5    truck.  At this time, and more than a year after the unveiling event, the Nikola One still
6    could not run under its own power. It was towed to the top of a hill, the brakes were
7    released, and then the Nikola One was filmed rolling down the hill and braking to a stop in
8    front of the stop sign.  The truck was again towed to the top of the hill and rolled down
9    twice more for additional takes. Additionally, the Nikola One's door, which had been
10   constructed using minivan parts, had to be taped up during the shoot to prevent it from
11   falling off.  Moreover, because the Nikola One was untested, unsafe, and inoperable,
12   certain precautions were taken before towing the vehicle to the commercial shoot.  In
13   particular, the batteries and turbine, which was designed to run on natural gas, were entirely
14   removed from the vehicle to mitigate the risk of fire, explosion, or damage.

15        131.   Milton attended the commercial shoot.  He obtained raw video footage shot
16   that day. Milton provided the footage to a Nikola digital media employee, whom he
17   instructed to create a short clip of a rolling Nikola One for the purpose of posting the clip
18   on social media.  The employee created the clip and showed it to Milton, who directed
19   certain edits to be made.  Milton ultimately approved a final version of the clip, which had
20   been sped up two-to-three times.  This had the effect of making the Nikola One appear to
21   move faster than it was.

22        132.   On or about January 25, 2018, Milton posted, or directed the posting of, the
23   edited video clip to Nikola's Twitter and Facebook accounts.  At Milton's direction, the
24   digital media employee also posted the clip to Nikola's YouTube account. The video

25

26                                           42

embedded in Nikola's tweet and on its YouTube post shows the Nikola One apparently moving on a road with no incline, seemingly at a high rate of speed on its own power. The video does not have any narration or text. The text of the tweet in which the video was embedded states: "Behold, the Nikola One in motion. Pre-production units to hit fleets in 2019 for testing. The Nikola Hydrogen Electric trucks will take on any semi-truck and outperform them in every category: weight, acceleration, stopping, safety and features – all with 500-1,000 mile range!" Milton drafted the text of this tweet. The video posted on YouTube had similar text accompanying it: "Behold, the 1,000 HP, zero-emission Nikola One semi-truck in motion. Get ready for the pre-production units to hit fleets next year in 2018 for testing . . . ." The "In Motion" video remained posted on Nikola's corporate Twitter, Facebook, and YouTube accounts, as well as on its website, and was available for viewing by investors and prospective investors until at least September 2020—months into the Class Period. The video misleadingly gave the impression that the Nikola One was capable of moving under its own power.

133.   According to Stasy Pasterick (VP, Corporate Controller), the video the Company posted did not originally show the vehicle moving at all. However, the plan was changed because Milton expressly wanted to show the truck in motion. Tony Epperson (Sr. Manager, FP&A) also told Pasterick that there had been internal discussions regarding whether it should be clearly stated when posting the video that the truck was not moving under its own propulsion. According to Tony Heaton (Battery Engineer), "[a]t the time, a number of employees were uncomfortable saying the truck was 'in motion' when they knew it was not driving."[13]

---

[13] USAO Presentation.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## C.   Materially False and Misleading Statements About the Nikola One

134.   Defendants made materially false and misleading statements about the Nikola One and omitted to disclose material facts that created an impression that was different from the state of affairs that actually existed.

### 1.   Pre-Merger False Statements Concerning the Nikola One

135.   On August 1, 2016, Nikola published a press release to its website, titled Nikola One Truck Achieves Zero Emissions, stating that Nikola "has achieved 100% zero emissions on the Nikola One commercial class 8 truck."[14]:

> While other companies have recently announced battery-powered semi-trucks, those trucks are restricted to a range of only a couple hundred miles and four to eight hours of charging between stops,' said Founder and CEO Trevor Milton. '***Nikola has engineered the holy grail of the trucking industry. We are not aware of any zero emission truck in the world that can haul 80,000 pounds more than 1,000 miles and do it without stopping***. The Nikola One requires only 15 minutes of downtime before heading out for the next 1,000 miles.

This statement remained on Nikola's website during the Class Period.

136.   The statement referenced in ¶135 was materially false and misleading because the Nikola Defendants knew or recklessly disregarded but failed to disclose that as of August 1, 2016, the Nikola One was still running on natural gas and thus was not "zero emission." Paul Lackey, who worked on the development of the Nikola One at Nikola, testified in the course of Milton's criminal trial that, as of August 1, 2016, the Nikola One was "designed to run off a natural gas turbine that does create emissions" and accordingly it was not a zero-emissions truck.

137.   As detailed in the USAO Presentation, Defendant Brady admitted that "As of August 1, 2016, the ***Nikola One was running on natural gas and thus was 'not zero***

---

[14] Press Release, Nikola Corporation, *Nikola One Truck Achieves Zero Emissions* (August 1, 2016), available at https://nikolamotor.com/press_releases/nikola-one-truck-achieves-zero-emissions-29.

*emission*.' Milton's statements to the contrary are false." Brady's testimony provided during Milton's criminal trial was consistent with his admissions included in the USAO Presentation. Similarly, Defendant Worthen admitted: "***The assertion that Nikola had 'achieved 100% zero emissions on the Nikola One' by August 1, 2016 is 'just not true.'***" Paul Lackey, who worked on the development of the Nikola One as an employee at Nikola, testified that the Nikola One prototype was never a hydrogen-based truck and did not have a hydrogen fuel cell. Lackey further testified that Milton was present while the truck was being built, kept up to date on the progress of the project, and that Milton made "many misstatements" about the progress of the project and its technology to persons touring the facility, allegedly claiming, for instance, that the truck had 2,000 horsepower and had shred tires during testing, when, in fact, there was "no truck that had ever been built, no test, no shredded tires."

138.    On October 14, 2016, Defendant Nikola, through its corporate Twitter account, promised to unveil its Nikola One prototype semi-truck to the market at its forthcoming convention, Nikola World 2016.[15] Nikola tweeted: "Only 47 days away from the @nikolamotor ONE electric semi unveiling! Live stream on our website for those not able to attend." The following day, October 15, 2016, in response to a question from a Twitter user about whether the December 1, 2016 event would be a "[d]esign unveiling or a functional prototype," Milton responded, via Nikola's corporate Twitter account, "***functioning. Fully built truck at event***." These statements remained on Nikola's Twitter account and publicly available to investors throughout the Class Period.

139.    On December 1, 2016, Nikola unveiled its Nikola One prototype semi-truck to the market in a webcast hosted by Milton. The Company posted a video recording of

---

[15] @nikolamotor, Twitter (Oct. 14, 2016, 10:07 P.M.), available at https://twitter.com/nikolamotor/status/787112661007732737.

this presentation to its official YouTube channel and its website, where it remained publicly available to investors throughout the Class Period.[16] As of January 2021, this video had been viewed 1,496,419 times. During the unveiling, Milton said that the Nikola One "*fully functions and works which is really incredible*" and went on to tell the audience that "you're going to see that *this is a real truck, this is not a pusher*."

140.    The following day, on December 2, 2016, in an interview with *CNET Road Show*, Milton explained that a "pusher" was a vehicle that does not "actually function" and that the Nikola One was "fully functioning":

> *This isn't just a pusher, like a lot of vehicles that they unveil are just vehicles that don't actually function. This is a fully functioning, uh, you know, vehicle which is really incredible. . . .*

141.    A video of the interview was posted on YouTube and was available publicly to investors and prospective investors throughout the Class Period. As of August 2020, this video was viewed on YouTube approximately 280,000 times.

142.    On October 10, 2017, Nikola posted an image of its Nikola One prototype to its official Twitter account.[17]   The Nikola One prototype bears a clearly-visible decal reading "H2" on the right of the front bumper. In response to a comment from another Twitter user the same day, Defendant Nikola said: "*It is fully electric but it uses hydrogen to give us 3x the range of battery only. We use battery and hydrogen 100% electric drive.*" These statements remained on Nikola's Twitter account and publicly available to investors throughout the Class Period.

---

[16] Nikola Motor Company (YouTube), *Nikola Motor Company - Nikola One Semi Electric Truck Unveiling – Official Video,* December 1, 2016, available at: https://www.youtube.com/watch?v=wLidTCqAAtY (accessed February 10, 2021).

[17] @nikolamotor, Twitter (Oct. 19, 2017, 6:03 P.M.), available at https://twitter.com/nikolamotor/status/917873309357785089.

143.    The statements referenced in ¶¶137-142 were materially false and misleading because the Nikola Defendants knew or recklessly disregarded but failed to disclose that the Nikola One was not a "fully functioning" or "fully built" vehicle—it was, in fact, an inoperable "pusher." As detailed in the USAO Presentation, Defendant Brady as well as Dane Davis (CTO), Kevin Lynk (Chief Engineer), Tony Epperson (Sr. Manager, FP&A), Vince Caramella (Global Head, Marketing) each admitted that "The Nikola One unveiled in December 2016 *was **not** 'fully functional*.'" Brady has also admitted, "[t]he Nikola One unveiled in December 2016 *was a pusher*." Lynk also stated, "[t]here was an instruction (potentially from legal) to Nikola employees before the event that they should be careful not to say the vehicle was 'fully functioning,' 'driving,' or an 'H2 vehicle,'" which was clearly ignored by Milton and the Company. Paul Lackey testified in the course of Defendant Milton's criminal trial that engineers working on the Nikola One knew as early as October of 2016 that the prototype would not be finished by the time of the unveiling event in December, informed Defendant Milton of that, and the decision was to focus "on things that were…externally visible." Lackey further testified that the truck at the unveiling was not operational and when asked if it was a "pusher," Lackey confirmed that the truck was in fact "not able to function under its own power" but got set up on stage by getting "pulled [] up" saying "I guess it was a puller." Defendant Russell testified at Milton's criminal trial that after he began working at Nikola in February of 2019, he learned that the Nikola One unveiled at the December 2016 event did not have a fuel cell at the time of the unveiling.[18] Russell therefore knew, or recklessly disregarded, that the Nikola One could not operate under its own power and was not a fully functioning FCEV.

---

[18] Milton Tr. 971:1-15, ECF No. 224

144.     On January 25, 2018, Nikola posted a tweet attaching the "Nikola One in Motion" Video to its official @nikolamotor Twitter account.[19] The video depicted the Company's Nikola One prototype vehicle traveling on an open road in the Arizona desert, including shots which made it appear as though the Nikola One was climbing uphill. The Nikola One prototype bears clearly visible decals reading, "H2" on the left and right of the front bumper. The accompanying post said:

> **Behold the Nikola One in motion.** Pre-production units to hit fleets in 2019 for testing. The Nikola Hydrogen Electric trucks will take on any semi-truck and outperform them in every category; weight, acceleration, stopping, safety and features – all with 500-1,000 mile range!

145.     This video and other statements remained on Nikola's Twitter account and publicly available to investors throughout the Class Period. It has been viewed 127,800 times, as of December 2021.

146.     Defendant Nikola also posted the "Nikola One In Motion" Video to its official public corporate Facebook account on January 25, 2018 with a similar message to the one on Twitter:

> **Nikola Hydrogen Electric Semi in Action**
>
> **Behold, the 1,000 HP, zero emission Nikola semi-truck in motion.** Get ready for the pre-production units to hit fleets in 2019 for testing. The Nikola Hydrogen Electric trucks will take on any semi-truck and outperform them in every category; weight, acceleration, stopping, safety and features - all with 500-1,000 mile range!

147.     This video and statements remained on Nikola's Facebook account and publicly available to investors throughout the Class Period. Stephanie Amzallag, in charge of Social Media at Nikola, testified during Defendant Milton's criminal trial that, between March 3, 2020 and September 9, 2020, the video was viewed 21,469 times and viewership

---

[19] @nikolamotor, Twitter (Jan. 25, 2018, 12:14 P.M.), available at https://twitter.com/nikolamotor/status/956576016809340928?lang=en.

48

peaked around in early June, 2020, contemporaneously with Nikola becoming a publicly traded company.

148.   In response to questions from a Facebook user about how the Nikola One performed in cold weather that he posted under the "Nikola In Motion" Video, Nikola's official Facebook account stated that the Nikola One was already "designed and tested," had over "1,000 HP," could climb a 7% grade hill, and had over "2,000 ft lbs. of torque." These statements remained on Nikola's Facebook account and publicly available to investors throughout the Class Period.

149.   The statements referenced in ¶¶144-148 were materially false and misleading because Defendants knew or recklessly disregarded but failed to disclose that (i) Nikola One was not a "fully functioning" or "fully built" vehicle—it was, in fact, an inoperable "pusher," (ii) it had not been "designed and tested," (iii) it did not have over 1,000 HP, it could not climb a 7% grade hill, or have over 2,000 ft lbs. of torque, (iv) the truck on the video was rolling down an incline due to gravity rather than under its own power. As detailed in Nikola's USAO Presentation, Caramella admitted "The video is misleading because it leads the viewer to believe the truck is operating under its own power." Defendant Russell testified in the course of Milton's criminal trial that the Nikola One was "not able to drive under its own power" in the way portrayed in the video. Paul Lackey testified that the Nikola One in the video was unable to move under its own power, could not be driven, and that the video had been made by rolling the truck down a hill with a consistent 3-percent grade. As set out above, testimony introduced into evidence during Milton's criminal trial confirmed that the Nikola One could never move under its own power and was not capable of actually performing in the way presented and described in the statements above.

150.   On December 18, 2019, during an interview with Liz Claman on Fox Business channel, Milton claimed "in 2016 when we first launched [the Nikola One], we were the first people to ever do it . . . We had the first zero-emissions semi truck that was available to the market."

151.   The statement referenced in ¶150 was materially false and misleading because the Nikola One was not, at any point, a functioning zero-emissions semi truck available to the market, and by the time of the statement the development of the truck had been abandoned for years.

   2.   *False and Misleading Statements After The Merger Is Announced But Before Nikola Begins to Publicly Trade on NASDAQ By the Nikola and VectoIQ Defendants*

152.   On March 4, 2020, in an interview with *CNBC*, Defendants Milton and Ubben discussed Nikola going public via SPAC to gain access to retail investors, as well as the Company's purported technology. Defendant Milton claimed "…that's probably one last thing that's really unique about Nikola is we're probably the only company in the world that offers both battery electric trucks and hydrogen electric trucks. . . ."

153.   The statements referenced in ¶152 were materially false and misleading because, at the time they were made, Nikola had no functional hydrogen electric trucks or battery electric trucks available for sale, and development of the Nikola One had been abandoned for years.

154.   Ahead of the merger, VectoIQ issued a proxy statement, filed with the SEC on May 8, 2020 (the "Proxy") which contained false and misleading statements. Defendants Milton and Girsky signed the Proxy.

155.   The Proxy represented that Nikola "designs and manufactures state-of-the-art battery-electric and hydrogen fuel cell electric vehicles, electric vehicle drivetrains,

energy storage systems, and hydrogen fueling stations." This was false and misleading as Nikola did not "manufacture" BEV or FCEV vehicles and did not manufacture "fueling stations." Instead, as set out in greater detail below, these were merely concepts and ideas of Nikola's.

156.   The Proxy lists the Nikola One as a "Zero-Emission product offering." The Nikola One is listed in the same sentence as the Nikola Two, and says:

> Nikola's FCEV trucks that are primarily designed for medium and long-haul applications. The FCEV trucks allow Nikola to address the longer-term opportunity by combining Nikola's fuel cell technology and a network of hydrogen stations across the US.
>
> FCEVs use fuel cells on-board to convert hydrogen into electricity to power the electric motors which transmit power to the wheels. The fuel cell generates electricity through a chemical reaction, supplied from on-board tanks, and oxygen from the atmosphere. A much smaller battery (compared to our BEV) provides supplemental power to the drivetrain, and stores energy recovered during regenerative braking. The voltage and charge of the battery are maintained through a combination of power supplied from the fuel cell and energy captured through regenerative braking.
>
> Nikola's FCEVs have an estimated range of 400 – 700 miles, designed to address the medium and long-haul market. Our FCEVs will be leased to customers via a bundled lease where customers receive an FCEV truck, hydrogen fuel, and maintenance based on a fix rate per mile, for 700 thousand miles, or 7 years (whichever comes first.)
>
> …
>
> The Nikola Two will be marketed in the North American market, with initial production expected in the first quarter of 2023.
>
> Production plans for the Nikola One will be announced once we have established a robust refueling infrastructure.[20]

157.   The statements referenced in ¶156 were false or misleading when made and omitted to reveal material facts necessary to not make them misleading. The Nikola One was at no time a functioning FCEV. It was never a viable product offering from Nikola. To date, the Nikola One is still not capable of moving under its own power and no

---

[20] *See* Proxy at 148.

51

development or production work has been done to make it so. After an abortive announcement and fraudulent video discussed in Sections I.A and I.B above, the Nikola One was abandoned by Nikola and not pursued as a product to be offered for sale or lease after 2016. Despite the fact the Nikola One was never capable of moving under its own power, the fraudulent video of a non-functioning Nikola One remained on Nikola's website until September 2020.

158.    The claims in the Proxy regarding the Nikola One are material because investors reading the statements would reasonably conclude that the Nikola One was a product offering from Nikola. A reasonable investor would think from the Proxy and the video being posted on Nikola's website that Nikola had a truck that could drive. Having a functional product offering bears directly on the value of Nikola, and the then prospective business combination with VectoIQ.

3.    *Class Period False and Misleading Statements by the Nikola Defendants*

159.    On June 15, 2020 Nikola filed a Form S-1 with the SEC to sell 76.39 million shares of common stock to the public (the "June 2020 S-1"). The June 2020 S-1 was signed by Defendants Milton, Girsky, Russell, Brady and Ubben.

160.    At pages 76-77, the June 2020 S-1 references the Nikola One as one of the Company's "product offerings." It also lists the capabilities of the Nikola One and Nikola Two in the same descriptive paragraph, claiming "Nikola's FCEVs have an estimated range of up to 400 to 750 miles, designed to address the medium and long-haul market." These statements were false and misleading when made and omitted to disclose the material fact that the Nikola One was abandoned as a potential product by the Company and it was a non-functioning and non-operational truck. It was materially misleading to estimate the mileage range of concept vehicles that were not yet in production and commercially tested.

Indeed, during Milton's criminal trial, Fretheim testified that the Nikola One was the "farthest from production" at the time the company went public in June 2020. Russell testified that he learned shortly after joining Nikola that the Nikola One was never developed and work on the project had been abandoned shortly after the vehicle's launch in December 2016, saying that by February of 2019, Nikola had "pivoted" from the Nikola One prototype and that it wasn't relevant by the time the merger with VectoIQ was announced. Russell further testified that he had multiple, daily conversations with Milton about the status of Nikola's products and technology.[21]

161.    On July 17, 2020, Nikola filed a form SEC Form S-1 in conjunction with a secondary public offering of common stock, consisting of 249,843,711 shares (the "July 2020 S-1"). The July 2020 S-1 was signed by defendants Milton, Girsky, Russell, Brady and Ubben.

162.    At pages 76 and 77 of the July 2020 S-1, under the heading "Nikola One and Two—Class 8 FCEV Trucks," Nikola stated, "The Nikola One (Class 8 sleeper cab) and Nikola Two (Class 8 day cab) are Nikola's FCEV trucks that are primarily designed for medium and long-haul applications . . . . Nikola's FCEVs have an estimated range of up to 400 to 750 miles, designed to address the medium and long-haul market . . . . Production plans for the Nikola One will be announced once we have established a robust refueling infrastructure." This statement was materially false and misleading because it spoke of the Nikola Two and Nikola One on the same terms, as though both are fully designed, fully functional vehicles, and the Nikola One is simply awaiting an established refueling infrastructure to enter production. For the reasons explained in Sections I.A and I.B above,

---

[21] Milton Tr. 979:20-25, ECF No. 224.

the Nikola One was a never-finished, never functional prototype whose development had been shelved after its unveiling in December 2016.

163.   On or about August 18, 2020, Nikola hosted a group of social-media influencers and content creators, including Tesla Joy, Lauren Kalo, and Sean Mitchell, to Nikola's headquarters for a guided tour and Q&A with Milton. The tour and interview were recorded by several of the participants, and recordings were subsequently posted publicly to YouTube, where they remained available to investors during the Class Period. On the recordings, Milton made several statements, including that the Nikola One was a "drivable truck"[22]:

> *[In 2016] we never put it under propulsion, but it was totally capable of driving, it had everything in it —power, steering, batteries—everything in it*, the e-axles, you know, in it. So, you know, this entire thing was designed to, uh… and the group that actually designed all of our e-axles with us in this vehicle was a group that Borg Warner eventually ended up buying…2016 is when we unveiled it. *So, this was totally capable of being driven.* We pulled all the parts out, displayed them to the public, and we got—I think you guys may have seen it, got hit with an article and said that the truck was a… was a lie and not really drivable truck. And there's some disgruntled employee that was feeding them fake stuff, um… guy named Jonathan, unfortunately…it was really hard for us because, like, no, it's totally drivable, we just didn't do it for safety.

164.   The statements referenced in ¶¶162-163163 were materially false and misleading for the reasons identified in ¶¶126, 143, 157, 160 and 168.

165.   On September 14, 2020, following the release of the Hindenburg Report, Nikola filed a form 8-K with the SEC ("the September 14 8-K") discrediting the

---

[22] Ty Kara, *HUGE NIKOLA TOUR OF FACTORY (Trevor Milton meets the people of Tesla Twitter*, YouTube (August 19, 2020), available at https://www.youtube.com/watch?v=MXU8UVANDJU (accessed February 21, 2021). Note that this video depicts clips from a series of videos originally posted by invitee Lauren Kalo to her Twitter account on August 18-19, 2020. Ms. Kalo appears to have subsequently deleted her entire Twitter history prior to September 22, 2020 — approximately the same time that Defendant Milton deleted his personal Twitter and Instagram accounts.

Hindenburg Report and dismissing its allegations as "false and misleading." The September 14 8-K was signed by Defendant Worthen, and the language was reviewed and approved of at a meeting of Nikola's Board of Directors which included Milton, Russell, Brady, Worthen, Ubben, and Girsky.

166.    In the September 14 8-K, Nikola again claimed "The Nikola One is a real truck that sits in Nikola's showroom." Nikola went further to claim that the Nikola One is not a "pusher" as alleged in the Hindenburg Report, because a "pusher means a vehicle not designed to be moved on its own propulsion system. The Nikola One was, in fact, *designed to be powered and driven by its own propulsion*. . . . The Nikola One was an *incredibly successful proof of concept*, and everything the Company learned from that experience has underpinned the successful development of its next generation of trucks that can be seen driven here." Nikola goes on to describe the functionality of the Nikola One:

> **Gearbox** was functional and bench tested prior to installation.
> **Batteries** were functional.
> **Inverters** functioned and powered the motors on a bench test prior to the show.
> **Power steering, Suspension, Infotainment, Air Disc Brakes, High Voltage, and Air Systems** were all functional.

167.    On September 14, 2020, contemporaneous with the September 14 8-K, at Cowen's 2020 Global Transportation & Sustainable Mobility Conference, Defendant Brady called the Hindenburg report a "hit job" that had "no substance to it," alleging it was "character assassination" of Defendant Milton.

168.    The statements referenced in ¶¶165-167 were materially false and misleading for the reasons identified in ¶¶126, 143, 157, and 160. The Nikola One's systems were powered via an electrical outlet in the floor that was plugged in for the entirety of its demonstration, and the only source of electrical power in what Nikola insisted on calling a

vehicle. As the SEC later revealed in its civil complaint: "(a) all electrical components were powered through a cord running from an external power source, ***rather than the truck's battery***; (b) neither the fuel cell nor the hydrogen gas storage tanks had been installed; (c) the ***air compressor and the turbine had not been commissioned***; (d) ***gearboxes had not been assembled, and certain parts necessary for assembly of the gear boxes had not arrived***; (e) the ***vehicle-level controls*** had not been completed; and (f) the ***human-machine interface, which Milton touted, consisted simply of off-the-shelf tablets set into a dashboard and were not integrated with the truck's systems***." Accordingly, it was false and materially misleading to state that the Nikola One's "**gearbox was functional,**" "**batteries were functional,**" "**Suspension** . . . **Infotainment . . . and Air Systems were all functional**" when these systems were not functional, or in some cases even installed. The Nikola One has never moved under its own power, at the demonstration show or after. Moreover, the Nikola One *never contained any hydrogen technology* and calling it a "successful proof of concept" was misleading by omitting to reveal this material fact. The Nikola One was originally "designed" to be a natural gas powered vehicle, and the Nikola One revealed in December 2016 was designed only to look like a functional truck, not to be powered and driven. In the words of one Nikola engineer, at the time of the December 2016 unveiling event, the Nikola One was "not even remotely ready to operate."

169.    Defendant Russell testified at Milton's criminal trial that he, Brady and Worthen confronted Milton in the summer of 2020 to curtail Milton from making misleading statements to investors.[23] At the time of the release of the Hindenburg Report, Russell testified that he, Brady and Worthen informed the Board at an emergency Board

---

[23] Milton Tr. 1126:13-21, ECF No. 225.

meeting that they were all prepared to resign from the Company after the release of the Hindenburg Report and they could no longer work at Nikola with Milton as an executive.[24]

170. It was materially false and misleading for Nikola to issue an 8-K terming the Hindenburg Report "false and misleading" when, simultaneously, Russell has testified he, Brady, and Worthen were informing the Board they would all resign because Milton was continuing to make false and misleading statements to investors. Moreover, Defendant Brady spoke with reckless disregard for the truth when he dismissed the Hindenburg Report as a "hit job" that had "no substance" at the Cowen conference. In fact, prior to dismissing the allegations as "character assassination," Brady himself, along with Worthen, had had conversations with Milton regarding his misstatements on social media. Defendant Worthen acted with reckless disregard for the truth when he signed the September 14 8-K terming the Hindenburg Report "false and misleading."

### D. Defendants' False and Misleading Statements Concerning the Nikola One Caused Investor Losses

171. On September 10, 2020, Hindenburg published the Hindenburg Report entitled, "Nikola: How to Parlay An Ocean of Lies Into a Partnership With the Largest Auto OEM in America." Asserting that it had gathered "extensive evidence—including recorded phone calls, text messages, private emails and behind-the-scenes photographs," Hindenburg represented that it had identified "dozens of false statements by" Milton, which had led Hindenburg to conclude that Nikola "is an intricate fraud built on dozen of lies over the course of . . . Milton's career." For example, concerning the functionality of the Nikola One, the Report alleged, *inter alia*:

> We reveal how, in the face of growing skepticism over the functionality of its truck, Nikola staged a video called "Nikola One in Motion" which showed

[24] Milton Tr. 1131:3-19, ECF No. 225.

the semi-truck cruising on a road at a high rate of speed. Our investigation of the site and text messages from a former employee reveal that the video was an elaborate ruse—Nikola had the truck towed to the top of a hill on a remote stretch of road and simply filmed it rolling down the hill. . .

We present behind-the-scenes photos showing that Nikola had an electricity cable snaked up from underneath the stage into the truck in order to falsely claim the Nikola One's electrical systems fully functioned. . . .

We learned through emails and interviews with former partners that Trevor had an artist stencil "H2" and "Zero Emission Hydrogen Electric" on the side of the Nikola One despite it having no hydrogen capabilities whatsoever; it was built with natural gas components. . . .

172.     On this news, Nikola's stock price fell $4.80 per share, or 11.33%, to close at $37.57 per share on September 10, 2020.

173.     On September 11, 2020, Nikola's stock price continued to fall, falling $5.44 per share, or 14.5%, to close at $32.13 per share on September 11, 2020.

174.     Various analysts (including those from S3 Analytics, Deutsche Bank Research, and RBC Capital Markets) issued reports attributing Nikola's stock price decline to the information revealed in the Hindenburg Report and specifically referenced the claims relating to the functionality of the Nikola One. This was new information that the stock market reacted to. Bloomberg Business News published a story on June 17, 2020 that Milton had exaggerated the "capabilities" of the Nikola One, that it was inoperable and missing key components to power itself. Milton refuted the Bloomberg News Story saying parts were taken out for safety reasons and that he "never deceived anyone." Nikola's stock price *rose* by $1.13 per share on June 17, 2020 and rose another $3.67 per share on June 18, 2020. Clearly, the Bloomberg Business News story did not correct any prior misrepresentations about the Nikola One.

175.     On September 14, 2020, before the market opened, Nikola unequivocally denied the allegations in the Hindenburg Report, asserting that the allegations themselves were "false and misleading," "false and defamatory," and "designed to provide a false

impression to investors and to negatively manipulate the market in order to financially benefit short sellers, including Hindenburg itself."

176.    The statements referenced in ¶175 were materially false and misleading for the reasons identified in ¶168 above. The Company has since admitted that many of the allegations in the Hindenburg Report were true.

177.    The September 14 8-K also claimed:

> Nikola described this third-party video on the Company's social media as "In Motion." It was never described as "under its own propulsion" or "powertrain driven." Nikola investors who invested during this period, in which the Company was privately held, knew the technical capability of the Nikola One at the time of their investment.

178.    As described in Sections I.A, and I.B above, Nikola repeatedly described the capabilities and status of the Nikola One in false or misleading terms to investors before and during the Class Period. The Nikola One was advertised to investors by Milton repeatedly and as a functional product in SEC filing as recently as July 17, 2020 S-1.

179.    On Nikola's fierce denials of any wrongdoing, Nikola's stock price increased $3.66 per share, closing at $35.79 on September 14, 2020, an 11.39% increase from its previous close on September 11, 2020.

180.    On September 14, 2020, after the market had closed, *Bloomberg* reported that the SEC was investigating Nikola in connection with the allegations in the Hindenburg Report, including those relating to the functionality of the Nikola One. The SEC eventually charged that the Nikola One was a non-functioning truck. See ¶168.

181.    In response to Nikola's denials, on September 15, 2020, Hindenburg Research issued a 25-page rebuttal report, which argued that Nikola had "debunked nothing" and had "either confirmed or sidestepped virtually everything we wrote about, and in some cases raised new unanswered questions."

182.   Also, on September 15, 2020, during intra-day trading, the *Wall Street Journal* reported that the DOJ had joined the SEC's investigation of Nikola. These investigations were subsequently confirmed by Milton's criminal conviction for violating the Federal Securities laws.

183.   On this news, Nikola's stock fell another $2.96 per share, closing at $32.83 on September 15, 2020, an 8.27% decline from its previous close on September 14, 2020.

184.   Both the SEC and DOJ investigations were triggered in part by and focused extensively on Defendants' statements regarding the functionality of the Nikola One, demonstrating that both actions were causally linked to Defendants' misstatements on this subject. The SEC complaint and DOJ indictment would ultimately assert, among other things, that the Nikola One unveiled in 2016 was inoperable and that the "in motion" video was faked. Accordingly, the SEC and DOJ investigations announced in September 2020 were caused, in part, by Defendants' misstatements and omissions related to the Nikola One, as the agencies later confirmed.

185.   On Sunday, September 20, 2020, the relevant truth and foreseeable risks concealed by Defendants' misconduct and false representations and omissions regarding the Nikola One materialized when Nikola announced that Milton had resigned from his position as Executive Chairman and from the Board of Directors.

186.   Following the Hindenburg Report's release, Nikola's Board of Directors held a flurry of meetings on September 11, 2020, September 13, 2020, September 15, 2020, September 16, 2020, September 18, 2020, and September 20, 2020. The Board discussed Milton's use of social media, the SEC and DOJ investigations, and the Hindenburg Report at these meetings. Milton tendered his resignation at the last of these meetings, on September 20, 2020. Milton's resignation was directly caused by his false and misleading

statements—particularly those made on social media, which frequently misrepresented the Nikola One's functionality and the Company's order book. *CNN* reported on September 21, 2020, that as part of his separation agreement, Milton agreed to "revise any references to the positions he held at Nikola on his social media profiles so it's clear he no longer holds them. He also agreed to check with lawyers for Nikola before posting anything about the company." Milton also surrendered 4.9 million performance-based stock units he had been granted in August 2020 and a two-year consultancy option worth $20 million.

187.    The September 20, 2020 resignation, and the widely reported related news coverage was a foreseeable consequence of and within the zone of the risk concealed by Defendants' misrepresentations and omissions. For example, *Ars Technica* reported on September 21, 2020 that Milton's decision to resign came in after the Hindenburg Report's "bombshell" revelations, including that "Milton wasn't telling the truth in 2016 when he unveiled the company's first product, the Nikola One" and the related government investigations, "put Nikola's management under immense pressure."

188.    Milton's resignation also partially revealed the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions regarding the Nikola One as it was the first tacit acknowledgement by the Company that the Hindenburg Report was credible. The market therefore understood Milton's resignation to be a revelation of fraud and reacted accordingly. Nikola later admitted that Milton had made misstatements about the Nikola One's functionality, confirming that the market's understanding was correct.[25]

---

[25] *See Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) (citing *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016)) (explaining that loss causation can be found where market understands event to be caused by fraud even absent contemporaneous admission of fraud when later revelations confirm market's understanding).

189.    Milton's resignation was also a materialization of the risk concealed by Defendants' false statements discrediting the Hindenburg Report and defending Milton, including the September 14, 2020 Press Release and Form 8-K which falsely asserted that the Nikola One had several working components, such as gearboxes and infotainment systems, that it lacked. Defendants' unequivocal defense of Milton misled investors about the risks related to Milton's misstatements by insisting that the Hindenburg Report's claims regarding Milton, including those asserting Milton misled investors regarding the Nikola One, were "false and misleading." These statements masked the risk that Milton would have to depart Nikola— a risk Nikola explicitly warned could have dire consequences for the Company in its SEC filings, which stated:

> We are highly dependent on the services of Trevor R. Milton, our Executive Chairman, and largest stockholder. Mr. Milton is the source of many, if not most, of the ideas and execution driving Nikola. If Mr. Milton were to discontinue his service to us due to death, disability or any other reason, we would be significantly disadvantaged.

This risk, which Defendants obscured in their denials that Milton had engaged in any misconduct that could lead to his departure, were partially realized by the announcement of Milton's resignation just days later. As one analyst stated in a *CNBC* interview: "Let's call it like it is. Trevor leaving. I mean he's a key part of the vision." Another analyst called it a "dark day for Nikola." A third said: "This will come as a shock to the big crowd of believers in the company and its founder. We expect heavy selling…"

190.    On the news of Milton's resignation, Nikola's stock fell another $6.60 per share, closing at $27.58 on Monday September 21, 2020, a 19.33% decline from its previous close on Friday September 18, 2020. The timing and magnitude of the Nikola common stock price decline demonstrates the impact Defendants' statements had on the Company's stock price and negates any inference that the loss suffered by investors was

caused by changed market conditions or macroeconomic, industry, or Company-specific factors unrelated to Defendants' fraudulent conduct.

191.    On February 25, 2021, after the close of trading, Nikola filed its Form 10-K for the year ended December 31, 2020. In the filing, Nikola admitted that the following statements concerning the Nikola One and reservations for Nikola's FCEV's were "**inaccurate in whole or in part, when made**" (emphasis added):

> (a)    in August 2016, Milton and the Company stated that the Company had engineered a zero emissions truck;
>
> (b)    in December 2016, Milton stated that the Nikola One was a fully functioning vehicle;
>
> (c)    that an October 2017 video released by the Company gave the impression the Nikola One was driven;
>
> (d)    in July 2020, Milton stated that five trucks were "coming off the assembly line" in Ulm, Germany.

192.    This news was widely reported to the market.  For example, on February 25, 2021, *CNBC* published an article entitled "Nikola admits ousted chairman misled investors as legal costs mount" that went on to explain "Milton and the company previously denied many of the claims in the report."

193.    As *CNBC* suggested, the February 25, 2021 10-K revealed not only that Milton's statements were incorrect, but that Defendants' unequivocal denials of the Hindenburg Report, including the September 14, 2020 press release, were false and misleading. In a reversal, Nikola acknowledged that the Hindenburg Report had been largely accurate and it was materially misleading to claim that the Hindenburg Report was "false and misleading" and designed to deceive investors.

194.    Moreover, the February 25, 2021 disclosures revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously

concealed and/or obscured from the market by authoritatively conceding that Nikola had not engineered a zero emissions truck in 2016, the Nikola One did not function, the "in motion" video gave a false impression, and that trucks were not "coming off the assembly line" in July 2020.

195.   On the news of Nikola's February 25, 2021 10-K, Nikola's stock fell another $1.62 per share, closing at $18.10 on February 26, 2021, an 8.22% decline from its previous close on February 25, 2021.

196.   On July 29, 2021, the relevant truth and foreseeable risks concealed by Defendants' misconduct and false representations and omissions were revealed and materialized when numerous news outlets reported that Milton had been indicted on three counts of fraud by the U.S. Attorney's Office in Manhattan for making deceptive and false claims to investors regarding "nearly all aspects of the business." The indictment said that, from November 2019 to September 2020, Milton schemed to defraud investors into buying Nikola shares through statements about the Company's product and technology development. The SEC also filed related civil charges. Both the criminal indictment and SEC charges included specific reference to false claims about the Nikola One. In response to the indictment, Milton stated that they were "false allegations."

197.   The July 29, 2021 announcement of the indictment and the related news coverage reporting on Nikola's representations about its production capabilities, products, technological advancements, and commercial prospects, was a foreseeable consequence of, and within the zone of the risk concealed by Defendants' misrepresentations and omissions. The DOJ and SEC actions were, to a large degree, premised on Milton's misstatements regarding the Nikola One.

198.    Moreover, the July 29, 2021 disclosures revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market. For example, the SEC complaint revealed that the Nikola One lacked a functional gearbox, air system, infotainment, and other components, despite Defendants' earlier representations to the contrary on September 14, 2020.

199.    On this news, Nikola's stock fell another $2.16 per share, closing at $12.03 on July 29, 2021, a 15.22% decline from its previous close on July 28, 2021. Nikola's stock continued to steadily decline another $1.88 per share, or 15.62%, over the next several days to close at $10.15 per share on August 5, 2021, as investors absorbed the lengthy and detailed indictment and SEC complaint, which totaled over 100 pages.

200.    Ultimately, evidence and testimony concerning Defendant Milton's false claims as to the functionality of the Nikola One were presented in the course of Milton's criminal trial which resulted in a conviction for violations of the Exchange Act, among other counts.

## II.    Defendants Misled Investors Regarding the Nature of Nikola's Purported Backlog of Reservations

### A.    Defendants Suggested Nikola's Reservations Were Worth Billions When They were Mere Expressions of Interest in a Product the Company Had Never Developed and Had Abandoned

201.    Beginning in or about May 2016, Nikola began taking reservations for the delivery of the Nikola One in connection with its announced development. Nikola originally required deposits to make a reservation, ranging from $1 to $1,500.

202.    Milton was personally involved in soliciting reservations from several potential customers.   He communicated to potential customers that the reservations were cancellable for any reason at any time.  For example, on May 9, 2016, as part of his efforts

to secure the largest reservation Nikola had received to-date, Milton wrote to a potential customer, "[y]ou have full ability to cancel at any time before the options, color and major deposit is made . . . ." He went on to note to the same reservation holder on three separate occasions that the reservation was cancellable, even going so far to note "you can cancel at any time and get [the deposit] back all the way up to the final order . . . ." Another time, Milton cited the non-binding nature of the reservations in an attempt to convince a potential customer to double the amount of reservations in which the customer was originally interested.  Milton wrote to this party, "[y]ou had asked for 50 trucks that would have been $500 for each deposit.  What I did since it is fully refundable at any time, is put you down for 100 at $250.  You can cancel at anytime any of those."

203.    In April 2018, Nikola refunded all deposits and ceased requiring deposits for reservations of the Nikola One.  Nikola has publicly represented, including in its SEC filings, that it has approximately 14,000 reservations projected to fill at least 2-3 years of production and representing billions of dollars in future revenue. As a pre-revenue company, Nikola consistently emphasized to potential investors that its pre-order book, which it characterized as a "backlog of interest," was a sign that the company was primed for profitability in the near future based on interest in its flagship FCEV semi-truck product. The majority of the reservations were made for the Nikola One, which the Company had abandoned shortly after its December 2016 "unveiling."

204.    Defendants repeatedly pointed to these reservations as demonstrating interest in Nikola's planned semi-trucks worth billions in expected revenues over several years.

205.    Defendant Milton, for example, repeatedly misstated the nature of Nikola's reservations to suggest that the reservations are firm and binding (even after Nikola had abandoned its plans for the Nikola One), giving an exaggerated and inaccurate impression

that Nikola had a predictable and committed future stream of revenue.  Nikola was not sold out of any trucks, nor was it building or capable of building the trucks to fulfill orders.

206.   For example, on or about June 1, 2020, in a podcast interview, Milton stated,

*We don't build on speculation; we build on orders*.  We're very similar to like Airbus or Boeing where *we're sold out for many, many years.  We're the only company in the world that is sold out for many, many years . . . It's all based on orders.  I think that's the reason Nikola is worth so much money today.*

**B.     Defendants' False and Misleading Statements Concerning Demand for the Nikola One**

*1.     Pre-Merger False Statements Concerning the Purported Backlog of Orders*

207.   On December 18, 2019, in an interview with Liz Claman on Fox Business channel, Milton claimed that after the Nikola One was unveiled in 2016: "Within about 4 months the market saw the traction we got because we got billions of dollars in orders…" He continued, stating "at $14 billion worth of orders we essentially stopped taking orders because we were sold out for five plus years…"

208.   The statement referenced in ¶207 was materially false and misleading because by the time of the statement the development of the truck had been abandoned for years. Additionally, the "$14 billion" in orders were, in fact, mere non-binding expressions of interest in products that the Company had no capacity to manufacture or sell.

*2.     False and Misleading Statements After The Merger Is Announced But Before Nikola Begins to Publicly Trade on NASDAQ By the Nikola and VectoIQ Defendants*

209.   On March 3, 2020, VectoIQ filed a Form 8-K (the "March 3 8-K") with the SEC that included the transcript of a "merger announcement conference call." During the call, Defendant Girsky emphasized "Nikola's. . . history of successfully winning customer orders" claiming "[t]he current fuel cell electric reservations, which come in at over $10

billion, are proof of how badly the market is seeking a solution like Nikola's." On the same call, Defendant Brady stated, "Our fuel cell electric truck reservations/orders stand at over $10 billion today assuming we convert those to contracts when delivery dates are guaranteed to fleets . . . With the first three years of manufacturing capacity already booked, we have good visibility into future performance . . . As we reach one year from delivery, we anticipate receiving significant deposits towards the fuel cell electric trucks from those customers."

210.   The statements referenced in ¶209 were false and misleading when made because the reservations were non-binding expressions of interest for Nikola Ones, a product the Company had already abandoned and which could not possibly be delivered in a year as Nikola's former Head of Development, Elizabeth Fretheim testified in the course of Milton's criminal trial. Defendant Russell confirmed he knew as much, testifying that by February of 2019, Nikola had "pivoted" from the Nikola One prototype and that it wasn't relevant by the time the merger with VectoIQ was announced. Yet, Girsky and Brady misleadingly claimed that Nikola had billions in orders for a truck that Nikola had abandoned.

211.   On March 4, 2020, in an interview with *CNBC*, Defendants Milton and Ubben discussed Nikola going public via SPAC to gain access to retail investors, as well as the Company's purported technology. Defendant Milton claimed the reason Nikola opted for going public via SPAC was: "We'll be sold out for quite a few years so we needed access to the markets as fast as possible . . . . We needed to expedite the factory build [in Phoenix]." Ubben emphasized the Company's focus on going "public early rather than to go public late when you have all this VC money that's marked the stock up and to let the

smaller – the small guy, the retail investor participate in the growth of this company and the industry . . ."

212.   The statements referenced in ¶211 were materially false and misleading because, at the time they were made, Nikola had no functional hydrogen electric trucks or battery electric trucks available for sale, and development of the Nikola One had been abandoned for years. Ubben's emphasis on retail investors underscores his willing participation in the scheme as described below in ¶¶731-835.

213.   On March 13, 2020, VectoIQ filed a prospectus on Form S-4 with the SEC signed by Milton, Girsky, and Shindler. The S-4 contained materially false and misleading statements and omitted to disclose material facts necessary to make the statements made therein not misleading.

214.   As justification for the merger, the S-4 represented that "VectoIQ's management and board of directors considered the fact that Nikola has a high volume of fuel cell electric vehicle pre-orders, currently at over $10 billion." This statement was false and materially misleading as these were not "pre-orders" but expressions of interest to purchase products, the majority of which were for the Nikola One that was no longer in development, and for products, FCEVs, for which commercial viability was not achievable at the time.

215.   On April 3, 2020, VectoIQ filed an 8-K with the SEC (the "April 6 8-K") in anticipation of its "Analyst Day" event scheduled for April 6, 2020. Defendant Shindler signed the April 6 8-K. Included in filing were slides for the "Analyst Day Presentation." The Presentation contained multiple slides emphasizing "+14,000 FCEV truck reservations to-date ($10B sales value)" and claims including "Nikola has over 14,000 FCEV truck pre-orders…"

216.    The statements referenced in ¶215 were materially false and misleading because, as confirmed by Fretheim's testimony during the course of Milton's criminal trial, the FCEV truck pre-orders referenced in each slide were mere expressions of interest, not binding sales order, for products that the Company had either abandoned or never developed and had no capacity to develop, manufacture, or sell.

217.    The April 6 8-K also describes Nikola's reservation book. It includes "~7900" trucks ordered in 2016.[26] In 2016, Nikola's only announced product was the Nikola One. As discussed above, and in Sections I.A and I.B, the Nikola One was, at no time, a functional product offering with a plan for production. The April 6 8-K lists a total of "~14,000" reservations for FCEV vehicles. This includes at least ~7,900 for the inoperable and abandoned Nikola One. At least half of the total number of reservations used by Nikola to market itself to investors published by VectoIQ in the April 6 8-K were for a product that did not exist.  The 14,000 reservations were also merely expressions of interest from potential customers and not orders. Elizabeth Fretheim testified in the course of Defendant Milton's criminal trial that the reservations were not binding orders, and that 78 percent of the orders as of June 2019 were for the Nikola One—a product the company had abandoned that was the farthest away from production at the time the Company went public. The April 6 8-K omitted to reveal that the 14,000 reservations were not actual orders but expressions of interest in products that were either abandoned in the case of the Nikola One, or products that were not yet operational and ready for commercial sale.  This statement is also materially misleading as it purports to represent reservations to sell products worth "$10B" as of April 6 8-K.[27]

---

[26] *See* April 6 8-K at 40.

[27] *See* April 6 8-K at 9.

218.    On April 9, 2020, Nikola posted a video of its April 6 Investor Day on the Company's YouTube channel in which Milton made the following statement referring to the Nikola One: "We launched the truck in 2016 to the world and at that point when it came out we racked up billions of dollars of pre-orders."

219.    The statement referenced in ¶218 was materially false and misleading because, as confirmed by the testimony of Fretheim, the FCEV truck pre-orders referenced in each slide were mere expressions of interest, not binding sales orders, for products that the Company had either abandoned or had never developed and had no capacity to develop, manufacture, or sell.

220.    On or about June 1, 2020, in an interview on *The Casey Adams Show* podcast, Milton stated,

> **We don't build on speculation; we build on orders.**  We're very similar to like Airbus or Boeing where **we're sold out for many, many years.  We're the only company in the world that is sold out for many, many years . . . It's all based on orders.  I think that's the reason Nikola is worth so much money today.**[28]

221.    The statements referenced in ¶220 were materially false and misleading because Defendants failed to disclose, as admitted in the USAO Presentation: (i) all the reservations except for an 800-truck order were non-binding, fully cancellable indications of interest, (ii) anyone could make a "reservation" through Nikola's website, (iii) Nikola made no attempts to contact each reservation-holder to determine the legitimacy of individual reservations, and (iv) over 35% of Nikola's reservations (5,000 trucks valued at approximately $3.5 billion) were by U.S. Xpress, which had only $1.3 million in cash on

---

[28] The Casey Adams Show, *Trevor Milton-Billionaire CEO of Nikola Motor—creating Hydrogen Powered Trucks*, available at https://anchor.fm/caseyadams/episodes/Trevor-Milton---Billionaire-CEO-of-Nikola-Motor--Creating-Hydrogen-Powered-Trucks-edl5er. This episode is currently publicly available online and was available to investors throughout the Class Period.

1    hand and Nikola internally recognized it was "doubtful" that US Xpress planned to

2    purchase the 5,000 vehicles as a bulk order.

3        3.    *False and Misleading Statements Concerning the Purported Backlog
              of Orders During the Class Period*

4    222.   On June 15, 2020 Nikola filed the June 2020 S-1. The June 2020 S-1 was

5    signed by defendants Milton, Girsky, Russell, Brady and Ubben.

6    223.   At pages 12-13 of the June 2020 S-1, Nikola stated, "as of December 31,

7    2019 we had reservations for 14,000 Nikola Two FCEV trucks." This statement was

8    materially false and misleading as, during Milton's criminal trial, Fretheim testified that

9    that claim was inaccurate and that 78% the reservations were, in fact, for the Nikola One,

10   which had been abandoned by the Company by that time and was, according to Fretheim's

11   testimony, the farthest from production at the time of the June 2020 S-1. Just 6% of the

12   reservations represented by the 14,000 figure were for the Nikola Two, with the remaining

13   16% being for the Nikola Tre. Nonetheless, the Company portrayed the same book of

14   orders it had previously touted for the Nikola One as current orders for the Nikola Two.

15   224.   At page 81 of the June 2020 S-1, Nikola stated, "The current backlog of over

16   14,000 FCEVs non-binding reservations represents more than two years of production and

17   over $10 billion of potential revenue. The FCEV reservation book was frozen in the fall of

18   2019 in order for Nikola to focus on negotiating with strategic fleet partners for launch."

19   This statement was materially false and misleading for the reasons stated in ¶¶221 and 223.

20   225.   As further noted in ¶223, the use of the 14,000 FCEV backlog figure was

21   false and misleading. Earlier uses of the 14,000 reservations figure in the April 6 8-K and

22   Proxy included the "~7900" reservations made in 2016 for the Nikola One. The reference

23   to reservations for the Nikola One as an indication of demand is false and misleading

24   because the Nikola One did not exist and has never existed as a product for sale. Demand

25

26                                          72

for a non-existent product is not demand at all, potential or otherwise. There is no indication from the S-1 that the 14,000-reservation figure used here removed any of the previously counted reservations from the Nikola One. As it is the same number used in the April 6 8-K and Proxy, and no communication or filing from Nikola indicated a new reservation or change in the reservation list since the April 6 8-K and Proxy, a reasonable investor would assume it described the same reservations. Fretheim testified during Milton's criminal trial that the reservations reported in the June 2020 S-1 were inaccurate because only 6% were for the Nikola Two—78% were for the Nikola One.

226.   On or about July 31, 2020, Milton had the following exchange on the *This Week in Startups* podcast regarding Nikola's truck reservations:

MILTON: Our margins are gigantic, and ***we have ten billion doll – ten – over ten billion dollars in preorder reservations like, like customers signed ready for us to deliver them trucks*** and it's –

HOST: Letters of intent.

MILTON: – it's just a great.

HOST: – these are people who want to have -- what -- and why do those trucks – why do those shippers want to switch off diesel? Is it because of – they have goals in terms of greenhouse gases or is it they see this as the future and they wanna invest in it or is it cost?

MILTON: No, real quick, I wanna correct something. ***Not letter of intents, they're actually contracts***. We've got –

HOST: Contracts, got it.

MILTON: ***Yeah, billions and billions of dollars with the contracts***. So I want to be clear about that 'cause ***a lot of people have thought that it's just like, a non-committal thing, it's not. These are like, sign on the dotted line, billions and billions and billions and billions of dollars in orders.*** Now, we have to deliver, and they can get out if we don't deliver, but that's how it is with any contract you do in life, like –

HOST: Right.

227.   The statements referenced in ¶226 were materially false and misleading for the reasons identified in ¶¶221 and 223.

73

228.    On August 4, 2020 Nikola filed its first Form 10-Q as a public company with the SEC for the period ending June 30, 2020 ("Q2 2020 10Q"). The Q2 2020 10Q, which Defendants Russell and Brady signed, contained false and misleading statements and omitted to disclose material facts.

229.    With regard to orders for its FCEV trucks, *i.e.*, the Nikola One, Nikola represented that it "[i]n 2019, we stopped soliciting FCEV reservations." It continued that it "consider[s] the reservation list as an indication of potential demand rather than backlog for pending vehicle sales, as customers have not made firm commitments to order and take deliveries of vehicles and may cancel such reservations at any time."[29] Earlier in the Q2 2020 10-Q, however, Nikola represented that "we expect the size of our committed backlog to be an important indicator of our future performance."[30]

230.    Nikola's efforts to inform investors that its FCEV reservations were merely indications of potential demand were materially misleading. First, Nikola omitted to reveal that it did not have a working FCEV vehicle, that it had no ability to create hydrogen, much less on a commercially viable scale, and that it had no ability to build its hydrogen fueling stations, without which no customer would purchase or lease an FCEV. This representation also directly conflicts with Milton's representations, just days earlier, where he said: "these are actual contracts" and that "[t]hese are like, sign on the dotted line, billions and billions and billions and billions of dollars in orders." Second, Nikola misled investors by claiming its "backlog" was an important indicator of our future performance when, in fact, Nikola did not have the ability to create its FCEV model because of its inability to produce hydrogen at a cost-effective price and no ability to build its fueling stations.

---

[29] Q2 2020 10-Q at 37.

[30] *Id.* at 26.

74

231.    In an earnings call on August 4, 2020 in connection with the Q2 2020 10-Q, Russell stated, "our fuel cell electric truck reservation book exceeded 14,000 units or approximately $10 billion in potential revenue some time ago."

232.    The statement referenced in ¶231 was false or misleading for the reasons set forth above in ¶¶216, 219, 221 and 223—the reservations were, in truth, mere non-binding expressions of interest for products that the Company had either abandoned or had no capacity to develop, manufacture or sell. 78% of the "reservations" were for the Nikola One, which Russell knew by February 2019 was no longer being developed.

233.    Milton further clouded the true nature of the reservations by touting that the Company's production facilities were "sold out" for many years.   For example, in an interview on *Cheddar News* on or about August 5, 2020, in response to a question about how the pandemic impacted Nikola's order list, Milton claimed:

> Actually, as a matter of fact, you seen them increase. And I think they're – which is really strange. At first I thought, oh, man, I wonder what this is going to do to – to – you know, to the – to everything. I had no idea. I don't think anyone knew, right? And the orders actually came in – they've come in bigger and stronger, and ***we've had to turn a lot of people away. So for our hydrogen truck, we – we essentially have to pick and choose who we can work with because we're sold out for so many years.***

234.    The statements referenced in ¶233 were materially false and misleading for the reasons identified in ¶¶221 and 223.

C.    **Defendants False and Misleading Statements Concerning the Purported Backlog of Orders Caused Investor Losses**

235.    As set out above, on September 10, 2020, Hindenburg published the Hindenburg Report identifying "dozens of false statements by" Milton.  For example, concerning Nikola's reservations, the Report alleged, *inter alia*:

> Nikola's much-touted multi-billion dollar order book is filled with fluff. U.S. Xpress reportedly accounts for a third of its reservations, representing ~$3.5

billion in orders. U.S. Xpress had only $1.3 million in cash on hand last quarter.

236.    On this news, Nikola's stock price fell $4.80 per share, or 11.33%, to close at $37.57 per share on September 10, 2020.

237.    On September 11, 2020, Nikola's stock price continued to fall, falling $5.44 per share, or 14.5%, to close at $32.13 per share on September 11, 2020.

238.    Various analysts (including those from S3 Analytics, Deutsche Bank Research, and RBC Capital Markets) issued reports attributing Nikola's stock price decline to the information revealed in the Hindenburg Report, including those concerning the true status of the Nikola's purported backlog of orders.

239.    On September 14, 2020, before the market opened, Nikola unequivocally denied the allegations in the Hindenburg Report, asserting that the allegations themselves were "false and misleading," "false and defamatory," and "designed to provide a false impression to investors and to negatively manipulate the market in order to financially benefit short sellers, including Hindenburg itself."

240.    The Company has since admitted that many of the allegations in the Hindenburg Report were true.

241.    On Nikola's fierce denials of any wrongdoing, Nikola's stock price increased $3.66 per share, closing at $35.79 on September 14, 2020, an 11.39% increase from its previous close on September 11, 2020.

242.    On September 14, 2020, after the market had closed, *Bloomberg* reported that the SEC was investigating Nikola in connection with the allegations in the Hindenburg Report.

243.    In response to Nikola's denials, on September 15, 2020, Hindenburg Research issued a 25-page rebuttal report, which argued that Nikola had "debunked

nothing" and had "either confirmed or sidestepped virtually everything we wrote about, and in some cases raised new unanswered questions."

244. Also, on September 15, 2020, during intra-day trading, the *Wall Street Journal* reported that the DOJ had joined the SEC's investigation of Nikola.

245. On this news, Nikola's stock fell another $2.96 per share, closing at $32.83 on September 15, 2020, an 8.27% decline from its previous close on September 14, 2020.

246. Both the SEC and DOJ investigations were triggered in part by and focused extensively on Defendants' statements regarding Nikola's reservations, demonstrating that both actions were causally linked to Defendants' misstatements on this subject. The SEC complaint and DOJ indictment would ultimately assert, among other things, that Nikola's order book was not full of binding reservations worth billions of dollars and that the Company was not "sold out" for many years. Accordingly, the SEC and DOJ investigations announced in September 2020 were caused, in part, by Defendants' misstatements and omissions related to the Nikola One, as the agencies later confirmed.

247. On Sunday September 20, 2020, the relevant truth and foreseeable risks concealed by Defendants' misconduct and false representations and omissions regarding the Nikola One materialized when Nikola announced that Milton had resigned from his position as Executive Chairman and from the Board of Directors.

248. Milton's September 20, 2020 resignation, and the widely reported related news coverage was a foreseeable consequence of and within the zone of the risk concealed by Defendants' misrepresentations and omissions. Milton's resignation also partially revealed the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions regarding the Nikola One as it was the first tacit acknowledgement by the Company that the Hindenburg Report was credible. The market therefore understood

Milton's resignation to be a revelation of fraud and reacted accordingly. Milton's resignation was also a materialization of the risk concealed by Defendants' false statements discrediting the Hindenburg Report and defending Milton, including the September 14, 2020 Press Release.

249.    On the news of Milton's resignation, Nikola's stock fell another $6.60 per share, closing at $27.58 on Monday September 21, 2020, a 19.33% decline from its previous close on Friday September 18, 2020. The timing and magnitude of the Nikola common stock price decline demonstrates the impact Defendants' statements had on the Company's stock price and negates any inference that the loss suffered by investors was caused by changed market conditions or macroeconomic, industry, or Company-specific factors unrelated to Defendants' fraudulent conduct.

250.    On February 25, 2021, after the close of trading, Nikola filed its Form 10-K for the year ended December 31, 2020. In the filing, Nikola admitted that statements concerning the Nikola One and reservations for Nikola's FCEV's were "inaccurate in whole or in part, when made:"

251.    This news was widely reported to the market.  For example, on February 25, 2021, *CNBC* published an article entitled "Nikola admits ousted chairman misled investors as legal costs mount" that went on to explain "Milton and the company previously denied many of the claims in the report."

252.    As *CNBC* suggested, the February 25, 2021 10-K revealed not only that Milton's statements were incorrect, but that Defendants' unequivocal denials of the Hindenburg Report, including the September 14, 2020 press release, were false and misleading. In a reversal, Nikola was now acknowledging that the Hindenburg Report had been largely accurate.

78

253.   Moreover, the February 25, 2021 disclosures revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market.

254.   On the news of Nikola's February 25, 2021 10-K, Nikola's stock fell another $1.62 per share, closing at $18.10 on February 26, 2021, an 8.22% decline from its previous close on February 25, 2021.

255.   On July 29, 2021, the relevant truth and foreseeable risks concealed by Defendants' misconduct and false representations and omissions were revealed and materialized when numerous news outlets reported that Milton had been indicted on three counts of fraud by the U.S. Attorney's Office in Manhattan for making deceptive and false claims to investors regarding "nearly all aspects of the business." The indictment said that, from November 2019 to September 2020, Milton schemed to defraud investors into buying Nikola shares through statements about the Company's product and technology development. The SEC also filed related civil charges. Both the criminal indictment and SEC charges included specific reference to false claims about Nikola's reservations. In response to the indictment, Milton stated that they were "false allegations."

256.   The July 29, 2021 announcement of the indictment and the related news coverage reporting on Nikola's representations about its production capabilities, products, technological advancements, and commercial prospects, was a foreseeable consequence of, and within the zone of the risk concealed by Defendants' misrepresentations and omissions. The DOJ and SEC actions were, to a large degree, premised on Milton's misstatements regarding the Nikola One and the value of the Company's purported backlog of reservations. Moreover, the July 29, 2021 disclosures partially revealed the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions regarding

Nikola's reservations. The disclosures revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market and confirmed the market's understanding of the fraud.

257.   On this news, Nikola's stock fell another $2.16 per share, closing at $12.03 on July 29, 2021, a 15.22% decline from its previous close on July 28, 2021. Nikola's stock continued to steadily decline another $1.88 per share, or 15.62%, over the next several days to close at $10.15 per share on August 5, 2021, as investors absorbed the lengthy and detailed indictment and SEC complaint, which totaled over 100 pages.

258.   Evidence and testimony concerning Defendant Milton's false claims concerning Nikola's purported backlog of reservations were presented in the course of Milton's criminal trial which resulted in a conviction for violation of the Exchange Act.

## III.   Defendants Misled Investors Regarding the Company's Hydrogen Production, Dispensing, Readiness, Costs, and Capabilities

### A.   Background on Nikola's Hydrogen Production and Dispensing Plans

259.   A key aspect of Nikola's business plan is its planned development of hydrogen production and fueling station infrastructure to support its FCEV trucks. Hydrogen vehicles faced what Nikola called the "chicken and the egg" problem: FCEV trucks were not feasible until there was somewhere to fuel them, but at the same time hydrogen fueling stations would not be viable until hydrogen-powered vehicles hit the roads. Nikola purported to have solved this problem by simultaneously offering both FCEV trucks and hydrogen fueling stations. Nikola represented that it offered "bundled leases" to its customers, through which customers could pay a single lease covering the cost of the Nikola truck, hydrogen fuel, and service and maintenance for the truck. Nikola told investors that this model would result in a lower total cost of ownership for trucking customers as compared to traditional diesel vehicles.

260.    Nikola therefore needed to produce, dispense, and store tens of millions of kilograms of hydrogen each year to support the trucks that it projected to put on the road and would need to construct a network of hundreds of hydrogen fueling stations.  To do so, Nikola represented to investors that it intended to produce hydrogen via electrolysis, a process that uses electricity to split water into hydrogen and oxygen.  However, producing Nikola's projected amount of hydrogen via electrolysis would require a massive amount of electricity.  In fact, Nikola has projected that, when its hydrogen station network is fully built out, this network would annually consume approximately 5 percent of all electricity consumed in the United States today.  Because the cost of electricity is the most significant cost input for operating the machines that create hydrogen, known as electrolyzers, the profitability of Nikola's business model has been and is highly dependent on Nikola's ability to acquire electricity at a price that would permit Nikola to produce hydrogen cheaply enough to make its leases economically viable to its customers—that is, a price that would let it sell hydrogen at comparable rates to diesel.

261.    Equally important for the viability of Nikola's business model was the ability of its hydrogen stations to quickly and reliably dispense hydrogen. A conventional semi-truck can refuel with diesel in approximately 10-15 minutes. To truly be competitive with diesel, Nikola knew it would have to offer electric semi-trucks with similar recharging or refueling times. The longer it takes a vehicle to recharge or refuel, the more it costs a trucking fleet in lost time and money. Because BEVs' long recharging times made them impractical for long-haul trucking operations, Nikola decided to develop FCEVs and hydrogen stations instead, which theoretically could dispense fuel at a comparable rate to a diesel station.

**B.     Nikola Defendants' Fraud Concerning Nikola's Hydrogen Production and Dispensing Capabilities**

262.   While Milton was CEO and Executive Chairman (2015-September 2020), Nikola: (i) never produced a single kilogram of hydrogen, (ii) did not have a station permitted to produce hydrogen, (iii) had not leased or purchased any land, or even selected any specific sites, on which to construct hydrogen stations, (iv) did not have any contracts signed with any electricity providers and had learned that electricity in its target market would cost three times more than the price Nikola needed in order to make hydrogen fuel economically feasible, (v) was unable to achieve refueling times shorter than 45-80 minutes at its Phoenix demonstration station, and (vi) was only able to operate its Phoenix demonstration station 21% of the time. In fact, Nikola did not even expect to have blueprints for its stations completed before September 30, 2020, and by October 2020 it was still unsure as to whether it would produce hydrogen onsite at its stations or pivot to a new business model of liquefying hydrogen at a "hub" location and shipping it out to the fueling stations. During this time, Nikola had only developed internal financial models that included electricity price targets necessary for Nikola to produce hydrogen at a level that would be commercially viable for Nikola to sell its FCEV trucks and ever reach future profitability. Yet as early as March 2020, Nikola's infrastructure team advised the executives that these models were unachievable, and that Nikola would incur costs that were triple (and in terms of Capital Expenditures for liquefication, tenfold) the Company's targets for viability.

263.   The only hydrogen station Nikola had during Milton's tenure was a dispensing-only hydrogen fueling station at its Phoenix, Arizona headquarters, which it built in April 2019. Because the City of Phoenix had denied Nikola a permit to install electrolyzers in 2018, the station was not capable of producing hydrogen. The hydrogen

used to stock that station was not produced by Nikola but was instead acquired from an outside vendor, Air Liquide, which did not use renewable or emission-free energy to produce its hydrogen.

264. The dispensing-only "demo station" in Phoenix was notoriously unreliable. The station was plagued with operational problems, including an inability to adequately and reliably cool and compress the hydrogen. Additionally, many of the station's components were not built to withstand the extreme heat in Phoenix. As a result of these technical issues, the station was only operable 21% of the time throughout 2020. When the station was operational, refueling Nikola's FCEV prototypes would take an excessively long time: 45-80 minutes, depending on how close to empty the truck was when it came in.

265. In February 2020, despite being previously informed of the lack of authorization from the City of Phoenix in a December 2018 email, Milton asked employees to create plans to install electrolyzers at Nikola's headquarters because "this will give us a complete system that works on site we can show investors." Nikola personnel notified Milton via email in March 2020 that installing electrolyzers "will take 5-6 months to get the site permitted for hydrogen production plus another 5-6 months to get the electrical supply and construction completed." As a result, and as Milton knew, Nikola had to purchase hydrogen from other suppliers for use in testing at its headquarters station. Further, Milton was aware that Nikola had not standardized the design of its hydrogen station because he had participated in the internal evaluation process for station design.

266. In May 2020, Milton asked an employee on Nikola's hydrogen infrastructure team to accelerate a previously planned purchase order for electrolyzers for Nikola's first five planned stations. As with certain other corporate actions he directed, Milton appeared

83

principally concerned with investor perception. As Milton explained to the employee, "[t]his [accelerated purchase order] will give us great news to disclose leading up to the merger." On May 31, 2020, Milton sent an email to Nikola's Board of Directors seeking approval, on one day's notice, of a nearly $31.5 million purchase order for electrolyzers. Milton justified the purchase order, in part, as follows:

> 2nd major point. IPO. I am getting ready to go on a media blitz and the most critical item in our business model is that we don't have stations. I would like to announce this on Monday as huge news. This will help our stock, create much stronger following and base layers of investors and it also will ease the criticism I am going to get going into interviews. I believe our PIPE and SPAC will be very happy to hear we are moving on our stations and not delaying.

## C. Nikola Defendants Fraud Concerning Nikola's Cost to Produce Hydrogen

267. According to Nikola's projections, the price of electricity comprises 75-85 percent of the cost of producing hydrogen via electrolysis. For purposes of its projections, which Nikola disclosed to the public, it assumed it could obtain electricity at an average of $0.035 per kilowatt-hour ("kWh")—a rate significantly cheaper than prevailing industrial rates—based on its expected large consumption of electricity and its goal of obtaining lower-cost renewable electricity during non-peak hours or sourcing it "behind the meter" (i.e., from a source other than the grid). Nikola disclosed that if it could obtain electricity at a significant discount to prevailing rates, it would not be profitable.

268. Both prior to and during the Class Period, Nikola never achieved cost reductions from the standardization of its hydrogen stations or from lower cost electricity. Indeed, the Company has since admitted that "Nikola *has never produced hydrogen*."[31] Instead, the Company had installed only one demonstration station, which at times dispensed, but never produced, hydrogen. Nikola was still evaluating various design and

---

[31] USAO Presentation.

84

production options for its future stations. ***Nikola had not produced hydrogen anywhere nor had Nikola purchased any energy for producing hydrogen, much less at the reduced prices Defendants claimed during the Class Period***.

269.   In March 2020, Nikola's Global Head of Infrastructure Development met with Milton, Brady, and Russell and presented them with a document comparing the rates the Company had been sharing with investors to what the hydrogen infrastructure team was finding to be more realistic in actual practice. Producing hydrogen would cost over three times Nikola's target price. Expenses would be significantly higher across the board. Electricity costs in particular were far higher than Nikola's $0.035/kWh target, and because of the reliability problems the Company was experiencing with its demo station, to reliably dispense hydrogen it would have to expend significantly more on capital expenditures, maintenance, and personnel costs at its stations. The issues were so significant that the hydrogen team had begun exploring the possibility of pivoting Nikola's business model altogether.

270.   Specifically, on March 21, 2020, Milton, Brady, and Russell were copied on an email sent by Dale Prows, Global Head of Infrastructure Development at Nikola, with the subject line "Board of director presentation." Prows was in charge of Nikola's hydrogen infrastructure development and the purpose of his email was to provide content for slides that would be prepared for a presentation to Nikola's board on the status of Nikola's electricity rate negotiations. Prows stated that Nikola had not found an economically viable source of electricity to support its planned "R&D Station" in the Phoenix area. While Nikola had proposed buying electricity from Arizona Public Service ("APS") for $0.02/kWh, and had negotiations with several solar power companies, none of these discussions had borne fruit. Nikola still had no contracts for electricity supply. Mr. Prows

also wrote that Nikola had yet to find a site in the Los Angeles area for a hydrogen station or to find a low-cost source of electricity in California. In fact, Prows wrote that the costs for just two components of electricity supply in California, transmission and distribution,[32] "are a minimum of 7 cents per kilowatt hour." The $0.07/kWh figure Prows shared did not include the third component, generating electricity, and that was already double Nikola's target price of $0.035/kWh. The price of electricity in California, therefore made it impossible to operate economically feasible onsite hydrogen production stations in that state because Nikola could not produce and sell hydrogen at the same price as diesel.

271.  Yet Nikola could not ignore California. Nikola's "launch" customer was Anheuser-Busch, located in the Van Nuys neighborhood of Los Angeles. Nikola's first hydrogen station networks would have to support Anheuser-Busch's delivery routes, and that meant Nikola would have to build stations in California, including near Anheuser-Busch's headquarters in Los Angeles, that could supply hydrogen at competitive rates to diesel. Nikola could not realistically build a hydrogen station network unless it could acquire energy for significantly less than the costs of transmission and distribution alone in California.

272.  Prows's March 21, 2020 email stated that his team was evaluating "virtual" power purchase agreements ("PPAs"), which entail acquiring power in one geography and using it in another where electricity may be more expensive, and on-site solar generation as possibilities to reduce the cost of electricity. However, Prows observed that both options had significant problems. Virtual PPAs created a "volume mismatch" that made it difficult to match up pricing across geographies. On-site electricity generation, meanwhile, would

[32] The final cost of electricity used at a given location is roughly the sum of three components: (i) the cost of generating electricity, (ii) the cost of transmitting electricity, generally through high-voltage power lines, and finally (iii) the cost of distributing the electricity locally to the target business or home.

86

require Nikola to build enormous solar farms, roughly 100 acres in size, for each hydrogen station. This would not be a workable solution in dense, urban areas like Los Angeles.

273.   Because of these challenges, Prows continued in his March 21, 2020 email, his team was beginning to "evaluat[e] the feasibility of liquefying hydrogen and distributing it to our fueling stations." Thus far, Nikola's plan had been to create gaseous hydrogen through electrolysis on-site at its fueling stations. Accordingly, the demo station in Phoenix, Arizona was built to store and dispense gaseous hydrogen. Prows's team, however, was finding Nikola's existing plan to be so impractical that they were considering a major pivot in Nikola's business model, which would require employing an additional technology to compress hydrogen produced in one location into a liquid, then ship the liquefied hydrogen long-distance to Nikola's fueling stations. Prows explained that he believed liquefying hydrogen also had the potential to help Nikola address the reliability issues it was experiencing with dispensing hydrogen, as Nikola's long refueling times were caused in part by Nikola's failure to sufficiently compress hydrogen gas. However, building liquefaction infrastructure would be incredibly expensive. Prows' team estimated that it would cost Nikola $150 million in capital expenditures to build a single 60-ton-per-day facility. Extrapolating out from Nikola's assumptions about the 8-ton capacity of its refueling stations, the Company would need approximately 93 times as much liquefaction to supply its full network of 700 hydrogen stations—which would require $14 billion in capital expenditures just for the liquefaction facilities. Accordingly, Prows still did not believe liquification would allow Nikola to achieve its target price in California.

274.   Days earlier, on March 17, 2020, Prows had an email exchange with Milton, Russell, and Brady, regarding conversations Nikola was having with Air Liquide, the company that supplied Nikola with hydrogen gas for its demo station, over liquefaction

equipment. Milton responded to the thread: "Keep these liquefication discussions quiet from the market and internally, as well, as much as possible."

275.    Prows and his team also met with Milton, Russell, and Brady in March 2020 to address: (1) the hydrogen dispensing reliability issues and the necessary costs to overcome those issues, and (2) the possibility of moving towards liquefying hydrogen. In a meeting that lasted approximately 45 minutes, and in which Milton, Russell, and Brady all asked questions, Prows presented the executives with a document that compared costs across different scenarios. The first column in Prows' comparison consisted of the "base case" costs that Nikola had represented to investors in its financial documents, such as the March 3 8-K and the slides attached thereto, where Nikola had listed the cost of producing and dispensing hydrogen at $2.72 per kilogram. The next column provided a revised base case that accounted for what Prows' hydrogen infrastructure team believed were the costs that Nikola would need to incur in order to improve the reliability of its hydrogen dispensing stations: $8.68 per kilogram. Prows' revised figure was much higher than the base case figure because of the need to invest in equipment, such as compressors, to allow Nikola to reliably dispense hydrogen and because Nikola was discovering that electricity input costs were significantly higher than Nikola's target price of $0.035/kWh. As Prows would later testify at Milton's criminal trial, "we were having difficulty getting the utilities to buy into our pitch that would enable us to have a win-win situation with them." Nikola would not be able to compete with diesel prices at a hydrogen cost of $8.68 per kilogram.

276.    The document Prows presented to Milton, Russell and Brady broke down the costs of producing and dispensing hydrogen into its component parts. The cost of electricity was $2.14 per kilogram in the base case, but Prows's team adjusted this figure upward over three times to a more realistic $6.73 per kilogram for the revised base case. The document

stated that this "[i]ncrease [was] due to higher electricity cost assumption. Per hydrogen H2 hydrogen [sic] team, $0.11, best rate available in California." 11 cents per kilowatt hour was triple the $0.035/kWh target communicated to investors. Electricity was not the only cost that was far higher than Nikola's target. CapEx increased from $0.25 in the base case to $0.68 per kilogram in the revised. The document noted that CapEx needed "to be increased significantly to achieve target uptime and to mitigate risk of equipment failure." Maintenance costs increased too, from $0.22 per kilogram in the base case to $0.81 per kilogram in the revised base case, again to address issues with station uptime. The cost of personnel increased seven times, from $0.04 per kilogram in the base case to $0.29 per kilogram in the revised base case because the team determined Nikola's stations would each need to be staffed by a hydrogen engineer.

277.    The document Prows shared with Milton, Russell, and Brady also provided revised total CapEx figures. Whereas Nikola had previously communicated to investors that station CapEx would total $16.6 million, Prows now put that figure at $35.7 million, which would be needed to address the reliability problems. If Nikola pursued liquefication instead, CapEx would drastically increase to a whopping $319.8 million according to the document shared with the executives. The document included the "key takeaway" that the "**Hydrogen team does not believe current base station model cost efficiency/reliability is achievable**. Stations will require significantly more CapEx and maintenance in order to achieve uptime." (Emphasis added).

278.    On March 25, 2020, Milton and Prows had an email exchange, copying Russell and Brady, to discuss the possibility of installing an electrolyzer at Nikola's Phoenix, Arizona headquarters. Prows explained that getting a site permitted for hydrogen production would take 5-6 months, and an additional 5-6 months would be required to

acquire the electricity supply and complete construction. Milton responded that Nikola should "wait now until we have a clear direction from Nel about us moving forward." Nikola thereafter did not move forward with requesting a permit to install an electrolyzer at its headquarters and did not install an electrolyzer at its headquarters.

279. Accordingly, after March 2020, at the latest, Milton, Russell, and Brady knew that: (i) Nikola was not able to reliably dispense hydrogen and fixing this problem would require significant capital expenditures; (ii) Nikola had no PPAs and the energy suppliers it was negotiating with were not convinced by Nikola's pitch that grid buffering offered them a "win-win;" (iii) Nikola had no land on which to build hydrogen stations and permitting any site could take up to and over a year; (iv) Nikola could not achieve electricity at $0.035/kWh – electricity would cost at least three times as much in California; (v) Nikola could not produce hydrogen under its "base case" existing business model for under $8.68 per kilogram because of the costs of CapEx, electricity, maintenance, and personnel were magnitudes higher than Nikola's targets; (vi) Nikola had not determined whether it would make hydrogen onsite or liquefy it offsite and ship it to its stations, and therefore was not certain what kind of stations it would build or how much land they would require; (vii) Nikola's CapEx would be substantially higher than $16.6 million per station no matter what approach it took; (viii) Nikola was not producing and could not produce hydrogen. Despite these stark realities, Milton requested that the executives and hydrogen team keep the liquefaction discussions concealed from the market. Defendants not only complied, they continued to use the inaccurate projections in public statements, including an April 6, 2020 slide presentation as part of Nikola's "Analyst Day" event.

280. As Russell testified at Milton's criminal trial: "As we continued to negotiate for electricity supply, it became clear there was going to be a *large geographic area across*

*the country and around the world* where you wouldn't be able to get an electricity price that you would need to make the hydrogen cost effectively."[33] As such, Russell testified that possible need to pivot to a liquefaction "hub" business model was still being actively discussed in the summer of 2020.

281.    On June 9, 2020, Nikola's Global Head of Infrastructure Development forwarded Milton an email from an electrolyzer supplier concerning costs and delivery. This employee sought Milton's input on the delivery schedule for the accelerated purchase order, noting that "we don't have PPA's [Purchase Power Agreements] executed yet to support these electrolyzers."

282.    Milton, Russell, Worthen, Brady, Girsky, and Ubben attended a July 2020 Board of Directors meeting at which Nikola's hydrogen infrastructure team apprised the Board that the company had not yet entered into any PPAs and that rate negotiations with electricity providers were ongoing at the time.  In fact, the first rate agreement that the Company ever entered into occurred after Milton left Nikola in September 2020.

283.    Milton, Russell, Worthen, Brady, Girsky, and Ubben knew, or recklessly disregarded, that Nikola had not entered into any PPAs or other rate agreements with any providers and that Nikola was not producing any hydrogen. They also knew, or recklessly disregarded, that Nikola: (i) had not sourced any "clean" or renewable electricity, (ii) was not acquiring cheaper electricity along freeways by tapping into federal lines, and (iii) was not acquiring electricity at specified rates.

284.    Nevertheless, Defendants repeatedly touted to investors that Nikola was producing over 1,000 kg/day of hydrogen at its headquarters and had driven down the price to less than $4/kg because Nikola had found a way to source electricity at a fraction of the

---

[33] Milton Tr. at 1073:3-13, ECF No. 226.

then-market price. For example, on June 4, 2020, after Nikola's stock began publicly trading, Milton proclaimed: "***But what Nikola solved was the cost***—was the economics on the trucking. When we first started, hydrogen was $16 a kilogram. ***We can now produce it for well under $4 a kilogram***. So we've cut – it's one quarter of the cost now than it was just a few years ago.  And we're now cheaper to operate per mile than diesel."[34] In an interview published on or about July 17, 2020, Milton stated: "We are contracting with wind, solar and hydro plants for energy and so far have been able to source plenty of energy under $.04 per kWh. Most of it is much lower in the 2.5 [cents] per kWh range."

285.    As detailed below, Milton's claims that Nikola had driven down or otherwise achieved this cost of production were materially false and misleading because Nikola did not have the ability to produce any hydrogen, much less at the prices that Milton represented. As an initial matter, any claims about Nikola's current cost to produce hydrogen were false simply because Nikola had never produced any hydrogen—a fact Milton knew.  Further, at that time, Nikola did not have any agreements with electricity providers that would have enabled it to produce hydrogen at Milton's claimed cost—a fact Milton also knew. Given that electricity costs make up 75-85 percent of hydrogen production costs, Milton's claims about Nikola's supposed ability to produce hydrogen at the specified costs—without Nikola having any agreements in place to lock in electricity costs—were false.

286.    The figures that Milton cited as Nikola's current costs were, in reality, Nikola's projections at which future production, if it ever occurred, could conceivably be profitable. However, by March 2020 at the latest, the executives had been advised that

---

[34] Yahoo Finance, *Nikola debuts on Nasdaq, how it plans to compete with other electric truck makers*, available at https://finance.yahoo.com/video/nikola-debuts-nasdaq-plans-compete-150245603.html.

these rates were unrealistic. Yet once again, Milton presented to investors something Nikola hoped to do as something it had already achieved.

287.   Defendant Russell has since acknowledged that any representation that Nikola produces hydrogen "is '*indefensible*.' The headquarters station is for storage and dispensing, not production." Defendant Brady has likewise admitted "It is a 'false statement' that Nikola is producing 1,000 kg/day of hydrogen at headquarters." Defendant Worthen admitted "The statement that Nikola can produce 1,000 kg/day *is not true*, and *Milton knew it was not true. We discussed this 'a million times*.' Milton states future plans as if they are a present reality."  Dale Prows (Global Head, Infrastructure Development) has stated "It is '*false*' for Milton to say 'we're down below $3/kg on our hydrogen now.' *There is no 'our hydrogen'* – Nikola is not producing any."[35]

288.   In fact, Nikola's executives understood in 2020 that the Company might have to purchase hydrogen from third-party vendors for years into the future because the Company had not come up with a plan to economically produce hydrogen. Even over a month after Milton's departure, Nikola was still trying to determine what model it would employ for producing hydrogen, *i.e.* whether its stations would produce hydrogen onsite as the Company told investors or liquefy and ship it. An October 28, 2020 Board presentation featured a slide stating that "Nikola Plan Starts with On-Site vs. Hub Production. A Network Combining Both Production Models Is Likely." Accordingly, even by the end of October 2020, Nikola was nowhere near ready to begin building its stations— it did not yet know what equipment they would even need or how they would get their fuel.

---

[35] USAO Presentation.

### D. False Statements Regarding Hydrogen Capabilities, Infrastructure, and Costs

#### 1. *Pre-Merger False Statements Regarding Hydrogen Capabilities, Infrastructure, and Costs*

289.    On May 3, 2018, Defendant Nikola posted to its official Twitter account, @nikolamotor: "800,000,000 miles. 28 Hydrogen Stations. 800 trucks. Beginning 2020 delivery. #emissionsgameover #oneclearwinner."

290.    On the same day, May 3, 2018, another user responded in part: "I am 90% sure hydrogen will be a limited market. As it is expensive to maintain and ship it." Defendant Nikola replied:

> ***We actually produce it on site and don't ship it***. Helps reduce costs dramatically. Good observations though. ***Under the right environment it's very cheap to produce which is how we do it.***

These statements remained on Nikola's Twitter account and publicly available to investors throughout the Class Period.[36]

291.    The statements referenced in ¶¶289-290 were materially false and misleading because Defendants knew or recklessly disregarded but failed to disclose that Nikola had never obtained a permit for, let alone constructed, a hydrogen production station, nor had it produced any hydrogen when the statements were made. Although Nikola did complete a storage-and-dispensing-only hydrogen fueling station at its Phoenix, Arizona headquarters in or about April 2019, that station had been plagued with problems and functioned only 21% of the time. Moreover, the hydrogen that was used to stock that station was not produced by Nikola but was instead acquired from an outside vendor. Further, at that time Nikola did not have any agreements with electricity providers, let alone clean energy from wind, solar, and hydroelectric facilities directly, or energy at less than $.04

---

[36] @nikolamotor, Twitter (May 3, 2018, 9:00 A.M.), available at https://twitter.com/nikolamotor/status/992026084626583552.

94

per kWh. Nikola had not purchased or leased any land on which to produce hydrogen, let alone secured any permits to install electrolyzers—a process which would itself take at least half a year if not more than twice that. As detailed in Nikola's USAO Presentation, Nikola admitted "Nikola **has never produced** hydrogen," Russell stated that any representation that Nikola could produce hydrogen "is '**indefensible**.' The headquarters station is for storage and dispensing, not production," and Defendant Brady admitted "**It is a 'false statement'** that Nikola is producing 1,000 kg/day of hydrogen at headquarters." Defendant Worthen admitted "The statement that Nikola can produce 1,000 kg/day **is not true**, and **Milton knew it was not true. We discussed this 'a million times**.' Milton states future plans as if they are a present reality." Dale Prows (Global Head, Infrastructure Development) admitted "It is '**false**' for Milton to say 'we're down below $3/kg on our hydrogen now.' **There is no 'our hydrogen' – Nikola is not producing any**."

292.   On December 2, 2019, in a joint event that Nikola hosted with Iveco, which was livestreamed and posted to Iveco's YouTube channel, Defendant Milton told the crowd:

> We're building out the hydrogen station right now globally. **In America, we've already got the largest hydrogen station in the western hemisphere at our headquarters. Can produce over 1,000 kilograms a day on-site.** We're planning to expand that up to—up to essentially eight tons which is about 8,000 kilograms a day. **That will be done in Phoenix, Arizona, the station's already up and operational for pumping right now.**

A video of the event is currently publicly posted online and remained publicly available to investors throughout the Class Period.[37]

293.   The statements referenced in ¶292 were materially false and misleading for the reasons identified in ¶291. Moreover, by this point Milton had been involved in

---

[37] IVECO, NIKOLA & IVECO EVENT, YouTube (December 2, 2019), available at https://www.youtube.com/watch?v=vGVb9yQ2s4o&t=683s (accessed March 1, 2021).

numerous discussions about the Company's inability to produce hydrogen, including a December 2018 email informing him that the City of Phoenix had denied Nikola a permit to install electrolyzers at its headquarters.

294.    On or around December 17, 2019, Milton appeared on *Fox Business's* program "Claman Countdown." Milton touted the advantages of FCEVs over the battery-powered trucks being developed by Nikola's rival, Tesla. The host, Liz Claman, asked Milton "How long does it take to fuel up with hydrogen?" to which Milton responded:

> Yeah, ***that's the advantage is you can do it in 15 minutes. So if you're turning a truck 2, 3 times a day, you can do that in 15 minutes*** and with batteries if you charged it 15 minutes it would actually ruin the battery. So you've got to scale that over 1-3 hours on a battery electric truck without doing damage to the battery. So you can turn it in 15 minutes with hydrogen.

295.    The statements referenced in ¶294 were materially false and misleading. Nikola had failed to achieve a refueling time of 15 minutes for its FCEV trucks. Even by the end of the 2020, it took Nikola 45-80 minutes to fill its FCEV prototype vehicles with hydrogen at its Phoenix, Arizona demo storage and dispensing-only station, the only hydrogen station Nikola had at this time. Even then, Nikola was struggling to keep the station operational. Problems with compression and cooling of the hydrogen, which has a tendency to heat up when going through the refueling process, meant that the demo station's up-time was abysmal. It was unable to dispense hydrogen *79% of the time*. Unless a truck arrived for fueling within the 21% of the time that the station was functional, it would not be able to be refueled at all, let alone in 45-80 minutes. Nikola had therefore not solved the operational challenges that could have made hydrogen fuel competitive to diesel (or more advantageous than batteries, for that matter) for long-haul trucking operations – it had not even cleared the first hurdle of determining how to reliably dispense hydrogen into a truck. It could not construct hydrogen stations until it solved this threshold challenge

(something it never did in 2020) because it could not realistically build a network of hydrogen stations that were 21% reliable and took over an hour to fuel a truck. Moreover, Nikola did not (and could not) produce the hydrogen that the demo station dispensed. At this time and throughout 2020, the only electrolyzer equipment Nikola owned had never been used and was sitting in a warehouse in Phoenix. Nikola purchased the hydrogen used in the demo station from a supplier, Air Liquide, which did not source electricity from zero-emissions sources to produce hydrogen.

296.    During the January 10, 2020 episode of the *Transport Topics Roadshow* podcast, Defendant Milton stated that Nikola was producing hydrogen at "***well below $4 a kilogram***":

> What we did is, we knew that hydrogen was very expensive to produce. ***Up until Nikola came into the market, hydrogen was around $16 a kilogram, U.S. dollars. Now, Nikola's producing it well below $4 a kilogram. We have driven the costs down times, almost four times…so, ¼th the cost of normal hydrogen production, Nikola is now at***. . . . For the last four years now, we've been working on the most advanced hydrogen station in the world. It's actually in Phoenix, Arizona, it's larger than any other hydrogen station in the western hemisphere. . . .[38]

297.    On January 23, 2020, Milton tweeted from his personal account: "Hydrogen costs have plummeted through @nikolamotor efforts not other OEM's [sic]. ***Our costs are below $3 per kg.*** Diesel parity is $4/kg. Game is over for diesel. . . ." This statement remained on Milton's Twitter account and publicly available to investors during the Class Period.

298.    The same day, a Twitter user tweeted at Milton asking him to "confirm that is compressed green electrolytic hydrogen at $3/kg, today? How soon will that be available

---

[38] TT Roadshow, *Meet Trevor Milton*, (Episode 4) (2020), available at https://roadsigns.ttnews.com/roadshow-episode-four/. This episode is currently publicly available online and was available to investors throughout the Class Period.

for public purchase, any update on that timeline?" Milton replied "Yes." This statement remained on Milton's Twitter account and publicly available to investors during the Class Period.

299.    The statements referenced in ¶¶296-296298 were materially false and misleading for the reasons identified in ¶¶269–279, 291 and 295.

300.    The March 3 8-K included a transcript of a joint pre-recorded merger announcement conference call that included statements by Milton, Girsky, Russell, and Brady. The March 3 8-K quoted Russell as stating during the conference call:

> ***Our fuel cell trucks are the first zero-emission vehicles with a range and refueling time that favorably competes with traditional diesel trucks***, and our battery electric trucks are the perfect zero-emission solution for shorter haul missions, and urban routes with tight driving and delivery spaces.
>
> ***Our bundled leasing model for our fuel cell electric vehicles allows us to solve the "chicken & egg" challenge*** that's hindered the growth of the hydrogen-electric vehicle market. We're working with the customers who have the largest dedicated-route long-haul fleets initially, and ***we simultaneously build the hydrogen stations tailored to serve their needs.*** What we offer these dedicated-route customers is essentially freight as a service, with a single price for a solution that includes the truck, maintenance and the fuel, locked in for the life of the lease, with a refueling station roll out plan that addresses concerns about access to fuel. ***And we offer do all of that at a price that is competitive with their existing diesel fleet. It's the closest to a no-brainer customer proposition as I've seen in my career.***

301.    Russell's statements in ¶300 identified in italics, made in the present tense, were false and misleading for the reasons identified in ¶¶267–283, 291 and 295. Nikola could not offer a comparable refueling time to diesel, even after nearly a year of failed efforts at the demo station – a station located at Nikola's headquarters where Russell's, Brady's, Milton's, and Worthen's offices were located. Russell knew the station was unreliable, as he instructed an employee to simulate refueling for a promotional video that aired in April 2020. Moreover, Nikola had not solved the "chicken & egg" problem or offered a no-brainer proposition at a competitive price to diesel. The Board, including

Russell, Worthen, and Brady, had been told in December 2019 that one of the reasons private investors were reluctant to back Nikola was because of the tremendous risk in simultaneously building trucks and hydrogen stations—the chicken and egg approach. Further, Nikola had no power agreements that would allow it to produce and supply hydrogen at prices comparable to diesel at this time. The company had never produced any hydrogen whatsoever. Russell knew this, or recklessly disregarded it, because Nikola's Global Head of Infrastructure Development reported to him directly and was the employee overseeing efforts to secure favorable electricity rates.

302.    The March 3 8-K also contained a 39-page slide deck. Most of these slides would later be put into an April 6, 2020 Investor Presentation, including slides which assumed Nikola would acquire electricity at $0.035/kWh and incur $16,610,000 in CapEx per hydrogen station. Russell, Brady, and Girsky used a substantially similar slide deck in a joint presentation given to investors in January 2020.

303.    The day after announcing the merger, March 4, 2020, Milton and Ubben appeared together on *CNBC*'s *Squawk Alley* program, where they were interviewed by host David Faber about Nikola's plans to go public. During the interview, Milton and Ubben sat side-by-side and made the following statements:

> **FABER**: You characterized the company as a merchant energy storage company with de-risking off tank. What does that even mean?
>
> **UBBEN**: Well, when you think about even the storage business today is you get a PPA with the utility or maybe a commercial customer, and it's an asset-driven business that generates a fairly low return, seven, eight, nine percent, because it's contracted. In this particular case, ***Trevor solved the chicken and the egg*** . . . . ***we've got this uncapped return, but he's de-risked it because of the business model that he came up with***.
>
> **FABER**: So what was the key advance here that you feel you've made? I would assume it has to do with the fuel cells themselves?
>
> **MILTON**: No, ***it's actually the chicken and the egg.*** Its very similar to Amazon. The reason why Amazon has been so successful around the world is that they cover not just the goods sold online, I mean anyone can do that,

but it's the entire logistics behind it, the vertical integration. It's very similar to what Nikola has done. What we've done is we don't just sell a truck, we're really a tech energy company is what we are. ***We actually sell all the energy for the truck to the consumer at the same time***. So these hydrogen stations are expensive to build. But if you match them up to truck orders, then you're only dedicating $30,000 per truck to a station. So that's nothing. BP when you, BP or Shell when you sell a truck, they get about somewhere right around $1,000,000 in revenue, in oil revenues, every truck that you ever sell in diesel. So what ***we did*** is we took that money, ***we brought it into Nikola now. So we sell the truck, we're an energy as a provider kind of solution.***

\*     \*     \*

**MILTON**: And then ***we do the grid buffering. So we help the grids buffer their grids***, [Ubben nods in agreement] ***and that's how we get our energy so cheap to be able to broker back to the fleets.***

**FABER**: So when are we going to be seeing your trucks on the road fueling at your stations?

**MILTON**: ***So we've got the largest hydrogen station in the Western World already operational in Phoenix, Arizona. That was like our big, test facility to show it all works.***

\*     \*     \*

**UBBEN**: ***It's an 8 minute refuel for a 500-mile haul on a hydrogen system.*** So you can go across the country on 4 stops.

304.    The statements in ¶303 were materially false and misleading for the reasons identified in ¶¶267–283, 291 and 295. Nikola had not solved the "chicken and the egg" problem because it had neither figured out how to economically produce or even reliably dispense hydrogen. Nikola certainly had not "de-risked" the sale of one unproven technology by pairing it with another, as Ubben and Milton knew because a December 11, 2019 presentation to the Board of Directors had stated that one of the reasons private investors "have been reluctant to commit" to financing Nikola was because of the "High execution risks associated with building two businesses – manufacturing trucks and building out the H2 station network." It was also misleading for Defendants to speak in the present tense about what Nikola planned to do as if it had already been accomplished, for example that Nikola was currently able to acquire cheap energy or engage in "grid buffering"—energy suppliers had not accepted Nikola's "win-win" pitch that if the utilities

sold Nikola below-market electricity, Nikola could help with grid buffering, as Brady would later testify at Milton's criminal trial.[39] Moreover, Nikola could not refuel hydrogen trucks in 8 minutes.

305.    On or about March 12, 2020, Milton stated on the *Transport Topics Roadshow* podcast:

> Up until Nikola came in the market, hydrogen was around $16 a kilogram, U.S. dollars. ***Now Nikola is producing it well below $4 a kilogram. We have driven the cost down times almost four times.*** That's how – you know, one-fourth the cost of normal hydrogen production, Nikola is now at.

306.    The statements referenced in ¶305 were materially false and misleading for the reasons identified in ¶¶267–283, 291 and 295.

307.    On April 6, 2020, Nikola hosted its "Analyst Day" event to showcase its business ahead of the SPAC merger. The event featured a video in which Milton and Russell gave a tour of Nikola's headquarters, then Brady and Russell proceeded to give a presentation for analysts on Nikola's data and finances. VectoIQ filed the April 6 8-K, signed by Shindler, with the SEC which included slides from the joint presentation by VectoIQ and Nikola and materials prepared by both entities for the event. The April 6 8-K presented a wholly unrealistic and deceptive picture of the state of Nikola's hydrogen production and dispensing abilities while attempting to convince investors to support the business combination.

308.    On a slide from the joint presentation titled "POWERED BY A UNIQUE BUSINESS STRATEGY" contained in the April 6 8-K, Defendants listed the characteristics of Nikola's "H$_2$ Stations," including: "Economically produce H$_2$ fuel via

---

[39] Milton Tr. at 1810:5-12, ECF No. 233.

electrolysis," and "Electricity input (grid, solar, wind) purchased via long-term supply agreements."

309.    The statements referenced in ¶308 were false and misleading for the reasons identified in ¶¶267–283, 291 and 295. Nikola could not produce hydrogen "economically" and was reconsidering its business strategy.

310.    Another slide contained in the April 6 8-K purported to provide a comparison between Nikola's hydrogen-electric and battery electric trucks and conventional diesel trucks. The slide listed "REFUEL/CHARGE TIME" as "10-15 minutes" for Nikola's hydrogen-electric trucks, equivalent to conventional diesel trucks:



(highlighting added)

311.   Another slide on page 22 of the presentation contained in the April 6 8-K listed one of the "BENEFITS OF HYDROGEN PRODUCTION AND REFUELING" as "Fast refuel time – similar to today's refueling time for diesel engines."

312.   Page 23 of the presentation contained in the April 6 8-K listed the "ADVANTAGES OF HYDROGEN." The slide stated that FCEVs had the "same benefits" as more traditional electric vehicles "while *eliminating many issues derived from battery electric vehicles (long recharge times*, limited range, cold start, added weight, etc.)," and stated that FCEV trucks had the advantage of "HEAVY DUTY FAST FUELING."

313.   The statements referenced in ¶¶310-312 were false and misleading for the reasons identified in ¶¶267–283, 291 and 295. Additionally, Prows wrote in an email to Milton, Brady, and Russell on March 17, 2020, that his team was considering pivoting to hydrogen liquification in part because "we're struggling to get 50 percent up time with our headquarter station and we're not even producing hydrogen."

1    314.   Another slide in the April 6 8-K purported to provide the "UNIT

2    ECONOMICS" of hydrogen stations. It listed several costs underlying Nikola's model,

3    including $0.035/kWh for electricity supply, $640,000 for "Repair and Maintenance," and

4    $115,500 for "Station Personnel Cost." It concluded that Nikola's cost per kg of hydrogen

5    produced was $2.47:



# H₂ STATION UNIT ECONOMICS

**Single-station model expected to generate cash to fund future stations and potentially have access to multiple financing options to fund ongoing H₂ network development**

**HYDROGEN STATION KEY ASSUMPTIONS**

- **$0.035/kWh of electricity**
- 61.2 kWh needed to produce 1 kg of hydrogen
- 11.1 liters required to produce 1 kg of hydrogen
- 3 FTE per station
- 100% station utilization, or 8,000 kg per day (2,920,000 kg per year)
- Station useful life of 21 years

*Working with Nel, Nikola plans to generate hydrogen at scale in a cost effective manner*

**Annual Cost to Produce Hydrogen** [1]

| Hydrogen Station Direct Variable Costs | | Assumption | Notes |
|---|---|---|---|
| Electricity Consumption Cost | $ 6,254,640 | 178,704 | MWh @ $35.00 per MWh |
| Water Consumption Cost | 39,407 | 8,585,484 | # of gallons @ $4.59 / 1,000 gallons |
| **Hydrogen Station Direct Fixed Costs** | | | |
| Repair and Maintenance [2] | 640,000 | 4.3% | % of total station equipment capex |
| Insurance Costs and Charges | 166,100 | 1.0% | % of total station capex |
| Station Personnel Cost | 115,500 | 3.0 | # of FTE's @ $35k salary + 10% benefits |
| **[A] Total Operating Expenses** | $ 7,215,647 | | |
| Station Depreciation | 731,429 | | |
| **Total P&L Expense** | $ 7,947,076 | | |
| **[B] Annual H2 Production (tonnes)** [3] | 2,920 | | Electrolyzer power consumption of 52.8 kWh/kg |
| **Cost per kg (excl. Depreciation)** | $ 2.47 | | [A] / [B] |

**CASH GENERATED PER STATION — 630 TRUCKS (3 LEASE CYCLES)**

| | Pre-Delivery | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Years 1-7 | Years 1-21 Full Station Life |
|---|---|---|---|---|---|---|---|---|---|---|
| Station CapEx [4] | ($16,610,000) | - | - | - | - | - | - | - | ($16,610,000) | ($16,610,000) |
| Fuel Revenue - 210 Trucks | | 10,500,000 | 10,500,000 | 10,500,000 | 10,500,000 | 10,500,000 | 10,500,000 | 10,500,000 | 73,500,000 | $220,500,000 |
| Station Fuel & Operating Cost [5] | | (6,919,114) | (6,919,114) | (6,919,114) | (6,919,114) | (6,919,114) | (6,919,114) | (6,919,114) | (48,433,797) | ($145,301,392) |
| **Annual Unlevered Cash Flow** | ($16,610,000) | $3,580,886 | $3,580,886 | $3,580,886 | $3,580,886 | $3,580,886 | $3,580,886 | $3,580,886 | $8,456,203 | $58,588,608 |
| **Implied 21-Year Unlevered IRR** [6] | 21% | | | | | | | | | |
| Implied 21-Year Levered IRR [7] | 43% | | | | | | | | | |

*A combination of debt and equity financing (at the station level) may be utilized to maximize capital efficiency and return to shareholders*

1. Assumes station at 100% utilization; based on initial costs, savings are expected in 2025 and beyond due to anticipated advances in technology
2. Repair and maintenance includes monthly, quarterly, and annual inspections of the electrolyzers, dispensers and compressors, sensors and detectors, worn out parts (including the work done to replace them), replacement/filling of misc. medias, analysis and optimization of operation parameters, remote monitoring, and troubleshooting
3. 1 metric tonne = 1,000 kg
4. Given construction lead-time for each station, upfront station capex for the first lease cycle is assumed one year prior to cash flow generated in Year 1
5. Represents all hydrogen station operating expenses including electricity costs, water costs, station personnel, and station maintenance; excludes corporate G&A expenses; based on expected hydrogen station utilization of 95.8%; 100% utilization would represent $7,215,647 per year in annual station fuel and operating costs
6. IRR based on quarterly cash flows evenly spread over each year unless otherwise noted
7. Assumes stations are financed with 60% debt, with a maturity of 10 years and a 6% interest rate

(highlighting added)

22    315.   The statements referenced in ¶314314 were false and misleading for the

23    reasons identified in ¶¶267–283, 291 and 295. Prows informed Milton, Russell, and Brady

24    that the base case numbers shared here were not achievable. Brady later testified that it was

25    openly discussed among management at Nikola that the Company had not achieved the

projections in its models. There was no basis for Defendants to claim that Nikola's bundled leases had achieved or could achieve "cost parity with diesel" and it was misleading to withhold information to the contrary that was within Defendants' possession.

316.    The next slide in the April 6 8-K provided a breakdown of Nikola's profit per truck lease. The slide stated that Nikola's "Cost per kg of Hydrogen" was $2.47:



(highlighting added)

317.    The statements referenced in ¶316 were materially false and misleading for the reasons identified in ¶¶270–279, 291, and 315.

318.    Page 24 of the slide presentation contained in the April 6 8-K described Nikola's strategy to mass-produce hydrogen fueling stations. The slide stated that the stations had a "Projected average one-time station capex of $16.6M" and broke down the expected capital expenditures for Nikola hydrogen stations as requiring $14,860,000 for "Station Production and Fueling Equipment" and $1,750,000 for "Land and Building" for a "Total Station CapEx" of $16,610,000.



(highlighting added)

319.    Slide 49 of the presentation contained in the April 6 8-K similarly stated that total station CapEx would be approximately $17 million, comprised of $15 million in hydrogen equipment and $2 million in land and building.

320.     The statements referenced in ¶¶318-319 were materially false and misleading for the reasons identified in ¶¶270–279. Nikola's hydrogen infrastructure team had told executives that CapEx would be $35.7 million in the revised base case hydrogen station, and could jump into the hundreds of millions if Nikola employed a liquefication strategy. Additionally, the April 6 8-K failed to disclose that Nikola was not producing, and had never produced any, Hydrogen. As Nikola's Global Head of Infrastructure Development Dale Prows testified at Milton's criminal trial, the statement on slide 24 that "stations will be built one at a time along dedicated routes" was "different than [saying we're] not producing hydrogen."[40]

321.     The April 6 8-K also identifies an "R&D 8-Ton Station" at the Company's Phoenix, AZ headquarters which Nikola claimed was going to "begin in Q2 2020" and that the "Station Offers H2 Production, storage, and dispensing" in addition to "(8) 1-ton electrolysers [sic] onsite capable of producing 8,000 kgs of hydrogen per day."

322.     The statements referenced in ¶321 were false and misleading for the reasons identified in ¶¶270–279 and 291. At the time of the April 6 8-K, Nikola was already in the second quarter of 2020 and the Company had not purchased electrolyzers to support the R&D station, did not have any electricity supply contracts, and did not have any permits. The Company could not possibly begin on its R&D Station in the current quarter.

323.     The April 6 8-K also lists an "AB 8-Ton Pilot Station" to be located in "Van Nuys, CA" to support Anheuser-Busch, with identical statistics to the "R&D 8-Ton Station." The April 6 8-K states that this station would "begin Q4 2020, complete by mid-2022" and would offer "H2 production, storage, and dispensing" using its "(8) 1-ton electrolysers [sic]"

---

[40] Milton Tr. at 823:4-8, ECF No. 224.

324.    The statements referenced in ¶323 were false and misleading for the reasons identified in ¶¶ 270–279 and 291. Nikola had not acquired or leased any land on which to build any stations, nor had it even identified any particular locations on which it could construct any station, even though stations would each require 3-10 acres, and if electricity were to be generated onsite via a dedicated solar farm, the stations would need 100 acres. It was completely unrealistic that work on the station could begin in Q4 2020. The process of acquiring permits to install electrolyzers would itself take 5-6 months if not years. More fundamentally, Nikola had not solved the engineering challenges of reliably dispensing hydrogen and Nikola's executives were informed by March 2020 at the latest that energy prices in California would be prohibitively high, rendering any plan to produce 8,000 kgs of hydrogen per day "onsite" through electrolysis unworkable. These problems were so significant that the Company was considering a major pivot in its business model away from the onsite production of hydrogen – the model the AB Station would purportedly employ.

325.    Nikola also aired a 17-minute long, pre-recorded "Analyst Day Video" on April 6, 2020 at the investor event, prior to going into the presentation quoted in the preceding paragraphs. The Analyst Day Video featured Milton, Russell, and Brady. The video was uploaded to YouTube on April 9, 2020, and remained publicly available throughout the Class Period. In the video, Milton gives a tour of Nikola's headquarters. The video then follows Milton as he moves outside to the demo station and states:

> And welcome to the largest hydrogen station in the Western world. ***This is where all the hydrogen is stored, cooled, pumped and dispensed***.

326.    The statement referenced in ¶325 was materially false and misleading for the reasons identified in ¶295. Nikola was struggling to cool hydrogen at its demo station and

could not reliably dispense it. Touting the capabilities of the station without acknowledging any of its limitations or problems was misleading.

327.    In the Analyst Day Video, Milton then introduces Russell, who goes on to give an overview of the demo hydrogen station. A Nikola Two prototype is docked inside the demo station as Russell speaks. Referring to the Nikola Two, Russell states:

> No diesel engine in here. Hydrogen fuel cells. They're taking oxygen from the air combining with hydrogen that we have on board and they're turning it into electricity. The only byproduct of this exchange is water **which is what we started out with when we made the hydrogen**.

328.    The statement referenced in ¶327 was materially false and misleading for the reasons identified in ¶¶279 and 291. It was false and misleading for Russell to state that Nikola made the hydrogen.

329.    The Analyst Day Video continues with the camera following Russell around the Nikola Two. As Russell speaks, the camera moves with him to reveal Dale Prows, Global Head of Infrastructure Development, holding a hydrogen fuel nozzle up to the Nikola Two's fueling port. As Prows enters the frame, Russell says: "Over here, is Dale



getting us some fuel so we can take a ride here

Prows – he's one of our hydrogen experts and he's getting us some fuel so we can take a ride here in a minute."

330.   The statement referenced in ¶329 was false and misleading for the reasons identified in ¶¶279 and 295. As Prows has since acknowledged, he was not fueling the Nikola Two in the Analyst Day Video.[41] Russell had wanted to show the truck being "fueled" and directed him to pretend to dispense hydrogen into it for the camera because it could not be fueled in real time. Defendants knew they could not show the truck actually being fueled because the station was notoriously unreliable, and even when it was working, fueling would have taken 45-80 minutes, far longer than the entire run-time of the Analyst Day Video. By stating that Prows was fueling the vehicle, Russell created the misleading impression that the demo station could reliably and quickly dispense hydrogen on cue.

331.   On April 9, 2020, Milton, Russell, Ubben, Brady, and Worthen attended a meeting of Nikola's Board of Directors. During the meeting, the Board received a presentation warning that Nikola was unable to develop its hydrogen infrastructure. The Board was advised that September 30, 2020, was the target date for completing the initial blueprints, contract, and charging standard for Nikola's hydrogen stations. No physical infrastructure would be completed before this date.

332.   The Proxy, signed by Milton and Girsky, also contained false and misleading statements regarding Nikola's hydrogen capabilities and preparedness. The Proxy claimed:

> "we have initiated the development of the hydrogen station infrastructure by completing our first 1,000 kg demo station in the first quarter of 2019 at our corporate headquarters in Phoenix, Arizona. ***The demo hydrogen station offers hydrogen storage and dispensing and serves as a model for future hydrogen stations***."

---

[41] Milton Tr. at 806:23-24, ECF No. 224; 1215:20-1216:3, ECF No. 226.

The following graphic appeared below the quoted text, which showed a "FAST 70 MPA FUELING STATION"[42] and a "FAST 70 MPA HYDROGEN DISPENSER":



333.    The statements referenced in ¶332 were materially false and misleading for the reasons identified in ¶¶291, 295, and 270–279. Nikola's demo station in Phoenix, Arizona functioned 21% of the time because of operational problems and could not fuel an empty truck in less than an hour. This made it unsuitable as a "model" for Nikola's future stations and it was misleading to state that the station was "complet[ed]" or that it offered "dispensing" without disclosing its unreliability. It was further misleading to state that Nikola would soon build out a network to include "FAST," high pressure, fueling equipment when Nikola had thus far failed to compress hydrogen to a point where it could quickly fuel a truck. Moreover, by March 2020, in part because of these operational problems, Nikola was considering switching its business model entirely to deploy liquid hydrogen at its stations. As the demo station dispensed gaseous hydrogen, it could not serve as a "model" for stations that might have to dispense liquid hydrogen instead.  Moreover, the graphic was misleading to the extent that Nikola had no plan or ability to generate electricity from renewable energy, it had no agreements or plans to purchase that energy, if it could produce or purchase that energy, and by this point was not even certain it would produce hydrogen "onsite." By omitting to disclose this information, and the material fact that Nikola had not produced *any* hydrogen to date, the statements misrepresented both

---

[42] MPa, or MegaPascal, is a measure of pressure.

Nikola's current capabilities and that it was ready to build out its hydrogen network when in fact it had yet to solve threshold operational problems or settle on a business model.

334.    The Proxy also stated: "The Energy business unit **is developing and constructing a network of hydrogen fueling stations** to meet hydrogen fuel demand for FCEV customers."

335.    The statement referenced in ¶334 was materially false and misleading when made for the reasons identified in ¶¶270–279. Nikola was not then "constructing" hydrogen fueling stations and was not close to doing so.

336.    The Proxy also contained a section on Nikola's hydrogen station rollout strategy. Under the sub-heading "California-First Hydrogen Station Strategy," the Proxy stated:

> Our initial plan for the station rollout begins with an eight-ton pilot station accessible to the AB brewery in Van Nuys, California. From there, we then plan to build up to 10-12 additional stations in California. These stations will supply fuel for our launch customers in those geographies that have dedicated routes in California. California is offering incentives to build out our hydrogen fueling infrastructure and deploy zero-emissions vehicles, including opportunities for funding along major freeway corridors. We expect to rollout these stations in 2022-2023.

337.    The statements referenced in ¶336 were materially false and misleading for the reasons identified in ¶¶270–279. It was misleading to discuss Nikola's plans to build stations in California without disclosing that Nikola's existing business model was not economically feasible in the state, in part due to a minimum cost of electricity which was more than triple Nikola's $0.035/kWh target.

338.    The Proxy also stated:

> **Hydrogen will normally be produced on-site at each station via electrolysis.** The electrolysis process occurs by passing electricity through water in an electrolyzer, thus breaking the water molecule into gaseous hydrogen and oxygen. **Nikola's base station is expected to have a daily production capacity of 8,000 kg** and will be capable of supporting approximately 210

FCEV trucks per day. ***Our stations are designed to be scalable to up to 40,000 kg per day of production, if needed.***

The Proxy further explained the benefits of onsite production: "The single-station strategy allows for maximum capital efficiency. Each station will be highly utilized from the start and is expected to generate substantial revenue and cash flow, which can be used to fund the development of future stations."

339.   The statements referenced in ¶338 were materially false and misleading for the reasons identified in ¶¶270–279. It was misleading to state that Hydrogen would "normally" be produced onsite at the hydrogen stations while omitting to disclose that Defendants were considering a change in Nikola's business model because onsite production was proving to be prohibitively expensive. Milton requested that Russell, Brady, and Prows not disclose to the market that Nikola was considering the liquefication option. Additionally, it was misleading to tout that the stations were "designed" to have certain production capacities when the blueprints for the stations would not be completed until September 2020.

340.   The Proxy also contained a risk factor that stated:

[G]iven our lack of experience building and operating fueling stations, there ***could be unanticipated challenges*** which ***may*** hinder our ability to provide our bundled lease to customers or ***make the provision of our bundled leases costlier than anticipated.*** If we are unable to build, or experience delays in building, our network of hydrogen fueling stations, we may be unable to meet our fueling commitments under our bundled lease arrangements with customers and experience decreased sales or leases of our vehicles, which may negatively impact our business, prospects, financial condition and operating results.

341.   The statements identified in ¶340 were materially false and misleading for the reasons identified in ¶¶270–279. It was misleading to present as an unrealized

113

hypothetical the danger that "unanticipated challenges" could result in the bundled leases being costlier than anticipated without disclosing that Russell, Brady, and Milton had already been informed that Nikola's station CapEx and cost of hydrogen would be substantially more expensive than Nikola's feasibility target.[43]

342.   On May 30, 2020, Milton tweeted from his personal account in response to a user's question about "where the electricity comes from." Milton stated:

> ***Wind solar and hydro for most. That's all we really touch is non carbon energy. Creating it on site under contracts give us 3 or 4 cents per kWh clean energy making hydrogen very competitive and cheaper than diesel.***

343.   The statements referenced in ¶342 were materially false and misleading for the reasons identified in ¶¶270–279 and 291.

344.   On June 3, 2020, the day before Nikola went public, Nikola issued a press release announcing that it had "signed a purchase order with Nel ASA for [$30 million worth of] 85 megawat alkaline electrolyzers supporting five of the world's first 8 ton per day hydrogen fueling stations. Together, these electrolyzers may produce over 40,000 kgs of hydrogen each day." The press release quoted Milton as saying: "We are building the largest hydrogen network in the world . . . These electrolyzers will support five heavy duty hydrogen stations which will cover multiple states and trucking routes. The future of clean transportation is here, and fleets are lining up to be part of the transition with Nikola."

345.   The statements referenced in ¶344 were materially false and misleading. It was misleading to state that the electrolyzers would produce 40,000 kgs of hydrogen per day, or that the electrolyzers were "supporting five of the world's first eight-ton-per-day hydrogen fueling stations," or that Nikola was currently "building" a hydrogen network

---

[43] *In re Alphabet, Inc. Sec. Litig.*, 1 F. 4th at 704 ("Risk disclosures that 'speak entirely of as-yet-unrealized risks and contingencies' and do not 'alert the reader that some of these risks may already have come to fruition' can mislead reasonable investors.").

114

while omitting to disclose that Nikola had not leased, purchased or even identified any sites on which to locate its stations, did not have any contracts for electricity to use the electrolyzers, did not have any permits to install any electrolyzers at any sites, and had still not solved its threshold dispensing reliability problems. Nikola was nowhere near being ready to build any hydrogen production and dispensing stations at this time, and, as described more fully in ¶¶775-783 it was for these reasons that Nikola's Head of Infrastructure Development informed Russell, Brady, and Milton that they should not go forward with the purchase order because it was premature and would deceive investors.[44] Additionally, Nikola had yet to decide whether it would produce hydrogen on-site (as the press release proclaimed) or opt for liquefication. Defendants rushed the purchase order so that they could announce seemingly positive news the day before Nikola's IPO. Milton explained to the hydrogen infrastructure team, the purchase order would "give us great news to disclose leading up to the merger," and Russell pushed the marketing team to draft a press release "ASAP" so that Nikola could publicize the deal as it went public.

346.     Nonetheless, Nikola's Board of Directors, including Ubben and Russell, as well as Brady, approved the purchase order of the electrolyzers and Nikola put out the June 3, 2020 Press Release.

2.     *Class Period False and Misleading Statements Regarding Hydrogen Capabilities, Infrastructure, and Costs*

347.     In a June 4, 2020 interview with Yahoo! Finance, which remained publicly available to investors during the Class Period, Milton told investors:

> ***But what Nikola solved was the cost-- was the economics on the trucking. When we first started, hydrogen was $16 a kilogram. We can now produce it for well under $4 a kilogram. So we've cut – it's one quarter of the cost***

---

[44] Milton Tr. at 742:4-745:2, ECF No 222.

115

1

***now than it was just a few years ago.  And we're now cheaper to operate per mile than diesel.***[45]

2

3

4

348.    On June 9, 2020, Milton replied on his personal Twitter account to another user, who appeared to have been citing a source projecting dispensed hydrogen to be priced at $6.00 to $8.50 per kilogram by 2025, "***[w]e are already under $4 working on $3***."

5

6

7

8

349.    On June 9, 2020, Milton tweeted from his personal account: "We source energy directly with either wind farms, solar or hydro electricity.  Once we broker a 20 year agreement, we feed it into the federal lines, pay some small fees, then take it out on location. This ensures the energy is clean and we don't pay post meter rates."

9

10

11

12

13

350.    On June 9, 2020, Milton also tweeted from his personal account: "I am the biggest supporter of BEV and FCEV.  We take all energy behind the meter which allows us to get below $.04 per kWh and guaranteed clean energy. Once you go post meter, you can't control the energy, you get 50% dirty energy. I am trying to help and educate. Not hurt BEV."

14

15

16

351.    Again, on June 9, 2020, Milton tweeted from his personal account: "Yes, we have stations going up in Canada and they use clean energy for our hydrogen. Solar, Wind and Hydro give us under $4 per kg hydrogen."

17

18

19

20

21

352.    The statements referenced in ¶¶347–351 were materially false and misleading for the reasons identified in ¶¶270–279 and 291. Moreover, federal utilities had told Nikola that it would not be possible for Nikola to connect into federal electricity transmission lines in or before April 2020 – a concern Fretheim relayed to Russell in an email expressing alarm at the misstatements Milton was making in his podcast

22

23

24

[45] Yahoo Finance, *Nikola debuts on Nasdaq, how it plans to compete with other electric truck makers* (June 4, 2020), available at https://finance.yahoo.com/video/nikola-debuts-nasdaq-plans-compete-150245603.html.

25

26

appearances. Additionally, on June 9, 2020, Prows noted in an email to Milton: "we don't have PPA's [sic] executed yet to support these electrolyzers."

353.   On June 9, 2020, Nikola's stock price increased another $6.46 per share, or 8.82%, above its closing price of $73.27 per share on June 8, 2020.

354.   On June 10, 2020, Milton tweeted from his personal account:
I love both BEV & Hydrogen. Here's the breakdown to combat all the lies. A loaded truck w/full weight & average weather conditions. *H2 is now under $4 per kg and working on sub $3 per kg*. . . . *15 min full* [sic] *time* & 10,000 lbs lighter . . . . Before anyone goes and slams me about cost of hydrogen, we don't produce it in the city, *we do it behind the meter at about $.04 / kWh on PPP clean energy.* That's why hydrogen makes sense for long haul. You're not fighting utilities and rates.

355.   The statement referenced in ¶354 was materially false and misleading for the reasons identified in ¶¶ 270–279, 291 and 295.

356.   On June 10, 2020, Milton tweeted from his personal account in reply to a user who asked, "[w]ondering if I could get your thoughts on how you intend to lower the cost/kg of hydrogen?" Milton responded: "*We are now below $4 per kg which is the lowest in the world. We started at $16 and now we are at $4. We plan on reducing that again*. The key is to order tons of equipment, scale it and buy clean energy cheap."

357.   In an interview on the *Autoline After Hours* podcast on or about June 11, 2020, Milton had the following exchange with the host:

MILTON: And we just ordered $30 million worth of equipment two days – or three days ago for our electrolyzer. *So, it's – all it takes is just electricity, clean energy from hydro, wind, or solar. And we can produce it all 24 hours of the day, never paying peak rates, never buying dirty energy, all zero emission. So, if you really love zero emissions –*

HOST: *You make it on site?*

MILTON: *We do. We make it on site.*

HOST: You make it on site at the station?

MILTON: Yes. And that's why it's so – this is – you know, people don't get Nikola . . . we have the largest hydrogen station in the western world at our

117

1

headquarters. So, we've already proven it . . . . ***Now we're down two, three bucks a kilogram and it's pretty awesome."***

2

358.    The statements referenced in ¶¶356-357 were materially false and misleading

3

for the reasons identified in ¶¶ 270–279 and 291.

4

359.    The June 2020 S-1, signed by defendants Milton, Girsky, Russell, Brady and

5

Ubben, contained further false and misleading statements.

6

360.    Russell testified at Milton's criminal trial that he understood before joining

7

Nikola that "[p]ublic companies have to be very careful about their statements being true

8

and correct . . . [b]ecause investors have to be able to rely on those."[46] Yet the June 2020

9

S-1 contained misleading statements, including statements that portrayed Nikola's future

10

ambitions as if they had already been achieved.

11

361.    In the June 2020 S-1, for example, Nikola touted the importance of both its

12

future FCEV/BEV sales and hydrogen technology and infrastructure as "***core***" to the

13

Company's ongoing success and a "***key differentiator***":

14

15
16
17

> ***Our core product offering*** is centered around our battery-electric vehicle ("BEV") and hydrogen fuel cell electric vehicle ("FCEV") Class 8 semi-trucks. ***The key differentiator of our business model*** **is our planned network of hydrogen fueling stations**. We are offering a revolutionary bundled lease model, which provides customers with the FCEV truck, hydrogen fuel, and maintenance for a fixed price per mile, locks in fuel demand and significantly de-risks infrastructure development.

18

362.    This statement was materially false and misleading when made and omitted

19

to reveal material facts for the reasons identified in ¶¶ 270–279 and 291. By March 2020

20

Nikola's executives were aware that it could not produce and sell hydrogen at economically

21

feasible rates. Additionally, as stated in ¶304, Nikola's infrastructure plan was not "de-

22

risk[ed]" and Nikola had still yet to commit, and was completely unprepared, to build out

23

a "network of hydrogen fueling stations." This statement also omitted to reveal material

24

---

[46] Milton Tr. at 958:3-7, ECF No. 224.

25

26

facts about the planned network of hydrogen fueling stations, the omission of which misled reasonable investors.

363.    At page 48 and 78–79, the June 2020 S-1 repeats some of the claims made previously in the Proxy, discussed fully in ¶¶332-339, regarding the dispensing station at Nikola's Phoenix headquarters serving as "a model for future hydrogen stations," that Nikola was currently "constructing" hydrogen stations, the "California-First Hydrogen Station Strategy," and that hydrogen would "normally be produced on-site at each station." These statements are false for the same reasons as they were in the Proxy. Moreover, in opposing the pending deal to purchase electrolyzers from Nel on May 31, 2020, Prows emailed Russell and Brady: "It seems ludicrous that Nel insists on us buying more stations when they can't even make our demo station run even after a full year of pathetic efforts."[47] The Phoenix HQ dispensing station was not and could not serve as a "model" for Nikola's hydrogen station for the simple reason that it did not work. Moreover, as Brady later testified, by June 2020 "the costs were too high than what we were estimating. So we were exploring different technology for electrolyzers as well as different vendors. We were exploring various models so that we moved on away from on-site gaseous hydrogen generation and dispending to potentially a centralized hydrogen hub production separate from dispensing stations."[48] However, Brady testified that Nikola had not by this point taken any steps to lock in land or electricity rates for any potential hydrogen station model and understood that Nikola might have to resort to purchasing hydrogen from a vendor rather than producing it, even when it began building out its stations in the coming years.

_____

[47] Milton Tr. at 743:2-5, ECF No. 222.

[48] Milton Tr. at 1812:3-22, ECF No. 232.

119

364.   On page 10, the June S-1 repeated the risk factor contained in the proxy concerning "unanticipated challenges which *may*" cause bundled leases to be "costlier than anticipated." The risk factor was materially misleading for the same reasons identified in ¶341.

365.   In a June 18, 2020 article in the *Irish Times* titled "Nikola Motor Takes a Big-Money Punt on the Hydrogen Future," Milton is quoted as follows: "**We can now produce hydrogen for between $2 and $4 a kilogram. We're now cheaper than diesel to operate per-mile** and we're almost at parity with a battery electric per-mile, and ultimately that's game over for diesel."

366.   On June 19, 2020, *CNN* aired an interview with Milton on "First Move with Julia Chatterley." Milton made multiple statements suggesting Nikola was currently able to produce hydrogen using zero-emission electricity, and that it could dispense hydrogen in 15 minutes:

> [T]he unique thing about Nikola is, we're the only company that I know of in the world that is fully vertically integrated. That means, we don't just provide the truck, *we provide all the hydrogen for it, too. We produce our own hydrogen through zero emission methods. So, our supply chain is zero emission from production to consumption* unlike anyone else in the world, and that's why there has really been so much excitement.
>
>        \*       \*       \*
>
> The advantage of hydrogen is you can turn that truck, *you can fill it up in 15 minutes and then go on the road again* and you can do that 24 hours a day without ever stopping. *Hydrogen is produced over 24 hours of the day using all the peak load from solar.* So, right now, throughout the world, like *solar and wind energy, a lot of it is just given away or they pay people to take it at their power companies because they have too much of it on the grid*.

367.   On June 21, 2020, a Twitter user asked Milton, "can you please explain how Nikola is achieving cheap power along freeways? And how will you still achieve cheap power for stations inner city? This is more of the game changer for nikola [sic] in my opinion. Thanks." Milton responded: "*Freeway allows you 20 year PPP without paying*

120

*high fees to transport through utilities. It is nearly 5x cheaper to produce h2 on freeways, where hydrogen excels.*"

368.    On June 21, 2020, Milton published on LinkedIn an article he wrote titled *Trevor Milton: Hydrogen vs Battery Electric-Why Nikola is the Leader-Reality Sets In*, in which he wrote:

> Most hydrogen that Nikola makes is on the freeway . . . . Nikola uses energy transmitted on the federal transmission lines before we enter the utility. We buy this clean energy directly from Wind, Solar and Hydro facilities directly. This allows us to get sub $.04/kwh 20-year agreements on the freeways.

369.    The statements referenced in ¶¶365–368 were materially false and misleading for the reasons identified in ¶¶270–279, 291 and 295.

370.    On June 27, 2020, Milton responded to a twitter user who posted "Hydrogen fuel prices could be as low as gas in five years" by tweeting:

> It's lower now. Which is awesome. Now has it below $4-kilogram, which is cheaper than diesel. Working on sub $2.50 kilogram now.

371.    On or about July 6, 2020, Milton stated on the Founder Hour podcast: "*We drove hydrogen down from 16 dollars a kilogram down below four dollars a kilogram now*. So why is that? Well, why is that important? Because *now, I can provide zero emission to a truck cheaper than diesel.* We've now won the game.*"

372.    The statements referenced in ¶¶370-371 were materially false and misleading for the reasons identified in ¶¶270–279 and 291.

373.    On or about July 14, 2020, the Observer.com posted a video of an interview with Milton on YouTube. Milton stated in this interview: "We build all of our hydrogen through clean energy directly from the energy source. So we go contract with like wind farms or solar farms or whatever. And with that, what we do, is *we take that energy and*

*we produce hydrogen 24 hours a day with it. And then we can produce that very cheap like you know like $2, $3 a kilogram. We're under $4 a kilogram for hydrogen*. . . ."

374.    The statement referenced in ¶373 was materially false and misleading for the reasons identified in ¶¶270–279 and 291.

375.    In the same July 14, 2020 Instagram Live video, Milton also stated:
We charge cost per mile, that's it. Everything all in, service, warranty, maintenance, the entire thing, including the hydrogen fuel, it's under a dollar a mile and, and in some area – it depends on how many miles you drive a year. That can range much cheaper than that, all the way up to about a dollar a mile. It depends on – that is, um, that is – that's it how would – that's how it's built out and that's much – *it's 20 to 30 percent less than diesel*.

376.    The statement referenced in ¶375 was materially false and misleading for the reasons identified in ¶¶270–279 and 291.

377.    In an interview with Jessica Meckmann published on LinkedIn on or about July 17, 2020, Milton stated: "We are contracting with wind, solar and hydro plants for energy and so far have been able to source plenty of energy under $.04 per kWh. Most of it is much lower in the 2.5 [cents] per kWh range."

378.    In an interview on the *Chartcast* podcast (hosted by "Tesla Charts" and "Georgia Orwell") recorded on or about July 17, 2020 and published by the podcast on or about July 19, 2020, Milton stated that Nikola has been able to "chop the cost of hydrogen from $16 per kilogram down to – *we're down below $3 per kilogram on our hydrogen right now*. . . ."

379.    On the same *Chartcast* podcast, Milton claimed:

So the energy on the freeway, we, we, *we tap directly into the main federal transmission lines and we contract directly with groups* . . . an example would be like, you know, um, would be like a Tennessee Valley Authority . . . . *So out on the freeways where the federal transmission lines are, and we can tap in, and we've, we've already preplanned all these, these locations where they can go. Um, and we're gobbling up the best locations right now*.

380.   Milton further claimed that "[w]e only look at areas where we can get this energy for sub, you know, sub three or four cents a kilowatt hour, guaranteed 24 hours a day. And we've been able to do that in almost every one of our major locations that we're going up, and we're gobbling up those locations." Milton also asserted that "we have exact costs for our customers" and "every contract we've been doing right now has been to where we get very good discounts, if not free for a lot of energy, you're talking about, you know, **$2 a kilogram**, buck, buck 50, buck 80."

381.   In the *Chartcast* podcast, Milton also stated, among other things, that when Nikola first started, hydrogen production stations "were going to be 50 to 60 million," but now Nikola is "down to, you know, 14, 14 million bucks" due to the "standardization of a hydrogen station."

382.   On the same *Chartcast* podcast, Milton stated that Nikola has been able to "**chop the cost of hydrogen from $16 per kilogram down to – we're down below $3 per kilogram** on our hydrogen right now: and that "**the standardization of the hydrogen station was the most important aspect**" of cost-saving."

383.   In the same *Chartcast* podcast, Milton stated: "You have essentially 30, you know, you're almost, you, **you're 25, 30% less than a diesel engine to operate**, um, which is game over for diesel."

384.   The statements referenced in ¶¶377-383 were materially false and misleading for the reasons identified in ¶¶270–279, and 291372. These statements were also materially false and misleading because Defendants knew or recklessly disregarded but failed to disclose that Nikola had not achieved the cost reductions from "standardization" of its hydrogen stations. Moreover, on July 20, 2020, Elizabeth Fretheim (Global Head, Business Development) emailed Defendants Russell, Brady and Worthen as well as Pablo Koziner

and the communications teams, acknowledging that Milton's statements that Nikola's "cost of hydrogen below \$3/kg" was an "inaccuracy[y]." Fretheim also took issue with Milton's portrayal of the Company as "gobbling up" locations when Nikola had neither acquired any property nor identified any specific sites to acquire.

385.    The July 2020 S-1, signed by defendants Milton, Girsky, Russell, Brady and Ubben, contained additional false and misleading statements.

386.    At page 78 of the July 2020 S-1, as in the June S-1 and the Proxy, Nikola stated, "[W]e have initiated the development of the hydrogen station infrastructure by completing our first 1,000 kg demo station in the first quarter of 2019 at our corporate headquarters in Phoenix, Arizona. ***The demo hydrogen station offers hydrogen storage and dispensing and serves as a model for future hydrogen stations***." Below, the S-1 included a graphic showing a "FAST 70 MPA FUELING STATION" and a "FAST 70 MPA HYDROGEN DISPENSER."

387.    The statements referenced in ¶386 were materially false and misleading for the same reasons identified in ¶¶295 and 333.[49]

388.    The July S-1 also repeated the statements in the June 2020 S-1 and the Proxy regarding the "California-First Hydrogen Station Strategy," that hydrogen would "normally be produced on-site at each station via electrolysis," that Nikola was "constructing" hydrogen stations, as well as the risk factor regarding the possibility of bundled leases proving to be costlier than anticipated. These statements were misleading for the same reasons identified in ¶¶332-341.[50]

---

[49] *In re Alphabet, Inc. Sec. Litig.*, 1 F. 4th at 704 ("Risk disclosures that 'speak entirely of as-yet-unrealized risks and contingencies' and do not 'alert the reader that some of these risks may already have come to fruition' can mislead reasonable investors.").

[50] *In re Alphabet*, 1 F.4th at 704.

124

389.    In late July 2020, when Nikola's stock price began to decline, Milton contacted a Nikola senior executive to discuss the possibility of Milton buying shares of Nikola "for the company's health" because Nikola has had "zero news for two weeks and it's important to prevent our stock from losing credibility." Shortly thereafter, Milton began another "media blitz" to inflate Nikola's stock price.

390.    In an interview on the *This Week in Startups* podcast on or about July 31, 2020, Milton claimed that "what we did is ***we've been able to drive hydrogen to under $4 a kilogram, we're about $3 a kilogram on hydrogen now.***" When asked by the host how Nikola got "from 14 to 3 – is there some special sauce there," Milton replied, "[y]eah, very simple. It's all about – ***it's about standardization***. . . . So in America right now, there's no two hydrogen stations that were actually developed on the same platform, they're all engineered from the ground up separately . . . . ***So we, we developed the first ever standard hydrogen station that can be produced in the thousands***."

391.    The statement referenced in ¶390 was materially false and misleading for the reasons identified in ¶¶270–279, 291 and 384. Nikola had not developed a standard hydrogen station that could be mass produced. Milton and the Board knew that Nikola had projected that it would not even have blueprints for the stations until the end of September 2020 at the earliest.

392.    In an interview on the *Stockcast* podcast on or about July 31, 2020, Milton stated that "diesel's dead in the trucking world. And why is that? Because trucking operates on eight percent margins, somewhere around there. So, if you're eight percent less than diesel, it's already game over and so that's why it's so great. ***We're almost 20 to 30 percent less than diesel right now and we're working on, you know, if we can get really good, if we can get down to two dollars a kilogram.***"

393.    The statements referenced in ¶392 were materially false and misleading for the reasons identified in ¶¶270–279 and 291. Moreover, Milton, along with Russell, Brady, Worthen, Girsky, and Ubben, had recently attended a July 23, 2020 Board of Directors meeting in which the hydrogen infrastructure team reiterated that the Company still had not entered into any PPAs.

394.    In an interview on the *Barron's Roundtable* show on Fox Business on or about August 1, 2020, Milton was asked by the anchor: "right now hydrogen, which powers those cells is about four times as expensive as diesel. Why do you like fuel cells and how can you make this actually work?" Milton responded:

> Yeah, that's, uh, that was a big problem we tackled. That's why we came into the market. We saw an opportunity to bring the cost of hydrogen down going zero emission and ***putting it on parity or lower than diesel***. And that's the first time in history that's been able to be done. So it went from about $16 a kilogram*, **we're down now below $4 a kilogram and there's lots of reasons for that. But the main one is standardization of a hydrogen station worldwide has allowed us to drive that cost down dramatically***.

395.    On August 3, 2020, a Twitter user asked Milton to share how he reduced the price of hydrogen in a way that was "more technical than standardized stations." Milton replied: "Essentially, ***$.04 kWh equals under $4 per kg. We are already locking in much lower than $.04 per kWh*** on our stations going in as they are on freeways with 20 year PPA. That along with other things I mentioned get us below that."

396.    The statements referenced in ¶¶394-395 were materially false and misleading for the reasons identified in ¶¶270–279, 291, and 384.

397.    On August 3, 2020, Nikola's stock price increased $6.49 per share, or 21.63%, above its closing price of $30.00 per share on the prior trading day, July 31, 2020, which was an increase of $7.43 per share, or 25.56%, above its closing price of $29.06 per share on July 30, 2020.

126

398.    The Q2 2020 10-Q, filed on August 4, 2020, signed by defendants Russell and Brady, contained additional false and misleading statements.

399.    The Q2 2020 10Q contained the same risk factor as the Proxy, June S-1, and July S-1 that "there **could be unanticipated challenges** which **may** hinder our ability to provide our bundled lease to customers or **make the provision of our bundled leases costlier than anticipated.**" This statement was materially misleading for the same reasons identified in ¶¶270-279, 3401, and 393.[51]

400.    On August 4, 2020, Nikola held its Q2 2020 Earnings Call. Russell, Worthen, and Brady participated in the call. In his remarks, Russell highlighted Nikola's recent purchase agreement for electrolyzers:

> During the quarter, we signed an order for 85 megawatts of alkaline electrolyzer capacity from Nel ASA, which is enough to build five of our base 8-ton hydrogen production and dispensing stations. At full capacity, these stations can produce 40,000 kilos of hydrogen every day which is enough to fuel up to 1,100 trucks. ***This milestone marks the beginning of the construction of our hydrogen station network***.

401.    The statements referenced in ¶400 were materially false and misleading for the reasons identified in ¶¶270–279 and 345. Russell was putting the chicken before the egg. It was misleading to refer to the purchase of electrolyzers as a "milestone" marking the "beginning of the construction of [Nikola's] hydrogen station network" when Nikola was not in a position to construct any hydrogen stations for a myriad of reasons that Russell and Brady knew of. Prows had protested the electrolyzer purchase as premature to Russell for this very reason: Nikola had no PPAs, couldn't yet reliably dispense hydrogen, and had yet to identify any specific sites on which to build stations, let alone acquire and permit them. In the summer of 2020, Nikola had merely identified general municipalities in which it aspired to build stations, such as Los Angeles, but had not had any conversations to

---

[51] *In re Alphabet*, 1 F.4th at 704.

purchase or lease any specific sites. Agreeing to purchase electrolyzers did little to move the needle. Brady testified that by June 2020 at the latest Nikola understood it might have to continue purchasing hydrogen from third-party vendors for years to come because the Company could not produce it.[52] Russell's representing to investors that purchasing electrolyzers was a "milestone mark[ing] the beginning of the construction of our hydrogen station network" was made with reckless disregard for the truth and the danger of misleading investors was so obvious that Russell must have been aware of it.

402.   During the August 4, 2020 Q2 2020 Earnings Call, analyst Emmanuel Rosner inquired about the "cost of electricity" Nikola had targeted. Rosner asked Nikola's executives to explain if they had had any discussions with electricity companies and if they had received any indication that Nikola's "input cost is actually realistic." Russell and Brady responded:

> **RUSSELL**: Absolutely. It's a great question. ***So, we can make hydrogen for about a decimal move or better on the cost of electricity. So, our – if we can get, say, the electricity at $0.035, then we should be able to make hydrogen at $3.50 a kilo or better, given our current technology and the current design of our stations***. So, the key for us to have our target hydrogen cost is for us to get the electricity at the right cost. . . .
>
> This is one of the reasons we got a big investment from a solar provider out there. We have a big – we had a big investment in our private realm from Hanwha, which is a big solar panel provider and solar array manufacturer, because they can profitably build solar arrays and sell the electricity on a long-term basis for the projected life of our stations ***even on a fixed cost basis for our target price. They can do that***. . . .
>
> The other thing you want to pay attention to is the wholesale price of electricity at the major trading points in places where it's free to trade. You're going to see that price, when it's being driven by the renewables, that price falls way down there. It even goes to zero once in a while and occasionally goes negative when one grid has too much of it. That's the reason ***we have faith that we're going to able to hit this number especially on the average. Some places will be lower, some places a little bit higher. But we're going to be on our average. We're very confident***.

---

[52] Milton Tr. at 1812:3-22, ECF No. 232.

**BRADY**: And, Emmanuel, we are having some conversations in the Phoenix area and ***we're getting some indications that it can be below $0.035 per kilowatt hour***. And we are also having some number of discussions in various areas about collaboration and various projects where we can achieve that.

403.    The statements referenced in ¶402 were materially false and misleading for the reasons identified in ¶¶270–279 and 291. It was additionally misleading for Russell to state that Nikola "can make hydrogen for about a decimal move or better on the cost of electricity" when Nikola had never made any hydrogen (a fact which Defendants had never disclosed and, as the testimony of Dale Prows illuminated, conspicuously avoided disclosing).[53] Moreover, it was misleading for Russell and Brady to state that Nikola could achieve its target price of $0.035 for electricity when this figure was unachievable. Russell and Brady both representing that Nikola would be able to produce hydrogen and economically feasible prices – when they both knew Nikola at the time could not produce any hydrogen and all internal models stated Nikola could not come close to producing hydrogen at prices anywhere near economically feasible prices was made with reckless disregard for the truth and the danger of misleading investors was so obvious that Russell and Brady must have been aware of it.

404.    Following a short period of stock price decline in August 2020, Milton sent a text message to a senior Nikola executive requesting to "talk strategy ASAP." Milton went on to say that the "continual stock decline is going to erode any confidence in our stock.  We have to do something . . . . We can't just sit here and watch it collapse."

405.    On August 13, 2020, Milton tweeted: "***We currently make our own green H2 for under $4 a kilogram***. We are open to others down the road, but ***we have our stations***

---

[53] Milton Tr. at 823:8, ECF No. 224.

1  *going up* and need to focus on completing ours first. Then we can work with others as we

2  expand."

3          406.    On September 14, 2020, Nikola issued a press release unequivocally refuting

4  the claims made by the Hindenburg Report. Nikola's Board of Directors had held a meeting

5  on September 13, 2020, in which Milton, Russell, Brady, Russell, Girsky, and Ubben

6  approved of a communications protocol for responding to the Hindenburg Report,

7  including the release of the September 14 press release. In one paragraph, the press release

8  stated: "*Short Seller Intentionally Underestimates Extent of Hydrogen Production*

9  *Capabilities*." In defense of Nikola's hydrogen capabilities, the press release stated:

10  "Nikola has already installed a 1,000 kg hydrogen storage and dispensing demo station at

11  its headquarters and ordered over $30 million of electrolyzers to support the initial

12  hydrogen station rollout." The press release also included a link to the June 3, 2020 press

13  release announcing the Nel purchase order, and concluded that the allegations by the short

14  seller regarding Nikola's hydrogen production capabilities "*are false and misleading, and*

15  *designed to manipulate the market to profit from a manufactured decline in Nikola's stock*

16  *price.*"

17          407.    The statements referenced in ¶406 were materially false and misleading for

18  the reasons identified in ¶¶270–279, 291, 295 and 345. Specifically, Hindenburg did not

19  underestimate Nikola's "Hydrogen Production Capabilities"—it accurately reported that

20  Nikola had never produced any hydrogen, which Defendants knew but did not disclose.

21  This was new information that had never been previously reported to investors. Moreover,

22  by referring to the purchase order of Nel electrolyzers, Defendants again created the

23  misleading impression that Nikola was much closer to being able to build out its hydrogen

24  station infrastructure than it was, as described in ¶401. By this point, Nikola had not even

25

26                                                    130

decided whether it would employ an on-site production model for hydrogen or a liquefication model, and, as Brady later admitted, Nikola's executives internally understood that the company might have to continue purchasing hydrogen from third-party vendors for years to come. It was additionally misleading for Nikola to tout that its demo station illustrated its hydrogen capabilities without disclosing that the station was inoperable 79% of the time and routinely took 45-80 minutes to fuel a truck.

408.   The Hindenburg Report also stated that "Trevor has claimed in a presentation to hundreds of people and in multiple interviews to have succeeded at cutting the cost of hydrogen by ~81% compared to peers and to *already be producing hydrogen*. Nikola has not produced hydrogen at this price or at *any* price." This was a truthful and accurate statement and Defendants claiming the Hindenburg Report was "false and misleading" was untrue as each of the Defendants knew Nikola was not producing hydrogen and at the costs claimed by Milton.

409.   The statements referenced in ¶406 were additionally misleading because by attempting to discredit the Hindenburg Report, Defendants obscured the legal risks that they understood Nikola faced. Nikola's Board of Directors met several times following the Hindenburg Report. On September 11, 2020, the Board held a meeting attended by Milton, Russell, Girsky, Ubben, Brady, and Worthen. Attorneys from Kirkland & Ellis were also "present for the purpose of providing legal advice to the Company in anticipation of potential litigation." The Kirkland & Ellis attorneys also discussed and answered questions from the Board regarding "the process and strategy with respect to the SEC, and other legal matters that can be expected to arise in the coming weeks." The Board met again on September 13, 2020, with Milton, Russell, Girsky, Ubben, Brady, and Worthen in attendance. On September 13, 2020, the Board discussed the "SEC Process and Other

Legal Matters" and the impact of the SEC investigation on future transactions, as well as Milton's use of social media. Nonetheless, despite discussing the real risks the Company was facing as a result of the Hindenburg Report's revelations, Milton, Russell, Girsky, Ubben, Brady, and Worthen approved Nikola's communications plan for responding to the Hindenburg Report and approved issuing the September 14, 2020 press release—a draft of which was distributed to the Board at the meeting.

410.    On September 22, 2020, Brady attended the Evercore ISI Virtual Forum. In a question-and-answer segment, the host brought up Nikola's target of acquiring electricity for $0.03 to $0.04/kWh and asked Brady "how do you get comfort over those assumptions and then how do we think about this cost assuming those assumptions relative to diesel at $2.50 a gallon?" In his response, Brady stated:

> [W]hat we **guarantee** them [customers] is that you got fixed price lease over seven years. And what that means is that **we're going to make sure that we are able to deliver hydrogen at the right price and we believe that right price is sub $3**. And as you pointed out, John, the biggest variable especially from operating perspective to achieve that is really cost of electricity. When we think about cost of electricity as you know it all depends on the location and that's really important and **we recognized that in many locations where you have solar and wind or even hydro that's highly achievable**.

411.    The statements referenced in ¶410 were materially false and misleading for the reasons identified in ¶¶270–279. Prows had notified Brady in March 2020 that a "sub $3" cost was not "achievable," in large part because Nikola was struggling to find cheap electricity. As Brady would later testify at Milton's criminal trial, Nikola was finding it challenging at this very time, September 2020, to find a partner who could provide energy at a price close to 3.5 cents per kilowatt hour.[54]

---

[54] Milton Tr. at 1810:5-12, ECF No. 232.

1

**E.    Defendants' False and Misleading Statements Regarding Hydrogen Production, Dispensing, and Infrastructure Caused Investor Losses**

2

3

4

5

412.   Prior to and during the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Nikola and operated as a fraud or deceit on Class Period purchasers of Nikola common stock by failing to disclose and misrepresenting the adverse facts detailed herein.

6

7

8

9

10

11

12

13

413.   Class members unknowingly and in reliance upon Defendants' materially false or misleading statements and/or omissions (prior to and during the Class Period) regarding Nikola's hydrogen capabilities and energy supply purchased Nikola common stock at artificially inflated prices, as the market perceived Nikola to be far more advanced in its ability to build out a network of stations that could produce and dispense low-cost hydrogen fuel.  But for Defendants' misrepresentations, omissions, and fraudulent scheme, Lead Plaintiffs and other Class members would not have purchased Nikola common stock at the artificially inflated prices at which it traded during the Class Period.

14

15

16

17

18

414.   The truth regarding Defendants' fraud was revealed in a series of corrective disclosures and/or materializations of concealed risk that occurred between September 9, 2020 and July 29, 2021. During this time, the price of Nikola common stock fell precipitously as the artificial inflation caused by Defendants' unlawful conduct exited Nikola common stock.

19

20

21

22

415.   The decline in the price of Nikola common stock during this period is directly attributable to the market absorbing information that corrected and/or reflected the materialization of risks concealed by the Defendants' material misrepresentations or omissions prior to and during the Class Period.

23

24

416.   As a result of their purchases of Nikola common stock during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss (*i.e.*, damages)

25

26

under the federal securities laws.  Defendants' materially false and misleading statements had the intended effect and caused Nikola common stock to trade at artificially inflated levels throughout the Class Period and, in certain instances, caused inflation in Nikola's stock price.

417.   By concealing from investors the adverse facts detailed herein, Defendants presented a false and misleading picture of Nikola's business.  As the truth about the Company and the extent of the fraud was revealed to the market, the price of Nikola common stock fell significantly.  This decline removed the inflation from the price of Nikola common stock, causing real economic loss to investors who had purchased Nikola common stock during the Class Period.

418.   Moreover, the market for Nikola common stock was open, well-developed, and efficient at all relevant times.  As a result of Defendants' misstatements and material omissions, as alleged herein, Nikola common stock traded at artificially inflated prices. Lead Plaintiffs and other Class members purchased Nikola common stock relying upon the integrity of the market relating to Nikola common stock and suffered economic losses as a result thereof.

419.   On September 10, 2020, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions prior to and during the Class Period were partially revealed when Hindenburg Research published the Hindenburg Report, partially exposing the truth about Nikola's hydrogen capabilities, supposedly "off-grid" headquarters, and ownership of natural gas wells, among other subjects.

420.   The Hindenburg Report asserted that Nikola had never produced any hydrogen and that Milton's claims that Nikola could do so at low cost—*e.g.*, that the

Phoenix demo station could "produce over 1,000 kilograms a day on site," that Nikola was "down below \$3/kg on our hydrogen now"—were baseless. The Hindenburg Report also found that Nikola was wholly unprepared to build out a nationwide hydrogen production and dispensing infrastructure. Hindenburg dug into the backgrounds of Nikola's primary hydrogen infrastructure personnel and learned that they (including Milton's brother, Travis Milton) had little to no relevant experience. Hindenburg based its report in part on "extensive evidence—including recorded phone calls, text messages, private emails and behind-the-scenes photographs" and no market participant had previously compiled and released the information Hindenburg had on Nikola's hydrogen capabilities. Hindenburg was the first to put together and release these findings.

421.   Additionally, the September 10, 2020 publication of the Hindenburg Report, and related news coverage reporting on Nikola's representations about its hydrogen production capabilities and technological advancements to achieve low-cost hydrogen was a foreseeable consequence of, and within the zone of the risk concealed by, the Defendants' misrepresentations and omissions regarding Nikola's hydrogen capabilities and the Company's readiness to begin building a hydrogen network.

422.   As a direct and proximate result of this corrective disclosure and/or materialization of the foreseeable risks concealed by Defendants' fraud, the price of Nikola common stock declined \$4.80 per share, or 11.33%, to close at \$37.57 per share on September 10, 2020.

423.   On September 11, 2020, Nikola's stock price continued to fall in response to the news, falling another \$5.44 per share, or 14.5%, to close at \$32.13 per share on September 11, 2020.

424.   The decline in Nikola's common stock price on September 10, 2020 and September 11, 2020 were a direct result of the nature and extent of Defendants' prior misstatements and omissions being revealed to investors, including Defendants' statements concerning Nikola's hydrogen capabilities. The timing and magnitude of the Nikola common stock price decline evidences the impact Defendants' statements had on the Company's stock price during the Class Period and negate any inference that the loss suffered by Lead Plaintiffs and other Class members was caused by changed market conditions or macroeconomic, industry, or Company-specific factors unrelated to Defendants' fraudulent conduct.  Moreover, various analysts (including those from S3 Analytics, Deutsche Bank Research, and RBC Capital Markets) issued reports attributing Nikola's stock price decline to the information revealed in the Hindenburg Report.

425.   As referenced in ¶ 406, on September 14, 2020, before the market opened, Nikola issued a statement that unequivocally denied the allegations in the Hindenburg Report, asserting that Hindenburg "Intentionally Underestimates Extent of [Nikola's] Hydrogen Production Capabilities" and concluding that the Hindenburg Report's assertions about hydrogen were "false and misleading."

426.   On Nikola's fierce denials of any wrongdoing, Nikola's stock price increased $3.66 per share, closing at $35.79 on September 14, 2020, an 11.39% increase from its previous close on September 11, 2020.

427.   On September 14, 2020, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions prior to and during the Class Period regarding Nikola's hydrogen capabilities partially materialized when, after the market had closed, Bloomberg reported that the SEC was investigating Nikola in connection with the allegations in the Hindenburg Report. "[T]he announcement

of an SEC investigation related to an alleged misrepresentation . . . can serve as a corrective disclosure for the purpose of loss causation." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1202 (9th Cir. 2016). [55] The investigation announcements partially revealed the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions regarding the Nikla's hydrogen capabilities as it was an acknowledgement that the Hindenburg Report was credible, which was later confirmed. The market therefore understood the announcements to be a revelation of fraud and reacted accordingly. Thus, the SEC and DOJ investigations announced in September 2020 were caused, in part, by Defendants' misstatements and omissions related to Nikola's hydrogen capabilities, as the agencies later confirmed.[56]

428.   The next day, on September 15, 2020, during intra-day trading, the Wall Street Journal reported that the DOJ had joined the SEC's investigation of Nikola.  Also, during the trading day, *CNBC* published an article noting explaining that the "SEC and DOJ are reportedly looking into the merits of a short seller's claims that electric vehicle manufacturer Nikola misled investors.

---

[55] The Ninth Circuit clarified in *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750 (9th Cir. 2018) that "Disclosure of the fraud is not a sine qua non of loss causation, which may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss. . . . In *Lloyd*, though the plaintiffs pleaded that the market understood the subpoena to be a revelation of fraud, we did not suggest that this path is the only way to satisfy loss causation. Indeed, we affirmed the opposite: the plaintiffs simply adequately pleaded a causal connection between the material misrepresentation and the loss." *Id.* at 753 (citations and internal quotations omitted).

[56] The Ninth Circuit clarified in *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750 (9th Cir. 2018) that "Disclosure of the fraud is not a sine qua non of loss causation, which may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss. . . . In *Lloyd*, though the plaintiffs pleaded that the market understood the subpoena to be a revelation of fraud, we did not suggest that this path is the only way to satisfy loss causation. Indeed, we affirmed the opposite: the plaintiffs simply adequately pleaded a causal connection between the material misrepresentation and the loss." *Id.* at 753 (citations and internal quotations omitted).

429.   The same day, Hindenburg issued also a 25-page rebuttal report, which argued that Nikola had "debunked nothing" and had "either confirmed or sidestepped virtually everything we wrote about, and in some cases raised new unanswered questions."

430.   The SEC and DOJ investigations were triggered in part by and focused extensively on Defendants' statements regarding Nikola's hydrogen production capabilities and the Company's costs of producing hydrogen, demonstrating that both actions were causally linked to Defendants' misstatements on these subjects. Nikola would ultimately settle civil fraud charges with the SEC for $125 million in December 2021. In announcing the settlement, the SEC stated that Nikola "misled investors by misrepresenting or omitting material facts about the refueling time of its prototype vehicles, the status of its headquarters' hydrogen station, [and] the anticipated cost and sources of electricity for its planned hydrogen production…" Moreover, the SEC and DOJ actions against Milton centered on Nikola's hydrogen capabilities. The SEC complaint against Milton confirmed that the SEC's action had been prompted by statements about Nikola's hydrogen production capabilities and costs, such as that Nikola could produce hydrogen, source electricity for under $0.04/kWh, or achieve a TCO that was cheaper than diesel. The DOJ indictment, meanwhile, stated that Nikola had never produced hydrogen and that the demo station "has been plagued with problems because many components of the station were not built to withstand the extreme heat in Phoenix." Accordingly, the SEC and DOJ investigations announced in September 2020 were caused, in part, by Defendants' misstatements and omissions related to Hydrogen, as the agencies later confirmed.

431.   The announcement of the DOJ and SEC investigations was also a materialization of the risk concealed by Defendants' false statements defending Milton in the wake of the Hindenburg Report, including the September 14, 2020 Press Release.

Defendants misled investors about the risks related to Milton's misstatements by insisting that the Hindenburg Report's claims regarding Milton, including those asserting Milton exaggerated Nikola's hydrogen production capacity, were "false and misleading" and "defamatory" and "Intentionally Underestimate[d]" Nikola's "Hydrogen Production Capabilities." These statements masked the risks that Milton had exposed the Company to government action and that Milton may have to depart Nikola. These obscured risks were partially realized by the announcement of the DOJ's and SEC's investigations.

432.   As a direct and proximate result of this corrective disclosure and/or materialization of the foreseeable risks concealed by Defendants' fraud, the price of Nikola common stock declined by $2.96 per share, closing at $32.83 on September 15, 2020, an 8.27% decline from its previous close on September 14, 2020.

433.   The decline in Nikola's common stock price on September 15, 2020 was a direct result of the nature and extent of Defendants' prior misstatements and omissions regarding Nikola's hydrogen capabilities and costs being revealed to investors.  The timing and magnitude of the Nikola common stock price decline evidences the impact Defendants' statements had on the Company's stock price during the Class Period and negate any inference that the loss suffered by Lead Plaintiffs and other Class members was caused by changed market conditions or macroeconomic, industry, or Company-specific factors unrelated to Defendants' fraudulent conduct.

434.   On Sunday September 20, 2020, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions prior to and during the Class Period regarding Nikola's hydrogen capabilities and costs materialized when Nikola announced that Defendant Milton had resigned from his position as Executive Chairman and from the Board of Directors.

435.     Following the Hindenburg Report's release, Nikola's Board of Directors held a flurry of meetings on September 11, 2020, September 13, 2020, September 15, 2020, September 16, 2020, September 18, 2020, and September 20, 2020. The Board discussed Milton's use of social media, the SEC and DOJ investigations, and the Hindenburg Report at these meetings. Milton tendered his resignation at the last of these meetings, on September 20, 2020. Milton's resignation was directly caused by his false and misleading statements—particularly those made on social media, which frequently misstated Nikola's hydrogen production capabilities and costs. *CNN* reported on September 21, 2020, that as part of his separation agreement, Milton agreed to "revise any references to the positions he held at Nikola on his social media profiles so it's clear he no longer holds them. He also agreed to check with lawyers for Nikola before posting anything about the company." Milton also surrendered 4.9 million performance-based stock units he had been granted in August 2020 and a two-year consultancy option worth $20 million.

436.     The September 20, 2020 resignation, and the widely reported related news coverage was a foreseeable consequence of and within the zone of the risk concealed by Defendants' misrepresentations and omissions. For example, on September 21, 2021 during intra-day trading, Barron's published an article entitled "Nikola Founder Trevor Milton Is Out. Wall Street Tries to Make Sense of the Chaos" which explained that analysts viewed the resignation as casting uncertainty on Nikola's ability to build out its network of hydrogen fueling stations, causing some analysts to lower their price targets. Wedbush analyst Dan Ives did not change his price target, but called Milton's resignation "shocking and said it 'will be perceived by the Street as a major near-term gut punch.' He is on the sidelines until he has more confidence about hydrogen filling stations."

437.   Milton's resignation also partially revealed the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions touting the Company's hydrogen production capabilities as it was the first tacit acknowledgement by the Company that the Hindenburg Report was true. The market therefore understood Milton's resignation to be a revelation of fraud and reacted accordingly. Nikola later admitted that Milton had made misstatements, confirming that the market's understanding was correct.[57]

438.   Milton's resignation was also a materialization of the risk concealed by Defendants' false statements defending Milton in the wake of the Hindenburg Report, including the September 14, 2020 Press Release. Defendants misled investors about the risks related to Milton's misstatements by insisting that the Hindenburg Report's claims regarding Milton, including those asserting Milton exaggerated Nikola's hydrogen production capacity, were "false and misleading," "defamatory," and "Intentionally Underestimate[d]" Nikola's "Hydrogen Production Capabilities." These statements masked the risk that Milton would have to depart Nikola—a risk Nikola explicitly warned could have dire consequences for Nikola in its SEC filings, which stated: "We are highly dependent on the services of Trevor R. Milton, our Executive Chairman, and largest stockholder. Mr. Milton is the source of many, if not most, of the ideas and execution driving Nikola. If Mr. Milton were to discontinue his service to us due to death, disability or any other reason, we would be significantly disadvantaged." This risk, which Defendants obscured in their unequivocal denials that Milton had engaged in any conduct that could lead to his departure, were partially realized by the announcement of Milton's resignation just days later. As one analyst stated in a *CNBC* interview: "Let's call it like it is. Trevor

---

[57] *See Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) (citing *Lloyd*, 811 F.3d at 1210) (loss causation can be found where market understands event to be caused by fraud even absent contemporaneous admission of fraud when later revelations confirm market's understanding).

leaving. I mean he's a key part of the vision." Another analyst called it a "dark day for Nikola." A third said: "This will come as a shock to the big crowd of believers in the company and its founder. We expect heavy selling…"

439.    As a direct and proximate result of this corrective disclosure and/or materialization of the foreseeable risks concealed by Defendants' fraud, the price of Nikola common stock declined by $6.60 per share, closing at $27.58 on Monday September 21, 2020, an 19.33% decline from its previous close on Friday September 18, 2020.

440.    The decline in Nikola's common stock price on September 21, 2020 was a direct result of Milton's resignation, which itself was caused in part by his fraud related to Nikola's hydrogen capabilities. The timing and magnitude of the Nikola common stock price decline evidences the impact Defendants' statements had on the Company's stock price during the Class Period and negate any inference that the loss suffered by Lead Plaintiffs and other Class members was caused by changed market conditions or macroeconomic, industry, or Company-specific factors unrelated to Defendants' fraudulent conduct.

441.    On September 23, 2020, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions prior to and during the Class Period regarding Nikola's hydrogen capabilities and costs were partially revealed and/or materialized when *The Wall Street Journal* and *Dow Jones Newswires* reported that talks between Nikola and several potential energy partners, including BP, to build hydrogen-refueling stations stalled "following allegations the company had misled investors."

442.    These reports were widely distributed by the financial news media. For example, during the trading day on September 23, 2020, Markets Insider issued an article

entitled "Nikola fell 22% on Wednesday amid a report from The Wall Street Journal that potential partnership talks have been put on hold after weeks of controversy" which detailed the stalled talks between energy companies and Nikola.

443.    The September 23, 2020 reports of stalled discussions with energy companies and the related news coverage was a foreseeable consequence of and within the zone of the risk concealed by Defendants' misrepresentations and omissions concerning Nikola's hydrogen capabilities. Nikola's hydrogen capabilities had been greatly exaggerated. The Company was, in fact, nowhere near ready to build its hydrogen stations. Even a month later, the Company had still not determined whether it would build hydrogen stations with on-site hydrogen production capabilities, or whether it would employ a hub-and-spoke liquefication model. Moreover, Nikola still had not figured out how to reliably and quickly dispense hydrogen, let alone produce it. The Company's head of Infrastructure Development had argued against a May 2020 purchase of electrolyzers as premature because Nikola was years away from being able to build out hydrogen infrastructure. Moreover, the Company had no realistic pathway to acquiring electricity at rates that would make its business model practical. As the Wall Street Journal reported, it was told by its sources close to the matter that talks between Nikola and its potential partners stalled because recent events had "cast doubt on the company and its statements about the readiness of its technology." Accordingly, the risk concealed by Defendants misstatements about Nikola's hydrogen capabilities partially materialized when potential partners walked away upon learning about Defendants' misstatements.

444.    As a direct and proximate result of this corrective disclosure and/or materialization of the foreseeable risks concealed by Defendants' fraud, the price of Nikola

common stock declined by $7.36 per share, closing at $21.15 on September 23, 2020, a 25.82% decline from its previous close on September 22, 2020.

445.    The decline in Nikola's common stock price on September 23, 2020 was a direct result of the nature and extent of Defendants' prior misstatements and omissions being revealed to investors.  The timing and magnitude of the Nikola common stock price decline evidences the impact Defendants' statements had on the Company's stock price during the Class Period and negate any inference that the loss suffered by Lead Plaintiffs and other Class members was caused by changed market conditions or macroeconomic, industry, or Company-specific factors unrelated to Defendants' fraudulent conduct.

446.    On February 25, 2021 the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions prior to and during the Class Period were partially revealed and/or materialized when, after the close of trading, Nikola filed its Form 10-K for the year ended December 31, 2020. In the filing, Nikola admitted that several of Milton's statements that were highlighted in the Hindenburg Report were "inaccurate in whole or in part, when made," including the statements Milton made in December 2019 and July 2020 that "the Company 'can produce' over 1,000 kg of hydrogen at the Company's demo stations and that the Company was 'down below' $3/kg at that time."

447.    This news was widely reported to the market.  For example, on February 25, 2021, *CNBC* published an article entitled "Nikola admits ousted chairman misled investors as legal costs mount" that went on to explain "Milton and the company previously denied many of the claims in the report."

448.    As *CNBC* suggested, the February 25, 2021 10-K revealed not only that Milton's statements were incorrect, but that Defendants' unequivocal denials of the

Hindenburg Report, including the September 14, 2020 press release, were false and misleading. In a reversal, Nikola was now acknowledging that the Hindenburg Report had been largely accurate. Moreover, by admitting that Nikola was not able to produce hydrogen below $3/kg even by July 2020, the 10-K demonstrated that the figures Defendants shared with investors and subsequent statements made by Russell and Brady asserting that Nikola could acquire electricity at its target price and produce and sell hydrogen at parity with diesel were false.

449.    The February 25, 2021 disclosure of the false and misleading nature of Defendants' statements, and the related news coverage reporting on Nikola's misrepresentations about its production capabilities, products, technological advancements, and commercial prospects, was a foreseeable consequence of, and within the zone of the risk concealed by Defendants' misrepresentations and omissions.

450.    Moreover, the February 25, 2021 disclosures revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market by authoritatively conceding that Nikola had not produced hydrogen and had not achieved a $3/kg cost of hydrogen.

451.    As a direct and proximate result of this corrective disclosure and/or materialization of the foreseeable risks concealed by Defendants' fraud, the price of Nikola common stock declined by $1.62 per share, closing at $18.10 on February 26, 2021, an 8.22% decline from its previous close on February 25, 2021.

452.    The decline in Nikola's common stock price on February 26, 2021, was a direct result of the nature and extent of Defendants' prior misstatements and omissions being revealed to investors by the 10-K, including statements about Nikola's hydrogen capabilities.   The timing and magnitude of the Nikola common stock price decline

evidences the impact Defendants' statements had on the Company's stock price during the Class Period and negate any inference that the loss suffered by Lead Plaintiffs and other Class members was caused by changed market conditions or macroeconomic, industry, or Company-specific factors unrelated to Defendants' fraudulent conduct.

453.   On July 29, 2021 the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions prior to and during the Class Period were revealed and/or materialized when numerous news outlets reported that Defendant Milton had been indicted on three counts of fraud by the U.S. Attorney's Office in Manhattan for making deceptive and false claims to investors regarding "nearly all aspects of the business." The indictment said that, from November 2019 to September 2020, Milton schemed to defraud investors into buying Nikola shares through statements about the Company's product and technology development. The SEC also filed related civil charges. In response to the indictment, Milton stated that they were "false allegations."

454.   The July 29, 2021 announcement of the indictment and the related news coverage reporting on Nikola's representations about its production capabilities, products, technological advancements, and commercial prospects, was a foreseeable consequence of, and within the zone of the risk concealed by Defendants' misrepresentations and omissions. The DOJ and SEC actions were, to a large degree, premised on Milton's misstatements regarding Nikola's hydrogen production capabilities and costs.

455.   Moreover, the July 29, 2021 disclosures revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market. Both the SEC complaint and the DOJ indictment described messages, discussions, and other evidence from inside Nikola that showed its hydrogen capabilities had been exaggerated. The DOJ indictment in particular

revealed that the demo station in Phoenix, Arizona lacked the capabilities that Defendants had touted:

> Nikola had never obtained a permit for, let alone constructed, a hydrogen production station, nor had it produced any hydrogen. Although Nikola did complete a dispensing-only hydrogen fueling station at its Phoenix, Arizona headquarters in or about April 2019, *that station has been plagued with problems because many components of the station were not built to withstand the extreme heat in Phoenix. Moreover, the hydrogen that was used to stock that station was not produced by Nikola, but was instead acquired from an outside vendor*.

(Emphasis added).

456.   As a direct and proximate result of this corrective disclosure and/or materialization of the foreseeable risks concealed by Defendants' fraud, the price of Nikola common stock declined by $2.16 per share, closing at $12.03 on July 29, 2021, a 15.22% decline from its previous close on July 28, 2021. Nikola's stock continued to steadily decline another $1.88 per share, or 15.62%, over the next several days to close at $10.15 per share on August 5, 2021, as investors absorbed the lengthy and detailed indictment and SEC complaint, which totaled over 100 pages.

457.   The decline in Nikola's common stock price on July 29 through August 5, 2021 was a direct result of the nature and extent of Defendants' prior misstatements and omissions being revealed to investors, including misstatements regarding Nikola's hydrogen capabilities.   The timing and magnitude of the Nikola common stock price decline evidences the impact Defendants' statements had on the Company's stock price during the Class Period and negate any inference that the loss suffered by Lead Plaintiffs and other Class members was caused by changed market conditions or macroeconomic, industry, or Company-specific factors unrelated to Defendants' fraudulent conduct.

**IV.     Defendants Misled Investors Regarding the Badger**

**A.     Nikola Did Not Produce the Badger, its Purported Pickup Truck**

458.     Defendants misrepresented the capabilities of Nikola's pickup truck, the Badger, even though the Badger did not exist. In November 2020, Nikola's partners finally completed the parts for two prototypes of the Badger, which were assembled in December 2020. By that time, Defendants had made numerous public statements about the Badger's specs, appearance, and manufacturing as if it were already in production. Nikola and its partners never produced the Badger for sale, and the two prototypes are the only versions of the Badger ever made.

459.     On November 22, 2019, Milton tweeted images of a rendering of a pickup truck in response to the public announcement by a large electric vehicle manufacturer that it would be producing an electric pickup truck. In January 2020, Milton approached other executives at Nikola with a proposal to develop a pickup truck based on the image he had tweeted. Although executives were reluctant to agree to the plan, which they understood to be distracting from and potentially harmful to Nikola's core business plan, Milton insisted on creating a pickup truck line based on, among other things, his perception of the interest the pickup truck had generated on social media.  Milton agreed that Nikola would only move forward with the pickup truck if he found an original equipment manufacturer ("OEM") partner to produce the vehicle.

460.     On February 9, 2020, when Nikola was working toward finalizing and announcing its deal with VectoIQ, Milton sent an email to Nikola's board and executive officers attaching a draft press release he had prepared with input from Nikola's public relations team and Russell. In the email, Milton asked Nikola's Board and officers, including Brady, Russell, and Worthen, to review and modify or approve the press release. Certain Nikola executives, including Russell and Brady, disagreed with the decision to

announce the development of a pickup. Brady, for example, replied that the Badger program might be a "[d]istraction from the BEV and FCEV truck programs" and a "strain on management's bandwidth," and that the program might require "[a]dditional capital and risks." He further anticipated "[l]ikely criticism that Nikola hasn't even started serial production of BEV and FCEV, yet we keep announcing new products." A Board meeting was held at which the Board, including Russell, unanimously approved the creation of the pickup truck program and the press release. At Milton's trial, Russell testified that he voted for approval despite sharing Brady's concerns because "after following the discussion at the board level, it was clear that it was going to go through."[58] On February 10, 2020, Nikola issued the press release, which misleadingly announced the creation of the Badger as if it already existed even though at the time it was merely a concept.

461.    On February 18, 2020, the Nikola Board held a meeting at which Milton, Russell, Brady, and Worthen were in attendance. At the meeting, the Board discussed obtaining help from third parties to help design and develop the Badger because Nikola was unable to develop a prototype on its own.[59]

462.    In January, February, and March 2020, Milton sought an OEM partner to develop the Badger. In the absence of an OEM partner, Milton directed a small group of Nikola employees to build two Badger prototypes. In a March 7, 2020 email, Milton instructed the group to build both prototypes as BEV rather than FCEV trucks because, according to Milton, that arrangement would be simpler than building one of each. He further ordered that the prototypes would appear to have hydrogen filling receptacles but no actual hydrogen fuel cell capacity.

---

[58] Milton Tr. at 1039:2-1041:23, ECF No. 226.

[59] See Compl. ¶ 150, *Rhodes v. Milton*, No. 2022-0023 (Del. Ch. Jan. 7, 2022).

463.    In the meantime, Milton embarked on a media blitz during which he repeatedly touted the Badger as if Nikola had already built it. His Twitter activity came to the attention of other Individual Defendants, who did nothing to correct Milton's misstatements. For example, on April 29, 2020, Girsky texted Russell, "Trevor pretty active on Twitter Re: Badger." Russell replied, "Wish he wouldn't. Can't convince him to stop that."[60]

464.    Milton specifically targeted retail investors with his lies about the Badger. For example, on May 30, 2020—when the Badger was still just an idea—Milton stated on *JMac Investing* podcast:

> Soon I'll be announcing when we're going to show off the Badger to the whole world.  And this thing is insanity.  It is the most beautiful truck I think the world has ever seen.  ***It's a fully functioning vehicle inside and outside, HVAC, and everything, windows, all of it works***.  I shouldn't say all of it – I'll probably have a couple of pieces that'll break on me, but hey, that's part of the process of building the truck, ***but it's a real real [sic] truck.  It's not just some mock up thing that other people have done.  This is a real, real truck.***

465.    The production of Badger prototypes was outsourced, at Milton's direction, to third parties, with one vendor contracted to create the upper body of the vehicles in Europe, and another to build the chassis in Michigan. The two parts would then be integrated. Under the terms of these agreements, very little, if any, of Nikola's design, engineering, or intellectual property were to be used in production. As a result, Nikola purchased several Ford F-150 pickup trucks—a highly popular model to which Milton had claimed his Badger would compare favorably—to use as "donor" or "surrogate" vehicles and used the F-150's chasses and bodies as the base for constructing the Badger prototypes. The third-party suppliers used some show car technology for the vehicles, which were not

---

[60] Milton Tr. at 1065:10-21, ECF No. 226.

engineered or intended to be used for production. As of May 2020, the Badger was in early stages of conceptual development.

466.    Once Nikola's stock was officially publicly traded on June 3, 2020, Milton increased the number of public comments he made about the Badger. Many of these statements concerning engineering of the Badger and the status of the trucks were false and misleading, giving the impression that the truck's development or engineering was more advanced than it really was.

467.    In order to further inflate the price of Nikola stock, Milton aimed to convince investors not only that the Badger was already a reality but that it was far enough along to justify taking reservations. On June 8, 2020, Milton announced on Twitter that Nikola was going to start taking reservations for the Badger on June 29, 2020.  However, as of June 8, 2020, Nikola only had renderings of the vehicles and concept sketches. Nevertheless, on June 8, 2020, in response to a Twitter user who asked, "when will the first prototype [of the Badger] be produced?," Milton tweeted, "Already."

468.    On June 8, 2020, the morning following the announcement by Milton that Nikola would take reservations for the Badger, Nikola's stock opened at $42 per share, $7 above where it had closed the prior day, and $9 above the price when it went public less than a week prior.  On or about June 9, 2020, Nikola's stock price opened at $93.13 per share.

469.    In early June 2020, a Nikola employee who led the Badger's design informed Milton that one third-party supplier was six to eight weeks from beginning tooling, which means making the tools needed to produce the parts of the vehicle that Nikola's subcontractors were fabricating.

470.    On June 29, 2020, before production of the Badger prototypes began and before any OEM had agreed to work with Nikola to manufacture the Badger for sale to the public, Nikola began taking deposits for the Badger with three differently priced reservation packages. On the day reservations opened, Nikola received approximately 2,411 preorders. Nikola received approximately 249 additional orders on June 30, 2020; approximately 87 on July 1, 2020; and approximately 124 on July 2, 2020. On July 2, 2020, without any basis whatsoever, Milton announced that the most expensive reservation for the Badger was sold out. Nikola employees then scrambled to remove the package from the company's website.

471.    At a meeting of Nikola's Board of Directors on July 23, 2020, which included Defendants Girsky, Russell, and Ubben, and at which Milton was present, Nikola provided to the Board materials indicating that the Badger prototypes would not be completed until at least November 2020. In August 2020, Nikola's partners began tooling. This meant that they were still weeks away from beginning actual construction of the prototypes. Defendants continued making public statements falsely touting the Badger's readiness for production and its capabilities.

472.    During June, July, and August 2020, while development of the two prototypes slowly moved forward, Milton continued to seek an OEM partner who could mass-produce the Badger. In late August 2020, Nikola, at Milton's direction, entered into an agreement with General Motors as an OEM partner, pursuant to which General Motors would develop and manufacture the Badger for production and make a $2 billion investment in Nikola in exchange for an 11% stake in the Company. Nikola further agreed to fund all capital expenditures to build the Badger. The Badger was to be built using one of General Motors' electric vehicle platforms. General Motors was responsible for all

components of the Badger except for the general aesthetic and potentially the infotainment system. Apart from the infotainment system, there was no plan to use any parts over which Nikola had intellectual property rights.

473. Milton received documents reflecting the proposed allocation of responsibilities for the Badger between General Motors and Nikola. These documents showed that nearly all technology and parts of the Badger would be General Motors' responsibility. No one at General Motors ever saw the Badger prototypes that Nikola had been working on and they were not part of General Motors' engineering or development plans.

474. The prototypes were not finished until about December 2020. Nikola never developed a Badger FCEV prototype and little, if any, of Nikola's technology was used on the Badger BEV prototypes. The two prototype Badgers were little more than show cars and not real consumer vehicles. The Badger prototypes could not be driven on roads because some of the parts of the body were carbon fiber composite and because they had not undergone safety testing. The Badger prototypes also lacked certain parts, such as airbags and an operable HVAC. Similarly, many of the lights in the interior of the Badger prototypes were not operable and were merely backlit.

475. On November 30, 2020, with the scandals surrounding the Hindenburg Report and Milton's departure engulfing Nikola, the company cancelled the Badger program. Nikola never produced Badger vehicles for consumer purchase. Despite the many false statements Defendants made about the Badger's capabilities as detailed below, all Nikola ever had to show for the program were conceptual sketches and two late-delivered prototypes. Put simply, there never was a Badger.

**B.  False and Misleading Statements Regarding the Badger**

> *1.  Pre-Merger False and Misleading Statements Regarding the Badger*

476.  On February 10, 2020, Nikola published the press release announcing the Badger, titled "Nikola Unveils the Nikola Badger Pickup." The press release and corresponding social media posts announced that Nikola was making a pickup truck called the Badger that would be unveiled at an event in or about late 2020. The press release touted the Badger as the "World's Most Advanced Zero-Emission FCEV/BEV Pickup with an Estimated 600-mile Range." This press release also stated that the Badger "is engineered to deliver 980 ft. lbs. of torque, 906 peak HP and 455 continuous HP," "was designed to handle 0-100 mph launches with minimal loss of performance and to operate on grades up to 40% through advanced software blending of batteries and fuel-cell," and was "engineered to outperform all electric pickup trucks on the market in both continuous towing, HP and range."[61] These statements, accompanied by a computer-generated rendering of the Badger, remained on Nikola's website and publicly available to investors during the Class Period.

477.  The same day, on February 10, 2020, a Twitter user replied to a tweet from Milton's personal account that promoted the Badger press release, commenting that "the spec sheet looks ridiculously exaggerated . . . ." Milton responded: "Specs are dead on actually." This statement remained on Milton's Twitter account and publicly available to investors during the Class Period.

478.  The statements referenced in ¶¶476-477 were materially false and misleading because Defendants knew or recklessly disregarded but failed to disclose that at the time

---

[61] Press Release, Nikola Corporation, *Nikola Unveils the Nikola Badger Pickup* (February 10, 2020), available at https://nikolamotor.com/press_releases/nikola-unveils-the-nikola-badger-pickup-73. This press release is publicly available online and was available to investors throughout the Class Period.

of the announcement, Nikola had not performed any engineering work or design work on the Badger other than CGI renderings, and that remained the case for several months. An OEM engineer, who visited Nikola's offices in February 2020 to conduct diligence in connection with a potential partnership to build the Badger, summed up the Badger's state at the time as "vaporware."  It was not until June or July 2020 that third-party suppliers were completing computer-aided design and beginning "tooling" for the Badger. Nikola's Vice President of Technology referred to the Badger in an internal email as "vapor ware" [sic] "with no technical plan." Badger prototypes were not delivered until November 2020. Further, Individual Defendants Russell, Brady, and Worthen knew these statements were false and misleading because they were asked to review the February 10, 2020 press release and were involved in discussions about the wisdom of starting development of the Badger.

479.   Defendants continued making false and misleading statements about the Badger before the prototypes were developed. In the April 6 8-K, signed by Defendant Shindler, the Badger is described as having a "blended FCEV/BEV" system with a range of "600 miles" or a "300 mile" range on just the BEV. The April 6 8-K further claimed the Badger could switch between an FCEV/BEV and BEV only system "only by touch of button." It additionally stated that the truck had "980 ft. lbs. of torque", "906 HP" engine, a "160kWh flood module lithium ion battery" and a "120 kW fuel cell."[62]

480.   The statements referenced in ¶479 were materially false and misleading for the reasons identified in ¶478.

481.   Further, on or about April 20, 2020, Milton stated on the *Truck Show Podcast*, referring to the Badger:

> ***"We built the thing to be a true vehicle," it is based on a "billion dollars of knowledge" from Nikola's semi-truck program, the "truck can go 700***

---

[62] April 6 8-K at 15.

155

1

*miles in a real environment," and it can "whoop a Ford F-150 . . . whoop a Silverado . . . whoop a Dodge Ram."*

2

482.    On the same podcast, Milton further stated:

3

4

*We spent a billion dollars essentially on our hydrogen program . . . with our semi-truck and we're the leaders in hydrogen technology around the world. . . . We took that billion dollars in knowledge and put it into this pickup truck.[63]*

5

483.    The statements referenced in ¶¶481–482 were materially false and

6

misleading for the reasons identified in ¶478. Moreover, these statements were materially

7

false and misleading because Defendants knew or recklessly disregarded but failed to

8

disclose that Nikola had not put a billion dollars of semi-truck technology into the Badger.

9

The prototypes that Nikola's partners eventually developed for the Badger were based on

10

the Ford F-150 and show car technology.

11

484.    The Proxy, signed by Defendants Milton and Girsky on May 8, 2020, also

12

contained false and misleading statements about the Badger. Page 149 of the Proxy states:

13

"Unlike anything on the market, the Badger is designed to target and exceed every electric

14

or fossil fuel pickup in its class."

15

485.    The statement referenced in ¶484 was materially false and misleading

16

because at the time, the Badger pickup truck did not exist aside from a computer generated

17

rendering of a pickup truck created by a Nikola employee before the Badger's

18

announcement in February 10, 2020.[64] A prototype of the Badger would not be delivered

19

to Nikola from its partners until November of 2020.[65] All statistics used to market the

20

Badger to investors in the April 6 8-K and summarized later in the Proxy consisted of

21

22

[63] The Truck Show Podcast, *Plugging In With Nikola CEO Trevor Milton* (Episode 118) (2020), https://truckshowpodcast.libsyn.com/ep-118-plugging-in-with-nikola-ceo-trevor-milton. This episode is currently publicly available online and was available to investors throughout the Class Period.

23

24

[64] *See* SEC Complaint at ¶ 89.

25

[65] *See id.* at ¶¶ 94-95.

26

nothing but modeling based on assumptions given to Nikola engineers by Milton.[66] The Proxy also omitted to reveal the material fact that the Badger was nothing more than a prototype in development.

486.    On or about May 30, 2020, Milton stated on the *JMac Investing* podcast:

> Soon I'll be announcing when we're going to show off the Badger to the whole world. And this thing is insanity. It is the most beautiful truck I think the world has ever seen. ***It's a fully functioning vehicle inside and outside, HVAC, and everything, windows, all of it works***. I shouldn't say all of it – I'll probably have a couple of pieces that'll break on me, but hey, that's part of the process of building the truck, but ***it's a real real [sic] truck. It's not just some mock up thing that other people have done. This is a real, real truck.***

487.    The statements referenced in ¶486 were materially misleading for the reasons identified in ¶¶478 and 485.

>    2.    *Class Period False and Misleading Statements Regarding the Badger*

488.    On June 8, 2020, Milton announced on Twitter that Nikola was going to start taking reservations for the Badger on June 29, 2020. At the time, Nikola only had renderings of the vehicles and concept sketches and had not even begun production of Badger prototypes. Nevertheless, on June 8, 2020, in response to a Twitter user who asked, "when will the first prototype [of the Badger] be produced?," Milton tweeted, "Already."

489.    The statements referenced in ¶488 were materially false and misleading because Nikola had not produced a prototype of the Badger at the time the statements were made, and would not until December 2020. Moreover, Milton's announcement that Nikola was going to start taking reservations for the Badger on June 29, 2020 furthered the false impression created by Defendants' other misrepresentations that the vehicle had already

---

[66] *See id.*at ¶ 95.

been produced when, at the time, it was nothing more than a concept sketch. At Milton's criminal trial, Russell testified that following Milton's June 8, 2020 tweets, Russell and Brady had a conversation with Milton in which they discussed that Milton's statements regarding the Badger's readiness for production were inaccurate.[67] Neither Russell, Brady, nor any other defendant publicly contradicted the statements or took any corrective action.

490.   Milton and Nikola's senior executives gloated about the money they were making from investors as a result of their fraudulent statements concerning the Badger. On June 8, 2020, Milton shared a tweet with a senior Nikola executive reflecting that over 36,000 new Robinhood users became Nikola stockholders that day. The senior executive responded, in part, by expressing his amazement at how many calls he received "from retail investors today that have no clue about Nikola, other than their friends told them to buy. A lot of hype out there with retail investors," to which Milton replied: "That's how you build a foundation. Love it."

491.   On or about June 11, 2020, Milton stated in an appearance on Cheddar News: "We've made it very clear that we don't want to build this [Badger] on our own. ***So we developed all the tech. We've built the whole truck***, and now what we want to do is partner with a big OEM."

492.   The statement referenced in ¶491 was materially false and misleading for the reasons identified in ¶¶478 and 485.  Moreover, this statement was materially false and misleading because Defendants knew or recklessly disregarded but failed to disclose that Nikola did not intend to develop a Badger FCEV prototype, and little, if any, of Nikola's technology was used on the Badger BEV prototype. Nikola retained two third-party suppliers to build the BEV prototype using "donor" vehicles manufactured by another

---

[67] *See* Milton Tr. at 1082:4-10, ECF No. 226.

1    OEM. The upper body was built by a supplier in Europe, while the chassis was built by a

2    supplier in Michigan, and then the two parts were integrated.

3            493.    In the June 2020 S-1, signed by defendants Milton, Girsky, Russell, Brady

4    and Ubben, Defendants stated regarding the Badger, "[r]ecently we announced the Nikola

5    Badger . . . an advanced zero-emission FCEV/BEV hybrid pickup truck. Unlike anything

6    on the market, the Badger is designed to target and exceed every electric or fossil fuel

7    pickup truck in its class."

8            494.    The statement referenced in ¶493 was materially false and misleading for

9    the reasons identified in ¶485. Moreover, this statement was materially false and

10   misleading because it did not disclose that Milton had directed that the prototypes in

11   development only be BEV trucks, not FCEV trucks.

12           495.    On or about June 25, 2020, Milton made the outlandish claim from his

13   personal Twitter account that the Badger uses "most all of" the water created as a byproduct

14   of the hydrogen fuel cell "for our windshield washer fluid and . . . a  little bit for clean,

15   pure, drinking water." Several minutes later, Milton tweeted, "***Yes, you heard that right,***

16   ***we will have a drinking fountain in our truck using the hydrogen bi product water for***

17   ***the drivers to have nice cold, clean, pure drinking water***." Milton instructed the team

18   working on the Badger to add drinking fountains.

19           496.    The statements referenced in ¶495 were materially false and misleading for

20   the reasons identified in ¶478. Moreover, the statements were materially false or

21   misleading because Defendants knew or recklessly disregarded but failed to disclose that

22   at that point, Milton had not discussed with Nikola's engineers the idea of using fuel cell

23   by-product as washer fluid or drinking water. Several days later, Milton attempted to

24

25

26                                                159

determine if it was even possible by searching on the internet, "can you drink water from a fuel cell?"

497. When informed of the tweets, one engineer questioned whether "this [is] a joke," a marketing employee wrote that his "head is fuzzy," and a designer texted, "[u]hhhhh what." The drinking fountains in the prototypes were simply connected to water reservoirs, as there was no fuel cell or system for converting fuel cell by-product to drinking water. Although both prototypes were BEV trucks (at Milton's direction) and neither was designed to operate on hydrogen fuel, Milton directed that they also be fitted with hydrogen fueling ports to make it appear as though they were FCEV trucks.

498. On June 29, 2020, in an interview on the Raging Bull podcast, Milton stated regarding the Badger: "So together *we literally built the most badass pickup truck the world had ever seen*, and it's the reason why Nikola is on the front page of almost every news organization out there around the world right now."

499. The statement referenced in ¶498 was materially false and misleading for the reasons identified in ¶¶478 and 485.

500. During the same podcast, Milton stated:

> *So when we built all this technology, we had billions of dollars spent on the electrification platforms for our big trucks*. I know I could take that money, all that technology that's been built, and port it over to the most advanced pickup truck in the world. . . . Now, we're going to use an existing OEM to build our Nikola Badgers. *So we own all the tech. So all the cool stuff you guys want, the design, the inside, the connectivity with your phone . . . all the e-axles or, you know the electric motors, the batteries, the controls, all that's done by Nikola. . . .*

501. The statement referenced in ¶500 was materially false and misleading for the reasons identified in ¶¶478 and 483.

502. On July 1, 2020, Milton tweeted from his personal account in response to a user who questioned "how are you able to get the [Badger] truck ready in 4 months." Milton

replied: "Exactly, which means it's not fake. ***Truck is real***. It's going to be fun releasing teaser videos leading up to #nikolaworld2020 of the #nikolabadger."

503.    The statement referenced in ¶502 was materially false and misleading for the reasons identified in ¶¶478 and 485.

504.    On July 2, 2020, Milton announced that the most expensive reservation for the Badger was sold out.

505.    The statement referenced in ¶504 was materially false and misleading because there were no Badger trucks in production.

506.    On a July 14, 2020 Instagram Live video, Milton stated that the Badger was "a real truck, comes from a billion-dollar program," and is "legitimate." Milton then asked rhetorically, in an apparent reference to the criticism he was receiving on social media, "[w]hy do I not show the Badger right now?" Answering his own question, Milton stated, "[b]ecause I don't have to. And why else? Because it's marketing. So go get a degree in marketing, learn what it's like, even negative press brings great press. With every hater comes great followers and great investors."

507.    The statement referenced in ¶506 was materially false and misleading for the reasons identified in ¶¶478 and 485.

508.    In the July 2020 S-1, signed by defendants Milton, Girsky, Russell, Brady and Ubben, Defendants stated, "Recently we announced the Nikola Badger (the 'Badger'), an advanced zero-emission FCEV/BEV hybrid pickup truck. Unlike anything on the market, the Badger is designed to target and exceed every electric or fossil fuel pickup in its class."

509.    The statement referenced in ¶508 was materially false and misleading for the reasons identified in ¶¶485 and 494.

510.    On or about July 19, 2020, Milton stated on the Jimmy Rex Show podcast: "So we . . . had been working on [the Badger] for a while. I decided to put my teams on it. We got it done."

511.    The statement referenced in ¶510 was materially false and misleading for the reasons identified in ¶¶478 and 485.

512.    The Q2 2020 10-Q, signed by Defendants Russell and Brady, represented that "[o]n June 29, 2020 we began accepting non-binding reservations for the Badger . . ."

513.    The statement referenced in ¶512 was materially false and misleading as the Badger was merely a concept vehicle at the time and "accepting reservations" implied that Nikola had a real product to sell when all it had was a concept of a product.

514.    On September 8, 2020, Nikola and General Motors announced their strategic partnership. Nikola published a press release on its website titled "Nikola and General Motors Form Strategic Partnership." The press release materially misled investors by failing to disclose the potential economic impact of the agreement with General Motors. Specifically, the press release claimed that "Nikola anticipates saving over $4 billion in battery and powertrain costs over 10 years and over $1 billion in engineering and validation costs."

515.    The statement referenced in ¶514 was materially false and misleading because it failed to disclose that Nikola in fact projected that the Badger program would create a huge loss for Nikola. Defendants were aware of the omission at the time of the press release. In an August 25, 2020 email exchange between Brady, Milton, Russell, and Worthen, Brady emailed an internal Nikola projection showing that the Badger program would create a net loss of $3.2 billion from 2022–2026. Brady added, "Based on the current deal structure with GM, we are projecting massive losses for the company, which will not

be sustainable." Brady finally stated that assuming the accuracy of the projections, "we will likely be putting the company in insolvency." The projections were provided to Nikola's board, which included Girsky and Ubben.[68] In short, the Individual Defendants knew the project would be financially crippling for the Company and evidently had no intention of consummating the deal as described—rather, it was yet another ploy to inflate the value of Nikola's stock.

516.   On September 8-9, 2020, Milton stated on Twitter that Nikola had "designed the Badger from a clean sheet," "built the [B]adger from the ground up," and that General Motors would "use Nikola's design, and engineer it to fit on the existing General Motors modular EV platform."

517.   On September 9, 2020, Milton engaged on his personal Twitter account with a user who commented that the Badger is "[n]ot Nikola, but a General Motors Badger. The unveiling at Nikola World will not even be the truck being sold, only the dream of what could have been. . . ." Milton replied: "***Actually it is the truck being sold. It's all Nikola. Sharing parts has nothing to do with who's [sic] truck it is. . . .***"

518.   On September 9, 2020, Milton stated on the *TD Ameritrade Network*: "So this is how it works, ***we actually build the Nikola Badger from the ground up ourselves, the whole thing*** . . . ." In response to a question about "what's the important IP that's coming from you guys," Milton stated:

> Yeah, the battery supply from the sale comes from GM, the cells and the module. ***The rest of the vehicle, like the over-air updating, the software, the controls, the infotainment, the design of the vehicle, the cab, the interior of the cab, even the, even the driver profile, we've been all the way down to suspension, that all comes from Nikola***, with some support of GM's integration team, but GM's gonna handle the, they've already built a multi-billion dollar platform for their electric truck platform, so we've, ***we've took our technology and our existing Badger, we overlaid it on theirs***, used what

---

[68] Milton Tr. at 1044:2-1048:9, ECF No. 226 (citing govt. ex. 274).

we could, implemented theirs, and then we built the rest around, um, around ours. So it's probably 70 percent Nikola 30 percent GM when it comes to, um, the parts that are really important to us . . . .

519.   The statements referenced in ¶¶517–519 were materially false and misleading for the reasons identified in ¶478. Further, these statements were materially false and misleading because Defendants knew or recklessly disregarded but failed to disclose that General Motors planned to use nearly all of its own intellectual property, parts, and components to build the Badger, except for the general aesthetic and potentially the infotainment system. No one at General Motors ever saw the Badger prototypes that Nikola had been working on and they were not part of GM's engineering or development plans.

### C.     Defendants' False and Misleading Statements About the Badger Caused Investor Losses

520.   The truth regarding the Badger first partially came out with the September 10, 2020 publication of the Hindenburg Report. Regarding the Badger, the Hindenburg Report stated, "In addition to now using GM's battery technology, Nikola seeks to use the automaker's production and fuel cell capabilities. Nikola seems to be bringing nothing to the partnership but concept designs, their brand name and up to $700 million they will be paying GM for costs related to production." The Hindenburg Report thus directly contradicted Defendants' statements about Nikola's role in building the Badger in ¶¶477, 479, 481, 482, 484, 486, 491, 493, 498, 500, 502, 508, 510, 516, 517, and 518.

521.   On this news, Nikola's stock price fell $4.80 per share, or 11.33%, to close at $37.57 per share on September 10, 2020.

522.   On September 11, 2020, Nikola's stock price continued to fall, falling $5.44 per share, or 14.5%, to close at $32.13 per share on September 11, 2020.

523.   On September 14, 2020, the foreseeable risks concealed by Defendants' misconduct and false representations partially materialized when, after the market had

closed, Bloomberg reported that the SEC was investigating Nikola in connection with the allegations in the Hindenburg Report.

524.    On September 15, 2020, the foreseeable risks concealed by Defendants' misconduct and false representations partially materialized when, during intra-day trading, the Wall Street Journal reported that the DOJ had joined the SEC's investigation of Nikola.

525.    On this news, Nikola's stock fell another $2.96 per share, closing at $32.83 on September 15, 2020, an 8.27% decline from its previous close on September 14, 2020.

526.    The SEC and DOJ investigations were triggered in part by and focused extensively on Defendants' statements regarding the Badger, demonstrating that both actions were causally linked to Defendants' misstatements on these subjects. The SEC complaint and DOJ indictment would ultimately charge that the February 10, 2020 press release and tweet, as well as statements regarding the Badger made by Milton on April 20, 2020, May 30, 2020, June 8, 2020, June 29, 2020, July 1, 2020, and July 19, 2020 were misleading. The investigation announcements partially revealed the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions regarding the Badger as it was an acknowledgement that the Hindenburg Report was credible, which was later confirmed. The market therefore understood the announcements to be a revelation of fraud and reacted accordingly. Accordingly, the SEC and DOJ investigations announced in September 2020 were caused, in part, by Defendants' misstatements and omissions related to the Badger, as the agencies later confirmed.

527.    On Sunday September 20, 2020, Nikola announced that Milton had resigned from his position as Executive Chairman and from the Board of Directors. As described above, Nikola's Board of Directors held a series of meetings between September 11, 2020, and September 20, 2020 in which it discussed Milton's use of social media and the impact

of the investigation and Hindenburg report on Nikola's ability to raise capital from investors. The Board determined that Milton should separate from Nikola because of the threat his continued involvement with the Company posed to its credibility with investors. Accordingly, Milton's resignation was directly caused by his false and misleading statements—particularly those made on social media, which frequently misrepresented the Badger's status and wholly invented its capabilities.

528.    Moreover, the market perceived that Milton's fraud-induced departure and Nikola's misrepresentations about its technology could threaten the Company's partnerships, including to build the Badger. As *Autoweek* reported on September 20, 2020: "It's hard to say if Milton's resignation will have a major impact on the company's deal with GM, though it might be safe to assume that if the SEC or Justice Department confirms the suspicion of fraud there could be trouble with the partnership." Deutsche Bank put out a note on Nikola on September 21, 2020, stating that Milton's resignation was "clearly another negative development for the company, potentially making it harder to sign new partnerships and customers, and for the NKLA stock which could struggle to regain credibility with investors."

529.    On the news of Milton's resignation, Nikola's stock fell another $6.60 per share, closing at $27.58 on Monday September 21, 2020, a 19.33% decline from its previous close on Friday September 18, 2020.

530.    Between September 29, 2020, and November 30, 2020, incremental news leaked into the market which slowly informed the market's perception of the probability that the Badger deal with General Motors would fall through as a result of Nikola's overstatements about its technology and the consequent loss of credibility and reluctance of partners to be associated with Nikola's sullied brand. These risks were obscured from

the market by Defendants' misstatements and scheme, but it became incrementally more clear that the deal would collapse. The market reacted accordingly and incrementally as more news came out, until the deal was finally and fully cancelled.

531.    On September 29, 2020, Reuters reported that General Motors and Nikola would not finalize their deal to jointly build electric pickup trucks and hydrogen fuel cell tractor-trailers by the previously announced target date of September 30, with General Motors stating that it was "continuing our discussions with Nikola." *CNBC* reported "General Motors and Nikola are not expected to finalize a $2 billion deal scheduled to close before Wednesday after allegations of fraud and sexual abuse surfaced against the embattled start-up's founder and former executive chairman, Trevor Milton, according to two people familiar with the negotiations."

532.    On the news that the fraud allegations against Nikola were causing General Motors to rethink its partnership with Nikola to build the Badger, Nikola's stock fell $1.42 per share, closing at $17.88 on September 29, 2020, a 7.36% decline from its previous close on September 28, 2020. This decline was a direct and proximate result of the undisclosed risk that Nikola's technology, including the Badger, was not as developed as it represented publicly as well as the risk that Defendants' fraud posed a reputational risk to Nikola that could undermine partners' willingness to work with the Company. That General Motors was faltering on its commitment to build the Badger was a foreseeable consequence of the Badger being a poorly conceived, under-developed product that was announced as part of a scheme to attract retail investors. These undisclosed risks partially materialized on September 29, 2020 as it became clear to the market that there was a significant probability General Motors may back out of the deal.

533.   On October 16, 2020, various news organizations reported that Nikola's new CEO, Defendant Russell, stated in an interview that Nikola had a plan in place to go it alone if deal talks with General Motors fall through and downplayed the role of the Badger in the company's business.

534.   On this news, Nikola's stock fell another $3.75 per share, closing at $19.55 on October 16, 2020, a 16.12% decline from its previous close on October 15, 2020. Fortune reported "Nikola shares sank as much as 16% in Friday trading after the electric-truck startup's chief executive officer said he sees a path for his company even if it can't come to terms with General Motors on a proposed strategic partnership." The October 16, 2020 decline was a direct and proximate result of the undisclosed reality that Nikola's technology, including the Badger, was not as developed as it represented publicly as well as the risk that Defendants' fraud posed a reputational risk to Nikola that could undermine partners' willingness to work with the Company. These undisclosed risks partially materialized on October 16, 2020 as the market digested the news to mean there was a heightened probability that General Motors may back out of the deal because of Defendants' actions.

535.   On November 13, 2020, Nikola gave a presentation to General Motors concerning the "Phase I" investigation conducted by the Company following the Hindenburg Report and the investigations launched by various government entities. The presentation included admissions that Milton had made numerous false and misleading statements concerning Nikola.

536.   On November 24, 2020, after the market closed, Nikola CEO Russell appeared on *CNBC*'s "Mad Money" and did not reassure investors that the partnership with General Motors would still go through, indicating that the previously announced General

Motors partnership was a ploy to inflate Nikola's stock, and that General Motors was not interested in partnering with a company that had misrepresented its capabilities and prospects.

537. On this news, Nikola's stock fell another $4.26 per share, closing at $30.24 on November 25, 2020, a 12.35% decline from its previous close on November 24, 2020. *CNBC* reported "Shares of embattled electric vehicle start-up Nikola Corp. fell by as much as 17.4% during trading Wednesday [11/25] morning after CEO Mark Russell failed to reassure investors that the company's $2 billion deal with General Motors would still go through." The November 25, 2020 decline was a direct and proximate result of the undisclosed risk that Nikola's technology, including the Badger, was not as developed as it represented publicly as well as the risk that Defendants' fraud posed a reputational risk to Nikola that could undermine partners' willingness to work with the Company. These undisclosed risks partially materialized on November 25, 2020 as the market digested the news to mean there was an even greater probability that General Motors would back out of the deal because of Defendants' actions.

538. On November 30, 2020, Nikola announced that the deal with General Motors had fallen through and that the companies had instead signed a much smaller, scaled-back, agreement in which General Motors would only supply its Hydrotec fuel-cell system for certain of Nikola's vehicles and take no ownership interest in Nikola. As a result, Nikola also announced that it was scrapping the Badger vehicle.

539. On this news, Nikola's stock fell $7.52 per share, closing at $20.41 on November 30, 2020, a 26.92% decline from its previous close on Friday November 27, 2020. Nikola stock continued to decline another $3.04, closing at $17.37 on December 1, 2020, a 14.89% decline from its previous close on November 30, 2020, for a two-day

decline of $10.56 per share, a 37.80% decline from its close on Friday November 27, 2020. Headlines stating: "Nikola Shr Slides 27% after GM Scraps Investment Plan," "GM pulls pin on electric ute," Nikola tumbles after GM drops equity tie…," "GM abandons plan to take equity stake in Nikola" made clear that the deal fell apart because of Defendants' fraud. As *The New York Times* reported: "Nikola…had made a big splash on Wall Street, announced a broad alliance with General Motors in September that promised to give the company critical technology, financial support and credibility with investors. But the news was quickly overtaken by claims that Nikola had exaggerated its capabilities, and the firm's founder resigned. Investors were left to wonder whether Nikola was indeed an automotive innovator and whether G.M. had made an embarrassing mistake in associating with the start-up."

540.   The November 30, 2020 decline was a direct and proximate result of the undisclosed risk that Nikola's technology, including the Badger, was not as developed as it represented publicly as well as the risk that Defendants' fraud posed a reputational risk to Nikola that could undermine partners' willingness to work with the Company. These undisclosed risks partially materialized on November 30, 2020 as the market learned that, as had begun to be forecasted and partially reflected in Nikola's share price declines in the previous weeks, General Motors would back out of the Badger deal.

541.   On July 29, 2021, numerous news outlets reported that Milton had been indicted on three counts of fraud by the U.S. Attorney's Office in Manhattan for making deceptive and false claims to investors regarding "nearly all aspects of the business." The indictment said that, from November 2019 to September 2020, Milton schemed to defraud investors into buying Nikola shares through statements about the Company's product and technology development. For example, the indictment alleged that Milton made "false and

misleading statements that Nikola had engineered and built an electric- and hydrogen-powered pickup truck known as 'the Badger' from the 'ground up' using Nikola's parts and technology." The SEC also filed related civil charges. In response to the indictment, Milton stated that they were "false allegations."

542.    On this news, Nikola's stock fell another $2.16 per share, closing at $12.03 on July 29, 2021, a 15.22% decline from its previous close on July 28, 2021. Nikola's stock continued to steadily decline another $1.88 per share, or 15.62%, over the next several days to close at $10.15 per share on August 5, 2021, as investors absorbed the lengthy and detailed indictment and SEC complaint, which totaled over 100 pages.

## V.    Defendants Misled Investors Regarding Nikola's Manufacturing of In-House Components

### A.    Nikola Did Not Manufacture Any Components In-House

543.    Semi-trucks like the Nikola One must be constructed from thousands of parts, including motors, batteries, inverters, transmissions, drive shafts, axles, steering components, brakes, the chassis frame, the metal body, lighting, HVAC, and wheels, to name a few.   Most truck and car manufacturers outsource production of many of the parts of a vehicle to third-party vendors.   Some large manufacturers, however, produce some components in-house because it is cheaper due to economies of scale, or because technology is proprietary.

544.    Since at least 2016 and into the Class Period, Milton claimed that Nikola has intellectual property rights over important components of its semi-truck line.   While Milton stated that Nikola outsources certain parts of the trucks, like tires or windshields, Milton also repeatedly stated that Nikola makes the most important parts of the semi-trucks "in-house."   Milton did so, among other reasons, to claim that Nikola has valuable intellectual property, to support his claims that Nikola's trucks outperform competitors, and to

differentiate the Company from other electric vehicle manufacturers and startups. However, to inflate Nikola's stock price, Milton exaggerated Nikola's in-house development of batteries, inverters and other components and falsely stated that the Company made parts in-house when it did not.  Milton also responded strongly to suggestions that Nikola was solely an "integrator" and perhaps not as valuable as an OEM that designed and manufactured its own key components.

545.   In 2020, Milton repeatedly stated that "all major components" such as batteries and inverters were designed or made by Nikola "in-house."  But what Milton presented to the public about Nikola's in-house design and manufacturing programs, capabilities, and achievements relating to the battery and the inverter, and the true state of those programs, diverged widely.

546.   For example, on or about February 14, 2020, in an interview on *Fox Business*, Milton said: "[W]e're probably one of the only companies in the world that ***does everything ourselves***.  We do our own ***batteries***, we do our own frames, ***we do our own vehicles from the ground up***, our own ***inverters***, our own infotainment, you know, the cool screens.  So ultimately, that ***entire truck from the ground up is designed by Nikola***, and they do cost a lot of money. . . ." On July 5, 2020, Milton tweeted from his personal account: "***All major components are done in house; batteries, inverters, software, controls, infotainment, over the air, etc***."

547.   As Defendant Brady has since admitted, "Nikola ***aspires*** to build components in-house but ***does not do so at present***." Kevin Lynk (Chief Engineer) admitted "***Nikola does not currently develop any components*** on its own." Indeed, on March 27, 2020, Lynk emailed Katherine Beebee (project manager, Truck) regarding responsibility for e-axle components: "FPT is responsible for the mechanical design of the e-axle. Iveco is

responsible for the vehicle integration of the e-axle and traction inverters. Nikola is responsible for purchasing the traction inverters and critical e-axle components and we provide support for the system design."

548.    Specifically, Nikola did not design or develop any functioning inverters in-house.  Nikola has used third-party "off the shelf" inverters for all its semi-truck prototypes, and it planned to use third-party inverters for the Nikola Tre vehicle.  And, while Nikola entered into an agreement to develop inverters with a supplier in early 2018, that effort was terminated in the spring 2020 due to a lack of progress.  On October 1, 2019, in preparation for a meeting of the Board of Directors, Milton, Russell, Brady, Worthen, and Ubben received materials stating that the inverters for the Nikola Tre were "off-the-shelf."[69] And, Milton was directly involved in terminating the inverter co-development effort with a supplier, even requesting a refund from the supplier due to lack of success.

549.    Nikola has since admitted that the Company used third-party inverters for all of its vehicles. According to Lynk, Nikola's Chief Engineer, "***Nikola has used and continues to use off-the-shelf inverters*** for demonstration and early phase prototype vehicles" and inverters "'aren't even in production yet.'" Varoujan Sarkissian (Global Head, Vehicle Electrical and Controls) admitted, "[e]fforts to develop in-house inverters only ramped up in early 2020, and it will take far more development time (perhaps up to ten years) before the in-house inverters could be used in Nikola production vehicles" and "***Milton knew that Nikola was in the early stages of inverter development*** – the company had canceled its contract with ITK for inverter development and was essentially starting over." According to Varoujan Sarkissian, "***There was no complete in-house inverter or software***."

---

[69] *In re Nikola Corp. Derivative Litig.*, C.A. No. 20222-0023-KSJM (Del. Ch. Feb. 15, 2022), ¶154(c).

173

550.   Similarly, Defendant Brady has admitted "***Nikola does not make its own battery in-house***." A May 11, 2020 internal Company document states "Nikola is not developing a battery in house" and "Nikola does not have a clear plan for battery development."

**B.   Nikola's Fictional Game-Changing Battery Technology**

551.   As discussed above, Nikola did not make in-house batteries or an electric powertrain at any time.  Batteries are critical to an electric vehicle's operation because they store energy to run the motors.  Although Nikola partnered with various companies to try to develop proprietary battery technology, these efforts had not been successful, and Nikola has not successfully developed, at any time relevant to the Class Period, any in-house battery technology. Plus, the batteries it planned to use in its semi-trucks were developed and manufactured by third parties.

552.   For BEVs and FCEVs, batteries have three main components: cells, modules, and packs.  Cells are the smallest component.  Cells are contained within modules, and modules are arranged in packs.  The design of these modules and packs can have a significant impact on battery performance and safety.  Cells, which are considered more of a commodity, are typically purchased from one of a few main worldwide suppliers.

553.   Milton was deeply involved in, and led all aspects of, Nikola's battery development projects.  Milton was aware that Nikola could not make the Nikola Tre BEV's batteries in-house and was pursuing a third-party supplier, Romeo, as the only realistic option for supplying the batteries for the Nikola Tre BEV, which Nikola did, in fact, engage to manufacture batteries for the Nikola Tre BEV.  Indeed, Nikola does not have the capability to manufacture batteries on its own.  Romeo designed the modules for the

batteries that Nikola is using for the Nikola Tre BEV, and Nikola relied on the assistance of Romeo to design the battery pack.

554.    As Defendant Brady has now admitted "Nikola does not make its own battery in-house." According to Defendant Russell, "Romeo was the best option, but Milton badly wanted Nikola to own its battery technology."[70]

555.    To this end, in May 2019, Milton sent an unsolicited email to a research professor at Drexel University ("Drexel") concerning research on lithium sulfur batteries that the professor was conducting.  A lithium sulfur cell uses different chemistry than a lithium-ion cell,which is the current conventional chemistry for rechargeable battery cells. Milton told the professor that Nikola was "looking at contributing financially and licensing some of your results." Milton stated that Nikola was "doing some programs with a few universities," and then asked if the professor would reveal some details of her research. Over the ensuing week in May 2019, Nikola executed a confidentiality agreement with Drexel and obtained access to the results of certain of the professor's research.  This research was in its early stages.

556.    Milton visited the Drexel professor and, after this visit, directed Nikola in September 2019 to enter into a preliminary term sheet, which contemplated terms of a sponsored research agreement.  Nikola executed a sponsored research agreement with Drexel on October 31, 2019 (the "Sponsored Research Agreement").

557.    Under the Sponsored Research Agreement, Nikola was to provide a modest amount of funding ($250,000 initially) to sponsor the lithium sulfur battery technology research that the professor at Drexel was conducting.   In exchange, any intellectual property developed with Nikola following entry into the agreement would be shared

---

[70] USAO Presentation.

between Nikola and Drexel.  This research pertained to coin size battery cells that were being developed and tested in a controlled lab environment as part of a university research project.  To scale coin-size lab-level cells to even a prototype size would require significant further development with no assurance of comparable performance levels.  From there, developing cells from prototype pouch size cells to commercial grade quality was a further, significant undertaking, with no assurance of utility for commercial applications.

558.   According to Jason Roycht (VP, Technology Development and Strategy), these "[d]ime sized 'coin cells' were in place at the time with Drexel; these are simplistic and nowhere near the complexity of what goes into a pack cell." Tony Heaton (Battery Engineer) stated in late 2020 that "Drexel's work *is still* in the early research and development phase."

559.   Milton was aware that the batteries produced for the Nikola Tre BEV would contain Romeo's modules, because in November 2019, Milton personally signed a multi-million-dollar purchase order for Romeo's modules. However, once the Sponsored Research Agreement was signed, Milton concocted a plan to conceal the reliance on a third-party for batteries and mislead investors just as VectorIQ and Nikola began to discuss the merger.

560.   Between November 1 and 4, 2019 Milton emailed Steve Cook (associate Corporate Counsel, Contracts) regarding an agreement with Romeo for its batteries, stating "we need to make sure we have a clause specifically stating they shall never represent their batteries are on our truck without our written permission. Which we will never give. I don't want the image issue with our investors." Defendant Worthen has admitted that "Milton worked hard to ensure that Romeo could never say that its batteries were in Nikola's

trucks." Similarly, Defendant Russell stated, "Romeo was the best option, but Milton badly wanted Nikola to own its battery technology."[71]

561.    Then, on November 18, 2019, Milton tweeted from his personal account, teasing a significant announcement the following day:"Tomorrow, it all changes.  I finally get to talk about it.  The news everyone has been waiting for.  Diesel trucks are obsolete for good.  We solved what no one else could.  It's time for other OEM's [sic] to stop producing diesels immediately.  See press tomorrow #emissionsgameover."

562.    The next day, November 19, 2019, Nikola issued a press release titled "Nikola Corporation to Unveil Game-Changing Battery Cell Technology at Nikola World 2020."  The purpose of the press release was for Nikola to "announce details of its new battery."

563.    In the press release, Nikola made several unqualified claims about the battery technology, which he is quoted describing as "the biggest advancement we have seen in the battery world."  Nikola claimed the following in the press release about Nikola's purported "prototype cell":

(a)    "record energy density of 1,100 watt-hours per kg on the material level and 500 watt-hours per kg on the production level";

(b)    "could increase the range of current EV passenger cars from 300 miles up to 600 miles with little or no increase to battery size and weight";

(c)    "technology is also designed to operate in existing vehicle conditions";

(d)    "cycling the cells over 2,000 has shown acceptable end-of-life performance";

(e)    "Nikola's battery electric trucks could now drive 800 miles fully loaded between charges" and "hydrogen-electric fuel cell

_____

[71] USAO Presentation.

177

trucks could surpass 1,000 miles between stops and top off in 15 minutes";

(f)     "World's first free-standing electrode automotive battery"; and

(g)     "40% reduction in weight compared to lithium-ion cells" and "50% material cost reduction per kWh compared to lithium ion batteries."

564.   The same day, Milton took to Twitter, where on his personal account he repeated the substance of the press release, and further misrepresented Nikola's purported "game-changing" achievement.   When a Twitter user asked, "[i]s it actually real though, or is it another Joi Scientific style 'breakthrough,'" Milton replied to the user, "It's real. I've seen it with my own eyes and watched them cycle."

565.   On December 2, 2019, when Milton was asked on the *Shift* podcast to comment on Nikola's November 19, 2019 battery announcement, he stated "our battery beats the Tesla battery in every metric, in every situation, and it's half the cost and it's double the range."

566.   On January 1, 2020, Brady texted Russell about a presentation Milton had given: "Spoke with Umran[72] for a few minutes this afternoon. He said Trevor's battery presentation was full of misrepresentation."[73]

567.   And, on March 12, 2020, Milton stated on the *Transport Topics Roadshow* podcast that "[w]e can – we're double the cycle life of a regular lithium-ion, and we're about half- to one-quarter the cost to produce the lithium-ion and we don't have any of the expensive metals. . . .we should have productionized cells probably by the years end."

568.   Defendant Brady has since admitted "Nikola is 'years away' from having the battery technology Milton described. There's no way he could have known how many miles the trucks could drive between charging. The whole statement was an embellishment

[72] Nikola's Global Head of Vehicle Engineering.

[73] USAO Presentation.

178

and fiction at the time…" Defendant Worthen stated "Nikola did not and still does not have 'commercializable' battery technology. Milton's statement to the contrary were a 'terrible and stupid idea' *and Worthen told him not to make the statement*." In an early April 2020 battery program update sent to Milton, a Nikola Vice President of Technology wrote that "on the basis of Tre timing alone, the only possible considerations would be [Romeo's] design. . . ."  Moreover, a May 11, 2020 internal company document states "Nikola is not developing a battery in house" and "Nikola does not have a clear plan for battery development."[74] And a Board presentation made July 23, 2020 to Milton, Russell, Brady, Worthen, Girsky, and Ubben said that Nikola had abandoned any plans to use its own battery for the Nikola Tre BEV and, as of June 9, 2020, was evaluating batteries manufactured by third-party suppliers Kreisel and BorgWarner.[75]

569.    Nevertheless, Milton continued to deny that Romeo was supplying Nikola's batteries for fear that it would undermine his false narrative about Nikola's design capabilities.  For example, on June 4, 2020, a Twitter user tweeted at Milton expressing concern that he "heard that Romeo … supplies the batteries" to Nikola.  Milton responded: "We do our own batteries at Nikola and have since day 1. We do however test with everyone and if a supplier builds a better battery we would use them. That goes for all supplied parts on our vehicle." Similarly, in September 2020, after Nikola had already entered into the battery supply agreement with Romeo, Romeo sought Nikola's permission to identify it as a customer as part of Romeo's road show in connection with a go-public

---

[74] USAO Presentation.

[75] *In re Nikola Corp. Derivative Litig.*, C.A. No. 20222-0023-KSJM (Del. Ch. Feb. 15, 2022), ¶161 (citing NIKOLABR_000075).

transaction.  Milton opposed the request stating, "***[i]t will leak everywhere and hurt our image***."

### C. False and Misleading Statements About In-House Vehicle Components and Proprietary Battery Technology

*1. Pre-Merger False and Misleading Statements Regarding In-House Vehicle Components and Proprietary Battery Technology*

570.   On November 18, 2019, Milton tweeted from his personal account, teasing a significant announcement the following day: "Tomorrow, it all changes.  I finally get to talk about it.  The news everyone has been waiting for.  Diesel trucks are obsolete for good. ***We solved what no one else could***.  It's time for other OEM's [sic] to stop producing diesels immediately. See press tomorrow #emissionsgameover." This statement remained on Milton's Twitter account and publicly available to investors during the Class Period.

571.   The next day, November 19, 2019, Nikola issued a press release titled "Nikola Corporation to Unveil Game-Changing Battery Cell Technology at Nikola World 2020." Milton drafted this press release and had ultimate authority over its content. Milton had provided a draft of the press release to Nikola's Board of Directors (which included Defendants Milton, Russell, Brady (Treasurer), Ubben, and Worthen (Secretary)) on November 15, 2019, and the Board authorized its issuance. The purpose of the press release was for Nikola to "announce details of its new *battery*." The November 19, 2019 press release was posted to Nikola's website and, together with the accompanying tweets, remained publicly available to investors throughout the Class Period.[76]

572.   In the press release, the Nikola Defendants made several unqualified claims about the battery technology, which Milton is quoted describing as "the biggest

---

[76] Press Release, Nikola Corporation, *Nikola Unveils the Nikola Badger Pickup* (November 19, 2019), available at https://nikolamotor.com/press_releases/nikola-corporation-to-unveil-game-changing-battery-cell-technology-at-nikola-world-2020-67.

180

advancement we have seen in the battery world." The Company claimed the following in the press release about what it asserted as *Nikola's* purported "prototype cell":

(a) "record energy density of 1,100 watt-hours per kg on the material level and 500 watt-hours per kg on the production level";

(b) "could increase the range of current EV passenger cars from 300 miles up to 600 miles with little or no increase to battery size and weight";

(c) "technology is also designed to operate in existing vehicle conditions";

(d) "cycling the cells over 2,000 has shown acceptable end-of-life performance";

(e) "Nikola's battery electric trucks could now drive 800 miles fully loaded between charges" and "hydrogen-electric fuel cell trucks could surpass 1,000 miles between stops and top off in 15 minutes";

(f) "World's first free-standing electrode automotive battery"; and

(g) "40% reduction in weight compared to lithium-ion cells" and "50% material cost reduction per kWh compared to lithium ion batteries."

573.    These statements remained on Nikola's website and publicly available to investors during the Class Period.

574.    The same day, Milton took to Twitter, where on his personal account he: (i) quoted the press release, in part, in one tweet, (ii) repeated the same claims as in the press release in another tweet (**"Nikola has developed the most energy dense, safe battery in the world . . . . It would double the range of every electric vehicle and nearly double the range of every fuel cell.** Making it available even to competitors."), and (iii) in a third tweet, further misrepresented Nikola's purported "game-changing" achievement (**"[y]ou're talking 600+ mile range in a model 3 Tesla. You're talking 50% less cost than Lithium Ion. You're talking mass adoption of zero emission vehicles. Could be worth**

181

*hundreds of billions if owned by one company but we decided to share it with the competition for greater good."*). When a Twitter user responded to this last tweet asking, "[i]s it actually real though, or is it another Joi Scientific style 'breakthrough,'" Milton replied to the user, *"It's real. I've seen it with my own eyes and watched them cycle."* These statements remained on Milton's Twitter account and publicly available to investors during the Class Period.

575.    On or about December 2, 2019, Milton was asked on the *Shift* podcast to comment on Nikola's November 19, 2019 battery announcement having been met with "some curiosity," and to address skeptics "who might doubt that such a battery exists." Milton responded, in part[77]:

> *Once we got the technology nailed down, we actually have over 2,000 cycles on our battery, which would mean it would be more than a million-mile battery. It would actually – our battery beats the Tesla battery in every metric, in every situation, and it's half the cost and it's double the range.* So, you know, for us, that was an exciting thing to be able to tell the world, and I actually appreciate the critics. I'm totally fine with it; I enjoy it. Because every time I prove them wrong, it drives them absolutely insane and they have to go back and admit they were wrong. For me, that's the funnest part of it.

576.    The statements identified in ¶¶570-575 were materially false and misleading because Defendants knew or recklessly disregarded but failed to disclose that (i) these attributes were applicable to only *coin size* battery cells that were being developed and tested in a controlled lab environment as part of a university research project, (ii) scaling these coin-size lab-level cells to even a prototype size—which had not been done at the time of the press release—would require over a year of significant further development

---

[77] Shift: A Podcast About Mobility, *Nikola Motor's Trevor Milton on electrification, Tesla and a beer delivery* (Episode 21) (2019), available at https://www.autonews.com/shift-podcast-about-mobility/nikola-motors-trevor-milton-electrification-tesla-and-beer-delivery. This episode is currently publicly available and was available to investors throughout the Class Period.

with was no assurance of comparable performance levels, and (iii) developing the cells from prototype pouch size cells to commercial grade quality was a further, significant undertaking, with no assurance of utility for commercial applications. Moreover, the statements above misled investors that Nikola developed the technology, when Nikola paid $250,000 to license coin-size cell technology created by someone else. As detailed in the USAO Presentation, Jason Roycht (VP, Technology Development and Strategy) stated, "[d]ime sized 'coin cells' were in place at the time with Drexel; these are simplistic and nowhere near the complexity of what goes into a pack cell." Tony Heaton (Battery Engineer) stated "Drexel's work is still in the early research and development phase, and it was likely too early to publish this statement in November 2019." Brady stated "Nikola is 'years away' from having the battery technology Milton described. There's no way he could have known how many miles the trucks could drive between charging. ***The whole statement was an embellishment and fiction at the time***…" Worthen stated "***Nikola did not and still does not have 'commercializable' battery technology. Milton's statement to the contrary were a 'terrible and stupid idea' and Worthen told him not to make the statement***." Joe Pike (CHRO) stated "This statement felt false and misleading; Milton was essentially saying 'we got it,' before they did." Milton's knowledge of contradictory facts; his personal involvement in negotiating, closing, and terminating supplier contracts; and the specificity of his false and misleading statements all demonstrate that he spoke knowingly or with deliberate recklessness.

577.    On or about February 14, 2020, in an interview on *Fox Business*, Milton said: "[W]e're probably one of the only companies in the world that ***does everything ourselves***. ***We do our own batteries***, we do our own frames, ***we do our own vehicles from the ground up***, our own ***inverters***, our own infotainment, you know, the cool screens.  So ultimately,

*that entire truck from the ground up is designed by Nikola*, and they do cost a lot of money. . . ."

578.   The statements referenced in ¶577 were materially false and misleading because Milton knew that Nikola did not and does not design, develop or produce the "entire truck" because Nikola did not design, develop, or produce components such as batteries, inverters, or e-axles. Nikola has used third-party "off the shelf" inverters for all its semi-truck prototypes, and it planned to use third-party inverters for the Nikola Tre. While Nikola entered into an agreement to develop inverters with a supplier in early 2018, Milton terminated that effort in the spring 2020 due to a lack of progress. For an October 2019 meeting of the Board of Directors, Milton received materials that referred to inverters for the Nikola Tre as "off-the-shelf." And, he was directly involved in terminating the inverter co-development effort with a supplier, even requesting a refund from the supplier due to lack of success. In a January 24, 2020 internal Company e-mail, several Nikola executives shared a list of questions forwarded by BlackRock, Inc., one of the world's largest asset management firms, who was considering investing in the Company.[78] Among the questions regarding the "Battery – Thermal Cooling," BlackRock asked, "Who would be your supplier for the flooded technology now that Bosch has curtailed development?" also "Who would provide the cooling plate option?" In a later e-mail, defendant Milton reminded his team that all discussions about the Company's batteries would go through him and that he would "be handling all the battery discussions from this point on and bringing you guys in when needed."

579.   As detailed in the USAO Presentation, Brady has admitted, "Nikola *aspires* to build components in-house but *does not do so at present*" and "Nikola does not make

---

[78] *Brown v. Milton*, C.A. No. 2022-0223 (Del. Ch. Mar. 10, 2022), ¶196 (citing NIKOLABR_006502).

its own battery in-house." Kevin Lynk (Chief Engineer) admitted "***Nikola does not currently develop any components*** on its own" and "Nikola has used and continues to use off-the-shelf inverters for demonstration and early phase prototype vehicles" and "aren't even in production yet." Varoujan Sarkissian (Global Head, Vehicle Electrical and Controls) admitted "[e]fforts to develop in-house inverters only ramped up in early 2020, and it will take far more development time (perhaps up to ten years) before the in-house inverters could be used in Nikola production vehicles" and "Milton knew that Nikola was in the early stages of inverter development – the company had canceled its contract with ITK for inverter development and was essentially starting over." According to Varoujan Sarkissian, "[t]here was no complete in-house inverter or software." Umran Ashraf (Global Head, Vehicle Engineering) stated "Virtually all of the batteries for vehicles are built with partners…(Samsung provides the cell, Romeo makes the module, Nikola builds and owns the pack)." Russell stated "Romeo was the best option, but Milton badly wanted Nikola to own its battery technology." Between November 1 and 4, 2019 Milton emailed Steve Cook (associate Corporate Counsel, Contracts) regarding an agreement with Romeo for its batteries, stating "we need to make sure we have a clause specifically stating they shall never represent their batteries are on our truck without our written permission. Which we will never give. I don't want the image issue with our investors." Britton Worthen (CLO) admitted that "Milton worked hard to ensure that Romeo could never say that its batteries were in Nikola's trucks. Moreover, a May 11, 2020 internal company document states "Nikola is not developing a battery in house" and "Nikola does not have a clear plan for battery development." On March 27, 2020, Kevin Lynk emailed Katherine Beebee (project manager, Truck) regarding responsibility for e-axle components: "FPT is responsible for the mechanical design of the e-axle. Iveco is responsible for the vehicle integration of the

e-axle and traction inverters. Nikola is responsible for purchasing the traction inverters and critical e-axle components and we provide support for the system design." And a Board presentation made July 23, 2020 to Milton, Russell, Brady, Worthen, Girsky, and Ubben said that Nikola had abandoned any plans to use its own battery for the Nikola Tre BEV and, as of June 9, 2020, was evaluating batteries manufactured by third-party suppliers Kreisel and BorgWarner.[79]

580.    On March 4, 2020, Milton and Ubben appeared on *CNBC*'s Sqawk Box to promote Nikola's stock and the IPO. Asked "how much of the intellectual property is actually yours and not [your partners']?," Milton said:

> So what we did is we went out to the biggest players in the world, the people that have access to tens of billions of dollars and we said, "Look, this is what we need. It doesn't exist, ***we'll share the IP with you if you'll help us build it.***" And we went to Bosch, we went to you know Meritor, we went to WABCO, we went to Nel, we went to all these different groups, and we said, "let's build all this stuff." ... ***So that's really what sets us apart is we have a piece of all the IP*** and we have the biggest suppliers in the world paying for our research and development so we don't have to go spend tens of billions of dollars.

581.    Ubben sat next to Milton throughout the more than 20 minute interview, occasionally interspersing his own thoughts and responses and otherwise nodding along as Milton spoke, saying nothing to correct Milton's false and misleading statements.

582.    Milton's statements in ¶580 were materially false and misleading and made knowingly or with reckless disregard for the truth because, as explained in ¶¶578-579, Nikola did not design, develop, or produce components such as batteries, inverters, or e-axles, but instead sourced these components from third party suppliers. Ubben's conduct

---

[79] *In re Nikola Corp. Derivative Litig.*, C.A. No. 20222-0023-KSJM (Del. Ch. Feb. 15, 2022), ¶161 (citing NIKOLABR_000075).

during the interview served to effectively vouch for Milton's false and misleading statements.

583.    On or about March 12, 2020, Milton stated on the *Transport Topics Roadshow* podcast that "[w]e can – we're double the cycle life of a regular lithium-ion, and we're about half- to one-quarter the cost to produce the lithium-ion and we don't have any of the expensive metals . . . we should have productionized cells probably by the years end."[80]

584.    The statements Milton made in ¶583 were materially false and misleading and made knowingly or with reckless disregard for the truth for the reasons identified in ¶¶576, 578, and 579.

> 2.    *Class Period False and Misleading Statements Regarding In-House Vehicle Components and Proprietary Battery Technology*

585.    On or about June 3, 2020, Milton tweeted out a link to a podcast interview, during which he claimed that Nikola did its "***own powertrains, battery, battery management systems, controls . . in-house***."

586.    On June 4, 2020, in a tweet, Milton represented, "***We do our own batteries at Nikola and have since day 1***. We do however test with everyone and if a supplier builds a better battery we would use them. That goes for all supplied parts on our vehicle."

587.    On or about June 6, 2020, Milton tweeted, "***All the technology, software, controls, E axle, inverters etc. we do internally.***"

---

[80] TransportTopics, *Roadshow: Episode Four Meet Trevor Milton*, YouTube (Mar. 12, 2020),  available at https://www.youtube.com/watch?v=ZJWINC1aGLk. This episode is currently publicly available and was available to investors throughout the Class Period.

588.    The statements referenced in ¶¶585-587 were materially false and misleading and made knowingly or with reckless disregard for the truth for the reasons identified in ¶¶576, 578, and 579.

589.    During the same *Raging Bull* podcast, Milton stated:

> ***So when we built all this technology, we had billions of dollars spent on the electrification platforms for our big trucks***. I know I could take that money, all that technology that's been built, and port it over to the most advanced pickup truck in the world. . . . Now, we're going to use an existing OEM to build our Nikola Badgers. ***So we own all the tech. So all the cool stuff you guys want, the design, the inside, the connectivity with your phone . . . all the e-axles or, you know the electric motors, the batteries, the controls, all that's done by Nikola***. . . .

590.    The statement referenced in ¶589 was materially false and misleading and made knowingly or with reckless disregard for the truth for the reasons identified in ¶¶501, 576, 578, and 579.

591.    On the same June 29, 2020 *Raging Bull* podcast, Milton was asked, "who is the manufacturer of the battery?" Milton replied:

> The battery is actually done by Nikola. ***We own all the tech and we're building all the batteries in-house. So it's all owned by Nikola***, but it will be done at a big plant. We're going to build a plant next to ours that will essentially build all the batteries for all of our applications. But we use other people's cells. So we use, like, LG, Samsung, Panasonic. We use their cells, but the rest of the entire battery is all our tech, like the cooling, the thermal, the structural, the battery management system, the software; all that's all Nikola.

592.    The statement referenced in ¶591 was materially false and misleading and made knowingly or with reckless disregard for the truth for the reasons identified in ¶¶576, 578, and 579.

593.    Moreover, this statement is materially false and misleading because Defendants failed to disclose that Nikola used a third-party supplier to manufacture batteries for its first production vehicle, the Nikola Tre BEV, and Nikola does not have the

capability to manufacture these batteries on its own.  The supplier designed the modules for the batteries that Nikola is using for the Nikola Tre BEV, and Nikola relied on the assistance of the supplier to design the battery pack. Indeed, a July 23, 2020 presentation to the Nikola Board (received by Milton, Russell, Brady, Worthen, and Ubben) stated that Nikola had abandoned its plans to use its own battery for the Nikola Tre BEV and as of June 9, 2020 had planned to use a battery manufactured by third-party supplier Kreisel, and that Nikola was also evaluating using a battery manufactured by third-party supplier BorgWarner.[81]

594.    On July 1, 2020, Milton tweeted from his personal account in response to a comment from a Twitter user who asserted that Nikola did not make its batteries: "We don't make the cells. *We make the entire pack* like the top guys do. *We do have an OEM making our truck* but *all internals are Nikola's IP; batteries, inverters, software, ota, infotainment, controls, etc. We own it all in-house*. Just not the plant to build the truck."

595.    The statement referenced in ¶594 was materially false and misleading and made knowingly or with reckless disregard for the truth for the reasons identified in ¶¶576, 578, and 579. Milton's statement "[w]e do have an OEM making our truck" is also materially false and misleading because Defendants knew or recklessly disregarded but failed to disclose that as of the date of the statement Nikola had not engaged any OEM to produce the Badger.

596.    On July 5, 2020, Milton tweeted from his personal account: "*All major components are done in house; batteries, inverters, software, controls, infotainment, over the air, etc*. you don't care about the truth you're just out to be a keyboard warrior."

---

[81] *In re Nikola Corp. Derivative Litig.*, C.A. No. 20222-0023-KSJM (Del. Ch. Feb. 15, 2022), ¶¶161 (citing NIKOLABR_000075).

597.   The statement referenced in ¶596 was materially false and misleading and made knowingly or with reckless disregard for the truth for the reasons identified in ¶¶576, 578, and 579. Nikola also admitted in its 2020 Form 10-K, filed February 25, 2021, that the statement "all major components are done in house" was "inaccurate in whole or in part, when made."

598.   On July 14, 2020, Milton stated the following on an Instagram Live video posted on his personal Instagram account:

> ***One difference of us compared to everyone is we're the – really the only group out there that does full dielectric fluid submersion batteries***. I'm gonna walk out here and show you that in a second. So what does that mean? That means our batteries are actually completely immersed into fluid. Now, watch our competitors follow us on that one, too.
>
> Why? Because you can cool and heat your batteries much faster, much more efficiently, and you're also able to stop thermal propagation, something that other people cannot do. So, pretty cool.

599.   In the same video, Milton further stated:

> So this is to everyone who's questioning what we do. Alright, so first of all, ***who makes our batteries? Who makes Nikola's batteries? Nikola does***. Do we make the cells? No, we do not. We buy the cells from either people like Samsung, LG, Panasonic, or other groups.
>
> . . .
>
> ***We do however, make everything in our battery. All the cooling, the thermal, the battery management system, the software, the hardware, everything except for the cell***. So let that clear up any of the lies and the, the fake lies out there about how Nikola doesn't do shit, it's quite interesting. You could not build a truck like this if you don't pretty much do everything .
>
> . . .

600.   The statements referenced in ¶¶598-599 were materially false and misleading and made knowingly or with reckless disregard for the truth for the reasons identified in ¶¶576, 578, and 579. Moreover, the statements regarding a submerged battery technology were materially false or misleading because Defendants knew or recklessly disregarded but failed to disclose that these batteries were only being used in two prototypes and had severe

functional limitations and associated safety issues, leading investors and prospective investors to believe that these batteries were viable when, in fact, they were not. Specifically, the third-party supplier who helped Nikola develop the batteries mandated that they could only be run on a vehicle with a state-of-charge limitation of 30 percent, due to safety test failures. Milton knew or was reckless in not knowing that his statements about the submerged batteries were misleading as he learned, at least as of February 2019 or sooner, about the batteries' functional limitations and safety issues first-hand from the third-party supplier. In an email sent on February 5, 2019, Milton wrote, "I will agree to one of two of those [restrictions] but it can not (sic) be my financial penalty as a result of your lack of [] not delivering what was promised. . . . These are test packs, not production. . . . We do not accept your demands on these batteries with exception to the state of charge on vehicle." Further, the statement that Nikola made "everything" in their battery was false and misleading because Nikola had not successfully developed battery technology internally, and the batteries it planned to use in its semi-trucks were developed and manufactured by third parties.

601.    In the same July 14, 2020 Instagram Live video, Milton stated that Nikola does "***all the e-axle design in-house***, all the gears, the gear reductions, the thermal, the cooling, even the controls that go with it, and ***also the inverters*** as well." Milton further stated, "[A]ll' inverters on the Nikola truck are probably some of the most advanced software systems that . . I know of anywhere in the automotive world. Why do I know that? It's because ***other OEMs are asking us to use it***. . . ."

602.    The statement referenced in ¶601 was materially false and misleading and made knowingly or with reckless disregard for the truth for the reasons identified in ¶¶578-579. Moreover, Milton's statements that "other OEMs are asking us to use [Nikola's

inverters] was materially false and misleading because Defendants knew or recklessly disregarded but failed to disclose that no OEM had ever made such a request. As detailed in the USAO Presentation, Brady admitted "Milton's assertion that other OEMs have asked to use Nikola's in-house inverters is '*complete fiction*.'" Varoujan Sarkissian stated, "[i]t is not true that OEMs asked to use Nikola's in-house inverter. There was no complete in-house inverter or software for OEMs to ask for at the time of Trevor's statement." Nikola also admitted in its 2020 Form 10-K, filed February 25, 2021, that the statements about Nikola's inverter software being the most advanced in the world and that other OEMs had asked to use it were "inaccurate in whole or in part, when made."

603.     On or about July 31, 2020, when asked on the *This Week in Startups* podcast, "[y]ou do make your own battery packs," Milton replied, "*we do make our own battery packs, that's the key, that's the key element because of the cost.*" Milton then went on to say that the "*battery pack is 30 percent of your vehicle's cost, or 40. So it's one of the most important things to actually bring in-house. And so we do make our own battery packs. The whole truck is our design, is our, is our build, but another manufacturer's gonna actually be spitting it out on their assembly line.*" When the host then asked Milton if he "is gonna be in the battery business, you are gonna build battery packs," Milton replied that "[y]ou'll never make it as an OEM if you don't build your own battery. That's the most critical part." Milton also stated during the same podcast: "*the tech is ours. So the battery – like, all the important stuff like software, batteries, or, or e-Axle designs, it just means we use someone else to, to build them in the thousands for us, but we own all the tech.*"

604.    The statements referenced in ¶603 were materially false and misleading and made knowingly or with reckless disregard for the truth for the reasons identified in ¶¶578-579.

605.    In a YouTube video posted on or about August 24, 2020 on the Tesla Joy YouTube Channel, Milton stated: "So the things that we do insource is ***all of our controls, all of our inverters . . . . All of that is actually done in-house in Nikola***. . . . But what we do not do is manufacture those in mass production. ***So we design and engineer them. . . . Same thing with our inverter. We designed our own inverter.*** We actually have full prototypes here."

606.    The statements referenced in ¶605 were materially false and misleading and made knowingly or with reckless disregard for the truth for the reasons identified in ¶¶578-579.

607.    On September 14, 2020, Nikola issued an 8-K, in which the Company responded to the allegations made in the Hindenburg Report. The 8-K was signed by Worthen, but the whole Nikola Board—including Milton, Russell, Girsky, Brady, Worthen, and Ubben—was responsible for it and the press release's content, having met on September 11, 13, and 14, 2020 to discuss Nikola's response, and review a draft press release, and approve a final version.[82] Nikola said the following:

> [The Hindenburg Report] *Misrepresents Nikola's Historic Position on Battery Technology*: The short seller report claims that Founder and Executive Chairman Trevor Milton made false statements regarding the Company's battery technology following the breakdown of its transaction discussions with ZapGo Ltd. *In fact the potential battery technology advancements* are related to an ongoing confidential R&D partnership with

---

[82] *Brown v. Milton*, C.A. No. 2022-0223 (Del. Ch. Mar. 10, 2022), ¶¶165-67 (citing NIKOLABR_000261 and NIKOLA_BR000263); *In re Nikola Corp. Derivative Litig.*, C.A. No. 20222-0023-KSJM (Del. Ch. Feb. 15, 2022), ¶¶216-17 (citing NIKOLABR_000263).

1

a leading academic institution, not ZapGo. *The Company is excited about potential breakthroughs related to its next generation battery technology*."

2

608.    The statements referenced in ¶607 were materially false and misleading and

3

made knowingly or with reckless disregard for the truth for the reasons identified in ¶¶576,

4

578, and 579. Indeed, Nikola did not have any useable proprietary battery technology, let

5

alone battery technology as described in Nikola's November 19, 2019 press release (which

6

contained the disputed underlying statements about battery technology). Worthen stated

7

that he knew Milton's statements about Nikola manufacturing its batteries in-house was

8

false and Worthen "***told him not to make the statement***."

9

 

10

**D.    Defendants' False and Misleading Statements About In-House Vehicle Components and Proprietary Battery Technology Caused Investor Losses**

11

609.    Class members unknowingly and in reliance upon Defendants' materially

12

false or misleading statements and/or omissions (prior to and during the Class Period)

13

regarding Nikola's purported "game changing" battery technology and in-house vehicle

14

components purchased Nikola common stock at artificially inflated prices, as the market

15

was misled into believing that Nikola developed and owned valuable intellectual property.

16

But for Defendants' misrepresentations, omissions, and fraudulent scheme, Lead Plaintiffs

17

and other Class members would not have purchased Nikola common stock at the artificially

18

inflated prices at which it traded during the Class Period. The truth regarding Defendants'

19

fraud was revealed in a series of corrective disclosures and/or materializations of concealed

20

risk that occurred between September 9, 2020 and July 29, 2021.  During this time, the

21

price of Nikola common stock fell precipitously as the artificial inflation caused by

22

Defendants' unlawful conduct exited Nikola common stock.

23

610.    The decline in the price of Nikola common stock during this period is directly

24

attributable to the market absorbing information that corrected and/or reflected the

25

26

materialization of risks concealed by the Defendants' material misrepresentations or omissions prior to and during the Class Period.

611.   As a result of their purchases of Nikola common stock during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss (*i.e.*, damages) under the federal securities laws.  Defendants' materially false and misleading statements had the intended effect and caused Nikola common stock to trade at artificially inflated levels throughout the Class Period and, in certain instances, caused inflation in Nikola's stock price.

612.   By concealing from investors the adverse facts detailed herein, Defendants presented a false and misleading picture of Nikola's business.  As the truth about the Company and the extent of the fraud was revealed to the market, the price of Nikola common stock fell significantly.  This decline removed the inflation from the price of Nikola common stock, causing real economic loss to investors who had purchased Nikola common stock during the Class Period.

613.   Moreover, the market for Nikola common stock was open, well-developed, and efficient at all relevant times.  As a result of Defendants' misstatements and material omissions, as alleged herein, Nikola common stock traded at artificially inflated prices. Lead Plaintiffs and other Class members purchased Nikola common stock relying upon the integrity of the market relating to Nikola common stock and suffered economic losses as a result thereof.

614.   On September 10, 2020, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions prior to and during the Class Period were partially revealed when Hindenburg Research published the

Hindenburg Report, partially exposing the truth about Nikola's battery technology and in-house vehicle components, among other subjects.

615.    The Hindenburg Report asserted that Nikola's touted revolutionary battery technology never existed; Nikola's pending acquisition of battery-maker ZapGo fell through when Nikola realized its technology was "vaporware," and Nikola in fact relied on third-party manufacturers for the batteries to be used in its FCEV and BEV trucks. The Hindenburg Report also revealed that Nikola was using off-the-shelf components in its FCEV and BEV trucks, including inverters sold by Cascadia Motion: "Nikola has regularly used off-the-shelf products from third parties, while claiming to have vast internal proprietary technology and to 'design' all the products itself." Hindenburg based its report in part on "extensive evidence—including recorded phone calls, text messages, private emails and behind-the-scenes photographs" and no market participant had previously compiled and released the information Hindenburg had on Nikola's hydrogen capabilities. Hindenburg was the first to put together and release these findings.

616.    Additionally, the September 10, 2020 publication of the Hindenburg Report, and related news coverage reporting on Nikola's representations about its purported "game changing" battery technology and in-house vehicle components was a foreseeable consequence of, and within the zone of the risk concealed by, the Defendants' misrepresentations and omissions regarding Nikola's battery technology and in-house vehicle component intellectual property.

617.    As a direct and proximate result of this corrective disclosure and/or materialization of the foreseeable risks concealed by Defendants' fraud, the price of Nikola common stock declined $4.80 per share, or 11.33%, to close at $37.57 per share on September 10, 2020.

618.   On September 11, 2020, Nikola's stock price continued to fall in response to the news, falling another $5.44 per share, or 14.5%, to close at $32.13 per share on September 11, 2020.

619.   The decline in Nikola's common stock price on September 10, 2020 and September 11, 2020 were direct results of the nature and extent of Defendants' prior misstatements and omissions being revealed to investors, including Defendants' statements concerning Nikola's purported "game changing" battery technology and in-house vehicle components. The timing and magnitude of the Nikola common stock price decline evidences the impact Defendants' statements had on the Company's stock price during the Class Period and negate any inference that the loss suffered by Lead Plaintiffs and other Class members was caused by changed market conditions or macroeconomic, industry, or Company-specific factors unrelated to Defendants' fraudulent conduct. Moreover, various analysts (including those from S3 Analytics, Deutsche Bank Research, and RBC Capital Markets) issued reports attributing Nikola's stock price decline to the information revealed in the Hindenburg Report.

620.   As referenced in ¶254, on September 14, 2020, before the market opened, Nikola issued a statement that unequivocally denied the allegations in the Hindenburg Report, asserting that Hindenburg "mispresents that Nikola is claiming a third-party inverter is the Company's own technology," that Hindenburg "Misrepresents Nikola's Historic Position on Battery Technology," and concluding that the Hindenburg Report's assertions about third-party components and battery technology were "false and misleading."

621.   On Nikola's fierce denials of any wrongdoing, Nikola's stock price increased $3.66 per share, closing at $35.79 on September 14, 2020, an 11.39% increase from its previous close on September 11, 2020.

622.   On September 14, 2020, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions prior to and during the Class Period regarding Nikola's battery technology and in-house componentry partially materialized when, after the market had closed, Bloomberg reported that the SEC was investigating Nikola in connection with the allegations in the Hindenburg Report. "[T]he announcement of an SEC investigation related to an alleged misrepresentation . . . can serve as a corrective disclosure for the purpose of loss causation." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1202 (9th Cir. 2016).

623.   The next day, on September 15, 2020, during intra-day trading, the Wall Street Journal reported that the DOJ had joined the SEC's investigation of Nikola.  Also, during the trading day, *CNBC* published an article noting explaining that the "SEC and DOJ are reportedly looking into the merits of a short seller's claims that electric vehicle manufacturer Nikola misled investors.

624.   The same day, Hindenburg issued also a 25-page rebuttal report, which argued that Nikola had "debunked nothing" and had "either confirmed or sidestepped virtually everything we wrote about, and in some cases raised new unanswered questions."

625.   The SEC and DOJ investigations were triggered in part by and focused extensively on Defendants' statements regarding Nikola's revolutionary battery technology and in-house component intellectual property, demonstrating that both actions were causally linked to Defendants' misstatements on these subjects. Nikola would ultimately settle civil fraud charges with the SEC for $125 million in December 2021. In

announcing the settlement, the SEC stated that Nikola "falsely gave investors the impression that Nikola had reached certain product and technological milestones" and "misled investors about Nikola's technological advancements [and] in-house production capabilities" Moreover, the SEC and DOJ actions against Milton centered on Nikola's purported battery technology and in-house componentry. The SEC complaint against Milton confirmed that the SEC's action had been prompted by statements about Nikola's "game-changing" battery technology and that Nikola was manufacturing and developing multiple key vehicle components "in-house." The DOJ indictment, meanwhile, stated that Nikola "had partnered with various companies to try to develop proprietary battery technology," but "these efforts have not been successful, and Nikola had not successfully developed" battery technology or "produced an inverter in-house;" instead, the batteries and inverters Nikola "planned to use in its semi-trucks were developed and manufactured by third parties." Accordingly, the SEC and DOJ investigations announced in September 2020 were caused, in part, by Defendants' misstatements and omissions related to battery technology and in-house vehicle components, as the agencies later confirmed.

626. The announcement of the DOJ and SEC investigations was also a materialization of the risk concealed by Defendants' false statements defending Milton in the wake of the Hindenburg Report, including the September 14, 2020 Press Release. Defendants misled investors about the risks related to Milton's misstatements by insisting that the Hindenburg Report's claims regarding Milton, including those asserting Milton misrepresented Nikola's battery technology and in-house production of vehicle components, were "false and misleading" and "defamatory." These statements masked the risks that Milton had exposed the Company to government action and that Milton may have

to depart Nikola. These obscured risks were partially realized by the announcement of the DOJ's and SEC's investigations.

627.   As a direct and proximate result of this corrective disclosure and/or materialization of the foreseeable risks concealed by Defendants' fraud, the price of Nikola common stock declined by $2.96 per share, closing at $32.83 on September 15, 2020, an 8.27% decline from its previous close on September 14, 2020.

628.   The decline in Nikola's common stock price on September 15, 2020 was a direct result of the nature and extent of Defendants' prior misstatements and omissions regarding Nikola's battery technology and in-house vehicle componentry being revealed to investors.   The timing and magnitude of the Nikola common stock price decline evidences the impact Defendants' statements had on the Company's stock price during the Class Period and negate any inference that the loss suffered by Lead Plaintiffs and other Class members was caused by changed market conditions or macroeconomic, industry, or Company-specific factors unrelated to Defendants' fraudulent conduct.

629.   On Sunday September 20, 2020, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions prior to and during the Class Period regarding Nikola's battery technology and in-house production of vehicle components materialized when Nikola announced that Defendant Milton had resigned from his position as Executive Chairman and from the Board of Directors.

630.   Following the Hindenburg Report's release, Nikola's Board of Directors held a flurry of meetings on September 11, 2020, September 13, 2020, September 15, 2020, September 16, 2020, September 18, 2020, and September 20, 2020. The Board discussed Milton's use of social media, the SEC and DOJ investigations, and the Hindenburg Report

at these meetings. Milton tendered his resignation at the last of these meetings, on September 20, 2020. Milton's resignation was directly caused by his false and misleading statements—particularly those made on social media, which frequently misstated Nikola's battery technology and in-house vehicle component development. *CNN* reported on September 21, 2020, that as part of his separation agreement, Milton agreed to "revise any references to the positions he held at Nikola on his social media profiles so it's clear he no longer holds them. He also agreed to check with lawyers for Nikola before posting anything about the company." Milton also surrendered 4.9 million performance-based stock units he had been granted in August 2020 and a two-year consultancy option worth $20 million.

631. The September 20, 2020 resignation, and the widely reported related news coverage was a foreseeable consequence of and within the zone of the risk concealed by Defendants' misrepresentations and omissions.

632. Milton's resignation also partially revealed the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions touting the Company's battery technology and in-house vehicle components as it was the first tacit acknowledgement by the Company that the Hindenburg Report was true. The market therefore understood Milton's resignation to be a revelation of fraud and reacted accordingly. Nikola later admitted that Milton had made misstatements, confirming that the market's understanding was correct. *See Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) (citing *Lloyd*, 811 F.3d at 1210) (loss causation can be found where market understands event to be caused by fraud even absent contemporaneous admission of fraud when later revelations confirm market's understanding).

633.   Milton's resignation was also a materialization of the risk concealed by Defendants' false statements defending Milton in the wake of the Hindenburg Report, including the September 14, 2020 Press Release. Defendants misled investors about the risks related to Milton's misstatements by insisting that the Hindenburg Report's claims regarding Milton, including those asserting Milton misrepresented Nikola's battery technology and in-house production of vehicle components, were "false and misleading" and "defamatory." These statements masked the risk that Milton would have to depart Nikola – a risk Nikola explicitly warned could have dire consequences for Nikola in its SEC filings, which stated: "We are highly dependent on the services of Trevor R. Milton, our Executive Chairman, and largest stockholder. Mr. Milton is the source of many, if not most, of the ideas and execution driving Nikola. If Mr. Milton were to discontinue his service to us due to death, disability or any other reason, we would be significantly disadvantaged." This risk, which Defendants obscured in their unequivocal denials that Milton had engaged in any conduct that could lead to his departure, were partially realized by the announcement of Milton's resignation just days later. As one analyst stated in a *CNBC* interview: "Let's call it like it is. Trevor leaving. I mean he's a key part of the vision." Another analyst called it a "dark day for Nikola." A third said: "This will come as a shock to the big crowd of believers in the company and its founder. We expect heavy selling…"

634.   As a direct and proximate result of this corrective disclosure and/or materialization of the foreseeable risks concealed by Defendants' fraud, the price of Nikola common stock declined by $6.60 per share, closing at $27.58 on Monday September 21, 2020, an 19.33% decline from its previous close on Friday September 18, 2020.

635.    The decline in Nikola's common stock price on September 21, 2020 was a direct result of Milton's resignation, which itself was caused in part by his fraud related to Nikola's battery technology and in-house vehicle components. The timing and magnitude of the Nikola common stock price decline evidences the impact Defendants' statements had on the Company's stock price during the Class Period and negate any inference that the loss suffered by Lead Plaintiffs and other Class members was caused by changed market conditions or macroeconomic, industry, or Company-specific factors unrelated to Defendants' fraudulent conduct.

636.    On February 25, 2021 the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions prior to and during the Class Period were partially revealed and/or materialized when, after the close of trading, Nikola filed its Form 10-K for the year ended December 31, 2020. In the filing, Nikola admitted that several of Milton's statements that were highlighted in the Hindenburg Report were "inaccurate in whole or in part, when made," including the statements Milton made in June and July 2020 that "all major components are done in house" and that "the inverter software was the most advanced in the world and that other OEMs had asked to use it."

637.    This news was widely reported to the market.  For example, on February 25, 2021, *CNBC* published an article entitled "Nikola admits ousted chairman misled investors as legal costs mount" that went on to explain "Milton and the company previously denied many of the claims in the report."

638.    As *CNBC* suggested, the February 25, 2021 10-K revealed not only that Milton's statements were incorrect, but that Defendants' unequivocal denials of the Hindenburg Report, including the September 14, 2020 press release, were false and

misleading. In a reversal, Nikola was now acknowledging that the Hindenburg Report had been largely accurate.

639.    The February 25, 2021 disclosure of the false and misleading nature of Defendants' statements, and the related news coverage reporting on Nikola's misrepresentations about its production capabilities, products, technological advancements, and commercial prospects, was a foreseeable consequence of, and within the zone of the risk concealed by Defendants' misrepresentations and omissions.

640.    Moreover, the February 25, 2021 disclosures revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market by authoritatively conceding that Nikola did not produce its major vehicle components in house.

641.    As a direct and proximate result of this corrective disclosure and/or materialization of the foreseeable risks concealed by Defendants' fraud, the price of Nikola common stock declined by $1.62 per share, closing at $18.10 on February 26, 2021, an 8.22% decline from its previous close on February 25, 2021.

642.    The decline in Nikola's common stock price on February 26, 2021, was a direct result of the nature and extent of Defendants' prior misstatements and omissions being revealed to investors by the 10-K, including statements about Nikola's battery technology and in-house vehicle componentry.  The timing and magnitude of the Nikola common stock price decline evidences the impact Defendants' statements had on the Company's stock price during the Class Period and negate any inference that the loss suffered by Lead Plaintiffs and other Class members was caused by changed market conditions or macroeconomic, industry, or Company-specific factors unrelated to Defendants' fraudulent conduct.

643.    On July 29, 2021 the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions prior to and during the Class Period were revealed and/or materialized when numerous news outlets reported that Defendant Milton had been indicted on three counts of fraud by the U.S. Attorney's Office in Manhattan for making deceptive and false claims to investors regarding "nearly all aspects of the business." The indictment said that, from November 2019 to September 2020, Milton schemed to defraud investors into buying Nikola shares through statements about the Company's product and technology development. The SEC also filed related civil charges. In response to the indictment, Milton stated that they were "false allegations."

644.    The July 29, 2021 announcement of the indictment and the related news coverage reporting on Nikola's representations about its production capabilities, products, technological advancements, and commercial prospects, was a foreseeable consequence of, and within the zone of the risk concealed by Defendants' misrepresentations and omissions. The DOJ and SEC actions were, to a large degree, premised on Milton's misstatements regarding Nikola's battery technology and in-house vehicle componentry.

645.    Moreover, the July 29, 2021 disclosures revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market. The SEC complaint revealed that the "detailed claims about [battery] functionality, reduced costs, increased vehicle range, energy density, number of cycles and weight … were attributable to *coin size* battery cells that were being developed as part of a university research project." (emphasis in original). This fact was significant because to scale these coin-size lab-level cells to even a prototype size – which had not been done at the time of the [November 2019] press release and was, according to the professor, about a year away – would require significant further development with no

assurance of comparable performance levels. From there, developing the cells from prototype pouch size cells to commercial grade quality was a further, significant undertaking, with no assurance of utility for commercial applications.

646.   As a direct and proximate result of this corrective disclosure and/or materialization of the foreseeable risks concealed by Defendants' fraud, the price of Nikola common stock declined by $2.16 per share, closing at $12.03 on July 29, 2021, a 15.22% decline from its previous close on July 28, 2021. Nikola's stock continued to steadily decline another $1.88 per share, or 15.62%, over the next several days to close at $10.15 per share on August 5, 2021, as investors absorbed the lengthy and detailed indictment and SEC complaint, which totaled over 100 pages.

647.   The decline in Nikola's common stock price on July 29 through August 5, 2021 was a direct result of the nature and extent of Defendants' prior misstatements and omissions being revealed to investors, including misstatements regarding Nikola's battery technology and in-house vehicle componentry.  The timing and magnitude of the Nikola common stock price decline evidences the impact Defendants' statements had on the Company's stock price during the Class Period and negate any inference that the loss suffered by Lead Plaintiffs and other Class members was caused by changed market conditions or macroeconomic, industry, or Company-specific factors unrelated to Defendants' fraudulent conduct.

## VI.   Defendants Misled Investors Regarding the Total Cost of Ownership of Nikola's Trucks Relative to Diesel

648.   Commercial vehicle buying decisions, particularly for large corporate fleets, are driven, in part, by the total cost of ownership ("TCO"), an analysis of the lifetime cost of a truck, from the acquisition through the operating period. To compete with traditional

diesel trucks, Nikola would have to produce and sell hydrogen fuel at a price that would make the TCO of its vehicles comparable to that of diesel semis.

649.    Prior to March 2019, Nikola touted that the TCO of its FCEV trucks would be up to 20 percent cheaper than diesel trucks. In March 2019, Brady emailed Milton third-party research regarding the TCO of Class 8 semi-trucks. In his email, Brady noted that the third-party firm cited TCO for diesel trucks in the "$.85-$.95 range," and that "for our purposes, we will use $.95. . . ."

650.    Also in March 2019, a Nikola financial analyst notified Nikola executives – including Milton – that the TCO cost the company was using for diesel trucks was too high, and that the projected TCO for Nikola would be, at best, on par with diesel. Finally, in April 2019, Nikola's Head of Business Development sent Milton and other senior executives notes from her discussions with semi-truck fleet representatives who provided feedback regarding Nikola's TCO.  This executive reported that Nikola's actual and potential customers noted that Nikola's "*costs are high and not at parity with diesel*."

651.    Milton also repeatedly misrepresented that Nikola's TCO is significantly less than diesel. For example, in an interview on the *Founder Hour* podcast on or about July 6, 2020, Milton claimed the following regarding Nikola's TCO, as compared to diesel: "***we're like 20 to 30 percent sometimes, cheaper. So it's game over, essentially. If you don't own a Nikola truck, you're gonna go bankrupt.***"

A.    **False and Misleading Statements Regarding the Total Cost of Ownership**

1.    *Pre-Merger False Statements Regarding Total Cost of Ownership*

652.    Defendants made false and misleading statements regarding the TCO for Nikola's vehicles in the April 6 8-K. On a slide titled "NIKOLA'S ADVANTAGE: BUNDLED FCEV OFFERING SIGNIFICNATLY MORE ATTRACTIVE THAN

207

DIESEL" in the April 6 8-K, Defendants included a chart showing Nikola's FCEV having a TCO of $0.95 per mile, less than the $0.97 TCO per mile stated for traditional diesel trucks. The Slide stated "Nikola's Bundled Lease offers operators complete cost predictability at cost parity with diesel."




(highlighting added)

653.    The statements referenced in ¶652 were false and misleading for the reasons identified in ¶¶270–279, 291 and 295. Brady testified that it was openly discussed among management at Nikola that the Company had not achieved the projections in its models. There was no basis for Defendants to claim that Nikola's bundled leases had achieved or

could achieve "cost parity with diesel" and it was misleading to withhold information to the contrary that was within Defendants' possession.

        2.    *Class Period False and Misleading Statements Regarding Total Cost of Ownership*

654.    In a June 18, 2020 article in the Irish Times titled Nikola Motor Takes a Big-Money Punt on the Hydrogen Future, Milton is quoted as follows: "***We can now produce hydrogen for between $2 and $4 a kilogram. We're now cheaper than diesel to operate per-mile*** and we're almost at parity with a battery electric per-mile, and ultimately that's game over for diesel."

655.    The statement referenced in ¶654 was false and misleading because Nikola was not capable of producing any hydrogen, much less at the prices represented by Milton, and therefore Nikola's TCO was not "cheaper than diesel to operate."

656.    In the July 6, 2020 Founder Hour podcast, Milton claimed that Nikola's TCO, as compared to diesel, was "***like 20 to 30 percent sometimes, cheaper. So it's game over, essentially. If you don't own a Nikola truck, you're gonna go bankrupt***."

657.    The statement referenced in ¶656 was materially false and misleading for the reasons identified in ¶¶270–279, 291 and 295. Further, Nikola's TCO was not significantly cheaper than diesel. In March 2019, a Nikola financial analyst notified Nikola executives – including Milton – that the TCO cost the company was using for diesel trucks was too high, and that the projected TCO for Nikola would be, at best, on par with diesel. Finally, in April 2019, Nikola's Head of Business Development sent Milton and other senior executives notes from her discussions with semi-truck fleet representatives who provided feedback regarding Nikola's TCO. This executive reported that Nikola's actual and potential customers noted that Nikola's "costs are high and not at parity with diesel."

658.    On August 4, 2020, Nikola held its Q2 2020 Earnings Call. Russell, Worthen, and Brady participated in the call. In his opening remarks, Russell stated:

> Our long-haul commercial transport solution is especially unique with a revolutionary bundled lease or freight-as-a-service model. We provide customers with a fuel cell electric truck, the hydrogen fuel it needs, and all scheduled maintenance for a fixed total cost. All that customer needs to provide is a driver. ***This approach has proven very attractive and many customers are finding that they will be able to transition to zero-emissions without an increase in total cost compared to their current fossil fuel solution.***

659.    The statements referenced in ¶658 were materially false and misleading for the reasons identified in ¶¶270–279, 291, 295 and 657. As Russell knew, Nikola was not able to offer a lower TCO to customers in August 2020 as compared to fossil fuels such as diesel, and it did not have a clear pathway to do so. Nor did it have any agreements to obtain zero-emission electricity from renewable sources.

### B.    Defendants' False and Misleading Statements Regarding Total Cost of Ownership Caused Investor Losses

660.    On September 10, 2020, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions prior to and during the Class Period were partially revealed when Hindenburg Research published the Hindenburg Report, partially exposing the truth about Nikola's hydrogen capabilities, and other subjects bearing on the TCO for its trucks. For example, the Hindenburg Report asserted that Nikola had never produced any hydrogen and that Milton's claims that Nikola could do so at low cost – e.g. that the Phoenix demo station could "produce over 1,000 kilograms a day on site," that Nikola was "down below $3/kg on our hydrogen now" – were baseless.

661.    Additionally, the September 10, 2020 publication of the Hindenburg Report, and related news coverage reporting on Nikola's representations about its hydrogen

production capabilities and technological advancements to achieve low-cost hydrogen was a foreseeable consequence of, and within the zone of the risk concealed by, the Defendants' misrepresentations and omissions regarding Nikola's TCO.

662.   As a direct and proximate result of this corrective disclosure and/or materialization of the foreseeable risks concealed by Defendants' fraud, the price of Nikola common stock declined $4.80 per share, or 11.33%, to close at $37.57 per share on September 10, 2020.

663.   On September 11, 2020, Nikola's stock price continued to fall in response to the news, falling another $5.44 per share, or 14.5%, to close at $32.13 per share on September 11, 2020.

664.   As referenced in ¶406, on September 14, 2020, before the market opened, Nikola issued a statement that unequivocally denied the allegations in the Hindenburg Report, asserting that Hindenburg "Intentionally Underestimates Extent of [Nikola's] Hydrogen Production Capabilities" and concluding that the Hindenburg Report's assertions about hydrogen were "false and misleading."

665.   On Nikola's fierce denials of any wrongdoing, Nikola's stock price increased $3.66 per share, closing at $35.79 on September 14, 2020, an 11.39% increase from its previous close on September 11, 2020.

666.   On September 14, 2020, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions prior to and during the Class Period regarding Nikola's hydrogen capabilities partially materialized when, after the market had closed, Bloomberg reported that the SEC was investigating Nikola in connection with the allegations in the Hindenburg Report.

667.   The next day, on September 15, 2020, during intra-day trading, the Wall Street Journal reported that the DOJ had joined the SEC's investigation of Nikola.  Also, during the trading day, *CNBC* published an article noting explaining that the "SEC and DOJ are reportedly looking into the merits of a short seller's claims that electric vehicle manufacturer Nikola misled investors.

668.   The same day, Hindenburg issued also a 25-page rebuttal report, which argued that Nikola had "debunked nothing" and had "either confirmed or sidestepped virtually everything we wrote about, and in some cases raised new unanswered questions."

669.   As explained in ¶430, The SEC and DOJ investigations were triggered in part by and focused on Defendants' statements regarding the Company's costs of producing hydrogen and Nikola's ability to produce hydrogen at prices comparable to diesel, demonstrating that both actions were causally linked to Defendants' misstatements on these subjects. The SEC's fraud complaint against Milton would ultimately allege that he misled investors about Nikola's TCO being "significantly less" than diesel when it was not, and he knew it was not. The DOJ indictment, meanwhile, stated that "MILTON made false and misleading claims regarding...the current cost of producing hydrogen [and] the cost of electricity needed to produce hydrogen." Accordingly, the SEC and DOJ investigations announced in September 2020 were caused, in part, by Defendants' misstatements and omissions related to the inputs for Nikola's TCO calculations, as the agencies later confirmed.

670.   As a direct and proximate result of this corrective disclosure and/or materialization of the foreseeable risks concealed by Defendants' fraud, the price of Nikola common stock declined by $2.96 per share, closing at $32.83 on September 15, 2020, an 8.27% decline from its previous close on September 14, 2020.

671.   On Sunday September 20, 2020, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions prior to and during the Class Period regarding Nikola's hydrogen costs and TCO materialized when Nikola announced that Defendant Milton had resigned from his position as Executive Chairman and from the Board of Directors. As discussed in ¶¶435-438, Milton's resignation was caused in part by his false and misleading representations about the cost of hydrogen and partially revealed the truth that Defendants' denials of wrongdoing were hollow.

672.   As a direct and proximate result of this corrective disclosure and/or materialization of the foreseeable risks concealed by Defendants' fraud, the price of Nikola common stock declined by $6.60 per share, closing at $27.58 on Monday September 21, 2020, an 19.33% decline from its previous close on Friday September 18, 2020.

673.   On February 25, 2021 the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions prior to and during the Class Period were partially revealed and/or materialized when, after the close of trading, Nikola filed its Form 10-K for the year ended December 31, 2020. In the filing, Nikola admitted that several of Milton's statements that were highlighted in the Hindenburg Report were "inaccurate in whole or in part, when made," including that "the Company was 'down below' $3/kg" for producing hydrogen.

674.   As a direct and proximate result of this corrective disclosure and/or materialization of the foreseeable risks concealed by Defendants' fraud, the price of Nikola common stock declined by $1.62 per share, closing at $18.10 on February 26, 2021, an 8.22% decline from its previous close on February 25, 2021.

675.     On July 29, 2021 the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions prior to and during the Class Period were revealed and/or materialized when numerous news outlets reported that Defendant Milton had been indicted on three counts of fraud by the U.S. Attorney's Office in Manhattan for making deceptive and false claims to investors regarding "nearly all aspects of the business." The indictment said that, from November 2019 to September 2020, Milton schemed to defraud investors into buying Nikola shares through statements about the Company's product and technology development. The SEC also filed related civil charges. The SEC complaint stated that Milton misled investors by asserting that Nikola's TCO was less than diesel's and the DOJ indictment alleged that Milton had engaged in fraud by stating, among other things, that "hydrogen costs have plummeted" and that Nikola was making hydrogen for "below $4 a kilogram." In response to the indictment, Milton stated that they were "false allegations."

676.     As a direct and proximate result of this corrective disclosure and/or materialization of the foreseeable risks concealed by Defendants' fraud, the price of Nikola common stock declined by $2.16 per share, closing at $12.03 on July 29, 2021, a 15.22% decline from its previous close on July 28, 2021. Nikola's stock continued to steadily decline another $1.88 per share, or 15.62%, over the next several days to close at $10.15 per share on August 5, 2021, as investors absorbed the lengthy and detailed indictment and SEC complaint, which totaled over 100 pages.

## VII.    Defendants Misled Investors Regarding the Nikola Tre and BEV Truck Orders
### A.     Nikola Was Not Producing Any BEV Trucks

677.     In July 2020, Nikola had plans to build the Nikola Tre BEV truck. However, just like the Nikola One and the Badger, the Company had not even completed building a

prototype. Rather, the company engaged to manufacture the Nikola Tre—Bosch—had not made a single truck. Indeed, as of July 2020, the facility that would contain the assembly line for the Tre itself was still under construction.

678.    Nevertheless, on July 17, 2020, Milton stated about the Nikola Tre: "We have the most advanced battery electric truck in the world. We have a truck coming into production right now with 720 kwh the largest battery we know of on a truck anywhere in the world coming into production. We have five of them coming off the assembly line right now in Ulm, Germany."

679.    During a Board meeting on April 9, 2020, Milton, Russell, Brady, Worthen, and Ubben were informed in a presentation that Nikola's target date for a production-ready Tre was September 30, 2020 and that, even then, Nikola was experiencing severe delays with the timeline.[83] Immediately after Milton's statement, on July 23, 2020, the same individuals received a Board presentation stating that the assembly line was still being built and Nikola was "at risk of producing ZERO trucks in 2021."[84]

680.    Nikola has also since admitted in its SEC filings that these statements were false. In the Company's 2020 Form 10-K, filed February 25, 2021, Nikola admitted that Milton's July 2020 statement "that five trucks were 'coming off the assembly line' in Ulm, Germany" was "inaccurate in whole or in part, when made." Umran Ashraf (Global Head, Vehicle Engineering) has stated "Characterization of the trucks as fully built was inaccurate. Nikola was shipping Tre components to Germany for assembly during July 2020. There was no 'assembly line in Ulm; there was a prototype shop." And Vince

___

[83] *In re Nikola Corp. Derivative Litig.*, C.A. No. 20222-0023-KSJM (Del. Ch. Feb. 15, 2022), ¶¶154(d) (citing NIKOLABR_000620).

[84] *In re Nikola Corp. Derivative Litig.*, C.A. No. 20222-0023-KSJM (Del. Ch. Feb. 15, 2022), ¶¶154(d) (citing NIKOLABR_000075).

Carmella (Global Head of Marketing) stated, "[t]his statement was premature. The trucks were being built at this time, but none had been completed."

681.    On August 10, 2020, Nikola announced that it had entered into a contingent and cancellable agreement with Republic Services ("Republic"), a publicly traded waste collection company, for an order of 2,500 to 5,000 trucks. Milton had personally negotiated the contract. Yet on the same day, Milton tweeted from his personal account a link to Nikola's press release announcing the order and claimed that it was the **"[l]argest class 8 zero emission order in the industry 2,500 guaranteed."** In another tweet that same day from his personal account, Milton promoted his upcoming appearance on *CNBC*'s *Fast Money* to discuss "the 2,500 – 5,000 (1-2 billion dollar) **binding** truck order!" Then, when he appeared on *Fast Money* on or about August 10, 2020, Milton again stated that the "contract" was **"worth about, between 1 and 2 billion dollars, um, they have the right – or they're obligated to buy up to 2,500 of these electric trash trucks, and they have the option to go up to 5,000."** Milton later referred to the billion plus dollar value of the Republic order in tweets from his personal account on August 16, 2020, and the *TD Ameritrade Network* interview on August 19, 2020, in which he referred to the order as "a couple-billion-dollar contract."

### B.    False and Misleading Statements About the Nikola Tre and BEV Truck Orders

682.    In a *Chartcast* podcast on or about July 17, 2020, which was published by the podcast on or about July 19, 2020, and contemporaneously posted on Nikola's Twitter account, Milton stated about the Nikola Tre: "We have the most advanced battery electric truck in the world. We have a truck coming into production right now with 720 kwh the largest battery we know of on a truck anywhere in the world coming into production. **We**

1  ***have five of them coming off the assembly line right now in Ulm, Germany***. They'll enter

2  production end of next year-ish, somewhere around there."

3        683.  The statement referenced in ¶682 was materially false and misleading and

4  made knowingly or with reckless disregard for the truth because Milton knew but failed to

5  disclose that Bosch, the company manufacturing the trucks, had not yet made any trucks.

6  Indeed, the "assembly line" was not in fact operable and the facility was still under

7  construction. During a Board meeting on April 9, 2020, Milton, Russell, Brady, Worthen,

8  and Ubben had been informed in a presentation that Nikola's target date for a production-

9  ready Tre was September 30, 2020 and that, even then, Nikola was experiencing severe

10  delays with the timeline.[85] Immediately after Milton's statement, on July 23, 2020, the

11  same individuals received a Board presentation stating that the assembly line was still being

12  built and Nikola was "at risk of producing ZERO trucks in 2021."[86] As detailed in the

13  USAO Presentation, Umran Ashraf (Global Head, Vehicle Engineering) stated,

14  "[c]haracterization of the trucks as fully built was inaccurate. Nikola was shipping Tre

15  components to Germany for assembly during July 2020. There was no 'assembly line in

16  Ulm; there was a prototype shop." Vince Carmella (Global Head of Marketing) stated,

17  "[t]his statement was premature. The trucks were being built at this time, but none had been

18  completed." Elizabeth Freitheim testified at Milton's criminal trial that she contacted and

19  spoke with Russell, Brady, and Worthen multiple times (beginning July 20, 2020) to warn

20  of Milton's false and misleading statements made in the *Chartcast* podcast, which, she also

23  [85] *In re Nikola Corp. Derivative Litig.*, C.A. No. 20222-0023-KSJM (Del. Ch. Feb. 15, 2022), ¶¶154(d) (citing NIKOLABR_000620).

24  [86] *In re Nikola Corp. Derivative Litig.*, C.A. No. 20222-0023-KSJM (Del. Ch. Feb. 15, 2022), ¶¶154(d) (citing NIKOLABR_000075).

26  217

1  highlighted, remained on Nikola's Twitter account.[87] Russell and Brady confirmed this in

2  their testimony.[88] Freitheim testified that Worthen personally listened to the episode, and

3  that Brady said he, Russell, and Worthen were talking to Milton about his statements in the

4  podcast. Despite Freitheim's warnings, none of Russell, Brady, or Worthen caused the

5  *Chartcast* episode to be taken off Nikola's social media.

6       684.   On August 10, 2020, Milton tweeted from his personal account a link to

7  Nikola's press release announcing the Republic order and claimed that it was the ***"[l]argest***

8  ***class 8 zero emission order in the industry 2,500 guaranteed."*** In another tweet that same

9  day from his personal account, Milton promoted his upcoming appearance on *CNBC*'s *Fast*

10 *Money* to discuss "the 2,500 – 5,000 (1-2 billion dollar) ***binding*** truck order!" Then, when

11 he appeared on *Fast Money* on or about August 10, 2020, Milton again stated that the

12 "contract" was ***"worth about, between 1 and 2 billion dollars, um, they have the right –***

13 ***or they're obligated to buy up to 2,500 of these electric trash trucks, and they have the***

14 ***option to go up to 5,000."*** Milton later referred to the billion plus dollar value of the

15 Republic order in tweets from his personal account on August 16, 2020, and the *TD*

16 *Ameritrade Network* interview on August 19, 2020, in which he referred to the order as "a

17 couple-billion-dollar contract."

18      685.   Milton's statements in ¶684 that the order for 2,500 trucks was "guaranteed"

19 and binding and that Republic was "obligated" to purchase at least 2,500 trucks for over

20 $1 billion were false and misleading, and made knowingly or with reckless disregard for

21 the truth, because they failed to disclose that under the terms of the agreement, which

22 Milton personally negotiated, for Republic to incur any obligation, a series of conditions

---

[87] Milton Tr. 312:14-313:20, 337:15-338:24, 342:8-22, 386:8-390:4, 413:12-415:13, ECF Nos. 218, 220.

[88] Milton Tr. 1094:17-1096:25, 1097:23-1098:15, 1820:5-1822:5, ECF Nos. 226, 232.

would have to be met, not all of which were even under Nikola's control. Among the conditions was a requirement for Nikola to achieve multiple development milestones before Republic was obligated to order any trucks. If Nikola did not meet the requirements for the initial phase, Republic had the right to terminate the agreement. Moreover, if the parties could not agree on essential terms (including price, service and parts network, warranties, training program, and more), Republic had the ability to terminate the agreement anytime on 30 days' notice. Finally, even if Nikola could meet all of those obligations, Republic still had the right to cancel its orders without liability or penalty as long as the delivery date was 120 days out. Moreover, the agreement did not have a price term. Rather, the agreement provided that the parties would negotiate the price later. For this reason, Republic specifically made a request to Milton that Nikola not include any reference to price or value of the transaction in any press release announcing the transaction. Accordingly, it was false and misleading for Milton to describe this highly contingent and cancellable order as guaranteed, without any qualification. Milton knew or was reckless in not knowing these terms because he personally negotiated them.

**C.    Defendants' False and Misleading Statements About the Nikola Tre and BEV Truck Orders Caused Investor Losses**

686.    On September 10, 2020, Hindenburg published the Hindenburg Report, entitled "Nikola: How to Parlay An Ocean of Lies Into a Partnership With the Largest Auto OEM in America." Hindenburg reported that it had identified "dozens of false statements by" Milton, which had led Hindenburg to conclude that Nikola "is an intricate fraud built on dozen of lies over the course of . . . Milton's career." Regarding the Nikola Tre and BEV truck orders, the Hindenburg Report provided evidence that Milton's statement that five Tre trucks were "coming off the assembly line right now" was false. Hindenburg reported that in an interview with a Bosch spokesperson at its headquarters in Germany,

the spokesperson stated, "No they are not ready yet. I don't know exactly the year but we're working on it." The Hindenburg Report additionally addressed Milton's misstatements regarding the Republic order, describing Nikola's order book as "more fluff than substance," that the trucks in the purported Republic order "would be supplied from the Nikola factory at Coolidge, which has barely begun," and concluding that "[h]aving a large order book sounds great but having buyers both willing and credibly able to pay is another matter entirely."

687.   On this news, Nikola's stock price fell $4.80 per share, or 11.33%, to close at $37.57 per share on September 10, 2020.

688.   On September 11, 2020, Nikola's stock price continued to fall, falling $5.44 per share, or 14.5%, to close at $32.13 per share on September 11, 2020.

689.   On September 14, 2020, before the market opened, Nikola unequivocally denied the allegations in the Hindenburg Report, asserting that the allegations themselves were "false and misleading," "false and defamatory," and "designed to provide a false impression to investors and to negatively manipulate the market in order to financially benefit short sellers, including Hindenburg itself."

690.   Also on September 14, 2020, Nikola filed the September 14 8-K, signed by Defendant Worthen.

691.   In the September 14 8-K, Nikola purported to rebut the Hindenburg Report with statements that doubled down on Milton's lies regarding the Nikola Tre and the Republic order while in some cases corroborating their falsity. For example, the September 14 8-K confirmed that the Tre trucks in Ulm, Germany were in pre-production and were not "coming off the assembly line right now" as Milton stated. Nikola wrote,

> **Nikola Tre Semi-Truck Production**: The Company expects the Nikola Tre semi-truck, a pioneer battery-electric semi-truck created in collaboration

220

with IVECO through a joint venture established in 2019 for the short haul trucking sector, *to be ready for production and available to customers by the fourth quarter of 2021*. The Nikola/IVECO joint venture has enabled dedicated focus toward delivering the Tre in 2021. The Nikola Tre is a zero-emission semi-truck with over 720 kWh of battery and an approximately 300-mile range.

**Large Order for Electrified Refuse Truck**: As previously announced, Nikola has received a minimum order of 2,500 electrified refuse trucks from Republic Services, Inc., with on-road testing likely to begin in early 2022 and full production deliveries expected to begin in 2023.

**Short Seller Mischaracterizes Quote by Bosch Employee**: Following the publication of the short seller report, Bosch stated, "Specific instances in the [Hindenburg] report quoting a Bosch employee were taken out of context." Bosch has also stated, "The employee spoke only about Bosch's own plans for the IAA industry show and H2Haul project for the European Union." Nikola and Bosch are aligned on the product roadmap for the Tre truck. *The five trucks are currently being built and commissioned in Ulm, Germany, and are pre-production builds*. Hindenburg either recklessly misunderstands or willfully misrepresents the vehicle pre-production process to fit its narrative.

692.    On Nikola's fierce denials of any wrongdoing, Nikola's stock price increased $3.66 per share, closing at $35.79 on September 14, 2020, an 11.39% increase from its previous close on September 11, 2020.

693.    On September 14, 2020, after the market had closed, *Bloomberg* reported that the SEC was investigating Nikola in connection with the allegations in the Hindenburg Report, including those relating to the Tre and BEV truck orders.

694.    In response to Nikola's denials, on September 15, 2020, Hindenburg Research issued a 25-page rebuttal report, which argued that Nikola had "debunked nothing" and had "either confirmed or sidestepped virtually everything we wrote about, and in some cases raised new unanswered questions."

695.    Also, on September 15, 2020, during intra-day trading, the *Wall Street Journal* reported that the DOJ had joined the SEC's investigation of Nikola.

696.    On this news, Nikola's stock fell another $2.96 per share, closing at $32.83 on September 15, 2020, an 8.27% decline from its previous close on September 14, 2020.

221

697.    Both the SEC and DOJ investigations were triggered in part by and focused on Defendants' statements regarding the Nikola Tre and BEV truck orders, demonstrating that both actions were causally linked to Defendants' misstatements on this subject. The SEC complaint would ultimately cite Milton's false statements regarding the Republic order, alleging that "[t]he statements that the order for 2,500 trucks was 'guaranteed' and that [Republic] was 'obligated' to purchase trucks was false and misleading." The DOJ indictment also brought allegations related to Milton's false statements regarding truck reservations. Accordingly, the SEC and DOJ investigations announced in September 2020 were caused, in part, by Defendants' misstatements and omissions related to the Nikola One, as the agencies later confirmed.

698.    On September 20, 2020, Nikola announced that Milton had resigned from his position as Executive Chairman and from the Board of Directors.

699.    On this news, Nikola's stock fell another $6.60 per share, closing at $27.58 on Monday September 21, 2020, a 19.33% decline from its previous close on Friday September 18, 2020.

700.    On December 23, 2020, news organizations reported that Republic had canceled its order for 2,500 battery-powered electric trucks from Nikola which had been announced in August 2020. The cancellation was in direct contradiction to Milton's prior misstatement that Republic was "obligated" to purchase at least 2,500 BEV trucks. Therefore, the undisclosed risk that Republic could cancel the order came to fruition.

701.    These reports were widely distributed through certain news publications. For instance, *CNBC* reported "Nikola shares slide after deal ends for electric garbage trucks with Republic Services" and *Fortune* reported "It doesn't take much reading between those

lines to infer that Nikola may have overpromised what it was capable of. That would align with the company's track record."

702.    The December 23, 2020 reports about the Republic cancelled order for 2,500 trucks suggested that the previously-announced deal was a ploy to inflate Nikola's stock because Nikola was not capable of fulfilling the order, and/or Republic Services was not interested in partnering with a company that had misrepresented its capabilities and prospects. These reports were a foreseeable consequence of, and within the zone of the risk concealed by Defendants' misrepresentations and omissions, and fraudulent scheme.

703.    As a direct and proximate result of this corrective disclosure and/or materialization of the foreseeable risks concealed by Defendants' fraud, the price of Nikola common stock declined by $1.80 per share, closing at $15.03 on December 23, 2020, a 10.70% decline from its previous close on December 22, 2020. Nikola's stock declined another $1.28 per share, closing at $13.75 on December 24, 2020, an 8.52% drop from its close on December 23, 2020, for a two-day decline of $3.08 per share, an 18.30% decline from its close on December 22, 2020.

704.    The February 25, 2021 10-K further revealed the truth about Nikola's misstatements regarding the Nikola Tre and its BEV truck orders. Nikola admitted that Milton's statement, which was highlighted in the Hindenburg Report, that "five trucks were 'coming off the assembly line' in Ulm, Germany" was "inaccurate in whole or in part, when made." It also contradicts the representation in the September 14, 2020 8-K that "[t]he five trucks are currently being built and commissioned in Ulm, Germany" as the trucks were not then "currently" being built.

705.    On this news, the price of Nikola common stock declined by $1.62 per share, closing at $18.10 on February 26, 2021, an 8.22% decline from its previous close on February 25, 2021.

706.    On July 29, 2021, numerous news outlets reported that Milton had been indicted on three counts of fraud by the U.S. Attorney's Office in Manhattan for making deceptive and false claims to investors regarding "nearly all aspects of the business." The indictment said that, from November 2019 to September 2020, Milton schemed to defraud investors into buying Nikola shares through statements about the Company's product and technology development. The SEC also filed related civil charges. As noted, the SEC Complaint and criminal indictment brought allegations related to Milton's false and misleading statements regarding the Nikola Tre and/or BEV truck orders. In response to the indictment, Milton stated that they were "false allegations."

707.    On this news, Nikola's stock fell another $2.16 per share, closing at $12.03 on July 29, 2021, a 15.22% decline from its previous close on July 28, 2021. Nikola's stock continued to steadily decline another $1.88 per share, or 15.62%, over the next several days to close at $10.15 per share on August 5, 2021, as investors absorbed the lengthy and detailed indictment and SEC complaint, which totaled over 100 pages.

## VIII.  Defendants Misled Investors Regarding Nikola's Supposedly "Off-Grid" Headquarters

708.    At no point in time has Nikola's headquarters been "off-grid" or contained solar panels. While Nikola had at one time discussed the possibility of moving to an off-grid headquarters, that plan was quickly abandoned because it was deemed cost prohibitive. Nevertheless, again portraying Nikola as on the cutting edge of technology, Milton asserted in 2019 that Nikola's headquarters was "off-grid" and powered by "hydrogen, battery, and solar."

709.   As the Company has since admitted in its SEC filings, this statement was false when made. Defendant Brady has stated, "This assertion is 'completely false.' Nikola had merely discussed moving to an off-grid headquarters, but it was deemed cost prohibitive."

A.   **False Statements Regarding Nikola's "Off-Grid" Headquarters**

710.   In a presentation on February 21, 2019, posted to YouTube on April 29, 2019, Defendant Milton claimed:

> *We have the only off-grid headquarters that we know of, completely off of hydrogen, battery, and solar. We have 3.5 megawatts of solar up on the roof producing about 18 megawatts of energy a day in our headquarters*, and we're storing 10,000 kilograms of hydrogen and using fuel cells as energy backup and batteries as energy sources as well. Our company is truly one of the most innovative companies in the world!

This video remained on YouTube and publicly available to investors throughout the Class Period.[89]

711.   The statement referenced in ¶710 was materially false and misleading because Defendants knew or recklessly disregarded but failed to disclose that Nikola's headquarters did not have solar panels on its roof at this time, and there were still no solar panels on the roof as of November 2020. As detailed in the USAO Presentation, Defendant Brady admitted "***This assertion is 'completely false.'*** Nikola had merely discussed moving to an off-grid headquarters, but it was deemed cost prohibitive." Moreover, the USAO Presentation stated: "Interviewees consistently stated that ***Nikola's headquarters did not have solar panels on its roof at this time, and that there are still no solar panels on the roof***."

---

[89] CleanCitiesSac, *2/21 Fuel Cell Vehicle Workshop: Trevor Milton – Nikola Motor Company,* YouTube (April 29, 2019), available at https://www.youtube.com/watch?v=a9J8jizLI2s&t=603s.

712.    On February 28, 2019, Defendant Nikola posted a photograph of its headquarters on it official Twitter account and represented that it was currently generating solar power and producing hydrogen at its headquarters:

> Nikola's new HQ in Phoenix. 150,000 sq. ft. 13 Acres. 300+ employees. ***1,000 kilogram hydrogen production and storage. Zero emissions with up to 3 megawatts of solar and 20 megawatt hour lithium storage***. Of course we did the impossible. It's like engineering the Nikola Two.

This statement remained on Nikola's Twitter account and publicly available to investors throughout the Class Period.[90]

713.    The statement referenced in ¶712 was materially false and misleading for the reasons identified in ¶711.

## A. Defendants' False and Misleading Statements Regarding Nikola's "Off-Grid" Headquarters Caused Investor Losses

714.    The truth regarding Nikola's headquarters' lack of solar panels first partially came out with the September 10, 2020 publication of the Hindenburg Report. Regarding the "off-grid" claims, the Hindenburg Report stated that "Aerial photos" revealed that there were no solar panels on the roof of Nikola's headquarters. The Hindenburg Report thus directly contradicted Defendants' claims regarding Nikola's headquarters.

715.    On this news, Nikola's stock price fell $4.80 per share, or 11.33%, to close at $37.57 per share on September 10, 2020.

716.    On September 11, 2020, Nikola's stock price continued to fall, falling $5.44 per share, or 14.5%, to close at $32.13 per share on September 11, 2020.

717.    On February 25-26, 2021, the relevant truth concealed by Defendants' misstatements regarding Nikola's Headquarters was partially revealed when Nikola filed

---

[90] @nikolamotor, Twitter (Feb. 28, 2019, 4:05 P.M.), available at https://twitter.com/nikolamotor/status/1101226897982218240.

its Form 10-K for the year ended December 31, 2020. In the filing, Nikola admitted that Milton's April 2019 statement "that solar panels on the roof of the Company's headquarters produce approximately 18 megawatts of energy per day" was "inaccurate in whole or part, when made."

718.    On this news, the price of Nikola common stock declined by $1.62 per share, closing at $18.10 on February 26, 2021, an 8.22% decline from its previous close on February 25, 2021.

## IX.    Defendants Misled Investors Regarding Nikola's Ownership of Natural Gas Wells

719.    As with Nikola's headquarters going "off-grid," Nikola had briefly considered purchasing its own natural gas wells, but the idea never advanced beyond speculation.

720.    Nevertheless, Nikola stated on its corporate website that the Company could guarantee low fuel prices because "Nikola owns the rights to its own natural gas wells" and on August 30, 2016, Milton proclaimed that the seven (nonexistent) wells were "[u]sed as backup to solar hydrogen production.!"

721.    Nikola has since admitted in its SEC filings that these statements were false when made. Milton himself has admitted that he once "looked at a property with seven wells on site, but Nikola never purchased the property or any other natural gas wells."

### A.    False Statements Regarding Natural Gas Wells

722.    On July 1, 2016, Nikola stated on its corporate website that the Company could guarantee low fuel prices because "***Nikola owns the rights to its own natural gas wells*** along with the ***Nikola One fleet*** that transports the natural gas from the wells to the stations. ***With 7 wells on a single property, Nikola can pump out millions of gallons of clean natural gas each day.***"

227

723.    The statement in ¶722 was materially false and misleading because Defendants knew or recklessly disregarded but failed to disclose that Nikola never at any time owned any natural gas wells. As detailed in the USAO Presentation, Milton admitted that he once "looked at a property with seven wells on site, but ***Nikola never purchased the property or any other natural gas wells***." Brady "is unaware of any natural gas wells owned by Nikola." No one else at Nikola interviewed pursuant to an investigation conducted by Nikola's counsel was aware of Nikola ever owning any natural gas wells.

724.    On August 30, 2016, after someone on Twitter asked about the status of the Company's gas wells, Nikola responded through its corporate Twitter account, "we still have them. Used as backup to solar hydrogen production.! If any production issues arise or systems go down." This statement remained on Nikola's Twitter account and publicly available to investors during the Class Period.

725.    The statement referenced in ¶724 was materially false and misleading for the reasons identified in ¶723.

**B.    Defendants' Materially False and Misleading Statements Regarding Natural Gas Wells Caused Investor Losses**

726.    The truth regarding Nikola's lack of natural gas wells first partially came out with the September 10, 2020 publication of the Hindenburg Report. Regarding the claims that Nikola owned natural gas wells, the Hindenburg Report stated in part: "at one point Nikola claimed to own its own natural gas wells. There is no evidence in company filings to support this."

727.    On the news of the Hindenburg Report and the revelations therein, which included information that Nikola lacked any natural gas wells, Nikola's stock price fell $4.80 per share, or 11.33%, to close at $37.57 per share on September 10, 2020.

728.    On September 11, 2020, Nikola's stock price continued to fall, falling $5.44 per share, or 14.5%, to close at $32.13 per share on September 11, 2020.

729.    On February 25-26, 2021, the relevant truth concealed by Defendants' misstatements regarding Nikola's gas wells was partially revealed when Nikola filed its Form 10-K for the year ended December 31, 2020. In the filing, Nikola admitted that the July 2016 statement "that [Nikola] owned rights to natural gas wells, and in August 2016 that the wells were used as a backup to solar hydrogen production" were "inaccurate in whole or part, when made."

730.    On the news of the admissions in Nikola's 2020 Form 10-K, the price of Nikola common stock declined by $1.62 per share, closing at $18.10 on February 26, 2021, an 8.22% decline from its previous close on February 25, 2021.

**THE INDIVIDUAL DEFENDANTS EMPLOYED DEVICES, SCHEMES, AND ARTIFICES TO DEFRAUD INVESTORS PURSUANT TO 10B-5(A) AND (C)**

731.    Throughout the Class Period, the Individual Defendants knowingly and/or recklessly engaged in acts and courses of business in furtherance of a scheme to defraud investors and artificially inflate the price of Nikola common stock. The scheme itself revolved around defrauding retail investors by encouraging the artificial inflation of Nikola's stock price based largely on the flagrant falsehoods and showmanship of the Company's charismatic CEO, Milton. Each participant in the scheme knew the truth, or acted with reckless disregard for it, as to the actual condition of the Company's vehicles, orders, technology, and infrastructure, but each elected to accept the financial benefit of false statements about those topics rather than publicly contradict claims they knew to be false.

732.     In furtherance of this scheme, the Individual Defendants employed devices, schemes, and artifices to defraud investors. The Individual Defendants intentional participation in the scheme consisted of: (i) establishing a system that rewarded their fraud; (ii) taking Nikola public through a process that allowed for more promotion with less oversight than a traditional IPO while enabling and encouraging Milton to make false statements in pursuit of a strategy to target retail investors; (iii) engaging in deceptive acts, including approving, disseminating, and making misleading statements and participating in misleading presentations, interviews, and transactions; (iv) knowingly signing false SEC filings; (v) repeatedly suppressing and deflecting efforts to set the record straight on Milton's misrepresentations; and (vi) adopting and carrying out a plan to discredit the Hindenburg Report's allegations, which the Individual Defendants knew to be true.

## I.     The Individual Defendants Established a System that Rewarded Their Fraud

733.     The Individual Defendants were motivated to carry out a scheme that was meant to artificially inflate the price of Nikola common stock, which in turn enriched each of the Individual Defendants. For example, Girsky was slated to receive shares of Nikola stock as a member of the post-merger Nikola Board. Further, as discussed above, Defendants Milton, Russell, Brady, and Worthen all established compensation structures that were directly tied to the price of Nikola common stock and thus designed to reward each Individual Defendant for furthering the scheme. Specifically, following the SPAC merger, the Individual Defendants took nearly all of their compensation as Nikola stock.

734.     Importantly, this unique compensation structure was established and agreed to by these defendants. Indeed, Russell testified during Milton's criminal trial that he came up with the stock-based compensation structure which Milton, Brady, and Worthen also agreed to. Russell testified: "When we were looking to look forward to the listing [to go

public], I said [to Milton] I would like to be paid no cash, just a symbolic salary of one dollar, and no bonus, and I would like to take compensation as Nikola stock." Russell explained that he proposed this compensation structure to Milton because "I wanted as much stock in Nikola as I could possibly get." According to Russell, Milton thought it was "a great idea" and said, "I want to do the same." Then, Russell and Milton "talked to the other people who would be named executive officers in the securities filings, [and] they all said we'll all do the same, we'll all take a dollar salary."[91] Thus, Milton, Russell, Brady, and Worthen each agreed to receiving essentially all their compensation from the value of Nikola's stock.

735.    Milton, Russell, Brady, and Worthen also had significant performance bonuses based on Nikola's stock price. Critically, the pre-set milestones for awarding RSUs to these defendants were based solely on the share price of Nikola common stock. Thus, the only way these defendants would receive such RSU bonuses was if the stock price reached a certain level.  On August 14, 2020, Nikola's share price achieved the first share price milestone specified in Milton's, Russell's, Brady's, and Worthen's employment agreements. As such, Milton was awarded 1,069,000 shares of Nikola stock, Russell was awarded 1,069,000 shares, Brady was awarded 570,000 shares, and Worthen was awarded 534,000 shares, which combined were worth approximately $81 million at that time.  As Milton wrote in a July 7, 2020 email exchange with one of Nikola's directors regarding a release from his lock-up agreement, the stock had gained "over 400%" *and he made* "*everyone else millionaires and billionaires*."

736.    Russell was additionally entitled to the upside on Nikola shares which Milton placed in T&M—the entity co-owned by Milton and Russell—while Milton retained the

---

[91] Milton Tr. at 1067:1-18, ECF No. 226.

base value of those shares. By September 20, 2022, Russell owned these shares outright and testified that the current value of his T&M shares in total were worth $190–200 million.[92]

737.    Defendants Girsky and Shindler also greatly benefited from Nikola's inflated stock price.  In exchange for their shares of VectoIQ stock (for which they had paid nominal sums of money), Girsky and Shindler received over 1.7 million and nearly 400,000 shares, respectively, of Nikola common stock at close of the merger. By August 14, 2020, after the Individual Defendants' false and misleading statements, Nikola shares were trading at $45.96, making Girsky and Shindler's Nikola holdings worth approximately $78 million and $18 million respectively.

738.    Additionally, the merger with Nikola allowed Girsky and Shindler to narrowly avoid crossing over VectoIQ's May 18, 2020 deadline to find a merger partner. Accordingly, Girsky and Shindler were highly motivated to make the deal work so that they would not have to dissolve VectoIQ and return investors' funds.

739.    Defendant Ubben also profited handsomely from Nikola's rapid appreciation in value. Ubben directly or indirectly through Spring Master Fund acquired 20,362,024 Nikola common shares ahead of the merger. Spring Master Fund acquired these shares at an average price of $7.54 per share. When Nikola went public, the value of his holdings skyrocketed. Nikola closed at $33.75 per share on June 4, 2020, following the merger, driving up the value of Ubben's holdings to over $687 million. Significantly, because Nikola was now a publicly traded company, Ubben could sell his previously illiquid shares of Nikola on the open market, although he had to wait 180 days following the merger to sell any stock under the Lock-Up Agreement. Nonetheless, Ubben—a Nikola director in

---

[92] Milton Tr. at 1189:13-15, ECF No. 226.

possession of material, non-public information—sold 1.4 million shares of Nikola stock on August 11, 2020, for a total of $59,766,000 in violation of the Lock-Up Agreement.

740.    Based on the Individual Defendants' compensation structure, each was motivated to enact and perpetuate the scheme to artificially inflate Nikola's share price and to maintain that inflation until their lock-up periods expired—December 1, 2020 for Milton, Ubben, and Russell, and one-year for Girsky, Shindler—and they could cash out on their holdings. As part of the scheme, the Individual Defendants both: (i) disseminated and made false and misleading statements, including in SEC filings, that both confirmed and echoed Milton's misleading statements about Nikola's production and technological capabilities and (ii) allowed and encouraged Milton to make false statements that the Individual Defendants knew were false and misleading.

741.    The Individual Defendants were further motivated to engage in the scheme by the pressures facing their respective companies. In late 2019, VectoIQ was running short on time required by its governing documents to complete a merger. If it could not find a merger partner by May 18, 2020, it would have to return investors' money and the venture would have been a failure.

742.    Nikola was facing a looming crisis in late 2019. The Company was burning through cash and its private funding sources were largely exhausted. A December 11, 2019 presentation to Nikola's Board of Directors stated that Nikola was having a difficult time raising private financing. A slide from the presentation noted that Nikola's Series D Capital Raise was "at an inflection point due to lack of meaningful traction from traditional financial investors" and that private investors were "reluctant to commit" to Nikola due to substantial risks with its unproven business model:

1

2

3



**CAPITAL RAISE UPDATE**

Series D Capital Raise is at an inflection point due to lack of meaningful traction from traditional financial investors

**LACK OF MEANINGFUL TRACTION FROM TRADITIONAL FINANCIAL INVESTORS POST CNHI/IVECO PARTNERSHIP ANNOUNCEMENT**

Morgan Stanley, Cowen, and the Company have reached out and met with a core group of potential lead financial investors and other interested investors; the group included those who are most familiar with and interested in Nikola

Financial investors have been reluctant to commit due to:
- Pre-revenue; a lack of clear visibility to revenue generation
- Capital intensive nature of the business (a green field manufacturing facility and H2 Station Network); preference towards capex lite businesses
- High execution risks associated with building two businesses – manufacturing trucks and building out the H2 station network
- Risks of being the next WeWork, Uber, Lyft (private round valuation being higher than the public valuation)



**REMAINING HIGHLY INTERESTED FINANCIAL INVESTORS**

Select Transatlantic Limited Partners and HAO Capital appears to be highly interested; however, it is unlikely Nikola will close more than $150M - $200M of additional cash in the Series D round
- A group of ultra high net worth family offices ( 5 to 6 companies) in Norway, led by Klaveness Marine, is seriously looking to make an investment in Nikola's Series D round in early January 2020
- HAO capital based out of Shanghai and Hong Kong is considering an investment and will be on-site December 5th



**POTENTIAL CATALYST EXISTS TO RE-ENGAGE FINANCIAL INVESTORS BUT LIKELY THE TIMING WILL BE OFF**

An Amazon commercial agreement and a BP JV strategic investment would likely encourage financial investors to re-engage and reconsider their decision
- BP is considering a strategic 50/50 JV investment for 30-40 H2 stations in the US; however, the proposed investment would be in the form of Capex/Opex support of approx. $300M in the JV, without a direct cash investment into Nikola Corp.
- The BP investment would be viewed by the financial community as de-risking of H2 station roll-out and to help fund Capex/Opex
- An Amazon commercial agreement would provide certainty to revenue visibility in 2021 and give credibility to Nikola Tre BEV as the battery electric truck of choice

29

4

5

6

7

8

9

10

11

12

13

14

743.    The same presentation noted that Nikola "cannot wait for the financial

15

16

community to potentially re-engage in late Q1 / early Q2, 2020." The Company needed

17

access to a new source of capital to continue funding its operations.

18

## II.    The Individual Defendants Leveraged Milton's Misleading Promotional Style to Target Retail Investors

19

20

744.    In late 2019, the Nikola Defendants had been considering two options for

21

bringing the Company public to meet its urgent need for financing. Nikola could list on the

22

Oslo Børs stock exchange in Norway, or engage in a reverse-merger with a SPAC. Both

23

options would give Nikola a quicker infusion of capital than a traditional IPO and would

24

allow Defendants to sell their shares on an open market much sooner. Both would also let

25

Defendants avoid much of the regulatory scrutiny associated with a traditional IPO.

26

745.    During the week of November 18, 2019, with just six months remaining before VectoIQ's May 18, 2020 deadline, Cowen and Company, LLC ("Cowen")—an early investor in VectoIQ—proposed Nikola as a potential acquisition target. Cowen had a prior relationship with Nikola, having previously provided financial advisory services to the Company in connection with a 2018 offering of preferred stock. Cowen also pitched Nikola on the idea of a reverse merger with VectoIQ around this same time. Beginning the week of November 25, 2019, members of the management teams of both VectoIQ and Nikola met at Nikola's headquarters.

746.    The SPAC option with VectoIQ proved to be more attractive for the Nikola Defendants' needs. Brady in particular favored the SPAC route over a listing on the Oslo Børs.[93] The SPAC route meant access to a larger pool of retail investors, but it also carried an additional advantage because it meant Defendants would not be subject to the "quiet period" mandated by the federal securities laws. In a normal IPO, executives would not be permitted to hype or promote a company's stock immediately before or after a public listing. Instead, a "quiet period" goes into effect from the time the issuing company discloses information about the issuance in the registration statements and prospectus filed with the SEC until forty days following the IPO. During this time, executives are forbidden from providing any information beyond what was contained in the registration statement and prospectus. The quiet period protects investors by ensuring a level playing field, as all investors have access to the same information, and by preventing executives from taking advantage of the listing to create runaway inflation in a new stock.

747.    If Nikola went public via SPAC, however, the executives theoretically would not be constrained in their ability to speak publicly and promote Nikola's stock. Indeed, a

---

[93] Milton Tr. at 1852:19-20, ECF No. 232.

November 2019 presentation given by VectoIQ to Nikola listed among the "KEY ADVANTAGES" of a SPAC versus a traditional IPO the "Ability to market off of forward projections" and "Completely confidential marketing to public investors with light documentation," as well as that the total process would take "~4 months to close." Significantly, the presentation also stated that a SPAC with VectoIQ could give Nikola's "early investors" such as Milton, Russell, and Ubben, "partial cash liquidity" at close.

748.   The "light documentation" advantage turned out to be significant to Nikola's ability to achieve an inflated valuation. As the *Financial Times* observed in a September 14, 2020 story, the Hindenburg Report "raised significant questions about Nikola's own technology that would normally be addressed in a traditional stock market listing process, but which the business largely sidestepped by merging with a [SPAC] this year."

749.   VectoIQ sent Nikola a letter of intent on December 19, 2019, and in a December 22, 2019 phone call, Girsky proposed a valuation of approximately $3 billion on a pre-money basis. Following further negotiations, the two companies agreed to the $3 billion valuation, that VectoIQ would receive one seat on Nikola's Board of Directors and that VectoIQ would raise at least $500 million in a PIPE offering. The two companies signed the letter of intent on December 24, 2019.

750.   The companies further agreed that immediately following the merger, Nikola would effectively make a $70 million cash payment to Milton by redeeming 7,000,000 shares of Nikola common stock from M&M, an entity owned by Milton, at a price of $10 per share.

751.     The merger agreement came just in time for Nikola as its financial situation became more dire in early 2020. On April 9, 2020, Nikola's Board of Directors held a telephonic meeting, attended by Milton, Russell, Ubben, Brady, and Worthen, in which the Board was told that there were delays in developing production-ready trucks and hydrogen infrastructure (including blueprints for the stations). Brady then provided an update on the SPAC process and timeline.



**EXECUTIVE GOALS**
AN UPDATE ON TREVOR AND MARK'S KEY OBJECTIVES

| ACCOUNTABILITY | MEASURE OF SUCCESS | WEIGHT | TARGET | ACTUAL | STATUS |
|---|---|---|---|---|---|
| Keep Nikola Employees Safe and Healthy | Recordable Incidents [1] | 20 | < 2.0 | 0.0 | 🟢 |
| Raise Capital | Series D Capital Raise | 20 | $1.0 B | SPAC/PIPE in place | 🟢 |
| Deliver a Production US BEV Truck | Production-ready Vehicle | 20 | 9/30/2020 | Minimizing delays | 🔴 |
| Allocate Capital with Discipline | Adherence to FY20 Budget | 20 | <= 5% | On track | 🟢 |
| Develop Infrastructure | Station Blueprint, Pilot Station Contract, PPA Let, Charging Standard | 10 | 9/30/2020 | Minimizing delays | 🔴 |
| Create a World-class Culture | Enterprise Engagement Score | 10 | 70% | Survey to take place Q3 2020 [2] | 🟢 |

1. Any work-related injury or illness is "recordable" if it results in medical treatment beyond first aid (i.e., stitches, referral to MBI or hospital)
2. Changed timing considering recent events

*PRIVILEGED & CONFIDENTIAL*

13

752.     Documents shared with the Board at this meeting revealed that Nikola expected to deplete 75% of its cash between mid-April 2020 and mid-September 2020 and projected negative cash flow until 2023. The Company was under particular pressure to close a SPAC deal by May 13, 2020, because this was the date Nikola's December 13, 2019 financials would become stale and would need to be updated with information from the first quarter of 2020, which would reflect the further deterioration in Nikola's financial condition at a time when the Company was far from generating revenue because its trucks and hydrogen infrastructure were facing delays:

237





753.    With the SPAC deal in place, the Individual Defendants turned to designing a strategy to promote Nikola's stock that leveraged Milton's innate talents as a salesman. The strategy the Individual Defendants settled on was to intentionally target retail investors, who were less sophisticated than large institutions and would apply less scrutiny to Milton's brash claims. While Milton's style would work to attract retail investors, Russel, Brady, Worthen, and to an extent Girsky would handle conversations with more sophisticated parties, such as analysts.

754.    On November 26, 2019, Brady circulated a document entitled "VectoIQ-Nikola discussion materials" in an email to Ubben, copying Milton, Russell, and others, which reported on a meeting with Girsky and VectoIQ regarding the SPAC process. The document stated that the "De-SPAC process requires a marketing effort to shore up financing." The document also used Virgin Galactic as an example of a company that went public through a SPAC, and provided a checklist of items Virgin Galactic reportedly did right, including: "Marketed forward projections: Successfully marketed the deal."

238

755.    Milton rose to the challenge by promising in a June 3, 2020 email to the Board of Directors to market Nikola through a "media blitz" strategy to attract retail investors as a means to drive up the Company's share price. Milton's media appearances and social media posts often employed embellished or outright false statements about the Company, its vehicles, prospects, and infrastructure. The Individual Defendants understood this, indeed, many of them discussed it repeatedly on various dates both before and during the Class Period, but nonetheless encouraged this strategy. Russell would later testify that he understood perfectly well that Milton's reference to a "media blitz" in June 2020 meant that "once we were public, he was intending to be out there and be very active promoting the company and advocating for it."[94] Russell further testified that he was aware that many of Milton's public statements were false or misleading.

756.    As part of this media blitz, Milton made numerous false statements to retail investors—including through social media, podcasts, and television appearances—which, as expected, drove up Nikola's share price. Moreover, according to Russell's testimony, at the first Board meeting following the Company going public, "[Milton] was talking about his ability to communicate through social media and reach out to retail investors and how that was help[ing] driv[e] the stock price up."[95]

757.    The Individual Defendants knew Milton intended to go on this media blitz to attract retail investors and, in fact, encouraged Milton to do it. For example, Russell admitted during Milton's criminal trial that he, Girsky, and Ubben supported the idea of Milton regularly communicating to the market to attract retail investors. Specifically, according to Russell, "Jeff [Ubben] and Steve [Girsky] and myself did support the idea that

[94] Milton Tr. at 1072:6-9, ECF No. 226.
[95] Milton Tr. at 1091:7-9, ECF No. 226.

239

we'd communicate to the market,"[96] which was done to attract investors when the Company went public. That awareness is sufficient to establish their liability for participation in the deceptive scheme alleged herein.[97]

758.    Russell testified at Milton's criminal trial that he knew, even before he joined Nikola as president, that Milton's promotional style was to misstate facts. Specifically, Russell testified that he knew when joining the Company that Milton "was prone to exaggeration in making public statements . . . . In situations where he was trying to persuade somebody, he would sometimes exaggerate, sometimes misstate facts."[98] Brady also acknowledged in his testimony that he learned long before Nikola went public that "from time to time [Milton] misstated facts."[99] Brady even emailed Milton on June 4, 2018, copying Worthen, to sending him a news article titled, "Inside the fall of Theranos," and warning Milton that "[t]here are some lessons here for us. As we get closer to commercializing, we need to be absolutely certain that our trucks/stations meet performance specs that we promise to market/customers. Otherwise, we will be exposed to all kinds of product liability and false representation litigations."[100]  Russell also testified that he and Defendant Brady exchanged text messages about Milton's strategy and how it worked with retail investors. Specifically, on July 10, 2020, Russell texted Brady that "***Trevor's style works for retail investors,*** speculating with a few dollars they should

---

[96] Milton Tr. at 1171:1-2, ECF No. 226.

[97] *See Abdo v. Fitzsimmons*, No. 17-CV-00851-TSH, 2021 WL 616324, at *12 (N.D. Cal. Feb. 17, 2021) (finding participation in scheme where directors knew executive had made misstatements to investors but encouraged him "to focus on raising money from investors because the Company desperately needed cash.").

[98] Milton Tr. at 957:25-958:1, ECF No. 224.

[99] Milton Tr. at 1789:20-21, ECF No. 232.

[100] Milton Tr. 1788:14-17:89-11, ECF No. 232.

240

1  probably put in a 401K index fund."[101] Russell's conscious decision to delegate the

2  authority to communicate to retail investors to an executive known to be dishonest is

3  sufficient to establish his participation in the fraudulent scheme described herein.[102]

4      759.   Critically, the Individual Defendants did not merely sit back and watch

5  Milton's media blitz strategy. Rather, they actively participated in the scheme to inflate

6  Nikola's stock price by encouraging Milton to continue attracting retail investors.

7      760.   For example, in a February 29, 2020 email, Ubben forwarded information

8  about billionaire Richard Branson's media strategy in anticipation of Virgin Galactic's de-

9  SPAC IPO to Milton and Girsky and wrote "Here is a template. Branson got a retail

10  following. We should aspire for Trevor to do the same." Girsky replied in agreement, but

11  suggested that Milton should appear solo for a television appearance. Milton replied on

12  March 2, 2020, requesting the Branson materials and agreeing that Nikola had to "make

13  sure we are getting retail investors on our side. That is what prevents the stock short selling.

14  This is super important to me."

15      761.   A couple days after sending the email referenced above, Ubben sent another

16  email to Russell, Brady, and Milton, stating "big launch on TV, Trevor personality comes

17  through. Then quiet for 2 months. Another round on regular way trading in June."

18      762.   As discussed in ¶¶303, 581, Milton and Ubben did in fact make an

19  appearance together on *CNBC* on March 4, 2020. In that appearance, Milton and Ubben

20  both misstated Nikola's current capabilities. At one point in the interview, Ubben explained

21

22  _____

    [101] Milton Tr. at 1084:12-13, ECF No. 226.

23  [102] *See Abdo*, 2021 WL 616324, at *12 (finding scheme where "by delegating authority"
    to an officer known to be dishonest to make "representations and then failing to check

24  that [the officer] and others were not again making misrepresentations to investors, the
    [directors] consciously ignored a substantial risk and that their conduct was an extreme

25  departure from standards of ordinary care.").

26                                          241

that ValueAct was interested in Nikola because it valued "partnering with mission-driven, brilliant CEOs that have a clean piece of paper, they're uncompromised, they can run to the goal, basically" and later called Miton a "courageous CEO." Ubben also stated that "Trevor solved the chicken and the egg" problem and created a "de-risked" business model. At another point in the segment, Ubben nodded in agreement as Milton stated "So we help the grids buffer their grids, and that's how we get our energy so cheap to be able to broker back to the fleets." Finally, Ubben asserted: "[Nikola] is a hundred billion dollar company. . . . the next hundred billion dollar company is going to be this."



(Ubben, left, and Milton, right, on "Squawk Alley," March 4, 2020)

763.   In early June 2020, Girsky sent Milton a screenshot of a chart showing that Nikola was one of the top stocks that had increased in the number of users holding it on Robinhood, a platform largely used by retail investors. Girsky sent this screenshot to Milton and said, "great job getting retail investors."

242

764.    Nikola's marketing department tracked and circulated emails summarizing Milton's and the other executives' media appearances. Milton, Russell, Brady, and Worthen all received these messages. One such message on August 13, 2020 highlighted Milton's July 2020 *CNN* appearance, July 19, 2020 *Chartcast* podcast interview, and August 1, 2020 *Barron's Roundtable* interview, among others.[103]

765.    Russell encouraged Milton to misspeak by praising him for media appearances in which Milton made outright false claims. For example, on December 17, 2019, Milton appeared on the *Fox Business* program "Claman Countdown" and made multiple misstatements, including that (i) the Nikola One released in 2016 was "the first zero-emissions semi-truck that was available to the market" and generated "billions of dollars in orders;" (ii) Nikola had $14 billion worth of orders; and (iii) it took 15 minutes to fuel a truck with hydrogen. After the appearance, the marketing team sent a link to the video in an email thread that included Milton and Russell. Russell responded on December 17, 2019: "Wow. I don't see how that could have gone better. Very well handled, Mr. Chairman."[104]

766.    Russell also praised Milton for his June 19, 2020 appearance on *CNN's* "First Move with Julia Chatterley." During that interview, Milton made multiple false statements, such as: (i) "[w]e produce our own hydrogen through zero emission methods;" (ii) "our supply chain is zero emission from production to consumption;" (iii) "you can fill [the hydrogen truck] up in 15 minutes;" and (iv) solar and wind companies were "giv[ing] away or they pay people to take" their electricity because "they have too much of it on the grid." However, perhaps the most notable portion of the interview was an extended rant Milton

---

[103] Milton Tr. at 439:5-445:5, ECF No. 220.

[104] Milton Tr. at 1194:18-19, ECF No. 226.

went on when the host asked him about a *Bloomberg* article which questioned if the Nikola

One unveiled in December 2016 could drive:

> Yeah, it was just really sad. I mean, Bloomberg -- this guy, well, he did a hit job on Nikola and he knew it was a lie because we recorded the whole interview and we're going to post it out there for everyone to actually listen to. He knew it was a lie. There are videos that show that we told people, hey -- I mean, his main claim was that the truck wasn't moving at Nikola World and in 2016 is what?
>
> Four or five years ago. Our first prototype we ever built. And *we told everyone in the audience it was capable of moving, but we didn't want to because of the danger of it. So, all of the parts functioned.* You had batteries, you had motors, you had the axels, you had inverters. *You had everything there. It was all there. And instead of you know, taking a risk and possibly hurting or killing someone, we decided to make the truck inoperable on the stage and we never -- you know, we never took it out on the road because it just wasn't safe. . . .*
>
> So, it is really sad because like, there was clear evidence what he was saying was a lie. *It was just a hit job.* He is a very big Tesla fanatic. He's in Tesla's back pocket, and so his entire job was to hit Nikola and try to stop our growth.
>
> And I just -- you know, look, it's bad for all journalists. When one journalist begins to become -- advocating for one company or deceiving people, I am going to call them out. I am not afraid.

That same day, Russell texted Milton: "Just caught your *CNN* interview. You have always

had a gift for battle in the war of ideas, but you have clearly worked and focused yourself

to a whole other level. So cool for me to see it."[105] Russell has since testified that he learned

shortly after joining Nikola that the Nikola One was never developed and work on the

project had been abandoned shortly after the vehicle's launch in December 2016.[106]

767.    Shortly after the merger, the Board rewarded Milton for his part in the

scheme. Milton originally wished not to be locked up from selling his Nikola stock

following the merger for any period of time, but ultimately signed a one-year lock-up

agreement, effective June 3, 2020 (with a carve-out for $70 million in stock which could

---

[105] Milton Tr. at 1205:12-15, ECF No. 226.

[106] Milton Tr. at 1134:18-25, ECF No. 226.

be sold 6 months after the merger, and which did not effect the separate $70 million cash payment to M&M). Following the merger, however, as Milton's misstatements drove up the value of the Individual Defendants' holdings, Milton requested that the Board release him from his lock-up agreement. In a July 7, 2020 email exchange with a Nikola director, Milton argued that he should be released from the lock-up because the stock had gained "over 400%" and he had made "everyone else millionaires and billionaires."

768.    The Board evidently agreed. On July 17, 2020, as Milton was, to their knowledge, defrauding investors to drive up Nikola's stock price, the Board approved an amendment to the lock-up agreement to permit Milton and Russell to sell all of their shares (owned through M&M and T&M) beginning on December 1, 2020, and transfer up to 16% of their shares as collateral to borrow money to buy more Nikola stock through open-market transactions–stock that Milton and Russell could presumably then turn around and sell at any time allowing them a loophole around the lock-up.

**III.    The Individual Defendants Engaged in Deceptive Acts Including Disseminating and Making False and Misleading Statements in Support of the Scheme**

769.    The Individual Defendants, having brought Nikola public through a process designed to obscure from investors the shaky state of the Company's finances and technology while maximizing Milton's opportunities to stoke retail investors' enthusiasm, further participated in the scheme to inflate the price of Nikola stock by actively disseminating false and misleading statements about subjects that Milton believed would attract retail investors, such as batteries and the Badger.

770.    For example, Defendants approved and disseminated a false and misleading press release on November 19, 2019. The press release, which was titled "Nikola Corporation to Unveil Game-Changing Battery Cell Technology at Nikola World 2020,"

was sent to Nikola's Board of Directors November 15, 2019, which included Defendants Russell, Brady, Ubben, and Worthen, before it was disseminated to the investing public. In the press release, Defendants made several unqualified claims about Nikola's battery technology, which Milton was quoted describing as "the biggest advancement we have seen in the battery world."

771.    The Individual Defendants also disseminated false and misleading statements that the Badger was a functioning, production-ready vehicle design when, in truth, it was still merely a concept.

772.    For example, in the February 10, 2020 press release, the Badger was described as being "engineered to deliver 980 ft. lbs. of torque" and "906 peak HP." The April 6, 2020 Form 8-K contained slides from the Analyst Day Presentation, the Badger Pickup Truck was described as having a "blended FCEV/BEV" system with a range of "600 miles" or a "300 mile" range on just the BEV, and could switch between an FCEV/BEV and BEV only system "only by touch of button." Moreover, the June 15, 2020 Form S-1, which was signed by Defendants Milton, Girsky, Russell, Brady and Ubben, stated, "Recently we announced the Nikola Badger (the 'Badger'), an advanced zero-emission FCEV/BEV hybrid pickup truck. Unlike anything on the market, the Badger is designed to target and exceed every electric or fossil fuel pickup in its class." Finally, the August 4, 2020 Form 10-Q, which was signed by Defendants Russell and Brady, stated that "[o]n June 29, 2020 we began accepting non-binding reservations for the Badger . . . ."

773.    In fact, the whole idea for the Badger seems to have originated as merely a stunt to generate retail investor enthusiasm. According to Russell's trial testimony,

"[Milton] believed that the Badger, being a retail product, would [] excite those people interested in the Badger to invest in the stock."[107]

774.   Defendants knew the statements they were disseminating were false and misleading. Leading up to the February 10, 2020 press release, for example, Defendants Milton, Brady, Russell, and Worthen exchanged emails discussing concerns about the press release. According to Russell's testimony, leading up to the press release, Brady sent an email to Milton, Russell, and Worthen.  The subject of the email was "Please review and modify or approve."  The email attached a draft of the February 10, 2020 press release. The email listed various concerns over the press release, including the "[l]ikely criticism that Nikola hasn't even started serial production of BEV and FCEV, yet we keep announcing new products." However, despite these concerns, Russell and the rest of the board approved the press release, which they then disseminated to the investing public.[108]

775.   The Badger was not the only decision that hurt Nikola's business but was done anyway for optics. Milton, Russell, Brady, and Ubben also rushed through a $31.85 million purchase order for electrolyzers to allow Nikola to put out a decepitve press release on June 3, 2020, just as Nikola went public. The purchase order was curious for a number of reasons. Nikola had no immediate use for the electrolyzers, given its lack of land, permits, PPAs, and had not yet even come to a decision as to whether it would produce hydrogen onsite at its stations or liquefy it at a "hub" location.

776.   As described above, the deal's only real value was in allowing Nikola to put out a seemingly positive press release on the eve of going public. In the lead up to the deal and the press release announcing it, on May 30, 2020, Milton sent an email to Russell,

---

[107] Milton Tr. at 1089:5-7, ECF No. 226.

[108] Milton Tr. at 1037:8-1041:18, ECF No. 226.

reading: "I'm going to ask you to approve a large purchase order. It is the electrolyzers for our stations. There are a few reasons why it is coming quickly for approval. I would like to get it tomorrow from the board."[109] Later that same day, Russell, in a thread that included Milton, Brady, and Worthen, emailed Nikola's head of marketing, Vince Caramella, requesting that he "start a draft PR for our agreement with Nel to purchase 40 tons of electrolyzer capacity[.]" Russell added: "Assuming all is in order with PO proposal form Nel (Trevor has and will forward) we will want to release ASAP."[110]

777.   The next day, May 31, 2020, Milton sent an email to Nikola's Board of Directors seeking approval, on one day's notice, of the over $31 million purchase order. As Russell later conceded at Milton's criminal trial, a one-day turnaround for a transaction of this magnitude was highly unusual. Major permissions were normally granted at quarterly Board meetings, or at least with significant advance notice.[111] Yet the ability to announce a major deal fit perfectly into the scheme even if it made little business sense. As Milton justified the accelerated purchase order in his message to the Board:

> 2nd major point.  IPO.  I am getting ready to go on a ***media blitz*** and the most critical item in our business model is that we don't have stations. I would like to announce this on Monday as huge news.  ***This will help our stock, create much stronger following and base layers of investors*** and it also will ease the criticism I am going to get going into interviews.  ***I believe our PIPE and SPAC will be veryhappy to hear we are moving on our stations and not delaying***.

778.   Ubben responded with approval less than twenty minutes after Milton sent the above message.

---

[109] Milton Tr. at 1071:1-15, ECF No. 226.

[110] Milton Tr. at 875:3-5, ECF No. 224.

[111] Milton Tr. at 1071:1-15, ECF No. 226.

779.   The purpose, of course, of the purchase of the electrolyzers and the press release was to allow Milton to back up his claims that Nikola was making its own hydrogen and Defendants' statements that Nikola was prepared to build out its hydrogen network— which was false—and to provide credibility to the claims that Nikola could make hydrogen at economically feasible prices to support the conversion of its purchase orders into real sales.

780.   On May 31, 2020, prior to the purchase order or press release being finalized, Dale Prows, Nikola's Global Head of Infrastructure Development, forwarded to Russell and Brady an email he had received from Milton, attaching terms of the pending Nel deal. Milton had written to Prows: "I just got this from Nel. Let's take a look. If acceptable, I would like to get this news out on Monday leading up to the merger." Prows' email message to Russell and Brady voiced his opposition to the purchase order. Prows stated that it was "ludicrous" that Nel was insisting Nikola buy equipment for hydrogen production stations when "they can't even make our demo station run even after a full year of pathetic efforts." Prows wrote: "Doing the deal with Nel this way, i.e., electrolyzers only, and doing it in a rush, will end up costing us millions of dollars. . . . We don't have PPAs or sites selected yet. We are literally getting the cart before the horse."[112] Prows believed Nikola was not ready for the equipment and objected to doing a deal as a way of falsely signaling to investors on the eve of the IPO that Nikola was prepared to build out its hydrogen network. As Prows would later testify: "we were not ready for $30 million worth of equipment to be purchased . . . we had not acquired any land. We had not even filed for permitting to get electrolyzer equipment installed, and that process would take many months, potentially years, to accomplish. . . . again, we were just not ready for five

[112] Milton Tr. at 741:17-744:17, ECF No. 222.

stations worth of electrolyzers. . . . this would be way ahead of our skis, so to speak, about the timing and the sequence of events that needed to take place."[113]

781.   Also on May 31, 2020, Prows emailed Milton, copying other executives. He again voiced his opposition to the Nel deal and listed out some of his concerns. One concern was that the purchase order contained "14 major deviations from our engineering specifications" including that the equipment was "not engineered to operate at temperatures above 104 degrees" and therefore was not suitable for the Phoenix climate.[114]

782.   Prows subsequently sent another email to Milton, Russell, Brady, and Worthen, before the purchase order was approved. This message stated: "I've also estimated in the attached file that each of the five eight-ton stations will cost $27.3 million."[115] This figure was far higher than the $16.6 million target CapEx figure the Individual Defendants communicated to investors in the April 6, 2020 Analyst Day Presentation.

783.   Nonetheless, Nikola's Board of Directors, including Ubben and Russell, approved the purchase order of the electrolyzers and Nikola issued the June 3, 2020 press release. Brady personally signed off on the purchase order. Again, while Prows was noting the rational business reasons for why purchasing the electrolyzers made no sense, Milton, Russell, Brady, Girsky and Ubben had other reasons for approving the purchase and issuing the press release: create positive buzz with retail investors just before Nikola stock began to publicly trade and inflate the stock price.

784.   In many cases, Milton's misstatements followed or were made in tandem with similar representations by the other Individual Defendants. For example, in January

---

[113] Milton Tr. at 740:23-744:5, ECF No. 222.

[114] Milton Tr. at 746:24-747:17, ECF No. 222.

[115] Milton Tr. at 748:22-24, ECF No. 222.

2020, just six weeks after Cowen introduced VectoIQ to Nikola, Defendants Russell, Brady, and Girsky gave a presentation to investors using a slide deck similar to the one that would later be contained in the April 6, 2020 8-K. The presentation made many of the same misrepresentations that would later be repeated in the April 6, 2020 Analyst Day Presentation, such as that Nikola had an "industry leading technology portfolio," the "world's most advanced Hydrogen (H2) FCEV truck," a "$10B+ FCEV order book" with a "2+ year backlog" and "+14,000 FCEV truck reservations to date" with "~$10B sales value."

785. On April 6, 2020, for the Company's "Analyst Day" event ahead of the de-SPAC merger, Russell, Brady, and Milton appeared together in a promotional video that contained misstatements as well as deceptive acts and imagery. In the Analyst Day Video, which was publicly available on YouTube throughout the Class Period, after a brief introduction, Russell, standing with Brady and Milton, tells the audience the executives have "some really cool stuff to show you," then turns the tour over to "Trevor[]" who is "going to start upstairs."



(From left to right: Russell, Brady, and Milton at Nikola's Phoenix, Arizona Headquarters in the Analyst Day Video)

786.    The Analyst Day Video rejoins Milton on the third floor of Nikola's headquarters, where Nikola's C-Suite executives—Milton, Russell, Brady, and Worthen—all had offices in close proximity. Worthen's office was immediately next to Milton's, and both were right down the hall from Russell and Brady. Indeed, Russell testified at Milton's trial that his and Milton's desks "were right next to each other" and, pre-merger, he and Milton spoke "multiple times a day usually" "about the status of Nikola's products and technology."[116]

787.    In the Analyst Day Video, Milton shows off a series of placards that adorned the walls of the third floor, purporting to give a timeline of Nikola's history, which the C-Suite executives would have seen whenever they came to work. Using the placards as visual aids, Milton talks through Nikola's history. The camera trains on the first placard, which reads that in "May 2016" Nikola "beg[a]n[] taking reservations for its first-ever electric driven class 8 semi truck." The Nikola One was never electric, was not capable of driving, and was not a real product that could be sold.



[116] Milton Tr. 979:20-980:3, ECF No. 224.

788.    Milton then states, referring to the Nikola One: "We launched the truck in 2016 to the world and at that point when it came out we racked up billions of dollars of pre-orders." At this point, the camera shows another placard that reads "December 2016 NIKOLA SURPASSES $4 BILLION IN RESERVATION PREORDERS[.] Following the Nikola One unveiling, preorders for the hydrogen-electric semi exceed $4 billion in value." The Nikola One was never a hydrogen-electric truck, nor a product that could be sold. As Nikola admitted in a February 25, 2021 SEC filing, the Company did not engineer any electric truck in 2016.



789.    Milton continues to discuss the Nikola One unveiling event in the Analyst Day Video. "When we first began no one thought that zero emission trucks would ever work. And that was what was so exciting about this Nikola story from the beginning. And in 2016, in December, we unveiled the Nikola [One]." At this point in the video, a clip plays of the December 2016 Nikola One unveiling event with the Nikola One on stage. As the Company would later admit, the Nikola One shown in the video was an inoperable "pusher" that lacked any hydrogen technology. Milton continues, as footage of the

unveiling event plays: "It was a big moment in my life. That's when I realized we really have something."

790.    The Analyst Day Video later shifts to Russell, who showcases Nikola's hydrogen demo station. After speaking in front of a Nikola Two prototype parked at the demo station and representing that the Nikola Two's only biproduct is water, which was what "we started out with when we made the hydrogen," Russell leads the camera to the far side of the station to reveal a Nikola employee holding a hydrogen fuel nozzle in the Nikola Two prototype's fueling port. Russell states: "Over here is Dale Prows. He's one of our hydrogen experts and he's getting us some fuel so we can take a ride here in a minute. So I'll turn it over to Dale."



791.    Prows then explains that Nikola has "compression and cooling equipment that takes the gas and brings it over here to this dispenser. This dispenser then loads the high-pressure gas onto the truck and as you can see it's very similar to a diesel fueling experience and one of our goals is to make sure that the fueling time on this fueling

experience is equal to or better than a diesel fueling experience, so something less than 15 minutes per fueling time." The camera shows a close-up of the nozzle in the truck as Prows speaks. Soon, Prows states "at this point, Mark [Russell], we're all fueled up. You want to take your first spin?"



loads the high-pressure gas onto the truck

792.    Prows later testified in the course of Milton's criminal trial that he was not, in fact, fueling the Nikola Two prototype.[117] Russell wanted to showcase the fueling process for the Analyst Day Video, but the demo station was notoriously unreliable and even when it was working took 45-80 minutes to refuel a truck. Accordingly, Russell came up with the idea for Prows to simulate fueling, which created the impression that the station was operationally sound and capable of quick, high-pressure fueling. In fact, many of the station's problems stemmed from the "cooling and compression equipment" touted in the video as making the station capable of loading "high-pressure gas" in a manner comparable to diesel.

---

[117] Milton Tr. at 806:23-24, ECF No. 224; 1215:20-1216:3, ECF No. 226.

793.    At the conclusion of the Analyst Day Video, Russell exits the Nikola Two and rejoins Brady in front of Nikola's Headquarters. Brady states that he is glad they "got to showcase . . . the demonstration of hydrogen fueling," then asks Russell if he is "ready for the next segment of the presentation?" Russell responds: "Absolutely. We know everybody wants to look at the numbers and get into the data, so that will be next." Brady states "Fantastic. Let's do it," and the pair walk together into Nikola's headquarters.

794.    The "numbers" and "data" Russell was referring to were contained in the slides of the "Analyst Day Presentation," which were also filed with the SEC in the April 6 8-K, subsequently posted to Nikola's website, and later accepted as exhibits in the course of Milton's criminal trial. The division of labor described in the Analyst Day Presentation slides perfectly summarizes the overall scheme. While Milton promoted Nikola through his enthusiastic, and often emotive, visionary style, which resonated with retail investors, Russell and Brady handled the more sophisticated, data-driven discussions with analysts, such as the Analyst Day Presentation at the April 6, 2020 event—to which retail investors were not extended an invitation—or the similar presentation Russell and Brady gave in January 2020 along with Girsky. As Russell testified, Milton typically did not participate in Analyst Day presentations or Earnings Calls with analysts—those were left to Russell, Brady, and Worthen.[118] As discussed previously in ¶¶215, 307-319, the April 6, 2020 Analyst Day Presentation was riddled with false and misleading statements and figures which Russell and Brady knew to be untrue, including because Prows informed Milton, Russell, and Brady in March 2020 that the figures Nikola cited for hydrogen production and CapEx in the presentation were not achievable. Brady's and Russell's acts in

---

[118] Milton Tr. at 1182:6-21, ECF No. 226.

256

connection with Analyst Day—knowingly presenting unachievable figures and appearing in a video containing misleading statements and visuals—were deceptive.

795.   Brady and Russell also joined Milton in hiding from the market the fact that Nikola was considering a major change in its business model, which could cause it to switch from producing hydrogen onsite at its stations (as it told investors) to producing and liquefying it at a "hub." Nikola was considering this strategic shift because it was finding energy costs to be too high to allow for onsite hydrogen production. Yet in a March 2020 email, Milton asked the other executives to keep the "liquefication discussions quiet from the market,"[119] and Russell and Brady obliged by omitting any mention of liquefication from their public statements, including SEC filings, and representing that Nikola was executing on its existing business model.

## IV.   The Individual Defendants Signed Misleading SEC Filings in Support of the Scheme

796.   While Milton served as the most vocal promotor, each Individual Defendant made their own misstatements in contribution to the scheme, including by signing false and misleading SEC filings that perpetuated Milton's fraud and conspicuously avoided contradicting what Milton had already said and what was contained in the Analyst Day Presentation. Defendant Russell testified at Milton's criminal trial that he understood that "[p]ublic companies have to be very careful about their statements being true and correct . . . [b]ecause investors have to be able to rely on those." Yet Russell, and the other Defendants, signed SEC filings containing material misstatements and omissions.

797.   For example, the Individual Defendants signed various SEC filings—*e.g.*, the March Form S-4 (signed by Milton, Girsky, and Shindler), the April 6, 2020 Form 8-

---

[119] Milton Tr. at 719:17-20, ECF No. 222.

K (signed by Shindler), the May 8, 2020 Proxy Statement (signed by Milton and Girsky), the June S-1 (signed by Milton, Girsky, Russell, Brady and Ubben), the July S-1 (signed by Milton, Girsky, Russell, Brady and Ubben), and the Second Quarter 2020 Form 10-Q (signed by Russell and Brady)—all of which misrepresented, among other things: (i) Nikola's value by referring to the backlog as a list of "pre-orders" or "reservations" when it contained only cancellable expressions of interest for products that were not fully developed or available for purchase and stated the company had 14,000 reservations for the Nikola Two when the overwhelming majority of these so-called reservations were actually for the non-existent Nikola One; (ii) Nikola's hydrogen dispensing and production capabilities and prospects for economically feasible electricity; and (iii) that the Badger and Nikola One were functioning, production ready vehicle designs when, in reality, they were still merely concepts. These false and misleading statements reaffirmed and echoed, and in some cases preceded, Milton's several misrepresentations on these very same topics.

798.    Moreover, accompanying Nikola's Second Quarter Form 10-Q, Russell and Brady executed SOX certifications attesting to the accuracy of the filing and its contents and the disclosure of all fraud. Specifically, Russell and Brady attested to the fact that "th[e] report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by th[e] report." However, Russell and Brady knew that the Form 10-Q contained several false and misleading statements, including misrepresentations regarding the Nikola One, Nikola's backlog, Hydrogen capabilities, and the Badger. *See* Sections I, II, III, IV, *supra*.

799.    By signing the SOX Certifications, Russell and Brady further contributed to the scheme by reassuring investors that the Company's statements (including Milton's)

were truthful and accurate, which created the false appearance that Milton could be trusted

and that his statements were truthful and accurate.

## V.   The Individual Defendants Deflected and Suppressed Concerns about Milton's Misstatements

800.   Moreover, the Individual Defendants signaled to investors that Milton should

be trusted by telling them he was essential to Nikola and by feeding into his persona as a

visionary. For example, the S-4, signed by Shindler and Girsky, as well as the June 15,

2020 S-1 and July 17, 2020 S-1, signed by Russell, Brady, Milton, Girsky, and Ubben, and

the August 4, 2020 10-Q, signed by Russell and Brady, all contained the following risk

disclosure:

> ***We are highly dependent on the services of Trevor R. Milton, our Executive Chairman***.
>
> We are highly dependent on the services of Trevor R. Milton, our Executive Chairman, and largest stockholder. Mr. Milton is the source of many, if not most, of the ideas and execution driving Nikola. If Mr. Milton were to discontinue his service to us due to death, disability or any other reason, we would be significantly disadvantaged.

801.   The Individual Defendants signed onto these disclosures despite knowing

that Milton was actively defrauding investors. *See Abdo*, 2021 WL 616324, at *13 ("A

reasonable jury could conclude that one effect—though not the only one—of [the

directors'] conduct," which consisted of "d[oing] nothing to establish controls" over the

officer despite knowing he had made false statements to investors, "was to contribute to

the false impression that [the officer] was somebody whose representations could be

trusted, instead of someone who had just directed fraud by the Company . . . All of this was

going on while the [directors] knew that the Company was in a desperate financial situation

and was in need of a sudden infusion of cash, which could easily be seen as a motive.").

259

802.    In addition to telling investors to trust in Milton, the Individual Defendants were told that investors were trusting Milton. Defendants knew that the public, including sophisticated analysts, followed Milton's social media postings for accurate news about the Company. When directly given the opportunity to set the record straight by an inquiring analyst, they obfuscated and deflected. Brady and Russell typically handled interactions with analysts, including by presenting and answering their questions during earnings calls, with Worthen serving as a moderator but rarely answering questions. On the August 4, 2020 Q2 2020 Earnings Call, Russell and Brady fielded a pair of questions from Cowen analyst Jeffrey Osborne. Osborne's third question, however, which sought further clarification on Nikola's orders, products, and commercial agreements in light of Milton's social media postings, elicited an unusual response:

> **OSBORNE**: [I]s the intent to communicate all of this [information regarding orders, products, CapEx, and commercial agreements] at Nikola world? **It's a bit confusing trying to follow Trevor on his various social media outlets about the timing and cadence of communication of the different variables that you're talking about**.

Rather than Russell or Brady answering Osborne's question, Worthen, in a rare move, jumped in:

> **WORTHEN**: Jeff, as you're aware, we have a number of initiatives that we anticipate that we'll be able to announce in the second half of the year, and we'll announce them as we execute them. The goal is not to simply wait until the year end, but we believe that we'll be able to announce several initiatives that we have working on over next six months.

803.    Other than to give a boilerplate introductory disclaimer and outro, Worthen did not otherwise speak or answer any questions during the August 4, 2020 call, other than to deflect this inquiry regarding the reliability of Milton's social media postings by an analyst who indicated he was relying on them as a source of information.

804.    This was not the first time the Individual Defendants were asked to respond to Milton's false and misleading statements but instead chose to let the market continue to believe them. On July 19, 2020, a high-level officer at Nikola who reported to Russell, Head of Business Development Elizabeth Fretheim, listened to the *Chartcast* podcast released that day featuring an interview with Milton. Fretheim was alarmed by the sheer volume of false statements Milton made during the course of the podcast. Fretheim contacted Nikola's President of Energy, Pablo Koziner, with a list of statements Milton made during the podcast and her concerns. Koziner responded that he had not yet listened to the podcast but that "based on [her] comments," she was "probably not overreacting."[120]

805.    Seeing that Nikola had posted references and links to the podcast on its social media, including on Nikola's official Twitter account, Fretheim also contacted Nikola's marketing department that day to ask them to remove the posts. As Fretheim testified at Milton's criminal trial, "I was concerned about the accuracy. If we referenced them on our social media, it was like we were saying it was true."[121] The marketing team, however, told Fretheim that they needed approval from a C-Suite executive to take down the postings. As Fetheim testified: "they wanted to make sure that they got our executive approval to remove those first."[122]

806.    Accordingly, on July 19, 2020, Fretheim sent text messages to Russell, Brady, and Worthen, stating: "Hi all. I am really worried about what some of what Trevor says on his latest podcast. In particular about contracts with utilities, getting power straight from federal lines, cost of stations, that we've already purchased land for stations and on.

---

[120] Milton Tr. at 342:5-6, ECF No. 218.

[121] Milton Tr. at 338:22-24, ECF No. 218.

[122] Milton Tr. at 338:17-20, ECF No. 218.

I asked the marketing team to remove references to it until it is properly reviewed by the right people."[123]

807.   Fretheim followed-up separately with Russell by text message, attaching a link to the *Chartcast* podcast. She also sent Russell an email message, listing all of the concerns she had regarding statements Milton made in the first half of the podcast—divided into a chart with her concerns in the left column and timestamps in the right column so Russell could quickly find each misstatement in the podcast. Additionally, Fretheim had an in-person discussion with Russell in which she once again expressed her concerns about the *Chartcast* podcast. In all, Fretheim raised her concerns with Russell at least four separate times. As she testified, Russell was Nikola's "president and CEO, and so I wanted to make sure he was aware of [the misstatements] and could take action as necessary."[124]

808.   Fretheim also followed-up individually with Worthen, sending him an email in which she listed her concerns and provided timestamps for the location of each misstatement Milton made over the course of the entire podcast. Fretheim then had two conversations with Worthen about her concerns, first to confirm he received her email, and second after Worthen had listened to the podcast. As with Russell, Fretheim raised her concerns with Worthen at least four separate times.[125]

809.   Fretheim testified that she was clear with Russell, Worthen, and Brady that the podcast would remain on Nikola's Twitter account unless they instructed it to be removed.[126]

---

[123] Milton Tr. at 338:5-10, ECF No. 218.

[124] Milton Tr. at 389:20-23, ECF No. 218.

[125] Milton Tr. at 390:5-11, ECF No. 218, 413:17-414:11, ECF No. 220.

[126] Milton Tr. at 386:12-16, ECF No. 386.

810.   Fretheim was not the only high-level officer to raise these concerns. An employee on Dale Prows' infrastructure team flagged Milton's misrepresentations in the podcast regarding Nikola's hydrogen infrastructure for Prows. Prows then brought these concerns to the attention of Brady during a previously scheduled meeting.[127]

811.   Russell responded to Fretheim by telling her that finance and legal—by which he meant Brady and Worthen—would be following up, and thanking her for raising the issues. Fretheim testified that she did not contact Milton directly because of Russell's assurances that the other C-Suite executives would handle the situation.[128] However, neither Russell, Brady, nor Worthen ever directed the marketing team to remove references and links to the misleading podcast from Nikola's social media. The references and links to the *Chartcast* podcast remained on Nikola's social media through at least September 2020. At Milton's criminal trial, Russell conceded in his testimony that "we should have taken it down."[129] Thus, despite being specifically informed that Milton had made materially false statements on the *Chartcast* podcast and knowing it was posted on Nikola's own Twitter account and links on its social media to the interview, and conceding that they should have "taken it down," Russell, Worthen, and Brady did nothing to remove it from Nikola's Twitter accounts or links to it, demonstrating they were directly participating in the scheme to defraud investors.

812.   Girsky did his part to add to the perception of Nikola's and Milton's legitimacy by insisting publicly that VectoIQ thoroughly vetted the Company. In August 2020, Girsky—a former VP at General Motors—stated, "[w]e showed up with an army of people to diligence this thing . . . I don't doubt there's gonna be twists and turns here, but

---

[127] Milton Tr. at 782:19-21, ECF No. 222.

[128] Milton Tr. at 342:20-22, 389:9, ECF No. 218.

[129] Milton Tr. at 1107:25, ECF No. 226.

I did put my reputation on the line for this thing. . . . My experience with situations like this though is these guys like to run fast and I don't want to slow them down."

813. All the while, the Individual Defendants knew Milton was deceiving investors. In fact, the Individual Defendants decided to transition Milton out of his role as CEO and into his Executive Chairman role once the de-SPAC merger was completed precisely because of his tendency to mislead. Brady testified at Milton's criminal trial that during negotiations with PIPE investors (in which Brady personally participated), the investors demanded that Trevor step down as CEO because "[t]here were a number of concerns by the institutional investors that Trevor was not prepared to be CEO of a public company, and there were comments during due diligence with respect to Trevor and some of his statements."[130] The Individual Defendants complied, but moved Milton into a role in which he could still be encouraged to speak on behalf of the Company after the de-SPAC merger.

814. Moreover, the Individual Defendants were repeatedly provided with information that contradicted Milton's statements. On October 1, 2019, Milton, Russell, Brady, Worthen, and Ubben attended a Board meeting and were informed that Nikola was using "off-the-shelf" inverters for the Nikola Tre. On February 18, 2020, the same Individual Defendants attended a Board meeting to discuss Nikola's inability to develop a working Badger prototype on its own and its need for third-party help to design and build it. On April 9, 2020, the same Individual Defendants attended a Board meeting in which they were warned that Nikola was not able to develop its hydrogen infrastructure and that it would not even have station blueprints until after September 30, 2020 at the earliest. At the same meeting, the Board discussed delays in the manufacture of Nikola's trucks. At a

---

[130] Milton Tr. 1731:5-1732:19, ECF No. 232.

July 23, 2020 Board meeting, the same Individual defendants, with the addition of Girsky, were told that Nikola had not entered into any PPAs, that it would use a battery manufactured by third-party suppliers in the Nikola Tre, that the Company was experiencing significant delays developing the Tre, and that Nikola was at risk of producing "ZERO trucks" even by the end of 2021. The Board was also informed that Nikola was in need of "$2.9B to fund cash flows for operations and investing activities."

815.   Given that Milton's misleading "media blitz" was working—and the fact that the Individual Defendants were reaping millions, if not billions, of dollars in compensation through Nikola stock—the Individual Defendants took no meaningful action to stop or correct Milton's false and misleading statements. Instead, they suppressed or deflected when directly called on to set the record straight.

816.   Russell, Girsky, Shindler, and Ubben in particular would have been motivated not to allow Milton's misstatements to be uncovered prior to the expiry of their lock-up periods.

817.   The Nikola Defendants knew of most (if not all) of the many lies Milton told about Nikola. Indeed, their internal acknowledgment of Milton's problematic use of social media and podcast appearances underscore their knowledge. *See, e.g.*, ¶¶111-118.

818.   The Individual Defendants have since admitted they knew that Milton's statements were false and misleading. For example, Worthen admitted "The statement that Nikola can produce 1,000 kg/day [of hydrogen] is not true, and Milton knew it was not true. We discussed this 'a million times.'" Similarly, in Nikola's USAO Presentation, Russell stated that any representation that Nikola could produce hydrogen was "***indefensible***," and Brady admitted "Milton's assertion that other OEMs have asked to use Nikola's in-house inverters is 'complete fiction.'"   In his testimony provided during

Milton's criminal trial, Brady said he repeatedly elevated concerns about Milton's social media use to Girsky and Ubben.

819.   Despite these internal acknowledgements that they monitored Milton's media appearances and knew that his statements were false and misleading, the Individual Defendants consciously—and conspicuously—took no meaningful action to stop Milton or correct the record. Instead, when the truth about Milton's statements started to come out, the Individual Defendants actively worked to discredit it.

## VI.   The Individual Defendants Attempted to Discredit the Hindenburg Report – Until It Became Clear That Milton's Continued Involvement With Nikola Threatened Their Stock's Value

820.   Defendants continued the scheme to defraud investors after the Hindenburg Report exposed much of the truth they had been concealing. On September 11, 2020, the same day the Hindenburg Report was released, Nikola issued a press release that stated:

> Yesterday, an activist short-seller whose motivation is to manipulate the market and profit from a manufactured decline in our stock price published a so-called "report" replete with misleading information and salacious accusations directed at our founder and executive chairman. To be clear, this was not a research report and it is not accurate. This was a hit job for short sale profit driven by greed.
>
> We have nothing to hide and we will refute these allegations.  They have already taken up more time and attention than they deserve. We have retained leading law firm Kirkland & Ellis LLP to evaluate potential legal recourse, including with respect to the activist short seller and any others acting in concert.
>
> Nikola also intends to bring the actions of the activist short-seller, together with evidence and documentation, to the attention of the U.S. Securities and Exchange Commission.

821.   The Board held a meeting the same day, September 11, 2020, attended by Milton, Russell, Girsky, Ubben, Brady, and Worthen, to discuss the press release and the Company's response to the Hindenburg Report, which was circulated to the Board in

266

advance of the meeting. Milton led a discussion, relating that, with the help of Kirkland & Ellis LLP, Nikola would work to prepare a more substantial press release in response to Hindenburg, a draft of which would be circulated for the Board's review with the goal of issuing by Monday morning (September 14, 2020). Kirkland & Ellis also led a discussion regarding "the process and strategy with respect to the SEC, and other legal matters that can be expected to arise in the coming weeks." At no point in the meeting did the Individual Defendants ask to speak outside of Milton's presence and at no point was Milton asked not to participate in the meeting.

822.    Also on September 11, 2020, Brady attended the Cowen Global Transportation & Sustainable Mobility Conference. Analyst Jeffrey Osborne facilitated a Q&A session with Brady. In his first exchange with Osborne, Brady insisted that the Hindenburg Report was a baseless attack on Milton, despite his earlier repeated efforts to elevate concerns about Milton's statements to Girsky and Ubben:

> **OSBORNE**: Well, I'd be remiss, Kim, if I didn't bring it up, but certainly the short-seller report has driven a lot of phone calls and emails from investors. Any thoughts on the report that you can share?
>
> **BRADY**: Jeff, as you know, ***this is a short sale hit job. It's character assassination on our Chairman and Founder, Trevor Milton. There's no softness in it***. The company will have a response next week.

823.    Also on September 11, 2020, *CNBC* reported that Brady at an RBC Capital Markets conference reassured investors that Nikola would realize billions of dollars in cost savings from partnerships, including the General Motors partnership, and stated: "I think it's offensive to our strategic partners what you have a short seller who's doing a hack job and essentially pointing fingers at our strategic partners that they don't know what they're doing . . . I would suggest it's ridiculous to think they haven't done a deep dive; much more deep dive than what any third party short seller would be able to perform."

824.   On September 13, 2020, the Board met again, with the same Individual Defendants once again in attendance. Ahead of the meeting, the Board had received a draft press release and communications plan, which included a top questions list. At the meeting, Individual Defendants Milton, Russell, Girsky, Ubben, Brady, and Worthen approved the communications protocol for responding to the Hindenburg Report, including by issuing the September 14, 2020 press release, titled "Nikola Sets the Record Straight on False and Misleading Short Seller Report." Tellingly, the Individual Defendants did not resolve to investigate the claims made in the Hindenburg Report prior to issuing a press release denying it.

825.   The September 14, 2020 press release unequivocally denied the Hindenburg Report's allegations, calling it "false and defamatory" and stated that Hindenburg's allegations about Nikola's in-house components, battery technology, Nikola One, and hydrogen production capabilities were "false and misleading, and designed to manipulate the market." The press release, approved by each Individual Defendant and signed by Defendant Worthen, also called the Nikola One a "real truck."

826.   Ubben too defended Milton's integrity. On September 15-16, 2020—just as Nikola's Board began discussing whether Milton would have to leave the Company—Ubben gave interviews to the *Financial Times* and *Bloomberg News* in which he insisted: "we went public way too early and it's my fault. I pushed Trevor to do it." Ubben attributed the tumult to a misunderstanding about Nikola's business model and stated: "How can this be an intricate fraud if you have your three biggest suppliers in the board room working together as partners? I don't get why there's so much suspicion."

827.   The Individual Defendants' vehement denials of the Hindenburg Report clash with their knowledge that Hindenburg's claims were accurate. Indeed, Brady and

Russell would later testify at Milton's criminal trial that they knew his statements were false.

828.    It was not until September 15, 2020 that the Board began discussing, outside of Milton's presence, whether Milton would have to leave the Company. At a meeting on that date attended by Milton, Russell, Girsky, Ubben, Brady, and Worthen, the Board discussed the SEC investigation and rumors of a DOJ investigation. After excusing Milton, the remaining Individual Defendants discussed the impact the Hindenburg Report was having on Nikola's conversations with investors, thereby jeopardizing its ability to raise the capital that it still desperately needed, and considered whether Milton should continue to serve in an active role at Nikola.

829.    The next day, September 16, 2020, the Board met again, with Milton, Russell, Girsky, Ubben, Brady, and Worthen again in attendance. After management left the meeting, the remaining Board discussed Nikola's "cash burn" and "transition considerations should Mr. Milton leave the Company," as well as "stock and lockup considerations moving forward."

830.    On September 17, 2020, Girsky was quoted in a *Reuters* article defending VectoIQ's due diligence into Nikola during a *Financial Times* conference. Gisrky stated: "We were comfortable with the diligence we did . . . We are still comfortable with the diligence we did. . . . We brought an army of people in here. We conducted a thorough process . . . Personally, I've driven those trucks four times. I've driven on electricity. I've driven on hydrogen. I think they're awesome trucks."

831.    On September 18, 2020, at the next Board meeting, Milton "advised the Board that he desired to resign." The meeting was attended by Milton, Russell, Girsky,

Ubben, Brady, and Worthen. After Milton recused himself, the Board authorized Nikola's officers to work with counsel for the Company on separation terms for Milton.

832. At a Board meeting on September 20, 2020, attended by Milton, Russell, Ubben, Brady, and Worthen, the Board voted in favor of the proposed terms of Milton's separation from Nikola.

833. Milton's separation terms were quite generous, especially considering the circumstances of his departure and the fact that two the executives who approved of the agreement would subsequently testify against Milton at a criminal trial. Although Milton's separation agreement required him to forfeit 4,859,000 RSUs he had been granted the previous month, the Board also approved the accelerated vesting and settlement of 600,000 time-vested RSUs, which Milton paid nothing for. Under the agreement, Nikola would also cover the costs of a security inspection of Milton's residence and would reimburse Milton up to $100,000 for a full-time security detail for three months. Despite knowing that Milton had defrauded Nikola's investors, the Individual Defendants allowed Milton to resign rather than terminating him for cause and gave Milton a golden parachute at a time when the Company desperately needed capital to fund its operations. Over the next several months, the Board would discuss "the impact of the existing investigations in light of the Company's need to raise additional capital."

834. On February 25, 2021, Nikola filed its Form 10-K for the year ended December 31, 2020. In it, the Company admitted that, contrary to the Individual Defendants' September 2020 denials, the Hindenburg Report correctly identified as "inaccurate" Milton's statements related to (a) Nikola's ownership of natural gas wells; (b) Nikola engineering a zero emissions truck in 2016 (the Nikola One); (c) the Nikola One's functionality; (d) the Nikola One "in motion" video; (e) solar panels at Nikola's

headquarters; (f) Nikola's cost to produce and ability to produce hydrogen; (g) Nikola's "in house" production of components; (h) Nikola's inverter technology; and (i) the trucks being assembled in Ulm, Germany.

835.    The Individual Defendants' intended to defraud investors in order to increase Nikola's stock price and their own compensation. Without the Individual Defendants' conduct, the scheme would have unraveled before Nikola could go public at its inflated valuation. As a result of their participation in the scheme, the Individual Defendants are liable as primary violators of Rules 10b-5(a) and (c).

## ADDITIONAL INDICIA OF SCIENTER

836.    Defendants Russell, Brady, Worthen, Ubben, Girsky and Shindler were active and culpable participants in the fraud, as evidenced by their knowing and reckless issuance and/or ultimate authority over Nikola's and Milton's materially false or misleading statements and omissions. Defendants Russell, Brady, Ubben, Worthen, Girsky and Shindler acted with scienter in that they knew or recklessly disregarded that the public statements more specifically set forth above were materially false or misleading when made, and knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements as primary violators of the federal securities laws. Russell, Brady, Worthen, Ubben, Girsky and Shindler knew Milton was making materially false and misleading statements and failed to correct those statements in any of the filings made with the SEC during the Class Period.  In addition to the numerous allegations above setting forth Defendants' knowledge or reckless disregard of the Company's claims about: the Nikola One; the existence of purchase orders for its non-existent products; Nikola's hydrogen production capabilities and network; the supposed cost of owning and operating the Nikola One compared to a traditional diesel powered truck; Nikola's development of

the Badger One using its own technology and pre-orders for the truck; Nikola's development of its own proprietary electric battery, Defendants' scienter is further evidenced by the following facts.

A.   **Nikola's Production of FCEV/BEV Vehicles and Hydrogen Fuel, Batteries, and Fueling Stations Were Nikola's Core Operations Supporting a Strong Inference of Scienter**

837.   The Individual Defendants' knowledge (i.e. scienter) of Nikola's inability to produce or manufacture many of its primary, revenue-generating products can be inferred because these facts were critical to Nikola's core operations.  For example, in the June 2020 S-1, Nikola touted the importance of both their future FCEV/BEV sales and hydrogen technology and infrastructure as "core" to the Company's ongoing success and a "key differentiator":

> ***Our core product offering*** is centered around our battery-electric vehicle ("BEV") and hydrogen fuel cell electric vehicle ("FCEV") Class 8 semi-trucks. ***The key differentiator of our business model*** is our planned network of hydrogen fueling stations. We are offering a revolutionary bundled lease model, which provides customers with the FCEV truck, hydrogen fuel, and maintenance for a fixed price per mile, locks in fuel demand and significantly de-risks infrastructure development.

838.   Similarly, in a press release on June 3, 2020, the day before the beginning of the Class Period, Nikola claimed that sales of its purportedly technologically advanced products would generate billions in revenues in the future thereby serving as a critical source of income for the Company and its shareholders. Specifically, the June 3, 2020 press release noted "***pre-orders represent more than $10 billion in potential revenue***" and that "***Nikola's hydrogen network anticipated to cover North America; set to become the largest hydrogen network in the world***."

839.   It was thus critical for Defendants to ensure that the Company's "core product"—vehicles that were supposed to generate "$10 billion in potential revenue"—

272

and "key differentiator"—hydrogen products that would "cover North America and become the largest hydrogen network in the world"— were actually real and operable products. It would be absurd to suggest that Defendants simply did not know about the fact that the FCEV/BEV and hydrogen technology and infrastructure they were touting to the market were in fact non-operable and that the commercial prospects (and revenues) potentially generated from those products were not grounded in reality.

840.   Because Nikola knew that it faced severe adverse consequences if its "core" vehicle and "key differentiator" hydrogen products did not operate or generate the revenues they promised to investors the operability and viability of those products were vital to Nikola's continued operational success.

841.   Defendants repeated false and misleading statements about those products therefore concerned a core operation of Nikola financial services business.  Accordingly, knowledge that Nikola's products were not operational or capable of generating the revenues or sale touted by the Company can be imputed to Defendants Russell, Brady, Worthen, Ubben, Girsky and Shindler.

B.   **Defendants' Statements Themselves Support a Strong Inference of Scienter**

842.   As discussed above, prior to and during the Class Period, in addition to speaking at length about the technology and components underlying Nikola's FCEV/BEV products and hydrogen fuel, batteries, and infrastructure, Defendants also made detailed statements that included mathematical and scientific quantifications about the capabilities of their supposedly operable vehicles and purportedly viable hydrogen products.

843.   These statements, and others like them, provide a strong inference that Defendants knew they were misleading the market.  At all points prior to and during the Class Period, Defendants had an informational advantage over the market as they were the

ones involved with the production of Nikola's FCEV/BEV and hydrogen products. Accordingly, Defendants knew that either their statements were false and/or misleading when made, or were reckless in not knowing, because unlike investors, they had access to internal information relating to Nikola's product and indeed knew that they could not achieve the quantifiable metrics they touted because, in reality, they were not operable at the time to the extent touted to the market.

844.    For example, prior to and during the Class Period, Defendants quantified the capabilities of its products in real terms stating, for example:

- *"Nikola's battery electric trucks could now drive 800 miles fully loaded between charges" and "hydrogen-electric fuel cell trucks could surpass 1,000 miles between stops and top off in 15 minutes*

- *We have 3.5 megawatts of solar up on the roof producing about 18 megawatts of energy a day in our headquarters . . .*

- Nikola's new HQ in Phoenix. 150,000 sq. ft. 13 Acres. 300+ employees. *1,000 kilogram hydrogen production and storage. Zero emissions with up to 3 megawatts of solar and 20 megawatt hour lithium storage*.

- ("*[y]ou're talking 600+ mile range in a model 3 Tesla. You're talking 50% less cost than Lithium Ion. You're talking mass adoption of zero emission vehicles. Could be worth hundreds of billions if owned by one company but we decided to share it with the competition for greater good."*).

    *…*

    *"It's real. I've seen it with my own eyes and watched them cycle."*

- *Once we got the technology nailed down, we actually have over 2,000 cycles on our battery, which would mean it would be more than a million-mile battery. It would actually – our battery beats the Tesla battery in every metric, in every situation, and it's half the cost and it's double the range.*

- *But what Nikola solved was the cost-- was the economics on the trucking. When we first started, hydrogen was $16 a kilogram. We can now produce it for well under $4 a kilogram. So we've cut – it's*

274

1

*one quarter of the cost now than it was just a few years ago.  And*
*we're now cheaper to operate per mile than diesel.*

2

3

- *So we own all the tech. So all the cool stuff you guys want, the*
*design, the inside, the connectivity with your phone . . . all the e-*
*axles or, you know the electric motors, the batteries, the controls,*
*all that's done by Nikola. . .*

4

5

845.    These statements and others like them which touted concrete, quantifiable

6

performance metrics, when in fact such performance either could not be met or did not

7

even exist demonstrate that Defendants were aware of the Company's inability to

8

manufacture the products it touted to the market or were reckless in not becoming aware

9

of such process prior to speaking publicly to investors about the products.

10

**C.    Defendant Milton's Deletion of His Twitter Account Supports a Strong**
**Inference of Scienter**

11

12

846.    On or about September 23, 2020, less than two weeks after the publication

13

of the Hindenburg Report and announcement of investigations by the SEC and DOJ,

14

Defendant Milton deleted his personal Twitter account.

15

847.    Milton's deletion of his Twitter account following the announcement of

16

multiple federal investigations into statements he made on that account further supports an

17

inference of scienter. Dozens of Milton's false and misleading statements were published

18

on his Twitter account. His sudden deletion of his entire account in the wake of accusations

19

of wrongdoing and federal investigations, after being an avid user of Twitter, suggests that

20

Milton deleted the account in an attempt to destroy evidence of his fraud.

21

**D.    Defendants Russell and Brady's SOX Certifications Support a Strong**
**Inference of Scienter**

22

23

848.    Finally, accompanying Nikola's Form 10-Q filed with the SEC on August 4,

24

2020, which contained materially false and misleading statements, Defendants Russell and

25

Brady executed certifications, respectively, pursuant to Sarbanes-Oxley Act of 2002

26

275

("SOX") Section 302 attesting to the accuracy of the filing and its contents and the disclosure of all fraud. Specifically, the certifications required that Defendants Russell and Brady attest to the fact that "th[e] report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by th[e] report."

849.   Defendants Russell and Brady also executed certifications pursuant to SOX Section 906, which accompanied the August 4, 2020 10-Q, attesting that the "[t]he information contained in the [reports] fairly presents, in all material respects, the financial condition and results of operations of the Company."

850.   By signing these certifications, Defendants Russell and Brady evidenced their access (and purported review of) Nikola's operations as well as the materially false and misleading statements set forth above.  However, based on the allegations set forth above, it is apparent that such a review would have uncovered the fact that many of the Company's claims about their FCEV/BEV vehicles and hydrogen technology and production capabilities were false.

851.   Had Defendants Russell and Brady actually conducted the assessments and evaluations required by SOX, they would have discovered Nikola's misrepresentations and omissions regarding their FCEV/BEV and hydrogen capabilities.   Accordingly, Defendants Russell and Brady, knew, or at the very least, were severely reckless in not knowing of the facts which rendered their public statements materially false and misleading.

**CONTROL PERSON ALLEGATIONS**

## I.     Control Person Allegations

852.   As detailed above, each of the Individual Defendants was a "controlling person" of Nikola during the Class Period within the meaning of Section 20(a) of the Exchange Act. The Individual Defendants, by virtue of their high-level and controlling positions at Nikola, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information about the Company, its business, operations, internal controls, growth, financial statements, and financial condition as alleged herein. As set forth below, the materially misstated information conveyed to the public was the result of the collective acts and omissions of these individuals.

853.   Defendant Milton founded Nikola, served as its CEO until the June 2020 merger, and served as its Executive Chairman until his resignation on September 20, 2020. As detailed throughout this Complaint, Milton was deeply involved in all aspects of Nikola's day-to-day operations and had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, internal controls, growth, financial statements, and financial condition, and to correct any previously issued statements that had become materially misleading or untrue. As set out above, Milton made numerous statements on behalf of the Company and exercised control over Nikola's communications. Milton also signed SEC filings that contained false and misleading statements and material omissions, including the March 13, 2020 S-4, the June 15, 2020 S-1, and the July 17, 2020 S-1. Further, as detailed throughout this Complaint, Milton directly participated in, knew of, or recklessly disregarded the misconduct giving rise to liability under Section 10(b) of the Exchange Act.

854.    Defendant Russell served as President of Nikola from February 2019 to June 2020, as a director since July 2019, and as CEO since the June 2020 merger. Russell was deeply involved in all aspects of Nikola's day-to-day operations and had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, internal controls, growth, financial statements, and financial condition, and to correct any previously issued statements that had become materially misleading or untrue. Russell made numerous statements on behalf of the Company and exercised control over Nikola's communications. *See e.g.*, ¶¶112, 307, 346, 402, 406, 460, 571, and 607. Russell also signed SEC filings that contained false and misleading statements and material omissions, including the June 15, 2020 S-1, the July 17, 2020 S-1, and the August 4, 2020 10-Q. Further, Russell directly participated in, knew of, or recklessly disregarded the misconduct giving rise to liability under Section 10(b) of the Exchange Act, including by failing to correct Milton's repeated misstatements.

855.    Defendant Brady served as Nikola's CFO and Treasurer from November 2017 to June 2020, and as the Company's CFO since the merger. Brady was deeply involved in all aspects of Nikola's day-to-day operations and had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, internal controls, growth, financial statements, and financial condition, and to correct any previously issued statements that had become materially misleading or untrue. Brady exercised control over Nikola's communications. *See e.g.,* ¶¶112, 116-117, 165-167, 209, 307, 325, 346, 402, 406, 410, 460, 571, and 607. Brady also signed SEC filings that contained false and misleading statements and material omissions, including the June 15, 2020 S-1, the July 17, 2020 S-1, and the August 4, 2020 10-Q. Further, Brady directly participated in, knew of, or recklessly disregarded the misconduct giving rise to liability

under Section 10(b) of the Exchange Act, including by failing to correct Milton's repeated misstatements.

856.    Defendant Worthen served as Nikola's CLO and Secretary since October 2015. Brady was deeply involved in all aspects of Nikola's day-to-day operations and had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, internal controls, growth, financial statements, and financial condition, and to correct any previously issued statements that had become materially misleading or untrue. As CLO, Worthen was charged with ensuring Nikola's compliance with its legal obligations. Worthen exercised control over Nikola's communications. *See e.g.*, ¶¶112, 117, 409, 460, 478, 571 and 607. Worthen also signed SEC filings that contained false and misleading statements and material omissions, including the September 14, 2020 8-K. Further, Worthen directly participated in, knew of, or recklessly disregarded the misconduct giving rise to liability under Section 10(b) of the Exchange Act, including by failing to correct Milton's repeated misstatements.

857.    Defendant Girsky served as a director of Nikola and as a member of Nikola's Audit Committee and its Nominating and Corporate Governance Committee following the June 2020 merger. Girsky became Chairman of Nikola in September 2020. Girsky was deeply involved in all aspects of Nikola's day-to-day operations and had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, internal controls, growth, financial statements, and financial condition, and to correct any previously issued statements that had become materially misleading or untrue. As a member of the Audit Committee, Girsky was responsible for overseeing the integrity of Nikola's financial statements and its compliance with legal and regulatory requirements. As a member of the Nominating and Corporate Governance

Committee, Girsky was responsible for evaluating Nikola's risk management process and system and the adequacy of the Company's policies and procedures designed to address risk. Girsky also signed SEC filings that contained false and misleading statements and material omissions, including the March 2020 S-4, the Proxy, the June 2020 S-1, and the July 2020 S-1. Further, Girsky directly participated in, knew of, or recklessly disregarded the misconduct giving rise to liability under Section 10(b) of the Exchange Act, including by failing to correct Milton's repeated misstatements.

858.   Defendant Shindler served as a Nikola director since September 2020 and serves as the Chair of the Audit Committee. Shindler was deeply involved in all aspects of Nikola's day-to-day operations and had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, internal controls, growth, financial statements, and financial condition, and to correct any previously issued statements that had become materially misleading or untrue.  As Chair of the Audit Committee, Shindler was responsible for overseeing the integrity of Nikola's financial statements and its compliance with legal and regulatory requirements. Shindler also signed SEC filings that contained false and misleading statements and material omissions, including the March 2020 S-4 and the April 2020 8-K. Further, Shindler directly participated in, knew of, or recklessly disregarded the misconduct giving rise to liability under Section 10(b) of the Exchange Act, including by failing to correct Milton's repeated misstatements.

859.   Defendant Ubben served as a Nikola director and a member of the Nominating and Corporate Governance Committee from the June 2020 merger until his resignation in February 2022. Ubben was deeply involved in all aspects of Nikola's day-to-day operations and had a duty to disseminate prompt, accurate, and truthful information

with respect to the Company's business, operations, internal controls, growth, financial statements, and financial condition, and to correct any previously issued statements that had become materially misleading or untrue. As a member of the Nominating and Corporate Governance Committee, Ubben was responsible for evaluating Nikola's risk management process and system and the adequacy of the Company's policies and procedures designed to address risk. Ubben also signed SEC filings that contained false and misleading statements and material omissions, including the June 2020 S-1 and the July 2020 S-1. Further, Ubben directly participated in, knew of, or recklessly disregarded the misconduct giving rise to liability under Section 10(b) of the Exchange Act, including by failing to correct Milton's repeated misstatements.

860.   By virtue of their high-level positions with Nikola and its Board, the Individual Defendants had the power to control and did control Nikola's decision-making, including the content and dissemination of the false and misleading statements described in this Complaint and the Company's responses to those false and misleading statements.

**APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE**

861.   To the extent that Lead Plaintiffs allege that Defendants made affirmative misstatements, Lead Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)   the omissions and misrepresentations were material;

(c)   the Company's securities traded in an efficient market;

(d)   the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

(e) Lead Plaintiffs and other members of the Class purchased Nikola's securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts;

(f) Nikola's common stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(g) as a regulated issuer, Nikola filed periodic public reports with the SEC and the NASDAQ;

(h) Nikola regularly communicated with public investors via established market communication mechanisms, including regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(i) Nikola was followed by numerous securities analysts employed by major brokerage firms including, but not limited to, Cowen, Loop Capital, and Colliers Securities and other financial, tech and automotive websites all of which wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace.

862.   As a result of the foregoing, the market for Nikola's securities promptly digested current information regarding Nikola from publicly available sources and reflected such information in Nikola's securities price(s).  Under these circumstances, all persons and entities who or which purchased or otherwise acquired Nikola's common stock during the Class Period suffered similar injuries through their purchase of Nikola at artificially inflated prices and thus, the presumption of reliance applies.

863.   The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Nikola common stock.

864.   Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiffs and other members of the Class purchased shares of Nikola's

common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

865. To the extent that the Defendants concealed or improperly failed to disclose material facts with respect to Nikola's business, Lead Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

### NO SAFE HARBOR

866. The statutory safe harbor provided by the PSLRA for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements alleged in this pleading. First, many of the statements alleged to be false and misleading relate to historical facts or existing conditions. Second, to the extent any of the allegedly false and misleading statements may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made. Third, any purported forward-looking statements were not accompanied by meaningful cautionary language because the risks that Defendants warned of had already come to pass.

867. To the extent any statements alleged to be false and misleading may be construed to discuss future intent, they are mixed statements of present or historical facts and future intent and are not entitled to PSLRA safe-harbor protection—at least with respect to the part of the statement that refers to the present.

868. In addition, the PSLRA imposes an additional burden on oral forward-looking statements, requiring Defendants to include a cautionary statement that the particular oral statement is a forward-looking statement, and that "actual results might differ materially from those projected in the forward-looking statement." 15 U.S.C. § 78u-

5(c)(2)(A)(i)-(ii).  Defendants failed to both identify certain oral statements as forward-looking and include the cautionary language required by the PSLRA.

869.    Furthermore, Defendants did not accompany their statements with meaningful cautionary language identifying important factors that could cause actual results to differ materially from any results projected.  To the extent Defendants included any cautionary language, that language was not meaningful because any potential risks identified by Defendants had already passed or manifested.  As detailed herein, Defendants failed to disclose to the market that, throughout the Class Period, Nikola was over-collecting its customer's personal information without their consent, in violation of multiple Chinese regulations.

870.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the forward-looking statement was authorized or approved by an executive officer of Nikola who knew that the statement was false when made.

**PLAINTIFFS' CLASS ACTION ALLEGATIONS**

871.    Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Nikola securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of Nikola during the Class

Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Nikola's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

872.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Nikola securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Lead Plaintiffs at this time and can be ascertained only through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Nikola or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

873.   Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

874.   Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

875.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Nikola;

- whether the Individual Defendants caused Nikola to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Nikola securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

876. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**COUNT I**
**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

877. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

878. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

879.   During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Lead Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Nikola securities; and (iii) cause Lead Plaintiffs and other members of the Class to purchase or otherwise acquire Nikola securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

880.   Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Nikola securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Nikola's finances and business prospects.

881.   By virtue of their positions at Nikola and VectoIQ, Defendants had actual knowledge of the materially false and misleading statements and material omissions

287

alleged herein and intended thereby to deceive Lead Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

882.   Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Nikola, the Individual Defendants had knowledge of the details of Nikola's internal affairs.

883.   The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Nikola.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Nikola's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Nikola securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Nikola's business and financial condition which were concealed by Defendants, Lead Plaintiffs and the other members of the Class purchased or otherwise acquired Nikola securities at artificially inflated prices and relied upon the price of the securities, the integrity of the

market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

884.   During the Class Period, Nikola securities were traded on an active and efficient market. Lead Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Nikola securities at prices artificially inflated by Defendants' wrongful conduct.  Had Lead Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Lead Plaintiffs and the Class, the true value of Nikola securities was substantially lower than the prices paid by Lead Plaintiffs and the other members of the Class.  The market price of Nikola securities declined sharply upon public disclosure of the facts alleged herein to the injury of Lead Plaintiffs and Class members.

885.   By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

886.   As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 10(b) of the Exchange Act And Rule 10b-5(a) and (c) Against All Defendants)

887.    Lead Plaintiffs repeat and re-allege every allegation set forth above as if fully set forth herein.

888.    This Count is brought solely and exclusively under the provisions of Rule 10b-5(a) and (c). Accordingly, Lead Plaintiffs need not allege in this Court nor prove in this case that any of the Defendants made any misrepresentations or omissions of material fact for which they may also be liable under Rule 10b-5(b) and/or any other provisions of law.

889.    During the Class Period, Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Lead Plaintiffs and the Class; (ii) artificially inflate the price of Nikola common stock; and (iii) cause Lead Plaintiffs to purchase Nikola common stock at artificially inflated prices.

890.    In furtherance of this unlawful plan, scheme and course of conduct, Defendants employed devices, schemes and artifices to defraud, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Lead Plaintiffs and the Class in connection with their purchases of Nikola common stock, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

891.    Defendants' fraudulent devices, schemes, artifices and deceptive acts, practices, and course of business included the knowing and/or reckless suppression and concealment of the Company's scheme to defraud investors concerning, among other things, (i) that Nikola had developed a fully operational "zero-emissions" tractor trailer

truck powered by hydrogen fuel cell technology—the Nikola One; (ii) that Nikola had, in hand, over 14,000 purchase orders for its trucks, which represented 2 to 3 years of production and billions in revenue; (iii) that Nikola was producing hydrogen at a fraction of the cost industry experts believed was possible and that Nikola was in the process of establishing a nation-wide network of hydrogen refueling stations, which would produce inexpensive hydrogen for the Nikola One and Nikola's other vehicles to operate on; (iv) that the cost of owning and operating Nikola's vehicles was significantly less than the cost of owning and operating a traditional diesel powered vehicle; (v) that Nikola had developed, using its own technology, a fully operational BEV pick-up truck, the Badger One, pre-order for which had sold out; (vi) that Nikola had developed all of its vehicles' critical components "in-house," including a proprietary "game-changing" electric battery, which exceeded the range of then-existing electric batteries; (vii) that commercial "assembly line" production of the Nikola Tre BEV truck had already been completed in Ulm, German; (viii) that Nikola's headquarters was completely "off-grid" with solar panels on the roof producing 18 megawatts of energy a day; and (ix) that Nikola owned seven natural gas wells that were used as backup to Nikola's solar hydrogen production.;

892.   Despite the numerous representations that were made to the market—and ample opportunity to supplement, alter, or correct such misrepresentations—Defendants failed to do so thereby concealing the Company's scheme to defraud from investors.

893.   Lead Plaintiffs and the Class reasonably relied upon the integrity of the market in which Nikola's common stock traded.

894.   During the Class Period, Lead Plaintiffs and the Class were unaware of Defendants' fraudulent scheme and unlawful course of conduct and/or the impact of the fraudulent scheme.  Had Lead Plaintiffs and the Class known the true extent of Defendants'

unlawful scheme and unlawful course of conduct, they would not have purchased Nikola's common stock, or if they had, would not have done so at the artificially inflated prices paid for such securities.

895.     As a direct and proximate result of Defendants' scheme to defraud and such unlawful course of conduct, Lead Plaintiffs and the Class suffered damages in connection with their purchases of Nikola common stock during the Class Period.

896.     By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder and are liable to Lead Plaintiffs and the Class for damages suffered in connection with their purchases of Nikola common stock during the Class Period.

## COUNT III
### (Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)

897.     Lead Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

898.     During the Class Period, the Individual Defendants participated in the operation and management of Nikola, and conducted and participated, directly and indirectly, in the conduct of Nikola's business affairs.  Because of their senior positions, they knew the adverse non-public information about Nikola's misstatement of income and expenses and false financial statements.

899.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Nikola's financial condition and results of operations, and to correct promptly any public statements issued by Nikola which had become materially false or misleading.

900.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Nikola disseminated in the marketplace during the Class Period concerning Nikola's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Nikola to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Nikola within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Nikola securities.

901.    Each of the Individual Defendants, therefore, acted as a controlling person of Nikola.  By reason of their senior management positions and/or being directors of Nikola, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Nikola to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Nikola and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiffs and the other members of the Class complain.

902.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Nikola.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiffs demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiffs as the Class representative;

1    B.    Requiring Defendants to pay damages sustained by Lead Plaintiffs and the

2 Class by reason of the acts and transactions alleged herein;

3    C.    Awarding Lead Plaintiffs and the other members of the Class prejudgment

4 and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other

5 costs; and

6    D.    Awarding such other and further relief as this Court may deem just and

7 proper.

8                    **DEMAND FOR TRIAL BY JURY**

9    Lead Plaintiffs hereby demand a trial by jury.

10

11  Dated:  April 3, 2023                    Respectfully submitted,

12                                            **KELLER ROHRBACK LLP**

13                                            */s/ Gary Gotto*
14                                            Gary Gotto (No. 007401)
                                              3101 North Central Avenue, Suite 1400
15                                            Phoenix, AZ 85012
                                              Telephone: (602) 230-6322
16                                            ggotto@kellerrohrback.com

17                                            *Liaison Counsel for Lead Plaintiffs*

18                                            **POMERANTZ LLP**
                                              */s/ Jeremy A. Lieberman*
19                                            Jeremy A. Lieberman
                                              (admitted *pro hac vice*)
20                                            Michael J. Wernke
                                              (admitted *pro hac vice*)
21                                            600 Third Avenue, 20th Floor
                                              New York, New York 10016
22                                            Telephone: (212) 661-1100
                                              Facsimile: (212) 661-8665
23                                            jalieberman@pomlaw.com
                                              mjwernke@pomlaw.com
24

25

26                      294

**BLOCK & LEVITON LLP**
/s/ *Jeffrey C. Block*
Jeffrey C. Block (admitted *pro hac vice*)
Jacob A. Walker (admitted *pro hac vice*)
Michael Gaines (admitted *pro hac vice*)
260 Franklin Street, Suite 1860
Boston, MA 02110
Telephone: (617) 398-5600
Facsimile: (617) 507-6020
jeff@blockleviton.com
jake@blockleviton.com
michael@blockleviton.com

*Counsel for Lead Plaintiffs and Co-Lead*
*Counsel for the Class*

**LABATON SUCHAROW LLP**
Jonathan Gardner (admitted *pro hac vice*)
Michael H. Rogers (admitted *pro hac*
*vice*)
David J. Schwartz (admitted *pro hac vice*)
James T. Christie (admitted *pro hac vice*)
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
jgardner@labaton.com
mrogers@labaton.com
dschwartz@labaton.com
jchristie@labaton.com

*Additional Counsel for Lead Plaintiffs*

295