1
2
3
4
5
6

IN THE UNITED STATES DISTRICT COURT

7

FOR THE DISTRICT OF ARIZONA

8
9
10
11
12
13
14

| Daniel Borteanu, et al., | ) | No. CV-20-01797-PHX-SPL |
|---|---|---|
| | ) | |
| Plaintiffs, | ) | No. CV-20-01819-PHX-SPL (cons.) |
| | ) | No. CV-20-02123-PHX-SPL (cons.) |
| vs. | ) | No. CV-20-02237-PHX-SPL (cons.) |
| | ) | No. CV-20-02374-PHX-SPL (cons.) |
| | ) | |
| Nikola Corporation, et al., | ) | **ORDER** |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

15

    Before the Court are three Motions to Dismiss (Docs. 139, 141, and 142). The first

16

was filed by Defendant Nikola Corporation ("Nikola") along with Defendants Kim Brady,

17

Steve Girsky, Mark Russell, Steven Shindler, and Britton Worthen ("Individual

18

Defendants"). (Doc. 139). The second was filed by Defendant Trevor Milton. (Doc. 141).

19

The third was filed by Defendant Jeffrey Ubben. (Doc. 142). Lead Plaintiff Nikola Investor

20

Group II ("Plaintiff") filed a Response addressing both the Individual Defendants' and

21

Defendant Trevor Milton's respective Motions. (Doc. 149). Lead Plaintiff also filed a

22

separate Response to Defendant Jeffrey Ubben's Motion. (Doc. 148). Defendants filed

23

three Reply briefs (Docs. 151, 152, & 153). Having fully reviewed and considered the

24

parties' briefing,[1] the Court will grant in part and deny in part Defendants' Motions, for the

25

26

    [1] The Court has also reviewed and considered Lead Plaintiff's Notice of
Supplemental Authority (Doc. 154), Individual Defendants and Defendant Nikola's

27

Response to Notice of Supplemental Authority (Doc. 155), the Request for Judicial Notice
in Support of Defendant Jeffrey Ubben's Motion to Dismiss (Doc. 144), and the Notice of

28

Joinder by Defendant Ubben to Individual Defendant's Response to Notice of

1  following reasons.[2]

2  **I.  <u>BACKGROUND</u>**

3       This is a private securities class action brought by Plaintiff (Lead Plaintiffs: Vincent

4  Chau, Stanley Karcynski, and George Mersho) on behalf of all investors who purchased

5  the common stock of Nikola during the period June 4, 2020, through February 25, 2021.

6  (Doc. 129 at 6). This action is against Nikola, several of the company's officers, Mark

7  Russell, Kim Brady, Britton Worthen, Steve Girsky, Steven Shindler ("Individual

8  Defendants"), Jeffrey Ubben ("Defendant Ubben"), and the company's former Executive

9  Chairman, Trevor Milton ("Defendant Milton"). (*Id.* at 6–8).

10      Nikola is a publicly traded Delaware corporation with its headquarters in Arizona.

11 (*Id.* at 20). Nikola designs and manufactures electric vehicles and their components. (*Id.* at

12 23). Plaintiff filed their initial Complaint on September 15, 2020, and subsequently their

13 First Consolidated Amended Class Action Complaint ("FCACAC") (Doc. 95) on January

14 24, 2022. (*Id.* at 5). On February 2, 2023, this Court dismissed that complaint for failure to

15 state a claim. (Doc. 126). Plaintiff then filed a Second Consolidated Amended Class Action

16 Complaint ("SCACAC") which remains the operative document. (Doc. 129).

17      Plaintiff alleges that Defendants violated §§ 10(b) and 20(a) of the Securities

18 Exchange Act of 1934 and Rule 10b-5 promulgated thereunder by misrepresenting

19 numerous aspects of Nikola's business and operations. (*Id.* at 6–8). Plaintiff alleges that

20 these misrepresentations inflated Nikola's stock value. (*Id.* at 19). According to Plaintiff,

21 when the falsity of these misrepresentations came to light, Nikola's stock value dropped

22 dramatically, causing significant losses and damages to Plaintiff's class members. (*Id.* at

23 17–18).

24  _____

25 Supplemental Authority (Doc. 156). The Court grants Plaintiff's Notice of Supplemental
   Authority (Doc. 154) and Defendant Ubben's Request for Judicial Notice (Doc. 144).

26

27      [2] Because it would not assist in resolution of the instant issues, the Court finds the
   pending motions are suitable for decision without oral argument. See LRCiv. 7.2(f); Fed.

28 R. Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

The SCACAC alleges that "[w]hile Defendants misrepresented numerous aspects of Nikola's operations, the fraud can be broken down into nine categories of misrepresentations." (*Id.* at 7). Plaintiff alleges that Defendants misrepresented:

> "first, that Nikola had developed a fully operational 'zero-emissions' tractor trailer truck powered by hydrogen fuel cell technology—the Nikola One;
>
> second, that Nikola had, in hand, over 14,000 purchase orders for its trucks, which represented 2 to 3 years of production and billions in revenue;
>
> third, that Nikola was producing hydrogen at a fraction of the cost industry experts believed was possible and that Nikola was in the process of establishing a nation-wide network of hydrogen refueling stations, which could reliably dispense and produce inexpensive hydrogen for the Nikola One and Nikola's other vehicles to operate on;
>
> fourth, that Nikola had developed, using its own technology, a fully operational pick-up truck called the Badger, for which pre-orders had sold out;
>
> fifth, that Nikola had developed all of its vehicles' critical components 'in-house,' including a proprietary 'game-changing' electric battery, which exceeded the range of then-existing electric batteries;
>
> sixth, that the cost of owning and operating Nikola's vehicles was significantly less than the cost of owning and operating a traditional diesel powered vehicle;
>
> seventh, that commercial 'assembly line' production of the Nikola Tre BEV truck had already been completed in Ulm, German[y], and that Nikola had binding orders in hand for its BEV trucks;
>
> eighth, that Nikola's headquarters was completely 'off-grid' with solar panels on the roof producing 18 megawatts of energy a day; and
>
> ninth, that Nikola owned seven natural gas wells that were used as backup to Nikola's solar hydrogen production."

(*Id.* at 9). For each of these categories, the SCACAC alleges specific statements made by different Defendants at varying times. Defendant Milton's alleged misstatements primarily occurred via Twitter and during various interviews he conducted. The Individual Defendants and Defendant Ubben's alleged misstatements primarily occurred in certain

SEC filings that they signed, and during other interactions with the media. All these alleged misstatements can be imputed to Defendant Nikola. Plaintiff also alleges that the Individual Defendants, Defendant Milton, and Defendant Ubben participated in a scheme to defraud investors by promoting these alleged misstatements.

## II.   LEGAL STANDARDS

### A. Motions to Dismiss Pursuant to Rule 12(b)(6)

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A court may dismiss a complaint for failure to state a claim under Rule 12(b)(6) for two reasons: (1) lack of a cognizable legal theory, or (2) insufficient facts alleged under a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). A claim is facially plausible when it contains "factual content that allows the court to draw the reasonable inference" that the moving party is liable. *Ashcroft*, 556 U.S. at 678. Factual allegations in the complaint should be assumed true, and a court should then "determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. Facts should be viewed "in the light most favorable to the non-moving party." *Faulkner v. ADT Sec. Servs., Inc.*, 706 F.3d 1017, 1019 (9th Cir. 2013).

On a motion to dismiss, it is the defendant's burden to demonstrate that the plaintiff has failed to state a claim. *See Avalanche Funding, LLC v. Five Dot Cattle Co.*, No. 2:16-cv-02555-TLN-KJN, 2017 WL 6040293, at *3 (E.D. Cal. Dec. 6, 2017) ("In the context of a motion to dismiss, the burden is on the defendant to prove that the plaintiff failed to state a claim."); *see also Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (on a Rule 12(b)(6) motion, the "defendant bears the burden of showing that no claim has been presented."); *Bangura v. Hansen*, 434 F.3d 487, 498 (6th Cir. 2006) ("district court erroneously placed the burden on Plaintiffs to demonstrate that they stated a claim for relief" and "[b]ecause . . . Defendants failed to meet their burden of proof, . . . the district court should have dismissed Defendants' motion.").

### B.  Heightened Pleading Standards for Securities Fraud Claims

Securities fraud claims "must satisfy the dual pleading requirements" of Federal Rule of Civil Procedure 9(b) ("Rule 9(b)") and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009). Under Rule 9(b)'s heightened pleading requirement, "a party must state with particularity the circumstances constituting fraud." This requires a pleading to identify "the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false." *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (internal quotation marks and alterations omitted).

Enacted in 1995, the PSLRA imposes more exacting pleading requirements for securities fraud complaints. *Zucco*, 552 F.3d at 990. Under the PSLRA's pleading requirement, a complaint must "plead with particularity both falsity and scienter." *Id.* (citation omitted). "Thus, to properly allege falsity, a securities fraud complaint must now 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading.'" *Id.* (citing 15 U.S.C. § 78u-4(b)(1)). "To adequately plead scienter, the complaint must now 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Id.* at 991 (citing 15 U.S.C. § 78u–4(b)(2)).

### III.  <u>DISCUSSION</u>

Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, "prohibit fraudulent activities in connection with securities transactions." *Lomingkit v. Apollo Educ. Grp. Inc.*, 275 F. Supp. 3d 1139, 1148 (D. Ariz. 2017). Specifically, § 10(b) provides that:

> "[i]t shall be unlawful for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . ., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors."

5

15 U.S.C. § 78j(b). Rule 10b-5 implements § 10(b) by declaring it unlawful:

> "(a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

17 C.F.R. § 240.10b-5. The Supreme Court has recognized that § 10(b) creates a private right of action for plaintiffs. *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 318 (2007) (citation omitted) (recognizing that § 10(b) "affords a right of action to purchasers or sellers of securities injured by its violation"). Claims brought under Rule 10b-5(a) and (c) are referred to as "scheme liability" claims and claims brought under Rule 10b-5(b) are referred to as "maker liability" claims. *See Lorenzo v. SEC*, 139 S. Ct. 1094, 1102–03 (2019) (discussing differences between provisions but recognizing "considerable overlap" between them).

