Gary Gotto (No. 007401)
**KELLER ROHRBACK LLP**
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Telephone:    (602) 230-6322
Email: ggotto@kellerrohrback.com
*Liaison Counsel for Lead Plaintiffs Nikola Investor Group II and for the Class*

(*Lead Counsel for Lead Plaintiffs Nikola Investor Group II and for the Class appear on the Signature Page*)

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Daniel Borteanu, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>Nikola Corporation, et al.,<br><br>Defendants. | No. CV-20-01797-PHX-SPL<br>No. CV-20-01819-PHX-DIR (cons.)<br>No. CV-20-02123-PHX-JJT (cons.)<br>No. CV-20-02168-PHX-DLR (cons.)<br>No. CV-20-02237-PHX-DLR (cons.)<br>No. CV-20-02374-PHX-DWL (cons.) |

## LEAD PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................... 1

II.     FACTUAL SUMMARY ............................................................................... 2

III.    PROCEDURAL HISTORY ......................................................................... 3

IV.     ARGUMENT ................................................................................................ 3

    A.      Class Certification Standards ......................................................... 3

    B.      The Rule 23(a) Requirements Are Satisfied ................................ 4

        1.      The Proposed Class Is So Numerous That Joinder of All Members Is Impracticable .................................................. 4

        2.      There Are Questions of Law and Fact Common to the Class ............... 5

        3.      Lead Plaintiffs' Claims Are Typical of the Class .................................. 7

        4.      Plaintiffs Will Fairly and Adequately Protect the Interests of the Class ............ 7

    C.      The Proposed Class Satisfies Rule 23(b)(3) ................................. 8

        1.      Common Questions of Law and Fact Predominate ............................. 9

        2.      Lead Plaintiffs and the Class Are Entitled to a Presumption of Reliance Because Nikola Common Stock Shares Traded in an Efficient Market ................................................. 10

            a.      Nikola Common Stock Was Listed and Traded on the NASDAQ, a Presumptively Efficient Market ......................... 10

                i.      *Cammer* 1: Weekly Trading Volume ............................ 11

                ii.     *Cammer* 2: Analyst Coverage ....................................... 12

                iii.    *Cammer* 3: Market Makers ........................................... 12

                iv.     *Cammer* 4: Eligibility to File SEC Form S-3 ................. 12

                v.      *Cammer* 5: The Relationship Between News Events and Security Price Changes ............................... 13

vi.    Additional Factors Further Establish Market Efficiency ..................................................... 14

(1)    Additional Factor 1: Market Capitalization ........ 14

(2)    Additional Factor 2: Bid-Ask Spread ................. 15

(3)    Additional Factor 3: Public Float ....................... 15

(4)    Additional Factor 4: Institutional Ownership.......................................................... 15

3.    The Proposed Damages Model Establishes a Method for Proving Damages on a Class Wide Basis.......................................................... 16

4.    A Class Action Is the Superior Method for This Controversy ............ 16

D.    Pomerantz LLP, Block & Leviton LLP and Labaton Keller Sucharow LLP Should Be Appointed Class Counsel ....................................................... 17

V.    CONCLUSION .................................................................................. 17

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

5 *Amchem Prod., Inc., v. Windsor,*
 521 U.S. 591 (1997) ........................................................................................3, 8, 9

6
 *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds,*
7 568 U.S. 455 ....................................................................................................4, 10

8 *Angley,*
9 311 F. Supp. 3d at 1121 ........................................................................................14

10 *Baker v. SeaWorld Ent., Inc.,*
 2017 WL 5885542 (S.D. Cal. Nov. 29, 2017) ......................................................7

11
 *Basic Inc. v. Levinson,*
12 485 U.S. 224 (1988) ..........................................................................................9, 10

13 *Binder v. Gillespie,*
14 184 F.3d 1059 (9th Cir. 1999) .............................................................................10

15 *Blackie v. Barrack,*
16 524 F.2d 891 (9th Cir. 1975) .................................................................................6

17 *Briseno v. ConAgra Foods, Inc.,*
 844 F.3d 1121 (9th Cir. 2017) .............................................................................16
18
 *Cammer v. Bloom,*
19 711 F. Supp. 1264 (D.N.J. 1989) ..................................................................*passim*

20 *Connecticut Retirement Plans & Trust Funds v. Amgen,*
21 2009 WL 2633743 (C.D. Cal. Aug. 12, 2009) ......................................................7

22 *DFC Glob. Corp.,*
23 2016 WL 4138613 ................................................................................................13

24 *Edwards v. First Am. Corp.,*
 798 F.3d 1172 (9th Cir. 2015) ...............................................................................9
25
 *Epstein v. MCA, Inc.,*
26 50 F.3d 644 (9th Cir. 1995) ................................................................................2, 4

27 *Erica P. John Fund, Inc. v. Halliburton Co.,*
28 563 U.S. 804 (2011) ....................................................................................9, 10, 16

iii

*Gen. Tel. Co. of Southwest v. Falcon*,
   102 S. Ct. 2364 (1982) ...................................................................................7

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014) ................................................................. 9, 10, 11, 13

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998),
   *overruled on other grounds by*,
   *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ...............................5, 8

*Hanon v. Dataproducts Corp.*,
   976 F.2d 497 (9th Cir. 1992) ..........................................................................7

*Harris v. Palm Springs Alpine Estates, Inc.*,
   339 F.2d 909 (9th Cir.1964) .......................................................................4, 5

*Hatamian v. Advanced Micro Devices, Inc.*,
   2016 WL 1042502 (N.D. Cal. Mar. 16, 2016) ..........................................6, 16

*Hodges v. Akeena Solar, Inc.*,
   274 F.R.D. 259 (N.D. Cal. 2011) .................................................................11

*In re AST Rsch. Sec. Litig.*,
   1994 WL 722888 (C.D. Cal. Nov. 8, 1994) ....................................................4

*In re Banc of California Sec. Litig.*,
   326 F.R.D. 640 (C.D. Cal. 2018) ...................................................................9

