**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Daniel Borteanu, et al.,                )    No.  CV-20-01797-PHX-SPL
                                         )
                    Plaintiffs,          )    No.  CV-20-01819-PHX-SPL (cons.)
                                         )    No.  CV-20-02123-PHX-SPL (cons.)
vs.                                      )    No.  CV-20-02237-PHX-SPL (cons.)
                                         )    No.  CV-20-02374-PHX-SPL (cons.)
Nikola Corporation, et al.,              )
                                         )    **ORDER**
                    Defendants.          )
                                         )
_____  )

        Before the Court is Lead Plaintiffs Daniel Borteanu, et al.'s Motion for Class Certification (Doc. 179), Defendants' Response (Doc. 185; sealed and unredacted at Doc. 195), Plaintiffs' Reply (Doc. 203), and Defendants' Sur-Reply (Doc. 223). Also before the Court is Defendants' Motion to Exclude the Opinions and Proposed Testimony of Zachary Nye (Doc. 187; sealed and unredacted at Doc. 196), Plaintiffs' Response (Doc. 200), and Defendants' Reply (Doc. 201). The Court now rules as follows.[1]

**I.    BACKGROUND**

        This is a private securities class action brought by Plaintiffs (Lead Plaintiffs: Vincent Chau, Stanley Karcynski, and George Mersho) on behalf of all investors who purchased the common stock of Nikola during the period June 4, 2020, through February 25, 2021. (Doc. 129 at 6). This action is against Nikola, several of the company's officers,

_____

        [1] Because it would not assist in resolution of the instant issues, the Court finds the pending motions are suitable for decision without oral argument. See LRCiv. 7.2(f); Fed. R. Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

Mark Russell, Kim Brady, Britton Worthen, Steve Girsky, Steven Shindler ("Individual Defendants"), Jeffrey Ubben ("Defendant Ubben"), and the company's former Executive Chairman, Trevor Milton ("Defendant Milton"). (*Id.* at 6–8).

Nikola is a publicly traded Delaware corporation with its headquarters in Arizona. (*Id.* at 20). Nikola designs and manufactures electric vehicles and their components. (*Id.* at 23). Plaintiffs filed their initial Complaint on September 15, 2020, and subsequently their First Consolidated Amended Class Action Complaint ("FCACAC") (Doc. 95) on January 24, 2022. (*Id.* at 5). On February 2, 2023, this Court dismissed that complaint for failure to state a claim. (Doc. 126). Plaintiffs then filed a Second Consolidated Amended Class Action Complaint ("SCACAC"), which remains the operative document. (Doc. 129).

Plaintiff alleges that Defendants violated §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder, by misrepresenting numerous aspects of Nikola's business and operations. (*Id.* at 6–8). Plaintiff alleges that these misrepresentations inflated Nikola's stock value. (*Id.* at 19). According to Plaintiff, when the falsity of these misrepresentations came to light, Nikola's stock value dropped dramatically, causing significant losses and damages to Plaintiff's class members. (*Id.* at 17–18).

The SCACAC alleges that "[w]hile Defendants misrepresented numerous aspects of Nikola's operations, the fraud can be broken down into nine categories of misrepresentations." (*Id.* at 7). Plaintiff alleges that Defendants misrepresented:

> "first, that Nikola had developed a fully operational 'zero-emissions' tractor trailer truck powered by hydrogen fuel cell technology—the Nikola One;
>
> second, that Nikola had, in hand, over 14,000 purchase orders for its trucks, which represented 2 to 3 years of production and billions in revenue;
>
> third, that Nikola was producing hydrogen at a fraction of the cost industry experts believed was possible and that Nikola was in the process of establishing a nation-wide network of hydrogen refueling stations, which could reliably dispense and produce inexpensive hydrogen for the Nikola One and Nikola's other vehicles to operate on;

> fourth, that Nikola had developed, using its own technology, a fully operational pick-up truck called the Badger, for which pre-orders had sold out;
>
> fifth, that Nikola had developed all of its vehicles' critical components 'in-house,' including a proprietary 'game-changing' electric battery, which exceeded the range of then-existing electric batteries;
>
> sixth, that the cost of owning and operating Nikola's vehicles was significantly less than the cost of owning and operating a traditional diesel powered vehicle;
>
> seventh, that commercial 'assembly line' production of the Nikola Tre BEV truck had already been completed in Ulm, German[y], and that Nikola had binding orders in hand for its BEV trucks;
>
> eighth, that Nikola's headquarters was completely 'off-grid' with solar panels on the roof producing 18 megawatts of energy a day; and
>
> ninth, that Nikola owned seven natural gas wells that were used as backup to Nikola's solar hydrogen production."

(*Id.* at 9). Plaintiffs now seek class certification of the following class:

> All those who purchased or otherwise acquired Nikola Corporation ("Nikola" or the "Company") securities during the period June 4, 2020 through February 25, 2021 (the "Class Period"), and were damaged upon the revelation of the alleged corrective disclosures (the "Class"). Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of Nikola during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Nikola's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

(Doc. 179 at 8).

Related to Plaintiffs' fully briefed Motion for Class Certification (Doc. 179) is Defendants' fully briefed Motion to Exclude the Opinions and Proposed Testimony of Zachary Nye (Doc. 196), which reiterates many of the same issues and arguments that

Defendants raise in their Opposition (Doc. 195) to the Motion for Class Certification. Of note, the parties have submitted multiple competing expert reports from their respective economics experts, Dr. Zachary Nye (Plaintiffs) and Dr. Andrew Roper (Defendants).[2] These expert reports are central to the arguments made by both parties in relation to both motions. Because the motions are so closely related, the Court will address each of them within this Order.

## II.    LEGAL STANDARDS

### 1.  Motion for Class Certification

Rule 23(a) of the Federal Rule of Civil Procedure lists four criteria that must be met to certify a class action: (1) numerosity; (2) commonality of law or fact; (3) typicality of the representative plaintiff's claims; and (4) adequacy of representation. A class may only be certified if the court is "satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 161 (1982). The burden is on the party seeking class certification to show that these elements have been met. *Doninger v. Pac. N.W. Bell, Inc.*, 564 F.2d 1304, 1308 (9th Cir. 1977); *see also Olean Wholesale Grocery Coop., Inc., v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022) ("[P]laintiffs must prove the facts necessary to carry the burden of establishing that the prerequisites of Rule 23 are satisfied by a preponderance of the evidence."). "Failure to meet any one of the requirements set forth in Rule 23 precludes class certification." *Miller v. Am. Standard Ins. Co. of Wis.*, 759 F. Supp. 2d 1144, 1146 (D. Ariz. 2010).

