Gary Gotto (No. 007401)
**KELLER ROHRBACK LLP**
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Telephone:   (602) 230-6322
Email: ggotto@kellerrohrback.com
*Liaison Counsel for Lead Plaintiffs Nikola Investor Group II and for the Class*

(*Lead Counsel for Lead Plaintiffs Nikola Investor Group II and for the Class appear on the Signature Page*)

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Daniel Borteanu, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>Nikola Corporation, et al.,<br><br>Defendants. | No. CV-20-01797-PHX-SPL<br>No. CV-20-01819-PHX-DIR (cons.)<br>No. CV-20-02123-PHX-JJT (cons.)<br>No. CV-20-02168-PHX-DLR (cons.)<br>No. CV-20-02237-PHX-DLR (cons.)<br>No. CV-20-02374-PHX-DWL (cons.) |

## PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS TO DEFENDANT UBBEN'S STATEMENT OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule 56.1, Plaintiffs submit their statement of genuine disputes of material fact to Defendant Ubben's Statement of Facts ("SOF"), ECF No. 329, based on the Declaration of Jeffrey C. Block and accompanying exhibits.

## I.     STATUTE OF LIMITATIONS DOES NOT BAR PLAINTIFFS' CLAIMS

**Ubben Statement of Fact No. 1:** The unsealed derivative complaints reference four Board meetings that Plaintiffs primarily rely on for their statute of limitations argument. Neither the unsealed complaints nor the minutes or presentations of the four Board meetings provide any information on "what Ubben knew" with respect to the three alleged misstatements presently before this Court.  [Derivative Compl. 1 (Doc. 116-2); Derivative Compl. 2 (Doc. 116-3).]

**Response to No. 1:** Disputed. The unsealed derivative complaints against Nikola revealed new facts concerning Ubben's knowledge. *See* Second Consolidated Class Action Complaint, ("SAC") ECF No. 129, at ¶¶282-83, 304, 331, 393, 471, 515, 548, 568, 671, 751-52, 757, 761, 777-78, 814.

**Ubben Statement of Fact No. 2:** At the Board meeting held in October 2019, the Board learned Nikola was using "off-the-shelf" inverters for the Nikola Tre, rather than inverters manufactured in-house. [Derivative Compl. 1 at ¶ 154(c) (Doc. 116-2); Oct. Board Minutes, attached as Ex. B; Oct. Board Presentation, attached as Ex. C.].

**Response to No. 2:** Undisputed to the extent that the Board did not solely learn that Nikola was using "off-the-shelf" inverters in October 2019. *See* ¶¶10, 24.

**Ubben Statement of Fact No. 3:** The February 18, 2020 Board meeting materials show that the Board discussed "possible OEM partnerships to help Nikola build the Badger[,]" as well as the "benefits" of a potential partnership to "help market and gather reservations" for the truck; they do not say Nikola was "incapable" of developing a working prototype of the Badger on its own. [Feb. Board Minutes, attached as Ex. D, at 1.]

**Response to No. 3:** Undisputed to the extent that the February 18, 2020 Board meetings show that the Board discussed OEM partnerships for building the Badger. However, later Board meeting materials demonstrate that Nikola would not develop a working prototype of the Badger on its own. ECF No. 329-3, at 38 (April 9, 2020 Board meeting materials with a

"Nikola Badger" update stating that "[w]ithout an OEM partner, the Company will discontinue Badger development" and that Nikola "plans to rely on 3rd party engineering firms to engineer and build the Alpha trucks").

**Ubben Statement of Fact No. 4:** The April 9, 2020 Board meeting materials and unsealed complaints state that the Nikola Board learned that Nikola did not expect to have any physical hydrogen infrastructure built or operational until after September 30, 2020. [Derivative Compl. 1 at ¶ 154(a) (Doc. 116-2); April Board Minutes, attached as Ex. E; April Board Presentation, attached as Ex. F.]

**Response to No. 4:** Undisputed.

**Ubben Statement of Fact No. 5:** Lead Plaintiffs and Class Representatives Vincent Chau and George Mersho testified that they did not learn any knew information from the unsealed derivative lawsuits. [Chau Dep. at 255:17-258:16, attached as Ex. G (admitting he did not know "of any information in the [unsealed] shareholder derivative lawsuits that . . . might support his claims against Ubben."; Mersho Dep. at 262:21-263:18, 257:12-23, attached as Ex. H (admitting he did not have "any knowledge" of new facts supporting Plaintiffs' SAC of which he was unaware when the FAC was filed and that Plaintiffs added Ubben to "make sure that [they] included[d] everyone [they thought] should be a part of [the lawsuit].").]

**Response to No. 5:** Disputed. Chau testified that he "rel[ied] on my attorneys to determine" the reasons why Mr. Ubben was named as a defendant. ECF No. 329-3, at 80-83. Similarly, when counsel asked Mersho whether "your testimony is that … you are not aware of any facts that support your allegations against Mr. Ubben in the second amended complaint that you were not aware of on January 24, 2022," he unequivocally responded, "No, that's not true." *Id.* at 89-91.

**Ubben Statement of Fact No. 6:** In their First Amended Complaint ("FAC"), Plaintiffs alleged against the other Defendants nearly verbatim claims as they now allege against Ubben in their Second Amended Complaint ("SAC"):

| Subject Matter | First Amend. Complaint (Without Ubben) | Second Amend. Complaint (Adding Ubben as a Defendant) |
|---|---|---|

