Gary Gotto (No. 007401)
**KELLER ROHRBACK LLP**
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Telephone:    (602) 230-6322
Email: ggotto@kellerrohrback.com
*Liaison Counsel for Lead Plaintiffs Nikola Investor Group II and for the Class*

(*Lead Counsel for Lead Plaintiffs Nikola Investor Group II and for the Class appear on the Signature Page*)

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Daniel Borteanu, Individually and on Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>      v.<br><br>Nikola Corporation, et al.,<br><br>        Defendants. | No. CV-20-01797-PHX-SPL<br>No. CV-20-01819-PHX-DIR (cons.)<br>No. CV-20-02123-PHX-JJT (cons.)<br>No. CV-20-02168-PHX-DLR (cons.)<br>No. CV-20-02237-PHX-DLR (cons.)<br>No. CV-20-02374-PHX-DWL (cons.) |

## LEAD PLAINTIFFS' OPPOSITION TO DEFENDANTS MARK A. RUSSELL AND KIM J. BRADY'S DAUBERT MOTION TO EXCLUDE THE OPINIONS OF DR. ZACHARY NYE, PH.D

# **TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................................1

II.     LEGAL STANDARD ...........................................................................................2

III.    SUMMARY OF DR. NYE'S ANALYSIS AND OPINIONS ..................................2

      A.      Dr. Nye' Qualifications............................................................................2

      B.      Dr. Nye's Expert Testimony Concerning Loss Causation and Damages..........3

IV.    dEFENDANTS' UNDEVELOPED ARGUMENTS SHOULD BE
         REJECTED ..........................................................................................................4

V.      dr. nye's testimony meets the standards for admissibility of expert testimony
         under Rule 702 and *daubert*............................................................................5

      A.      Dr. Nye Followed the Well-Accepted Methodology for Analyzing Loss
                 Causation and Damages ..........................................................................5

      B.      The Well-Established Loss Causation Event Study Analysis Does Not
                 Require A "Statement-By-Statement" Apportionment of Inflation .................7

      C.      Dr. Nye Properly Analyzed the Total Mix of Information, Including
                 Non-Fraud-Related Company-Specific News....................................11

      D.      Defendants' Remaining Loss Causation Arguments Are Meritless..............12

      E.      Dr. Nye's Inflation and Damages Model Follows the Well-Accepted
                 Methodology..........................................................................................14

VI.    CONCLUSION ..................................................................................................17

1

## **TABLE OF AUTHORITIES**

2
**Page(s)**

3
**Cases**

4

5
*C.f. SEC v. Aly*,
   2018 U.S. Dist. LEXIS 51596 (S.D.N.Y. Mar. 27, 2018) .........................................13

6

7
*Cleaver v. Transnation Title & Escrow, Inc.*,
   2024 WL 326848 (D. Idaho Jan. 29, 2024) ...............................................................6

8

9
*Couturier v. Am. Invsco Corp.*,
   2013 WL 4499008 (D. Nev. Aug. 20, 2013) ...............................................................5

10
*Dorn v. Burlington N. Santa Fe R.R. Co.*,
   397 F.3d 1183 (9th Cir. 2005) .......................................................................................2

11

12
*Dura Pharm., Inc. v. Broudo*,
   544 U.S. 336 (2005)........................................................................................................15

13

14
*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*,
   618 F.3d 1025 (9th Cir. 2010) .......................................................................................2

15

16
*Freeland v. Iridium World Communications*, *Ltd.*,
   545 F. Supp. 2d 59 (D.D.C. 2008) ..............................................................................6

17
*Glickenhaus & Co. v. Household Int'l, Inc.*,
   787 F.3d 408 (7th Cir. 2015) ...............................................................................7, 15

18

19
*Hayes v. MagnaChip Semiconductor Corp.*,
   2016 U.S. Dist. LEXIS 177787 (N.D. Cal. Dec. 22, 2016) ....................................1, 2

20

21
*Ignite Spirits, Inc. v. Consulting by AR, LLC*,
   2024 WL 1007894 (D. Nev. Mar. 8, 2024),

22
   *aff'd*, 2025 WL 999481 (9th Cir. Apr. 3, 2025)..........................................................4

23
*In re Adams Golf, Inc., Sec. Litig.*,
   2009 U.S. Dist. LEXIS 56032 (D. Del. July 1, 2009) ..............................................13

24

25
*In re DVI, Inc. Sec. Litig.*,
   U.S. Dist. LEXIS 129136 (E.D. Pa. Sept. 16, 2014) ...............................................12

26

27
*In re Gilead Scis. Sec. Litig.*,
   536 F.3d 1049 (9th Cir. 2008)......................................................................................17

28

*In re Heckmann Corp. Sec. Litig.*,
  2013 U.S. Dist. LEXIS 79345 (D. Del. June 6, 2013)...........................................1, 14

*In re Imperial Credit Indus. Sec. Litig.*,
  252 F. Supp. 2d 1005 (C.D. Cal. 2003) ...........................................................5

*In re Motorola Sec. Litig.*,
  505 F. Supp. 2d 501 (N.D. Ill. 2007) ...........................................................10

*In re Novatel Wireless Sec. Litig.*,
  2013 U.S. Dist. LEXIS 154599 (S.D. Cal. Oct. 25, 2013) .......................................12

*In re Ocwen Fin. Corp. Sec. Litig.*,
  2017 WL 11680400 (S.D. Fla. June 21, 2017) ..................................................1

*In re Pfizer, Inc. Sec. Litig.*,
  819 F.3d 642 (2d Cir. 2016).....................................................................14

*In re REMEC Inc. Sec. Litig.*,
  702 F. Supp. 2d 1202 (S.D. Cal. 2010)..........................................................10

*In re Twitter, Inc. Sec. Litig.*,
  2020 U.S. Dist. LEXIS 272096 (N.D. Cal. Jan. 28, 2020).......................................13

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016)..............................................................*passim*

*In re Vivendi Universal, S.A. Sec. Litig.*,
  765 F. Supp. 2d 512 (S.D.N.Y. 2011) .........................................................17

*Lattanzio v. Deloitte & Touche LLP*,
  476 F.3d 147 (2d Cir. 2007)...................................................................17

