Gary Gotto (No. 007401)
**KELLER ROHRBACK LLP**
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Telephone:   (602) 230-6322
Email: ggotto@kellerrohrback.com
*Liaison Counsel for Lead Plaintiffs Nikola Investor Group II and for the Class*

(*Lead Counsel for Lead Plaintiffs Nikola Investor Group II and for the Class appear on the Signature Page*)

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Daniel Borteanu, Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>        v.<br><br>Nikola Corporation, et al.,<br><br>                    Defendants. | No. CV-20-01797-PHX-SPL<br>No. CV-20-01819-PHX-DIR (cons.)<br>No. CV-20-02123-PHX-JJT (cons.)<br>No. CV-20-02168-PHX-DLR (cons.)<br>No. CV-20-02237-PHX-DLR (cons.)<br>No. CV-20-02374-PHX-DWL (cons.)<br><br>**LEAD PLAINTIFFS' OPPOSITION TO DEFENDANT TREVOR MILTON'S MOTION FOR SUMMARY JUDGMENT** |

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................ 1

ARGUMENT ............................................................................................................... 1

I.      LEGAL STANDARD FOR LOSS CAUSATION AND SUMMARY
        JUDGMENT ................................................................................................... 1

II.     PLAINTIFFS' EVIDENCE OF LOSS CAUSATION ................................. 3

III.    MILTON HAS FAILED TO CARRY HIS HEAVY BURDEN FOR
        SUMMARY JUDGMENT ............................................................................. 4

        A.      Milton Has Failed to Meet His Burden of Production ...................... 4

        B.      Dr. Nye's Testimony Supports a Finding of Loss Causation ........... 6

        C.      The DOJ's July 29, 2021 Announcement of Milton's Indictment Is a
                Valid Corrective Disclosure For the Jury to Consider ................... 10

        D.      Plaintiffs Have Presented Evidence Supporting A Finding of Loss
                Causation For Milton's September 21, 2020 Resignation
                Announcement ................................................................................. 13

        E.      Plaintiffs Have Produced Ample Evidence That the Hindenburg Report
                Contained New Information ............................................................. 15

CONCLUSION ........................................................................................................ 19

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Caremark, Inc. v. Coram Healthcare Corp.*,
  113 F.3d 645 (7th Cir. 1997)..................................................................1, 4

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)...............................................................................2

*Cement & Concrete Workers Dist. Council Pen. Fund v. Hewlett Packard Co.*,
  964 F. Supp. 2d 1128 (N.D. Cal. 2013) ....................................................14

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005).................................................................................1

*Evanston Police Pension Fund v. McKesson Corp.*,
  No. 18-CV-06525-CRB, 2021 WL 4902420 (N.D. Cal. Oct. 21, 2021)...................3, 4

*Freeland v. Iridium World Communications*, Ltd.,
  545 F. Supp. 2d 59 (D.D.C. 2008)..............................................................8

*Harris v. Provident Life & Accident Ins. Co.*,
  310 F.3d 73 (2d Cir. 2002).......................................................................5

*Hayes v. MagnaChip Semiconductor Corp.*,
  2016 WL 7406418 (N.D. Cal. Dec. 22, 2016) ...........................................10

*High Tech Gays v. Defense Indus. Sec. Clearance Office*,
  895 F.2d 563 (9th Cir. 1990)....................................................................2

*Hsu v. Puma Biotechnology, Inc.*,
  2018 WL 4945703 (C.D. Cal. Oct. 5, 2018) ..............................................5

*In re BofI Holding, Inc. Sec. Litig.*,
  977 F.3d 781 (9th Cir. 2020)............................................................*passim*

*In re Bradley Pharms., Inc. Sec. Litig.*,
  421 F. Supp. 2d 822 (D.N.J. 2006)...........................................................11

*In re Cardinal Health Inc. Sec. Litigations*,
  426 F. Supp. 2d 688 (S.D. Ohio 2006) .....................................................11

*In re Daou Sys., Inc.*,
  411 F.3d 1006 (9th Cir. 2005)...................................................................2

*In re Dura Pharms., Inc.* Sec. Litig.,
 452 F. Supp. 2d 1005 (S.D. Cal. 2006)...................................................................11

*In re Fastly, Inc. Sec. Litig.*,
 2025 WL 2721693 (N.D. Cal. Sept. 24, 2025)...........................................................7

*In re Fed. Nat. Mortg. Ass'n Sec., Derivative & ERISA Litig.*,
 247 F.R.D. 32 (D.D.C. 2008)....................................................................................10

*In re Firstenergy Corp.*,
 2022 WL 681320 (S.D. Ohio Mar. 7, 2022).............................................................12

*In re Genius Brands Int'l, Inc. Sec. Litig.*,
 97 F.4th 1171 (9th Cir. 2024).......................................................................................1

*In re Mattel, Inc. Sec. Litig.*,
 2021 WL 1259405 (C.D. Cal. Jan. 26, 2021)...........................................................15

*In re Nature's Sunshine Prod.'s Inc. Sec. Litig.*,
 251 F.R.D. 656 (D. Utah 2008).................................................................................10

*In re Nektar Therapeutics Sec. Litig.*,
 34 F.4th 828 (9th Cir. 2022).........................................................................................7

*In re Novatel*,
 830 F. Supp. 2d 996 (S.D. Cal. 2011).........................................................................4

*In re Novatel Wireless Sec. Litig.*,
 830 F. Supp. 2d 996 (S.D. Cal. 2011).........................................................................1

*In re Pharmaprint, Inc. Sec. Litig.*,
 2002 WL 31056813 (D.N.J. Apr. 17, 2002)...............................................................5

*In re Snap Inc. Sec. Litig.*,
 2018 WL 2972528 (C.D. Cal. June 7, 2018).............................................................19

*In re Vivendi, S.A. Sec. Litig.*,
 838 F.3d 223 (2d Cir. 2016).....................................................................................8, 9

*Leader Techs., Inc. v. Facebook, Inc.*,
 2011 WL 1514701 (D. Del. Mar. 14, 2011)...............................................................5

*Leykin v. AT&T Corp.*,
 423 F. Supp. 2d 229 (S.D.N.Y. 2006) ......................................................................12

*Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp., PLC*,
 2013 WL 4405538 (S.D.N.Y. Aug. 5, 2013).............................................................12

*Lloyd v. CVB Fin. Corp.*,
   811 F.3d 1200 (9th Cir. 2016) ................................................................. 1, 4, 13, 14

