Gary Gotto (No. 007401)
**KELLER ROHRBACK LLP**
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Telephone:   (602) 230-6322
Email: ggotto@kellerrohrback.com
*Liaison Counsel for Lead Plaintiffs Nikola Investor Group II and for the Class*

(*Lead Counsel for Lead Plaintiffs Nikola Investor Group II and for the Class appear on the Signature Page*)

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Daniel Borteanu, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>Nikola Corporation, et al.,<br><br>Defendants. | No. CV-20-01797-PHX-SPL<br>No. CV-20-01819-PHX-DIR (cons.)<br>No. CV-20-02123-PHX-JJT (cons.)<br>No. CV-20-02168-PHX-DLR (cons.)<br>No. CV-20-02237-PHX-DLR (cons.)<br>No. CV-20-02374-PHX-DWL (cons.) |

**PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS TO DEFENDANT TREVOR MILTON'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Local Rule 56.1, Plaintiffs submit their statement of genuine disputes of material fact to Defendant Milton's Statement of Facts ("SOF"), ECF No. 334.

## I.    RESPONSES TO MILTON'S STATEMENTS OF FACT

**Milton Statement of Fact No. 1:** Plaintiffs' Second Consolidated Amended Class Action Complaint ("SAC") spans 902 paragraphs over 295 pages, wherein they allege that Defendants misrepresented numerous aspects of Nikola's business and operations. *See* Doc. 129.

**Response to No. 1:** Undisputed.

**Milton Statement of Fact No. 2:** Plaintiffs allege that one or more of the defendants made 139 separate misrepresentations over a four-year period between July 2016 and September 2020. See Chart Summarizing the 139 Alleged Misrepresentations with references to the SAC, prepared by Milton's retained expert Laurel Van Allen, attached as Exhibit A.

**Response to No. 2:** Disputed. Many of the 139 misrepresentations identified in the identified Exhibit A contain multiple misrepresentations.

**Milton Statement of Fact No. 3:** Plaintiffs describe the 139 alleged misrepresentations in the SAC as being broken down into nine categories:

1) that Nikola had developed a fully operational "zero-emissions" tractor trailer truck powered by hydrogen fuel cell technology—the Nikola One;

2) that Nikola had, in hand, over 14,000 purchase orders for its trucks, which represented 2 to 3 years of production and billions in revenue;

3) that Nikola was producing hydrogen at a fraction of the cost industry experts believed was possible and that Nikola was in the process of establishing a nation-wide network of hydrogen refueling stations, which could reliably dispense and produce inexpensive hydrogen for the Nikola One and Nikola's other vehicles to operate;

4) that Nikola had developed, using its own technology, a fully operational pick-up truck called the Badger, for which pre-orders had sold out;

5) that Nikola had developed all of its vehicles' critical components "in-house," including a proprietary "game-changing" electric battery, which exceeded the range of then-existing electric batteries;

    6) that the cost of owning and operating Nikola's vehicles was significantly less than the cost of owning and operating a traditional diesel-powered vehicle;

    7) that commercial "assembly-line" production of the Nikola Tre [battery-electric vehicle] truck had already been completed in Ulm, German[y], and that Nikola had binding orders in hand for its BEV trucks;

    8) that Nikola's headquarters was completely "off-grid" with solar panels on the roof producing 18 megawatts of energy a day; and

    9) that Nikola owned seven natural gas wells that were used as backup to Nikola's solar hydrogen production.

Doc. 129 at p. 4, ¶ 10.

**Response to No. 3:** Undisputed as to the fact that Milton has accurately summarized certain information contained in Paragraph 10 of the Second Amended Class Action Complaint ("SAC"). ECF No. 129.

**Milton Statement of Fact No. 4:** The Court ruled in its Feb. 2, 2023 Order granting the Defendants' motions to dismiss the First Consolidated Amended Class Action Complaint ("FAC") that Plaintiffs had at that time failed to allege loss causation "because Plaintiff fails to identify the specific misstatements or omissions that each alleged corrective disclosure revealed the truth for," and "Instead, Plaintiff repeats the *exact same* generalized allegation for all eleven corrective disclosures…." Doc. 126 at p. 67. The Court noted that "Plaintiff's entirely conclusory and generalized allegation leaves the Court unable to trace any particular loss 'back to the very facts about which [Defendants] lied.'" Id. p. 68 (citations omitted).

**Response to No. 4:** Undisputed as to the fact that Milton has accurately quoted certain portions of the Court's February 2, 2023 Order. ECF No. 126.

**Milton Statement of Fact No. 5:** The Court's Feb. 2, 2023 Order also held that Plaintiffs failed to sufficiently allege that certain statements contained in Nikola's SEC filings were false or misleading, and that "these Statements are dismissed from the Complaint to the extent Plaintiff relies on them as a basis for Defendants' liability under Rule 10b-5(b)." Doc. 126 at pp. 14-17, 36.

**Response to No. 5:** Undisputed as to the fact that Milton has accurately quoted certain portions of the Court's February 2, 2023 Order. ECF No. 126.

**Milton Statement of Fact No. 6:** In the SAC, Plaintiffs reasserted eight alleged misstatements from the FAC that the Court previously found to not be misleading as matter of law and dismissed from the case (the "Dismissed Statements"):

a. **April 6, 2020 VectoIQ Form 8-K ("April 8-K")**:

Listing three "demo stations" related to hydrogen infrastructure plan: (i) completed Phoenix, Arizona "Demo Station" which offers hydrogen "storage and dispensing"; (ii) "R&D 8-Ton Station" which offers hydrogen "production, storage, and dispensing" and scheduled to be "complete by Q4 2021"; (iii) "AB 8-Ton Pilot Station" which offers hydrogen "production, storage, and dispensing" and scheduled to be "complete by mid-2022." (Doc. 129 at 107).

b. **May 8, 2020 VectorIQ Proxy Statement ("May Proxy")**:

"[Nikola] designs and manufactures state-of-the-art battery-electric and hydrogen fuel cell electric vehicles, electric vehicle drivetrains, energy storage systems, and hydrogen fueling stations." (Doc. 129 at 51).