To state a claim for securities fraud under Section 10(b) and Rule 10b-5, a plaintiff must demonstrate with particularity "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005)).

**A. Rule 10b-5(b) Maker Liability**

Strewn throughout the 300-page SCACAC, Plaintiff alleges that Individual Defendants, Defendant Milton, and Defendant Ubben made multiple false and misleading statements about various aspects of Nikola's future products and services. (*E.g.*, Doc. 129 at 287). All Defendants argue that Plaintiff has not sufficiently demonstrated a material misrepresentation or omission, scienter, and loss causation regarding these statements.

(Docs. 139 at 2, 141 at 2, and 142 at 7–8). Defendant Ubben also raises the separate argument that some of the claims against him are barred by the statute of limitations. (Doc. 142 at 8). For the purposes of this Order, the Court will address the sufficiency of the allegations against each Defendant individually.

1. *Whether each Defendant was a "maker" of misrepresentations made by Nikola*

All Defendants argue that they were not the "makers" of certain actionable statements under Rule 10b-5(b). (Docs. 139 at 14, 141 at 2, and 142 at 11). Specifically, the Individual Defendants and Defendant Ubben argue that they cannot be held liable for any statements made by Defendant Milton, and that they should not be considered "makers" of the statements contained in various SEC filings on behalf of Nikola. (Docs. 139 at 14, 141 at 2, and 142 at 11). Plaintiff argues that all Defendants are "makers" of the SEC filings which they personally signed, and any statements they personally made on behalf of the company. (Doc. 149 at 7–8).

Claims under Rule 10b-5(b) may only be applied against those who "directly or indirectly, . . . make any untrue statement of a material fact" in connection with the purchase or sale of securities. 17 C.F.R. § 240.10b–5(b). In *Janus Capital Group, Inc. v. First Derivative Traders* ("*Janus*"), the Supreme Court clarified what it means to "make" a statement under this Rule, holding that "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." 564 U.S. 135, 142 (2011) (emphasis added). In the Ninth Circuit, company executives who sign forms submitted to the SEC are the "makers" of the statements captured in those forms for the purposes of Rule 10b-5(b). *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1062–1063 (9th Cir. 2000). However, "district courts applying *Janus* have found that a corporate officer's position alone, without additional allegations as to the officer's ability to control the contents of the statement at issue, does not suffice to render the officer a 'maker' of the statement." *Mandalevy v. Bofi Holding, Inc.*, No. 17CV667-GPC-KSC, 2021 WL 794275, at *6 (S.D. Cal. Mar. 2, 2021); *see also Hampton*

*v. Aqua Metals, Inc.*, No. 17-CV-07142-HSG, 2020 WL 6710096, at *17 (N.D. Cal. Nov. 16, 2020) ("Here, there is no allegation that [defendant] signed any of the SEC filings or press releases, nor are there any allegations that he was responsible for or had ultimate authority over their content.").

As previously stated in this Court's First Dismissal Order, "maker liability" will only attach to Defendants for the SEC filings or press releases which they personally signed, or for statements they personally made to those outside the company. (Doc. 126 at 12). Plaintiff's argument attempts to impermissibly expand this definition of "maker liability." Plaintiff attempts to do so by classifying Defendants as the "makers" of all written statements of Nikola, regardless of whether they signed them, simply because they were on the board of Nikola which approved them. (*E.g.*, Doc. 129 at 59–60) (arguing that Defendant Ubben was a "maker" of the September 14, 2020, Form 8-K). While it is a close call as to whether board members can be said to have ultimate authority over a statement from the board, what Plaintiff has alleged here is insufficient to demonstrate this. In each case, Plaintiff merely states that the Defendants "reviewed and approved of" the language of each statement at various board meetings. (*Id.*). Nowhere else in the complaint does Plaintiff explain whether each Individual Defendant was personally involved in the crafting these respective statements, or whether a unanimous board vote was required to approve each statement or filing. Simply alleging that as members of the board the Individual Defendants had "the ability and opportunity to prevent [SEC filings] issuance or to cause them to be corrected" does not make them "makers" under *Janus*. (Doc. 129 at 22). Without any evidence showing that the Individual Defendants had ultimate control over the delivery of each statement, Plaintiff has failed to demonstrate that "maker liability" should attach for any statement or filing which Individual Defendants did not personally sign. Plaintiff cites no cases in which non signatory board members have been considered "makers" of a board's statement, and courts generally seem to disapprove of this interpretation. *E.g.*, *In re CytRx Corp. Sec. Litig.*, No. CV141956GHKPJWX, 2015 WL 5031232, at *7 (C.D. Cal. July 13, 2015) (finding that reviewing, editing, or approving a

statement does not render someone its "maker" under Rule 10b-5). Thus, Defendants will only be considered the "makers" of the statements which they personally signed or verbalized out loud. The Court will address each of these alleged misstatements in their appropriate context and determine whether the Court may, at this motion-to-dismiss stage, determine as a matter of law that the statements were not misleading.

>    2.  *Whether Plaintiff's claims against Defendant Ubben are barred by the*
>    *statute of limitations*

Defendant Ubben argues separately that Plaintiff's "maker liability" claims against him are barred by the statute of limitations. (Doc. 142 at 8). Defendant Ubben argues that Plaintiff's claims rely on statements made before April 3, 2021, the operative date for the statute of limitations, and that a reasonably diligent plaintiff would have discovered the facts necessary to state a claim against him before that date. (Doc. 142 at 8–9). Plaintiff responds by claiming they did not discover the requisite facts for stating a claim against him until the derivative complaints were unsealed on April 4 and 14, 2022. (Doc. 148 at 6).

Under 28 U.S.C. § 1658(b)(1), plaintiffs have "2 years after the discovery of the facts constituting the violation" to bring a claim. The U.S. Supreme Court has clarified this language stating that "the limitations period in § 1658(b)(1) begins to run once the plaintiff did discover or a reasonably diligent plaintiff would have 'discover[ed] the facts constituting the violation'—whichever comes first." *Merck & Co. v. Reynolds*, 559 U.S. 633, 653 (2010) (quoting § 1658(b)(1)). Whether plaintiffs should have discovered the requisite facts may be decided as a matter of law only when "uncontroverted evidence irrefutably demonstrates plaintiff discovered or should have discovered the fraudulent conduct." *Kramas v. Security Gas & Oil Inc.*, 672 F.2d 766, 770 (9th Cir. 1982), *cert. denied*, 459 U.S. 1035.

In *York County on Behalf of County of York Retirement Fund v. HP, Inc.*, the Ninth Circuit held that awareness of potential misstatements by company executives was insufficient on its own to show that a plaintiff should have "discovered" their claim for

statute of limitations purposes. 65 F.4th 459, 468 (9th Cir. 2023). In that case, plaintiffs brought securities fraud claims based on allegedly fraudulent statements by company executives which occurred more than two years before they filed their claim. *Id*. at 461. The court held that simply because the plaintiffs were aware of the statements did not necessarily mean they were aware of their potential falsity. *Id*. at 467 ("Without additional information, these statements seem like standard assurances to shareholders; they could not form the basis of a claim for securities fraud."). Thus, for the purposes of "discovering" their claim, the plaintiffs required additional information, and the statute of limitations had not yet begun to run. *Id*.

Here, Plaintiff filed their SCACAC on April 3, 2023, which makes April 3, 2021, the outer limit of the statute of limitations. (Doc. 129). Many of Defendant Ubben's statements, which form the basis of Plaintiff's claims, occurred before that date. (*E.g.,* Doc. 129 at 268). This alone, though, does not prove that Plaintiff should have been aware of their significance at that time. *See York Cnty.*, 65 F.4th at 468. Defendant Ubben does point out that Plaintiff was aware of the report published by Hindenburg Research titled, "Nikola: How to Parlay An Ocean of Lies Into a Partnership With the Largest Auto OEM in America" ("Hindenburg Report"), months before the derivative complaints were unsealed. (Doc. 153 at 2). Defendant Ubben also correctly points out that many of the statements attributed to him are mirrored in the FCACAC, which was also filed months before the derivative complaint was unsealed. (*Id*.). However, the Court is not satisfied that this "irrefutably demonstrates plaintiff discovered or should have discovered the fraudulent conduct." *Kramas*, 672 F.2d at 770. In drawing all inferences in a light most favorable to the nonmoving party, it is possible that Plaintiff was not aware of Defendant Ubben's alleged involvement until the derivative complaints were unsealed. *See Faulkner*, 706 F.3d at 1019 (directing district courts to draw all inferences in favor of the non-moving party). Defendant Ubben's statements could have been viewed as a hopeful positive outlook for Nikola. The Hindenburg Report could have been viewed as unsubstantiated. Defendant Ubben could have potentially been absent from the board meetings which allegedly reveal

scienter. All these things would likely raise a reasonable suspicion in a potential plaintiff, but a failure to successfully uncover the facts supporting these assumptions does not necessarily constitute a lack of due diligence. Defendant Ubben has not demonstrated that through "uncontroverted evidence" Plaintiff was on notice, and thus his statute of limitations argument fails. *Kramas*, 672 F.2d at 770.

3. *Whether each Defendant made a material misrepresentation or omission*

To meet the first element, the PSLRA requires plaintiffs to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1); *Tellabs*, 551 U.S. at 313. "Falsity is alleged when a plaintiff points to defendant's statements that directly contradict what the defendant knew at that time." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018) (citation omitted). "Indeed, 'to be misleading, a statement must be capable of objective verification.'" *Id.* (quoting *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017)). "Even if a statement is not false, it may be misleading if it omits material information." *Id.* (citing *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1054 (9th Cir. 2014)). "A plaintiff can establish a material omission by pointing to the defendant's 'silence' despite a 'duty to disclose.'" *Kang v. PayPal Holdings, Inc.*, No. 21-cv-06468, 2022 WL 3155241, at *8 (N.D. Cal. Aug. 8, 2022) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 (2011)).

Courts must consider the full context in which a statement was made when determining whether the statement is materially false or misleading. *See In re Vaxart, Inc. Sec. Litig.*, 576 F. Supp. 3d 663, 670 (N.D. Cal. 2021) (quoting *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991)) ("Statements are evaluated through a fisheye, not a telescope. Words, after all, cannot be viewed 'in complete isolation' but must instead be 'read in light of all the information then available to the market' to decide if they 'conveyed a false or misleading impression.'"); *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 933 (9th Cir. 1996) ("[W]e must emphasize that the challenged statements must be viewed in context."); *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008) ("[S]tatements

11

literally true on their face may nonetheless be misleading when considered in context.").