*In re BofI Holding, Inc. Sec. Litig.*,
   2021 WL 3742924 (S.D. Cal. Aug. 24, 2021) (*BofI II*).........................*passim*

*In re Cooper Companies Inc. Sec. Litig.*,
   254 F.R.D. 628 (C.D. Cal. 2009)............................................................2, 4, 5

*In re Diamond Foods, Inc.*,
   295 F.R.D. 240 (N.D. Cal. 2013) ..............................................................10, 16

*In re DVI, Inc. Sec. Litig.*,
   249 F.R.D. 196 (E.D. Pa. 2008) ...................................................................14

*In re LDK Solar Sec. Litig.*,
   255 F.R.D. 519 (N.D. Cal. 2009) ...................................................................6

*In re Lendingclub Sec. Litig.*,
   282 F.Supp. 3d 1171 (N.D. Cal. 2017) .....................................................6, 16

*In re Montage Tech. Grp. Ltd. Secs. Litig.*,
  2016 WL 1598666 (N.D. Cal. Apr. 21, 2016) ...................................................... 10, 17

*In re Portal Software, Inc. Sec. Litig.*,
  2007 WL 1991529 (N.D. Cal. June 30, 2007) ................................................................4

*In re Snap Inc. Sec. Litig.*,
  334 F.R.D. 209 (C.D. Cal. 2019)..............................................................................5, 16

*In re THQ Inc. Sec. Litig.*,
  2002 WL 1832145 (C.D. Cal. Mar. 22, 2002) ................................................................4

*In re Twitter Inc. Sec. Litig.*,
  326 F.R.D. 619 (N.D. Cal. 2018) ..............................................................................5, 16

*In re UTStarcom, Inc. Sec. Litig*,
  2010 WL 1945737 (N.D. Cal. May 12, 2010) ................................................................5

*In re Verisign, Inc. Sec. Litig.*,
  2005 WL 7877645 ......................................................................................................5, 8

*Loritz v. Exide Techs.*,
  2015 WL 6790247 (C.D. Cal. July 21, 2015) ..............................................................15

*Luna v. Marvell Tech. Grp., Ltd.*,
  2017 WL 4865559 (N.D. Cal. Oct. 27, 2017) ................................................................5

*Parsons v. Ryan*,
  754 F.3d 657 (9th Cir. 2014) .........................................................................................6

*Petrie v. Elec. Game Card, Inc.*,
  308 F.R.D. 336 (C.D. Cal. 2015)............................................................................11, 14

*Phillips Petroleum Co. v. Shutts*,
  105 S. Ct. 2965 (1985) ...................................................................................................4

*Schleicher v. Wendt*,
  618 F.3d 679 (7th Cir. 2010) .......................................................................................16

*SEB Inv. Mgmt. AB v. Symantec Corp.*,
  335 F.R.D. 276 (N.D. Cal. 2020) ............................................................................10, 16

*Sec. & Exch. Comm'n v. Jensen*,
  2013 WL 12129377 (C.D. Cal. Mar. 13, 2013) .......................................................13, 14

*Todd v. STAAR Surgical Co.*,
  2017 WL 821662 (C.D. Cal. Jan. 5, 2017) ...............................................................4, 12

*Vaquero v. Ashley Furniture Indus.*,
   824 F.3d 1150 (9th Cir. 2016) ..........................................................16

*Vinh Nguyen v. Radient Pharms. Corp.*,
   287 F.R.D. 563 (C.D. Cal. 2012) .......................................................12

*Wolin v. Jaguar Land Rover N. Am., LLC*,
   617 F.3d 1168 (9th Cir. 2010) .............................................................7

## **Statutes**

Exchange Act Section 10(b) .......................................................... 6, 7, 9

Exchange Act Section 20(a) ............................................................ 6, 7

SEC Securities Act ..........................................................................12

Securities Exchange Act of 1934 Sections 10(b) and 20(a) ..............2, 3

## **Rules**

Fed. R. Civ. P. 23 ...................................................................*passim*

Rule 10b-5..................................................................................2, 9

Rule 12b-2...................................................................................12

Lead Plaintiffs George Mersho, Vincent Chau, and the estate of Stanley Karczynski (collectively, "Lead Plaintiffs" or "Plaintiffs") respectfully submit this memorandum in support of their motion for an Order: (i) certifying this action as a class action pursuant to Federal Rule of Civil Procedure 23; (ii) appointing Lead Plaintiffs as class representatives; and (iii) appointing Lead Counsel, Pomerantz LLP, Block & Leviton LLP and Labaton Keller Sucharow LLP as class counsel.[1]

## I.    INTRODUCTION

Plaintiffs seeks certification of the following class (the "Class"):

> All those who purchased or otherwise acquired Nikola Corporation ("Nikola" or the "Company") securities during the period June 4, 2020 through February 25, 2021 (the "Class Period"), and were damaged upon the revelation of the alleged corrective disclosures (the "Class"). Excluded from the Class are: (i) Defendants[2]; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of Nikola during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Nikola's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

This lawsuit exemplifies a case warranting class action treatment. Plaintiffs seek to prove that, like other Class members, they were injured by a common course of misconduct—the issuance of false and misleading statements and material omissions by Defendants concerning the core aspects of Nikola's business. The questions of law and fact relevant to the merits—issuance of false and misleading statements, reliance, materiality, scienter, loss causation and economic loss—are identical for each and every member of the putative Class. As detailed below, this action satisfies all the requirements for class certification under Rule 23(a): numerosity; commonality; typicality; and adequacy of representation. This action also satisfies the two core requirements for certification under Rule 23(b)(3): predominance of common questions of law or fact and superiority of a class action over other available methods for adjudication. The common liability and damages questions overwhelmingly predominate

---

[1] All "¶ " references are to the Second Consolidated Amended Class Action Complaint ("SAC"). ECF No. 129

[2] "Defendants" refers to Nikola, Trevor R. Milton ("Milton"), Mark Russell ("Russell"), Kim J. Brady ("Brady"), and Jeffery Ubben ("Ubben").

over any individual questions. Lead Plaintiffs' expert, Dr. Zachary Nye, has confirmed in his accompanying report (the "Nye Report"), that Nikola common stock traded in an efficient market during the Class Period. *See* Declaration of Gary Gotto ("Gotto Decl."), Ex. 1.