A plaintiff seeking class certification must "affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc.*

---

[2] *See* Dr. Nye's initial Expert Report (Doc. 179-2); Dr. Roper's initial Expert Reply Report (Doc. 185-1); Dr. Nye's own Expert Reply Report (Doc. 204-1); and Dr. Roper's additional Expert Reply Report (Doc. 223), filed alongside Defendants' Motion Seeking Leave to File Sur-Reply (Doc. 206), which this Court has now granted (Doc. 222).

*v. Dukes*, 564 U.S. 338, 350 (2011). Likewise, when considering class certification courts must engage in "a rigorous analysis." *Id.* at 350–51 (quoting *Falcon*, 457 U.S. at 161). The Rule 23 analysis may "entail some overlap with the merits of the plaintiff's underlying claim," *id.* at 351, but it "grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.*; *see also United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO v. ConocoPhillips Co.*, 593 F.3d 802, 808 (9th Cir. 2010) ("Although certification inquiries such as commonality, typicality, and predominance might properly call for some substantive inquiry, the court may not go so far . . . as to judge the validity of these claims." (cleaned up)). In fact, "[n]either the possibility that a plaintiff will be unable to prove his allegations, nor the possibility that the later course of the suit might unforeseeably prove the original decision to certify the class wrong, is a basis for declining to certify a class which apparently satisfies [Rule 23]." *United Steel*, 593 F.3d at 809 (quoting *Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975)).

### 2.  Motion to Exclude Opinions and Testimony

"Trial courts have always had a gatekeeping function for opinion evidence." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010), *as amended* (Apr. 27, 2010). Federal Rule of Evidence 702, as interpreted by the Supreme Court in *Daubert*, establishes a threshold for determining the admissibility of expert opinion and testimony. The Rule requires that the proponent of a qualified expert witness "demonstrates to the court that it is more likely than not that" the expert's testimony is helpful, "is based on sufficient facts or data," "is the product of reliable principles and methods," and "reflects a reliable application" of those principles and methods. Fed. R. Evid. 702. The Ninth Circuit, on remand, emphasized that "the test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology." *Daubert v. Merrell Dow Pharms., Inc.*,

43 F.3d 1311, 1318 (9th Cir. 1995). "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564.

In the securities litigation context, multiple federal courts have responded to attacks on an expert's cause-and-effect study by noting that "Defendants' arguments contesting the validity of plaintiffs' expert's conclusions based on his market model may be presented at trial." *In re Montage Technlogy Grp. Ltd. Sec. Litig.*, 2016 WL 1598666, at *10 (N.D. Cal. Apr. 21, 2016); *see also Hayes v. MagnaChip Semiconductor Corp.*, 2016 WL 7406418, at *7 (N.D. Cal. Dec. 22, 2016). So long as the Court determines that each expert's opinion is sufficiently relevant and reliable under *Daubert*, it is the jury who must decide what weight to afford conflicting testimony between those experts. *See Primiano*, 598 F.3d at 565; *Wyler Summit Pshp. v. Turner Broad. Sys.*, 235 F.3d 1184, 1192 (9th Cir. 2000) ("Weighing the credibility of conflicting expert witness testimony is the province of the jury."); *Lewert v. Boiron, Inc.*, 212 F. Supp. 3d 917, 924 (C.D. Cal. 2016) ("In making this preliminary [Rule 702] assessment, the court should not weigh conflicting expert testimony or attempt to determine whether the conclusions are correct.").

## III. <u>DISCUSSION</u>

The Court will address each requirement for class certification under Rule 23 of the Federal Rules of Civil Procedure in turn, keeping in mind that "[t]he underlying merits of the case, while admittedly relevant at the class certification stage, should not overly cloud the Court's certification analysis—the only question presently before the Court is whether the requirements of Rule 23 are met." *In re FibroGen Sec. Litig.*, 2024 WL 1064665, at *4 (N.D. Cal. Mar. 11, 2024).

### 1. **Rule 23(a)**

#### a. <u>Numerosity</u>

While no bright-line number exists, numerosity is met when general knowledge and common sense indicate that joining the unnamed plaintiffs would be impracticable. *Horton v. USAA Cas. Ins. Co.*, 266 F.R.D. 360, 365 (D. Ariz. 2009). The Supreme Court has

suggested that a class of 15 members is too small to meet the numerosity requirement. *Harik v. Cal. Teachers Ass'n*, 326 F.3d 1042, 1051 (9th Cir. 2003) (citing *Gen. Tel. Co. of the Nw. v. Equal Emp. Opportunity Comm'n*, 446 U.S. 318, 330 (1980)). However, 40 or more members has been found to satisfy the numerosity requirement. *See Horton*, 266 F.R.D. at 365.

Here, Plaintiffs' allegations meet the standard for numerosity, and Defendants do not contest class certification on the basis of numerosity. During the Class Period there were more than 115 million shares of Nikola stock outstanding. (Doc. 179 at 12). The Court certainly may infer that, when a corporation has millions of shares trading on a national exchange, more than 40 individuals purchased stock over the course of more than a year. *See, e.g.*, *In re UTStarcom, Inc. Sec. Litig.*, 2010 WL 1945737, at *4 (N.D. Cal. May 12, 2010) ("Some courts have assumed that the numerosity requirement is met in securities fraud suits involving nationally traded stocks."). It is likely that thousands of people made such purchases, and joinder of more than a thousand plaintiffs would be impracticable. The numerosity requirement is easily met.

### b. Commonality

To establish commonality, Plaintiff must demonstrate that there are "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The claims must "depend upon a common contention such that determination of its truth or falsity will resolve an issue that is central to the validity of each claim in one stroke." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012) (quoting *Wal-Mart*, 564 U.S. at 350) (internal quotations omitted). However, the Ninth Circuit has held that "merely pointing to a pattern of harm, untethered to the defendant's conduct, is insufficient" to prove commonality. *C.R. Educ. & Enf't Ctr. v. Hosp. Properties Tr.*, 867 F.3d 1093, 1104 (9th Cir. 2017).