| | | |
|---|---|---|
| Nikola One | ¶ 303. At pages 76 - 77, the June 2020 S-1 references the Nikola One as one of the Company's "product offerings." It also lists the capabilities of the Nikola One and Nikola Two in the same descriptive paragraph, claiming "Nikola's FCEVs have an estimated range of up to 400 to 750 miles, designed to address the medium and long-haul market." These statements were false and misleading when made and omitted to disclose the material fact that the Nikola One was abandoned as a potential product by the Company and it was a non-functioning and non-operational truck. It was materially misleading to estimate the mileage range of concept vehicles that were not yet in production and commercially tested. | ¶ 160. At pages 76 - 77, the June 2020 S-1 references the Nikola One as one of the Company's "product offerings." It also lists the capabilities of the Nikola One and Nikola Two in the same descriptive paragraph, claiming "Nikola's FCEVs have an estimated range of up to 400 to 750 miles, designed to address the medium and long-haul market." These statements were false and misleading when made and omitted to disclose the material fact that the Nikola One was abandoned as a potential product by the Company and it was a non-functioning and non-operational truck. It was materially misleading to estimate the mileage range of concept vehicles that were not yet in production and commercially tested. |
| Badger | ¶ 304. [T]he June 2020 S-1 states "[r]ecently we announced the Nikola Badger . . . an advanced zero-emission FCEV/BEV hybrid pickup truck. Unlike anything on the market, the Badger *is designed* to target and exceed every electric or fossil fuel pickup truck in its class." | ¶¶ 493, 772. [T]he June 2020 S-1 . . . state[s] . . . "[r]ecently we announced the Nikola Badger . . . an advanced zero-emission FCEV/BEV hybrid pickup truck. Unlike anything on the market, the Badger is designed to target and exceed every electric or fossil fuel pickup truck in its class." |
| 14,000 FCEV Reservations | ¶¶ 306, 359. At page 81 of the June 2020 S-1, Nikola stated, "The current backlog of over 14,000 FCEVs non-binding reservations represents more than two years of production and over $10 billion of potential revenue. The FCEV reservation book was frozen in the fall of 2019 in order for Nikola to focus on negotiating | ¶ 224. At page 81 of the June 2020 S-1, Nikola stated, "The current backlog of over 14,000 FCEVs non-binding reservations represents more than two years of production and over $10 billion of potential revenue. The FCEV reservation book was frozen in the fall of 2019 in order for Nikola to focus on negotiating with strategic fleet partners for launch." This statement was |

| | | | |
|---|---|---|---|
| | with strategic fleet partners for launch." This statement was materially false and misleading for the reasons stated in ¶¶ 251-261. | materially false and misleading for the reasons stated in ¶¶ 221 and 223. | |
| Nikola One | ¶ 356. At pages 76 and 77 of the July 2020 S-1, under the heading "Nikola One and Two—Class 8 FCEV Trucks," Nikola stated, "The Nikola One (Class 8 sleeper cab) and Nikola Two (Class 8 day cab) are Nikola's FCEV trucks that are primarily designed for medium and long-haul applications….Nikola's FCEVs have an estimated range of up to 400 to 750 miles, designed to address the medium and long-haul market…. Production plans for the Nikola One will be announced once we have established a robust refueling infrastructure." This statement was materially false and misleading because it spoke of the Nikola Two and Nikola One on the same terms, as though both are fully designed, fully functional vehicles, and the Nikola One is simply awaiting an established refueling infrastructure to enter production. For the reasons explained in Sections V.A and V.B above, the Nikola One was a never-finished, never functional prototype whose development had been shelved after its unveiling in December 2016. | ¶ 162. At pages 76 and 77 of the July 2020 S-1, under the heading "Nikola One and Two—Class 8 FCEV Trucks," Nikola stated, "The Nikola One (Class 8 sleeper cab) and Nikola Two (Class 8 day cab) are Nikola's FCEV trucks that are primarily designed for medium and long-haul applications….Nikola's FCEVs have an estimated range of up to 400 to 750 miles, designed to address the medium and long-haul market…. Production plans for the Nikola One will be announced once we have established a robust refueling infrastructure." This statement was materially false and misleading because it spoke of the Nikola Two and Nikola One on the same terms, as though both are fully designed, fully functional vehicles, and the Nikola One is simply awaiting an established refueling infrastructure to enter production. For the reasons explained in Sections I.A and I.B above, the Nikola One was a never-finished, never functional prototype whose development had been shelved after its unveiling in December 2016. | |
| Badger | ¶ 357. [T]he July 2020 S-1 [] stated, "Recently we announced the Nikola Badger (the 'Badger'), an advanced zero-emission | ¶¶ 508, 485. [T]he July 2020 S-1 [] stated, "Recently we announced the Nikola Badger (the 'Badger'), an advanced zero-emission FCEV/BEV hybrid | |

| | | |
|---|---|---|
| | FCEV/BEV hybrid pickup truck. Unlike anything on the market, the Badger is designed to target and exceed every electric or fossil fuel pickup in its class." This statement was materially false and misleading because . . . the Badger was little more than concept art in June 2020. . . . There was no completed prototype for the vehicle. | pickup truck. Unlike anything on the market, the Badger is designed to target and exceed every electric or fossil fuel pickup in its class." [This] statement [] was materially false and misleading because at the time, the Badger [] did not exist aside from a computer generated rendering [] . . . The Proxy also omitted to reveal the material fact that the Badger was nothing more than a prototype in development. |

[*Compare* FAC ¶¶ 303-04, 306, 356-57, 359 (Doc. 95) *with* SAC ¶¶ 160, 162, 224, 485, 493, 508, 772 (Doc. 129).]

**Response to No. 6:** Undisputed to the extent this fact reproduces Plaintiffs' claims in the SAC.

**Ubben Statement of Fact No. 7:** In both their FAC and SAC, Plaintiffs allege identical facts concerning the Individual Defendants' scienter but, in the SAC, simply include the name "Ubben" to the list of co-Defendants' names. [*Compare* FAC ¶ 436 (Doc. 95) *with* SAC ¶ 836 (Doc. 129).]

**Response to No. 7:** Disputed. The scienter facts in the SAC are not identical to the FAC, and numerous new paragraphs implicate Ubben's scienter. *E.g.* ¶¶91, 282-83, 331, 739, 814.

**Ubben Statement of Fact No. 8:** ValueAct's August 11, 2020 sale of Nikola shares was public and available approximately eight months before the Critical Date of April 3, 2021. [SAC ¶¶ 91, 739-40 (Doc. 129) (citing Ubben's 2018 purchase and subsequent sale of Spring Master Fund's (formerly ValueAct's) Nikola stock on August 11, 2020).]