*Liberty Media Corp. v. Vivendi Universal, S.A.*,
  923 F. Supp. 2d 511 (S.D.N.Y. 2013) .........................................................12

*Luciani v. Luciani*,
  2012 U.S. Dist. LEXIS 149526 (S.D. Cal. 2012)................................................2

*Marquez v. City of Cypress*,
  2025 WL 2507017 (C.D. Cal. Sept. 2, 2025)....................................................4

*Mauss v. NuVasive, Inc.*,
  2018 WL 656036 (S.D. Cal. Feb. 1, 2018) .............................................1, 4, 6

*Oaktree Principal Fund V, LP v. Warburg Pincus LLC*,
  2017 WL 3187688 (C.D. Cal. Jan. 17, 2017) ...................................................4

*Officia Imaging, Inc. v. Langridge*,
  2018 WL 61371863 (C.D. Cal. Aug. 7, 2018) ............................................................5

*Primiano v. Cook*,
  598 F.3d 558 (9th Cir. 2010) ....................................................................................2

*RMED International, Inc. v. Sloan's Supermarkets, Inc.*,
  2000 U.S. Dist. LEXIS 4892 (S.D.N.Y. 2000) ........................................................5

*S.E.C. v. Leslie*,
  2010 WL 2991038 (N.D. Cal. July 29, 2010) ........................................................12

*Todd v. STAAR Surgical Co.*,
  2017 U.S. Dist. LEXIS 1919 (C.D. Cal. Jan. 5, 2017) ..........................................13

*U.S. v. Graf*,
  610 F.3d 1148 (9th Cir. 2010) ..................................................................................4

*United States v. Prime*,
  431 F.3d 1147 (9th Cir. 2005) ..................................................................................2

*Waggoner v. Barclays PLC*,
  875 F.3d 79 (2d Cir. 2017) ...............................................................................1, 17

**Statutes**

15 U.S.C.A. § 78u-4(f) ...............................................................................................10

15 U.S.C. 78t(a) ...........................................................................................................9

15 U.S.C. § 78j(b) .........................................................................................................9

Exchange Act Section 20(a) .........................................................................................9

Private Securities Litigation Reform Act of 1995 ...................................................7, 10

**Rules**

Local Rule of Civil Procedure 7.1(e) ...........................................................................4

Rule 702 ....................................................................................................................2, 5

**Other Authorities**

17 C.F.R. § 240.10b-5(a)–(c).........................................................................................9

Brealey, Richard A., Stewart C. Myers and Franklin Allen, *Principles of
  Corporate Finance* ..................................................................................................16

*Journal of Financial Economics*, Vol. 75 ........................................................................12

Tabak, David I. and Frederick C. Dunbar, "Materiality and Magnitude: Event
     Studies in the Courtroom," Litigation Services Handbook, The Role of the
     Financial Expert, Ed. Roman L. Weil, Michael J. Wagner, and Peter B.
     Frank, John Wiley & Sons, Inc., 3rd ed., 2001, Ch. 19, p. 5 ......................................13

1    Lead Plaintiffs and Class Representatives George Mersho and Vincent Chau
2    (collectively, "Plaintiffs") respectfully submit this memorandum in opposition to Defendants
3    Mark A. Russell and Kim J Brady's ("Defendants") Daubert Motion to Exclude the Opinions
4    of Dr. Zachary Nye, Ph.D (the "Motion" or "Def. Br."). ECF No. 330.[1]

## I.    INTRODUCTION

6    Dr. Zachary Nye is one of the foremost experts in market efficiency, loss causation
7    and damages in class action securities cases. Over the course of his career, he has submitted
8    reports utilizing his event study approach in over 40 cases. Despite regular challenges by
9    defendants to his testimony, ***no court has ever excluded any aspect of Dr. Nye's analyses as***
10   ***unreliable***. To the contrary, courts expressly credit Dr. Nye's analyses, routinely denying
11   motions to exclude just as this Court did at the class certification stage. ECF No. 224 at 21.
12   *See, e.g. Mauss v. NuVasive, Inc.*, 2018 WL 656036, at *5 (S.D. Cal. Feb. 1, 2018) (denying
13   motion to exclude and denying motion for summary judgment); *In re Ocwen Fin. Corp. Sec.*
14   *Litig.*, 2017 WL 11680400, at *3 (S.D. Fla. June 21, 2017) (denying motion to exclude at
15   summary judgment stage); *Hayes v. MagnaChip Semiconductor Corp.*, 2016 U.S. Dist.
16   LEXIS 177787, at *23 n.3 (N.D. Cal. Dec. 22, 2016) (denying motion to exclude, granting
17   class certification); *In re Heckmann Corp. Sec. Litig.*, 2013 U.S. Dist. LEXIS 79345, at *19-
18   24 (D. Del. June 6, 2013) (denying motion to exclude, granting class certification, and
19   discussing "the reliability of Dr. Nye's approach"); *Waggoner v. Barclays PLC*, 875 F.3d 79,
20   98 (2d Cir. 2017) (affirming class certification where "[i]n its analysis, the court cited Dr.
21   Nye's report favorably").

22   Defendants do not dispute that Dr. Nye employed the same methodology here as in all
23   his prior cases, which courts have found reliable. Instead, Defendants rely on broad
24   generalizations of law and conclusory mischaracterizations of Dr. Nye's analysis with vague
25   references to the hundreds of pages of expert evidence submitted in this action. Tellingly,
26   Defendants fail to cite a single case excluding an expert's loss causation or damages opinion

27
28
---
[1] Defendants' motion is premature. Pursuant to the Court's scheduling Order, motions *in limine*, which include motions to exclude expert testimony, are not to be filed until the date set in the Court's Order Setting Final Pretrial Conference. ECF No. 173 at 6.

for utilizing the methods employed by Dr. Nye. To the contrary, Defendants cases are either off point or explicitly credit Dr. Nye's methodology. *See MagnaChip*, 2016 U.S. Dist. LEXIS 177787, at *23 n.3. As discussed below, numerous courts have expressly rejected the exact arguments that Defendants' advance, holding that such criticisms are either meritless or go to the weight of the testimony, not the admissibility.