*Magro v. Freeport-McMoran Inc.*,
   2018 WL 3725781 (D. Ariz. Aug. 3, 2018) ................................................... 14

*Mauss v. NuVasive, Inc.*,
   2016 WL 3681831 (S.D. Cal. July 12, 2016) ............................................... 14

*Maverick Fund, L.D.C. v. First Solar, Inc.*,
   2018 WL 6181241 (D. Ariz. Nov. 27, 2018) ............................................... 13

*McCabe v. Ernst & Young, LLP*,
   494 F.3d 418 (3d Cir. 2007) ........................................................................ 2

*Meyer v. Greene*,
   710 F.3d 1189 (11th Cir. 2013) ................................................................. 12

*Mineworkers' Pension Scheme v. First Solar Inc.*,
   881 F.3d 750 (9th Cir. 2018) ............................................................ 2, 8, 12, 14

*Nguyen v. Radient Pharms. Corp.*,
   946 F. Supp. 2d 1025 (C.D. Cal. 2013) ....................................................... 5

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*,
   210 F.3d 1099 (9th Cir. 2000) .................................................................... 2

*No. 84 Emp.-Teamster Joint Council Pen. Tr. Fund v. Am. W. Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003) ..................................................................... 19

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda*,
   730 F.3d 1111 (9th Cir. 2013) .................................................................. 2, 7

*Parker Freeland v. Iridium World Commc'ns, Ltd.*,
   233 F.R.D. 40 (D.D.C. 2006) ..................................................................... 11

*Provenz v. Miller*,
   102 F.3d 1478 (9th Cir. 1996) ............................................................ 2, 5, 15, 16

*Rabkin v. Lion Biotechs., Inc.*,
   2018 WL 905862 (N.D. Cal. Feb. 15, 2018) ............................................. 13

*Roe v. Doe*,
   2009 WL 1883752 (N.D. Cal. June 30, 2009) ........................................... 5

*Roofer's Pension Fund v. Papa*,
   687 F. Supp. 3d 604 (D.N.J. 2023) ........................................................... 5

*Smilovits v. First Solar Inc.*,
    119 F. Supp. 3d 978 (D. Ariz. 2015),
    *aff'd sub nom., Mineworkers'*, 881 F.3d 750 ................................................................4

*Zelman v. JDS Uniphase Corp.*,
    376 F. Supp. 2d 956 (N.D. Cal. 2005) .................................................................10

## **<u>Rules</u>**

Fed. R. Civ. P. 56(a) ..........................................................................................................2

## **<u>Other Authorities</u>**

10A Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, Federal
    Practice and Procedure § 2727 (3d ed.1998) ...............................................2

**INTRODUCTION**

The Court may grant summary judgment as to loss causation only if Milton, "'establish[es] that, as a matter of undisputed fact, the depreciation in the value of [Nikola's stock] could not have resulted from the alleged false statement or omission...'" *In re Novatel Wireless Sec. Litig.*, 830 F. Supp. 2d 996, 1019 (S.D. Cal. 2011). In other words, Milton must "establish[] that the decline in the value of the security is attributable in total to some other factor." *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 649-50 (7th Cir. 1997); *see Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016) (defendants must establish that it was "some other fact" unrelated to their misstatements that caused the stock price decline).

Here, Milton submits only the expert report and testimony of Dr. Zachary Nye – ***Plaintiffs' expert*** – who opines that Nikola's stock price declined as a result of the alleged corrective disclosures and that Defendants' alleged misrepresentations were the proximate cause of the declines. Milton has produced no evidence – ***zero*** – that ***any*** portion of Nikola's stock price declines were the result of non-fraud factors, much less evidence that ***all*** declines were. Notably, he does not even submit an expert report to refute the opinions of Dr. Nye. This alone mandates denial of Milton's Motion.

The remainder of Milton's arguments should be rejected for the reasons discussed below.

**ARGUMENT**

**I.    LEGAL STANDARD FOR LOSS CAUSATION AND SUMMARY JUDGMENT**

The element of loss causation for 10(b) claims requires a showing of simply "a causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). This element is akin to ordinary proximate cause. *See In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1183 (9th Cir. 2024) ("[I]n the end, loss causation is simply a variant of proximate cause, [and] the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's

loss."); *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) (showing loss causation "requires no more than the familiar test for proximate cause").

"Typically, 'to satisfy the loss causation requirement, the plaintiff must show that the revelation of that misrepresentation or omission was a substantial factor in causing a decline in the security's price, thus creating an actual economic loss for the plaintiff.'" *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1119 (9th Cir. 2013) (quoting *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 425-26 (3d Cir. 2007)). The Ninth Circuit has repeatedly emphasized that "[a] plaintiff is not required to show 'that a misrepresentation was the **sole** reason for the investment's decline in value' in order to establish loss causation." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1025 (9th Cir. 2005) (emphasis in original).

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When seeking summary judgment, the moving party bears the "heavy burden" of proving the lack of any genuine issue of material fact. *Provenz v. Miller*, 102 F.3d 1478, 1493 (9th Cir. 1996)

On a summary judgment motion, a defendant "has both the initial burden of production and the ultimate burden of persuasion." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000) (citing 10A Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, Federal Practice and Procedure § 2727 (3d ed.1998)). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Id.* (citing *High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 574 (9th Cir. 1990). "In order to carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact." *Id.* (internal citation omitted). "If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything." *Id.* at 1103 (internal citation

omitted). "If, however, a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense….[I]f the nonmoving party produces enough evidence to create a genuine issue of material fact, the nonmoving party defeats the motion." *Evanston Police Pension Fund v. McKesson Corp.*, No. 18-CV-06525-CRB, 2021 WL 4902420, at *3 (N.D. Cal. Oct. 21, 2021).

## II.   PLAINTIFFS' EVIDENCE OF LOSS CAUSATION

It is an undisputed fact that following each of the alleged corrective disclosures Nikola's stock price declined. ¶13.[1]

Plaintiffs' loss causation and damages expert Dr. Nye conducted an event study analysis to evaluate whether there is a causal connection between the stock price declines following the alleged corrective disclosures and Defendants' (including Milton's) alleged misstatements. *Id*. As Dr. Nye summarizes, following his analysis:

> With respect to the alleged corrective events on: September 10–11, 2020; September 14 (after market close) and September 15, 2020; September 21, 2020; September 23, 2020; October 15, 2020 (after market close); November 24, 2020 (after market close); November 30, 2020, December 23, 2020; and July 29, 2021, as discussed below, based on my event study, I have found no other negative Company-specific information unrelated to Plaintiffs' allegations that materially contributed to the statistically significant declines observed in Nikola's stock price. Accordingly, ***it is my opinion that the entire Company-specific return following each of these disclosures was proximately caused by information that corrected prior alleged misstatements and omissions made during the Class Period***.