"[W]e have initiated the development of the hydrogen station infrastructure by completing our first 1,000 kg demo station in the first quarter of 2019 at our corporate headquarters in Phoenix, Arizona. The demo hydrogen station offers hydrogen storage and dispensing and serves as a model for future hydrogen stations." (*Id.*).

Contains graphic showing hydrogen process and then states: "Our initial plan for the station rollout begins with an eight-ton pilot station accessible to the [Anheuser-Busch] brewery in Van Nuys, California. From there, we then plan to build up to 10-12 additional stations in California. These stations will supply fuel for our launch customers in those geographies that have dedicated routes in California. California is offering incentives to build out our hydrogen fueling infrastructure and deploy zero-emissions vehicles, including opportunities for funding along major freeway corridors. We expect to rollout these stations in 2022–23." (Doc. 129 at 110, 112).

c. **June 15, 2020 Form S-1 ("June S-1")**:

"*Our core product offering* is centered around our battery-electric vehicle ("BEV") and hydrogen fuel cell electric vehicle ("FCEV") Class 8 semitrucks. *The key differentiator of our business model* is our planned network of hydrogen fueling stations. We are offering a revolutionary bundled lease model, which provides

customers with the FCEV truck, hydrogen fuel, and maintenance for a fixed price per mile, locks in fuel demand and significantly de-risks infrastructure development." (Doc. 129 at 118, 272).

d. **July 17, 2020 Form S-1 ("July S-1")**:

"We have initiated the development of the hydrogen station infrastructure by completing our first 1,000 kg demo station in the first quarter of 2019 at our corporate headquarters in Phoenix, Arizona. The demo hydrogen station offers hydrogen storage and dispensing and serves as a model for future hydrogen stations." (Doc. 129 at 124).

e. **September 14, 2020 Form 8-K ("September 8-K")**:

"The Nikola One is a real truck that sits in Nikola's showroom. A pusher means a vehicle that was not designed to be moved on its own propulsion system. The Nikola One was, in fact, designed to be powered and driven by its own propulsion."; Describes the functionalities of Nikola One (Doc. 129 at 55).

"Nikola described this third-party video on the Company's social media as 'In Motion.' It was never described as 'under its own propulsion' or 'powertrain driven.' Nikola investors who invested during this period, in which the Company was privately held, knew the technical capability of the Nikola One at the time of their investment." (Doc. 129 at 59).

**Response to No. 6:** Disputed. Milton correctly identifies certain statements contained in the SAC. While the Court previously found that Plaintiffs had not adequately alleged falsity as to these statements, the Court granted Plaintiffs leave to amend. ECF No. 126.

**Milton Statement of Fact No. 7:** In its Dec. 8, 2023 Order on the Defendants' motions to dismiss the SAC, the Court reaffirmed its prior ruling that the Dismissed Statements are dismissed from the case because they "are not misleading as a matter of law." Doc. 157 at p. 16.

**Response to No. 7:** Undisputed as to the fact that Milton has accurately quoted certain portions of the Court's December 8, 2023 Order. ECF No. 157 at p. 16.

**Milton Statement of Fact No. 8:** Plaintiffs intend to demonstrate class-wide reliance on the 139 alleged misstatements under the "fraud-on-the-market" presumption of reliance. The Court found that Plaintiffs are entitled to this presumption in its Jan. 6, 2025 Order

1    certifying the class. Doc. 224 at p. 14, 25.[1]

2        **Response to No. 8:** Undisputed as to the fact that Milton has accurately quoted certain

3    portions of the Court's January 6, 2025 Order. ECF No. 224 at p. 14, 25.

4        **Milton Statement of Fact No. 9:**  The Court certified a class "defined as all those who

5    purchased or otherwise acquired Nikola Corporation securities during the period June 4, 2020

6    through February 25, 2021, and were damaged upon the revelation of the alleged corrective

7    disclosures." Doc. 224 at p. 27.

8        **Response to No. 9:** Undisputed as to the fact that Milton has accurately quoted certain

9    portions of the Court's January 6, 2025 Order. ECF No. 224 at p. 27.

10        **Milton Statement of Fact No. 10:** Plaintiffs disclosed Dr. Zachary Nye on August 4,

11    2025 as their only expert witness to attempt to establish loss causation and damages. See

12    August 4, 2025 Expert Report of Zachary Nye, PH.D. ("Nye Damages Report"), attached as

13    **Exhibit B**.

14        **Response to No. 10:** Undisputed.

15        **Milton Statement of Fact No. 11:** Dr. Nye assumes that all of Plaintiffs' allegations

16    in the SAC are true. **Ex. B**, Nye Damages Report at p. 3, ¶ 9 ("Class Counsel in this matter

17    has asked me to assume Plaintiffs' allegations are true."); September 18, 2025 Deposition of

18    Zachary Nye, Ph.D. ("Nye Depo."), at 10:9-21, attached as **Exhibit C**.

19        **Response to No. 11:** Disputed. Plaintiffs' expert, Dr. Zachary Nye, Ph.D assumed that

20    Plaintiffs' liability allegations are true. Dr. Nye did not assume a causal connection between

21    the alleged misrepresentations and investors' losses, loss causation, inflation or damages. His

22    report details his independent loss causation and damages analysis and opinions. ECF No.