"Whether a statement is misleading and whether adverse facts were adequately disclosed are generally questions that should be left to the trier of fact." *Syntex Corp.*, 95 F.3d at 926 (citing *Fecht v. The Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995)). "[O]nly if the adequacy of the disclosure or the materiality of the statement is 'so obvious that reasonable minds [could] not differ' are these issues 'appropriately resolved as a matter of law.'" *Fecht*, 70 F.3d at 1081 (quoting *Durning v. First Bos. Corp.*, 815 F.2d 1265, 1268 (9th Cir. 1987)).

i.   Statements previously found to be sufficiently misleading

In its February 2, 2023, Dismissal Order (Doc. 126), the Court found twelve statements from various SEC filings, signed by different combinations of Individual Defendants, Defendant Milton, and Defendant Ubben, to be sufficiently misleading at the pleadings stage. (Doc. 126 at 36).  Plaintiff re-asserts those statements in the SCACAC, and they are:

**March 13, 2020 VectoIQ Prospectus Form S-4 ("March Prospectus")**:

"VectoIQ's management and board of directors considered the fact that Nikola has a high volume of fuel cell electric vehicle pre-orders, currently at over $10 billion." (Doc. 126 at 69, 213) (Signed by Defendants Milton, Girsky, and Shindler).

**April 6, 2020 VectoIQ Form 8-K ("April 8-K")**:

Describing Nikola's "reservation book" and indicating that "~7900 trucks" were ordered in 2016 and that a total of "~14,000 reservations" were made for FCEV vehicles by 2018. (Doc. 126 at 69-70) (Signed by Defendant Shindler).

Specifying that Badger has: "blended FCEV/BEV" system with range of "600 miles" or "300 miles on BEV alone"; ability to switch between systems "by touch of a button"; "906 HP peak/455 HP continuous"; "980 ft. lbs. of torque"; and "160 kWh flood module lithium-ion battery" and "120 kW fuel cell." (Doc. 126 at 155) (Signed by Defendant Shindler).

**May 8, 2020 VectorIQ Proxy Statement ("May Proxy")**:

Listing Nikola One as a "Zero-Emission Product Offering," estimating its range, and stating that "[p]roduction plans . . .

will be announced once we have established a robust refueling infrastructure." (Doc. 126 at 51) (Signed by Defendants Milton and Girsky).

"Unlike anything on the market, the Badger is designed to target and exceed every electric or fossil fuel pickup in its class." (Doc. 126 at 156) (Signed by Defendants Milton and Girsky).

**June 15, 2020 Form S-1 ("June S-1")**:

"Recently we announced the Nikola Badger (the "Badger"), an advanced zero-emission FCEV/BEV hybrid pickup truck. Unlike anything on the market, the Badger is designed to target and exceed every electric or fossil fuel pickup truck in its class." (Doc. 126 at 161) (Signed by Defendants Milton, Girsky, Russell, Brady, and Ubben).

"The current backlog of over 14,000 FCEVs non-binding reservations represents more than two years of production and over $10 billion of potential revenue. The FCEV reservation book was frozen in the fall of 2019 in order for Nikola to focus on negotiating with strategic fleet partners for launch." (Doc. 126 at 72) (Signed by Defendants Milton, Girsky, Russell, Brady, and Ubben).

**July 17, 2020 Form S-1 ("July S-1")**:

Listing Nikola One as a "Zero-Emission Product Offering," estimating its range, and stating that "[p]roduction plans . . . will be announced once we have established a robust refueling infrastructure." (Doc. 126 at 53) (Signed by Defendants Milton, Girsky, Russell, Brady, and Ubben).

"Recently we announced the Nikola Badger (the "Badger"), an advanced zero-emissions FCEV/BEV hybrid pickup truck. Unlike anything on the market, the Badger is designed to target and exceed every electric or fossil fuel pickup truck in its class." (Doc. 126 at 161) (Signed by Defendants Milton, Girsky, Russell, Brady, and Ubben).

"The current backlog of over 14,000 FCEVs non-binding reservations represents more than two years of production and over $10 billion of potential revenue. The FCEV reservation book was frozen in the fall of 2019 in order for Nikola to focus on negotiating with strategic fleet partners for launch." (Doc. 126 at 72) (Signed by Defendants Milton, Girsky, Russell, Brady, and Ubben).

**August 4, 2020 Form 10-Q ("August 10-Q")**:

"In 2019, we stopped soliciting FCEV reservations"; "[Nikola] considers the reservation list as an indication of potential demand rather than backlog for pending vehicle sales, as

13

customers have not made firm commitments to order and take deliveries of vehicles and may cancel such reservations at any time"; "[W]e expect the size of our committed backlog to be an important indicator of our future performance." (Doc. 126 at 74) (Signed by Defendants Russell and Brady).

"On June 29, 2020, we began accepting non-binding reservations for the Badger." (Doc. 126 at 162) (Signed by Defendants Russell and Brady).

Individual Defendants' only argument regarding the above statements is that they "maintain these statements . . . were not misleading for the reasons described in the First Motion." (Doc. 139 at 15 n. 1). Defendant Ubben does not address these statements except to argue that he was not the "maker" of them, which the Court has already resolved. (Doc. 142 at 11). Accordingly, the Court finds that these statements are again sufficiently misleading for the reasons stated in the First Dismissal Order (Doc. 126). The Court will thus assess these statements, along with the newly revealed statements from the SCACAC which Defendants argue are not misleading.

ii.   <u>Statements previously found to be not misleading</u>

In the SCACAC, Plaintiff reasserts several statements from the FCACAC that the Court previously found to not be misleading as a matter of law. (Doc. 126 at 36).

**<u>April 6, 2020 VectoIQ Form 8-K ("April 8-K")</u>:**

Listing three "demo stations" related to hydrogen infrastructure plan: (i) completed Phoenix, Arizona "Demo Station" which offers hydrogen "storage and dispensing"; (ii) "R&D 8-Ton Station" which offers hydrogen "production, storage, and dispensing" and scheduled to be "complete by Q4 2021"; (iii) "AB 8-Ton Pilot Station" which offers hydrogen "production, storage, and dispensing" and scheduled to be "complete by mid-2022." (Doc. 129 at 107).

**<u>May 8, 2020 VectorIQ Proxy Statement ("May Proxy")</u>:**

"[Nikola] designs and manufactures state-of-the-art battery-electric and hydrogen fuel cell electric vehicles, electric vehicle drivetrains, energy storage systems, and hydrogen fueling stations." (Doc. 129 at 51).

"[W]e have initiated the development of the hydrogen station infrastructure by completing our first 1,000 kg demo station in the first quarter of 2019 at our corporate headquarters in Phoenix, Arizona. The demo hydrogen station offers hydrogen

14

storage and dispensing and serves as a model for future hydrogen stations." (*Id.*).

Contains graphic showing hydrogen process and then states: "Our initial plan for the station rollout begins with an eight-ton pilot station accessible to the [Anheuser-Busch] brewery in Van Nuys, California. From there, we then plan to build up to 10-12 additional stations in California. These stations will supply fuel for our launch customers in those geographies that have dedicated routes in California. California is offering incentives to build out our hydrogen fueling infrastructure and deploy zero-emissions vehicles, including opportunities for funding along major freeway corridors. We expect to rollout these stations in 2022–23." (Doc. 129 at 110, 112).

**June 15, 2020 Form S-1 ("June S-1")**:

"*Our core product offering* is centered around our battery-electric vehicle ("BEV") and hydrogen fuel cell electric vehicle ("FCEV") Class 8 semitrucks. *The key differentiator of our business model* is our planned network of hydrogen fueling stations. We are offering a revolutionary bundled lease model, which provides customers with the FCEV truck, hydrogen fuel, and maintenance for a fixed price per mile, locks in fuel demand and significantly de-risks infrastructure development." (Doc. 129 at 118, 272).

**July 17, 2020 Form S-1 ("July S-1")**:

"We have initiated the development of the hydrogen station infrastructure by completing our first 1,000 kg demo station in the first quarter of 2019 at our corporate headquarters in Phoenix, Arizona. The demo hydrogen station offers hydrogen storage and dispensing and serves as a model for future hydrogen stations." (Doc. 129 at 124).

**September 14, 2020 Form 8-K ("September 8-K")**:

"The Nikola One is a real truck that sits in Nikola's showroom. A pusher means a vehicle that was not designed to be moved on its own propulsion system. The Nikola One was, in fact, designed to be powered and driven by its own propulsion."; Describes the functionalities of Nikola One (Doc. 129 at 55).

"Nikola described this third-party video on the Company's social media as 'In Motion.' It was never described as 'under its own propulsion' or 'powertrain driven.' Nikola investors who invested during this period, in which the Company was privately held, knew the technical capability of the Nikola One at the time of their investment." (Doc. 129 at 59).

15

Defendants argue that the above statements should again be considered not misleading as a matter of law. (Doc. 139 at 14–15). Plaintiff does not challenge this assertion in their Response. (Doc. 149). The Court finds that despite adding 128 pages from the FCACAC to the SCACAC, none of the additional facts alleged change the context of the above statements. While the new facts which Plaintiff alleges may change the analysis as to the other elements of Rule 10b-5, such as scienter, they do not cast the above statements in a different light from the perspective of a reasonable investor. Indeed, a reasonable investor would only be able to evaluate the deceptiveness of the above statements based on their content, which has not changed from the FCACAC to the SCACAC. Thus, in accordance with the reasoning of the First Dismissal Order (Doc. 126), the Court again finds these statements are not misleading as a matter of law.

### iii.  Defendant Worthen

In the SCACAC, Plaintiff only alleges that Defendant Worthen made two actionable statements: (1) his answer to a question posed by an analyst during an August 4, 2020, earnings call (Doc. 129 at 42) and (2) a September 14, 2020, press release and accompanying Form 8-K which he signed (Doc. 129 at 62). Defendants argue that neither of these statements are misleading as a matter of law. (Doc. 139 at 13–14).