Finally, the class action mechanism is the superior method for fairly and efficiently adjudicating all Class members' claims. In short, this securities case fits Rule 23's certification requirements "like a glove." *In re Cooper Companies Inc. Sec. Litig.*, 254 F.R.D. 628, 632 (C.D. Cal. 2009) (quoting *Epstein v. MCA, Inc.*, 50 F.3d 644, 668 (9th Cir. 1995)). As such, Lead Plaintiffs respectfully submit that this motion be granted in all respects.

## II.   FACTUAL SUMMARY

This putative securities fraud class action alleges that Defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder by misleading the market as to the Company's ability to develop a fleet of hydrogen fueled trucks that would be cheaper and more environmentally friendly than current diesel trucks.

For example, on June 4, 2020, the day Nikola began publicly trading, the Company's founder and Chairman, Milton, declared "what Nikola solved was the cost – was the economics on the trucking. When we first started, hydrogen was $16 a kilogram. We can now produce it for well under $4 a kilogram." ¶347. This was false. Nikola has never produced any hydrogen, let alone at an economically feasible price. SAC ¶¶259-288.

Defendants also announced the "fully functioning" Nikola One and Badger vehicles, which Defendants claimed were made completely "in-house." *See, e.g.*, SAC ¶¶139-40, 486-91, 577, 585-605. In truth, the Nikola One was a non-operational "pusher," *id*. ¶¶119-33, and the Badger was merely a CGI rendering. *Id*. ¶¶458-75. Nevertheless, Defendants touted illusory orders for both, as well as the lucrative partnerships secured through these lies. *Id*. ¶¶223-34, 504, 514, 684.

Investors began to learn the truth when Hindenburg Research published a report, on September 10, 2020, alleging that Nikola was "an intricate fraud built on dozens of lies over the course of … Milton's career." *Id*. ¶34. Nikola's stock price plummeted in response. *Id*.

¶¶35-36. The Company's stock price continued to decline following announcements of (i) SEC and DOJ investigations into Nikola, (ii) the resignation of Milton, (iii) Nikola's recently announced partners cancelling their contracts with the Company, (iv) Nikola's admission in the Company's annual report that numerous statements made by the Company were "inaccurate in whole or in part, when made," and (v) Milton's criminal indictment. ¶¶37-46.

## III.   PROCEDURAL HISTORY

On September 15, 2020, Daniel Borteanu filed a Class Action Complaint against Nikola, Milton, Russell, Brady, Steve Girsky and Steve Shindler, asserting violations of Sections 10(b) and 20(a) of the Exchange Act. ECF No. 1. Several related complaints were then filed in this District and others. On December 15, 2020, the Court consolidated the actions and appointed Angelo Baio as Lead Plaintiff. ECF No. 50. Following a writ of mandamus, the Ninth Circuit vacated the order appointing Angelo Baio as lead plaintiff. On remand, the Court appointed George Mersho, Vincent Chau, and Stanley Karczynski as Lead Plaintiffs on November 18, 2021. ECF No. 81. On January 24, 2022, Lead Plaintiffs filed the Consolidated Amended Class Action Complaint ("AC"), adding Britton M. Worthen as a defendant. ECF No. 95. On February 2, 2023, the Court granted the defendants' motion to dismiss, providing Lead Plaintiffs leave to amend. ECF No. 126. On April 3, 2023, Lead Plaintiffs filed the SAC, adding Ubben as a defendant. ECF No. 129. On December 8, 2023, the Court granted in part and denied in part the defendants' motions to dismiss, dismissing all claims against Worthen, Girsky and Shindler, and sustaining claims against the remaining Defendants. ECF No. 157. On February 14, 2024, Defendants filed their Answers to the SAC. ECF Nos. 160-162. Plaintiffs now seek certification of the Class.

## IV.   ARGUMENT

### A.   Class Certification Standards

To certify a putative class, the Court must determine whether four threshold requirements of Fed. R. Civ. P. 23(a) are met: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. *Amchem Prod., Inc., v. Windsor*, 521 U.S. 591, 617 (1997). In addition, the Court must determine whether the action is maintainable under Fed.

R. Civ. P. 23 (b)(1), (2) or (3). *Id.* "Class actions . . . permit the plaintiffs to pool claims which would be uneconomical to litigate individually. [M]ost of the plaintiffs would have no realistic day in court if a class action were not available." *Phillips Petroleum Co. v. Shutts*, 105 S. Ct. 2965, 2973 (1985).

"The Ninth Circuit has recognized explicitly that 'class actions . . . have 'proved useful where a large number of purchasers or holders of securities claim to have been defrauded by a common course of dealing on the part of the defendants . . . .'" *In re AST Rsch. Sec. Litig.*, 1994 WL 722888, at *2 (C.D. Cal. Nov. 8, 1994) (quoting *Harris v. Palm Springs Alpine Estates, Inc.*, 339 F.2d 909, 913 (9th Cir.1964)). "As the Ninth Circuit has so aptly stated, securities fraud cases fit Rule 23 'like a glove.'" *Cooper*, 254 F.R.D. at 632 (quoting *Epstein*, 50 F.3d at 668). Recognizing the value of class actions in the securities law context, courts in the Ninth Circuit "liberally construe" the requirements of Rule 23 in favor of certification. *See In re THQ Inc. Sec. Litig.*, 2002 WL 1832145, at *2 (C.D. Cal. Mar. 22, 2002) "Especially in the case of a class action alleging securities fraud, then, '[a]ny doubts a court has about class certification should be resolved in favor of certification.'" *Todd v. STAAR Surgical Co.*, 2017 WL 821662, at *3 (C.D. Cal. Jan. 5, 2017). Accordingly, courts throughout the Ninth Circuit regularly grant class certification in cases like this one. *See*, *e.g.*, *In re BofI Holding, Inc. Sec. Litig.*, 2021 WL 3742924, at *10 (S.D. Cal. Aug. 24, 2021) (*BofI II*).