In the present case, Plaintiffs detail a series of material omissions and misrepresentations from the remaining Defendants, and Plaintiffs have sufficiently alleged that investors typically rely upon this type of information when making financial decisions. The Court finds that Plaintiffs' allegations raise multiple common questions of law and

fact: "(i) Whether federal securities laws were violated by Defendants' conduct as alleged; (ii) Whether Defendants made any false and misleading statements; (iii) Whether Defendants acted with the requisite level of scienter under Section 10(b) of the Exchange Act; (iv) Whether Defendants engaged in a scheme to defraud investors; (v) Whether the Individual Defendants were controlling persons of the Company under Section 20(a) of the Exchange Act; (vi) Whether and to what extent the prices of Nikola common stock shares were artificially inflated during the Class Period due to the alleged false and misleading statements or omissions; (vii) Whether reliance is presumed under the fraud on-the-market doctrine; and; (viii) Whether Lead Plaintiffs and other members of the Class suffered damages, as well as the appropriate measure thereof." (Doc. 179 at 13). These common questions form the core of a case for securities fraud; they are also extremely similar to questions of law and fact that other courts have found to be common in previous securities fraud cases. *See, e.g.*, *In re UTStarcom*, 2010 WL 1945737, at *4 ("Repeated misrepresentations by a company to its stockholders satisfy the commonality requirement of Rule 23(a)(2).") If they chose to press this action as individuals, all class members would still have to prove these questions. Accordingly, the Court finds that there is sufficient commonality of questions of law and fact to certify the class.

c. <u>Typicality</u>

A proposed class satisfies the typicality requirement if the claims of the representative party are typical of the claims of the class. Fed. R. Civ. P. 23(a)(3). As long as the representative's claims are "reasonably coextensive with those of absent class members[,] they need not be substantially identical." *Staton v. Boeing Co*., 327 F.3d 938, 957 (9th Cir. 2003) (quoting *Hanlon v. Chrysler Corp*., 150 F.3d 1011, 1020 (9th Cir. 1998)).

In this case, Plaintiffs' claims and the nature of their alleged losses are sufficiently similar to other class members' claims and alleged losses to be considered typical. Plaintiffs all purchased Nikola shares during the Class Period, allegedly suffering significant losses as a result of Defendants' alleged wrongdoing. Specifically, all proposed

class members base their claims on the same alleged misstatements or omissions by Defendants and the same Section 20(a) "control person" liability. Furthermore, lead Plaintiffs claim that the remainder of the proposed class will utilize the same evidence and legal theories. (Doc. 179 at 14).

Defendants argue that none of the three lead Plaintiffs are adequate or typical class representatives under Rule 23. (Doc. 195 at 14). The Court need not address the typicality of the Estate of Stanley Karczynski, as it will exclude the Estate on the basis of adequacy. As to the typicality of Vincent Chau's claim, Defendants argue that "his views contradict the theories of harm being pursued by the Class" based on a few questions Chau answered during a deposition (Doc. 195-3). Defendants' threadbare assertion hardly destroys the typicality of Chau's claim, and it does nothing to cast into doubt the fact that his losses are sufficiently similar to other class members. The Court finds Chau to satisfy the typicality requirement. As to George Mersho, Defendants' only argument against him on this issue is that he was an "active trader" who "purchased Nikola stock *after* the Hindenburg report," which "subject[s] him to unique and disqualifying reliance defenses." (Doc. 195 at 18) (emphasis added). However, the Court does not find this sufficient to render Mersho an atypical representative. *See, e.g.*, *SEB Inv. Mgmt. AB v. Symantec Corp.*, 335 F.R.D. 276, 283–84 (N.D. Cal. 2020) (finding that a plaintiff's post-disclosure purchases alone were not enough to show atypicality).

Accordingly, the Court finds that the claims of both Chau and Mersho are typical of the rest of the class.

### d. Adequacy

The class representatives must fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a)(4). The adequacy requirement depends on: (1) whether the class representatives and their counsel have any conflicts of interest with other class members; and (2) whether the class representatives and their counsel will prosecute the action vigorously on behalf of the class. *Staton*, 327 F.3d at 957. Reviewing a securities class action, the district court in *Schaefer* formulated the issue of adequacy as determining

whether the "representative party's attorney [would] be qualified" and whether "the named plaintiffs' interests [would] not be antagonistic to the remainder of the class." *Schaefer v. Overland Exp. Fam. of Funds*, 169 F.R.D. 124, 130 (S.D. Cal. 1996).

Here, all proposed class representatives possess the same interest in seeking to redress alleged wrongs by Defendants. Lead Plaintiffs have also been actively involved in this litigation from the beginning, and their counsel avows to being highly experienced in litigating securities class action cases. (Doc. 179 at 15). This Court is unconvinced by Defendants' arguments that Chau and Mersho are inadequate representatives because they have "no knowledge of this litigation" and have left their lawyers "to their own devices." (Doc. 195 at 17–18). Defendants attempt to cherry pick out-of-context answers from Chau's and Mersho's depositions to cast them in a negative light, but none of their supposed evidence actually suggests that either Chau or Mersho have conflicts of interest with other class members or that they would not prosecute the action vigorously on behalf of the class.[3]

However, the Court does share Defendants' concerns with the adequacy of the Estate of Stanley Karczynski as a representative. Mr. Karczynski passed away in July 2022, and his Estate was substituted in May 2023. (*Id.* at 14; Doc. 147). The Estate was represented by William J. McDevitt, the Karczynski family's tax advisor, in a Rule 30(b)(6) deposition, where Defendants argue that it became clear that "McDevitt knew

---

[3] For example, Defendants claim that Chau "freely admitted that he did 'not supervis[e]' his counsel, which is an absolute bar to serving as a class representative" (Doc. 105 at 17) (quoting Doc. 195-3 at 32) (citation omitted). In reality, Chau was asked, "Have you supervised your counsel in this case?" to which he responded, "Communicating, not supervising." (Doc. 195-3 at 32). Nothing about this exchange would suggest, as Defendants insinuate, that Chau is disinterested in this lawsuit or has failed to monitor the status of the litigation. On the contrary, when asked how much time he had devoted to the case at the time of the deposition, Chau testified that he had spent "maybe 100" hours "looking and calculating and talking to the lawyer" regarding the case. (*Id.* at 31–32). This only further supports the Court's finding that Chau will vigorously prosecute on behalf of the class. Furthermore, Defendants fail to make *any* arguments as to why Mersho would be an inadequate representative except to say that he is "incredibly busy." (Doc. 195 at 18).

practically nothing about the litigation." (Doc. 195 at 15). The Court agrees that Mr. McDevitt appeared to have little familiarity with the Nikola litigation beyond minimal preparations for his deposition. (*See* Doc. 195-2 at 17–22). Mr. McDevitt understood Mrs. Karczynski, the widow of Stanley Karczynski, to be the Executor of the Estate; however, he had never spoken with Mrs. Karczynski. (*Id.* at 20). Even though Mrs. Karczynski, as the Executor, would be expected to make decisions on behalf of the Estate for purposes of litigation (*Id.* at 23), when Mr. McDevitt was asked, "Do you know, with certainty, who, if anyone, is making decisions on behalf of the estate, with respect to this litigation?" he answered, "No." (*Id.* at 24).