**Response to No. 8:** Undisputed to the extent that ValueAct Spring Master Fund, L.P.'s ("Spring Fund") August 11, 2020 sale of 1.4 million shares of Nikola stock became public upon the filing of the Form 4 on August 13, 2020. On June 2, 2020, the Spring Fund invested $50 million for 5,000,000 shares in Nikola through a private investment in public equity ("PIPE") and later sold 1.4 million shares for $59.766 million dollars on August 11, 2020. Ex. 7 at 8; Ex. 8. The shares sold thus appreciated from $10 to approximately $40 per share—a four-fold increase (400% return) in roughly two months, which corresponds to an

1  approximately 2,400% annualized rate of return. *See* Ex. 1 at 214:12-17.

2      **Ubben Statement of Fact No. 9:** The Hindenburg Report was released on September 10,

3  2020 and Nikola's response to the report on was released on September 14, 2020, both of

4  which came out several months before the Critical Date of April 3, 2021. [SAC ¶¶ 165, 186,

5  189, 235, 406-09, 419-38, 520, 732, 820-33 (Doc. 129).]

6      **Response to No. 9:** Undisputed to the extent that the Hindenburg Report was released on

7  September 10, 2020 and Nikola's response was released on September 14, 2020. As a member

8  of the Board, Ubben approved the press release responding to the Hindenburg Report. Ex. 9;

9  Ex. 1 at 216:14-219:19. The Hindenburg Report made no mention of Ubben and thus has no

10  bearing on his scienter. *See* Ex. 4.

11  ## II.   THERE IS SUFFICIENT EVIDENCE OF UBBEN'S SCIENTER

12      **Ubben Statement of Fact No. 10:** Ubben testified that he was not a member of

13  management, was far removed from the day-to-day development of Nikola's product lines

14  like Nikola One and the Badger, and did not have any specific knowledge about the production

15  status of those projects. [Ubben Dep., attached as Ex. I, at 168.] He "didn't focus on" Nikola's

16  products in detail, but instead "was focused on the vision and the ten-year opportunity" for

17  the company and "not focused on [] exactly what's being produced or not produced." [*Id.* at

18  36, 58.]

19      **Response to No. 10:** Disputed. Ubben was specifically informed at the Board meetings

20  he attended of the production status of Nikola's trucks. *See* ECF No. 329-2, at 28 (updates on

21  build timelines for Nikola Tre and Nikola Two were given at October 15, 2019 Board meeting,

22  with no mention of Nikola One); ECF No. 329-3, at 2 (discussion of design and build of

23  prototype Badger at February 18, 2020 Board meeting); ECF No. 329-3, at 38 (April 9, 2020

24  Board materials demonstrating plan to discontinue Badger development without OEM

25  partner); Ex. 6 at 35 (July 23, 2020 Board meeting materials showing that "Nikola at risk of

26  producing ZERO trucks in 2021"). Ubben testified in his deposition he could not recall

27  whether he attended Board meetings or what was discussed. *See* Ex. 1 at 197:3-16; *id.* at

28  216:1-219:20.

1    **Ubben Statement of Fact No. 11:** Ubben testified that his role at Nikola was that of a

2    high-level visionary, and therefore he was not privy to or aware of the current status of

3    Nikola's product development. [*Id.* at 36, 58-59.]

4    **Response to No. 11:** Disputed. Nikola's development of a drivable truck was an

5    important part of Ubben's investment decision. Ex. 1 at 32:2-18 (Ubben testifying that in 2018

6    he told Milton: "Call me when you have a truck to show me that is driving"); *see also* Ex. 10

7    at 6 (Ubben describing Nikola as a "truck company" in an interview). Ubben knew that

8    Nikola's success depended on its execution of its vehicle production plans. Ex. 1 at 55:21-

9    56:1; Ex. 11; Ex. 12.

10    **Ubben Statement of Fact No. 12:** Ubben did not have visibility into the makeup of

11    Nikola's FCEV reservations, and he did not know which products were included to quantify

12    the total number of reservations. [*See id.* at 44-45.]

13    **Response to No. 12:** Disputed. During ValueAct's diligence process, an analyst was

14    asked to investigate Nikola's preorders. Ex. 2 at 46:2-23; 48:13-50:2; 66:18-68:7 (analyst Ian

15    Mellin testifying that his superiors at ValueAct directed him to investigate Nikola's pre-orders

16    after a meeting with Ubben); Ex. 13 (Mellin noting in an email "I strongly suspect that how

17    easy it is to pre-order may be a reason why Nikola has so many reservations . . . ."); Ex. 14 at

18    3; Ex. 2 at 51:17–57:4 ("Key questions" following ValueAct meeting with Nikola in February

19    2019 included "how real is Nikola's order book of $14bn?" and "How 'sure' are the pre-

20    orders?"); Ex. 2 at 57:22-60:9 (Mellin testifying that Ubben had access to FactSet, a research

21    tool where the notes on the February 2019 ValueAct meeting were published); *id.* at 66:18–

22    69:23 (Mellin testifying that ValueAct did not expect "every single pre-order to result into a

23    sale" and so "mentally adjusted the orders" figure so as to not "put as much weight or stock

24    in it."). Ubben did not claim a lack of visibility into Nikola's reservations; he testified they

25    were "[n]ot really" important to him, adding "I didn't focus so much, in these early days, on

26    details around pre-orders … it did not matter to me." Ex. 1. at 40:10–42:4. Asked about the

27    S-1 pre order references, Ubben replied: "I didn't – I didn't read it … I've probably read it in

28    a cursory way" and "I wasn't paying attention to this." *Id.* at 42:5-44:13. He also testified that

1  he "wasn't paying attention" to whether the pre orders were for trucks that relied on natural

2  gas. *Id.* at 44:14-25.

3  **Ubben Statement of Fact No. 13:** Ubben was "aware" of Trevor Milton's Twitter use,

4  but not closely "tracking" it, as he was "not on Twitter" and he believed the Nikola "PR

5  department was on it." [*Id.* at 168-74; *id.* at 183-84 (noting his lack of familiarity with the

6  content of Milton's tweets, "hav[ing] not read any of [his] Twitter e-mails or Twitter

7  comments").]