## II.     LEGAL STANDARD

Rule 702 imposes a basic gate-keeping obligation on the district court judge to ensure that an expert's testimony is relevant, reliable, and will assist the trier of fact. *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1035 (9th Cir. 2010) (citation omitted). The standard of reliability is a "liberal standard of admissibility." *Dorn v. Burlington N. Santa Fe R.R. Co.*, 397 F.3d 1183, 1196 (9th Cir. 2005); *see also* Fed. R. Evid. 702 Advisory Comm. Notes, 2000 Am. ("A review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule."). As the Ninth Circuit explained, the Supreme Court in *Daubert*:

> had in mind a flexible inquiry focused solely on principles and methodology, not on the conclusions that they generate. As long as the process is generally reliable, any potential error can be brought to the attention of the jury through cross-examination and the testimony of other experts.

*United States v. Prime*, 431 F.3d 1147, 1153 (9th Cir. 2005) (quotations omitted); *see also Luciani v. Luciani*, 2012 U.S. Dist. LEXIS 149526, *10 (S.D. Cal. 2012) ("The credibility and methodology of conflicting expert testimony present jury questions") (citing cases). When an expert meets the threshold established by Rule 702 and *Daubert*, the expert may testify and the factfinder decides how much weight to give that testimony. *See, e.g., Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010).

## III.     SUMMARY OF DR. NYE'S ANALYSIS AND OPINIONS

### A.     Dr. Nye' Qualifications

Dr. Nye is a financial economist, who holds an A.B. in economics from Princeton University; a M.Sc. in Finance from the London Business School, and a Ph.D. in Finance from the University of California, Irvine. He has taught and published in the areas of market

efficiency, financial econometrics, valuation, and corporate finance, among others. He has also testified as an expert witness in numerous securities litigation actions. Defendants do not dispute that Dr. Nye possesses the requisite qualifications to proffer an expert opinion on market efficiency, materiality, loss causation, and damages in this case.

**B.     Dr. Nye's Expert Testimony Concerning Loss Causation and Damages**

With respect to loss causation, Dr. Nye opines:

> Information disclosed on the Corrective Event Dates, collectively, revealed the relevant truth concealed by Defendants' alleged misstatements and omissions in this matter, and proximately caused, at least in part, the price of Nikola stock to decline. The statistically significant Company-specific declines in the price of Nikola stock in response to these events reflects the actual loss per share suffered by investors as a result of Defendants' alleged misstatements and omissions, and provides a measure of the artificial inflation present in the price of the stock throughout the Class Period.

ECF No. 330-2, at ¶12(i).

Dr. Nye performed an event study via a standard regression analysis to determine whether the alleged corrective disclosures identified in the Complaint caused a measurable stock price reaction. *Id.* at ¶¶48-51; Appendix A (¶¶177-181). To ensure that the reaction in Nikola stock price is due to the announcement of Company-specific information and not market-wide or industry factors, Dr. Nye measured the relationship between Nikola stock returns and 1) changes in market-wide factors that would be expected to impact all stocks; and 2) changes in industrywide factors that would be expected to impact stocks in the industry. *Id.* By measuring how Nikola stock returns move in relation to an overall market index and an industry index, Dr. Nye was able to isolate Nikola's stock price response to Company-specific news during the Class Period. *Id.* Dr. Nye also considered whether any non-fraud-related Company-specific information was disclosed at the same time as the alleged corrective disclosures and whether that information impacted the price of Nikola stock. *Id.* at ¶55; Appendix B. It is undisputed that the methodology employed by Dr. Nye is widely accepted in securities litigation to analyze the issues of materiality, loss causation, and artificial price

inflation in connection with fraudulent misrepresentations and omissions. *NuVasive*, 2018 WL 656036, at \*5 ("The use of an event study is often necessary to provide an evidentiary basis for a reasonable jury to determine the existence of loss causation and damages")

As Dr. Nye summarizes, following his analysis:

> With respect to the alleged corrective events on: September 10–11, 2020; September 14 (after market close) and September 15, 2020; September 21, 2020; September 23, 2020; October 15, 2020 (after market close); November 24, 2020 (after market close); November 30, 2020, December 23, 2020; and July 29, 2021, as discussed below, based on my event study, I have found no other negative Company-specific information unrelated to Plaintiffs' allegations that materially contributed to the statistically significant declines observed in Nikola's stock price. Accordingly, it is my opinion that the entire Company-specific return following each of these disclosures was proximately caused by information that corrected prior alleged misstatements and omissions made during the Class Period.

ECF No. 330-2, at ¶54.

## IV. DEFENDANTS' UNDEVELOPED ARGUMENTS SHOULD BE REJECTED

Utilizing only six of the seventeen pages permitted by Local Rule of Civil Procedure 7.1(e), Defendants' Motion consists almost entirely of single sentence conclusory assertions of law and mischaracterizations of Dr. Nye's analysis accompanied with references to hundreds of pages of the expert evidence submitted during discovery. Neither Plaintiffs nor the Court should be required to decipher, reconstruct and address such arguments when Defendants did not bother to do so in the first instance. *See U.S. v. Graf*, 610 F.3d 1148, 1166 (9th Cir. 2010) ("Arguments made in passing and not supported by citations to the record or to case authority are generally deemed waived"); *Marquez v. City of Cypress*, 2025 WL 2507017, at \*6 (C.D. Cal. Sept. 2, 2025) (declining to address argument that "is not developed"); *Oaktree Principal Fund V, LP v. Warburg Pincus LLC*, 2017 WL 3187688, at \*23 (C.D. Cal. Jan. 17, 2017); (refusing to consider arguments where the defendants "make conclusory statements about Plaintiffs' inability to state a claim"); *Ignite Spirits, Inc. v. Consulting by AR, LLC*, 2024 WL 1007894, at \*5 (D. Nev. Mar. 8, 2024), *aff'd*, 2025 WL 999481 (9th Cir. Apr. 3, 2025) ("The remainder of Brands's objections are similarly bereft of

substantive legal analysis and contain many misstatements—both of the law and Judge Youchah's R&R. The court finds them unavailing") citing *Couturier v. Am. Invsco Corp.*, 2013 WL 4499008, at *3 (D. Nev. Aug. 20, 2013) ("[a] judge is the impartial umpire of legal battles, not a party's attorney. He is neither required to hunt down arguments the parties keep camouflaged, nor required to address perfunctory and undeveloped arguments."); *Officia Imaging, Inc. v. Langridge*, 2018 WL 61371863, at *13 (C.D. Cal. Aug. 7, 2018) (denying portion of the motion to dismiss which contained undeveloped arguments).