*Id.* (citing ECF No. 334-2, at ¶54).[2] Moreover, Dr. Nye opines that each of the alleged corrective disclosures was "a direct and foreseeable consequence of Defendants' fraudulent conduct" (*id.* (citing ECF No. 334-2, at ¶¶80, 94, 103, 130, 140, 165)), "partially revealed the relevant truth" and "proximately caused the price of Nikola's stock to decline" (*id.* (citing ECF No. 334-2, at ¶¶70, 81, 95, 104, 131, 141, 166)), concluding, "it is my opinion that the statistically significant decline in Nikola's stock price on [the date] is demonstrative of loss

---

[1] Unless otherwise specified, citations to "¶" are to Plaintiffs' Statement of Genuine Disputes of Material Facts.

[2] Unless otherwise specified, all emphasis has been added.

causation associated with Defendants' alleged misstatements and omissions." *Id.* (citing ECF No. 334-2, at ¶¶70, 81, 95, 104, 131, 141, 166).

Having established the causal connection, Dr. Nye calculated the inflation in Nikola's stock price on each day of the Class Period as well as class members' per share recoverable damages under the "out-of-pocket" method required under the law. ¶19.

## III. MILTON HAS FAILED TO CARRY HIS HEAVY BURDEN FOR SUMMARY JUDGMENT

### A. Milton Has Failed to Meet His Burden of Production

To satisfy his burden of production Milton must submit evidence that, if uncontested, "'establish[es] that, as a matter of undisputed fact, the depreciation in the value of [Nikola's stock] could not have resulted from the alleged false statement or omission of the defendant.'" *In re Novatel*, 830 F. Supp. 2d 996, 1019 (S.D. Cal. 2011). In other words, defendants must "establish[] that the decline in the value of the security is attributable in total to some other factor." *Caremark*, 113 F.3d at 649-50. *See Lloyd*, 811 F.3d at 1210 (defendants must establish that it was "some other fact" unrelated to their misstatements that caused the stock price decline).

In support of his Motion, Milton submits only the expert report and testimony of Dr. Nye – ***Plaintiffs' expert*** – who demonstrates that Nikola's stock price declined as a result of the alleged corrective disclosures and opines, *inter alia*, that Defendants' alleged misrepresentations were the proximate cause of the declines. ¶13. Curiously, Milton has produced no evidence – ***zero*** – that ***any*** portion of Nikola's stock price declines were the result of non-fraud factors, much less evidence that ***all*** declines were. Notably, he does not even submit an expert report to refute the opinions of Dr. Nye. This alone supports denying his Motion. Having produced no evidence that the decline in Nikola stock was caused by something other than the alleged misrepresentations, Milton has failed to carry his burden of production. His Motion should be denied. *See Smilovits v. First Solar Inc.*, 119 F. Supp. 3d 978, 996 (D. Ariz. 2015) (denying summary judgment as to a corrective disclosure, even though plaintiff's expert did not suggest that "'all, or a substantial portion' of the stock

decline" was due to the revelation of the concealed information, because plaintiff need only show that "'"the misrepresentation is one substantial cause"'"), *aff'd sub nom. Mineworkers'*, 881 F.3d 750; *Nguyen v. Radient Pharms. Corp.*, 946 F. Supp. 2d 1025, 1040 (C.D. Cal. 2013) (denying summary judgment where defendants did not "show that depreciation of a stock was the result of factors other than alleged false and misleading statements"); *Hsu v. Puma Biotechnology, Inc.*, 2018 WL 4945703, at *9 (C.D. Cal. Oct. 5, 2018) (denying summary judgment where defendants "failed to show that factors other than the . . . corrective disclosures caused the stock's decline").

Indeed, denial would be required even if Milton had submitted expert evidence because Milton still would have failed to carry his burden of persuasion. A "battle of the experts" precludes summary judgment. *See e.g, Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 79 (2d Cir. 2002) ("Where, as here, there are conflicting expert reports presented, courts are wary of granting summary judgment."); *Roofer's Pension Fund v. Papa*, 687 F. Supp. 3d 604, 637 (D.N.J. 2023) ("Perrigo and Plaintiffs have both submitted detailed, but conflicting expert reports on loss causation, making summary judgment inappropriate."); *In re Pharmaprint, Inc. Sec. Litig.*, 2002 WL 31056813, *10 (D.N.J. Apr. 17, 2002) (denying summary judgment where "Lead Plaintiffs have offered an expert opinion that disputes [defendants' claim that fraudulent conduct did not cause plaintiff's injury]"); *Leader Techs., Inc. v. Facebook, Inc.*, 2011 WL 1514701, at *2 (D. Del. Mar. 14, 2011) (denying summary judgment and ruling that "conflicting expert testimony raises genuine issues of material fact that are appropriate for consideration by a jury in the first instance and, hence, preclude summary judgment"). Having submitted no expert report or evidence supporting his loss causation position, the Court need not go any further. Milton's Motion should be denied for his failure to meet his burden of production.

Milton is precluded from attempting to cure this fatal deficiency on reply. *Provenz*, 102 F.3d at 1483 ("'[W]here new evidence is presented in a reply to a motion for summary judgment, the district court should not consider the new evidence without giving the [non-]movant an opportunity to respond.'"); *Roe v. Doe*, 2009 WL 1883752, at *5 (N.D. Cal. June

1    30, 2009) ("'It is well accepted that raising new issues and submission of new facts in [a]

2    reply brief is improper.'"). Having failed to identify any factor(s) that account for Nikola's

3    stock price decline following any of the alleged corrective disclosures, Milton's Motion must

4    be denied.

5    **B.    Dr. Nye's Testimony Supports a Finding of Loss Causation**

6         Milton argues that Dr. Nye's opinions are legally insufficient for any jury to find loss

7    causation because, Defendants assert, Dr. Nye applies the "zone of risk" analysis that has not

8    been expressly adopted by the Ninth Circuit. Def. Br. at 6. Milton is wrong on the facts and

9    the law.