23    334-2.

24        **Milton Statement of Fact No. 12:** Dr. Nye assumes that all of the alleged

25

26

27    ---
[1]  The legal standards regarding what a Plaintiff must prove to show loss causation under a fraud-on-the-market theory are set forth in Section I.A. of the argument contained in Milton's Motion for Summary Judgment, filed contemporaneously herewith.

28

misstatements in the SAC are actionable, **including the Dismissed Statements**.[2] **Ex. C**, Nye Depo., at 29:21-23 ("I'm assuming that all of the alleged misstatements are actionable…."); 32:7-9 ("…they're all actionable under Plaintiffs' theory of liability, which I've assumed is true."); 135:20-21 ("…all of the misstatements are actionable….").

**Response to No. 12:** Disputed. Dr. Nye assumed that the alleged misrepresentations upheld by the Court to be actionable. Dr. Nye's Report does not discuss or cite to the paragraphs in the SAC containing the eight statements dismissed by the Court. ECF No. 334-2.

**Milton Statement of Fact No. 13:** Dr. Nye assumes, **but does not himself establish**, that there are eleven corrective disclosure events which caused economic losses to the class upon the revelation of the relevant truth about the alleged misrepresentations: (i) September 10-11, 2020; (ii) September 14 (after market close) and September 15, 2020; (iii) September 21, 2020; (iv) September 23, 2020; (v) September 29, 2020; (vi) October 15, 2020 (after market close); (vii) November 24, 2020 (after market close); (viii) November 30, 2020; (ix) December 23, 2020; (x) February 25, 2021 (after market close); and (xi) July 29, 2021. **Ex. B**, Nye Damages Report, at p. 3, ¶ 10; **Ex. C**, Nye Depo., 14:5-17 (Q: And so what are you assuming here…? A: That at this point in the case, these are the alleged corrective events that Plaintiffs believe caused economic losses to the class upon the revelation of the relevant truth. Q: Okay. So are you assuming that these are all corrective disclosure dates? A: Yes, I am…. **I'm not opining that they're corrective, because that's not my place**.") (emphasis added).

**Response to No. 13:** Disputed. Dr. Nye does not assume that the eleven corrective disclosure events caused economic losses to the class upon the revelation of the relevant truth about the alleged misrepresentations. Dr. Nye has conducted an independent analysis to determine, *inter alia*, "whether Defendants' alleged misstatements and omissions were the proximate cause of any losses suffered by the Class." ECF No. 334-2, at ¶6(ii). As part of that

---

[2] Dr. Nye testified that if he were asked to, he could go back and redo his calculations to account for a finding that certain alleged misstatements are not misleading, but he has not done so because he assumes that Plaintiffs' alleged theory is true. **Ex. C**, Nye Depo., 31:7-19.

analysis, he conducted an event study. *Id.* at ¶¶48-51; Appendix A (¶¶177-181). For each alleged corrective disclosure, Dr. Nye (i) evaluated the content of the disclosure, (ii) determined whether the "residual" stock price decline (the decline in Nikola stock price after removing market and industry factors that could impact the price) was "statistically significant," (iii) evaluated analyst and media discussion of the alleged corrective disclosure, and (iv) determined whether any Company-specific information unrelated to the alleged misrepresentations and fraud contributed to the stock price decline. Based on this information, Dr. Nye determined (i) whether the alleged corrective disclosure caused the statistically significant stock price decline and (ii) whether the stock price decline is "directly related to Defendants' alleged misstatements and omissions" by comparing the alleged misstatements and Plaintiffs' theory of fraud as stated in the SAC to the contents of the alleged corrective disclosure. For example, Dr. Nye identifies the revelations in the Hindenburg Report, expressly discussing how they mirror the very facts about which Plaintiffs allege Milton lied, footnoting specific alleged misrepresentations in the Complaint. *Id.* at ¶¶66-67. Dr. Nye conducts the same analysis by category and misrepresentations for each of the alleged corrective disclosures on September 10–11, 2020 (¶¶55-71); September 14 (after market close) and September 15, 2020 (¶¶72-82); September 21, 2020 (¶¶83-96); September 23, 2020 (¶¶97-105); September 29, 2020 (¶¶107-112); October 15, 2020 (after market close) (¶¶113-118); November 24, 2020 (after market close) (¶¶119-122); November 30, 2020 (¶¶123-133); December 23, 2020 (¶¶134-142); February 25, 2020 (¶¶143-154); and July 29, 2021. ¶¶155-166. He identified which of the "subjects of the alleged misstatements and omissions" were implicated by each alleged corrective disclosure. ¶¶70, 81, 95, 104, 131, 141. Dr. Nye found that each alleged corrective disclosures "caused the statistically significant, Company-specific stock price decline on [the date]." ¶¶65, 78, 91, 101, 127, 138, 149, 162. As Dr. Nye summarizes, following his analysis:

> With respect to the alleged corrective events on: September 10–11, 2020;
> September 14 (after market close) and September 15, 2020; September 21,
> 2020; September 23, 2020; October 15, 2020 (after market close); November
> 24, 2020 (after market close); November 30, 2020, December 23, 2020; and

July 29, 2021, as discussed below, based on my event study, I have found no other negative Company-specific information unrelated to Plaintiffs' allegations that materially contributed to the statistically significant declines observed in Nikola's stock price. Accordingly, ***it is my opinion that the entire Company-specific return following each of these disclosures was proximately caused by information that corrected prior alleged misstatements and omissions made during the Class Period***.