First, regarding the alleged statement in the August 4, 2020, earnings call, there is some dispute as to whether Defendant Worthen even made the statement. (*Compare* Doc. 129 at 260 "WORTHEN: Jeff, as you're aware we have a number of initiatives . . ." and Doc. 140-3 at 7 "Kim Brady: Jeff, as you're aware we have a number of initiatives . . .") While determining who actually made the statement may seem like a dispute of fact best left for trial, the Court finds the point moot as neither version of the statement is misleading as a matter of law. No reasonable investor could claim to be deceived by a company executive stating that it will continue to release information in the future. Statements such as these occur every day in the marketplace for securities as almost all companies regularly announce new initiatives. Further, Nikola was already under an obligation by law to communicate these things in their future SEC filings, and so this non-committal statement

essentially just reiterated the company's intent to obey the disclosure rules.

Next, the Court's analysis of the September 14, 2020, Form 8-K has not changed from its dismissal of the FCACAC. (Doc. 126 at 33–36). Plaintiff has alleged no additional facts which cast that filing in a different light or characterize the contents of this form in a different manner. For the same reasons found in the FCACAC, the contents of that form are not misleading as a matter of law. (*Id.*). Given that neither alleged statement by Defendant Worthen is actionable, Plaintiff has failed to state a claim for "maker liability" against him, and he is dismissed.

iv.   Defendant Russell

Defendants have moved to dismiss the following statements of Defendant Russell: (1) the contents of the March 3, 2020, Form 8-K which included a transcript of a conference call, (2) a statement from an April 6, 2020, analyst day video, (3) statements made during an August 4, 2020, earnings call, and (4) a statement made during the September 22, 2020, Evercore ISI Virtual Forum. (Doc. 139 at 15–17). Plaintiff argues that the March 3, 2020, Form 8-K, the August 4, 2020, earnings call, and the September 22, 2020, Evercore ISI Virtual Forum were communicated in the present tense, making them ineligible for the safe harbor provision under 15 U.S.C. § 78u-5(c)(1)(A)(i). (Doc. 149 at 8–9).

Under the PSLRA's safe harbor provision, liability does not extend to any "forward looking statement" that is "identified" as such "and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i). "A 'forward-looking statement' is any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions 'underlying or related to' any of these issues." *No. 84 Emp.–Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 936 (9th Cir. 2003) (citing § 78u-5(i)). "However, a person may be held liable if the 'forward-looking statement' is made with 'actual knowledge . . . that the statement was false or misleading.'" *Id.* (citing § 78u-5(c)(1)(B)).

17

For some of Defendant Russell's statements, Plaintiff's argument fails. Specifically, the contents of the March 3, 2020, Form 8-K, the statements made during the August 4, 2020, earnings call, and the statement made during the Evercore ISI Virtual Forum. Whether a speaker uses the present tense is only one consideration among many when deciding whether a statement qualifies for safe harbor under § 78u-5(c) (1)(A)(i). What is more indicative here is that these statements mirror the same issue which warranted dismissal from the FCACAC. (Doc. 126 at 21). Namely that, when viewed of the context of the whole, Defendant Russell was speaking in each case about bringing a product from development to reality. (*Id.*). In each case, the conversation was about a future product or capability that Nikola did not yet offer. Thus, a reasonable investor would not have found the present tense in itself to be misleading. While Plaintiff has alleged facts that suggest Defendants may have known these products and services were unlikely to be offered at touted price, that speaks more to the scienter analysis than whether this statement was misleading on its face. (*See* Doc. 129 at 84–90, 149 at 8–9). The context of these statements indicate that questions of cost still needed to be resolved before the product went to market. A reasonable investor would thus have interpreted these statements as forward looking.

The same cannot be said about Defendant Russell's statements during the April 6, 2020, analyst day video. While the purpose of the video may have been to discuss plans for future hydrogen stations, this is not enough to adequately disclaim the statement that Nikola "made" the hydrogen at the featured station. (Doc. 129 at 109). Disclaimers and context clues about future hydrogen stations do not impact a reasonable investor's impression of where the hydrogen featured in the video may have come from. Further, this false impression was bolstered by the fact that the fueling station was represented as a model for future stations. (Doc. 129 at 93, 109). These statements by Defendant Russell differ from the previous ones because these indicated to the listener that the hydrogen fueling capability was in hand. This implied that the service simply needed to be expanded to scale. While this expansion might be considered forward looking, the claims of possessing the underlying technology are not. Thus, Defendants have not met their burden

in showing these statements are not misleading as a matter of law, and the Court declines to Dismiss Defendant Russell under this theory.

v.   <u>Defendant Brady</u>

Defendants have moved to dismiss the following statements of Defendant Brady: (1) statements made during an August 4, 2020, earnings call and (2) a statement made during the September 22, 2020, Evercore ISI Virtual Forum. (Doc. 139 at 16–17). Plaintiff applies the same argument regarding the use of present tense and the safe harbor provision to Defendant Brady as well. (Doc. 149 at 8–9).

For the same reasons as Defendant Russell above, Plaintiff has failed to state a claim regarding these statements. Specifically, the Court finds that the topic of these two conversations was sufficiently clear to not mislead a reasonable investor. As another member of the conversation with Defendant Russell, Defendant Brady was similarly speaking about bringing future products from development to reality. This was clear from the context of the statements. This does not preclude, however, Defendant's actionable statements from the SEC filings which he signed and the Court previously found to be misleading.

vi.   <u>Defendants Girsky and Shindler</u>

In their motion, Defendants do not argue that any additional statements by Defendants Girsky and Shindler were not misleading as a matter of law. (Doc. 139 at 14–17). Thus, the Court will continue to evaluate "maker liability" against Defendants Girsky and Shindler based on the SEC filings which they signed.

vii.   <u>Defendant Ubben</u>

Defendant Ubben has moved to dismiss the following statements as not misleading: (1) the June 2020 Form S-1, (2) the July 2020 Form S-1, and (3) his comments during an interview with CNBC on March 4, 2020. (Doc. 142 at 11–13). Plaintiff argues that Defendant Ubben's statements were misleading because they touted capabilities which Nikola could not realistically ever offer. (Doc. 148 at 8–9). As previously stated in subsection (III)(A)(3)(i), the Court finds the statements from both the June and July 2020

19

S-1 Forms to be potentially misleading. Thus, only Defendant Ubben's comments during the March 4, 2020, CNBC interview are in question for the purposes of this section.

Defendant's first moves to dismiss the statement, "one thing . . . that Trevor [Milton] and I talked about was to get public early rather than to go public late when you have all this VC money that's marked the stock up and to let the smaller – the small guy, the retail investor participate in the growth of this company and the industry. . . ." (Doc. 142 at 6, 143-1 at 5). Plaintiff's only counter to this statement is that Nikola knew it needed a new source of capital to fund its illicit scheme, and thus Defendant Ubben was not advocating for retail investors to join for their own good. (Doc. 153 at 8). Again, this goes to scienter and not to whether the statement was misleading. Further, Plaintiff provides no evidence showing that Defendant Ubben did not want retail investors to also share in the growth of the company. This is the natural purpose of all publicly owned companies, which all reasonable investors are aware of. Reasonable investors are also aware that all investments carry some level of risk, and without additional statements by Defendant Ubben mischaracterizing this risk, the Court cannot conclude that the above statement is plausibly misleading.

Next, Defendant Ubben argues that his description of Defendant Milton, his personal values, and Nikola in general during the interview were merely puffery. The Court agrees with Defendant Ubben on this point as well. Defendant Ubben stated that he valued "partnering with mission-driven, brilliant CEOs" and that Nikola would be "the next hundred billion dollar company." The Court finds that a reasonable investor would not feel mislead if Nikola's CEO did not ultimately prove to be completely brilliant, or if its stock price did not eventually reach a one hundred-billion-dollar valuation. Instead, these statements are merely "generalized, vague and unspecific assertions" which is exactly how the court in *Glen Holly Ent., Inc. v. Tektronix, Inc.* defined "puffery." 352 F.3d 367, 379 (9th Cir. 2003).

Plaintiff's largest contention with the CNBC interview is Defendant Ubben's claim that Milton had "solved the chicken and the egg [problem]" of both storing and dispensing

hydrogen which was "de-risked" because Nikola was developing both storage stations and hydrogen powered trucks. (Doc. 153 at 8). Plaintiff's argument is that Nikola knew at the time of this statement that simultaneously building hydrogen stations and hydrogen powered trucks was a risky strategy that private investors had become reluctant to finance. (*Id.*). This argument misses the point in analyzing what is misleading. Regardless of whether Nikola was aware of the challenges of this business model, Plaintiff has not shown that this was not actually Nikola's strategy for the future. This would make the statement a full disclosure rather than a misleading statement. In fact, Nikola took a number of actions after the CNBC interview to further this plan to both store hydrogen and sell trucks that consumed it. (*E.g.,* Doc. 129 at 101–102) (Describing both hydrogen stations and hydrogen powered trucks in the April 6, 2020, Form 8-K). The fact that Nikola was still working to bring their trucks and hydrogen infrastructure from conception to reality does not necessarily make it false or misleading that this plan would offer complimentary products or services.

Finally, Defendant Ubben points out that his statement advertising an "eight minute refuel for a 500-mile haul on a hydrogen system" during the interview was made in the context of describing Milton's prediction about the state of the market 10 years in the future. (Docs. 142 at 12, 143-1 at 6,7). This contextual background is sufficient such that no reasonable minds could disagree as to whether Defendant Ubben was touting an existing capability. He clearly was not. Therefore, this statement is also not misleading.