"A Rule 23 determination is wholly procedural and has nothing to do with whether a plaintiff will ultimately prevail on the substantive merits of its claim." *In re Portal Software, Inc. Sec. Litig.*, 2007 WL 1991529, at *2 (N.D. Cal. June 30, 2007). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466.

## B. The Rule 23(a) Requirements Are Satisfied

### 1. The Proposed Class Is So Numerous That Joinder of All Members Is Impracticable

Rule 23(a)(1) requires that the class be so numerous that joinder of all members would

1    be "impracticable." Fed. R. Civ. P. 23(a)(1). Impracticable does not mean impossible, only

2    that it would be difficult or inconvenient to join all members of the class. *Harris*, 329 F.2d at

3    913-14. "No exact numerical cut-off is required; rather, the specific facts of each case must

4    be considered." *Cooper*, 254 F.R.D. at 633. In securities cases, numerosity is presumed when

5    millions of shares are traded during the proposed class period. *Id*. "[C]ourts are quite willing

6    to accept common sense assumptions in order to support a finding of numerosity, often

7    looking at the number of shares traded or transactions completed rather than seeking to

8    determine directly the number of potential class members involved." *In re Verisign, Inc. Sec.*

9    *Litig*., 2005 WL 7877645, at *4.

10            During the Class Period, the common stock of Nikola was listed on the NASDAQ and

11    traded under the ticker symbol "NKLA." *See* Gotto Decl. Ex. 1; Nye Report ¶20. On average,

12    over 115 million shares of Nikola common stock was traded by investors each week. *Id*. ¶27.

13    Because Nikola "has millions of shares trading on a national exchange" the Court "'may infer

14    that' the numerosity requirement is met." *In re Twitter Inc. Sec. Litig*., 326 F.R.D. 619, 626

15    (N.D. Cal. 2018); *see also In re Snap Inc. Sec. Litig*., 334 F.R.D. 209, 226 (C.D. Cal. 2019)

16    ("Courts generally find that 'the numerosity requirement is met in securities fraud suits

17    involving nationally traded stocks.'"); William B. Rubenstein, 1 Newberg on Class Actions §

18    3:12 (5th ed.) (updated Dec. 2020) ("[I]n class actions involving nationally traded securities,

19    courts generally presume that the numerosity requirement is met.").

20            **2.    There Are Questions of Law and Fact Common to the Class**

21            The "commonality" requirement under Rule 23(a) is met if "there are questions of law

22    or fact common to the class." Fed. R. Civ. P. 23(a)(2). The Ninth Circuit construes this

23    requirement "permissively." *In re UTStarcom, Inc. Sec. Litig*, 2010 WL 1945737, at *4 (N.D.

24    Cal. May 12, 2010) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998),

25    *overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011)). Both

26    "[t]he existence of shared legal issues with divergent factual predicates" and "a common core

27    of salient facts coupled with disparate legal remedies" suffice. *Luna v. Marvell Tech. Grp.,*

28    *Ltd.*, 2017 WL 4865559, at *2 (N.D. Cal. Oct. 27, 2017) (quoting *Hanlon*, 150 F.3d at 1019).

A single common question is enough. *In re Lendingclub Sec. Litig.*, 282 F.Supp. 3d 1171, 1179 (N.D. Cal. 2017) (quoting *Parsons v. Ryan*, 754 F.3d 657, 675 (9th Cir. 2014)) (plaintiff "need not show . . . that every question in the case, or even a preponderance of questions, is capable of class wide resolution. So long as there is even a single common question, a would-be class can satisfy the commonality requirement.").

There are many common factual and legal questions in this case. All Class members are "unified by an interest in proving the same common course of conduct regarding [Defendants'] allegedly fraudulent . . . representations." *In re LDK Solar Sec. Litig.*, 255 F.R.D. 519, 530 (N.D. Cal. 2009). Common proof will be used to answer many questions of law and fact, including, *inter alia*: (i) Whether federal securities laws were violated by Defendants' conduct as alleged; (ii) Whether Defendants made any false and misleading statements; (iii) Whether Defendants acted with the requisite level of scienter under Section 10(b) of the Exchange Act; (iv) Whether Defendants engaged in a scheme to defraud investors; (v) Whether the Individual Defendants were controlling persons of the Company under Section 20(a) of the Exchange Act; (vi) Whether and to what extent the prices of Nikola common stock shares were artificially inflated during the Class Period due to the alleged false and misleading statements or omissions; (vii) Whether reliance is presumed under the fraud-on-the-market doctrine; and; (viii) Whether Lead Plaintiffs and other members of the Class suffered damages, as well as the appropriate measure thereof.

These common issues are more than enough to satisfy the commonality requirement. *See Blackie v. Barrack*, 524 F.2d 891, 902 (9th Cir. 1975) ("Confronted with a class of purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that the class is united by a common interest…, which is not defeated by slight differences in class members' positions, and that the issue may profitably be tried in one suit."); *Hatamian v. Advanced Micro Devices, Inc.*, 2016 WL 1042502, at *4 (N.D. Cal. Mar. 16, 2016) ("The Ninth Circuit recognizes that public disclosures alleged to contain material misrepresentations and omissions . . . present common questions of law and fact.").