In the Ninth Circuit, a class representative must "have a lay understanding of the basis for the suit and an understanding of their injury" to be considered "adequate" under Rule 23(a)(4). *In re FibroGen*, 2024 WL 1064665, at *7. Additionally, "courts considering a motion for class certification should ensure a lead plaintiff is adequately capable of" monitoring class counsel and "not 'simply lending their name[ ] to a suit controlled entirely by the class attorney.'" *In re Honest Co. Sec. Litig.*, 2023 WL 3190506, at *6 (C.D. Cal. May 1, 2023) (quoting *Alberghetti v. Corbis Corp.*, 263 F.R.D. 571, 580 (C.D. Cal. 2010)). However, courts have cautioned that a party "will be deemed inadequate only if [they are] 'startlingly unfamiliar' with the case." *Moeller v. Taco Bell Corp.*, 220 F.R.D. 604, 611 (N.D. Cal. 2004), *amended in part*, 2012 WL 3070863 (N.D. Cal. July 26, 2012) (citation omitted).

It is certainly "startling," in the view of this Court, that the Estate's designated 30(b)(6) deponent was himself unsure who would be making decisions on behalf of the Estate for purposes of this litigation. At various times, Mr. McDevitt suggested that Stanley Karvczynski's son, Michael Karczynski, and his longtime business associate, Eli Zimbler, had been interacting with counsel regarding the litigation. (Doc. 195-2 at 24, 36). The Court is inclined to agree with Defendants that "there is no singular person willing or able to act on behalf of the Estate"—instead, there are multiple parties that seem to be participating in piecemeal fashion, which suggests "lawyer-driven litigation." (Doc. 195 at 15–16). Given

these concerns regarding the Estate's cohesiveness, it is doubtful whether the Estate could operate effectively as part of a group with other Lead Plaintiffs.

Defendants do not identify, nor has this Court found, any case law that would categorically exclude an Estate from serving as a class representative in a securities class action. (*See* Doc. 203 at 16 n.19). To the contrary, numerous courts have allowed for the appointment of estate executors as class representatives in various types of class actions. In *Negrete v. Allianz Life Insurance Co. of North America*, 2013 U.S. Dist. LEXIS 94030, at *9 (C.D. Cal. July 3, 2013), for example, the court allowed an estate executor to serve as one of two class representatives in a RICO class action against an insurance company. However, *Negrete* is distinguishable from the present case for two notable reasons: first, the executor in *Negrete* had been involved in the litigation since its inception (as the conservator of the injured party, then as the executor of that party's estate). *Id.* at *10. Second, it was clear that a single party would be acting on behalf of the estate in *Negrete*. *Id.* at *10–11. Here, by contrast, it is entirely unclear who will take primary responsibility for acting on behalf of Mr. Karczynski's Estate; furthermore, as Mr. McDevitt's deposition testimony underscored, it does not appear that the interested parties have been involved in the litigation since its inception.

Accordingly, the Court finds that the Estate of Stanley Karczynski does not meet the adequacy requirement of Rule 23(a)(4). This appears to be a case where the Estate— composed of a varying cast of spokespersons and representatives—is indeed merely lending a name to a suit controlled by the class attorney. *See In re Honest Co. Sec. Litig.*, 2023 WL 3190506, at *6. However, the adequacy requirement does not mean that *all* proposed representatives must be adequate, as long as at least one class representative is adequate. *Chambers v. Whirlpool Corp.*, 980 F.3d 645, 670–71 (9th Cir. 2020) (citing *Loc. Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 n.2 (9th Cir. 2001)). Because the Court finds both Chau and Mersho to be adequate class representatives, the adequacy-of-representation requirement is satisfied.

With the four prerequisites under Rule 23(a) satisfied, the Court may now proceed

to its analysis of this class action under Rule 23(b)(3).

### 2.  Rule 23(b)(3) Predominance

Rule 23(b)(3) permits certification where "the court finds that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy" in light of, among other things, "the difficulties likely to be encountered in the management of a class action." Fed. R. Civ. P. 23(b)(3). Predominance is a similar inquiry to commonality, but it requires a heightened showing that facts and issues common to the class predominate over any individual issues that might be present. *Id*. The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 623 (1997). "Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) ("*Halliburton I*") (citing Rule 23(b)(3)). Accordingly, the Rule 23(b)(3) predominance inquiry turns on whether Plaintiffs could offer evidence to prove the elements of their 10(b)(5) claim on a *class-wide*, rather than individualized, basis. *See* McLaughlin on Class Actions, 1 § 5:23 (20th ed.).

To establish liability under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, a plaintiff must show "(1) a material misrepresentation or omission of fact by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) ("*Halliburton II*"). The United States Supreme Court has held that when securities fraud class-action plaintiffs meet certain requirements, they are entitled to a fraud-on-the-market presumption of reliance. *Basic Inc. v. Levinson*, 485 U.S. 224, 248 (1988). This creates a rebuttable presumption that all plaintiffs in the class actually relied on the defendants' material misrepresentations or

omissions when purchasing or selling a security. *Id*. The presumption is founded on the theory that "in a modern and *efficient* securities market, the market price of a stock incorporates all available public information. Therefore, any person who trades shares relies on the integrity of the market price." *No. 84 Employer–Teamster Joint Council Pension Trust Fund v. America West Holding Corp*., 320 F.3d 920, 947 (9th Cir. 2003) (citations omitted) (emphasis added).

In the present case, Lead Plaintiffs claim they will demonstrate class-wide reliance under this "fraud-on-the-market" presumption of reliance. (Doc. 179 at 16). In order to demonstrate that the presumption applies in a given case, Plaintiffs must show "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Halliburton II*, 573 U.S. at 268. As to the first, second, and fourth factors, Plaintiffs note that "Defendants' misrepresentations were public," that "Plaintiffs purchased or acquired Nikola stock during the Class Period, before the corrective disclosures," and that "materiality is not litigated at class certification." (Doc. 179 at 17). Accordingly, "the only determinative question is whether Nikola's stock traded in an efficient market." (*Id.*). Of course, this issue is hotly contested between the parties.

When considering a motion for class certification, the Court must consider whether a particular security traded in an efficient or inefficient market during the relevant period. *See Halliburton II*, 573 U.S. at 276 ("The burden of proving [publicity, market efficiency, and market timing] still rests with plaintiffs and . . . must be satisfied before class certification."). To determine whether a security trades in an efficient market, courts generally consider the five *Cammer* factors: "(1) whether the stock trades at a high weekly volume; (2) whether securities analysts follow and report on the stock; (3) whether the stock has numerous market makers and arbitrageurs; (4) whether the company is eligible to file SEC registration form S–3, as opposed to form S–1 or S–2; and (5) whether there are 'empirical facts showing a cause and effect relationship between unexpected corporate

14

events or financial releases and an immediate response in the stock price.'" *Petrie v. Elec. Game Card, Inc.*, 308 F.R.D. 336, 349 (C.D. Cal. 2015) (citation omitted).