8  **Response to No. 13:** Disputed. Ubben was supportive of and enthusiastic about

9  Milton's use of social media, including Twitter, to target retail investors. Ex. 15 at 4 (Ubben

10 texting Milton: "Just keep talking to investors like you do."); *id.* at 2 (Ubben texting Milton

11 "[t]his is the best of all worlds. The customer buzz of being public and the retail

12 involvement—we nailed this."); Ex. 16 (Ubben writing that he did not know if Nikola had a

13 media strategy, but "Trevor's doing it all on Twitter, quite successfully."); Ex. 1 at 205:12-15

14 (Ubben testifying that he "[l]et Trevor execute on his Twitter account" to target retail

15 investors); Ex. 20 at 78:19-25 (Russell testifying that "Ubben was the board member who was

16 most open to the idea of social media being a powerful tool for somebody like Trevor to use

17 to promote the company"); *see also id.* at 121:5-6 (Russell testifying that "[t]he only

18 sympathetic ear [Milton] had" on targeting retail investors was Ubben); Ex. 35 (Ubben noting

19 in an email "[w]e should aspire for Trevor to" get a "retail following"); Ex. 26 (Ubben

20 exclaiming "[w]e nailed the retail demographic I wanted."); Ex. 42 (Ubben explaining that

21 "[w]hen Trevor and I decided to go public at this early stage, we specifically targeted the retail

22 investor...."). Russell testified the Board was "very aware" of Milton's exaggerations on social

23 media, Ex. 20 at 122:23-123:10, and that Ubben was often involved in conversations about

24 Milton's posts because "he was a high profile board member" who "made . . . media

25 appearances with Trevor occasionally and was influential in that way." *Id.* at 209:9-15.

26 **Ubben Statement of Fact No. 14:** Ubben was asked whether he was "specifically

27 aware of any facts related to [Nikola's product offerings]"—including those regarding Nikola

28 One, the Badger, and the 14,000 FCEV reservations. [*Id.* at 58-59.] His answer was "No. . . .

I did not know." [*Id.*] Ubben "counted on management and the lawyers to write [the S-1s]." [*Id.* at 42.]

**Response to No. 14:** Disputed. Ubben signed SEC disclosures containing false and misleading statements. SAC ¶¶ 160, 162, 224, 485, 493, 508, 772. Ubben testified he signed Nikola's Form S-1s without reading them. Ex. 1 at 42:13; *see also id.* at 42:22 (testifying that he "probably" read the S-1s "in a cursory way"). Ubben has stopped short of making a reliance on counsel defense. *Id.* at 42:8-9.

**Ubben Statement of Fact No. 15:** The Nikola employees responsible for business and product development testified that they never discussed the status of Nikola's products or reservations with Ubben. Nikola's head of business development, Elizabeth Fretheim, said she "very rarely" interacted with Ubben, and did not "recall [ever having] a direct conversation" with him about the status of Nikola's technology (which would include the Nikola One and Badger) nor about the reservation numbers for Nikola's trucks. [Fretheim Dep., attached as Ex. J, at 110-11.] Likewise, Brendan Babiarz, who was on Nikola's design team and responsible for consumer end products, said he did not "recall ever interacting with," "speaking with" or having "any conversations" with Ubben, including about the Badger—a project on which Babiarz was lead designer. [Babiarz Dep., attached as Ex. K, at 106-07.]

**Response to No. 15:** Disputed. Nikola executives regularly discussed the status of Nikola's products at Board meetings attended by Ubben. *See* ¶9. Ubben was also independently warned of the shortcomings of Nikola's ambitious production plans by his employee. *See* ¶42.

**Ubben Statement of Fact No. 16:** From 2019 to early 2020, before Nikola went public, Ubben was involved in investing in Nikola by acquiring both common and preferred stock on behalf of ValueAct–Spring Fund, an investment fund Ubben founded and managed. [Ubben Dep., Ex. I, at 48-51.] Ubben also invested in Nikola through a co-invest vehicle called VA Spring NM, LLC ("Spring NM") which consisted of Ubben's personal funds as well as money from other ValueAct–Spring Fund partners and Ubben's family and personal friends. [*Id.*]

**Response to No. 16:** Undisputed.

**Ubben Statement of Fact No. 17:** When Nikola went public, the common and preferred stock held by ValueAct–Spring Fund and Spring NM converted to equity in public Nikola, resulting in approximately 6.7 million shares held by ValueAct–Spring Fund and 8.7 million shares held by Spring NM in the resulting public company. [Registration Rights & Lock-Up Agreement at 59, Schedule A (Doc. 143-1, Ex. 3).] Concurrently with this conversion, ValueAct–Spring Fund and Spring NM entered into a Registration Rights and Lock-Up Agreement (the "Lock-Up Agreement") preventing the sale of any of these shares for a period of six months. [Registration Rights & Lock-Up Agreement (Doc. 143-1, Ex. 3).]

**Response to No. 17:** Undisputed.

**Ubben Statement of Fact No. 18:** ValueAct–Spring Fund separately subscribed to a PIPE (private investment in public equity) investment in connection with the Nikola go-public transaction that granted ValueAct–Spring Fund an additional 5 million shares, for a total of just over 20 million shares held by the two funds when Nikola went public. [PIPE Letter dated July 17, 2020, attached as Ex. L, Schedule 1.]

**Response to No. 18:** Undisputed.

**Ubben Statement of Fact No. 19:** On August 11, 2020, Ubben sold a small percentage of ValueAct's Nikola investment, a total of 1.4 million shares held by ValueAct–Spring Fund and comprising less than 7% of the approximately 20 million shares held by Ubben's two funds collectively, to reduce the fund's total concentration in that single stock. [Ubben Dep., Ex. I, at 79-80, 128-33, 213; Ubben Decl. & Ex. 3, attached at Ex. M.] After Nikola went public followed by a rapid increase in stock price, ValueAct's "shares in Nikola represented 40 percent of the value of [t]he fund." [*Id.* at 129-30, 132 ("[T]he [Nikola] stock went up so far, so fast, that it became 40 percent of the fund on a mark-to-market basis.").] In keeping with ValueAct's risk management approach and his fiduciary obligations to his investors, Ubben sold off a portion of the investment to realize gains and to remove additional volatility risk associated with being over-exposed to a single equity. [*See id.* at 129-30 (40 percent was not a risk level he could accept "as a fiduciary" "on behalf of [his] investors").]