## V. DR. NYE'S TESTIMONY MEETS THE STANDARDS FOR ADMISSIBILITY OF EXPERT TESTIMONY UNDER RULE 702 AND *DAUBERT*

### A. Dr. Nye Followed the Well-Accepted Methodology for Analyzing Loss Causation and Damages

Defendants assert that Dr. Nye's opinions should be excluded because he conducted his event study based on the assumption that the allegations in the Complaint are true. Def. Br. at 3-4. Defendants do not appear to understand the role of financial econometrics in establishing loss causation.

As the very cases upon which Defendants rely explain, event studies are "standard operating procedure in federal securities litigation." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 253 (2d Cir. 2016) ("*Vivendi*"). An event study is a statistical regression analysis that examines the effect of an event on a dependent variable, such as a corporation's stock price. *See In re Imperial Credit Indus. Sec. Litig.*, 252 F. Supp. 2d 1005, 1014 (C.D. Cal. 2003) (*citing RMED International, Inc. v. Sloan's Supermarkets, Inc.*, 2000 U.S. Dist. LEXIS 4892, *6 (S.D.N.Y. 2000)). As the Second Circuit has explained:

> [A]n event study can help an expert determine whether, and the extent to which, the release of certain information caused a stock price to fall. This, in turn, allows an expert to make inferences about the degree to which the company's stock price may have been artificially inflated on the basis of the market's misconception as to the truth prior to the release of that information.

*Vivendi*, 838 F.3d at 253-4.

Thus, event studies test whether there is the necessary "casual connection" between the information that the plaintiffs allege was misrepresented and subsequent economic loss;

they *do not* and *cannot* measure whether changes in stock price are actually caused by alleged fraud or whether the underlying misrepresentations themselves are fraudulent, which is the province of the jury. *See Vivendi*, 838 F.3d at 256 ("It was up to the *jury* to determine how much, if any, of the artificial inflation identified by Nye was caused by Vivendi's alleged fraud…by assessing the alleged misstatements and their connection to the misconception in question. *Nye's analysis merely operated on the assumption that Plaintiffs would be able to prove at trial all the necessary elements [of a 10b-5 claim]*…") (first emphasis original)[2]. Defendants advance the absurdity that a forensic economist should somehow be required to make findings on such issues as whether Defendants' statements were false, were made with scienter, or whether the dates on which Plaintiffs contend the truth was revealed constitute "corrective disclosures" under federal securities laws. *See Freeland v. Iridium World Communications, Ltd.*, 545 F. Supp. 2d 59, 87-88 (D.D.C. 2008) (denying motion to exclude loss causation expert because "Plaintiffs told [the expert] to assume their fraud allegations were true, and to assume the disclosures corrected prior misrepresentations" because "[i]t is not [the expert's] responsibility to prove [the defendants] committed fraud; [the expert] is only proposing to illustrate how disclosures correcting that fraud affected the stock price" and "whether those disclosures corrected earlier misstatements by [the defendants] is an issue of fact for the jury to decide"); *see also NuVasive*, 2018 WL 656036, at *5 (denying motion to exclude Dr. Nye's loss causation analysis and rejecting the defendants' argument that "Dr. Nye should have sought to determine whether the fraud or fraudulent practices alleged by Plaintiffs were ever revealed to the market").

The lone case upon which Defendants rely is inapposite. In *Cleaver v. Transnation Title & Escrow, Inc.*, 2024 WL 326848, at *5 (D. Idaho Jan. 29, 2024), the expert did not conduct any independent damages analysis. Instead, he reviewed the loss calculation conducted by the plaintiff and her attorney and simply agreed with it. He was not involved in any way with the methodological design or analysis of loss calculation. *Id.* Here, Dr. Nye

---

[2] Unless otherwise specified, all emphasis has been added.

1    conducted a completely independent and rigorous loss causation and damages analysis.[3]

2       **B.    The Well-Established Loss Causation Event Study Analysis Does Not
3             Require A "Statement-By-Statement" Apportionment of Inflation**

4       Defendants do not dispute that Dr. Nye employed the well-established and universally

5    accepted event study approach to analyzing loss causation and damages. Nevertheless,

6    Defendants repeatedly assert that Dr. Nye's analysis should be excluded because he did not

7    (i) distinguish what portion of the stock price decline following each alleged corrective

8    disclosure was related to the alleged fraud committed by each Defendant, and (ii) attribute a

9    specific inflation amount to each Defendant and each of the dozens of alleged false statements

10   (many of which contain several subject matters). Def. Br. at 5-6

11      Despite the thousands of federal securities class actions filed since the passage of the

12   Private Securities Litigation Reform Act of 1995, Defendants fail to cite a single case

13   supporting their assertion that a loss causation and damages analysis is inadmissible unless it

14   allocates inflation on a statement-by-statement or defendant-by-defendant basis. This is

15   because the law is precisely the opposite. "The best way to determine the impact of a false

16   statement is to observe what happens when the truth is finally disclosed and use that to work

17   backward, on the assumption that the lie's positive effect on the share price is equal to the

18   additive inverse of the truth's negative effect." *Glickenhaus & Co. v. Household Int'l, Inc.*,

19   787 F.3d 408, 415 (7th Cir. 2015).

20      Dr. Nye employed the same methodology used in the widely-cited *Vivendi* case –

21   analyzing the stock price declines following the alleged corrective disclosures, measuring

22   inflation, and then working backwards to determine the level of inflation at the start of the

23   Class Period. In *Vivendi*, the defendants argued that the analysis was deficient because it did

24   not identify the inflation created by each alleged misrepresentation. The Court rejected this

25   argument:

26      ───────────────
27      [3] Dr. Nye's "Summary of Plaintiffs' Theory of Liability", will assist the jury in
     understanding the purpose and relevance of his loss causation and damages analysis as it
28   relates to Plaintiffs' allegations. The fact that he summarizes Plaintiffs' allegations and refers
     to "Defendants" generally, rather than repeating every sentence contained in the 902
     paragraph Complaint does not render this portion of his Report unhelpful to the jury.