10        ***The facts***: Dr. Nye does not rely exclusively on the "zone of risk" standard for his loss

11   causation analysis or opinions. Rather, following a detailed analysis of each alleged corrective

12   disclosure – the information revealed (both fraud and non-fraud related), analyst commentary

13   and the "residual return" in the stock price (after removing market and industry factors) – Dr.

14   Nye concludes that each of the corrective disclosures on September 10–11, 2020; September

15   15, 2020; September 21, 2020; September 23, 2020; September 29, 2020; October 16, 2020;

16   November 25, 2020; November 30, 2020; December 23, 2020; February 26, 2021; and July

17   29, 2021 "caused a statistically significant, Company-specific stock price decline", "are

18   directly related to Defendants' alleged misstatements and omissions", "the subjects of the

19   alleged misstatements and omissions—[identifying the specific subjects]—were the root

20   cause of the actual losses suffered by Plaintiffs," there is "strong economic evidence that the

21   disclosures…partially revealed the alleged relevant truth…as risks previously concealed by

22   Defendants' alleged fraud partially materialized and proximately caused the price of Nikola's

23   stock to decline", and that "the statistically significant declines in Nikola's stock price…are

24   demonstrative of loss causation associated with Defendants' alleged misstatements and

25   omissions." ¶13. Moreover, for each corrective disclosure in which he references the "zone

26   of risk" standard, he also concludes that the corrective disclosure "was a direct and foreseeable

27   consequence of Defendants' fraudulent conduct…" Dr. Nye's opinions are in line with the

28   "infinite variety" of ways that loss causation can be demonstrated in the Ninth Circuit. *See,*

1   *e.g.*, *Nuveen*, 730 F.3d at 1120 ("loss causation can be established by showing 'that the

2   Defendants' misrepresentation ***was directly related*** to the actual economic loss [the plaintiff]

3   suffered.'") (citations omitted).

4        ***The law***: Even if Dr. Nye's opinions were limited to the "zone of risk" standard, Milton

5   incorrectly suggests that the courts of the Ninth Circuit have rejected that standard. While the

6   Ninth Circuit has not expressly adopted the "zone of risk" standard as one of the "infinite

7   variety" of ways to demonstrate loss causation, it also has not rejected it. Indeed, the very case

8   upon which Milton relies states, "Our court has never expressly adopted that theory, though

9   other circuits have. We have continued to require securities fraud plaintiffs to allege that the

10  defendant lied about "the very facts" causing the plaintiffs' losses, and ***it is unclear in any***

11  ***event that courts employing the "zone of risk" theory require any lesser showing***." *In re*

12  *Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 840 (9th Cir. 2022) (citations omitted).

13  Moreover, the Ninth Circuit has cited favorably to the "zone of risk analysis", stating that it

14  is "[a]long similar lines" to the standards "we have recognized." *Nuveen*, 730 F.3d at 1120

15  (citations omitted). At bottom, "[w]hile the Ninth Circuit has neither endorsed nor rejected

16  the materialization-of-the-risk theory of loss causation, it has recognized that district courts

17  in this circuit have accepted that theory." *In re Fastly, Inc. Sec. Litig.*, 2025 WL 2721693, at

18  *22 (N.D. Cal. Sept. 24, 2025) (citation omitted).

19       Next, Milton asserts that Plaintiffs cannot produce any evidence of loss causation

20  because, Milton asserts, "Dr. Nye merely assumes and does not establish, that the

21  requirements [of loss causation] are satisfied." Def. Br. at 6. Milton blatantly mischaracterizes

22  Dr. Nye's independent analysis and conclusions. Dr. Nye only assumed that Plaintiffs'

23  liability allegations are true. ¶13. While Dr. Nye is not opining on the legal question as to

24  whether the alleged disclosures are "corrective disclosures" under the law, he did ***not*** assume

25  loss causation as is obvious from his thorough (and lengthy) reports. *Id*. Dr. Nye made this

26  crystal clear in his deposition:

27       Q.    Okay. So are you assuming that these are all corrective disclosure

28            dates?

1
2
3
4
5

A.      Yes, I am, because what is corrective or not, my understanding is that that's a legal issue that's to be determined by the trier of fact upon weighing all the evidence. ***These are definitely economic loss-inducing events. I've tried, in my report, to demonstrate a causal connection between these events and the alleged misstatements and omissions***, but I'm not -- the reason this is here is, I'm not opining that they're corrective, because that's not my place.

6
7
8
9
10
11
12
13
14
15
16
17
18
19

*Id.* (citing ECF No. 334-3, at Tr. 14:14-23). Dr. Nye followed and applied the well-established methodology for assessing loss causation. *See In re Vivendi, S.A. Sec. Litig.,* 838 F.3d 223, 256 (2d Cir. 2016) ("It was up to the *jury* to determine how much, if any, of the artificial inflation identified by Nye was caused by Vivendi's alleged fraud…by assessing the alleged misstatements and their connection to the misconception in question. ***Nye's analysis merely operated on the assumption that Plaintiffs would be able to prove at trial all the necessary elements [of a 10b-5 claim]***…"); *Freeland v. Iridium World Communications, Ltd*., 545 F. Supp. 2d 59, 87-88 (D.D.C. 2008) (denying motion to exclude loss causation expert because "Plaintiffs told [the expert] to assume their fraud allegations were true, and to assume the disclosures corrected prior misrepresentations" because "[i]t is not [the expert's] responsibility to prove [the defendants] committed fraud; [the expert] is only proposing to illustrate how disclosures correcting that fraud affected the stock price" and "whether those disclosures corrected earlier misstatements by [the defendants] is an issue of fact for the jury to decide").