With respect to the alleged corrective disclosures on September 29, 2020 and February 25, 2020 (after market close), based on my event study, I cannot rule out the possibility that the statistically significant Company-specific decline following these events were at least partly attributable to information that corrected Defendants' prior alleged misstatements and omissions during the Class Period. ***However, because there were contemporaneous adverse disclosures unrelated to the alleged fraud, for the sake of conservatism, I have excluded the September 29, 2020 and February 26, 2020 declines from my estimate of price inflation for Nikola stock during the Class Period***.

*Id*. at ¶¶53-54. Moreover, Dr. Nye opines that each of the alleged corrective disclosures was "a direct and foreseeable consequence of Defendants' fraudulent conduct" (*id*. at ¶¶80, 94, 103, 130, 140, 165), "the subjects of the alleged misstatements and omissions—[identifying the specific subjects]—were the root cause of the actual losses suffered by Plaintiffs," (*id*. at (*id*. at ¶¶70, 81, 95, 104, 131, 141, 166), "partially revealed the relevant truth" and "proximately caused the price of Nikola's stock to decline" (*id*.), concluding, "these disclosures, which caused the Company-specific stock price decline on [the date], are directly related to Defendants' alleged misstatements and omissions" and "it is my opinion that the statistically significant decline in Nikola's stock price on September 15, 2020 is demonstrative of loss causation associated with Defendants' alleged misstatements and omissions."

The only assumption Dr. Nye made regarding the alleged corrective disclosures is that they are legally valid "corrective disclosures"; he is providing economic evidence for the trier of fact as to whether there is a causal connection between the alleged misrepresentations and the alleged corrective disclosures:

Q.     Okay. So are you assuming that these are all corrective disclosure dates?

A.    Yes, I am, because **what is corrective or not, my understanding is that that's a legal issue** that's to be determined by the trier of fact upon weighing all the evidence. **These are definitely economic loss-inducing events. I've tried, in my report, to demonstrate a causal connection between these events and the alleged misstatements and omissions**, but I'm not -- the reason this is here is, **I'm not opining that they're corrective, because that's not my place**.

ECF No. 334-3, at 14:14-23.

**Milton Statement of Fact No. 14:** Dr. Nye conducted an event study to evaluate whether Nikola's stock price declined on the alleged corrective disclosure dates. He concluded that Nikola's stock price declined on all eleven dates, but he excluded from his damages analysis the price declines on Sept. 29, 2020 and Feb. 25, 2021 because he determined there were contemporaneous adverse disclosures about the company unrelated to the alleged fraud on those dates. **Ex. B**, Nye Damages Report, pp. 36-37, ¶ 54.

**Response to No. 14:** Undisputed.

**Milton Statement of Fact No. 15:** Dr. Nye agreed that he would have to disentangle the contemporaneous unrelated information on Sept. 29, 2020 and Feb. 25, 2021 in order to use these dates in his damage calculations, but he did not do so, and instead he decided to exclude these two dates from his estimate of price inflation. *Id.*; **Ex. C**, Nye Depo., 94:17 to 95:5.

**Response to No. 15:** Undisputed.

**Milton Statement of Fact No. 16:** Taking into account his exclusion of Sept. 29, 2020 and Feb. 25, 2021, Dr. Nye opines that the total Company-specific decline in the price of Nikola stock on the dates he assumes to be corrective disclosure events is as follows:

| Impact Date | Previous Closing Price | Actual Return | Company-Specific Return | Confidence Level | Contribution to Price Inflation[432] |
|---|---|---|---|---|---|
| 9/10/2020 | $42.37 | -11.33% | -11.98% | 95.37% | $5.07 |
| 9/11/2020 | $37.57 | -14.48% | -15.01% | 98.69% | $5.64 |
| 9/15/2020 | $35.79 | -8.27% | -10.15% | 91.15% | $3.63 |
| 9/21/2020 | $34.19 | -19.33% | -15.37% | 98.98% | $5.26 |
| 9/23/2020 | $28.51 | -25.82% | -22.43% | 99.98% | $6.40 |
| 10/16/2020 | $23.30 | -16.12% | -15.53% | 99.45% | $3.62 |
| 11/25/2020 | $34.50 | -12.35% | -12.98% | 98.81% | $4.48 |
| 11/30/2020 | $27.93 | -26.92% | -24.70% | 99.99% | $6.90 |
| 12/23/2020 | $16.83 | -10.70% | -13.26% | 98.27% | $2.23 |
| 7/29/2021 | $14.19 | -15.22% | -18.47% | 99.99% | $2.62 |
| | | | | Total: | $45.84 |

**Ex. B**, Nye Damages Report at p. 127, ¶ 169.

**Response to No. 16:** Disputed. Dr. Nye did not assume causal connection between the alleged misrepresentations and investors' losses, loss causation, inflation or damages. *Supra,* at Response No. 11 and Response No. 13.

**Milton Statement of Fact No. 17:** Dr. Nye uses his calculations of Nikola's stock price decline on the assumed corrective disclosure dates to present the following summary of

| Artificial Price Inflation in Nikola Stock | | |
|---|---|---|
| From | Through | Per-Share Price Inflation |
| June 4, 2020 | September 9, 2020 | $45.84 |
| September 10, 2020 | September 10, 2020 | $40.77 |
| September 11, 2020 | September 14, 2020 | $35.13 |
| September 15, 2020 | September 20, 2020 | $31.50 |
| September 21, 2020 | September 22, 2020 | $26.24 |
| September 23, 2020 | October 15, 2020 | $19.85 |
| October 16, 2020 | November 24, 2020 | $16.23 |
| November 25, 2020 | November 29, 2020 | $11.75 |
| November 30, 2020 | December 22, 2020 | $4.85 |
| December 23, 2020 | July 28, 2021 | $2.62 |
| July 29, 2021 | Thereafter | $0.00 |

his price inflation damages  analysis under Section 10(b) (i.e., the damages per share that investors incurred upon the revelation of the truth about the alleged misstatements): **Ex. B**, Nye Damages Report, p. 130, ¶ 171.