In sum, none of Defendant Ubben's statements from the March 4, 2020, CNBC interview are sufficiently misleading to state a claim. Again though, the Court will continue to evaluate "maker liability" against Defendant Ubben based on the SEC filings which he signed and were previously found misleading.

viii.   Defendant Milton

In his three-page Second Motion to Dismiss, Defendant Milton re-asserts his prior arguments from his First Motion to Dismiss for the record. (Doc. 141 at 2). As this does not change the analysis of the statements previously found to be misleading, the Court finds

that Plaintiff has again sufficiently alleged numerous actionable misstatements made by Defendant Milton. Having previously rejected all of Defendant Milton's arguments in his First Motion to Dismiss on this issue, the Court need not analyze the falsity of every misstatement he is alleged to have made or otherwise address all the issues raised by the appendices attached to his Motion. *See Feyko v. Yuhe Int'l., Inc.*, No. CV 11-05511 DDP (PJWX), 2013 WL 816409, at *4 n.2 (C.D. Cal. Mar. 5, 2013) ("The Court is under no obligation to evaluate every misrepresentation that was made in the [Complaint], because Plaintiff can survive a motion to dismiss by alleging a single material misrepresentation."); *Cunha v. Hansen Nat. Corp.*, No. EDCV 08-1249-GW(JCx), 2011 WL 8993148, at (C.D. Cal. May 12, 2011) ("Indeed, while a thorough assessment in that regard might result in some winnowing of the scope of discovery going forward, it would significantly delay a final resolution of the instant motion because of the scope of the analysis it would require, and the end-result might not be a significant 'partial dismissal' at all, let alone one that would involve issues that obviously could not be cured by further amendment.").

        ix.  Summary of alleged material misrepresentation or omission of Individual Defendants

To conclude Section (3), the Court has considered the arguments of both parties with respect to the first element of Rule 10b-5(b) under a theory of "maker liability." The Court finds that Plaintiff has sufficiently alleged that Nikola through Defendants Russell, Brady, Girsky, Schindler, Milton, and Ubben all made material misstatements in their SEC filings. The Court also finds Defendant Russell's statement about having "made" the hydrogen in the April 6, 2020, Analysist Day video to be misleading. Conversely, Defendant Worthen's SEC filing and possible statement from August 4, 2020, are not misleading as a matter of law and he is dismissed.

    4. *Whether the Individual Defendants acted with scienter*

All Defendants argue that Plaintiff has failed to state individualized facts showing that they acted with scienter. (Docs. 139 at 8–13, 141 at 2, and 142 at 9–10). Plaintiff argues that the SCACAC "now alleges facts supporting the strong inference that all Defendants

knew, or recklessly disregarded . . ." that their various misleading statements were false. (Doc. 149 at 2).

The second element of a claim under Rule 10b-5 is scienter. *Stoneridge Inv. Partners, LLC*, 552 U.S. at 157. Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). When determining whether a plaintiff has adequately alleged scienter in a claim under Rule 10b-5, "[t]he inquiry ... is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322–23. "An inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314. While PLSRA requires particularized allegations, "the [scienter] standard is not insurmountable" and plaintiffs "need not prove [their] case at the outset." *ESG Capital Partners, LP v. Stratos*, 828 F.3d 1023, 1035 (9th Cir. 2016); *see also Tellabs*, 551 U.S. at 324 (explaining that the inference that a defendant acted with scienter "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences"). Instead, they must "provide a narrative of fraud—facts which, if true, substantiate an explanation at least as plausible as a nonfraudulent alternative." *ESG Capital Partners*, 828 F.3d at 1035.

To adequately demonstrate that the defendant acted with the required state of mind, a complaint must allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness. *Zucco*, 552 F.3d at 991. In *Zucco*, the Ninth Circuit instructed that "following *Tellabs*, we will conduct a dual inquiry: first, we will determine whether any of the plaintiff's allegations, standing alone, are sufficient to create a strong inference of scienter; second, if no individual allegations are sufficient, we will conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *Id.* at 992. A misrepresentation or omission is deliberately reckless if it is highly unreasonable and involves not merely simple negligence but "an extreme departure

from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990) (internal quotation omitted). Plaintiffs alleging deliberate recklessness need not prove that a defendant "actually knew" their statements were false or misleading, just that they "recklessly turn[ed] a blind eye" to the falsity. *In re VeriFone Holdings, Inc. Secs. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012).

i.   Defendants Russell and Brady

The thrust of Plaintiff's argument on the element of scienter against Defendants Russell and Brady is that they were aware of the falsity of their respective statements, and yet they intentionally chose to make the statements despite this. (Doc. 149 at 8). Plaintiff makes this argument by referencing communications between Defendants Russell, Brady, and Milton which show that Nikola's public statements did not align with its internal evaluations of the company. (*E.g.,* Doc. 149 at 9) (arguing that since "Brady knew Nikola had abandoned the Nikola One" from a board meeting, it was misleading to continue to tout backlog orders for it). Defendants Russell and Brady base their Motion to Dismiss on the argument that these communications do not demonstrate their actual knowledge at the time when they made the respective statements. (Doc. 139 at 9).

The flaw with Defendants Russell and Brady's argument is that at the pleadings stage, Plaintiff does not need to present evidence of "a smoking gun." *Tellabs*, 551 U.S. at 324. While Plaintiff does need to establish a "strong inference" of scienter, this can be shown by demonstrating evidence of deliberate recklessness. *Zucco*, 552 F.3d at 992. Plaintiff largely does so here in the SCACAC with respect to Defendants Russell and Brady by including multiple facts not alleged in the FCACAC. For example, Plaintiff alleges that Defendants Russell and Brady attended a board meeting on April 9, 2020, which confirmed that there was no plan to continue pursing production of the Nikola One, despite it comprising 78% of the reservations they touted to investors. (Docs. 129 at 72, 215). Plaintiff also alleges that Defendants Russell and Brady also knew that the projected profits

24

of Nikola's vehicles was far different than the projections reported to the SEC. (*Id*. at 104). Plaintiff further alleges that Defendants Brady and Russell knew as early as 2016 that the Nikola One in the demonstration video was not capable of operating under its own power. (*Id*. at 52). In regard to the Nikola Badger, Plaintiff points out Defendant Russell's testimony that he knew the April 6, 2020, press release on the project was misleading. (*Id*. at 149). This occurred despite multiple conversations between Defendants Russell and Brady about the viability of the product. (*Id*. at 252). According to Plaintiff, Defendant Russell voted for approval of the press release, despite sharing concerns about it with Defendant Brady, because he said, "after following the discussion at the board level, it was clear that it was going to go through." (*Id*. at 149). All these allegations point to the conclusion that Defendants Russell and Brady did not "appreciate the gravity of the risk of misleading others." *S.E.C. v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1093–1094 (9th Cir. 2010). Thus, in conducting a "holistic review" of all of Plaintiff's allegations, the Court finds that Defendant Russell's and Brady's statements on behalf of Nikola likely were deliberately reckless. *Zucco*, 552 F.3d at 992. This is all that Plaintiff needs to demonstrate scienter at the pleading stage. *Id*.

### ii.   Defendants Girsky and Shindler

Plaintiff argues that Defendants Girsky and Shindler also acted with scienter because they became aware of the truth behind the Nikola's operations. (Doc. 149 at 5–6). Plaintiff alleges they became aware of Nikola's problems when they conducted their due diligence prior to merging VectorQ with Nikola. (*Id*.). Plaintiff made this same argument in the FCACAC, but the Court found it insufficient without offering "specific, individualized details as to how the due diligence was conducted or to the level of involvement Girsky and Shindler had in the process." (Doc. 126 at 56).  Despite this, Plaintiff has not added any factual detail regarding what due diligence was conducted in the SCACAC, except to say that Defendant Girsky was satisfied with the review. (Doc. 129 at 269). As a result, the Court again cannot find the bare assertion that Defendants Girsky and Shindler 'should have known' is sufficient on its own to create a strong

inference of scienter. Accordingly, Plaintiff has not sufficiently pled that Defendants Girsky and Shindler intended to deceive or defraud the public, or were deliberately reckless, when they signed their respective SEC filings. Thus, Plaintiff has failed to state a claim of "maker liability" against Defendants Girsky and Shindler.

### iii.    Defendant Ubben

Defendant Ubben's argument against the element of scienter largely resembles that of Defendants Russell and Brady, in that Plaintiff lacks specific allegations demonstrating his intent. (Doc. 142 at 15). For similar reasons as Defendants Russell and Brady, this is not entirely true. While Plaintiff's evidence against Defendant Ubben sparser than compared to Defendants Russell and Brady, there is one series of alleged events which raises a strong inference of scienter. First, Plaintiff alleges that Defendant Ubben was made aware of the lack of production plans for the Nikola One on April 9, 2020. (Docs. 129 at 220, 148 at 10). Then, in June and July of 2020, Defendant Ubben signed two SEC Forms which touted the "current backlog of over 14,000 FCEVs non-binding reservations [which] represents more than two years of production and over $10 billion of potential revenue." (Doc. 126 at 72). Finally, on August 11, 2020, Defendant Ubben sold 1.4 million of his personal shares of Nikola. (Doc. 148 at 10). Defendant Ubben argues that this sale was not in violation of the established lock up agreement, but the Court finds this to be beside the point. (Doc. 142 at 15–16). The timing of those three events raises a strong inference of scienter sufficient for the pleadings stage. Moreover, in construing the facts in a light most favorable to the non-moving party, that is Plaintiff, the Court is required at this stage to consider the sale in violation of the lock-up agreement. *See Faulkner*, 706 F.3d at 1019. From that perspective, it only becomes more suspicious that Defendant Ubben completed the sale at all. As a result, Plaintiff has sufficiently pled scienter with respect to Defendant Ubben.

### iv.    Defendant Milton

As with the previous elements, Defendant Milton re-asserts his arguments from the First Motion to Dismiss for the record. (Doc. 141 at 2). Again, as this does not change the

26

Court's previous analysis (Doc. 126 at 60–64), Plaintiff has sufficiently alleged scienter with respect to Defendant Milton here.

> 5. *Whether Plaintiff has sufficiently demonstrated loss causation against Defendants Russell, Brady, Ubben, and Milton*

Defendants Russell and Brady argue that Plaintiff has failed to allege facts showing that new information was revealed to the market through a corrective disclosure, and that Plaintiff's loss was then caused by the purported revelation of these truths. (Doc. 139 at 18–19). Defendant Ubben only addresses loss causation in respect to his statute of limitations argument. (Doc. 142 at 10). Defendant Milton re-asserts his arguments from his First Motion to Dismiss, in that Plaintiff's allegations are "entirely conclusory." (Doc. 141 at 3). Plaintiff counters all of these points by arguing that the Hindenburg Report and subsequent government actions against Defendant Milton sufficiently revealed the truth behind the company and caused a decline in stock price. (Doc. 149 at 19, 21).