### 3. Lead Plaintiffs' Claims Are Typical of the Class

Rule 23(a)(3) mandates that the claims of the representative plaintiffs be typical of the claims of the class. The Supreme Court has acknowledged that the "commonality and typicality requirements of Rule 23(a) tend to merge." *Gen. Tel. Co. of Southwest v. Falcon*, 102 S. Ct. 2364, 2373 n.13 (1982). Rule 23(a)'s "typicality" requirement is met when "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." *Connecticut Retirement Plans & Trust Funds v. Amgen*, 2009 WL 2633743, at *5 (C.D. Cal. Aug. 12, 2009) (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). "The test of typicality is whether other members [of the class] have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Baker v. SeaWorld Ent., Inc.*, 2017 WL 5885542, at *6 (S.D. Cal. Nov. 29, 2017) (quoting *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010)).

Typicality is established here. Lead Plaintiffs and Class members all purchased Nikola common stock and assert the same Section 10(b) claims, based on the same misstatements/omissions and fraudulent scheme by Defendants, and the same Section 20(a) claim of "control person" liability. Lead Plaintiffs' claims will be proven using the same evidence and legal theories that apply to the Class as a whole. The nature of damages is also typical: when the truth about Nikola was revealed through the various disclosures, the price of Nikola common stock declined. For these reasons, typicality is established. *See, e.g.*, *BofI II*, 2021 WL 3742924, at *3 (finding typicality where the plaintiff's claim was "essentially the same as that of the proposed class members.").

### 4. Plaintiffs Will Fairly and Adequately Protect the Interests of the Class

Rule 23(a)(4)'s requirement that "the representative parties will fairly and adequately protect the interests of the class" is met. Fed. R. Civ. P. 23(a)(4). Courts have established a

two-prong test for this requirement: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon*, 150 F.3d at 1020.

Both prongs are met here. Plaintiffs "possess the same interest and suffer[ed] the same injury as the class members," *Amchem*, 521 U.S. at 594, and no actual or potential conflicts exist. Plaintiffs and all Class members have suffered losses from purchasing Nikola securities at artificially inflated prices. They have been injured by the identical wrongful underlying misrepresentations/omissions and scheme of Defendants. Plaintiffs have been actively involved in this litigation, understand their duties as Class representatives and are willing and able to serve as representatives on behalf of the Class and prosecute this action on behalf of the Class to a successful conclusion. *See* Gotto Decl. Ex. B (Mersho Decl.), ¶¶5-13; Ex. C (Chau Decl.), ¶¶5-13; Ex. D (Karczynski Decl.), ¶¶5-13. Accordingly, Plaintiffs "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4); *see, e.g.*, *BofI II*, 2021 WL 3742924, at *3–4 (stating that the plaintiff and the lead counsel satisfied the adequacy requirements because they actively participated in the litigation of the case and there was no evidence that their interests were in conflict with other Class members).

Lead Counsel is also well-qualified to represent the Class. Each of the three firms representing the Lead Plaintiffs are highly experienced in litigating securities class actions, have and will vigorously prosecute the claims of the proposed Class. *See* Gotto Decl. Exs. E, F and G (firm resumes).

## C.    The Proposed Class Satisfies Rule 23(b)(3)

Rule 23(b)(3) requires that issues common to the class predominate over individualized issues and that a class action be superior to other methods of adjudication. "The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Amchem*, 521 U.S. at 617. "Class actions are particularly well-suited in the context of securities litigation, wherein geographically dispersed shareholders with relatively small holdings would otherwise have difficulty in challenging wealthy corporate defendants." *In re*

1  *Verisign, Inc. Sec. Litig.*, 2005 WL 7877645, at *9.

2  **1. Common Questions of Law and Fact Predominate**

3  "Predominance is a test readily met in certain cases alleging consumer or securities

4  fraud . . . ." *Amchem*, 521 U.S. at 625. "Considering whether 'questions of law or fact common

5  to class members predominate' begins, of course, with the elements of the underlying cause

6  of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011)

7  ("*Halliburton I*"). "Common issues predominate over individual issues when the common

8  issues 'represent a significant aspect of the case and they can be resolved for all members of

9  the class in a single adjudication.'" *Edwards v. First Am. Corp.*, 798 F.3d 1172, 1182 (9th

10 Cir. 2015).

11 To establish liability under Section 10(b) of the Exchange Act and Rule 10b-5

12 promulgated thereunder, a plaintiff must show "(1) a material misrepresentation or omission

13 of fact by the defendant; (2) scienter; (3) a connection between the misrepresentation or

14 omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or

15 omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund,*

16 *Inc.,* 573 U.S. 258, 267 (2014) ("*Halliburton II*").

17 Most of the elements at issue—falsity, materiality, scienter, and loss causation—

18 present questions "necessarily common to the class" because "they depend on defendants'

19 actions, not those of any class member." *In re Banc of California Sec. Litig.*, 326 F.R.D. 640,

20 648 (C.D. Cal. 2018); *see also BofI II*, 2021 WL 3742924, at *4 (stating that "the materiality

21 of the misrepresentation and the defendant's scienter are issues that would require the same

22 proof for any class member"). Thus, whether common questions predominate for Section

23 10(b) claims "turns on the element of reliance." *Halliburton I*, 563 U.S. at 810.

24 Lead Plaintiffs will demonstrate Class-wide reliance under the "fraud-on-the-market"

25 presumption of reliance, which dispenses with the requirement that each Class member must

26 prove individual reliance upon Defendants' alleged misstatements. Under *Basic* and

27 *Halliburton II*, plaintiffs may "satisfy the reliance element of the Rule 10b-5 cause of action

28 by invoking a presumption that a public, material misrepresentation will distort the price of a

stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation." *Halliburton II*, 573 U.S. at 283–84; *see Basic Inc. v. Levinson*, 485 U.S. 224, 241–42 (1988). As explained below, Nikola common stock traded in an efficient market, such that the presumption applies.