As a preliminary matter, the Court notes that numerous federal courts have found that where a company's securities have been listed on the NASDAQ or other national secondary market, there is a strong presumption in favor of market efficiency. *See Todd v. STAAR Surgical Co.*, 2017 WL 821662, at *6 (C.D. Cal. Jan. 5, 2017). In the present case, "[a]t all relevant times, Nikola common stock was listed and traded on the NASDAQ." (Doc. 179 at 18). While this fact alone indicates market efficiency, the Court must nonetheless consider the five *Cammer* factors determine whether the market for Nikola stock, specifically, was efficient. *See Todd*, 2017 WL 821662, at *7. Defendants primarily attack the Motion for Class Certification by arguing that Nikola's stock was not efficient throughout the Class Period. (Doc. 195 at 7). The Court will now address each of the *Cammer* factors and Defendants' various arguments. Defendants do not dispute that Plaintiffs have satisfied the first, second, and fourth factors, but rather focus their arguments on the third and fifth *Cammer* factors.

a.  *Cammer* Factor 1: Weekly Trading Volume

The first *Cammer* factor is the average weekly trading volume during the Class Period. *Cammer v. Bloom*, 711 F. Supp. 1264, 1286 (D.N.J. 1989). A high trading volume supports a finding of market efficiency "because it implies significant investor interest in the company" and "a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information." *Id.* An average weekly trading of two percent or more of a company's outstanding shares can justify a presumption of market efficiency. *Id.*; *see also, e.g.*, *In re FibroGen*, 2024 WL 1064665, at *9 (4.65% average weekly trading volume weighed toward a finding of market efficiency).

Here, Plaintiffs note that "the average weekly trading volume during the Class Period was 30.5% - 15 times the 2% amount that justifies a 'strong presumption' of market efficiency." (Doc. 179 at 18). Accordingly, the Court finds that the first *Cammer* factor favors a finding of market efficiency.

b.  *Cammer* Factor 2: Coverage by Securities Analysts

The second *Cammer* factor "relates to how new information on the Company was being disseminated and acted upon by investors during the proposed Class Period." *In re FibroGen*, 2024 WL 1064665, at *9.  Plaintiffs state that "[a]t least 9 analysts issued over 140 reports regarding Nikola during the Class Period," which "strongly supports market efficiency." (Doc. 179 at 19). This Court agrees. *See, e.g.*, *In re FibroGen*, 2024 WL 1064665, at *9 (eight securities firms that issued at least 111 analyst reports); *Brown v. China Integrated Energy Inc.*, 2015 WL 12720322, at *17 (C.D. Cal. Feb. 17, 2015) (at least five financial analysts following the company).

c.  *Cammer* Factor 3: Market Makers and Arbitrageurs

This factor looks to "market makers" or other "individuals [who] would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." *Cammer*, 711 F. Supp. at 1286. "Market-makers stand by as available counterparties to a trade, thereby enhancing the possibility that a trade can occur at a price that reflects information rather than a party's urgent need to buy or sell." *In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 614 (C.D. Cal. 2009). Plaintiffs contend, and this Court agrees, that "Nikola had over 110 market makers," which supports a finding of market efficiency. (Doc. 179 at 19); *see, e.g.*, *In re FibroGen*, 2024 WL 1064665, at *10 (over one hundred market makers supported market efficiency); *China Integrated Energy Inc.*, 2015 WL 12720322, at *17 (twenty-one market makers weighed in favor of market efficiency).

Defendants counterargue that Dr. Nye "ignores evidence that arbitrage activity was *significantly* constrained during the Class Period." (Doc. 195 at 10). Specifically, as they expound in their Motion to Exclude Dr. Nye's proposed testimony, Defendants argue that Dr. Nye's calculations "fail[] to account for the fact that large portions of Nikola's stock were locked up and therefore could not be traded at the start of the Class Period," which placed "significant constraints on short-trading," meaning that "arbitrageurs were unable to trade on available information and, by extension, that Nikola's stock price did not reflect

downside pessimistic views." (Doc. 196 at 4). Of course, Plaintiffs contend that these arguments regarding constraints on short-selling are "pure speculation" for various reasons explained in Dr. Nye's Reply Report (Doc. 204-1). (Doc. 203 at 8).

At this juncture, the Court's role is not to nitpick, line by line, the competing expert reports offered by the parties. For the purposes of a motion for class certification, this Court reiterates the Supreme Court's admonishment that "[m]erits questions may be considered to the extent—but *only* to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen*, 568 U.S. at 466. Similarly, for the purposes of Defendants' Motion to Exclude, the Court's Rule 702 gatekeeping function hardly justifies Defendants' attempts to force this Court to reject Dr. Nye's conclusions under the guise of rejecting his "methodologies." Defendants' contention that there is an "utter lack of methodology supporting Nye's opinions" is an extreme overstatement and is itself unsupported. (Doc. 196 at 13).

Dr. Nye adequately responds to Defendants' and Dr. Roper's concerns about lockup constraints on shares, demonstrating that he reliably applied reliable methodologies to form his opinions. When deposed regarding his conclusions on *Cammer* factor 3, for example, Dr. Nye explained how he looked "at the short interest data and compared it to the public float of Nikola," and then "compared it against a benchmark of securities that are widely considered on average to be efficient." (Doc. 195-1 at 34). He then "observed that short interest . . . increased over the class period as more negative news occurred," which was the result he expected to see under the circumstances. (*Id.*). He "also noted that not a single analyst described any short sale constraints whatsoever during the class period." (*Id.*).

It is clear that Defendants disagree with Dr. Nye's opinions regarding arbitrage opportunities, but their disagreement does not warrant wholesale exclusion of those opinions—to the contrary, it would be an impermissible invasion into the province of the jury to decide whether to afford Dr. Nye's or Dr. Roper's expert opinions more weight, so long as the Court is satisfied that the threshold admissibility requirements of Rule 702 have been met. The Court is so satisfied here. It finds no grounds on which to exclude Dr. Nye's

opinions or testimony based on Defendants' arguments, and furthermore, it concludes that the third *Cammer* factor weighs toward a finding of market efficiency.

### d.  *Cammer* Factor 4: SEC Form S-3 Eligibility

"Form S-3 is an 'abbreviated' SEC filing, for which entities are eligible to file if they filed SEC reports for the previous 12 months consecutively and meet certain financial and minimum stock requirements." *In re FibroGen*, 2024 WL 1064665, at *10. When a company meets the Form S-3 filing requirements, this indicates that the market for its securities is likely efficient. *See id.* Plaintiffs argue that "Nikola did not file any registration statements during the Class Period, but met the definition of a 'large accelerated filer' under Rule 12b-2 of the Exchange Act, for which the public float and reporting history requirements are virtually identical to the Form S-3 filing requirements." (Doc. 179 at 19). They also note that Nikola "adhered to all the Form S-3 requirements imposed by the SEC during the Class Period." (*Id.* at 19–20). Additionally, this Court notes that Form S-3 ineligibility "is not fatal to a finding of market efficiency." *Petrie*, 308 F.R.D. at 352.