**Response to No. 19:** Disputed. Spring Fund's August 11 sale of 1.4 million PIPE shares generated $59.766 million—roughly 120% of the original $50 million PIPE investment, occurred during the Class Period and before the lock-up agreement expired, when no other officers or directors could sell. Ex. 7 at 9; Ex. 8. Ubben testified that he sold because Value Act investors were "not used to" the volatility of Nikola's stock. Ex. 1 at 204:4-12. His employee Mellin warned him, "we should be prepared for a rather rapid decline in price once [Nikola] goes public" and that SPACs generally "do not return to their initial price in their first year as a new company." Ex. 17. Furthermore, Ubben also discussed plans to liquidate even more shares—10% of his holdings for $75 million—with Milton in late August 2020. Ex. 15 at 5 ("I own 19M shares. If we sold 10% that would be 1.9M shares, or $75M.").

**Ubben Statement of Fact No. 20:** Ubben did not sell all of ValueAct's Nikola shares, just enough "to take as little off the table as possible and get [the investment] back down that 25 to 30 percent [of the portfolio]." [Ubben Dep., Ex. I, at 132; Ubben Decl. & Ex. 3, Ex. M.]

**Response to No. 20:** Undisputed to the extent that Ubben did not sell all of ValueAct's Nikola shares. Disputed as to his subjective intent.

**Ubben Statement of Fact No. 21:** Ubben did not sell any Nikola stock from Spring NM, the entity which held Ubben's personal funds and those of his ValueAct partners, friends, and family; instead, Spring NM held onto those shares beyond the end of the class period. [Ubben Dep., Ex. I, at 49-50, 68-80.]

**Response to No. 21:** Undisputed.

**Ubben Statement of Fact No. 22:** Ubben consulted both the general counsel and outside counsel, as is his standard practice before selling stock in any company where he serves on the Board. [Ubben Decl. & Exs. 1-2, Ex. M; Ubben Dep., Ex. I, at 209-10.] Ubben testified he "would never sell without approval from both the company and [] [his] own counsel, and that's what [he] did here." [Ubben Dep., Ex. I, at 210.]

**Response to No. 22:** Undisputed.

**Ubben Statement of Fact No. 23:** The Lock-Up Agreement did not apply to the 5 million PIPE shares acquired by ValueAct–Spring Fund in June 2020; because Ubben sold a

percentage of shares well below the Lock-up threshold, he did not violate the Agreement. [*See id.* at 211-12 (explaining his "understanding [] that the lockup did not apply to [those] shares"); Nikola-ValueAct Email dated June 12, 2020, attached as Ex. N; *see also* Neal Marder Decl. (Doc. 143); Registration Rights & Lock-Up Agreement at 58-59, Schedule A (Doc. 143-1, Ex. 3) (showing that the June 3, 2020 Registration Rights and Lock-Up Agreement restricted the disposition of only 6,675,437 of ValueAct's 20,362,024 Nikola shares).]

**Response to No. 23:** Disputed. The scope of Nikola's Lock-Up Agreement is a legal conclusion, not a fact. The Lock-Up agreement restricted signatories from selling any shares of common stock for 180 days beginning June 3, 2020. Ex. 33 to Russell Disputed Facts at 19. ValueAct Spring Master Fund, L.P. is listed as a "New Holder" in Schedule A to the Agreement, *see* ECF No. 143-1, at 59. None of the exceptions in 5.2 of the Lock-Up agreement apply to Ubben's sale, and none of the exceptions in 5.1.2 apply because neither Ubben nor his entities are also listed as an "Original Holder" in the Schedule A. Ex. 33 to Russell Disputed Facts at 19-20. Ubben did not recognize the distinction between the PIPE shares and his own holdings at his deposition, saying "I sold shares, I guess, shortly after the company went public." Ex. 1 at 129:21-22. Ubben was uncertain when asked directly whether the PIPE shares were subject to the Lock-Up. *Id.* at 212:2-14.

## III.     UBBEN'S ALLEGED MISSTATEMENTS WERE MATERIALLY FALSE OR MISLEADING

**Ubben Statement of Fact No. 24:** Nikola One was the sleeper-cab version of its Class 8 truck, and it remained an actively developing project up until and after the S-1s were filed. [*See* Fretheim Dep., Ex. J, at 130-44.]  Nikola's head of business development, Elizabeth Fretheim, confirmed that the Nikola One was designed as a sleeper truck for long-haul drivers, and though the original 2016 prototype did not reach production, Nikola One served as the ongoing base for the sleeper variant. [*Id.* at 29, 122-23.] Fretheim also testified that the Nikola One project was not scrapped but rather, as is standard in truck development, continued to evolve and was known within the industry as Nikola's sleeper truck offering. [*Id.* at 131-33;

Fretheim Ex. 28, attached as Ex. O; Russell Dep., attached as Ex. P, at 224-27.]

**Response to No. 24:** Disputed. The Nikola One was not an "actively developing project" when the S-1s were filed; Nikola was "never actually ... going to build a Nikola One" because it was a non-functional "concept prototype." Ex. 20 at 146:25–147:4; Ex. 22 at 1219:4-12 (Russell testifying at trial that the Nikola One prototype could not drive under its own power). Russell agreed at trial that by 2019, Nikola had abandoned the One as irrelevant and a "historical artifact." Ex. 22 at 1134:18–1135:17; *see also* Ex. 20 at 237:3-15 (Russell testifying that Nikola One "was a concept prototype and we were moving to a different concept"); 241:7:-12 (Russell testifying that the Nikola One prototype was "[n]ever finished"); 243:6-11 (Russell testifying that the Nikola One had been set aside since 2019). The Court previously held that "the Nikola One—like the Badger—was little more than a concept at the time the May Proxy, the June S-1, and the July S-1 were issued." ECF No. 126, at 32-33. It was not the "ongoing base" for a "sleeper variant"—Fretheim testified that it was infeasible as a commercial vehicle, Ex. 18 at 125:16–127:4, and the October 2019 Board presentation identifies only "plans to offer three truck variants[,]" the "Nikola Tre," based on the "Iveco S-Way," the "[a]ll new" "Nikola Two BEV," and "[a]ll new" "Nikola Two FCEV,"—none of which match the specifications listed for the Nikola One in the S-1s, corroborating Fretheim's testimony. *See* ECF No. 329-2, at 28.