1
2
3
4

> **It was up to the *jury* to determine how much, if any, of the artificial inflation identified by Nye was caused by Vivendi's alleged fraud (and thus by the various statements Vivendi released in the relevant period)**, by assessing the alleged misstatements and their connection to the misconception in question….

5
6
7
8
9
10
11
12

> Because Nye determined the amount of artificial inflation due to the market's lack of information about Vivendi's true liquidity risk, without reference to whether that inflation was a result of Vivendi's alleged misstatements, ***Nye's testimony did not depend on the specific identification of the fifty-seven alleged misstatements*** that Plaintiffs later identified at the close of trial. By design, then, Nye's testimony did not exhibit any obvious correlation between the inflation increases identified by Nye and the timing of the fifty-seven statements. Though fifteen of the fifty-seven statements issued on days where, under Nye's model, inflation increased, such correlation was not something Nye himself sought to prove. And to the degree that the remaining forty-two statements were not associated with an immediate increase in inflation under Nye's model, that would not obviously affect Nye's own testimony.

13

*Id.* at 255-56.

14
15
16
17
18
19
20
21
22
23

Here, as in *Vivendi*, Plaintiffs allege that the inflation created by Defendants' fraud existed in Nikola's stock price on the first day of the Class Period – June 4, 2020, the day when Nikola began trading as a public Company. The fact that Defendants continued making false statements, which maintained the inflation already in Nikola's stock price, does not necessitate Dr. Nye demonstrating a separate "price impact" for each statement or attribution to particular Defendants. *Id*. at 256-59 (approving of "price maintenance" theory and rejecting the defendants' argument that each alleged misrepresentation must be associated with a "price impact"). Even if Defendants were correct that Plaintiffs must prove inflation on a statement-by-statement and defendant-by-defendant basis, it would not mandate the exclusion of Dr. Nye's opinions:

24
25
26
27
28

> All of that said, it is unclear how Vivendi's "price impact" argument, even were it valid, bears on the question here: whether the district court abused its discretion in concluding that Nye's testimony "rest[ed] on a reliable foundation and [was] relevant to the task at hand." Nye's model measured " 'actual inflation'—inflation due to investors not knowing the truth" about Vivendi's liquidity risk. And it identified the amount of inflation due to

investors not knowing the truth "*even if no false statement* [*was*] *ever made*[,] because investors might not know the truth for reasons other than false statements." This method of measuring actual inflation, without reference to the timing or nature of a defendant's alleged misstatements, is commonly employed by experts who provide testimony on loss causation and/or damages in securities-fraud cases.

Here, Nye's testimony is relevant as to loss causation because the total amount of actual inflation that Nye identified is the maximum amount of loss potentially caused by Vivendi's alleged misstatements. Nye's testimony is also relevant as to damages because Nye's model of inflation over the course of the Class Period provides a means for calculating each Plaintiff's damages.

*Id.* at 259–60.

Finally, Defendants' assertion that Dr. Nye's inflation calculation "fails" if even one alleged misrepresentation is not actionable (Def. Br. at 6) is wrong for several additional reasons. *First*, as discussed above and in *Vivendi*, many of the alleged misrepresentations **maintained** the inflation in Nikola's stock price. Therefore, removal of a single misrepresentation would not impact the inflation on day one of the Class Period. *Second*, Plaintiffs have adequately alleged "scheme liability" against Defendants Russell and Brady because their conduct contributing to the wide-ranging fraud that Defendant Milton perpetrated against Nikola investors. Therefore, even if their individual statements are found to not be actionable, they will still be liable for the full amount of inflation from Milton's fraud. See 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5(a)–(c). *Third*, Plaintiffs have also adequately alleged Section 20(a) "control person" liability against all Defendants. Section 20(a) of the Exchange Act extends liability to a corporation's "controlling persons" in the presence of other violations. *See* 15 U.S.C. 78t(a).

Moreover, the statement-by-statement and defendant-by-defendant allocation proposed by Defendants would be impossible. Such an allocation would require Dr. Nye to calculate inflation for every liability permutation. At a bare minimum, it would require a separate inflation calculation for every possible combination of actionable misrepresentations. The Complaint alleges well over 100 misrepresentations. Therefore, an expert would need to

1 | calculate at least 100! (factorial) permutations of inflation, which equals trillions upon trillions
2 | of permutations. Tellingly, neither Defendants nor their expert provides any guidance on how
3 | this could be done before any liability determination is made. Dr. Nye has put forward a
4 | methodology for calculating per-share inflation depending on which statements Plaintiffs can
5 | prove false and which loss events Plaintiffs can prove were caused by those statements. He
6 | need not do more.

7     At bottom, Russell and Brady confuse two distinct concepts: disaggregation, the
8 | separation of fraud related stock drops from not fraud related stock dops, and apportionment,
9 | the determination of relative responsibility between multiple defendants. "The burden... rests
10 | with Defendants, on summary judgment, to show that a decline in [a stock's] share price ...
11 | did *not* result from [a corrective] disclosure. Lead Plaintiff's burden is to present sufficient
12 | evidence from which a reasonable jury could conclude that those price declines indeed
13 | resulted from such a disclosure." *In re Motorola Sec. Litig.*, 505 F. Supp. 2d 501, 548–51
14 | (N.D. Ill. 2007). When a plaintiff can show as much, "the trier of fact can determine the
15 | damages attributable to the fraudulent conduct." *Id.* The PSLRA expressly reserves
16 | apportionment to the trier of fact at trial. *See* 15 U.S.C.A. § 78u-4(f)(2)(A); 15 U.S.C.A. §
17 | 78u-4(f)(3).

18     The lone securities case cited by Defendants is distinguishable. In *In re REMEC Inc.*
19 | *Sec. Litig.*, 702 F. Supp. 2d 1202, 1273-4 (S.D. Cal. 2010), the expert was excluded because
20 | he purportedly "[made] no attempt to account for other possible causes, *i.e.*, industry-specific
21 | news…, market-specific news …, or other measurable macroeconomic variables" that may
22 | have affected the stock price.[4] Here, there is no dispute that Dr. Nye did consider and exclude
23 | other market and industry factors when attributing certain residual stock price declines solely
24 | to alleged corrective disclosures. ECF No. 330-2, at ¶49 and Appendix A.