20
21
22
23
24
25
26
27
28

Milton also argues that Dr. Nye's opinions are insufficient as a matter of law for any jury to find loss causation because, Milton asserts, Dr. Nye fails to "trac[e] the alleged losses 'back to the very facts about which [Defendants] lied.'" Def. Br. at 7 (quoting *Mineworkers'*, 881 F.3d at 753). Milton is wrong. For each alleged corrective disclosure, Dr. Nye details the connection between that disclosure and the alleged misstatements and omissions. For example, Dr. Nye identifies the revelations in the Hindenburg Report, expressly discussing how they mirror the very facts about which Plaintiffs allege Milton lied, footnoting certain of the specific alleged misrepresentations in the Complaint. ¶13 (citing ECF No. 334-2, at ¶¶66-67. Dr. Nye similarly traced each corrective disclosure back to Milton's (and Defendants')

alleged misrepresentations by category, concluding that the corrective disclosure was a "direct and foreseeable consequence of Defendants' fraudulent conduct first brought to light by the Hindenburg Report." *Id.* The details of the misrepresentations in each category are in the Complaint, which Dr. Nye identifies. *Id.* Dr. Nye conducted the same thorough analysis for each of the alleged corrective disclosures. ¶13. At the conclusion of each analysis, Dr. Nye opines that each of the alleged corrective disclosures was "a direct and foreseeable consequence of Defendants' fraudulent conduct" (*id.* (citing ECF No. 334-2, at ¶¶80, 94, 103, 130, 140, 165)), "partially revealed the relevant truth" and "proximately caused the price of Nikola's stock to decline" (*id.* (citing ECF No. 334-2, at ¶¶70, 81, 95, 104, 131, 141, 166)), concluding, "it is my opinion that the statistically significant decline in Nikola's stock price on September 15, 2020 is demonstrative of loss causation associated with Defendants' alleged misstatements and omissions." *Id.* (citing ECF No. 334-2, at ¶¶70, 81, 95, 104, 131, 141, 166).

Contrary to Milton's assertion, Dr. Nye is not required to "to identify the specific misstatements or omissions that each alleged corrective disclosure revealed the truth for." Def. Br. at 7. The Court required Plaintiffs to include that detail as part of a notice ***pleading*** standard in order "to give the defendant 'some indication of the loss and the causal connection that the plaintiff has in mind.'" ECF No. 126, at 67. The Court has already held that Plaintiffs have provided Milton adequate notice of their theory of liability. As discussed above, Dr. Nye's analysis assumes that Plaintiffs will be able to prove Milton's liability as to the alleged misrepresentations. He is not required to do more. *See Vivendi,* 838 F.3d at 255–56 (denying motion to exclude the plaintiffs' loss causation expert, approving the "price maintenance" theory and rejecting the defendants' argument that each alleged misrepresentation must be associated with a "price impact" where "Nye's testimony did not depend on the specific identification of the fifty-seven alleged misstatements that Plaintiffs later identified at the close of trial").

1

2

**C.     The DOJ's July 29, 2021 Announcement of Milton's Indictment Is a Valid Corrective Disclosure For the Jury to Consider**

3       Milton argues that the DOJ's July 29, 2021 announcement of Milton's indictment

4   cannot support loss causation as a matter of law because it occurred after the end of the Class

5   Period. Def. Br. at 8. Milton misunderstands and mischaracterizes the law.

6       The purpose of defining a plaintiff class, through dates or otherwise, is to limit the

7   class of plaintiffs to those ascertainable individuals who have standing to bring the action. *See*

8   Alba Conte & Herbert Newberg, 1 Newberg on Class Actions §§ 2.3 (4th ed.2002)

9   (addressing class definition, scope, and member identification), 6.14 (addressing prefiling

10   definition of plaintiff class). A class period defines the group of investors on whose behalf the

11   action is brought and "is not a device for limiting the universe of actionable conduct." *Zelman*

12   *v. JDS Uniphase Corp.*, 376 F. Supp. 2d 956, 966 (N.D. Cal. 2005).

13       Here, the Class Period ends on February 25, 2021, when Nikola filed its Form 10-K,

14   admitting that the allegations in the Hindenburg Report were correct and that Milton and the

15   Company had made false and misleading statements as to nine separate categories of

16   statements. Plaintiffs ended the Class Period on this date, in an abundance of caution, because

17   some courts have shortened class periods to end after a company has admitted that its prior

18   statements were inaccurate and, therefore, purchasers after that date could not have reasonably

19   relied on the prior false statements. *See Hayes v. MagnaChip Semiconductor Corp.*, 2016 WL

20   7406418, at *8 (N.D. Cal. Dec. 22, 2016) (shortening the class period following statement by

21   the company that prior financial statements "should not be relied upon" even though the

22   disclosure was not "fully corrective" and additional partial corrective disclosures continued

23   after the class period, which the court had previously upheld at the motion to dismiss stage);

24   *In re Fed. Nat. Mortg. Ass'n Sec., Derivative & ERISA Litig.*, 247 F.R.D. 32, 39-40 (D.D.C.

25   2008) (ending the class period on the date that the "company explicitly warned investors to

26   discount its prior financial statements and that it anticipated a restatement" because "investors

27   who purchased Fannie Mae stock after [the disclosure] . . . should not be able to claim a

28   reasonable reliance on Fannie Mae's financial statements"); *In re Nature's Sunshine Prod.'s*

1    *Inc. Sec. Litig.*, 251 F.R.D. 656, 666-67 (D. Utah 2008) (finding that "an 8—K warning

2    investors not to rely on any of its financials" was "a curative disclosure . . . render[ed] it

3    unreasonable for an investor, or the market, to continue to be mislead [sic] by the defendants

4    alleged misrepresentations").

5        However, the end of the Class Period – which defines the investors who, *inter alia*,

6    reasonably relied on the prior misstatements – does not prohibit corrective disclosures after

7    that date. This is because investors who purchased **prior** to the end of the Class Period (and

8    therefore undeniably reasonably relied on Defendants' false statements) suffered additional

9    losses from the fraud when Milton's indictment was announced and the stock price declined.

10        It is well-settled that corrective disclosures "need not reveal the full scope of the

11    defendant's fraud in one fell swoop; the true facts concealed by the defendant's misstatements

12    may be revealed over time through a series of partial disclosures." *In re BofI Holding, Inc.*

13    *Sec. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020). Moreover, there is no requirement that every

14    partial corrective disclosure within a series occur within the class period. *In re Bradley*

15    *Pharms., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 828-29 (D.N.J. 2006) (finding loss causation

16    satisfied where a corrective disclosure occurred one month after the close of the class period,

17    and rejecting "Defendants' rigid and dogmatic interpretation of Dura"); *In re Dura Pharms.,*

18    *Inc.* Sec. Litig., 452 F. Supp. 2d 1005, 1023 (S.D. Cal. 2006) (district court, on remand from

19    *Dura*, explained "the Supreme Court could have held that as a matter of law Plaintiffs cannot

20    establish loss causation because the corrective disclosures . . . were made several months after

21    the Class Period," but it "did not so hold"). Indeed, Milton's loss causation logic – that the

22    end of the class period prohibits additional corrective disclosures -- "'would allow

23    wrongdoers to immunize themselves with a protracted series of partial disclosures.'" *In re*

24    *Cardinal Health Inc. Sec. Litigations*, 426 F. Supp. 2d 688, 761 n.75 (S.D. Ohio 2006)

25    (compiling cases and quoting *Parker Freeland v. Iridium World Commc'ns, Ltd.*, 233 F.R.D.