**Response to No. 17:** Disputed. Dr. Nye did not assume causal connection between the alleged misrepresentations and investors' losses, loss causation, inflation or damages. *Supra,* at Response No. 11 and Response No. 13.

**Milton Statement of Fact No. 18:** Dr. Nye's calculation of per-share price inflation exceeds the actual price of Nikola's stock on 43 days of the Class Period between June and September 2020. For example, on June 4, 2020, during the period when Dr. Nye opines that Nikola's stock is artificially inflated by $45.84, Nikola's stock closing price is only $33.75. *See* **Ex. B**, Nye Damages Report Exhibit 3B.

**Response to No. 18:** Undisputed.

**Milton Statement of Fact No. 19:** In an attempt to justify the impossibility of the true value of Nikola's stock price being negative, Dr. Nye claims that his measure of price inflation is capped at Nikola's actual share price on any date when the actual price is less than the artificial inflation he measured. He opines that the stock was worthless on those days and could have been purchased for free if the truth about the alleged fraud had been known. **Ex. C**, Nye Depo., 28:18 to 29:14.

**Response to No. 19:** Disputed. After calculating the amount of inflation removed from Nikola's stock price from the alleged corrective disclosures, Dr. Nye worked backwards to calculate an inflation ribbon that estimated the amount of inflation on each day of the Class Period. ECF No. 334-2, at ¶¶167-172. Using this inflation ribbon, each class member's per share "out of pocket" damages can be calculated by subtracting the amount of inflation in Nikola's stock price on the date that the class member sold their shares from the amount of inflation that existed on the day of their purchase. *Id*. at ¶¶167, 173-175.  The "out-of-pocket" measure of damages has several legal constraints. One such constraint, as suggested by its name, is that an investor cannot recover more than they paid for a security:

As defined in the *Litigation Services Handbook*, under "the out-of-pocket

> measure of damages used in most cases filed under § 10(b) … [t]he difference between the actual price and the but-for price is the inflation per share." (Gold *et al*. (2017), p. 12.) Thus, as the price of a corporation's stock can never be less than zero in an efficient market, it is simply impossible for price inflation to exceed the "actual price" paid, under the out-of-pocket measure of damages.  (*See* Brealey, Richard A., Stewart C. Myers and Franklin Allen, *Principles of Corporate Finance*, McGraw-Hill/Irwin, 8th ed., 2006, p. 6: "Stockholders can lose their entire investment, but no more.")

*Id*. at ¶172, n. 443. Dr. Nye does not providing any opinion as to what the value of Nikola's stock would have been in an alternate reality in which Milton and the other Defendants had always told the truth; rather, he is calculating the amount of inflation removed from Nikola's stock price from the alleged corrective disclosures and using that to calculate inflation on each day of the Class Period as well as recoverable damages under the "out-of-pocket", which recognizes that an investor cannot recover more than they paid for a stock, regardless of the amount of inflation:

> Q You're saying that that entire amount is artificially inflated, and it's worth zero that day. That's what you're saying; correct?
>
> A It's -- *I really don't have an opinion about what the like but-for value would have been, because what I'm really providing here is a limitation on damages*; which is consistent with my prior opinions and my understanding of what other experts have done, that has been accepted in federal securities litigation. *And it really just amounts to the logic that you can't lose more than the amount of money you put in and that stocks can't have a negative value, by virtue of their limited liability*. So that's what I'm capturing here, is really the actual losses that an investor who purchased on June 4, 2020 incurred….[W]hat we're really doing here, with the out-of-pocket -- as the name suggests -- damages methodology, is trying to estimate the fraud-related losses investors incurred as a result of purchasing an allegedly inflated stock.

ECF No. 443-3, at 34:21-35:21.

**Milton Statement of Fact No. 20:** Dr. Nye does not have any opinions to explain what portion, if any, of the price inflation he calculated throughout the class period is caused by the revelation of the truth about any specific misstatement or category of misstatements. He treats each assumed corrective disclosure date as being partially corrective of all 139 alleged

misstatements, including the eight Dismissed Statements (*see* SOF ¶¶ 6–7). He did not "disentangl[e] it by the various misstatements," because he is "assuming that all of the alleged misstatements are actionable…." **Ex. C**, Nye Depo., 29:15-23.

**Response to No. 20:** Disputed. Dr. Nye opines that inflation was removed from Nikola's stock price following each of the alleged corrective disclosures on September 10–11, 2020; September 14 (after market close) and September 15, 2020; September 21, 2020; September 23, 2020; October 15, 2020 (after market close); November 24, 2020 (after market close); November 30, 2020, December 23, 2020; and July 29, 2021. *Supra*, at Response No. 13. He identifies the alleged categories and misrepresentations related to the alleged corrective disclosures. *Id*. He calculates the amount of that inflation for each disclosure, as well as in total, which is related to the alleged misrepresentations and categories thereof identified in Plaintiffs' SAC for each alleged corrective disclosure. ECF No. 334-2, at ¶171. Dr. Nye did not include the alleged misrepresentations that the Court held to be not actionable. *Supra*, at Response No. 12.

**Milton Statement of Fact No. 21:** It would take Dr. Nye a lot of additional work and time to try to figure out what artificial inflation is caused by any particular misstatement or category of misstatements if he were asked to do it. **Ex. C**, Nye Depo 32:10 to 33:11 ("I haven't prepared that in this report to date.").