 "To prove loss causation, [a plaintiff] must demonstrate a causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the [plaintiff]." *Or. Pub. Emps.*, 774 F.3d at 608 (quotations omitted) (quoting *Ambassador Hotel Co., Ltd. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1027 (9th Cir. 1999)). In analyzing this element, "the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016). "To establish loss causation in a fraud-on-the-market case, the plaintiff must show that after purchasing her shares and before selling, the following occurred: (1) the truth became known, and (2) the revelation caused the fraud-induced inflation in the stock's price to be reduced or eliminated." *In re Bofl Holding, Inc. Sec. Litig.*, 977 F.3d 781, 789 (9th Cir. 2020) (citations omitted). "At the pleading stage, the plaintiff's task is to allege with particularity facts 'plausibly suggesting' that both showings can be made." *Id.* at 791 (citations omitted). Although particularity is required, "the effort should not prove burdensome, for even under Rule 9(b) the plaintiff's allegations will suffice so long as they give the defendant notice of [the]

plaintiff's loss causation theory and provide the court some assurance that the theory has a basis in fact." *Id.* at 794 (citations omitted).

"The most common way for plaintiffs to prove that 'the truth became known' is to identify one or more corrective disclosures." *Id.* at 790 (citations omitted). "A corrective disclosure occurs when 'information correcting the misstatement or omission that is the basis for the action is disseminated to the market.'" *Id.* (quoting 15 U.S.C. § 78u-4(e)(1)). "[A] corrective disclosure need not consist of an admission of fraud by the defendant or a formal finding of fraud by a government agency." *Id.* (citation omitted). Instead, it can come from "any source, including knowledgeable third parties such as whistleblowers, analysts, or investigative reporters." *Id.* (citations omitted). A corrective disclosure also does not need to "reveal the full scope of defendant's fraud in one fell swoop; the true facts concealed by the defendant's misstatements may be revealed over time through a series of partial disclosures." *Id.* (citations omitted). That said, the critical feature of a corrective disclosure is that it reveals new information to the market that was not previously publicly available. *Id.* at 794 ("A corrective disclosure . . . must by definition reveal new information to the market that has not yet been incorporated into the price.").

In this Court's First Dismissal Order, Plaintiff failed to specify "which misstatements or omissions were implicated in each alleged corrective disclosure." (Doc. 126 at 68). Plaintiff has rectified that issue in the SCACAC. For example, the SCACAC now alleges that the Hindenburg Report exposed the non-functional status of the Nikola One, and that shortly thereafter, Nikola Stock prices began to plumet. (Doc. 129 at 57–58). The Court already found descriptions of the Nikola One by Defendants Russell, Brady, and Ubben to be misleading in the June 15, 2020, SEC Form S-1. (*See* subsection (III)(A)(3)(i)). Likewise, the Court found Defendant Milton's statements about the truck to be misleading. (*See* subsection (III)(A)(3)(viii)). Building upon this, Plaintiff next alleges that Nikola's stock price dropped 11.33% the day the Hindenburg Report was released, along with another 14.5% the following day. (Doc. 129 at 58). Finally, Plaintiff alleges that outside analysts issued reports attributing the stock price decline to the information

1  revealed in the Hindenburg Report. (*Id.*). Thus, by plausibly demonstrating that this new

2  information from the Hindenburg Report directly implicated previous misstatements about

3  the Nikola One, along with a loss in stock value, Plaintiff successfully alleged loss

4  causation. (*Id.* at 12).

5         Defendant Russell and Brady's argument that the Hindenburg Report was based on

6  publicly available information, and thus not an adequate corrective disclosure, was

7  previously refuted by this court in the First Dismissal Order. (Doc. 126 at 66–67 ("In *Bofl*,

8  the Ninth Circuit recognized that corrective disclosures can be based on publicly available

9  information, but only if the plaintiff 'plead[s] with particularity facts plausibly explaining

10 why the information was not yet reflected in the company's stock price.' *Bofl*, 977 F.3d at

11 794")). Here, Plaintiff has explained why the Hindenburg Report included new

12 information. Specifically, Plaintiff claims the Hindenburg Report included newly revealed

13 photographs showing the Nikola One to be a non-functional shell, which directly countered

14 Defendant Milton's previous denials about the truck prior to the release of this visual

15 evidence. (Doc. 149 at 25). By claiming that these newly revealed photographs changed

16 the market's perception of the Nikola One, Plaintiff has successfully alleged that the

17 Hindenburg Report revealed new information. Similarly, all Defendants' statements about

18 Nikola's reservation backlog and Badger Project were also exposed as potentially false by

19 the Hindenburg Report. (Doc. 129 at 75–76, 164). Together, Plaintiff's individualized

20 connection between each Defendant's misstatement on these topics, the subsequent

21 revelations about them in the report, and the resulting stock price change are sufficient to

22 consider the Hindenburg Report a corrective disclosure at the pleadings stage. *See Bofl*,

23 977 F.3d at 794 (describing the particularity requirement as "plausibly alleg[ing] a causal

24 connection between the defendant's misstatements and the plaintiff's economic loss. . .

25 [providing] enough factual content to give the defendant 'some indication of the loss and

26 the causal connection that the plaintiff has in mind.'" (quoting *Dura Pharms.*, 544 U.S. at

27 347)). Thus, Plaintiff has sufficiently pled loss causation.

28 ///

29

1

### 6. *Conclusion*

In summary, Plaintiff has sufficiently alleged a claim of "maker liability" against Defendants Russel, Brady, Ubben, Milton, and Nikola. All other Defendants are dismissed under this theory.

**B. 10b-5(a) and (c) Scheme Liability**

In addition to Plaintiff's "maker liability" theory, Plaintiff also alleges that Individual Defendants, Defendant Milton, and Defendant Ubben engaged in a scheme to artificially inflate Nikola's stock price. (Doc. 149 at 22). Plaintiff alleges that all Defendants stood to benefit from Nikola's increased stock value that resulted from Defendant Milton's repeated misstatements and that they aided his efforts by empowering, encouraging, and rewarding him for making such statements. (*Id.* at 23). Individual Defendants and Defendant Ubben counter that the SCACAC lacks individualized allegations against them demonstrating this. (Docs. 139 at 4, 142 at 13).

Whereas Rule 10b-5(b) imposes liability against only those who "*make* any untrue statement of a material fact," subsections (a) and (c) make it unlawful "to employ any device, scheme, or artifice to defraud" or "to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5(a)–(c); *see also In re Robinhood Ord. Flow Litig.*, No. 4:20-cv-9328-YGR, 2022 WL 9765563, at *5 (N.D. Cal. Oct. 13, 2022) (citation omitted) ("Misrepresentations and omissions tend to fall under Rule 10b-5(b) and manipulative [or deceptive] conduct and acts tend to fall under Rule 10b-5(a) or (c)."). Under subsection (a), a "device" is defined as "that which is devised, or formed by design"; a "scheme" is a "project, plan, or program of something to be done"; and an "artifice" is "an artful stratagem or trick." *Lorenzo*, 139 S. Ct. at 1101 (quotations and alterations omitted) (citation omitted). Under subsection (c), the terms "act" and "practice" are "similarly expansive"; an act is defined as "a doing" or a "thing done" and a practice is defined as an "action" or "deed." *Id.* (citation omitted). Together, subsections (a) and (c) "capture a wide range of conduct." *Id.*

30

1
2

      1.  *Whether Defendants engaged in conduct with the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme*

3

      Plaintiff argues that Individual Defendants and Defendant Ubben, through their

4

actions, enabled Defendant Milton to make false and deceptive statements about Nikola.

5

(Doc. 149 at 23–24). Plaintiff argues that these Defendants enabled him by empowering,

6

encouraging, covering up for, and rewarding Defendant Milton and by making false

7

statements of their own. (*Id.*). Individual Defendants and Defendant Ubben argue that

8

despite these actions, Plaintiff has not alleged sufficient facts to show that they were done

9

with the purpose and effect of defrauding investors. (Docs. 139 at 4, 142 at 7).

10

      The first element of a scheme liability claim requires a plaintiff to sufficiently allege

11

that the defendant "use[d] or employ[ed] any manipulative or deceptive device or

12

contrivance."[3] *Simpson v. AOL Time Warner, Inc.*, 452 F.3d 1040, 1047 (9th Cir. 2006)

13

(citing *Dura Pharms.*, 544 U.S. at 341–42), *vacated on other grounds*, 519 F.3d 1041 (9th

14

Cir. 2008). In other words, Plaintiff must allege facts sufficient to show that Defendants

15

"committed a deceptive or manipulative act in furtherance of the alleged scheme." *In re*

16

*Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1192 (D. Or. 2015) (citations

17

omitted). If more than one defendant is alleged to have participated, the plaintiff must

18

allege that *each defendant* committed their own deceptive act in furtherance of the scheme.

19

*See Cooper v. Pickett*, 137 F.3d 616, 624 (9th Cir. 1997) (emphasis added) ("*Central Bank*

20

does not preclude liability based on allegations that a group of defendants acted together

21

to violate the securities laws, *as long as* each defendant committed a manipulative or

22

deceptive act in furtherance of the scheme."); *see also Simpson*, 452 F.3d at 1050 ("[W]hen

23

determining whether a defendant is a 'primary violator,' the conduct *of each defendant* . . .

24

must be viewed *alone* for whether it had the purpose and effect of creating a false

25

_____

26
27
28

      [3] The remaining five elements of a claim under subsections (a) and (c) are identical to the elements required for a claim under subsection (b): scienter, a connection with the purchase or sale of a security, reliance, economic loss, and loss causation. *See Simpson*, 452 F.3d at 1047 (citing *Dura Pharms.*, 544 U.S. at 341–42).

appearance of fact in furtherance of an overall scheme to defraud.").

In *Simpson*, the Ninth Circuit considered the type of conduct that constitutes a deceptive act in furtherance of a scheme to defraud, and thus sufficient to render the defendant a "primary violator" of § 10(b):

> "We agree . . . that engaging in a transaction, the principal purpose and effect of which is to create the false appearance of fact, constitutes a "deceptive act." Participation in a fraudulent transaction by itself, however, is insufficient to qualify the defendant as a "primary violator" if the deceptive nature of the transaction or scheme was not an intended result, at least in part, of the defendant's own conduct.