### 2. Lead Plaintiffs and the Class Are Entitled to a Presumption of Reliance Because Nikola Common Stock Shares Traded in an Efficient Market

To invoke the fraud-on-the-market presumption of reliance, a plaintiff must establish that "(1) the alleged misrepresentations were publicly known, (2) the stock traded in an efficient market, and (3) the relevant transaction took place 'between the time the misrepresentations were made and the time the truth was revealed.'" *In re Diamond Foods, Inc.*, 295 F.R.D. 240, 247 (N.D. Cal. 2013) (quoting *Halliburton I*, 563 U.S. at 811). Where the presumption applies, "a plaintiff need not prove that it read or heard the misrepresentation that underlies its securities claim"—that is, a plaintiff need not prove individual reliance. *SEB Inv. Mgmt. AB v. Symantec Corp.*, 335 F.R.D. 276, 283 (N.D. Cal. 2020).

In this case, Defendants' misrepresentations were public and that Plaintiffs purchased or acquired Nikola stock during the Class Period, before the corrective disclosures. And materiality is not litigated at class certification. *Amgen*, 568 U.S. at 459. Thus, the only determinative question is whether Nikola's stock traded in an efficient market.

### a. Nikola Common Stock Was Listed and Traded on the NASDAQ, a Presumptively Efficient Market

"To determine whether a particular security traded in an efficient market, the Ninth Circuit looks to the nonexclusive factors set out in *Cammer v. Bloom*, 711 F. Supp. 1264, 1285–87 (D.N.J. 1989))." *Binder v. Gillespie*, 184 F.3d 1059, 1064 (9th Cir. 1999) (adopting the *Cammer* approach). *See, e.g., In re Montage Tech. Grp. Ltd. Secs. Litig.*, 2016 WL 1598666, *8 (N.D. Cal. Apr. 21, 2016).

The five *Cammer* factors are whether: (1) the stock trades at high weekly volume; (2) securities analysts follow and report on the stock; (3) the stock has market makers and arbitrageurs; (4) the company is eligible to file a Form S–3 registration statement with the

1  SEC; and (5) there are "empirical facts showing a cause and effect relationship between
2  unexpected corporate events or financial releases and an immediate response in the stock
3  price." *Hodges v. Akeena Solar, Inc.*, 274 F.R.D. 259, 268 (N.D. Cal. 2011).

4        In *Halliburton II*, the Supreme Court confirmed that market efficiency for the fraud-
5  on-the-market presumption is not tied to any academic strain of market efficiency. *Id.* at 2408
6  (rejecting that efficiency is related to "any particular theory of how quickly and completely
7  publicly available information is reflected in market price."). Instead, it is based on the "fairly
8  modest premise that market professionals generally consider most publicly announced
9  material statements about companies, thereby affecting stock market prices." *Id.* (quotation
10  and citation omitted). Accordingly, "[d]ebates about the precise degree to which stock prices
11  accurately reflect public information are thus largely beside the point." *Id.* at 2410.

12        At all relevant times, Nikola common stock was listed and traded on the NASDAQ.
13  Nye Report ¶¶20-24. "[T]he federal courts are unanimous in their agreement that a listing on
14  the NASDAQ or a similar national market is a good indicator of efficiency." *Radient*, 287
15  F.R.D. at 573 n.7. This supports invoking the presumption of reliance. Nye Report ¶24.

16                 **i.   *Cammer* 1: Weekly Trading Volume**

17        *Cammer* noted that an average weekly turnover "of two percent or more of the
18  outstanding shares would justify a strong presumption that the market for the security is an
19  efficient one." 711 F. Supp. at 1286. "A high average trading volume supports a finding of
20  market efficiency, because it 'implies significant investor interest in the company,' and that
21  interest 'implies a likelihood that many investors are executing trades on the basis of newly
22  available or disseminated corporate information.'" *Petrie v. Elec. Game Card, Inc.*, 308
23  F.R.D. 336, 349 (C.D. Cal. 2015) (quoting *Cammer*, 711 F. Supp. at 1286). Nikola shares
24  meet this standard, as the average weekly trading volume during the Class Period was 30.5%
25  - 15 times the 2% amount that justifies a "strong presumption" of market efficiency. Nye
26  Report ¶27, Ex. 4. *See, e.g., Petrie*, 308 F.R.D. at 349 (stating that, under *Cammer*, the average
27  weekly trading volume of 3.3% "justifie[d] a strong presumption of an efficient market").

28

### ii.   *Cammer* 2: Analyst Coverage

Nikola shares were the subject of broad analyst coverage during the Class Period. At least 9 analysts issued over 140 reports regarding Nikola during the Class Period. Nye Report ¶31, Ex. 5. Investors also received information and analyses about Nikola during Class period via media coverage, investor conferences, trade magazines, Company presentations and SEC filings. *Id*. ¶¶32-33. This factor strongly supports market efficiency. *Id*. ¶34; *STAAR Surgical*, 2017 WL 821662, at *7 (finding market efficiency where "[a]t least six different securities analysts covered STAAR and provided investment recommendations regarding its stock").

### iii.   *Cammer* 3: Market Makers

*Cammer* noted that the "existence of market makers . . . would ensure completion of the market mechanism; these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." 711 F. Supp. at 1286–87. During the Class Period, Nikola had over 110 market makers that traded Nikola stock on the NASDAQ. Nye Report ¶37. This factor supports market efficiency. *See Vinh Nguyen v. Radient Pharms. Corp.*, 287 F.R.D. 563, 572-73 (C.D. Cal. 2012) (at least one market maker supported market efficiency).

### iv.   *Cammer* 4: Eligibility to File SEC Form S-3

The *Cammer* court discussed the relationship between S-3 eligibility and market efficiency: "[t]he issue is not whether [the company] recently completed a public offering, but whether, if it did, it would enjoy the benefit of making abbreviated prospectus disclosure because the SEC viewed it to be in an efficient market where documents 'on file' could be deemed to be known by the investment community." 711 F. Supp. at 1284. Form S-3 eligibility "is predicated on the Commission's belief that the market operates efficiently for these companies." *Id*. (quoting SEC Securities Act Release No. 6331 (Aug. 13, 1981)).