Ultimately, because Defendants have not challenged Plaintiffs' assertion that Nikola "[met] the minimum stock requirements to file S-3 Registration Statements . . . the Court concludes that this factor weighs in favor of a finding of market efficiency." *Hayes*, 2016 WL 7406418, at *6.

### e.  *Cammer* Factor 5: Cause-and-Effect Relationship

"The fifth *Cammer* factor is whether there are facts to support a cause-and-effect relationship between unexpected corporate events or financial releases and an immediate response in stock price. This factor is 'the essence of an efficient market and the foundation for the fraud on the market theory.'" *Petrie*, 308 F.R.D. at 352 (quoting *Cammer*, 711 F. Supp. at 1287). The cause-and-effect relationship is often tested through an event study, which "attempts to determine whether new information correlates with a price movement." *In re Countrywide.*, 273 F.R.D. 586, 614. Plaintiffs argue that the event study conducted by their expert, Dr. Zachary Nye, provides ample support of a cause-and-effect relationship between company disclosures and stock prices. (Doc. 179 at 20). Summarizing Dr. Nye's

findings, they state that "Dr. Nye examined four dates on which Nikola released quarterly or year-end financial results," that "[o]ut of the four event dates examined, three (*i.e.* 75%) were associated with a statistically significant Company-specific return," and that "for the event date that is associated with a statistically *insignificant* Company-specific return, the Company's financial results were in line with expectations such that the insignificant price reaction is consistent with an efficient market." (*Id.* at 20–21).

By contrast, Defendants dispute Plaintiffs' ability to establish the fifth *Cammer* factor. They argue that the event study conducted by Dr. Nye, is "fatally flawed" for multiple reasons. First, they point out that Dr. Nye only studied Nikola's earnings announcements when Nikola was a "pre-revenue" company, which means he studied "the wrong type of events *for this particular case*." (Doc. 195 at 8). Furthermore, they argue that focusing on the earnings announcements also fails to test for unexpected news, which is "the intended focus of *Cammer* Factor 5." (*Id.*). Next, Defendants argue that Dr. Nye improperly relies on analyst commentary published *after* the earnings announcements, rendering his study unreliable, subjective, and results oriented. (*Id.* at 8–9). Finally, they argue that Dr. Nye's regression model fails to account for the volatility in Nikola's stock price. (*Id.* at 9). These arguments are repeated in Defendants' Motion to Exclude Dr. Nye's opinions and testimony as grounds on which the Court should find Dr. Nye unreliable as a witness. (*See* Doc. 196 at 6–9).

Plaintiffs make various counterarguments in their Reply (Doc. 203). First, they argue that "[c]ourts routinely find market efficiency without considering *Cammer* 5 where, as here, the security traded on a national exchange and other *Cammer* factors support market efficiency." (Doc. 203 at 6). In *Smilovits v. First Solar, Inc.*, 295 F.R.D. 423, 437 (D. Ariz. 2013), for example, the court described the parties' opposing causation evidence as an empirical "stand-off" that was "too close to call"; nonetheless, the court was able to reach a conclusion regarding market efficiency on the basis of the other *Cammer* factors. *See also Di Donato v. Insys Therapeutics, Inc.*, 333 F.R.D. 427, 442 (D. Ariz. 2019) (noting that "[a]lthough the fifth *Cammer* factor is important," it was not necessary to satisfy where

the other four factors were satisfied).

Additionally, the *Di Donato* court noted that "the *Cammer* factors can be supplemented" by the three *Krogman* factors: "(1) the capitalization of the company; (2) the bid-ask spread of the stock; and (3) the percentage of stock not held by insiders (the 'float')." *Id.* at 438 (quoting *Krogman v. Sterritt*, 202 F.R.D. 467, 474 (N.D. Tex. 2001)). Plaintiffs argue that each of the three *Krogman* factors support market efficiency, noting that (1) Nikola's market capitalization "averaged $230.5 million over the Class Period," (2) that there was a narrow bid-ask spread for its common stock, and (3) that the "public float of Nikola stock was, on average, 55.1% of shares outstanding during the Class Period." (Doc. 179 at 21–22). Plaintiffs also add that the percentage of institutional ownership of Nikola's shares supports a finding of market efficiency. (*Id.* at 22). *See Petrie*, 308 F.R.D. at 356–57.

Of these additional factors, Defendants dispute only the "public float" factor. "Float" refers to "the percentage of shares held by the public, rather than insiders." *Krogman*, 202 F.R.D. at 478. A high level of float weighs toward a finding of market efficiency. *See id.* Defendants argue that, based on the analysis performed by Dr. Roper, Nikola's float was "substantially lower than Nye's estimate." (Doc. 195 at 10). Once again, although Defendants and their expert disagree with Dr. Nye's *conclusions*, the Court finds that Dr. Nye's *methodologies* in calculating public float are sufficient under Rule 702, and, furthermore, it finds that this factor weighs toward market efficiency. The Court agrees that "[a]t bottom, Defendants' arguments go to the weight, not admissibility, of Dr. Nye's opinions." (Doc. 200 at 19); *see also In re Groupon, Inc. Sec. Litig.*, 2015 WL 1043321, at *10 n.9 (N.D. Ill. Mar. 5, 2015).

Here, the Court's finding that all three *Krogman* factors weigh toward market efficiency supplements its finding that the *Cammer* factors also weigh toward a finding of market efficiency. *See, e.g.*, *Angley v. UTi Worldwide Inc.*, 311 F. Supp. 3d 1117, 1121 (C.D. Cal. 2018) ("Because there is no evidence disputing the first four *Cammer* factors and the *Krogman* factors weigh in favor of market efficiency, the Court finds Plaintiff has

20

met its burden of showing market efficiency."); *In re FibroGen*, 2024 WL 1064665, at \*10 ("Some courts have found that where the first four *Cammer* factors and the three *Krogman* factors are satisfied, it is not necessary for a court to consider *Cammer* factor five."). Even *if* this Court were to agree with Defendants that Dr. Nye's event study is insufficient to establish the fifth *Cammer* factor, Plaintiffs have provided this Court with ample independent reasons to find market efficiency. Regardless, this Court need not go so far, because it ultimately agrees with Plaintiffs that *Cammer* factor 5 *also* weighs toward a finding of market efficiency based on Dr. Nye's event study.