**Ubben Statement of Fact No. 25:** Nikola's former CEO, Mark Russell, testified that the Nikola One was never "abandoned" for the Nikola Two, but the concept morphed as Nikola made adjustments to the prototype in preparation for production. [Russell Dep., Ex. P, at 239-44; 143-44, 146.]

**Response to No. 25:** Disputed for the reasons stated in ¶24.

**Ubben Statement of Fact No. 26:** Internal discussions in April 2020 demonstrate Nikola's plans to build a "sleeper variant Nikola One" with updated specifications, and by late May 2020, Nikola was in talks with customers about bringing the Nikola One sleeper to the U.S. market. [Fretheim Ex. 28, Ex. O; Fretheim Dep., Ex. J, at 135-36.]

**Response to No. 26:** Disputed. Nikola's "plans to build" a "sleeper variant" have no

bearing on the false and misleading nature of listing the Nikola One as a "product offering" with an "estimated range" in the June and July S-1s when in fact, the Nikola One was a never-finished, never functional prototype. *See* ¶24. Furthermore, in her deposition Elizabeth Fretheim testified that any sleeper truck Nikola would have built "wouldn't look like the Nikola One" because it was "way too big" and "didn't have the turning radius, et cetera." Ex. 18 at 125:16–127:4. A different sleeper truck would have to be redesigned with different specifications "for it to sell." *Id.* Stephen Girsky, the Nikola Board Member during the class period who became Nikola's CEO after Russell's departure, testified that Nikola did not prioritize a sleeper cab until approximately April 2024, and that Nikola "spent zero time" on sleeper variants until then. Ex. 19 at 241:25–242:2; 237:8. *See also* Ex. 20 at 243:6-244:22 (Russell testifying that the descriptions of the Nikola One and Two in Nikola's SEC filings were inaccurate).

**Ubben Statement of Fact No. 27:** Around the time of the June 2020 public offering, Nikola's largest reservation holders understood that the sleeper truck to be produced sometime in 2024. [Fretheim Dep., Ex. J, at 82-83, 125-27.] And after the S-1 filing, internal Nikola communications confirmed that the Nikola One sleeper remained central to the company's North American plans. [*Id.* at 147-48; Fretheim Ex. 31, attached as Ex. Q.]

**Response to No. 27:** Disputed for the reasons stated in ¶24. Additionally, reservation holders for the Nikola One were not informed that the vehicle was the "farthest from production" when Nikola went public. Ex. 21 at 346:16-347:23. Furthermore, whether Nikola's largest reservation holders understood that a sleeper truck variant would be produced sometime in 2024 is irrelevant to whether investors were aware that the Nikola One had been abandoned when it was being listed as a "product offering" in the June and July S-1s. *See* Ex. 22 at 1134:18-1135:17. Nikola also admitted to the U.S. Department of Justice that (i) all the reservations except for an 800-truck order were non-binding, fully cancellable indications of interest, (ii) anyone could make a "reservation" through Nikola's website, (iii) Nikola made no attempts to contact each reservation-holder to determine the legitimacy of individual reservations, and (iv) over 35% of Nikola's reservations (5,000 trucks valued at

approximately $3.5 billion) were by U.S. Xpress, which had only $1.3 million in cash on hand, and Nikola internally recognized it was "doubtful" that U.S. Xpress planned to purchase the 5,000 vehicles as a bulk order. ECF No. 326-7, at 25-34.

**Ubben Statement of Fact No. 28:** As of June 2020, "Nikola was already in the process of building Badger prototypes," including "tooling" specific pieces for construction prior to assembly, 3D-printing and fabricating certain parts, and otherwise "procuring the parts necessary to build [the] prototype[s]." [Roycht Dep., attached as Ex. R, at 197-98.] As part of this process, Nikola was in "active discussions" with potential partners including Kriesel about developing the Badger's battery modules and packs. [*Id.* at 200, 207-09; Roycht Ex. 14, attached as Ex. S (showing Nikola and Kreisel discussing battery pack specifications in the May-July 2020 timeframe); Roycht Ex. 11, attached as Ex. T (showing internal discussions at Nikola regarding potential partnership with Kreisel).

**Response to No. 28:** Disputed. Materials from a July 23, 2020 Board meeting in which Ubben was in attendance showed that a Badger prototype would not be built until November 2020. Ex. 6 at 41. *See also* ECF No. 327-6, at 2. Nikola was still "defining/finalizing technical specs" for the Badger as of August 11, 2020, well after the challenged SEC filings. Ex. 35 to Stmnt. of Genuine Disputes of Material Facts to Defs.' Russell and Brady's Stmnt. Of Facts ("Russell Disputed Facts"). As this Court has previously held, at the time Ubben signed the June 2020 and July 2020 S-1 Forms, "the Badger was merely a concept." ECF No. 126, at 31.

**Ubben Statement of Fact No. 29:** Nikola paid Kreisel close to $700,000 for its work to develop the battery pack for the Badger prototype. Roycht Dep., Ex. R, at 206; Roycht Ex. 13, attached as Ex. U.]

**Response to No. 29:** Undisputed.

**Ubben Statement of Fact No. 30:** There was a "considerable amount" of design and engineering work done on the Badger in early 2020, which led to the construction of a fully operational prototype. [Babiarz Dep., Ex. K, at 109-12; Babiarz Ex. 13, attached as Ex. V (showing summary of negotiations with and Nikola's contract with Italdesign for design work on the Badger).]

**Response to No. 30:** Disputed for the reasons stated in ¶28. Additionally, Nikola was not in the process of building the Badger prototype in June 2020—by August 31, 2020, construction of the Badger prototype had not begun. Ex. 20 at 165:3-7.

**Ubben Statement of Fact No. 31:** Unlike other industry prototypes, which are generally built as "show car[s]," Nikola's Badger was always intended to and ultimately did become a drivable pickup truck. [Babiarz Dep., Ex. K, at 112.] By mid-2020, the Badger was no longer "just a picture or just a concept." [*Id.* at 108-09.] And by early July 2020, the production phase of the Badger had begun. [*Id.* at 116-19 (explaining that by July 10, 2020 certain phases of the Badger project had moved from design to being "physically" produced).]