_____

25 |     [4] The expert in *REMEC*, was not Dr. Nye, but his father Dr. Blaine Nye. Moreover,
26 | Plaintiffs respectfully submit that the case was wrongly decided. Specifically, despite the
court concluding that the expert did not account for "other possible cause, *i.e.*, industry-
27 | specific news…, market-specific news…, or other measurable macroeconomic variables", the
court observed that he "uses regression analysis to measure the relationship between the
28 | REMEC stock returns and changes in market-wide factors and changes in industry-wide
factors." *Id.* at 1272.

**C.      Dr. Nye Properly Analyzed the Total Mix of Information, Including Non-Fraud-Related Company-Specific News**

Contrary to Defendants' conclusory assertions (Def. Br. at 5-6), Dr. Nye analyzed all Company-specific news disclosed on each of the alleged corrective disclosure dates, distinguishing between fraud-related information and non-fraud-related information, and excluding from his inflation calculation disclosures that contained new non-fraud-related Company information. ECF No. 330-2, at ¶50. Dr. Nye painstakingly documents and analyzes every bit of Nikola-specific news disclosed on the alleged corrective event dates. *Id.* at Appendix B. As Dr. Nye summarized before beginning his detailed analysis for each disclosure:

> With respect to the alleged corrective events on: September 10–11, 2020; September 14 (after market close) and September 15, 2020; September 21, 2020; September 23, 2020; October 15, 2020 (after market close); November 24, 2020 (after market close); November 30, 2020, December 23, 2020; and July 29, 2021, as discussed below, based on my event study, ***I have found no other negative Company-specific information unrelated to Plaintiffs' allegations that materially contributed to the statistically significant declines observed in Nikola's stock price. Accordingly, it is my opinion that the entire Company-specific return following each of these disclosures was proximately caused by information that corrected prior alleged misstatements and omissions made during the Class Period***.

> With respect to the alleged corrective disclosures on September 29, 2020 and February 25, 2020 (after market close), based on my event study, I cannot rule out the possibility that the statistically significant Company-specific decline following these events were at least partly attributable to information that corrected Defendants' prior alleged misstatements and omissions during the Class Period. ***However, because there were contemporaneous adverse disclosures unrelated to the alleged fraud, for the sake of conservatism, I have excluded the September 29, 2020 and February 26, 2020 declines from my estimate of price inflation for Nikola stock during the Class Period***.

*Id.* at ¶¶53-54. *See also id*., at ¶¶65, 78, 91, 101, 131, 132, 138, 149, 153, 162.

Defendants and Dr. Roper merely disagree with Dr. Nye as to what information is fraud related. They are free to make their argument to a jury. But such disagreements between experts is no basis for excluding testimony. Indeed, even if Defendants were correct in their

1  assertion that Dr. Nye failed to consider all non-fraud related activity in his loss causation

2  analysis, which they are not, case law suggests that this does not render his opinions

3  unreliable.  *See, e.g.*, *In re Novatel Wireless Sec. Litig.*, 2013 U.S. Dist. LEXIS 154599, at

4  *24-26 (S.D. Cal. Oct. 25, 2013) (finding that "the failure to include one of the relevant

5  variables does not dictate exclusion of the report as unreliable. This deficiency may affect the

6  probative value of the analysis but not necessarily its admissibility, and Plaintiffs will have to

7  overcome that large obstacle at trial"); *S.E.C. v. Leslie*, 2010 WL 2991038 , at *15 (N.D. Cal.

8  July 29, 2010) ("While [defendant] certainly may argue to the jury that [the expert] did not

9  reliably filter out other confounding variables that would have affected the stock price[,] . . .

10  he has not shown that [the] opinion is so unreliable that it must be excluded."); *In re DVI, Inc.*

11  *Sec. Litig.*, U.S. Dist. LEXIS 129136, at *20-24 (E.D. Pa. Sept. 16, 2014) (finding that a

12  proffered expert's failure to disaggregate non-fraud related influences on price did not touch

13  on admissibility); *Liberty Media Corp. v. Vivendi Universal, S.A.*, 923 F. Supp. 2d 511, 520

14  (S.D.N.Y. 2013) (plaintiff's expert's testimony not inadmissible "simply because it took an

15  aggressively skeptical view of the significance of non-fraud-related news on the nine

16  materialization days, any more than [defendants' expert's] testimony was inadmissible

17  because of his equally aggressive but opposite interpretation of potential confounding

18  events…"[t]he weighing of the experts' conflicting testimony ***was a matter for the jury*** and

19  will not be disturbed by this Court").

20  **D.    Defendants' Remaining Loss Causation Arguments Are Meritless**

21  Defendants repeat their argument from the class certification stage that Dr. Nye's event

22  study is unreliable because he considered analysts' responses to the disclosures he examined

23  as part of his analysis. Def. Br. at 4. This Court has already rejected this argument. ECF No.

24  224 at 21-22. The academic literature and case law agree that Dr. Nye's analysis is proper.

25  *See* Asquith, Paul, Michael B. Mikhail and Andrea S. Au, 2005, "Information content of

26  equity analyst reports," *Journal of Financial Economics*, Vol. 75, pp. 245–282 at p. 281("both

27  target prices and analyst justifications are important in explaining the market's reaction to

28  analyst reports. The market reacts positively and significantly to these two sources of

information regardless of what other report elements are considered and regardless of whether other information is announced contemporaneously"). Criticisms of determinations of whether the news contained in selected event dates would be expected to be associated with a statistically significant residual stock price movement goes to the weight of the opinions, not admissibility. *Todd v. STAAR Surgical Co.*, 2017 U.S. Dist. LEXIS 1919, at *24 (C.D. Cal. Jan. 5, 2017) (denying motion to exclude event study where defendants claimed the selection of event dates was subjective because the expert "reviewed news media and analyst reports published around the three relevant dates to determine whether the information conveyed in these events . . . could reasonably be expected to cause the Company's stock price to move by a statistically significant amount"); *In re Twitter, Inc. Sec. Litig.*, 2020 U.S. Dist. LEXIS 272096, at *31 (N.D. Cal. Jan. 28, 2020) (denying motion to exclude event study: "many decision points in designing an event study require some subjectivity: identifying news, categorizing which news is 'material,' and determining whether news should have a certain (albeit rough) magnitude of positive or negative influence on price are all subjective determinations…. On cross-examination, Defendants can address this concern") (collecting cases).