26    40, 47 (D.D.C. 2006)). This Court rejected a similar argument at the motion to dismiss stage,

27    holding that pre-Class Period statements are actionable. ECF No. 126, at 8-9 ("if each member

28    of the plaintiff class 'pursued this action in their individual capacities, there would be no class

period to limit the universe of actionable statements.'") (citations omitted). If investors pursued their claims individually, there would be no basis for Milton to assert that the July 29, 2021 disclosure is not a valid corrective event.

The authorities cited by Milton are inapposite. As a court has explained in response to the very argument Milton makes here, "Tellingly, [the defendant]'s cited authorities find loss causation lacking where plaintiffs' ***first*** concrete knowledge of the scheme or misstatement postdates the class period." *In re Firstenergy Corp.*, 2022 WL 681320, at *29 (S.D. Ohio Mar. 7, 2022) (citing *Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp., PLC*, 2013 WL 4405538, at *10 (S.D.N.Y. Aug. 5, 2013)) ("Plaintiffs only allege that the truth about [defendant's] exposure to subprime securities came out in [defendant's] 2008 annual report," released "more than a month after the close of the proposed class period," and "do not allege that the market became aware [of the scheme] at any previous point" (emphasis removed)); *Leykin v. AT&T Corp.*, 423 F. Supp. 2d 229, 243 (S.D.N.Y. 2006) (complaint "does not allege facts showing that, during the class period, the market became aware" of the scheme; "[o]n the contrary, plaintiffs acknowledge that [defendants' wrongdoing] ***did not become public knowledge during the class period***"). However, "[w]here, as here, details of wrongdoing emerge in the Class Period and a series of disclosures continues beyond it, no rule prohibits loss causation as to the later events." *Firstenergy Corp.*, 2022 WL 681320, at *29.

Contrary to Milton's assertion, the loss causation sufficiency of the announcement of the filing of the DOJ's criminal indictment and SEC civil complaint on July 29, 2021 is unaffected by the SEC's later dismissal of its civil complaint against Milton. The only authority Milton cites is an out-of-circuit case, for the proposition that "the disclosures of the SEC ***investigations***, ***without more***, are insufficient as a matter of law to constitute corrective disclosures." Def. Br. at 9 (quoting *Meyer v. Greene*, 710 F.3d 1189, 1202 (11th Cir. 2013)). *First*, the announcement at issue concerns a complaint, not merely an investigation, rending Milton's authority inapposite. Even if the announcement did concern only an investigation and *Meyer* was binding on this Court, Nikola's admission in its 10-K that Milton made false statements as well as Milton's criminal conviction would certainly constitute the "something

more." *Second*, unlike the announcement of an investigation, the filing of a complaint suggests to the market that the defendant has done something wrong. *Third,* Milton ignores the fact that the DOJ indictment was announced at the same time. Therefore, the disclosure is still valid. *Fourth*, the SEC complaint was based on the same facts as the DOJ indictment, which led to Milton's criminal conviction and the SEC complaint was dismissed only ***after*** that conviction. Moreover, the Ninth Circuit has held, "the announcement of an SEC ***investigation*** related to an alleged misrepresentation, coupled ***with a subsequent revelation of the inaccuracy of that misrepresentation***, can serve as a corrective disclosure for the purpose of loss causation." *Lloyd*, 811 F.3d at 1203.[3] *Rabkin v. Lion Biotechs., Inc.,* 2018 WL 905862, at *13-18 (N.D. Cal. Feb. 15, 2018) (finding that disclosure of enforcement actions, which followed prior disclosure of an SEC subpoena, satisfies loss causation).

### D.    Plaintiffs Have Presented Evidence Supporting A Finding of Loss Causation For Milton's September 21, 2020 Resignation Announcement

Milton asserts that Plaintiffs cannot demonstrate loss causation based on the September 21, 2020 announcement of Milton's resignation because the resignation did not accompany an express admission that it was because Milton committed fraud, arguing: "Without an admission of wrongdoing, a resignation cannot be the basis for a loss causation theory…" Def. Br. at 9. He misstates the law. Moreover, Dr. Nye directly connects Milton's resignation to the fraud.

Dr. Nye analyzes the announcement of Milton's resignation and opines that Milton's resignation and the resulting stock price decline was proximately caused by Milton's alleged misrepresentations, supporting loss causation. ¶13 (citing ECF No. 334-2 at ¶83-96). *See, e.g., Maverick Fund, L.D.C. v. First Solar, Inc.,* 2018 WL 6181241, at *8-10 (D. Ariz. Nov. 27, 2018) (finding loss causation adequately alleged when stock drops followed resignations of CEO and CFO, who were alleged to be vital to the company's business). *See also Rabkin*, 2018 WL 905862, at *13-18 (finding that the totality of alleged partial disclosures which included announcement of officer resignations for "personal reasons" pleaded loss causation);

---

[3] More recently, the Ninth Circuit qualified *Lloyd* and held that allegations standing alone support loss causation so long as "the market reasonably *perceived* [the] allegations as true and acted upon them accordingly." *BofI*, 977 F.3d at 791-92.

*Mauss v. NuVasive, Inc.,* 2016 WL 3681831, at *11-12 (S.D. Cal. July 12, 2016) (disclosure of resignation of CEO resulting in further decline in stock price adequately pleaded loss causation); *Cement & Concrete Workers Dist. Council Pen. Fund v. Hewlett Packard Co.*, 964 F. Supp. 2d 1128, 1146 (N.D. Cal. 2013) (finding loss causation adequately pled where CEO's resignation amid misconduct allegations preceded stock drop, giving rise to plausible inference that market treated resignation as disclosure of fraud).