**Response to No. 21:** Disputed. Dr. Nye has calculated the inflation in Nikola's stock price based on Plaintiffs' theory of fraud that was upheld by the Court in its December 8, 2023 Order. ECF No. 157. If needed, Dr. Nye is capable of adjusting the inflation calculation based on the determination of the Court and/or the trier of fact, if need be. ECF No. 334-3, at 76:7-11; 137:16-24:

> I think that the report provides a lot of detail with respect to each of the corrective disclosures and their contribution to overall damages such that if there were an alternate liability finding that excluded one or more of the alleged categories of misstatements, that there is information that the trier of fact could consider in determining what is the appropriate measure of fraud-induced inflation, upon weighing all the facts and merits of the case.

> As I mentioned earlier, I've also been a part of certain litigations, where, after a motion for summary judgment, I've been asked to prepare alternate damage analyses that are consistent with a certain category of the alleged fraud in that case being deemed inactionable at that point.

*Id.* at 131:21-132:11. Dr. Nye further explained his role and how his analysis would be helpful to the trier of fact:

> what I provided, hopefully, is helpful information to the trier of fact regarding damages as a result of the entire set of alleged misstatements and omissions. I had mentioned it before, I've been a part of cases where, upon weighing all the facts of the case, Courts have asked juries to ascribe percentage values to -- of the damages, according to each individual defendant.
>
> I don't know that it would occur here, but I know that that's possible. I know there's case law that says that it is the role of the trier of fact, be it the jury or the judge, to determinate the level of fraud-induced inflation, upon weighing all the evidence, including my, hopefully, helpful economic evidence.

*Id.* at 133:7-21.

**Milton Statement of Fact No. 22:** Dr. Nye provides a purported discussion about loss causation in his report for each of the eleven dates that he assumes to be a corrective disclosure. **Ex. B**, Nye Damages Report, at pp. 45 (analysis for Sept. 10-11, 2025—Hindenburg Report and Company's Response); p. 58 (analysis for Sept. 14-15 SEC/DOJ Investigations); p. 67 (analysis for Sept. 21, 2020 Milton Resignation); p. 73 (analysis for Sept. 23, 2020—Stalled Partnership Talks); p. 92 (analysis for Sept. 23, Sept. 29, Oct. 15, and Nov. 30, 2020—Dissolution of GM Partnership); p.102 (analysis for Dec. 23, 2020—Republic Services Cancels Order); p. 113 (analysis for Feb. 25, 2021 Form 10-K Filed); and p. 122 (analysis for July 29, 2021—Milton Indictment).

**Response to No. 22:** Disputed. Dr. Nye analyzes and discusses (it is not a "purported discussion") loss causation as to each of the alleged corrective disclosures. *Supra,* at Response No. 13.

**Milton Statement of Fact No. 23:** Dr. Nye's discussion of loss causation does not

identify or opine about the specific misstatements or omissions, or even categories of misrepresentations, that any of the alleged corrective disclosure events revealed the truth for. *See id.*

**Response to No. 23:** Disputed. Dr. Nye thoroughly discusses how each of the alleged corrective disclosures relates to the alleged misrepresentations as well as categories of misrepresentations. *See supra* at Response No. 13.

**Milton Statement of Fact No. 24:** Dr. Nye's discussion of loss causation does not offer any opinions or analysis to establish what, if any, truth correcting a misrepresentation was revealed by any of the alleged corrective disclosure events. *See id.*

**Response to No. 24:** Disputed. Dr. Nye thoroughly discusses how each of the alleged corrective disclosures relates to the alleged misrepresentations as well as categories of misrepresentations. *See supra* at Response No. 13. Dr. Nye also opines as to each alleged corrective disclosure included in his inflation calculation, *inter alia*, there is "strong economic evidence that the disclosures…partially revealed the alleged relevant truth…as risks previously concealed by Defendants' alleged fraud partially materialized and proximately caused the price of Nikola's stock to decline." ECF No. 334-2, at ¶¶70, 81, 95, 104, 131, 141.

**Milton Statement of Fact No. 25:** Instead, Dr. Nye repeats the same series of vague and conclusory assertions for each assumed corrective disclosure, asserting:

a. that "based on a plain reading of Plaintiffs' allegations," he concludes that the disclosure is "directly related" to all 139 of Defendants' alleged misstatements and omissions. (Ex. B, Nye Damages Report, at ¶¶ 66, 79, 92, 102, 128, 139, 150, 163);

b. that his "event study provides strong economic evidence that the disclosure [] partially revealed the alleged relevant truth regarding key aspects of Nikola's business, as the risks previously concealed by Defendants' alleged fraud partially materialized and proximately caused the price of Nikola's stock to decline…," (Ex. B, Nye Damages Report, at ¶¶ 70, 81, 95, 104, 131, 141, 152, 166 ); and that

c. "Under Plaintiffs' theory of liability, however, the [disclosure] only partially revealed the relevant truth concealed by Defendants. Thus, notwithstanding the artificial inflation that dissipated on [date], under Plaintiffs' theory of liability, Nikola's stock price remained inflated throughout the remainder of the Class Period and beyond." (Ex. B, Nye Damages Report, at ¶¶ 71, 82, 96, 105, 133, 142, 154).

1

2    **Response to No. 25:** Disputed. The quoted passages from Dr. Nye's Merits Report are

3    neither "vague" nor "conclusory assertions"; Dr. Nye's opinions as to each alleged corrective

4    disclosure are prefaced by numerous paragraphs and pages of detailed analysis of Nikola's

5    stock price movements, regression analysis results, analyst and news outlet commentary, and

6    comparison to the alleged misrepresentations. *Supra*, at Response No. 13.