> We hold that to be liable as a primary violator of § 10(b) for participation in a "scheme to defraud," the defendant must have engaged in conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme. It is not enough that a *transaction* in which a defendant was involved had a deceptive purpose and effect; the defendant's *own conduct* contributing to the transaction or overall scheme must have had a deceptive purpose and effect."

*Simpson*, 452 F.3d at 1048 (emphasis in original). In distinguishing the "purpose and effect" test from the element of scienter, the Ninth Circuit explained that the former is focused on examining "whether the challenged conduct of the defendant had a principal purpose, and not just an accidental effect, of creating a false appearance as part of a deceptive transaction or fraudulent scheme." *Id.* at 1048 n.5. In contrast, the scienter element "ensures a culpable state of mind," that is, that the defendant acted consciously or with deliberate recklessness. *Id.* "Unlike the scienter requirement, the 'purpose and effect' test is focused on differentiating conduct that may form the basis of a primary violation under § 10(b) from mere aiding and abetting activity that the Supreme Court has held does not constitute a primary violation." *Id.* "A defendant may intend to deceive the public by substantially assisting another's misconduct as part of a scheme to defraud, but fail to perform personally any action that created a false appearance as part of this scheme." *Id.* "The scienter requirement, therefore, will not in all cases distinguish aiding and abetting from primary liability." *Id.*

In analyzing the pleading sufficiency of a plaintiff's scheme liability claim, courts

recognize that "the exact mechanism of the scheme is likely to be unknown to the plaintiff[]," at least at the motion-to-dismiss stage. *Galena*, 117 F. Supp. 3d at 1193 (quotations omitted) (quoting *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 580 (S.D. Tex. 2002)) (other citations omitted). Thus, a plaintiff need not plead facts that reveal the scheme's particular mechanisms; rather, "allegations of the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants are sufficient for alleging participation." *Id.* (quoting *Enron*, 235 F. Supp. 2d at 580). That said, the plaintiff must make such allegations with particularity in accordance with Rule 9(b). *See id.* (citations omitted) ("Although not subject to the PSLRA pleading requirements, the conduct underlying claims for scheme liability must be alleged with particularity under Rule 9(b)."); *see also In re Parmalat Sec. Litig.*, 414 F. Supp. 2d 428, 432 (S.D.N.Y. 2006) ("[To satisfy Rule 9(b) particularity, a plaintiff must specify] what [deceptive] acts were performed, which defendants performed them, when the [deceptive] acts were performed and what effect the scheme had on the securities at issue.").

### i.     Defendants Girsky, Shindler, Worthen, and Ubben

As echoed in the First Dismissal Order, Plaintiff has satisfied their burden in showing that many of the actions by Defendants plausibly had the *effect* of inflating the value of Nikola securities. (Doc. 126 at 42). If, for example, these Defendants hid negative information about Nikola from the market, that would presumably cause investors to over-value Nikola securities. However, Plaintiff has alleged no facts indicating that the *purpose* of Defendants Girsky, Shindler, Worthen, and Ubben's actions was to create a false appearance of fact in furtherance of the scheme. For example, Plaintiff alleges that Defendant Girsky sent Defendant Milton a message saying "great job getting retail investors" yet cannot provide any factual support for the idea that Defendant Girsky was sending this message for the principal purpose of defrauding these retail investors. (Doc. 129 at 241). Defendant Girsky may have sent this message because he wanted Nikola to continue to gain retail investors for the purposes of funding its growth. Without additional facts to suggest otherwise, the Court cannot assume that this was done for a malicious

purpose. The same can be said about the other above-named Defendants in their respective SEC filings, earnings calls, investor presentations, and demonstration videos. All these actions had a legitimate business purpose, and in none of them can Plaintiff point to facts supporting the inference that they were conducted for illegitimate means. *Simpson*, 452 F.3d at 1048 ("Conduct that is consistent with the defendants' normal course of business would not typically be considered to have the purpose and effect of creating a misrepresentation."). As a result, Plaintiff has failed to state a claim under "scheme liability" in regard to Defendants Girsky, Shindler, Worthen, and Ubben.

ii.    Defendants Russell and Brady

Unlike the above-named Defendants, Plaintiff has sufficiently plead the first element of "scheme liability" with respect to Russell and Brady. The Court finds two events in which Plaintiff has provided additional facts which support the inference that the principal purpose and effect of each respective Defendant's actions was to create a false appearance of fact.

First, Plaintiff alleges that the Nikola Head of Business Development, Elizabeth Fretheim, sent text messages to Defendants Russell and Brady regarding the accuracy of Defendant Milton's statements. (Doc. 129 at 266–267). These statements came from a podcast featuring Defendant Milton which was later posted to Nikola's social media pages. (*Id*.). Fretheim also allegedly followed up with Defendant Russell by sending him a link to the podcast and a chart with her concerns in the left column and corresponding timestamps of Defendant Milton's statements in the right. (*Id*. at 267). Plaintiff alleges that Fretheim raised this issue with Defendant Russell four separate times. (*Id*.). According to Plaintiff, Defendant Russell thanked her and informed her that C-Suite executives would follow up on the issue, but then never did. (*Id*. at 268). While Defendant Russell is under no duty to correct Defendant Milton's alleged misstatements, Plaintiff has alleged sufficient facts to argue that Defendant Russell may have buried Defendant Milton's statements. Intentionally hiding this information, if he knew the underlying statements to be false, would be an act with the principal purpose and effect of creating a false appearance of fact.

The second instance the Court finds sufficient at the pleading stage comes from Plaintiff's allegations regarding Defendants Russell and Brady's participation in the April 6, 2020, Analyst Day video. (*Id*. at 251). Here, Plaintiff alleges that Defendant Russell misleadingly led a demonstration of hydrogen fueling, and that Defendant Brady later stated that he was glad they "got to showcase . . . the demonstration of hydrogen fueling." (*Id*. at 255–256). This was the same video which contained the statement by Defendant Russell that the Court found sufficiently misleading under the "maker liability" analysis under subsection (III)(A)(3)(iv). (Doc. 129 at 109 (stating that Nikola "made" the hydrogen)). Plaintiff also alleges that throughout the video, Defendant Milton made various misstatements about Nikola. (*Id*. at 253). For example, Milton stated, "[w]e launched the truck [Nikola One] in 2016 to the world and at that point when it came out we racked up billions of dollars of pre-orders" when Nikola had in fact never built a functioning Nikola One. (*Id*). The Court already found many of these statements to be misleading in subsection (III)(A)(3)(viii) as well. The corresponding SEC Form 8-K which Nikola filed in anticipation for the event in the video also contained misleading statements, as found by the court in subsection (III)(A)(2). Many of these statements were repeated in the video, without disclaimer, such as describing the Nikola One as having a "2+ year backlog," with "+14,000 FCEV truck reservations to date," and "~$10B sales value." (*Id*. at 251). During the video, Plaintiff alleges that Defendants Russell, Brady, and Milton not only appeared together, but also affirmed each other's statements. (*Id*. at 251–252). Plaintiff alleges that the video continues with a demonstration of the fueling of a Nikola Two with hydrogen. (*Id*. at 254). While making a demonstration video would have a legitimate business purpose, Plaintiff's allegations differ here in that they claim the demonstration was a complete falsehood. (*Id*. at 254–253). Creating a counterfeit demonstration, coupled with misleading statements about Nikola's orders, is sufficient to characterize the event as having a non-legitimate purpose. In sum, Plaintiff has sufficiently alleged that the creation of the video was an act with the principal purpose and effect of creating a false appearance of fact.

1

2

   2. *Whether Defendants Russell, Brady, Milton and Nikola acted with*
      *scienter*

3    Defendants Russell and Brady's arguments in regard to scienter can be summarized

4 in three points: (1) Plaintiff has not shown that they had "actual knowledge" with regard to

5 the falsity of Defendant Milton's statements (Doc. 139 at 9), (2) their own conduct suggests

6 that they were opposed to Milton's misstatements (*Id.* at 10), and (3) that Plaintiff's "core

7 operations" theory fails as a matter of law. (*Id.* at 11–12). Defendant Milton merely

8 incorporates his arguments on scienter from his First Motion to Dismiss. (Doc. 141 at 2).

9 Plaintiff argues that the SCACAC "alleges facts supporting the strong inference that all

10 Defendants knew, or recklessly disregarded . . ." that their actions were perpetuating a false

11 impression about the strength of Nikola as a company. (Doc. 149 at 8).

12    "Scienter can be established by direct or circumstantial evidence." *Gebhart v.*

13 *S.E.C.*, 595 F.3d 1034, 1041 (9th Cir. 2010). A plaintiff may successfully allege scienter

14 under the "core operations theory" in three circumstances: (1) when the allegations, read

15 together, raise an inference of scienter that is cogent and compelling, (2) when the

16 allegations are particular and suggest that defendants had actual access to the disputed

17 information, and (3) when the nature of the disputed relevant fact is of such prominence

18 that it would be absurd to suggest that management was without knowledge of the matter.

19 *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785–786 (9th Cir. 2008). "Allegations

20 regarding management's role in a corporate structure and the importance of the corporate

21 information about which management made false or misleading statements may also create

22 a strong inference of scienter when made in conjunction with detailed and specific

23 allegations about management's exposure to factual information within the company." *Id.*

24 at 785.