Nikola did not file any registration statements during the Class Period, but met the definition of a "large accelerated filer" under Rule 12b-2 of the Exchange Act, for which the public float and reporting history requirements are virtually identical to the Form S-3 filing requirements. Nye Report, ¶48. Nikola also adhered to all the Form S-3 requirements imposed

by the SEC during the Class Period. *Id.* ¶49. This supports a finding of efficiency. *Id.*

### v.    Cammer 5: The Relationship Between News Events and Security Price Changes

"[O]ne of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between the company disclosures and resulting movements in stock price." *Cammer*, 711 F. Supp. at 1291. Though "[c]ourts have rejected the idea that the fifth *Cammer* factor is necessary to establish market efficiency," *W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, 2016 WL 4138613, at *12 (E.D. Pa. Aug. 4, 2016), Plaintiffs nonetheless provide far more than necessary support here through Dr. Nye's event study. Nye Report ¶52. Event studies seek "to show that the market price of the defendant's stock tends to respond to pertinent publicly reported events." *Halliburton II*, 573 U.S. at 280. "[E]vent studies . . . are generally accepted by both the academic community and the courts as a reliable principle or method for determining whether a particular announcement by a company has caused the price of the company's stock to decline." *Sec. & Exch. Comm'n v. Jensen*, 2013 WL 12129377, at *5 (C.D. Cal. Mar. 13, 2013).

In an efficient market, it would be expected that the price of a stock would respond to news. Nye ¶51. The event study is a multiple step process to test this response. *Id.* Those steps include: "(i) the *a priori* definition and selection of events to study; (ii) identification of a study period; (iii) estimation of a regression model to remove non-company-specific effects from the security's return; (iv) testing for statistical significance; and (v) interpretation of empirical results." *Id.* To determine which events to study in his analysis, Dr. Nye relied on a large body of event study literature that has evaluated what types of information affect stock prices. *Id.* ¶53. Consistent with this literature, Dr. Nye examined four dates on which Nikola released quarterly or year-end financial results and/or guidance. *Id.* Such news announcements are objective events shown in the academic finance literature to have a material impact on stock prices. *Id.*

Out of the four event dates examined, three (*i.e.* 75%) were associated with a statistically significant Company-specific return at or above the 95% confidence level. Nye

¶55. At the 95% level of confidence, a statistically significant return is expected to occur 5% of the time. *Id.* Here, 75% of the events examined were associated with statistically significant returns at the 95% confidence level. *Id.* This result is 15 times more frequent than one would expect from a random sampling of days. *Id.* Moreover, Dr. Nye concluded:

> the event date on which predominantly *positive* Company-specific news reached the market is associated with statistically significant *positive* return. The event dates on which predominantly *negative* Company-specific news reached the market are associated with statistically significant *negative* returns.

*Id*. at ¶56. Conversely, for the event date that is associated with a statistically *insignificant* Company-specific return, the Company's financial results were in line with expectations such that the insignificant price reaction is consistent with an efficient market. *Id.* Dr. Nye found that "a strong cause-and-effect relationship existed between the information disclosed on the event dates and resulting stock price movements," and that "Nikola's stock price reflected the information disclosed to the market, and promptly responded to the disclosure of new, material unexpected information, thereby supporting my conclusion that the market for Nikola stock was efficient throughout the Class Period." *Id*. at ¶¶56-57.

### vi.   Additional Factors Further Establish Market Efficiency

"The *Cammer* factors are an analytical took, not a checklist of requirements, and can be supplemented by other measures, such as (6) the company's market capitalization; (7) the bid-ask spread; (8) the float, or issue amount outstanding excluding insider-owned securities; and (9) the percentage of institutional ownership." *Petrie*, 308 F.R.D. at 349.

### (1)   Additional Factor 1: Market Capitalization

Nikola's market capitalization was as high a $28.77 billion during the Class Period and averaged $230.5 million over the Class Period. Nye Report ¶58, Ex. 13. At the start of the Class Period, Nikola's market capitalization was greater than 93.6% and 76.1% of NASDAQ-listed and NYSE-listed stocks, respectively. *Id.* ¶59 According to Dr. Nye, "Nikola's high market capitalization during the Class Period weighs in favor of a finding of market efficiency." *Id. See, e.g., Angley v. UTI Worldwide Inc.*, 311 F. Supp. 3d 1117, 1121 (C.D. Cal. 2018) (considering evidence of market capitalization among other *Krogman* factors and

finding market efficiency); *In re DVI, Inc. Sec. Litig.*, 249 F.R.D. 196, 212 (E.D. Pa. 2008) (market capitalization of $12 million to $300 million indicative of an efficient market).

### (2)   Additional Factor 2: Bid-Ask Spread

The narrow bid-ask spread for Nikola common stock supports efficiency. "A large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade." *Krogman*, 202 F.R.D. at 478. Nikola's average and median bid-ask spread during the Class Period of 0.11% and 0.08%, respectively, were smaller than that of randomly sampled stocks listed on the Nasdaq Global Select Market, which were 0.29% and 0.26%, respectively. Nye Report ¶43, Ex. 10. Dr. Nye concluded that this supports his conclusion that Nikola's stock traded in an efficient market throughout the Class Period. *Id*. ¶¶44, 60.

### (3)   Additional Factor 3: Public Float

When evaluating efficiency, "courts also consider the percentage of shares held by the public, rather than insiders," known as the float. *Krogman*, 202 F.R.D. at 478. A larger float may be an indicator of market efficiency. Nye Report ¶61. The public float of Nikola stock was, on average, 55.1% of shares outstanding during the Class Period. *Id*. The large percentage of Nikola common stock shares in the float supports market efficiency. *Id*.

### (4)   Additional Factor 4: Institutional Ownership

Institutional investors can improve market efficiency by digesting new public information and making investment decisions over large block holdings of shares, thus causing the new information to be quickly incorporated in stock prices. Thus, the presence of institutional shareholders can be an indicator of market efficiency. Nye Report ¶41.