Furthermore, Defendants' continued attempts to couch their disagreements with the findings of Dr. Nye's event study as methodological criticisms are unavailing for the purposes of their Motion to Exclude his proposed opinions and testimony. For example, in his Expert Report (Doc. 185-1, Ex. A), Dr. Roper states that Dr Nye's "opinion is primarily based upon counts and comparisons commonly considered in litigation, but which failed to detect the inefficiency in the market in this case." (Doc. 185-1 at 16). In the same stroke, Dr. Roper seems to acknowledge that Dr. Nye's methods are common to this type of litigation yet dispute the conclusion those methods led Dr. Nye to make. None of the Defendants' arguments cast into doubt the reliability of Dr. Nye's methods, and their arguments on the merits are best saved for the jury.

Plaintiffs also adequately address each of Defendants' claimed "fatal flaws" in Dr. Nye's study. As to Dr. Nye's selection of event dates, Plaintiffs note that the events were defined "*ex ante* . . . as the Company's quarterly and year-end earnings announcements," which is a methodology "supported by the literature" and regularly employed by experts. (Doc. 200 at 10). Here, as in other cases, the Court agrees that "[w]hile Dr. Nye's study may not be perfect, it is not unreliable. Defendants may challenge Dr. Nye's conclusions in the appropriate forum, that is, at trial." *In re Heckmann Corp. Sec. Litig.*, 2013 WL 2456104, at \*8 (D. Del. June 6, 2013). Next, as to Defendants' argument that Dr. Nye "selectively curat[ed] snippets of statements from analyst reports" to "engag[e] in an improper ex-post analysis," (Doc. 196 at 7), the Court finds that Dr. Nye took sufficient

steps to minimize the "inevitable subjectivity" that arises in designing an event study. *See China Integrated Energy Inc.*, 2015 WL 12720322, at *7. In his expert reports and deposition, Dr. Nye fully explained why he did not believe the earnings announcements that Defendants contend he should have analyzed were likely to significantly affect the valuation of Nikola's stock, given that there were "different expectations from the market at the time of each earnings announcement." (Doc. 200 at 15). Finally, as to their criticism of Dr. Nye's statistical modeling, even if Defendants would choose to use a different control period for their modeling, they've failed to establish that Dr. Nye's choice of a forward-looking control period is unsupported by the academic literature. (Doc. 196 at 9; Doc. 200 at 16–17). Their criticisms therefore go to the weight of Dr. Nye's opinions, not admissibility. *See In re Barclays Bank PLC Sec. Litig.*, 2017 WL 4082305, at *24 (S.D.N.Y. Sept. 13, 2017), *aff'd*, 756 F. App'x 41 (2d Cir. 2018), *as amended* (Nov. 20, 2018).

The Court need not waste any more words parsing Defendants' multitudinous arguments regarding *Cammer* factor 5. Ultimately, after analysis of all the *Cammer* and *Krogman* factors, consideration of the arguments of both parties, and evaluation of both experts' competing reports and deposition testimony, this Court finds that Nikola stock traded in an efficient market throughout the Class Period. Plaintiffs are therefore entitled to a fraud-on-the-market presumption of reliance, unless Defendants rebut this presumption "through direct evidence that the misrepresentation at issue did not *in fact* affect the stock price." *Di Donato*, 333 F.R.D. at 442 (citing *Halliburton II*, 573 U.S. at 279). The Court will now examine Defendants' rebuttal arguments.

f.   Price Impact

In *Halliburton II*, the Supreme Court held that securities fraud defendants could "rebut the presumption of reliance with evidence of a *lack* of price impact, not only at the merits stage—which all agree defendants may already do—but also before class certification." *Halliburton II*, 573 U.S. at 277. This is because the fraud-on-the-market theory presumes that an investor "relies on a misrepresentation *so long as it was reflected*

*in the market price* at the time of his transaction." *Halliburton I*, 563 U.S. at 813 (emphasis added). If defendants can show that an alleged misrepresentation was *not* reflected in the market price, "the presumption completely collapses." *Halliburton II*, 573 U.S. at 283. "The Supreme Court provided a non-exhaustive list of ways that defendants can rebut the presumption, including by showing: (1) the market did not respond to the alleged misrepresentations; (2) the misrepresentations were immaterial; (3) a plaintiff did not actually rely on the misrepresentations; or (4) a plaintiff would have sold the securities without relying on the integrity of the market." *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 637 (3d Cir. 2011) (summarizing *Basic*, 485 U.S. at 248–49). Here, Defendants argue that "none of the alleged misrepresentations had a price impact," which renders the fraud-on-the-market presumption inappropriate in this case. (Doc. 195 at 12).

Defendants' primary price-impact argument is what Plaintiffs label a "truth-on-the-market defense" (Doc. 203 at 11), as they argue that much of the allegedly concealed information had already been publicly disclosed. (Doc. 195 at 12–14). Defendants and Dr. Roper organize "68 misrepresentations still at-issue in this case" into six categories: (1) statements relating to Nikola alleging to have over 14,000 units reserved (the "FCEV Statements"); (2) statements regarding Nikola's hydrogen production capabilities (the "Hydrogen Statements"); (3) statements relating to the  Nikola Badger (the "Badger Allegations"); (4) statements relating to a proposed agreement between Nikola and General Motors (the "GM Statements"); (5) statements relating to whether Nikola's components were developed in-house (the "In-House Statements"); and (6) statements relating to its battery technology (the "Battery Statements"). (Doc. 185-1 at 81–82).

The Court agrees that it has already addressed and rejected Defendants' arguments in large part in its First Dismissal Order (Doc. 126 at 66–67). There, the Court noted that the Ninth Circuit in *BofI* "recognized that corrective disclosures can be based on publicly available information," as long as there are facts explaining why that information had not yet been reflected in Nikola's stock price. (*Id.*); *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 794 (9th Cir. 2020) ("Prior cases reflect the understanding that some information,

although nominally available to the public, can still be 'new' if the market has not previously understood its significance."). For example, Dr. Roper spends multiple pages of analysis in his Expert Report (Doc. 185-1) arguing that the FCEV Statements could not have had price impact "because it was known that [Nikola's FCEV pre-orders] were non-binding." (Doc. 185-1 at 87). While addressed in the distinct context of a Motion to Dismiss, this Court's previous analysis is telling: as this Court stated, "[t]he underlying truth is that Nikola had never produced even a single consumer-ready FCEV truck. Likewise, Nikola remained unable to produce any hydrogen fuel, as its hydrogen infrastructure was entirely undeveloped. Thus, to refer to the backlog as a list of 'pre-orders' or 'reservations' . . . is incredibly generous." (Doc. 126 at 20). Similar reasoning applies to the current dispute regarding the potential price impact of the FCEV misstatements, as Dr. Nye highlights in his Reply Report (Doc. 204-1): "Notwithstanding disagreements about the extent to which the reservations were binding, had investors learned that 78% of the $10 billion backlog was for an abandoned [vehicle prototype], it does not take a financial economist to determine that they would have been severely disappointed to see 78% of this future revenue stream evaporate . . . ." (Doc. 204-1 at 78).