**Response to No. 31:** Disputed for the reasons stated in ¶28.

**Ubben Statement of Fact No. 32:** As is the case with every consumer vehicle, the market understood that an OEM partnership would be necessary before Nikola's Badger concept was ready for production. [*See* Roycht Dep., Ex. R, at 131 (explaining that securing an OEM partnership was generally the first step in these vehicle programs).]

**Response to No. 32:** Disputed. Industry knowledge of whether an OEM partnership was necessary to produce the Badger would not have alerted investors to the fact that at the time, the Badger did not actually exist, nor that the prototypes currently in development were both battery-electric vehicles ("BEVs") lacking hydrogen technology. *See also* ¶28; Ex. 3 at 537:21-540:12; 602:10-603:5; 628:12-629:7 (Babiarz testifying that there was never any hydrogen in any Badger truck); ECF No. 320-4, at 2 (email from Milton stating "[w]e will only build these show trucks with the BEV version only . . . We will till [sic] build in a hydrogen filling receptacle in the truck but other than that, we won't put anything hydrogen related...").

**Ubben Statement of Fact No. 33:** The industry understood that Nikola's FCEV reservations were cancellable: a research analyst conducting due diligence in connection with his fund's Nikola investment similarly confirmed that, based on publicly available information, he understood the Nikola reservations as a "no money down/no obligation" process. [*See* Mellin Dep., attached as Ex. W, at 67-69.]. And as Nikola CFO Kim Brady

1  testified, these reservations were "simply an expression of interest" submitted online, and not
2  contractual commitments but instead simply indicative of potential future demand. [Brady
3  Dep., attached as Ex. X, at 285.] Nikola CEO Mark Russell further explained that—though
4  the bulk of reservations came from large fleets like U.S. Xpress and Anheuser-Busch that
5  were unlikely to cancel—reservation holders knew they were cancelable. [Russell Dep., Ex.
6  P, at 222-236.]

**Response to No. 33:** Disputed. Industry knowledge of the cancellable nature of
Nikola's FCEV reservations would not have alerted investors to the fact that the reservations
were for a product that was no longer being manufactured by Nikola. Nikola's June S-1 touted
"[a]s of December 31, 2019, we had reservations for 14,000 Nikola Two FCEV trucks"
totaling "over $10 billion of potential revenue," and the backlog represented more than "two
years of production and over $10 billion of potential revenue." ECF No. 331-2, at 21, 91. In
reality, only 6% of the roughly 14,000 reservations were for the Nikola Two, while 78% were
for the Nikola One. Ex. 11 to Russell Disputed Facts; Ex. 18 at 81:3-83:24; Ex. 21 at 346:4-
13. The "Nikola One Reservation / Terms & Conditions" made clear that customers were
"ordering an electric powered semi-truck nicknamed 'Nikola One' and not another Nikola
product." Ex. 42 to Russell Disputed Facts. And at least 6,500 Nikola One reservations were
not for an FCEV at all, but for a proposed natural-gas variant before Nikola pivoted to
hydrogen in August 2016. Ex. 22 to Russell Disputed Facts at 1-2 (1,500 trucks with
"compressed natural gas"); Ex. 23 to Russell Disputed Facts at 1-3 (5,000 natural gas Nikola
Ones); Ex. 18 at 127:15-22.

## IV. PLAINTIFFS HAVE PROVEN LOSS CAUSATION

**Statement of Fact No. 34:** Plaintiffs' damages expert Zachary Nye testified that he
was "not asked to isolate each defendant's misstatements and to calculate damages according
to each individual defendant." Nye's damage model aggregates the total damages allegedly
stemming from all nine categories of fraud identified and provides no basis to determine what
portion, if any, of the loss is attributable to the three statements attributed to Ubben. [Nye
Dep., attached as Ex. Y, 130:15-25; 136:20-137:14.]

1    **Response to No. 34:** Undisputed.

2    **Statement of Fact No. 35:** Nye claims the Hindenburg Report corrected alleged
3    misstatements regarding Nikola's cost of producing hydrogen, production of the Nikola Tre
4    BEV, whether Nikola's headquarters were "off-grid," and Nikola's ownership of seven
5    natural gas wells. [Nye Report, attached as Ex. Z, ¶ 67.] But Nye never disaggregated the
6    damages per share caused by these misstatements from anything attributed to the correction
7    of Ubben's alleged unrelated misstatements. [*Id.* ¶ 169.]

8    **Response to No. 35:** Undisputed.

9    **V.   ADDITIONAL FACTS**

10   36. Ubben signed SEC disclosures containing false and misleading statements. SAC ¶¶
11   160, 162, 223, 224, 493, 508, 772.

12   37. Ubben led the Company's Board, and as such, was the person most appropriate to bring
13   concerns to about how the chairman of the board was conducting himself. Ex. 19 at 49:11-
14   51:12; 107:2-7; 218:9-219:2;. At all relevant times the Board, of which Ubben was the lead
15   independent director, had the authority to control the Company's social media policies and
16   fire Trevor Milton. Ex. 20 at 219:20-220:8.

17   38. Ubben orchestrated the SPAC transaction that established Nikola as a publicly traded
18   company. Ex. 25 (Nel Hydrogen General Manager Arndt Lutz asks Ubben "Did you
19   orchestrate the merger with VectoIQ?" Ubben responds: "Yes. Been forty percent of my time.
20   Needed to get public to [] access retail.").

21   39. Ubben organized several of Milton's media appearances. Ex. 23 (Ubben introducing
22   Milton to David Faber of CNBC via text); Ex. 15 at 2 (Ubben texting Milton "Maria
23   Bartiromo will have you on Fox News next week."); Ex. 24 (Ubben emailing "Trevor and I
24   are talking about doing some TV . . . .").

25   40. Ubben authorized the purchase of electrolyzers for Milton's stated purpose of
26   facilitating a "media blitz" without any review. Ex. 28; Ex. 1 at 184:19-188:14.