Defendants similarly repeat their argument that Dr. Nye's use of a 120-day rolling control period after each event he studied. Def. Br. at 5. This Court rejected this argument at the class certification stage (ECF No. 224 at 21-22) and should do so again. Defendants do not dispute that the established academic literature specifically endorses the 120-day rolling control period used by Dr. Nye. As Dr. Nye notes in Appendix A to his Report: "Three general choices for the placement of an estimation window are before the event window, surrounding the event window, and ***after the event window***." ECF No. 330-2, ¶178 n. 446, quoting Tabak, David I. and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Litigation Services Handbook, The Role of the Financial Expert, Ed. Roman L. Weil, Michael J. Wagner, and Peter B. Frank, John Wiley & Sons, Inc., 3rd ed., 2001, Ch. 19, p. 5. Defendants' criticism goes to the weight of Dr. Nye's study, not its admissibility. *C.f. SEC v. Aly*, 2018 U.S. Dist. LEXIS 51596, at *41 (S.D.N.Y. Mar. 27, 2018) (denying motion

1    to exclude and finding that criticisms about length of event windows goes to weight, not

2    admissibility); *In re Adams Golf, Inc., Sec. Litig.*, 2009 U.S. Dist. LEXIS 56032, at *6 (D.

3    Del. July 1, 2009) (same).[5]

4            Citing only to Dr. Roper's opinions from the class certification stage, Defendants again

5    criticize Dr. Nye because he analyzed earnings announcements at the class certification stage

6    and now assert, with zero support, that analyzing the alleged corrective disclosures is

7    improper. Def. Br. at 4. The Court should once again reject these recycled arguments. ECF

8    No. 224 at 21-22. *See Heckmann*, 2013 U.S. Dist. LEXIS 79345, at *19-24 (denying motion

9    to exclude Dr. Nye's opinions: "Defendants argument that these dates were not objective go

10   to weight"). As discussed above, analysis of the alleged corrective disclosures is the standard

11   and well-accepted methodology for assessing loss causation and damages. Defendants cite no

12   authority to the contrary.

13      **E.    Dr. Nye's Inflation and Damages Model Follows the Well-Accepted**
               **Methodology**

14

15           The appropriate methodology for calculating inflation throughout the Class Period is

16   well established. Price inflation is appropriately measured based on the "residual return" (*i.e.*,

     the Company-specific return) "on a day when the market discovers allegedly concealed

17   information":

18

19           Just as the existence of a residual return on a day when the market discovers
             allegedly concealed information shows that the company's stock price was
20           artificially inflated, the *size* of the residual return on such a day provides
             evidence of the *amount* by which concealing that particular information
21           inflated the defendant company's stock. As a result, if concealed information
             reached the market through multiple corrective disclosures, the sum of the
22           residual returns associated with those disclosures provides evidence about
             the amount of artificial inflation in the company's stock after the fraud but
23           before those corrections. Thus, an expert using an event study can estimate
             the amount of artificial inflation in the defendant company's stock price
24           when shareholders purchased their shares, which is equivalent to estimating
             the difference between what those investors should have paid for the shares
25

26

27           [5] Indeed, the Class Period begins on the first day of trading for Nikola, which went public
     on June 4, 2020. Therefore, there are no trading days before the beginning of the Class Period
28   that could be used for the estimation window before the event window.

1  but-for the alleged fraud, and what they actually paid."

2  *In re Pfizer, Inc. Sec. Litig.*, 819 F.3d 642, 649 (2d Cir. 2016) (internal citations omitted,

3  emphasis in original). The Seventh Circuit has gone even further: "The **best way** to determine

4  the impact of a false statement is to observe what happens when the truth is finally disclosed

5  and use that to work backward, on the assumption that the lie's positive effect on the share

6  price is equal to the additive inverse of the truth's negative effect.", 787 F.3d at 415. Indeed,

7  as noted by the Supreme Court in *Dura*, "the Restatement of Torts, in setting forth the judicial

8  consensus, says that a person who 'misrepresents the financial condition of a corporation in

9  order to sell its stock' becomes liable to a relying purchaser 'for the loss' the purchaser

10  sustains 'when the facts . . . become generally known' and 'as a result' share value

11  'depreciate[s].'" *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 344 (2005).

12  Dr. Nye faithfully applied this methodology in his loss causation and damages analysis.

13  After calculating the amount of inflation removed from Nikola's stock price from the alleged

14  corrective disclosures, Dr. Nye worked backwards to calculate an inflation ribbon that

15  estimated the amount of inflation on each day of the Class Period. ECF No. 330-2, at ¶¶167-

16  172. Using this inflation ribbon, each class member's per share "out of pocket" damages can

17  be calculated by subtracting the amount of inflation in Nikola's stock price on the date that

18  the class member sold their shares from the amount of inflation that existed on the day of their

19  purchase. *Id.* at ¶¶167, 173-175.  The "out-of-pocket" measure of damages has several legal

20  constraints. One such constraint, as suggested by its name, is that an investor cannot recover

21  more than they paid for a security. *Id.* at ¶172, n. 443. This is the precise methodology that

22  Dr. Nye articulated at the class certification stage, has been universally approved by courts,

23  and which was approved by this Court when granting class certification. ECF No. 224 at 25-

24  26. Defendants do not dispute that Dr. Nye faithfully applied this damages calculation

25  methodology. Therefore, their motion to exclude should be denied.