Milton egregiously mischaracterizes *Magro v. Freeport-McMoran Inc.,* 2018 WL 3725781, at *9 (D. Ariz. Aug. 3, 2018) as holding that a resignation "can be a corrective disclosure *only* if accompanied by an express statement of wrongdoing." Def. Br. at 9. *Margo* held no such thing. The court stated that resignations can be a corrective disclosure (and indicative of scienter) where "the resignation at issue was uncharacteristic" or "accompanied by suspicious circumstances." *Magro*, 2018 WL 3725781, at *6. The court also stated that a resignation following the announcement of an investigation can be corrective where, as in *Lloyd*, "a company admitted to the inaccuracy of its prior statements." *Id*. at *9. Here, analysts recognized that Milton was the "key" executive at Nikola, its founder and visionary who was accused of fraud; his resignation 10 days after publication of the Hindenburg Report signaled to the market that there was merit to the allegations. ECF No. 332-2 at ¶¶89-90 Nikola later admitted in its SEC filings the inaccuracy of Milton's prior statements. *Id*. at ¶144. Indeed, as Dr. Nye discusses in detail, the officers and directors of Nikola have testified that Milton was forced to resign because of the alleged misstatements identified in the Hindenburg Report. Specifically, the CEO, CFO and other officers gave an "ultimatum that either Trevor goes or we go." ¶34 (citing ECF No. 330-2, at ¶¶49-51). The fact that the Company did not issue a *mea culpa* admitting that Milton was forced to resign because of the alleged fraud is no barrier to the jury finding loss causation. *See Mineworkers*, 881 F.3d at 754 ("A plaintiff may also prove loss causation by showing that the stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss"). A Court recently recognized the moral hazard of Milton's proposition in rejecting a similar "categorical rule whereby companies may announce the fact of a whistleblower letter (the accuracy of which is later confirmed), but not its contents, and avoid liability." *In re Mattel,*

*Inc. Sec. Litig.*, 2021 WL 1259405, at \*11 (C.D. Cal. Jan. 26, 2021).

### E.    Plaintiffs Have Produced Ample Evidence That the Hindenburg Report Contained New Information

Milton argues that no jury could find loss causation based on the September 10, 2020 Hindenburg Report because, he asserts, the Report did not contain any new information. Def. Br. at 10-11. Milton's argument is frivolous.

As a threshold matter, Milton has not produced ***any*** evidence supporting his assertion that ***any*** of the information contained in the Hindenburg Report had been previously disclosed, much less ***all*** of it. He has not identified a single newspaper article, analyst report, SEC filing or other public disclosure predating the Hindenburg Report that purportedly contains the same information. Because Milton has failed to carry his burden of production, the Court's analysis can stop here. Milton's Motion should be denied.

Even if Milton had made any attempt to carry his burden of production, summary judgment would not be warranted. Determining whether the truth was known to the market is an intensely fact-specific inquiry and requires defendants to prove that the concealed information was "transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by insider's one-sided representations." *Provenz*, 102 F.3d at 1492-93. This is a "heavy burden," and summary judgment is proper only if defendants establish that "no rational jury could find that the market was misled." *Id*. at 1493.

Here, Plaintiffs have uncovered overwhelming evidence that the Hindenburg Report contained new information. Dr. Nye quotes the findings of Hindenburg, discussing much of the new information revealed in the Report. ¶30 (citing ECF No. 334-2, at ¶56 (mentioning "investigation of the site and text messages from a former employee," and information obtained by Hindenburg from "A spokesman for Volvo spin-off Powercell AB," and "A spokesperson for Bosch," "behind-the-scenes photos," and "emails and interviews with former partners").

Moreover, the Hindenburg Report itself identifies some of the new information:

> We have gathered extensive evidence—*including recorded phone calls, text messages, private emails and behind-the-scenes photographs*—detailing dozens of false statements by Nikola Founder Trevor Milton. We have never seen this level of deception at a public company, especially of this size.

*Id.* (citing ECF No. 334-4 at __).

Specifically, regarding the Nikola One unveiling and the "Nikola one in Motion" video, the Hindenburg Report states:

> We reveal how, in the face of growing skepticism over the functionality of its truck, Nikola staged a video called "Nikola One in Motion" which showed the semi-truck cruising on a road at a high rate of speed. *Our investigation of the site and text messages from a former employee reveal that the video was an elaborate ruse*—Nikola had the truck towed to the top of a hill on a remote stretch of road and simply filmed it rolling down the hill. . .
>
> *We present behind-the-scenes photos showing that Nikola had an electricity cable snaked up from underneath the stage into the truck in order to falsely claim the Nikola One's electrical systems fully functioned*. . . .
>
> *We learned through emails and interviews with former partners that Trevor had an artist stencil "H2" and "Zero Emission Hydrogen Electric" on the side of the Nikola One despite it having no hydrogen capabilities whatsoever*; it was built with natural gas components. . . .

*Id.* (citing ECF No. 334-4 at __). The Report also shows text messages from a former employee that revealed that Nikola had abandoned the Nikola One and had not done any work on it in a year. *Id.* (citing ECF No. 334-4 at __).

Hindenburg also had a private phone call with prior partners of Nikola who discussed Nikola's claims concerning hydrogen fuel cell and battery:

> A spokesman for Volvo spin-off Powercell AB, a hydrogen fuel cell technology company that formerly partnered with Nikola, called Nikola's battery and hydrogen fuel cell claims "hot air".

*Id.* (citing ECF No. 334-4 at __).

Hindenburg revealed information it obtained regarding Milton's July 2020 podcast appearance in which he said of Nikola's "Tre" truck: "We have five of them coming off the assembly line right now in Ulm Germany." The Hindenburg Report revealed:

> But in a phone interview on Sept. 9, Bosch said not so. Thorsten Schoenfeld, spokesman for Bosch's electro-mobility unit at headquarters in Germany said this:
>
> > *"No they are not ready yet. I don't know exactly the year but we're working on it."*

*Id.* (citing ECF No. 334-4 at __).

The Hindenburg Report also revealed:

> Nikola's much-touted multi-billion dollar order book is filled with fluff. U.S. Xpress reportedly accounts for a third of its reservations, representing ~$3.5 billion in orders. U.S. Xpress had only $1.3 million in cash on hand last quarter.

*Id.* (citing ECF No. 334-4 at __). While the amount of cash on hand that U.S. Xpress had was obtained from its SEC filings, Hindenburg was the first to assemble the information and make the connection to the orders touted by Nikola and conclude: "There is no realistic way that the company could possibly order the number of trucks it has 'reserved'. Having a large order book sounds great but having buyers both willing and credibly able to pay is another matter entirely." *Id.* (citing ECF No. 334-4 at __). The market had not previously appreciated these facts. *In re BofI*, 977 F.3d at 794 ("information, although nominally available to the public, can still be "new" if the market has not previously understood its significance").