7    **Milton Statement of Fact No. 26:** Dr. Nye also repeats the same conclusory assertions

8    for each assumed corrective disclosure event after the Sept. 10, 2020 release of the

9    Hindenburg Report that, based on his assumption that Plaintiffs' theory of liability is true, "it

10   is clear that 'the risk that caused the loss was within the zone of risk concealed by the

11   misrepresentations.'" Ex. B, Nye Damages Report, at ¶¶ 80, 94, 103, 130, 140, 165.

12   **Response to No. 26:** Disputed. The quoted passages from Dr. Nye's Merits Report are

13   not "conclusory assertions"; Dr. Nye's opinions as to each alleged corrective disclosure are

14   prefaced by numerous paragraphs and pages of detailed analysis of Nikola's stock price

15   movements, regression analysis results, analyst and news outlet commentary, and comparison

16   to the alleged misrepresentations. *Supra*, at Response No. 13.

17   **Milton Statement of Fact No. 27:** Dr. Nye has no opinion about whether the full truth

18   about all nine categories of alleged misstatements was fully revealed as of the final corrective

19   disclosure event that he was instructed to assume on July 29, 2021. **Ex. C**, Nye Depo., 139:2-

20   9 ("I have no opinion on that. That's the plaintiff's theory, which they intend to prove.").

21   **Response to No. 27:** Undisputed. The determination of whether Milton and the

22   Defendants told the truth is an issue for the trier of fact.

23   **Milton Statement of Fact No. 28:** Dr. Nye did not do anything to assess the validity

24   of his assumption that all alleged corrective disclosure dates before July 29, 2021 only

25   partially revealed the truth about defendants' alleged omissions and misstatements. **Ex. C**,

26   Nye Depo., 139:10-19 ("Q: Have you done anything to assess the validity of that assumption?

27   A: No. I consider that to be a liability issue. That's outside the scope of my expertise.");

28   142:12-20 ("No, I didn't. Again, Plaintiffs' theory is that all these are misstatements. They're

all actionable…. So I didn't disentangle the various components….")

**Response to No. 28:** Undisputed. The determination of whether Milton and the Defendants told the truth is an issue for the trier of fact.

**Milton Statement of Fact No. 29:** Dr. Nye did not do anything to assess which portion of each individual defendant's misstatements or omissions were revealed on each corrective disclosure date prior to July 29, 2021. **Ex. C**, Nye Depo., 143:7-18.

**Response to No. 29:** Undisputed.

**Milton Statement of Fact No. 30:** The Hindenburg Report is a sensationalized article about Nikola published by the short-selling research firm Hindenburg Research on its website on September 10, 2020. Throughout the over 50-page article, the author accused Nikola and its founder Milton of making misrepresentations about at least 24 separate topics. Hindenburg Research concluded the article with a prominent disclaimer stating that all information in the report is "obtained from public sources," and that "Hindenburg Research makes no representation, express or implied, as to the accuracy, timeliness, or completeness of any such information…." Hindenburg Report, attached as **Exhibit D.**

**Response to No. 30:** Disputed. Sophisticated investors as well as the academic literature recognizes Hindenburg as "producing high-quality and influential research," "plays a significant whistleblowing role," "provid[ing] evidence of malpractice and misconduct," "sniffing out corporate wrongdoing or inflated stock prices." ECF No. 334-2, at ¶86. The legal disclaimer quoted by Milton also states, "To the best of our ability and belief, all information contained herein is accurate and reliable…" ECF No. 334-4, at 66. The Hindenburg identifies numerous pieces of new information never made public before "***including recorded phone calls, text messages, private emails and behind-the-scenes photographs.***" *Id.* at 2. The new information is provided in detail throughout the Hindenburg Report. For example:

> We have gathered extensive evidence—***including recorded phone calls, text messages, private emails and behind-the-scenes photographs***—detailing dozens of false statements by Nikola Founder Trevor Milton. We have never seen this level of deception at a public company, especially of this size.

*Id*.

Specifically, regarding the Nikola One unveiling and the "Nikola one in Motion" video, the

Hindenburg Report states:

> We reveal how, in the face of growing skepticism over the functionality of its truck, Nikola staged a video called "Nikola One in Motion" which showed the semi-truck cruising on a road at a high rate of speed. ***Our investigation of the site and text messages from a former employee reveal that the video was an elaborate ruse***—Nikola had the truck towed to the top of a hill on a remote stretch of road and simply filmed it rolling down the hill. . .
>
> We present behind-the-scenes photos showing that Nikola had an electricity cable snaked up from underneath the stage into the truck in order to falsely claim the Nikola One's electrical systems fully functioned. . . .
>
> We learned through emails and interviews with former partners that Trevor had an artist stencil "H2" and "Zero Emission Hydrogen Electric" on the side of the Nikola One despite it having no hydrogen capabilities whatsoever; it was built with natural gas components. . . .

*Id*. at 2-4. The Report also shows text messages from a former employee that revealed that

Nikola had abandoned the Nikola One and had not done any work on it in a year. *Id*. at 27.

Hindenburg also had a private phone call with prior partners of Nikola who discussed

Nikola's claims concerning hydrogen fuel cell and battery:

> A spokesman for Volvo spin-off Powercell AB, a hydrogen fuel cell technology company that formerly partnered with Nikola, called Nikola's battery and hydrogen fuel cell claims "hot air".

*Id*. at 3, 37-38. Hindenburg revealed information it obtained regarding Milton's July 2020

podcast appearance in which he said of Nikola's "Tre" truck: "We have five of them coming

off the assembly line right now in Ulm Germany." The Hindenburg Report revealed:

> But in a phone interview on Sept. 9, Bosch said not so. Thorsten Schoenfeld, spokesman for Bosch's electro-mobility unit at headquarters in Germany said this:
>
> *"No they are not ready yet. I don't know exactly the year but we're working on it."*

*Id*. at 51. The Hindenburg Report also revealed:

> Nikola's much-touted multi-billion dollar order book is filled with fluff. U.S. Xpress reportedly accounts for a third of its reservations,

representing ~$3.5 billion in orders. U.S. Xpress had only $1.3 million in cash on hand last quarter.