25    In the present case, the Court finds that Plaintiff has alleged enough facts to

26 demonstrate that Defendants Russell and Brady had sufficient knowledge of the falsity of

27 Defendant Milton's statements to demonstrate scienter in "scheme liability." Plaintiff has

28 pointed out that Russell testified at Defendant Milton's criminal trial that he knew Milton's

promotional style was to misstate facts. (Doc. 129 at 240). Additionally, Plaintiff makes a sufficient comparison between instances where Defendants Russell and Brady deflected third parties' inquiries of Defendant Milton's statements, and where Defendants Russell and Brady had inside knowledge of those issues from board meetings. For example, Plaintiff uses the previously mentioned email from Elizabeth Fretheim, which directly pointed out many of Defendant Milton's misstatements, to show that Defendants Russell and Brady were aware of the disputed information. (*Id*. at 266–267). Finally, Plaintiff has also alleged communications that potentially illuminate Defendants Russell's and Brady's intent. Specifically, Defendant Russell and Brady texted each other about Defendant Milton's strategy, with Russell stating, "Trevor's style works for retail investors, speculating with a few dollars they should probably put in a 401K index fund." (*Id*. at 240–241). Plaintiff's complaint contains several other factual allegations detailing what Defendants Russell and Brady actually knew about Defendant Milton's misstatements, but what has been described is sufficient. Plaintiff has sufficiently alleged that Defendant's Russell and Brady knew that Defendant Milton's statements were false, and yet still potentially attempted to hide the truth and promote these potential falsehoods. Analyzing these facts from a "holistic" viewpoint, the inference of scienter here is as strong as all other innocent explanations. *Zucco*, 552 F.3d 991.

Defendant's do raise several points about how their conduct demonstrates that they were attempting to stop Defendant Milton from continuing to make misstatements. (Doc. 139 at 10–11). For example, Defendant Brady emailed Defendant Milton a news article on the infamously fraudulent company Theranos and told him that they needed to be "absolutely certain that our trucks/stations meet performance specs that we promise to market/customers." (Doc. 129 at 240). While allegations of scienter "must be cogent and at least as compelling as any opposing inference of nonfraudulent intent," the Court finds that Defendant's assertions of good conduct merely present an equally plausible nonfraudulent explanation for some of their conduct. *Tellabs*, 551 U.S. at 314. As a result, Defendants have not defeated Plaintiff's scienter allegations as a matter of law at the

pleadings stage. *See N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011) ("the scienter inquiry is 'inherently comparative,' and the Court must 'compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive . . . if the malicious inference is at least as compelling as any opposing innocent inference.'" (internal citation omitted)). Furthermore, the ultimate comparison of these inferences appears to the Court to be a question of fact best left to the jury. *See Gebhart v. S.E.C.*, 595 F.3d 1034, 1042 (9th Cir. 2010) ("although we may consider the objective unreasonableness of the defendant's conduct to raise an inference of scienter, the ultimate question is whether the defendant knew his or her statements were false, or was consciously reckless as to their truth or falsity.").

Defendants Russell and Brady's attempt to refute Plaintiff's use of the "core operations" theory also fails as the SCACAC includes additional factual allegations not included in the FCACAC. Plaintiff's allegation that Defendant Russel had "multiple, daily conversations with Milton about the status of Nikola's products and technology" strongly implies that he had knowledge of the status of the Nikola One. (Doc. 129 at 58). Plaintiff further alleges that Defendants Russell's and Brady's offices were in close proximity, with their desks being "right next to each other." (*Id*. at 257). Finally, Plaintiff described the official roles of Defendants Russell and Brady, such as Russell running "the Company's day-to-day operations" and that Brady "exercised control over Nikola's communications. (*Id*. at 20, 283). As the CEO and CFO of Nikola, respectively, Defendants Russell and Brady's arguments that they did not have actual access to the disputed information is insufficient to defeat Plaintiff's pleading of scienter under the "core operations" theory. *S. Ferry LP, No. 2*, 542 F.3d at 785–786. This inside knowledge, combined with the prominence of the Nikola One within Nikola's business model, also creates a strong inference of scienter.

Regarding Defendant Milton, the Court again finds that Plaintiff has sufficiently alleged scienter as previously found in the First Dismissal Order. (Doc. 126 at 64).

3.  *Whether Plaintiff has sufficiently alleged loss causation as to Defendants Russell, Brady, Milton, and Nikola.*

The Court's analysis of loss causation regarding Plaintiff's "maker liability" theory from section (III)(A)(5) applies equally in force to Plaintiff's "scheme liability" theory. Plaintiff alleges that the Hindenburg report exposed Nikola's lack of Hydrogen production capabilities, which were touted in the Analyst Day video. (Doc. 129 at 210–211). This video was the one of the acts which the Court found to satisfy the first element under Rule 10b-5(a) and (c). (*See* Section (III)(B)(1)). Plaintiff then alleges that the stock price sharply declined after the publication of the report. (Doc. 129 at 211). Further demonstrating loss causation, Plaintiff alleges that Defendants Russell and Brady signed a statement attempting to refute the report. (*Id.* at 270–271). This statement allegedly caused a slight uptick in Nikola stock price, but then Defendants Russell and Brady later conceded that the Hindenburg Report correctly identified Defendant Milton's misstatements, resulting in another fall. (*Id.*). In subsection (III)(A)(5) the Court explained what new information the Hindenburg Report revealed which countered the claims of the Analyst Day video. The Report also directly challenged several of Defendant Milton's misstatements, many of which were identified by Elizabeth Fretheim's email, and potentially were hidden by Defendants Russell and Brady. (*Id.* at 123–124). Thus, Plaintiff has sufficiently put forth factual allegations suggesting that the Hindenburg Report revealed new information which challenged the above deceptive acts, causing a market correction. Accordingly, Plaintiff has met their burden with respect to loss causation under a theory of "scheme liability."

**C.  Control Persons Liability Under § 20(a) of 15 U.S.C. §§ 78j(b) and 78t(a)**

Individual Defendants and Defendant Milton do not contest that they qualify as "control persons" under Plaintiff's § 20(a) theory. (Docs. 139 at 25, 141 at 3). Defendant Ubben argues that he is not liable under this theory because Plaintiff has not alleged sufficient facts concerning his involvement in the alleged misstatements. (Doc. 142 at 16). Plaintiff argues that by signing the respective SEC filings, approving Nikola's communications, and designing Nikola's media strategy, Ubben can thus sufficiently be

considered a "control person." (Doc. 148 at 14).

In order to prove a prima facie case under § 20(a) of 15 U.S.C. §§ 78j(b) and 78t(a), a plaintiff must prove: (1) a primary violation of federal securities laws, and (2) that the defendant exercised "actual power or control" over the primary violator. *Howard*, 228 F.3d at 1065. Determining whether defendant exercised "actual power or control" is normally an "intensely factual question." *Paracor Fin., Inc. v. Gen. Elec. Cap. Corp.*, 96 F.3d 1151 (9th Cir. 1996). "Control" is defined in the regulations as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405 (emphasis added).

Here, Defendant Ubben's contention that the SCACAC lacks any factual allegations that he directly participated in the publication of misstatements by Nikola is incorrect. Plaintiff alleges that Defendant Ubben signed both the June and July SEC Form S-1s. (Doc. 129 at 16). Plaintiff also alleges that Defendant Ubben served on the board of directors (*Id.* at 21), owned a 5.6% share of Nikola (*Id.*), and approved of a press release responding to the Hindenburg Report (*Id.* at 130). These allegations, taken as true, are sufficient to demonstrate Defendant Ubben plausibly exerted control over above mentioned SEC filings by Nikola at the pleadings stage.

## IV.    **CONCLUSION**

In conclusion, Plaintiff has successfully stated a claim against Defendants Russell, Brady, Ubben, Milton and Nikola under Rule 10b-5(b) "maker liability." Plaintiff has also successfully stated a claim against Defendants Russell, Brady, Milton and Nikola under Rule 10b-5(a) and (c) "scheme liability." As Plaintiff has successfully stated a primary violation of federal securities laws, Plaintiff's § 20(a) claim against Defendants Russell, Brady, Ubben, Milton, and Nikola survives as well. Due to Plaintiff's failure to state a claim against Defendants Worthen, Girsky, and Shindler under any theory, they are dismissed.

Leave to amend a deficient complaint should be freely given "when justice so

requires." Fed. R. Civ. P. 15(a)(2). When dismissing for failure to state a claim, "a district court should grant leave to amend . . . unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (quotations omitted). Other factors to be considered include undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendment, or undue prejudice to the opposing party. *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

With regard to Defendants Worthen, Girsky, and Shindler, the Court finds several of the above factors present here. First, this case is already three years old, and thus undue delay would result in allowing Plaintiff to amend this complaint again. Additional delay would be unjust in seeking a resolution for the remaining Defendants. Next, the SCACAC represents Plaintiff's third attempt to state a claim against Defendants Worthen, Girsky, and Shindler. Since filing the initial complaint, Plaintiff has failed to add any meaningful facts supporting the claims against these Defendants. Thus, a fourth opportunity to cure this deficiency would be similarly unjust. Finally, leave to amend here would only be based on Plaintiff's hope that they could cure the previously identified defects. Allowing leave to amend based on a hope, as opposed to some indication of additional forthcoming facts, can only be described as undue prejudice for the remaining Defendants. As a result, leave to amend will not be given with regard to Defendants Worthen, Girsky, and Shindler.

Accordingly,

**IT IS ORDERED** that Defendant Jeffrey Ubben's Motion for Judicial notice (Doc. 144) and Plaintiff's Notice of Supplemental Authority (Doc. 154) are **granted**.

**IT IS FURTHER ORDERED** that the Motion to Dismiss (Doc. 139) filed by Defendants Nikola Corporation, Mark Russell, Kim Brady, Britton Worthen, Steve Girsky, and Steven Shindler is **granted in part and denied in part**. The Motion is **granted** with respect to Defendants Britton Worthen, Steve Girsky, and Steven Shindler. Plaintiff's claims against these Defendants are **dismissed with prejudice**. The Motion is **denied** with respect to Defendants Mark Russell, Kim Brady, and Nikola.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

      **IT IS FURTHER ORDERED** that the Motion to Dismiss (Doc. 141) filed by Defendant Trevor R. Milton is **denied**.

      **IT IS FURTHER ORDERED** that the Motion to Dismiss (Doc. 142) filed by Defendant Jeffrey Ubben is **granted in part and denied in part**. Defendant Jeffrey Ubben's Motion with respect to Plaintiff's claim under "scheme liability" is **granted**. Plaintiff's claim under this theory is **dismissed with prejudice**. Defendant Jeffrey Ubben's Motion, with respect to Plaintiff's "maker liability" and § 20(a) claims, is **denied**. Plaintiff's claims against Defendant Jeffrey Ubben under these theories may proceed.

      Dated this 8th day of December, 2023.

Honorable Steven P. Logan
United States District Judge