Here, institutions held between 65.2% and 72.4% of the Company's shares available to trade, and between 187 and 295 institutional investors held Nikola stock during the Class Period. Nye Report ¶42 This further supports a finding of market efficiency. *Id*. *See, e.g.*, *Loritz v. Exide Techs*., 2015 WL 6790247, at *16 (C.D. Cal. July 21, 2015) (finding market efficiency where the defendants notes were held by 88 institutions).

### 3.   The Proposed Damages Model Establishes a Method for Proving Damages on a Class Wide Basis

For damages questions to predominate, Plaintiffs must "show that their damages stemmed from the defendant's actions that created the legal liability" and can "feasibly and efficiently be calculated once the common liability questions are adjudicated." *Leyva v. Medline Indus.*, 716 F.3d 510, 514 (9th Cir. 2013) "[T]he need for individual damages calculations does not, alone, defeat class certification." *Vaquero v. Ashley Furniture Indus.*, 824 F.3d 1150, 1155 (9th Cir. 2016). This is especially true in securities cases, where "the process of computing individual damages will be virtually a mechanical task." *Diamond Foods, Inc.*, 295 F.R.D. at 252."). "Because each investor's loss usually can be established mechanically, common questions predominate and class certification is routine, if a suitable representative steps forward." *Schleicher v. Wendt*, 618 F.3d 679, 682 (7th Cir. 2010).

Dr. Nye's report demonstrates that per-share damages can be determined on a Class-wide basis by a well-established and formulaic "out-of-pocket" method of calculating damages for all Class members. Nye Report ¶¶ 62-67. That is sufficient at this stage. *Leyva*, 716 F.3d at 514; *Twitter*, 326 F.R.D. at 630. "Rule 23(b)(3) requires only that plaintiffs be able to show that their damages stemmed from the defendant's actions that created the legal liability." *In re Snap Inc. Sec. Litig.*, 334 F.R.D. at 217–18 (cleaned up). Thus, Lead Plaintiff need not, at this stage of the proceedings, provide a loss causation model or actually calculate damages. *See Halliburton I*, 563 U.S. at 809–15; *see also Hatamian*, 2016 WL 1042502, at *9 ("Plaintiffs need not show loss causation as a condition of class certification.").

Because the evidence and methodology for calculating the daily artificial inflation, and thus damages, are both common to the Class and applicable on a classwide basis, common issues predominate. *See SEB*, 335 F.R.D. at 288; *In re Lendingclub*, 282 F.Supp.3d at 1184.

### 4.   A Class Action Is the Superior Method for This Controversy

The superiority inquiry "calls for a comparative assessment of the costs and benefits of class adjudication, including the availability of 'other methods' for resolving the controversy." *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1128 (9th Cir. 2017). "If united

by a common core of facts, and a presumption of reliance on an efficient market, class actions are the superior way to litigate a case alleging violations of securities fraud." *Radiant*, 287 F.R.D. at 575.

Here, the superiority of class treatment is evident upon consideration of the four factors set forth in Rule 23(b)(3): "(1) the interest of each class member in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against the class; (3) the desirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to be encountered in the management of a class action." *Montage*, 2016 WL 1598666, at *13. Class members are too numerous and too geographically dispersed, and the typical claim too small, for individual actions to be feasible. *See Montage,* 2016 WL 1598666, at *13.

### D.   Pomerantz LLP, Block & Leviton LLP and Labaton Keller Sucharow LLP Should Be Appointed Class Counsel

In appointing class counsel, the Court must consider: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A). These considerations all weigh in favor of appointing Lead Counsel as class counsel. Lead Counsel have devoted substantial time and resources to identifying and prosecuting the claims, investigating the legal and factual bases for those claims, drafting the multiple complaints, including the operative SAC, defeating Defendants' motions to dismiss and pursuing discovery. And Lead Counsel has extensive experience prosecuting complex securities-fraud actions and have achieved substantial recoveries for investors. *See* Gotto Decl., Exs. E, F and G.

### V.   CONCLUSION

Lead Plaintiffs respectfully requests entry of an Order certifying this action as a class action, appointing Lead Plaintiffs as the Class Representatives, and appointing Pomerantz LLP, Block & Leviton LLP and Labaton Keller Sucharow LLP as Class Counsel.

May 17, 2024

Respectfully submitted,

**KELLER ROHRBACK LLP**

By:   /s/ Gary Gotto
Gary Gotto (No. 007401)
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Telephone:   (602) 230-6322
ggotto@kellerrohrback.com

*Liaison Counsel for Lead Plaintiffs*
*Nikola Investor Group II and for the Class*

**POMERANTZ LLP**
Jeremy A. Lieberman (*pro hac vice*)
Michael J. Wernke (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone:   (212) 661-1100
Facsimile:   (212) 661-8665
jalieberman@pomlaw.com
mjwernke@pomlaw.com

**BLOCK & LEVITON LLP**
Jeffrey C. Block (*pro hac vice*)
Jacob A. Walker (*pro hac vice*)
Michael D. Gaines (*pro hac vice*)
260 Franklin Street, Suite 1860
Boston, MA 02110
Telephone:   (617) 398-5600
Facsimile:   (617) 507-6020
jeff@blockleviton.com
jake@blockleviton.com
michael@blockleviton.com

*Counsel for Lead Plaintiffs Nikola Investor*
*Group II and Co-Lead Counsel for the Class*

**LABATON KELLER SUCHAROW LLP**
Jonathan Gardner (*pro hac vice*)
James T. Christie (*pro hac vice*)
David J. Schwartz (*pro hac vice*)
140 Broadway
New York, NY 10005
Telephone:   (212) 907-0700
Facsimile:   (212) 818-0477
jgardner@labaton.com
jchristie@labaton.com
dschwartz@labaton.com

*Additional Counsel for Lead Plaintiffs*
*Nikola Investor Group II*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

 I hereby certify that on May 17, 2024, a copy of the foregoing was filed electronically. Notice of this filing will be sent by email to all parties through the court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the court's CM/ECF system.

*/s/ Gary Gotto*
Gary Gotto