Ultimately, Defendants' price impact statements as to each of the six categories of misstatements boil down to an argument that the relevant facts underlying those misstatements were already "publicly known" and therefore could not be misleading. (Doc. 195 at 12–14). But based on the evidence presented, the Court cannot say that "the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff[s]" has been "sever[ed]" such that Defendants have managed to rebut the presumption of reliance. *See Basic*, 485 U.S. at 248. As further explicated in this Court's First Dismissal Order (Doc. 126), and based on the arguments and expert reports presented in the instant motions, there has been an ample showing that the facts at issue were genuinely misleading and that they caused a statistically significant stock price impact (Doc. 203 at 11). A plaintiff is not required, at class certification stage, to prove that the market *in fact* responded to alleged misrepresentations; however, to rebut the presumption

of reliance, a defendant *is* required to show that the market *did not* respond to those misrepresentations. *See Di Donato*, 333 F.R.D. at 444. Here, Defendants have failed to make such a showing. Accordingly, their price impact rebuttal fails, and Plaintiffs are entitled to a fraud-on-the-market presumption of reliance.

g.  Damages

"To meet the predominance requirement under Rule 23(b)(3), 'plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability' under the proposed damages model." *In re BofI*, 2021 WL 3742924, at *5 (quoting *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013)). However, "[u]ncertainty regarding class members' damages does not prevent certification of a class as long as a valid method has been proposed for calculating those damages." *Lambert v. Nutraceutical Corp.*, 870 F.3d 1170, 1182 (9th Cir. 2017), *rev'd on other grounds*, 586 U.S. 188 (2019).

In their Motion to Exclude, Defendants argue that Dr. Nye's "opinion on whether damages can be measured on a class-wide basis and in a manner consistent with Plaintiffs' theory of liability is also unreliable because he does not even purport to offer a methodology for his assessment of that question *in this case*." (Doc. 196 at 14). Defendants' main dispute seems to be that Dr. Nye's report is similar to those he has conducted in other securities litigation. (*Id.*). The Court finds this argument unavailing.

Courts have "generally found" that the requirement for Plaintiff to pose "a workable class-wide damages model in relation to the predominance requirement" is not "a significant obstacle to class certification in securities litigation." *In re BofI*, 2021 WL 3742924, at *7. Here, Dr. Nye has explained "that damages can be calculated on a class-wide basis using the 'out-of-pocket' method utilizing an event study." (Doc. 200 at 21). This is "the standard method for calculating damages in virtually every Section 10(b) class action." *City of Miami Gen. Employees' & Sanitation Employees' Ret. Tr. v. RH, Inc.*, 2018 WL 4931543, at *3 (N.D. Cal. Oct. 11, 2018). The Court is therefore unconvinced by Defendants' claim that a damages calculation methodology most frequently used in cases like this one is somehow rendered unreliable by the fact that Dr. Nye, an expert in many of

these cases, frequently uses it.

Having rejected Defendants' *Daubert* argument regarding damages, the Court can now resume its central Rule 23 analysis for the purposes of Plaintiffs' Motion for Class Certification.

### 3. Rule 23(b)(3) Superiority

Rule 23(b)(3) also requires that a class action be superior to other methods for fairly and efficiently adjudicating the controversy. District courts have consistently recognized that the common liability issues involved in securities fraud cases are ideally suited for resolution by way of a class action. *In re Cooper Companies Inc. Sec. Litig.*, 254 F.R.D. 628, 641 (C.D. Cal. 2009). The Ninth Circuit has also recognized that class actions are an effective way to pursue shareholders' actions for securities fraud, finding that class actions "have proved useful where a large number of purchasers or holders of securities claim to have been defrauded by a common course of dealing on the part of the defendants, and have been frequently utilized in such situations." *Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 913 (9th Cir. 1964) (citations omitted). "The availability of the class action to redress such frauds has been consistently upheld, in large part because of the substantial role that the deterrent effect of class actions plays in accomplishing the objectives of the securities laws." *Blackie*, 524 F.2d at 903 (citations omitted). "[I]t is well recognized that Rule 23 is to be liberally construed in a securities fraud context because class actions are particularly effective in serving as private policing weapons against corporate wrongdoing." *Id.*; *see also In re Seagate Technology II Sec. Litig.*, 843 F.Supp. 1341, 1350 (N.D.Cal.1994) ("The use of the class action device has long been the favored approach of courts faced with a Rule 10b-5 action in which numerous traders have allegedly been injured.").

The Court is satisfied that in this case, a class action is the superior method for fairly and efficiently adjudicating Plaintiffs' securities fraud claims. Undoubtedly, the parties will have to conduct extensive discovery and trial preparation to resolve their controversy. It makes no sense for the parties to conduct that discovery and trial preparation more than

once. Trying each individual plaintiff's case separately would be incredibly inefficient, burdensome, and costly. Judicial economy demands that the Court certify the class and resolve the parties' controversy in just one forum.

## IV.    **CONCLUSION**

Plaintiffs have satisfied the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a), as well as the predominance and superiority requirements of Rule 23(b)(3). Therefore, the Court orders certification of the proposed class pursuant to Rule 23(b)(3). Furthermore, nothing in Defendants' Motion to Exclude renders Dr. Nye's opinions and proposed testimony inadmissible.

Accordingly,

**IT IS ORDERED** that Defendants' Motion to Exclude the Opinions and Proposed Testimony of Zachary Nye (Doc. 187; sealed and unredacted at Doc. 196) is **denied**.

**IT IS FURTHER ORDERED** that Plaintiffs Daniel Borteanu, et al.'s Motion for Class Certification (Doc. 179) is **granted as modified**.

**IT IS FURTHER ORDERED** that pursuant to Rule 23(b)(3), the Court certifies a class defined as all those who purchased or otherwise acquired Nikola Corporation securities during the period June 4, 2020 through February 25, 2021, and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of Nikola during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Nikola's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

///

///

///

**IT IS FURTHER ORDERED** appointing the offices of Pomerantz LLP and Block & Leviton LLP as class counsel.

**IT IS FURTHER ORDERED** appointing Vincent Chau and George Mersho as class representatives.

Dated this 6th day of January, 2025.

Honorable Steven P. Logan
United States District Judge