27   41. Ubben was highly attuned to the impact Milton's statements had on Nikola's stock
28   price. *See* Ex. 27 (noting in an email that "[t]here's a good chance [Nikola's stock price]

1  doubles quickly"). He hoped that Nikola's rapidly rising stock price would "close the
2  performance gap" of ValueAct "quickly." *Id.*

3      42. ValueAct employees repeatedly and specifically warned Ubben that Milton's
4  statements about Nikola's products, technology, and business plan were unreliable or untrue.
5  For example, Mellin wrote on February 13, 2019 that "Nikola's product exists primarily on
6  paper." Ex. 29. A March 11, 2019 ValueAct investment memo emailed to Ubben identified
7  as a "[r]isk" that although "Nikola Motors's product is, on paper, superior to similar vehicles,"
8  it "mostly exists just on paper and no consumers have yet received a finished vehicle." Ex. 11
9  at 3; Ex. 12. *See also* ¶12 (ValueAct employees reporting that Nikola's pre-orders were
10 inflated); Ex. 2 at 165:7 (Mellin testifying about memo showing Nikola's stations "would be
11 losing money" at prevailing energy prices); Ex. 30 (email from Mellin stating Nikola's H2
12 truck may not offer cost savings relative to diesel due to faulty assumptions in Nikola's
13 modeling).

14     43. On July 24, 2020, a member of Disney's pension and investments team—an investor
15 in the Spring Fund—emailed Ubben's partner George Hamel expressing concern about
16 "Trevor Milton talking up his stock so much" and noting that Milton's "approach doesn't
17 seem aligned with the Spring Fund in terms of good corporate governance/acting in the best
18 interest of shareholders." Ex. 31. Hamel forwarded the message to Ubben, who responded
19 that "Elon is an over promise and inspire guy . . . This is the model ... We will work like crazy
20 to make Trevor's hyperbole happen – mostly later than he says...." *Id.* Ubben added that he
21 "talked about" Milton's social media use with Milton. *Id. See also* Ex. 15 at 6 (Ubben texting
22 Milton "I am worried about securities law with you on social media.").

23     44. Ubben admitted he deliberately lied to *Bloomberg* and *The Financial Times.* Ex. 1 at
24 233:16-18; 234:6-8. In a September 15, 2020 article, he claimed: "We are doing something
25 for the first time … we went public way too early and it's my fault. I pushed Trevor to do it."
26 Ex. 32. Ubben admitted this was "not true, because Trevor was already scheming on how to
27 get public in Norway." Ex. 1 at 233:16-18. Asked to clarify if he was testifying that his public
28 statement was untrue, Ubben acknowledged "I think that's probably right..." *Id.* at 234:8-16.

1  Ubben further testified that he made the false statement "to create space for the management
2  team to execute, not with tremendous scrutiny and pressure that we didn't expect." *Id.* at
3  232:18-19. In a text exchange on September 16, 2020, Ubben texted Brady that his comment
4  to Bloomberg was meant to "[g]ive Trevor some cover." Ex. 33.

5      45. The Spring Fund was both controlled by Ubben as a practical matter and Ubben was
6  personally invested in it in his capacity as chairman of ValueAct. *See* Ex. 7; Ex. 1 at 48:17-
7  49:7 (Ubben testifying "I started ValueAct in 2000," and that he was "chairman of
8  ValueAct"). ValueAct's initial investments in Nikola were substantially financed by Ubben's
9  personal and family funds. Ex. 1 at 73:22-75:3; Ex. 34 (Ubben noting in an email that he was
10 "[a]ccessing all available cash at a family level" for "a private deal with Nikola Motors").

11     46. Nikola's allegedly "breakthrough" battery technology was untested. In an email to
12 Ubben, Mellin warned "that tech is still in its relative infancy and only currently being used
13 for small batteries." Ex. 5; Ex. 2 at 215:17-221:22. In his deposition, Mellin testified that
14 Nikola's battery tech was "still in the lab experiment rather than commercial project phase."
15 Ex. 2 at 222:4-20.

16     47. After Nikola went public, Ubben received calls and emails from important investors
17 who were concerned the stock was volatile and Milton was talking up his stock improperly.
18 Ex. 1 at 132:6-24 (Ubben describing calls from ValueAct's limited partners saying: "'W, "'ow
19 your fund is too volatile. What's going on?' I had to explain the Nikola situation."); *see also*
20 ¶43 (Disney investment team expressing concern with Milton "talking up his stock so much").
21 Ubben later identified one of those partners as Hall Capital, who he characterized as an
22 "important" investor. Ex. 1 at 132:17-24.

24 Dated: December 3, 2025                           Respectfully submitted,

26                                                   */s/ Gary Gotto*
                                                     Gary Gotto (No. 007401)
27                                                   **KELLER ROHRBACK LLP**
                                                     3101 North Central Avenue, Suite
28                                                   1400

Phoenix, AZ 85012
Telephone:    (602) 230-6322
ggotto@kellerrohrback.com

*Liaison Counsel for Lead Plaintiffs
Nikola Investor Group II and for the
Class*

**BLOCK & LEVITON LLP**
Jeffrey C. Block (*pro hac vice*)
Jacob A. Walker (*pro hac vice*)
Michael D. Gaines (*pro hac vice*)
Brendan Jarboe (*pro hac vice*)
Mark Byrne (*pro hac vice*)
260 Franklin Street, Suite 1860
Boston, MA 02110
Telephone:    (617) 398-5600
Facsimile:    (617) 507-6020
jeff@blockleviton.com
jake@blockleviton.com
michael@blockleviton.com
brendan@blockleviton.com
mark@blockleviton.com

**POMERANTZ LLP**
Jeremy A. Lieberman (*pro hac vice*)
Michael J. Wernke (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone:    (212) 661-1100
Facsimile:    (212) 661-8665
jalieberman@pomlaw.com
mjwernke@pomlaw.com

*Counsel for Lead Plaintiffs Nikola
Investor Group II and Co-Lead
Counsel for the Class*

**LABATON KELLER
SUCHAROW LLP**
Michael P. Canty (*pro hac vice*)
James T. Christie (*pro hac vice*)
Jacqueline R. Meyers (*pro hac vice*)
140 Broadway
New York, NY 10005
Telephone:    (212) 907-0700
Facsimile:    (212) 818-0477
mcanty@labaton.com
jchristie@labaton.com
jmeyers@labaton.com

*Additional Counsel for Lead
Plaintiffs
Nikola Investor Group II*