26  Nevertheless, Defendants assert that Dr. Nye's calculation of recoverable damages

27  should be excluded because "Dr. Nye's model implies negative or zero 'true value' for

28

1    Nikola's stock on certain dates and censors those values at zero." Def. Br. at 6. *First*,

2    Defendants' argument as to what the ***outputs*** of Dr. Nye's model "implies" does not go to his

3    methodology or the admissibility of his opinions. *Second*, Defendants do not dispute that the

4    implied negative "true value" is a result of the well-accepted methodology that Dr. Nye

5    employed. The reason that Dr. Nye "censors those values to zero" as characterized by

6    Defendants is because (i) as equity, common shares of a publicly traded company cannot have

7    a negative value, and (ii) federal securities laws cap the amount of recoverable damages at the

8    price paid for the security. As Dr. Nye explains:

> As defined in the *Litigation Services Handbook*, under "the out-of-pocket
> measure of damages used in most cases filed under § 10(b) … [t]he
> difference between the actual price and the but-for price is the inflation per
> share." (Gold *et al*. (2017), p. 12.) Thus, as the price of a corporation's stock
> can never be less than zero in an efficient market, it is simply impossible for
> price inflation to exceed the "actual price" paid, under the out-of-pocket
> measure of damages. (*See* Brealey, Richard A., Stewart C. Myers and
> Franklin Allen, *Principles of Corporate Finance*, McGraw-Hill/Irwin, 8th
> ed., 2006, p. 6: "Stockholders can lose their entire investment, but no
> more.").

16   *See* ECF No. 330-2, ¶172 n. 443.

17          Defendants fundamentally misunderstand the purpose of Dr. Nye's damages

18   calculation in that they seem to incorrectly suggest that Dr. Nye damages inflation ribbon (and

19   limitation that Nikola's stock price cannot be below zero) is an opinion as to what Nikola's

20   stock price would have been in a "but for" world in which Defendants always told the truth.

21   As Dr. Nye explained, he is providing no such opinion. He is merely providing a damages

22   opinion based on his applied methodology (discussed above) and recognizing the applicable

23   limitations.

> Q You're saying that that entire amount is artificially inflated, and it's worth
> zero that day. That's what you're saying; correct?
>
> A It's -- ***I really don't have an opinion about what the like but-for value
> would have been, because what I'm really providing here is a limitation on
> damages***; which is consistent with my prior opinions and my understanding
> of what other experts have done, that has been accepted in federal securities

1  litigation. ***And it really just amounts to the logic that you can't lose more***
2  ***than the amount of money you put in and that stocks can't have a negative***
3  ***value, by virtue of their limited liability***. So that's what I'm capturing here,
   is really the actual losses that an investor who purchased on June 4, 2020
4  incurred....[W]hat we're really doing here, with the out-of-pocket -- as the
   name suggests -- damages methodology, is trying to estimate the fraud-
5  related losses investors incurred as a result of purchasing an allegedly
   inflated stock.
6
7  ECF No. 330-3, at 34:21-35:21.

8      Even if the criticisms levied by Defendants went to Dr. Nye's methodology (they do

9  not) and had any merit (they do not), it would not be a basis to exclude Dr. Nye's damages

10 opinions. As the Supreme Court explicitly stated in *Comcast* damages "[c]alculations need

11 not be exact." 569 U.S. at 35." *See also Waggoner v. Barclays PLC*, 875 F.3d 79, 106 (2d Cir.

12 2017). "In securities fraud cases, plaintiffs need not prove the amount of loss caused by each

13 misstatement with complete mathematical precision." *In re Vivendi Universal, S.A. Sec. Litig.*,

14 765 F. Supp. 2d 512, 562 (S.D.N.Y. 2011); *see Lattanzio v. Deloitte & Touche LLP*, 476 F.3d

15 147, 158 (2d Cir. 2007) (requiring plaintiffs to produce sufficient evidence for the fact finder

16 to "ascribe some rough proportion of the whole loss" to defendant's fraud); *Lentell*, 396 F.3d

17 at 177 ("We do not suggest that plaintiffs were required to allege the precise loss attributable

18 to [defendant's] fraud. . . ."); *Vivendi V*, 634 F. Supp. 2d at 364 ("In theory, plaintiffs need

19 only prove that they suffered some damage from the fraud."); *In re Gilead Scis. Sec. Litig.*,

20 536 F.3d 1049, 1055–56 (9th Cir. 2008) (holding "misrepresentation need not be the sole

21 reason for the decline in value of the securities," merely a "'substantial cause'").

22 **VI.    CONCLUSION**

23     For the reasons stated above, Defendants' motion should be denied.

24
   December 3, 2025                          Respectfully submitted,
25
                                             **KELLER ROHRBACK LLP**
26
                                             By:  /s/ Gary Gotto
27                                                Gary Gotto (No. 007401)
                                                  3101 North Central Avenue, Suite 1400
28                                                Phoenix, AZ 85012

Telephone:    (602) 230-6322
ggotto@kellerrohrback.com

*Liaison Counsel for Lead Plaintiffs*
*Nikola Investor Group II and for the Class*

**POMERANTZ LLP**
Jeremy A. Lieberman (*pro hac vice*)
Michael J. Wernke (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone:    (212) 661-1100
Facsimile:    (212) 661-8665
jalieberman@pomlaw.com
mjwernke@pomlaw.com

**BLOCK & LEVITON LLP**
Jeffrey C. Block (*pro hac vice*)
Jacob A. Walker (*pro hac vice*)
Michael D. Gaines (*pro hac vice*)
260 Franklin Street, Suite 1860
Boston, MA 02110
Telephone:    (617) 398-5600
Facsimile:    (617) 507-6020
jeff@blockleviton.com
jake@blockleviton.com
michael@blockleviton.com

*Counsel for Lead Plaintiffs Nikola Investor*
*Group II and Co-Lead Counsel for the Class*

**LABATON KELLER SUCHAROW
LLP**
Michael P. Canty (*pro hac vice*)
Michael H. Rogers (*pro hac vice*)
James T. Christie (*pro hac vice*)
Jacqueline R. Meyers (*pro hac vice*)
140 Broadway
New York, NY 10005
Telephone:    (212) 907-0700
Facsimile:    (212) 818-0477
mcanty@labaton.com
mrogers@labaton.com
jchristie@labaton.com
jmeyers@labaton.com

*Additional Counsel for Lead Plaintiffs*
*Nikola Investor Group II*

1

**CERTIFICATE OF SERVICE**

2   I hereby certify that on December 3, 2025, a copy of the foregoing was filed electronically.

3   Notice of this filing will be sent by email to all parties through the court's electronic filing

4   system or by mail to anyone unable to accept electronic filing. Parties may access this filing

5   through the court's CM/ECF system.

6

7                                                              */s/ Gary Gotto*
                                                              Gary Gotto

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28