The Hindenburg Report also contained new information concerning Milton and Nikola's claims that the Company made all of its own components such as inverters. Hindenburg examined footage of Nikola's vehicles and discovered that there was "a relatively inconspicuous green piece of masking tape on the component" and was able to confirm through text messages with a sales engineer from Cascadia Motion that it was not made Cascadia, not Nikola, and that the product was generally available to the public. *Id.* (citing ECF No. 334-4 at __).

The Hindenburg Report was also the first disclosure to connect the dots concerning Milton and Nikola's wide-ranging scheme to defraud investors. No other outlet had uncovered that Milton and Nikola were systematically lying about every aspect of its business as part of a larger scheme to inflate the stock price and announce partnerships, concluding:

> Today, we reveal why we believe Nikola is an intricate fraud built on dozens of lies over the course of its Founder and Executive Chairman Trevor Milton's career… We have never seen this level of deception at a public company, especially of this size. Trevor has managed to parlay these false statements made over the course of a decade into a ~$20 billion public company. He has inked partnerships with some of the top auto companies in the world, all desperate to catch up to Tesla and to harness the EV wave."

*Id*. (citing ECF No. 334-4 at 1). Even if the Report had merely repackaged public information, a disclosure based on publicly available information can constitute a corrective disclosure where "great effort [is] needed to locate and analyze" the information. *BofI*, 977 F.3d at 795. Here, Hindenburg undertook a great effort that included compiling information from non-public sources and synthesized it in a manner that no other analyst had into a 52-page Report exposing a pattern of misrepresentation. Plaintiffs' theory, which they will argue to the jury, is that "other market participants *had not* done the same analysis" *Id*. Defendants have failed to produce any evidence, much less create an undisputed fact, that other market participants had already done this analysis.[4]

Dr. Nye also explains that analysts and media outlets universally reacted to the Hindenburg Report as new value-relevant information and attributed Nikola's stock price decline to the information revealed in the Report. *Id*. (citing ECF No. 334-4 at ¶¶63-64, 68).

Dr. Nye also demonstrates that Nikola's stock experience as statistically significant residual (i.e. Company-specific) stock price decline in response to the Hindenburg Report and

---

[4] As Dr. Nye explains, sophisticated investors as well as the academic literature recognizes Hindenburg as "producing high-quality and influential research," "plays a significant whistleblowing role," "provid[ing] evidence of malpractice and misconduct," "sniffing out corporate wrongdoing or inflated stock prices." ¶30 (citing ECF No. 334-2, at ¶86.

1  that such declines in an efficient market only occur when new value relevant information is

2  revealed. *Id*. (citing ECF No. 334-4 at ¶¶62, 65, 70).

3  At bottom, arguing that the information was already public is a fact-intensive "truth-

4  on-the-market" defense, and Defendants' burden to prove. *In re Snap Inc. Sec. Litig.*, 2018

5  WL 2972528, at *7 (C.D. Cal. June 7, 2018). Even if Milton had presented any evidence at

6  all that any information contained in the Hindenburg Report was already public he certainly

7  had failed to create an undisputed fact that "the information was transmitted to the public with

8  a degree of intensity and credibility sufficient to effectively counterbalance any misleading

9  impression created by the alleged [misstatements]." *Snap*, 2018 WL 2972528, at *7 (internal

10  quotations omitted). This is particularly true given that Milton was issuing false statements

11  on the issue of hydrogen mere weeks before the Hindenburg Report was issued, and that

12  Milton and the other Defendants denied the validity of the information in the Hindenburg

13  Report when it was issued. *Id*. (citing ECF No. 334-4 at ¶¶60, 68). *Cf. Snap*, 2018 WL

14  2972528, at *7 (defendants cannot seek refuge from loss causation in the Report when, at the

15  time, they "misleadingly reassured investors" it was not credible, "thus 'operat[ing] as a direct

16  rebuttal of'" the truth) (collecting cases); *see also No. 84 Emp.-Teamster Joint Council Pen.

17  Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 935 (9th Cir. 2003) (that defendants

18  "continued to reassure analysts" following initial disclosure plausibly explained delay in

19  market reaction).

## **CONCLUSION**

21  For all these reasons, Milton's motion for summary judgment should be denied.

22

23  December 3, 2025                          Respectfully submitted,

24                                           **KELLER ROHRBACK LLP**

25                              By:   /s/ Gary Gotto
                                     Gary Gotto (No. 007401)
26                                   3101 North Central Avenue, Suite 1400
                                     Phoenix, AZ 85012
27                                   Telephone:   (602) 230-6322
                                     ggotto@kellerrohrback.com
28

*Liaison Counsel for Lead Plaintiffs*
*Nikola Investor Group II and for the Class*

**POMERANTZ LLP**
Jeremy A. Lieberman (*pro hac vice*)
Michael J. Wernke (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone:    (212) 661-1100
Facsimile:    (212) 661-8665
jalieberman@pomlaw.com
mjwernke@pomlaw.com

**BLOCK & LEVITON LLP**
Jeffrey C. Block (*pro hac vice*)
Jacob A. Walker (*pro hac vice*)
Michael Gaines (*pro hac vice*)
260 Franklin Street, Suite 1860
Boston, MA 02110
Telephone:    (617) 398-5600
Facsimile:    (617) 507-6020
jeff@blockleviton.com
jake@blockleviton.com
michael@blockleviton.com

*Counsel for Lead Plaintiffs Nikola Investor*
*Group II and Co-Lead Counsel for the Class*

**LABATON SUCHAROW LLP**
Jonathan Gardner (*pro hac vice*)
James W. Johnson (*pro hac vice*)
Michael H. Rogers (*pro hac vice*)
David J. Schwartz (*pro hac vice*)
James T. Christie (*pro hac vice*)
140 Broadway
New York, NY 10005
Telephone:    (212) 907-0700
Facsimile:    (212) 818-0477
jgardner@labaton.com
jjohnson@labaton.com
mrogers@labaton.com
dschwartz@labaton.com
jchristie@labaton.com

*Additional Counsel for Lead Plaintiffs*
*Nikola Investor Group II*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# CERTIFICATE OF SERVICE

I hereby certify that on December 3, 2025, a copy of the foregoing was filed electronically. Notice of this filing will be sent by email to all parties through the court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the court's CM/ECF system.

*/s/ Gary Gotto*
Gary Gotto