*Id.* at 4. While the amount of cash on hand that U.S. Xpress had was obtained from its SEC filings, Hindenburg was the first to assemble the information and make the connection to the orders touted by Nikola and conclude "There is no realistic way that the company could possibly order the number of trucks it has 'reserved'. Having a large order book sounds great but having buyers both willing and credibly able to pay is another matter entirely." *Id.* at 55. The market had not previously appreciated these facts.

The Hindenburg Report also contained new information concerning Milton and Nikola's claims that the Company made all of its own components such as inverters. Hindenburg examined footage of Nikola's vehicles and discovered that there was "a relatively inconspicuous green piece of masking tape on the component" and was able to confirm through text messages with a sales engineer from Cascadia Motion that it was not made Cascadia, not Nikola, and that the product was generally available to the public. *Id.* at 49-50.

The Hindenburg Report was also the first disclosure to connect the dots concerning Milton and Nikola's wide-ranging scheme to defraud investors. No other outlet had uncovered that Milton and Nikola were systematically lying about every aspect of its business as part of a larger scheme to inflate the stock price and announce partnerships, concluding:

> Today, we reveal why we believe Nikola is an intricate fraud built on dozens of lies over the course of its Founder and Executive Chairman Trevor Milton's career… We have never seen this level of deception at a public company, especially of this size. Trevor has managed to parlay these false statements made over the course of a decade into a ~$20 billion public company. He has inked partnerships with some of the top auto companies in the world, all desperate to catch up to Tesla and to harness the EV wave."

*Id.* at 2.

**Milton Statement of Fact No. 31:** Dr. Nye does not have any opinions about the Hindenburg Report explaining why the already-public information reported in the Hindenburg Report was not yet reflected in Nikola's stock price. **Ex. B**, Nye Damages Report, pp. 37-52.

1    **Response to No. 31:** Disputed. Dr. Nye specifically details new information contained

2    in the Hindenburg Report. ECF No. 334-2, at ¶56 (mentioning "investigation of the site and

3    text messages from a former employee," and information obtained by Hindenburg from "A

4    spokesman for Volvo spin-off Powercell AB," and "A spokesperson for Bosch," "behind-the-

5    scenes photos," and "emails and interviews with former partners"). Dr. Nye also discusses the

6    reactions from analyst and news outlets that identified the information as new and attributing

7    Nikola's stock price to the information in the Hindenburg Report. *Id.* at ¶¶63-64, 68. Dr. Nye

8    also examines Nikola's stock price movement in response to the Hindenburg Report and

9    determines that it caused a statistically significant stock price decline, which occurs in an

10   efficient market as a result of the disclosure of new value-relevant information. *Id.* at ¶¶62,

11   65, 70.

12   **Milton Statement of Fact No. 32:** Dr. Nye does not identify or explain any "new"

13   truth that was revealed to the market through the Hindenburg Report, and he does not provide

14   any market evidence to support Plaintiffs' allegations in the SAC that newly revealed

15   photographs or other new information in the Hindenburg Report changed the market's

16   perception. *See id;* Doc. 157 at p. 29.

17   **Response to No. 32:** Disputed. Dr. Nye details the new information contained in the

18   Hindenburg Report as well as the reactions from analyst and news outlets that identified the

19   information as new and attributing Nikola's stock price to the information in the Hindenburg

20   Report. For example, one analyst discussed the disclosure of the "intricate fraud" being

21   committed by Nikola and that allegations and Nikola's response left investors "disappointed."

22   ECF No. 334-2, at ¶¶63-64; Appendix B. Dr. Nye also examines Nikola's stock price

23   movement in response to the Hindenburg Report and determines that it caused a statistically

24   significant stock price decline, which occurs in an efficient market as a result of the disclosure

25   of new value-relevant information. *Id.* at ¶¶65-71.

26   **Milton Statement of Fact No. 33:** The U.S. Securities and Exchange Commission

27   ("SEC") issued a letter to Milton's attorney on October 30, 2025 stating that the SEC's July

28   29, 2021 complaint against Milton in Case No. 21-cv-6445 was dismissed with prejudice on

September 15, 2025 pursuant to a joint stipulation of dismissal. The SEC further explained that its settlement with Nikola on December 21, 2021 "did not make any findings with any entity or persons other than Nikola," and that "[t]he settlement with Nikola related to Nikola's conduct." Milton was "not a party to the settlement and did not consent to the settlement." Oct. 30, 2025 Letter from SEC to Ms. Sells, attached as **Exhibit E**.

     **Response to No. 33:** Undisputed as to the fact that Milton correctly quotes from the identified exhibit.

## II.    ADDITIONAL FACTS REGARDING THE SEPTEMBER 21, 2020 ANNOUNCEMENT OF MILTON'S RESIGNATION

     34.    The officers and directors of Nikola have testified that Milton was forced to resign because of the alleged misstatements identified in the Hindenburg Report. Board member Stephen Girsky testified that following the Hindenburg Report, "management" – "Russell, Brady, Worthen, and Pike" came to the board and said that "they can't work with [Milton] as chariman" and gave an "ultimatum" at the board meeting that "either Trevor [Milton] goes or we go" and "Milton was ultimately forced to resign from Nikola." ECF No. 330-8, at ¶50. *See also, id.* at ¶¶49, 51.

Dated: December 3, 2025                                    Respectfully submitted,


                                        */s/ Michael J. Wernke*
                                        Michael J. Wernke