**HATCH LAW GROUP PC**
Brent O. Hatch (*pro hac vice*)
Adam M. Pace (*pro hac vice*)
Tyler V. Snow (*pro hac vice*)
22 E. 100 S., Suite 400
Salt Lake City, UT 84111
(801) 869-1919
hatch@hatchpc.com
pace@hatchpc.com
snow@hatchpc.com

**WALLIN HESTER, PLC**
Troy A. Wallin (No. 023522)
Chad A. Hester (No. 022894)
1760 E. Pecos Rd., #332
Gilbert, AZ 85295
(480) 240-4150
TWallin@wallinhester.com
C.Hester@wallinhester.com
*Attorneys for Defendant Trevor Milton*

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Daniel Borteanu, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>Nikola Corporation; Trevor Milton; Mark A. Russell; Kim J. Brady; Britton M. Worthen; Steve Girsky; Steven Shindler; and Jeffrey Ubben,<br><br>Defendants. | No. CV-20-01797-PHX-SPL<br>No. CV-20-01819-PHX-DIR (cons.)<br>No. CV-20-02123-PHX-JJT (cons.)<br>No. CV-20-02168-PHX-DLR (cons.)<br>No. CV-20-02237-PHX-DLR (cons.)<br>No. CV-20-02374-PHX-DWL (cons.)<br><br>**DEFENDANT TREVOR MILTON'S RESPONSE TO "PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS"** |

## RESPONSE TO PLAINTIFFS' "UNCONTROVERTED FACTS"

**A.    Milton's Criminal Convictions for Securities and Wire Fraud[1]**

1.    On July 28, 2021, a criminal indictment ("Indictment") previously obtained by the United States Attorney's Office for the Southern District of New York was unsealed. The Indictment charged Milton and concerned the same conduct on which the Second Consolidated Amended Class Action Complaint ("SAC") is based. Declaration of Jeffrey C. Block in Support of Motion for Partial Summary Judgment ("Block Decl.") ¶2, Ex. 3.

**Response:** Disputed.   The SAC is based on a **much broader** scope of alleged conduct and **much larger** number of alleged misstatements than what was at issue in the indictment. The SAC spans 294 pages and includes over 900 paragraphs, alleging 139 misstatements made by one or more defendants. By comparison, the indictment (Plfs.' Ex. 3) is only 48 pages and includes 88 paragraphs of allegations. The SAC contains numerous allegations that are not contained in or addressed by the indictment, including the following examples, organized by alleged category of misrepresentation:

- Nikola One:
  - Nikola's pivot away, in approximately 8/16, from CNG to a hydrogen fuel cell for the Nikola One, and its decision to proceed with the unveiling anyway despite the pivot (¶¶ 120-121)

---

[1] Plaintiffs' headings are restated for convenience only. Pursuant to Local Rule 56.1(a)-(b), Milton only responds to those facts that are "support[ed]" and that are set forth in "a separately numbered paragraph."

o   Nikola's 8/1/16 press release regarding the Nikola One: Nikola "has achieved 100% zero emissions on the Nikola One commercial class 8 truck" (¶¶ 135-137)

o   Prior to 12/1/16, Instructions purportedly given prior to the unveiling of the Nikola One event: Nikola employees "should be careful not to say the vehicle was 'fully functioning,' 'driving,' or an 'H2 vehicle'" (¶¶ 122, 143)

o   On 10/10/17, Nikola posted image of the Nikola One prototype on its official Twitter account, bearing a clearly-visible decal reading "H2" (¶ 142)

o   Internal debate at Nikola re: what the 1/25/18 "Nikola One in motion" caption should say (¶ 133)

o   Nikola's 5/3/18 tweet regarding Nikola One's delivery date: "[w]e actually produce it on site" (¶¶ 289-290)

o   12/17/19, Milton, Fox Business program Claman Countdown: "in 2016 when we first launched [the Nikola One], we were the first people to ever do it . . . We had the first zero-emissions semi truck that was available to the market." (¶¶ 150, 207, 765)

o   6/15/20, Nikola S-1: (P 76-77) References the Nikola One as a product offering, and Nikola Two, says they have range of 400-750 miles (Plfs: Fretheim testified that Nikola One was farthest from production when company went public; Russell testified that by 2/19, Nikola had pivoted from Nikola One prototype, wasn't relevant by time of merger) (¶ 160)

- o 7/17/20, Nikola S-1: (P 76-77) Describes Nikola One and Nikola Two as fully designed, fully functional vehicles, that Nikola One is awaiting established refueling infrastructure to enter production (¶ 162)

- o 8/18/20, Milton: "it was totally capable of driving, it had everything in it — power, steering, batteries—everything in it . . . . So, this was totally capable of being driven. We pulled all the parts out, displayed them to the public, and we got—I think you guys may have seen it, got hit with an article and said that the truck was a . . . was a lie and not really drivable truck." (¶¶ 12, 127, 163)

- Purchase Orders:

  - o 5/9/16 communication from Milton to a customer regarding the Nikola One; "[y]ou have full ability to cancel at any time before the options, color and major deposit is made"; other similar communications are alleged (¶ 202)

  - o 12/17/19, Milton, Fox Business program Claman Countdown: "Within about 4 months the market saw the traction we got because we got billions of dollars in orders . . . ." He continued, stating "at $14 billion worth of orders we essentially stopped taking orders because we were sold out for five plus years . . . ." (¶¶ 150, 207, 765)

  - o 3/4/20, Milton, CNBC interview on Squawk Alley: "We'll be sold out for quite a few years so we needed access to the markets as fast as possible . . . . We needed to expedite the factory build [in Phoenix]." (¶ 211)

- o  3/13/20, VectoIQ Form S-4 filing: As justification for the merger, S-4 said "VectoIQ's management and board of directors considered the fact that Nikola has a high volume of fuel cell electric vehicle pre-orders, currently at over $10 billion." (¶ 214)

- o  4/6/20, Nikola Analyst Day Presentation: a "$10B+ FCEV order book" with a "2+ year backlog" and "+14,000 FCEV truck reservations to date" with "~$10B sales value" (¶ 784)

- o  4/6/20, Nikola Analyst Day video: Milton shows off a series of placards that adorned the walls of the third floor, purporting to give a timeline of Nikola's history, which the C-Suite executives would have seen whenever they came to work. Using the placards as visual aids, Milton talks through Nikola's history. The camera trains on the first placard, which reads that in "May 2016" Nikola "beg[a]n[] taking reservations for its first-ever electric driven class 8 semi truck." The Nikola One was never electric, was not capable of driving, and was not a real product that could be sold (¶ 787)

- o  Milton then states, referring to the Nikola One: "We launched the truck in 2016 to the world and at that point when it came out we racked up billions of dollars of pre-orders." At this point, the camera shows another placard that reads "December 2016 NIKOLA SURPASSES $4 BILLION IN RESERVATION PREORDERS[.] Following the Nikola One unveiling, preorders for the hydrogen-electric semi exceed $4 billion in value." The Nikola One was never a hydrogen-electric truck, nor a product that could be

sold. As Nikola admitted in a February 25, 2021 SEC filing, the Company did not engineer any electric truck in 2016 (¶ 788)

o  6/3/20, Nikola press release: Nikola claimed that sales of its purportedly technologically advanced products would generate billions in revenues in the future thereby serving as a critical source of income for the Company and its shareholders. Specifically, the June 3, 2020 press release noted "pre-orders represent more than $10 billion in potential revenue" and that "Nikola's hydrogen network anticipated to cover North America; set to become the largest hydrogen network in the world" (¶ 838)

o  6/15/20, Nikola S-1: (P 12-13) "as of December 31, 2019 we had reservations for 14,000 Nikola Two FCEV trucks." (Plfs: inaccurate, 78% of the reservations were for the Nikola One; just 6% were for the Nikola Two, with the remaining 16% being for the Nikola Tre) (¶ 223)

o  6/15/20, Nikola S-1: (P 81) "The current backlog of over 14,000 FCEVs non-binding reservations represents more than two years of production and over $10 billion of potential revenue. The FCEV reservation book was frozen in the fall of 2019 in order for Nikola to focus on negotiating with strategic fleet partners for launch" (Plfs: Fretheim testified that the 14k number was inaccurate b/c only 6% were for the Nikola Two; 78% were for the Nikola One) (¶¶ 224-25)

- o  8/4/20, Nikola 10-Q: "[i]n 2019, we stopped soliciting FCEV reservations"; "we expect the size of our committed backlog to be an important indicator of our future performance" (¶ 229)

- o  8/4/20, Russell, Nikola earnings call: "our fuel cell electric truck reservation book exceeded 14,000 units or approximately $10 billion in potential revenue some time ago." (¶ 231)

- o  8/5/20, Milton, Cheddar News: "we're sold out for so many years" (¶ 233)

- o  8/10/20, Milton, Tweets re: Republic Services deal: it was the "[l]argest class 8 zero emission order in the industry 2,500 guaranteed"; "the 2,500 – 5,000 (1-2 billion dollar) binding truck order!" (¶¶ 681, 684)

- o  8/10/20, Milton, CNBC's Fast Money: the "contract" was "worth about, between 1 and 2 billion dollars, um, they have the right – or they're obligated to buy up to 2,500 of these electric trash trucks, and they have the option to go up to 5,000." (¶¶ 681, 684)

- o  8/16/20, Milton, Tweets: referred to billion plus dollar value of the Republic order re: semi-trucks (¶¶ 681, 684)

- o  8/19/20, Milton, TD Ameritrade Network: referred to the Republic order as "a couple-billion-dollar contract" (¶¶ 681, 684)

- • Hydrogen:

  <u>Dispensing Station at Nikola's HQ:</u>

o  2/18/19, Nikola posted photograph of HQ on its Twitter account, represented that it was currently generating solar power and producing H2 at its HQ (¶ 712)

o  12/2/19, Milton, Event with OEM partner Iveco live-streamed on Nikola's website: "Can produce over 1,000 kilograms a day on site" (¶ 292)

o  12/17/19, Milton, Fox Business program Claman Countdown: "Yeah, that's the advantage is you can do it [fuel up] in 15 minutes" (Plfs: dispensing station at Nikola HQ was only operable 21% of the time throughout 2020; when it was operational, refueling took 45-80 minutes) (¶¶ 264, 294, 765)

o  4/6/20, Nikola Analyst Day video, Milton: "This is where all the hydrogen is stored, cooled, pumped and dispensed" (Plfs: Nikola was struggling to cool hydrogen at its demo station and could not reliably dispense it) (¶¶ 325-26)

o  6/15/20, Nikola S-1: (P 48, 78-79) the June 2020 S-1 repeats some of the claims made previously in the Proxy regarding the dispensing station at Nikola's Phoenix headquarters serving as "a model for future hydrogen stations," that Nikola was currently "constructing" hydrogen stations, the "California-First Hydrogen Station Strategy," and that hydrogen would "normally be produced on-site at each station" (¶ 363)

o  6/19/20, Milton, CNN interview: "you can fill it up in 15 minutes" (¶ 366)

o  7/17/20, Nikola S-1: (P 78) "The demo hydrogen station offers hydrogen storage and dispensing and serves as a model for future hydrogen stations" (¶ 386)

Production of Hydrogen:

o 1/10/20, Milton, Transport Topics Roadshow podcast: "Now, Nikola's producing it well below $4 a kilogram" (¶ 296)

o 3/20, Dale Prows, Nikola meeting: Producing hydrogen would cost over three times Nikola's target price; a "sub $3" cost was not "achievable," in large part because Nikola was struggling to find cheap electricity (¶¶ 262, 269, 275-77, 279, 286, 411)

o 3/4/20, Milton, CNBC interview on Squawk Alley: "So we help the grids buffer their grids, and that's how we get our energy so cheap to be able to broker back to the fleets" (¶ 762)

o 5/30/20, Milton, Tweet: "Creating it on site under contracts give us 3 or 4 cents per kWh clean energy making hydrogen very competitive and cheaper than diesel" (¶ 342)

o By 6/20 (Brady testified) Nikola understood it might have to continue purchasing hydrogen from third-party vendors for years to come because the company could not produce it (¶ 401)

o 6/4/20, Milton, Yahoo! Finance: "But what Nikola solved was the cost—was the economics on the trucking. When we first started, hydrogen was $16 a kilogram. We can now produce it for well under $4 a kilogram. So we've cut – it's one quarter of the cost now than it was just a few years ago. And we're now cheaper to operate per mile than diesel" (¶¶ 15, 284, 347)

- o  6/9/20, Milton, Tweet: "Once we broker a 20 year agreement, we feed it into the federal lines" (¶ 349)

- o  6/9/20, Milton, Tweet: "We take all energy behind the meter which allows us to get below $.04 per kWh and guaranteed clean energy" (¶ 350)

- o  6/9/20, Milton, Tweet: "Solar, Wind and Hydro give us under $4 per kg hydrogen" (¶ 351)

- o  6/9/20, Milton, Twitter: User cited source projecting dispensed hydrogen to be priced at $6 to $8.50 per kg by 2025; Milton: "[w]e are already under $4 working on $3" (¶ 348)

- o  6/10/20, Milton, Twitter: User: "[w]ondering if I could get your thoughts on how you intend to lower the cost/kg of hydrogen?" Milton: "We are now below $4 per kg which is the lowest in the world. We plan on reducing that again" (¶ 356)

- o  6/10/20, Milton, Tweet: "H2 is now under $4 per kg and working on sub $3 per kg"; "we do it behind the meter at about $.04 / kWh on PPP clean energy" (¶ 354)

- o  6/11/20, Milton, Autoline After Hours interview: "Now we're down two, three bucks a kilogram" (¶ 357);

- o  6/19/20, Milton, CNN interview: "We produce our own hydrogen through zero emission methods"; "solar and wind energy, a lot of it is just given away or they pay people to take it at their power companies because they have too much of it on the grid" (¶¶ 366, 766)

- o 6/21/20, Milton, Tweet: "Freeway allows you 20 year PPP without paying high fees to transport through utilities. It is nearly 5x cheaper to produce h2 on freeways, where hydrogen excels" (¶ 367);

- o 7/6/20, Milton, Founder Hour: "We drove hydrogen down from 16 dollars a kilogram down below four dollars a kilogram now"; Milton claimed that Nikola's TCO (total cost of ownership) is "like 20 to 30 percent sometimes, cheaper" (¶¶ 22, 371, 651, 656)

- o 7/14/20, Observer.com YT video, Milton: "we produce hydrogen 24 hours a day…like $2, $3 a kilogram"; "it's 20 to 30 percent less than diesel" (¶¶ 373, 375)

- o 7/17/20, Milton, Chartcast: "We're down below $3 per kilogram on our hydrogen right now"; "$2 a kilogram, buck, buck 50, buck 80" (¶¶ 378, 380, 382)

- o 7/17/20, Milton, LinkedIn interview: "[s]o far have been able to source plenty of energy under $.04 per kWh. Most of it is much lower in the 2.5 [cents] per kWh range" (¶¶ 284, 377)

- o 7/31/20, Milton, This Week in Startups: "we've been able to drive hydrogen to under $4 a kilogram, we're about $3 a kilogram on hydrogen now"; "we developed the first ever standard hydrogen station that can be produced in the thousands" (¶ 390)

- o 8/1/20, Milton, Barron's Roundtable: "we're down now below $4 a kilogram" (¶ 394)

o  8/3/20, Milton, Tweet: "$.04 kWh equals under $4 per kg. We are already locking in much lower than $.04 per kWh on our stations going in as they are on freeways with 20 year PPA" (¶ 395)

o  8/4/20, Russell, Nikola earnings call: "We can make hydrogen for about a decimal move or better on the cost of electricity" (¶ 231)

Hydrogen Stations:

o  12/2/19, Milton, Event with OEM partner Iveco live-streamed on Nikola's website: "We're building out the hydrogen station right now globally" (¶ 292)

o  3/21/20, Dale Prows (Nikola's Global Head of Infrastructure Development) proposed possibility of liquefying hydrogen and distributing it to Nikola's fueling stations, which would be a major pivot in Nikola's business model; even this alternative would be incredibly expensive ($150M to build single 60-ton-per-day facility, $14B in total capital expenditures) (¶¶ 270-273)

o  5/8/20 Registration Statement: Proxy contained false statements: "The demo hydrogen station offers hydrogen storage and dispensing and serves as a model for future hydrogen stations"; "The Energy business unit is developing and constructing a network of hydrogen fueling stations to meet hydrogen fuel demand for FCEV customers"; "We expect to rollout these [California] stations in 2022-2023"; "Hydrogen will normally be produced on-site at each station via electrolysis"; "there could be unanticipated challenges which may hinder our ability to provide our bundled lease to customers or make the

provision of our bundled leases costlier than anticipated" (¶¶ 332, 334, 336, 338, 340)

- o 6/3/20, Nikola press release: it had signed a purchase order with Nel ASA for $30M worth of 85 megawat alkaline electrolyzers supporting five of the world's first 8 ton per day hydrogen fueling stations; together, these electrolyzers may produce over 40k kgs of hydrogen each day; Milton: "We are building the largest hydrogen network in the world" (¶ 344);

- o 6/9/20, Milton, Tweet: "we have stations going up in Canada" (¶ 351)

- o 6/15/20, Nikola S-1: (P 48, 78-79) the June 2020 S-1 repeats some of the claims made previously in the Proxy regarding the dispensing station at Nikola's Phoenix headquarters serving as "a model for future hydrogen stations," that Nikola was currently "constructing" hydrogen stations, the "California-First Hydrogen Station Strategy," and that hydrogen would "normally be produced on-site at each station" (¶ 363)

- o 7/17/20, Nikola S-1: Repeated the statements in the June 2020 S-1 and the Proxy regarding the "California-First Hydrogen Station Strategy," that hydrogen would "normally be produced on-site at each station via electrolysis," that Nikola was "constructing" hydrogen stations, as well as the risk factor regarding the possibility of bundled leases proving to be costlier than anticipated (¶ 388)

- Badger:

  - o 4/6/20, Nikola's 8-K: Contained specs for the Badger (¶¶ 479, 772)

o   5/8/20 Registration Statement: "Unlike anything on the market, the Badger is designed to target and exceed every electric or fossil fuel pickup in its class" (¶ 484)

o   6/11/20, Milton, Cheddar News: "we developed all the tech. We've built the whole truck, and now what we want to do is partner with a big OEM" (¶ 491)

o   6/15/20, Nikola S-1: "the Badger is designed to target and exceed every electric or fossil fuel pickup truck in its class"; "an advanced zero-emission FCEV/BEV hybrid pickup truck" (Plfs: did not disclose that Milton had directed that the prototypes in development only be BEV trucks, not FCEV trucks) (¶¶ 493-94, 772);

o   6/29/20, Milton, Raging Bull: "we literally built the most badass pickup truck the world had ever seen" (¶ 498)

o   7/1/20, Milton, Twitter: User: "how are you able to get the [Badger] truck ready in 4 months"; Milton: "Exactly, which means it's not fake. Truck is real" (¶ 502)

o   7/17/20, Nikola S-1: "Recently we announced the Nikola Badger (the 'Badger'), an advanced zero-emission FCEV/BEV hybrid pickup truck. Unlike anything on the market, the Badger is designed to target and exceed every electric or fossil fuel pickup in its class" (¶ 508)

o   7/19/20, Milton, Jimmy Rex Show: "So we . . . had been working on [the Badger] for a while. I decided to put my teams on it. We got it done" (¶ 510)

- o 8/4/20, Nikola 10-Q: Represented that "[o]n June 29, 2020 we began accepting non-binding reservations for the Badger . . ." (¶¶ 512, 772)

- o 9/9/20: Milton engaged on his personal Twitter account with a user who commented that the Badger is "[n]ot Nikola, but a General Motors Badger. The unveiling at Nikola World will not even be the truck being sold, only the dream of what could have been. . . ." Milton replied: "Actually it is the truck being sold. It's all Nikola. Sharing parts has nothing to do with who's [sic] truck it is. . . ." (¶ 517)

- In-House:

  <u>Generally:</u>

  - o 3/4/20, Milton, CNBC interview on Squawk Alley: Q: "how much of the intellectual property is actually yours and not [your partners']?" Milton: "So what we did is we went out to the biggest players in the world, the people that have access to tens of billions of dollars and we said, 'Look, this is what we need. It doesn't exist, we'll share the IP with you if you'll help us build it.' And we went to Bosch, we went to you know Meritor, we went to WABCO, we went to Nel, we went to all these different groups, and we said, 'let's build all this stuff.' … So that's really what sets us apart is we have a piece of all the IP and we have the biggest suppliers in the world paying for our research and development so we don't have to go spend tens of billions of dollars" (¶ 580)

- 14 -

o 6/29/20, Milton, Raging Bull: "we literally built the most badass pickup truck the world had ever seen"; "So we own all the tech. So all the cool stuff you guys want, the design, the inside, the connectivity with your phone . . . all the e-axles or, you know the electric motors, the batteries, the controls, all that's done by Nikola. . . ."; "The battery is actually done by Nikola. We own all the tech and we're building all the batteries in-house" (¶¶ 498, 500, 589, 591)

o 8/24/20, Milton, Tesla Joy YouTube Channel: "So the things that we do in insource [sic] is all of our controls, all of our inverters. . . . All of that is actually done in-house in Nikola" (¶ 605);

Batteries:

o 11/15/19, draft press release sent to Nikola's Board of Directors with Milton quote: "the biggest advancement we have seen in the battery world" (¶ 770)

o 11/18/19, Milton tweet: "Tomorrow, it all changes"; "Diesel trucks are obsolete for good"; "#emissionsgameover" (¶¶ 561, 570)

o 11/19/19, Milton directed Nikola to issue press release claiming that Nikola had developed game-changing battery technology (¶¶ 561-563, 568, 571-572, 576, 608)

o 11/19/19, Milton tweets re: battery: "Nikola has developed the most energy dense, safe battery in the world"; "It's real. I've seen it with my own eyes and watched them cycle" (¶¶ 564, 574)

o  12/2/19, Milton, Shift podcast: "[w]e actually have over 2,000 cycles on our battery"; "our battery beats the Tesla battery in every metric, in every situation, and it's half the cost and it's double the range" (¶¶ 565, 575)

o  3/12/20, Milton, Transport Topics Roadshow: "we're double the cycle life of a regular lithium-ion, and we're about half to one quarter the cost to produce the lithium-ion and we don't have any of the expensive metals…. we should have productionized cells probably by the years end" (¶¶ 567, 583)

o  7/31/20, Milton, This Week in Startups: "[w]e do make our own battery packs" (¶ 603)

o  9/20: Romeo sought Nikola's permission to identify it as a customer as part of its road show in connection with a go-public transaction; Milton opposed, "[i]t will leak everywhere and hurt our image" (¶ 569)

- Cost of Hydrogen v. Diesel-powered trucks:

o  Prior to 3/19, Nikola touted that the total cost of ownership (TCO) of its FCEV trucks would be up to 20% cheaper than diesel trucks (Plfs: 3/19, Nikola financial analyst notified Nikola executives that TCO the company was using for diesel trucks was too high; projected TCO for Nikola would be, at best, on par with diesel) (¶¶ 649-650; *see also* ¶ 657)

o  4/6/20, Nikola 8-K: On a slide titled "NIKOLA'S ADVANTAGE: BUNDLED FCEV OFFERING SIGNIFICNATLY MORE ATTRACTIVE THAN DIESEL" in the April 6 8-K, Defendants included a chart showing Nikola's FCEV having a TCO of $0.95 per mile, less than the $0.97 TCO

per mile stated for traditional diesel trucks. The Slide stated "Nikola's Bundled Lease offers operators complete cost predictability at cost parity with diesel" (¶ 652)

o  6/4/20, Milton, Yahoo Finance: "But what Nikola solved was the cost—was the economics on the trucking. When we first started, hydrogen was $16 a kilogram. We can now produce it for well under $4 a kilogram. So we've cut – it's one quarter of the cost now than it was just a few years ago. And we're now cheaper to operate per mile than diesel" (¶¶ 15, 284, 347)

o  7/6/20, Milton, Founder Hour: "We drove hydrogen down from 16 dollars a kilogram down below four dollars a kilogram now"; Milton claimed that Nikola's TCO (total cost of ownership) is "like 20 to 30 percent sometimes, cheaper" (¶¶ 22, 371, 651, 656)

o  7/14/20, Observer.com YT video, Milton: [w]e produce hydrogen 24 hours a day…like $2, $3 a kilogram"; "it's 20 to 30 percent less than diesel" (¶¶ 373, 375)

o  7/14/20, Milton, Instagram live video: "We charge cost per mile"; "Everything all in . . . including the hydrogen fuel, it's under a dollar a mile"; "it's 20 to 30 percent less than diesel" (¶ 375)

o  7/17/20, Milton, Chartcast: "you're 25, 30% less than a diesel engine to operate" (¶ 383)

- 7/31/20, Milton, Stockcast: "We're almost 20 to 30 percent less than diesel right now"; "we're working on . . . if we can get down to two dollars a kilogram" (¶ 392)

- 8/4/20, Russell, Nikola earnings call: "This approach has proven very attractive and many customers are finding that they will be able to transition to zero-emissions without an increase in total cost compared to their current fossil fuel solution" (¶ 658)

- Tre:

  - 3/4/20, Milton, CNBC interview on Squawk Alley: "we're probably the only company in the world that offers both battery electric trucks and hydrogen electric trucks" (Plfs: at that time, Nikola had no functional hydrogen electric trucks or battery electric trucks available for sale, and development of the Nikola One had been abandoned for years) (¶¶ 152-153)

  - 7/17/20, Milton: "We have the most advanced battery electric truck in the world. We have a truck coming into production right now with 720 kwh the largest battery we know of on a truck anywhere in the world coming into production. We have five of them coming off the assembly line right now in Ulm, Germany" (¶¶ 678, 680, 682-683)

- Off-Grid:

  - 2/18/19, Nikola posted photograph of HQ on its Twitter account, represented that it was currently generating solar power and producing H2 at its HQ (¶ 712)

-     ○ 2/21/19, Milton, Presentation: "We have the only off-grid headquarters that we know of, completely off of hydrogen, battery, and solar" (¶¶ 708-711)

- Natural Gas Wells:
  - ○ Nikola's statements regarding natural gas wells on 7/1/16 and 8/30/16 (¶¶ 720-724)

- Generally:
  - ○ Frequency of Milton's tweets between 2016 and 2020 (¶ 103)
  - ○ In 2019-2020, Milton only had Nikola's Chief Legal Officer pre-screen tweets a few times (¶ 115)
  - ○ 11/26/19, document circulated by Defendant Russell used Virgin Galactic as an example of a company that went public through a SPAC, and provided a checklist of items Virgin Galactic reportedly did right, including: "Marketed forward projections: Successfully marketed the deal" (¶ 754)
  - ○ 2/29/20, Ubben forwarded information about billionaire Richard Branson's media strategy in anticipation of Virgin Galactic's de-SPAC IPO to Milton and Girsky and wrote, "Here is a template. Branson got a retail following. We should aspire for Trevor to do the same" (¶¶ 760-761)

    **2.**    On June 22, 2022, the grand jury returned a superseding indictment ("Superseding Indictment) which alleged that Milton violated 15 U.S.C. §§ 78j(b) and 78(ff) and 17 C.F.R. § 240.10b-5 by: (a) "employing devices, schemes, and artifices to defraud;" (b) "making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which

they were made, not misleading;" and (c) "engaging in a scheme to defraud investors in Nikola through false and misleading statements regarding the company's product, technology, and business development." Block Decl. ¶2, Ex. 4.

**Response:** Undisputed.

**3.** The jury was specifically instructed with respect to each of the elements that the United States was required to prove beyond a reasonable doubt to find Milton guilty of securities fraud. Block Decl. ¶2, Ex. 15 at 3197:3-3242:13.

**Response:** The jury in the criminal case was instructed regarding the elements of the criminal charges in the indictment, which are **not** the same elements that Plaintiffs are required to prove for their private securities fraud claims.

Regarding <u>Count One</u>, of Title 15 (securities fraud), the court instructed the jury as follows:

First, that in connection with the purchase or sale of securities, Mr. Milton did any one or more of the following:

    (1) employed a device, scheme, or artifice to defraud, or

    (2) made an untrue statement of a material fact or omitted to state a material fact which made what was said, under the circumstances, misleading, or

    (3) engaged in an act, practice, or course of business that operated, or would operate, as a fraud or deceit upon a purchaser or seller;

Second, that Mr. Milton acted knowingly, willfully, and with an intent to defraud; and

Third, that in furtherance of the fraudulent conduct, there occurred at least one use of any means or instruments of transportation or communication in interstate commerce, or the use of the mails, or the use of any facility of any national securities exchange.

Dkt. 323-4, 3203:5-21.

Regarding <u>Count Two</u>, under Title 18 (securities fraud), the court instructed the jury as follows:

First, that the defendant executed a scheme or artifice either

(a) to defraud a person or

(b) to obtain money or property by means of materially false and fraudulent pretenses, representations, or promises;

Second, that the defendant knowingly and willfully participated in the scheme or artifice; and

Third, that the scheme to defraud was in connection with the purchase or sale of stock in a company whose securities were registered under section 12 of the Securities Exchange Act of 1934 or was otherwise required to file reports under that act.

*Id.*, 3210:13-3211:1.

Regarding <u>Counts Three and Four</u>, under Title 18 (wire fraud), the court instructed the jury as follows:

First, that there was a scheme or artifice to defraud the victims of money or property or to obtain money or property by false or fraudulent pretenses, representations, or promises;

second, that the defendant knowingly and willfully participated in the scheme or artifice to defraud with knowledge of its fraudulent nature and with specific intent to defraud; and

Third, that in execution of the scheme or artifice, the defendant used, or caused the use of, interstate wires.

*Id.*, 3212:18-25.

Regarding this first element, the court stated that "[t]he element does not require that any particular person actually relied on, or actually suffered damages as a consequence of, any fraudulent representation or concealment of facts. . . . You must concentrate on

whether there was such a scheme, not on the consequences of the scheme." *Id.*, 3213:23-3214:7. Regarding the second element, it stated, "The government need not prove that the intended victim or victims was or were actually harmed; only that such harm was contemplated." *Id.*, 3216:15-17.

**4.**    On October 14, 2022, after a four-week trial, a federal jury convicted Milton on one count of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78(ff) and 17 C.F.R. § 240.10b-5, and two counts of wire fraud. Block Decl. ¶2, Ex. 15 at 3261:1-3262:20.

**Response:** Undisputed.  Milton was also found **not guilty** of the second count of securities fraud under Title 18. *See* Pl. Ex. 15 at 3261:9-11; Jury verdict form, attached as Exhibit 1.  The elements of the two securities fraud charges in the indictment are nearly identical. For example, when instructing the jury regarding Count Two, the Court repeatedly referred to his earlier instructions (given regarding Count One):

- "As I instructed you earlier, a scheme or artifice to defraud is . . . ."

- "As I instructed you earlier, to act knowingly means . . . ."

- "With respect to the third element, as I instructed you with respect to Count One with respect to the third element, a scheme to defraud is connected to the purchase or sale of a security if . . . ."

Dkt. 323-4, 3211:2-25. As part of these instructions for Count Two, the court also instructed the jury that the terms "materially" or "material fact" would be the same as that which he would later explain regarding Counts Three and Four (which counts also resulted in convictions). *Id.*, 3211:9-12.

Moreover, the Verdict Form does not indicate anything other than guilt or non-guilt; it does not include any findings regarding any particular statement(s) that the jury based regarded as a material misrepresentation.

**5.**    At sentencing, Judge Edgardo Ramos, United States District Judge for the Southern District of New York, sentenced Milton to a total term of imprisonment of 48 months, imposed a fine, ordered the forfeiture of certain real property, and imposed an order of restitution but deferred determining an amount pending further briefing. Block Decl. ¶2, Ex. 16 at 89:6-19. Judge Ramos addressed Milton directly, stating, in part: "[Y]ou used your considerable social media talents to tout your company in ways that were materially false, whether it was the then current status of the development of the technology that would power your trucks or the number of binding orders or the state of your requisition for rights to build hydrogen generating facilities. What you said over and over in different media outlets was wrong and it was materially wrong, and you knowingly said those things." *Id.* at 92:16-24.

**Objection:** Judge Ramos' statements at sentencing are irrelevant and inadmissible under Fed. R. Evid. 802, 402, and 403. Courts around the country, including in the Ninth Circuit, have ruled that it is presumptively improper to apply collateral estoppel to sentencing findings in a subsequent civil action. *See, e.g., Maciel v. Commissioner of Internal Revenue*, 489 F.3d 1018 (9th Cir. 2007); *United States v. U.S. Currency in the Amount of $119,984.00*, 304 F.3d 165 (2d Cir. 2002); *Honken v. United States*, 42 F. Supp. 3d 937, 1003 (N.D. Iowa 2013); *Doe v. Schneider*, Civ. A. 08-3805, 2013 WL 5429229 at *1 n. 3 (E.D. Pa. Sept. 30, 2013); *United States v. Real Prop. Located at 7401-03 S. Racine*

*Ave., Chicago, Ill.*, No. 04 CV 5885, 2009 WL 806120, at *2 (N.D. Ill. Mar. 25, 2009); *United States v. Moon*, No. 3:06-0406, 2007 WL 9782951, at *4 (M.D. Tenn. Aug. 24, 2007).

**Response:** Undisputed but immaterial. The sentencing and potential imposition of fines or forfeiture in the criminal case was made irrelevant on March 27, 2025 when Pres. Donald J. Trump issued a "Full and Unconditional Pardon" to Milton based on his conviction that Milton had been unfairly prosecuted and had done nothing wrong. *See* Ex. 2, Pardon; *see also* Ex. 3, President Trump's explanatory comments made at a news conference on March 28, 2025 (citing the political and procedural unfairness of the criminal trial for Milton, and stating, "[H]e did nothing wrong").

**6.** Judge Ramos also expressly found by a preponderance of the evidence that Milton's false statements caused investor losses. Block Decl. ¶2, Ex. 16 at 91:19 – 92:4; *see also id.* at 21:17-22:9; 25:20-21; 98:20.

**Objection:** Judge Ramos's statements and findings at sentencing are irrelevant and inadmissible under Fed. R. Evid. 802, 402, and 403. Courts around the country, including in the Ninth Circuit, have ruled that it is presumptively improper to apply collateral estoppel to sentencing findings in a subsequent civil action. *See, e.g., Maciel v. Commissioner of Internal Revenue*, 489 F.3d 1018 (9th Cir. 2007); *United States v. U.S. Currency in the Amount of $119,984.00*, 304 F.3d 165 (2d Cir. 2002); *Honken v. United States*, 42 F. Supp. 3d 937, 1003 (N.D. Iowa 2013); *Doe v. Schneider*, Civ. A. 08-3805, 2013 WL 5429229 at *1 n. 3 (E.D. Pa. Sept. 30, 2013); *United States v. Real Prop. Located at 7401-03 S. Racine Ave., Chicago, Ill.*, No. 04 CV 5885, 2009 WL 806120, at *2 (N.D.

Ill. Mar. 25, 2009); *United States v. Moon*, No. 3:06-0406, 2007 WL 9782951, at \*4 (M.D. Tenn. Aug. 24, 2007).

**Response:** Disputed but immaterial. Judge Ramos did not find Milton's statements caused the losses that Plaintiffs allege and seek to recover in this lawsuit; rather, his finding of "loss" was based only on the decrease in Nikola's stock price on Sept. 10, 2020 after the release of the Hindenburg report, and was purely in the context of applying sentencing guidelines, not establishing losses or for any purpose applicable to Plaintiffs' claims in this case.

7.    Judge Ramos further found that the evidence presented to the jury at trial allowed it to determine that investors suffered losses as the result of Milton's misstatements. Block Decl. ¶2, Ex. 16 at 14:12-23. This evidence included testimony from a special agent with the U.S. Attorney's Office in the Southern District of New York regarding movements of Nikola's stock price in response to Milton's misstatements and the Hindenburg Report. Block Decl. ¶2, Ex. 14 at 2400:10-2402:7; *id.* at 2406:1-2410:14; Block Decl. ¶2, Ex. 14(a); Block Decl. ¶2, Ex. 14(b); Block Decl. ¶2, Ex. 14(c). Defendants' expert, in turn, presented charts of Nikola's stock price and testified that "Mr. Milton's statements at issue did not affect the stock price during the public period, the June to September period." Block Decl. ¶2, Ex. 14 at 2528:20-22; Block Decl. ¶2, Ex. 14(d); *see generally* Block Decl. ¶2, Ex. 14 at 2528:13- 2535:1. The Government also called two retail investors who testified that they lost money in their Nikola investment following the Hindenburg Report. Block Decl. ¶2, Ex. 11 at 1560:7-16; Block Decl. ¶2, Ex. 13 at 2216:21-2217:9.

**Objection:** Judge Ramos's statements at sentencing are irrelevant and inadmissible under Fed. R. Evid. 802, 402, and 403. Courts around the country, including in the Ninth Circuit, have ruled that it is <u>presumptively improper</u> to apply collateral estoppel to sentencing findings in a subsequent civil action. *See, e.g., Maciel v. Commissioner of Internal Revenue*, 489 F.3d 1018 (9th Cir. 2007); *United States v. U.S. Currency in the Amount of $119,984.00*, 304 F.3d 165 (2d Cir. 2002); *Honken v. United States*, 42 F. Supp. 3d 937, 1003 (N.D. Iowa 2013); *Doe v. Schneider*, Civ. A. 08-3805, 2013 WL 5429229 at *1 n. 3 (E.D. Pa. Sept. 30, 2013); *United States v. Real Prop. Located at 7401-03 S. Racine Ave., Chicago, Ill.*, No. 04 CV 5885, 2009 WL 806120, at *2 (N.D. Ill. Mar. 25, 2009); *United States v. Moon*, No. 3:06-0406, 2007 WL 9782951, at *4 (M.D. Tenn. Aug. 24, 2007).

**Response:** Disputed. The jury **did not find** that investors suffered any loss as a result of Milton's alleged misstatements. Loss was not an element of any of the charges in the indictment, and the jury was expressly instructed that the government did not need to prove that the intended victim or victims was or were actually harmed; "only that such harm was contemplated." Dkt. 323-4, 3216:15-17. Plaintiffs' paraphrasing and characterization of what Judge Ramos said at the sentencing hearing is not accurate, and in any event, Judge Ramos' belief that there had been a loss, in the context of applying the sentencing guidelines, is immaterial and irrelevant, and cannot be relied upon to establish collateral estoppel.

Further, the excerpt Plaintiffs provided containing certain testimony of the "special agent" referred to here by Plaintiffs fails to describe the special agent's background and

the work she did for her analysis. DeLeassa Penland testified that her role with the U.S. Attorney's Office was to "investigate federal crimes," and that her background is that she worked for the IRS and has a bachelor's degree in accounting. *See* Ex. 4, Penland Testimony, 2367:6-20. Given her lack of economic expertise, it is unsurprising that she testified that she did not "do any type of economic analysis of the stock price." *Id.* 2401:1-7. Her "work was limited to taking the stock price on a particular day." *Id.* 2401:5-7. Ms. Penland's chart did not take into account the general movement of the stock market overall at the time, or similar companies and similar sectors as Nikola. *Id.* 2437:24-2438:13. And contrary to Plaintiffs' SOF No. 7, Ms. Penland testified that her chart was not intended to convey that the Hindenburg report caused certain alleged price movement upon its release. *Id.* 2446:12-15; *see also* Dkt. 323-2, GX-1003.

8.    On April 9, 2025, Milton voluntarily dismissed his then pending appeal of his conviction in the United States Court of Appeals for the Second Circuit. *See United States v. Milton*, No. 24-00259 at Dkt. 54 (2d Cir. April 9, 2025).

**Response:**  Undisputed; however, Milton only withdrew his appeal because, on March 27, 2025, Pres. Donald J. Trump issued a "Full and Unconditional Pardon" to Milton based on his conviction that Milton had been unfairly prosecuted and had done nothing wrong. *See* Ex. 2, Pardon; *see also* Ex. 3, President Trump's explanatory comments made at a news conference on March 28, 2025 (citing the political and procedural unfairness of the criminal trial for Milton, and stating, "[H]e did nothing wrong").

9.    As set out below, the prosecution's case is coextensive with the claims for which Plaintiffs seek partial summary judgement. *See* Block Decl. ¶2, Ex. 1. As such, the

key elements of the criminal claims are co-extensive with the claims made against Milton in the SAC and have already been adjudicated and decided against Milton. The verdict rendered against Milton necessarily affirms both that Milton engaged in false and misleading conduct as part of the issues litigated at trial and that he acted willfully and knowingly. Block Decl. ¶2, Ex. 15 at 3261:1-3262:20.

**Objection:** Plaintiffs' SOF 9 is attorney argument, not a statement of fact supported by materials in the record as required under Fed. R. Civ. P. 56.

**Response:** Disputed. To the extent that SOF 9 is incorporating facts "[a]s set out below," Milton incorporates here his responses to each of the below facts.

The time periods involved are dissimilar. *Compare* Dkt. 318-4, Indictment p. 1 ("From at least in or about November 2019 up through and including at least in or about September 2020") *with* Dkt. 224, Order granting class certification p. 27 (defining the class period as "the period June 4, 2020 through February 25, 2021").

The SAC is based on a **much broader** scope of alleged conduct and **much larger** number of alleged misstatements that what was at issue in the indictment. *See* Response to SOF No. 1, incorporated by reference here.

The jury in the criminal case was instructed regarding the elements of the criminal charges in the indictment, which are **not** the same elements that Plaintiffs are required to prove for their private securities fraud claims. *See* Response to SOF No. 3, incorporated by reference.

Unlike this case, the jury did not need to find reliance, causation, or damages in the criminal case, and indeed it did not.

1

2

**B.     The Arbitration**

3

4     **10.**     On November 3, 2021, Nikola initiated arbitration proceedings at the

5     American Arbitration Association ("AAA") against Milton for breach of fiduciary duty

6     and various damage claims (the "Arbitration"). The Arbitration was held before the

7     Honorable Russ Fagg, Mr. Jonathan J. Lerner, Esq., and Mr. Dan K. Webb, Esq. (together,

8     "the Panel"). *See* Block Decl. ¶2, Ex. 21 at 3.

9

10    **Response:** Disputed in part. The "various damage claims" that Plaintiffs refer to

11    were theories of relief associated with Nikola's breach of fiduciary duty claim. See Plfs.'

12    Ex. 18, Dkt. 323-7 p. 77 (Nikola's request to recover legal fees it advanced for Milton's

13    defense, its attempt to recover the fine it paid to the SEC, and legal fees and related

14    professional fees for services rendered to Nikola and its employees).

15

16    **11.**     The Arbitration culminated in an eight-day evidentiary hearing held in

17    person from July 24 to August 2, 2023, during which over 1,300 exhibits were entered into

18    evidence. Block Decl. ¶2, Ex. 18 at 6-7. Nikola called four fact witnesses and two experts

19    and introduced Milton's July 11, 2023 deposition by written questions, where he declined

20    to answer any questions about his wrongful conduct, repeatedly invoking his Fifth

21    Amendment privilege. *Id.*; Block Decl. ¶2, Ex. 19.

22

23    **Objection:** Milton's invocation of the Fifth Amendment during the Arbitration over

24    a breach of fiduciary duty claim which Plaintiffs were not party to is irrelevant and

25    inadmissible.  The purpose of the rule permitting a civil court to draw an adverse inference

26    based on a deponent's invocation of the Fifth Amendment is to avoid unfairness and

27

28

prejudice to the party which did not have the opportunity to receive answers to deposition questions. *See, e.g., Nationwide Life Ins. Co. v. Richards*, 541 F.3d 903, 911-912 (9th Cir. 2008); *S.E.C. v. Colello*, 139 F.3d 674, 677 (9th Cir. 1998) (citing *Wehling v. Columbia Broadcasting System*, 608 F.2d 1084, 1089 (5th Cir. 1979)). That rule is not implicated here whatsoever, given that Milton has not invoked the Fifth Amendment in any way in this lawsuit, and he did not decline to answer any questions that Plaintiffs' counsel asked him during his deposition in this case.  See generally Ex. 5.

**Response**: Disputed in part. Milton's invocation of the Fifth Amendment privilege in the Arbitration does not establish that his conduct was "wrongful," as Plaintiffs argumentatively assert in SOF 11.

**12.**    In the Arbitration, Nikola sought to recover over $300 million in damages from Milton based on claims that from 2016 through at least September 2020, "Milton breached his fiduciary duties to Nikola by repeatedly making false and misleading public statements to hype the stock price to increase his personal wealth" and "exaggerated and overstated the Company's achievements and products, at times making wildly speculative, overly optimistic and misinformed public comments about Nikola's long-haul truck prototypes, hydrogen production capabilities, in-house technology maturity and development status of its trucks." Block Decl. ¶2, Ex. 18 at 5.

**Response:** Milton disputes any inference that the issues involved in the Arbitration were identical to the issues involved in this case. For example, the timeframe involved is dissimilar. *Compare* Plfs.' Ex. 18, Dkt. 323-7 p. 5 ("The gravamen of the claims is that beginning in at least 2016, when Nikola was still a private company, and, continuing

through September 2020, when he separated from the company. . . .") *with* Dkt. 224, Order granting class certification p. 27 (defining the class period as "the period June 4, 2020 through February 25, 2021").

Additionally, the exhibit provided by Plaintiffs (Plfs.' Ex. 2) reveals that the alleged misstatements that were involved in the Arbitration amount to only 26 paragraphs and 10 pages (pp. 25-35) of the Decision and Final Award issued by the Arbitration panel. That is dwarfed by the SAC in this case, which runs to 294 pages and includes over 900 paragraphs of allegations. Dkt. 129. Not only are the nature of the claims completely dissimilar (fiduciary duty claim versus securities claims), but the allegations themselves are also vastly dissimilar.

Moreover, in arriving at its decision on Nikola's fiduciary duty claim, the Arbitration panel did not analyze: whether any alleged misrepresentations were material; whether they were made in connection with a purchase or sale of a security; whether any investors relied upon any alleged misrepresentation; whether any investors suffered loss; and whether loss causation existed. See Plfs.' Ex. 18, Dkt. 323-7 p. 53-57.

**13.** After considering the Parties' arguments and post-hearing submissions, the Panel entered a Decision and Interim Award on October 20, 2023. *Id.* at 2. After additional briefing, the Panel entered a Final Decision and Award on November 17, 2023. *Id.* The majority of the Panel ("Majority") found that Milton "violated his fiduciary duties of loyalty and good faith" to Nikola through a "pattern of false and misleading public statements" about Nikola 's products and their state of development and that he was liable for 97% of certain damages caused to Nikola. *Id.* at 53.

**Response:** Milton disputes any inference that the issues involved in the Arbitration were identical to the issues involved in this case. *See* Response to SOF No. 12, which is incorporated here.

14.     A claim for breach of fiduciary duty under Delaware law includes only "two formal elements: (i) the existence of a fiduciary duty and (ii) a breach of that duty." *Basho Techs. Holdco B, LLC v. Georgetown Basho Invs., LLC*, C.A. No. 11802- VCL, 2018 WL 3326693, at *23 (Del. Ch. July 6, 2018), *aff'd sub nom. Davenport v. Basho Techs. Holdco B, LEC*, 221 A.3d 100 (Del. 2019). The fiduciary duty of loyalty requires that directors and officers be disinterested and independent and act in good faith, with an honest belief that the action is in the best interests of the company and its stockholders. *City of Fort Myers Gen. Emples. Pension Fund v. Haley*, 235 A.3d 702, 721 (Del. 2020). The duty of good faith, which may be characterized as a subset of the duty of loyalty, *Stone ex rel. AmSouth Bancorp. v. Ritter*, 911 A.2d 362, 369-70 (Del. 2006), requires that directors and officers "act at all times with an honesty of purpose and in the best interests and welfare of the corporation." *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 755 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006).

**Objection:** The elements and contours of a fiduciary duty claim, along with the scope of the duty of loyalty and duty of good faith, under Delaware law are legal conclusions. Milton addresses and/or advances any necessary argument in the Argument section of his Memorandum in Opposition, filed contemporaneously herewith.

**Response:** Irrelevant and immaterial.  Milton does not owe any fiduciary duties to Plaintiffs and there is no claim for breach of fiduciary duty at issue in this lawsuit.

Moreover, Milton disputes any inference that the issues involved in the Arbitration were identical to the issues involved in this case. *See* Response to SOF No. 12, which is incorporated here.

15.    On September 9, 2024, the Honorable Diane Humetewa, United States District Judge of the District of Arizona, issued an Order granting Nikola's "Petition for Confirmation of Arbitration Award and For Entry of Judgment Thereon" and denying Milton's "Motion to Vacate." Block Decl. ¶2, Ex. 21. Judge Humetewa approved of the arbitration panel's finding that the SEC settlement with Nikola was "based on three separate and independent categories of violation of the securities laws and SEC Rules and Regulations" including Milton's false and misleading statements which substantiated claims that Nikola, through Milton, had violated Section 10(b) of the Exchange Act and several provisions of the Securities Act. *Id.*

**Response:** Irrelevant and immaterial. Milton disputes any inference that the issues involved in the confirmation of the Arbitration were identical to the issues involved in this case. *See* Response to SOF No. 12, which is incorporated here; *see also* the accompanying Memorandum in Opposition.

16.    In finding that Milton had violated his fiduciary duties of loyalty and good faith, the Majority focused on precisely the same categories of misstatements alleged in the SAC: (1) the Nikola One prototype; (2) the Company's purported production of hydrogen and hydrogen stations; (3) Nikola's plans for and development of a zero-emissions consumer-focused truck, the "Badger"; (4) Nikola's development of in-house technology; and (5) Nikola's product reservations. *See* Block Decl. ¶2, Ex. 2; Block Decl. ¶2, Ex. 18 at

53 n.6. The Majority held that "Milton knew these statements were false at the time he made them (or caused the Company to make them) . . . [and] that Milton made these misstatements with the goal of inflating the Company's stock price and, in turn, his own net worth." Block Decl. ¶2, Ex. 18 at 53 n.6.

**Objection**: Whether the alleged misstatements and issues involved in the Arbitration are identical to the issues here for the purposes of Plaintiffs' collateral estoppel argument is a legal conclusion, and is addressed in the accompanying Memorandum opposing Plaintiffs' Motion.

**Response**: Disputed.  See Responses to SOF Nos. 1 and 12, incorporated by reference.

17.    As such, as set out below, the key elements of Nikola's fiduciary claims against Milton are co-extensive with the claims made against Milton in the SAC and have already been adjudicated and decided against Milton. The verdict rendered against Milton in the Arbitration necessarily affirms both that Milton engaged in false and misleading conduct and that he acted willfully and knowingly. Block Decl. ¶2, Ex. 2.

**Objection**: This is attorney argument, not a statement of fact properly supported by supporting materials as required under Fed. R. Civ. P. 56.  Whether the alleged misstatements and issues involved in the Arbitration are identical to the issues here for the purposes of Plaintiffs' collateral estoppel argument is a legal conclusion, and is addressed in the accompanying Memorandum opposing Plaintiffs' Motion.

**Response**: Disputed.  See Responses to SOF Nos. 1 and 12, incorporated by reference.

**C.**     **Plaintiffs' Second Consolidated Amended Class Action Complaint**

**18.**     On April 3, 2023, Lead Plaintiffs George Mersho, Vincent Chau, Stanley Karcynski (collectively, "Plaintiffs") filed the SAC in this case. Dkt. No. 129.

**Response:** Undisputed.

**19.**     The SAC charged Defendant Milton with violating 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§ 78j(b), 78t(a) and 78t(b)), and Rule 10b-5 promulgated thereunder by the U.S. Securities and Exchange Commission (the "SEC") (17 C.F.R. § 240.10b-5). *Id.*

**Response:** Undisputed.

**20.**     The SAC identified six categories of Milton's alleged misstatements that overlapped with those at issue in Milton's criminal case and the Arbitration: (1) that Nikola had developed a fully operational 'zero-emissions' tractor trailer truck powered by hydrogen fuel cell technology—the Nikola One; (2) that Nikola had over 14,000 binding purchase orders for its trucks; (3) that Nikola was producing hydrogen at a fraction of the cost industry experts believed was possible and was in the process of establishing a nation-wide network of hydrogen refueling stations; (4) that Nikola had developed, using its own technology, a fully operational pick-up truck called the Badger; (5) that Nikola had developed all of its vehicles ' critical components "in-house." *Id.*, ¶9; Block Decl. ¶2, Ex. 1; Block Decl. ¶2, Ex. 2.

**Objection:** Whether the issues involved in this case are identical with any prior case is a legal conclusion.

**Response:** Disputed. *See* Responses to SOF Nos. 1, 9, and 12, which are incorporated by reference. Moreover, the exhibit cited by Plaintiffs purports to show only three categories alleged to be overlapping as between the Arbitration and this case (hydrogen, in-house, and orders). *See* Plfs.' Ex. 2, Dkt. 318-3.

**D.    The Bankruptcy Matter**

21.    On September 5, 2025, the United States Bankruptcy Court for the District of Delaware found "overwhelming evidence" that Milton's "fraudulent statements and breaches of fiduciary duty" resulted in injury "to shareholders" and "that damage caused millions and millions and millions, hundreds of millions of dollars in losses" which "largely led to Nikola's inability to pay a lot of its debt, the fall of its stock price, and ultimately its insolvency." Block Decl. ¶2, Ex. 22 at 130-31.

**Objection:** Whether the issues involved in this case are identical with the Nikola Bankruptcy is a legal conclusion.

**Response:** Milton disputes any inference that the issues involved in this case are identical to the issues involved in the Nikola Bankruptcy. *See* the accompanying Memorandum in Opposition. Moreover, in arriving at its decision on Milton's objection regarding the equitable subordination issue, the Bankruptcy court did not analyze: whether any alleged misrepresentations were material; whether they were made with scienter; whether they were made in connection with a purchase or sale of a security; and whether

any investors relied upon any alleged misrepresentation. *See* Plfs.' Ex. 22, Dkt. 326-1, 123:1-131:19.[2]

22.    The Bankruptcy Court also rejected Milton's argument that his criminal conduct could not constitute evidence to support equitable subordination because of the President's pardon, reasoning that "the pardon power does not extend to the authority to determine innocence" and that "when we're determining if somebody is criminally liable or innocent, the judiciary has to make that determination." *Id.* at 125-128. The Court noted that "even if the pardon power did extend to determine innocence . . . the pardon is clear on its face and there was no finding of innocence. And I assume that the President speaks with complete clarity and he did so when issuing an official grant of clemency pursuant to that constitutional pardon power, and because the pardon is unambiguous and clear on its face, I don't need to look to, nor can I look to extrinsic evidence or the President's other statements to interpret or supplement the official pardon." *Id.* at 129.

**Objection:** Whether the issues involved in this case are identical with the Nikola Bankruptcy is a legal conclusion.

**Response:** Immaterial and irrelevant. Milton disputes any inference that the issues involved in this case are identical to the issues involved in the Nikola Bankruptcy. *See* the

---

[2] Although the Bankruptcy court briefly touched on the issues of loss and loss causation, the court made those statements in a purely conclusory fashion. *See* Plfs.' Ex. 22, Dkt. 326-1, 130:20-24 ("The evidence before me is that the fraudulent statements and breaches of fiduciary duty resulted in an injury to creditors, to shareholders, and to the company itself, and that damage caused millions and millions and millions, hundreds of millions of dollars in losses."). The Bankruptcy court did not analyze those issues under applicable law, and those issues were certainly not fully and fairly litigated, for example, after receiving a report or even testimony from an economist expert who has performed a robust loss causation analysis.

accompanying Memorandum in Opposition, the relevant portions of which are incorporated here.

**E.    There is No Genuine Dispute that the Challenged Statements Were Materially False and Misleading[3]**

**23.    *Milton's False Statements about the Nikola One*.**

**[¶ 23a]** The Nikola One was originally engineered as a natural gas turbine truck and was never a zero-emissions hydrogen electric truck. Block Decl. ¶2, Ex. 5 at 89:5-9; *id.* at 120:20-121:15; Block Decl. ¶2, Ex. 27 at 69; Block Decl. ¶2, Ex. 29.

**Response:** Disputed. Development on the Nikola One began in 2014. Ex. 5, Milton Dep. 124:11-17 ("we started in 2014"). It was originally intended to be a natural gas turbine electric vehicle, but during development, the design was changed in 2016 to that of a hydrogen fuel cell vehicle. *Id.* 124:18-23 ("we pivoted to fuel cell in 2016"). Two years after the unveiling in December 2016, the Nikola One was operating as a zero-emissions hydrogen electric truck. *Id.* 135:7-22 ("It was rebuilt with fuel cell, and by a little over two years later it was driving on the roads."). For example, a delivery for Anheuser-Busch was completed using the Nikola One. *Id.* 135:17-25 ("we actually did a delivery under fuel cell with Anheuser-Busch . . . . It was a Nikola One.").

---

[3] LRCiv 56.1(a) requires "each material fact on which the party relies in support of the motion" to be "set forth in a separately numbered paragraph." Instead, in this section Plaintiffs cobbled together numerous separate and distinct alleged material facts and crammed them together into one purported material fact. "A failure to submit a separate statement of facts in this form may constitute grounds for the denial of the motion." *Id.* Milton objects to Plaintiffs' Statement of Facts on this ground and submits that Plaintiffs' Motion should be denied on this ground alone. For the convenience of the Court, Milton has inserted bracketed letters such as [a], [b], [c], etc. to indicate the beginning of a discreet, new subpart under each of the numbered paragraphs contained in this section.

Moreover, for this subpart, Plaintiffs infer or implicitly argue that the vehicle that had different internally-used project names at different times (Nikola One, Nikola Two) was somehow not the same vehicle because it had different project names. It was the same regardless of project name. *See, e.g.,* Ex. 5, Milton Dep. 136:1-17 ("the Nikola One and Nikola Two are actually the same truck. One just has a bed in it. . . . [T]here's no difference in the actual vehicle itself."). *id.* 179:4-11 ("The Nikola One and the Nikola Two were actually the same truck."); *id.* 363:7-364:6 ("Q. There's been allegations -- assertions that the Nikola One at some point in time was abandoned. Is that -- do you agree with that? A. No."); Ex. 6, Brady Dep. 218:10-20 ("I think you are trying to complicate this. Nikola One is Nikola Two. Nikola One was simply a naming convention for a truck that Trevor introduced and when we start to develop that, then it got named to Nikola Two.").

**[¶ 23b]** Milton was kept informed of the truck's development. Block Decl. ¶2, Ex. 5 at 104:23-24; Block Decl. ¶2, Ex 30.

**Response**: Disputed in part. The cited testimony of Mr. Lackey speaks for itself:

A. You know, very early on in October we started talking about what we would finish and what we would not finish.

Q. And when you say 'we,' who would you discuss that topic with?

A. That would be in meetings with the engineers, e-mails and so forth.

Q. And were those discussions [in October 2016] held with Mr. Milton as well?

A. In many cases, yes.

Plfs.' Ex. 5, Dkt. 318-6, 104:17-24.

1

2

3

4

**[¶ 23c]** The Nikola One at the December 2016 unveiling was not functional. Block Decl. ¶2, Ex. 5 at 104:10-109:5; Block Decl. ¶2, Ex. 28 at 103; Ex. 27 at 75; Block Decl. ¶2, Ex 30.

5

6

7

8

9

10

11

12

13

14

<u>**Response**</u>: Disputed. Trevor Milton testified that the Nikola One was functional because each component of the truck was functional. *See* Ex. 5, Milton Dep. 130:20-131:3 ("It was -- it was a functioning truck. It could have -- it could have driven if we wanted it to. All the parts were there."); *id.* 137:15-16 ("The Nikola One was not a pusher. The Nikola One had functioning parts."); *id.* 152:7-153:2 ("Then you have a preproduction unit, which is what the Nikola One was, which had functioning parts, functioning brakes, functioning batteries, functioning inverters, functioning lights, functioning infotainment, basic, but functioning, that could move.").

15

16

17

**[¶ 23d]** The vehicle revealed at that event was a non-operational "pusher," meaning it could not move under its own power. Block Decl. ¶2, Ex. 5 at 118:16-25; *id.* at 122:14-122:24.

18

19

20

21

22

23

24

25

26

<u>**Response**</u>: Disputed.  *See* Ex. 5, Milton Dep. 137:15-16 ("The Nikola One was not a pusher. The Nikola One had functioning parts."); *id.* 152:7-153:2 ("Then you have a preproduction unit, which is what the Nikola One was, which had functioning parts, functioning brakes, functioning batteries, functioning inverters, functioning lights, functioning infotainment, basic, but functioning, that could move."); *id.* 156:25-157:16 ("Step 2 would be a pusher. Step 3 would be a -- essentially a preproduction prototype . . . which is what this truck was."); *id.* 158:12-16 ("this truck, when you talk about production

27

28

ready, that would be -- that would be above a pusher but below handing trucks to customers to drive by themselves.").

*See also* Responses to SOF Nos. ¶¶ 23a & 23c, which responses are incorporated here.

**[¶ 23e]** Similarly, in the "In Motion" video, the Nikola One appeared to drive but was in fact rolling downhill on a slight ~3% incline. Block Decl. ¶2, Ex. 5 at 198:3-199:7; Block Decl. ¶2, Ex. 28 at 103; Block Decl. ¶2, Ex. 27 at 81.

**Response:** Disputed in part. *See* Ex. 5, Milton Dep. 152:2-15 ("[W]e wanted a video of the truck moving to where you could show that it was not a pusher, which it was not."); *see also id.* 155:3-11. Moreover, the Nikola One was in motion as shown in the video. *Id.* 145:3-7 ("It just says 'in motion,' which the truck was in motion."). The language "in motion" was drafted/approved by Nikola's Chief Legal Officer, Britton Worthen. *Id.* 151:13-18 ("I believe Britton brought this up to the board, and he's the one who drafted the language on this for . . . the approval. And he's the one who instructed an employee to publish it").

**[¶ 23f]** The Nikola One was never capable of driving under its own power. Block Decl. ¶2, Ex. 9 at 1219:4-11.

**Response:** Disputed. *See* Response to SOF No. 23a, which response is incorporated here.

**24.    *Milton's False Statements about the "Backlog" of Orders*.**

**[¶ 24a]** Nikola did not have contracts or orders for its trucks, Nikola had non-binding expressions of interest. Block Decl. ¶2, Ex. 6 at 343:18-344:14; Block Decl. ¶2,

Ex. 6(d); Block Decl. ¶2, Ex. 20x at 1349:13-15; *id.* at 1688:17-1689:8; Block Decl. ¶2, Ex. 31 at NKLA-BORTEANU_01382581.

**Response:** Disputed. Many customers were required to place a deposit. *See* Ex. 5, Milton Dep. 162:17-22 ("So some of the customers that signed contracts did not have a deposit requirement. Some of them did."); *id.* 162:17-22 ("we just let them sign up online if they wanted to. We didn't have any -- any requirements of disclosure by them, other than that they paid a deposit and that was it."). Moreover, Nikola had signed contracts with some customers. *Id.* 161:14-17 ("We did have some customers sign contracts for trucks, yes."); *id.* 162:6-16 ("A lot of different contracts were used with different people . . . and different customers."); *id.* 190:21-191:2 ("they signed an agreement when they signed up for the vehicle online, and on top of that, we had -- we had wet signatures on many of the larger fleets, including U.S. Express [sic]"). Often what began as a non-binding arrangement resulted in a contract. *See id.* 197:10-198:10-23 ("many of these start as pre-reservation orders. Then you go get contracts on ones that . . . are bigger.").

**[¶ 24b]** Additionally, at trial it was shown that thousands of Nikola's purported reservations were for trucks powered by a natural gas turbine—which Nikola would no longer produce after pivoting to hydrogen fuel cell and battery powered vehicles in late 2016. Ex. 7 at 473:4-476:21; *id.* at 484:13-485:2; Block Decl. ¶2, Ex. 7(f); Block Decl. ¶2, Ex. 7(g).

**Response:** Disputed. While this issue may have been argued at trial, it was certainly not "shown," i.e., evidence that resulted in findings. The jury made no findings on this issue. *See* Ex. 1, Verdict Form (no findings included); *see also* Court Instructions: Judge

Ramos instructed the jury, "you are the sole and exclusive judges of the facts." Plfs.' Ex. 15, Dkt. 323-4, 3224:12-14. He also said, "You are the sole judges of the credibility of all witnesses and the weight and effect of all evidence." *Id.* 3226:17-24.

Development on the Nikola One began in 2014. Ex. 5, Milton Dep. 124:11-17 ("we started in 2014"). It was originally intended to be a natural gas turbine electric vehicle, but during development, the design was changed in 2016 to that of a hydrogen fuel cell vehicle. *Id.* 124:18-23 ("we pivoted to fuel cell in 2016").

A few months before the design was changed from natural gas turbine to hydrogen, on May 27, 2016, Ryder Truck Rental, Inc. and Nikola's predecessor entity ("Nikola") entered into a "Purchase Order Agreement for the NIKOLA ONE." Plfs.' Ex. 7(f), Dkt. 320-7 p. 1. On June 10, 2016, U.S. Xpress, Inc. and Nikola entered into a "Lease Order Agreement for NIKOLA ONE Electric Drivetrain Trucks." Plfs.' Ex. 7(g), Dkt. 320-8 p. 1. Nikola's customers (such as Ryder or U.S. Xpress) were not signing up for a particular type of power train and regardless they were fully aware that they would be getting (and wanted) what the vehicle became, i.e., hydrogen fuel cell electric trucks. *See* Ex. 6, Brady Dep. 215:18-216:7 ("I don't think they were expecting that they were buying a gas turbine truck. I think they were buying Nikola's promise to deliver a battery electric truck."); *id.* 222:5-223:5 ("What they were expecting -- and I think you need to pay less attention to the name; 1, what they were expecting was what was advertised. Hydrogen fuel cell electric truck."); *see also* Ex. 7, Transcript of Day Two of Nikola One Unveiling, 12/2/16, p. 3

(SCOTT PERRY[4]: "We've been playing a very major role in the natural gas space for the past five or six years and have developed a service network that's really second to none, second to none. And now, with this new relationship with Nikola, playing in the hydrogen fuel cell and the electric drive space is something that we're very, very motivated to build solutions around. We're very excited to be at the table with the team.").

Moreover, for this subpart, Plaintiffs infer or implicitly argue that the vehicle that had different internally-used project names at different times (Nikola One, Nikola Two) was somehow not the same vehicle because it had different project names. It was the same regardless of project name. *See, e.g.,* Milton Dep. 136:1-17 ("the Nikola One and Nikola Two are actually the same truck. One just has a bed in it. . . . [T]here's no difference in the actual vehicle itself."). *id.* 179:4-11 ("The Nikola One and the Nikola Two were actually the same truck."); *id.* 363:7-364:6 ("Q. There's been allegations -- assertions that the Nikola One at some point in time was abandoned. Is that -- do you agree with that? A. No."); Brady Dep. 218:10-20 ("I think you are trying to complicate this. Nikola One is Nikola Two. Nikola One was simply a naming convention for a truck that Trevor introduced and when we start to develop that, then it got named to Nikola Two.").

**25.    *Milton's False Statements about Hydrogen Production*.**

**[¶ 25a]** Nikola had not started building any hydrogen infrastructure when the company went public in June 2020, had not purchased any land on which to build hydrogen stations, and had never produced any hydrogen. Block Decl. ¶2, Ex. 6 at 310:23-311:9;

---

[4] Chief Technology and Procurement Officer for Ryder's Fleet Management Solutions Division. Ex. 7, Transcript of Day Two of Nikola One Unveiling, 12/2/16, p. 2.

Block Decl. ¶2, Ex. 6(a); Block Decl. ¶2, Ex. 9 at 1068:7-1069:8; Block Decl. ¶2, Ex. 25 at 40:2-16.

**Response**: Disputed in part. The process of building hydrogen infrastructure includes numerous steps. Two of those stages are (1) storage of hydrogen and (2) dispensing of hydrogen. Ex. 8, Prows Dep. 209:10-13 ("Q. Are storage and dispensing two of the major stages of supply chain that are depicted in the graphic below? A. Yes."). By the end of 2019, Nikola had built out a demo station which allowed Nikola to perform both storage and dispensing. Ex. 9, Nikola S-1 dated June 15, 2020 p. 78 ("Through our partnership with Nel ASA, a Norweigian hydrogen company ('Nel'), we have initiated the development of the hydrogen station infrastructure by completing our first 1,000 kg demo station in the first quarter of 2019 at our corporate headquarters in Phoenix, Arizona. The demo hydrogen station offers hydrogen storage and dispensing and serves as a model for future hydrogen stations.").

Nikola purchased assorted capital/equipment as part of its work building out its hydrogen infrastructure, including the demo station, electrolyzers, pumps, chillers, and storage. Ex. 5, Milton Dep. 205:20-24: ("We had already acquired it. It was electrolyzers, the stations, the pumps, chillers, storage, . . . ."). The electrolyzers purchased included a 1-ton electrolyzer (to be used in Phoenix) and five additional electrolyzers (for stations to be built in other areas). Ex. 8, Prows Dep. 68:10-24 ("Q. The first sentence of your e-mail mentions a '1-ton electrolyzer at HQ.' What is that? A. That's the size of an electrolyzer that we had previously acquired from NEL that was being stored in a warehouse."); *id.* 149:5-8 ("Q. So had these five stations been built yet? A. No. Q. And what does it mean

that they're 8-ton-per-day hydrogen fueling stations? A. So that would be the capacity of hydrogen production at each of the five refueling stations.").

As a result of the infrastructure being built out by Nikola, Nikola reported in June 2020 that "[w]e continue to experience negative cash flows from investing activities as we expand our business and build[] our infrastructure. Cash flows from investing activities primarily relate to capital expenditures to support our growth." Ex. 9, Nikola S-1 dated June 15, 2020 p. 62.

Moreover, Nikola "was considered the owner of the leased assets," *i.e.*, the land for Nikola's headquarters/demo station in Phoenix, "for accounting purposes during the construction period." *Id.* at F-34/PDF p. 185.

**[¶ 25b]** As of June 2020, Nikola was not connected to federal transmission lines and had no electricity contracts with power providers. Block Decl. ¶2, Ex. 20 at 934:8-14; Block Decl. ¶2, Ex. 23 at 125:12-22; Block Decl. ¶2, Ex. 25 at 115:23-116:23; *id.* at 117:8-18; *id.* at 134:22-135:12; *id.* at 138:20-140:10; *id.* at 184:2-25.

**<u>Response</u>**: Undisputed that Nikola did not have a signed electricity contract. However, Nikola was in talks with utilities in Arizona, including APS and SRP, and utilities in California. Ex. 8, Prows Dep. 229:21-25 ("Q. So in bringing costs down, did you have -- what -- who did you have discussions with, you know, for example, here in Arizona? Is it APS or SRP, one of those two? A. Both, yep."); *id.* 121:4-15 (referring to rates Nikola had been offered in southern California). *See also* Response to SOF No. 25d, which is incorporated here.

**[¶ 25c]** By September 2020, Nikola had not produced any hydrogen or built a functioning hydrogen station at any cost, including in Canada. Block Decl. ¶2, Ex. 27 at 38; *id.* at 109-110; Block Decl. ¶2, Ex. 12 at 1781:18-21; Block Decl. ¶2, Ex. 20 at 938:4-5; Block Decl. ¶2, Ex. 32 at NKLA-BORTEANU_01022666.

**Response:** Disputed in part. By the end of 2019, Nikola had built out a functioning hydrogen station which allowed Nikola to perform both storage and dispensing. Ex. 9, Nikola S-1 dated June 15, 2020 p. 78 ("Through our partnership with Nel ASA, a Norweigian hydrogen company ('Nel'), we have initiated the development of the hydrogen station infrastructure by completing our first 1,000 kg demo station in the first quarter of 2019 at our corporate headquarters in Phoenix, Arizona. The demo hydrogen station offers hydrogen storage and dispensing and serves as a model for future hydrogen stations.").

**[¶ 25d]** Nikola never produced hydrogen at a cost of $3-$4 a kilogram. Block Decl. ¶2, Ex. 26 at 62:19-24; Block Decl. ¶2, Ex. 28 at 103; Block Decl. ¶2, Ex. 25 at 146:10-147:7; Block Decl. ¶2, Ex. 27 at 38.

**Response:** Disputed. Towards the end of 2021 or in 2022, Nikola was able to achieve electricity rates below 3.5 cents. Ex. 6, Brady Dep. 44:15-23 ("[W]e believe on a blended basis, we were able to achieve less than 3.5 cents per kilowatt hour."); *id.* 54:22-55:16 ("I also believe he [Milton] understood what we were trying to achieve and ultimately I think we got the rate down to below 3 1/2 cents."). Electricity at below 3.5 cents per kilowatt hour translates to production of hydrogen at a cost of below $3.50. *See* Ex. 5, Milton Dep. 214:14-25 ("It's . . . not an exact science, but it's just – it's just a

generality that if you can get energy under 4 cents a kilowatt hour, your . . . cost of hydrogen will be under $4 a kilogram.").

**[¶ 25e]** Nikola was buying hydrogen from a third party in 2020 for $14.76/kilogram. Block Decl. ¶2, Ex. 25 at 43:11-47:14.

**Response:** As was disclosed in the company's June 2020 S-1 filing, Nikola's "demo hydrogen station offers hydrogen storage and dispensing"—not production. Ex. 9, Nikola S-1 dated June 15, 2020 p. 78. It is undisputed that the hydrogen being stored and dispensed came from a third party.

### 26. *Milton's False Statements about the Badger*.

**[¶ 26a]** As of February 10, 2020, Nikola had not validated the Badger's technical specifications or done any engineering work beyond running 12 hours of simulations. Block Decl. ¶2, Ex. 7 at 529:11-532:2; Block Decl. ¶2, Ex. 10 at 1459:13-1460:23; Block Decl. ¶2, Ex. 11 at 1479:16-1480:5; Block Decl. ¶2, Ex. 20 at 480:8-20.

**<u>Response</u>:** Disputed. The original plan was to build the Badger over the chassis of a Nikola NZT, which had had some engineering work done on it previous to February 10, 2020. Ex. 10, Babiarz, Criminal Case testimony, 651:23-25 ("Q. Now Trevor's initial plan was to use Nikola's NZT, its off-road vehicle? A. That was the original plan, yes.").

Ultimately for the prototypes, the decision was made to use donor/surrogate vehicles, such as the Ford Raptor, which had also been engineered previous to February 10, 2020. Ex. 11, Babiarz Dep. 69:9-24. Babiarz testified in the Criminal Case that Ford's chassis "had similar specs to what we wanted ours to be." Ex. 10, Babiarz, Criminal Case testimony, 652:5-11. Although a donor vehicle was used as a starting point, 95% of the end

result was modified by Nikola. *See* Ex. 10, Babiarz, Criminal Case testimony, 653:5-6 ("Q. So you estimate that Nikola had to modify it 95 percent? A. My estimation, yes."); *see also* Ex. 11, Babiarz Dep. 90:25-91:13 ("So in my aspect of what we call the top hat of the vehicle, so the body, the interior, the exterior, body panels, et cetera, a hundred percent of the exterior panels were custom to Nikola. The -- what we call the body in white in our industry, which is the back side of those panels, call it the overall structure of the vehicle, we did use from the donor Ford Raptors.").

Milton disputes any inference that until a prototype is built, the company does not know what the vehicle can do, i.e., could not "validate" the Badger's expected technical specifications. Ex. 6, Brady Dep. 76:12-77:6 ("Q. My question is until a prototype is actually built, the company doesn't know what that vehicle can do in the real world, correct? [Objections] A. I am not sure whether that statement is accurate."); *see also id.* 74:23-75:12 ("You are talking about potential. For example, a . . . diesel semi truck, one that carries two tanks -- could that go between 500 to 1,000 miles? Yes. If they decide to add two more tanks, that could then go 1,000, to potentially 2,000 miles? Yes. So it's a design for longer travel.").

**[¶ 26b]** The two Badger prototypes designed in 2020 were both battery-electric vehicles ("BEVs") lacking hydrogen technology and thus incapable of producing water as a byproduct. Block Decl. ¶2, Ex. 7 at 537:21-540:12; *id.* at 602:10-603:5; Block Decl. ¶2, Ex. 7(c); Block Decl. ¶2, Ex. 8 at 628:12-629:7; Block Decl. ¶2, Ex. 34.

**Response:** Milton disputes any inference that only BEV versions were to be created. The two pre-production prototypes were BEV, and a FCEV version was shortly to follow.

Ex. 5, Milton Dep. 254:3-9 ("The one that was delivered and produced and operational . . . [s]ometime in October or November [2020] was the battery-electric version and the fuel cell was shortly to follow.").

**[¶ 26c]** The prototypes were not expected to be completed and tested before November 2020. Block Decl. ¶2, Ex. 36; Block Decl. ¶2, Ex. 32 at NKLA-BORTEANU_01022687.

**Response**: Undisputed.

**[¶ 26d]** Nikola did not build the Badger from the ground up. Block Decl. ¶2, Ex. 7 at 553:13-555:24; Block Decl. ¶2, Ex. 33; Block Decl. ¶2, Ex. 32 at NKLA-BORTEANU_01022687; Block Decl. ¶2, Ex. 35.

**Response**: Disputed. Although a donor vehicle was used as a starting point (*see* Response to SOF No. 26a, which is incorporated here), 95% of the end result was modified by Nikola. *See* Ex. 10, Babiarz, Criminal Case testimony, 653:5-6 ("Q. So you estimate that Nikola had to modify it 95 percent? A. My estimation, yes.").

**[¶ 26e]** Nikola originally decided to use the Ford F-150 as a donor vehicle from which to build the Badger prototype. Block Decl. ¶2, Ex. 7 at 535:25-537:7; Block Decl. ¶2, Ex. 11 at 1495:24-1496:5.

**Response**: Disputed. The original plan was to build the Badger over the chassis of a Nikola NZT, which had had some engineering work done on it previous to February 10, 2020. Ex. 10, Babiarz, Criminal Case testimony, 651:23-25 ("Q. Now Trevor's initial plan was to use Nikola's NZT, its off-road vehicle? A. That was the original plan, yes.").

**[¶ 26f]** Under its agreement with General Motors, the Badger contained no Nikola technology—GM was responsible for nearly all functional components as well as the vehicle's design. Block Decl. ¶2, Ex. 11 at 1482:5-1483:9; *id.* at 1484:24-1493:7; *id.* at 1504:20-1505:1; Block Decl. ¶2, Ex. 11(a); Block Decl. ¶2, Ex. 26 at 208:6-12.

**Response:** Disputed. Nikola's IP and designs that it had already built would be contributed to the program. Ex. 5, Milton Dep. 267:16-24. In the end, 90% of the intended product was going to be Nikola's, only 10% GM's. *Id.* 256:8-18.

**[¶ 26g]** The Badger was to be assembled using parts from two existing GM models: the Hummer EV and the Silverado EV. Block Decl. ¶2, Ex. 11 at 1483:10-1484:22.

**Response:** Milton disputes the inference that the Badger would <u>only</u> be assembled using parts from the Hummer EV and the Silverado EV. Nikola's IP and designs that it had already built would be contributed to the program. Ex. 5, Milton Dep. 267:16-24. In the end, 90% of the intended product was going to be Nikola's, only 10% GM's. *Id.* 256:8-18.

27.  ***In-House Components***:

**[¶ 27a]** Nikola did not develop or manufacture its own batteries, frames, or inverters. Block Decl. ¶2, Ex. 28 at 103; Block Decl. ¶2, Ex. 27 at 43, 56-58; Block Decl. ¶2, Ex. 24 at 184:18-22, 187:3-23.

**Response:** Disputed. Nikola developed and used its own battery module designs in 2019 prototypes. Ex. 12, Roycht Dep. 74:1-12 ("Q. . . . Would you say that at this time in 2019, Nikola developed in-house some component of a battery that it could be used for its truck? A. I would say generally yes. Whether or not those packs were at a level that could have been mass produced, I would call them kind of more in development or prototypes.

But this would have supported a claim that our vehicles have our own battery packs."); *see also id.* 72:25-73:14 ("In 2019, there were battery packs comprised of Samsung battery cells in Nikola battery module designs in battery packs that were technically, you could say were Nikola-owned battery packs, but they were developed with outside engineering services groups and those would have been in the . . . prototype vehicles that were around in 2019."). Nikola designed its own battery packs. *Id.* 113:17-114:8 ("There were Nikola battery modules and battery packs, but not battery cells on all of the vehicles operating in that timeframe."). Nikola licensed and/or owned inverter technology, with the ability to modify the inverters as needed. Ex. 5, Milton Dep. 293:20-23 ("We bought the ability to modify it, to change it. We bought it. That means we own it from scratch to production. That's ours. . . . When we bought the ITK inverter technology or licensed it from Bosch . . . it became ours, Nikola's."). Nikola developed its own frame for at least of its vehicles, and it was involved with developing frames that were developed with a partner. Ex. 12, Roycht Dep. 115:6-22 ("I believe, when we say 'We do our own frames' means we design our own frames with the intent to build them. That's how I would interpret that statement. And that is or was true for at least half of the vehicles."); *see also id.* 116:13-117:11 ("I would say we do our own frames.").

**[¶ 27b]** Instead, the company relied on partners for technology, controls, E-axle, and inverter development. Block Decl. ¶2, Ex. 20 at 978:19-23; *id.* at 982:14-22; Block Decl. ¶2, Ex. 27 at 43, 50-52; Block Decl. ¶2, Ex. 24 at 190:17.

**Response:** Disputed. Nikola modified donor vehicles (re: the Badger) by 95%, and also developed or was developing (or co-developed) its own batteries/battery modules,

frames, and inverters. *See* Responses to SOF Nos. 27a and 26d, which are incorporated here. Further answering, Nikola provided the infotainment. Ex. 5, Milton Dep. 298:16-17 ("Infotainment was done by Nikola headed up by two dozen engineers at Nikola."). Nikola provided the software. *Id.* 298:11 ("We did our own software."). Nikola provided the over-the-air updating. *Id.* 298:18. Nikola designed the components such as the E-axle. Ex. 6, Brady Dep. 87:4-16 ("I think there are a lot of nuances when it comes to what it means. We do all the components in-house. Nikola was involved in design of all of those components -- many of those components, such as the E axle, meaning, they partner with third-party firms, joint venture development."). Nikola was attempting to do everything itself. Ex. 12, Roycht Dep. 111:22-112:11 ("Nikola was attempting to do everything themselves.").

**[¶ 27c]** Milton frequently led negotiations and agreements with various third parties to produce these components. Block Decl. ¶2, Ex. 18 at 27.

**Response:** Disputed. See response to [¶ 27b] above.

## F.    Plaintiffs Have Already Established their Entitlement to the *Basic* Presumption

28.    The overlapping Challenged Statements were public. ECF No. 224 at 13 (January 6, 2025).

**Response:** This is not a statement of fact, it is attorney argument. The Court's class certification order does not say anything about "overlapping Challenged Statements." It is undisputed that the Court granted plaintiffs a **rebuttable** presumption of reliance in the class-certification order, but it is also clear, as the Court recognized in its order, that Defendants have the right to present evidence to rebut that presumption at trial.

**29.**    Plaintiffs bought stock during the Class Period. ECF No. 24-4 (November 16, 2020).

**Response:** Undisputed.

**30.**    The Court has already found "that Nikola stock traded in an efficient market throughout the Class Period." ECF No. 224 at 22 (January 6, 2025).

**Response:** Undisputed that the Court made this finding in the class certification order.

**31.**    The Court previously expressly rejected Defendants price impact arguments and granted Plaintiffs' Motion for Class Certification. *Id.* at 22-25.

<u>**Response:**</u> Disputed.  The arguments and evidence advanced by Nikola's expert, Dr. Andrew Roper, to oppose class certification are not the same the same as the evidence that Milton has developed to rebut the presumption of reliance through the expert opinions and testimony of his retained expert, Laurel Van Allen.

At class certification, Defendants Nikola, Russell, and Brady designated an expert (Dr. Roper[5]) who opined, as summarized by the Court, "that much of the allegedly concealed information had already been publicly disclosed." Dkt. 224 p. 23. In his class certification report, Dr. Roper did not include any discussion of intraday stock price movement. Ex. 13, Roper Dep. 92:13-21 ("I don't describe specifically the intraday stock price movements in my August 19th, 2024 [report].").

Defendant Milton's expert, Laurel Van Allen with Coherent Economics, performed

---

[5] Dkt. 185 p. 2 (referring to Dr. Roper as "the Nikola Defendants' rebuttal expert Dr. Andrew Roper").

an exhaustive analysis of intraday stock price movement which effectively rebuts any fraud-on-the-market presumption. Ex. 14, Report of Laurel Van Allen dated Aug. 4, 2025; Ex. 15, Rebuttal Report of Laurel Van Allen dated Sept. 26, 2025. Her thorough, minute-level intraday analysis[6] establishes that "'the market did not respond to the alleged misrepresentations.'" *See* Dkt. 224 p. 23 (quoting *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 637 (3d Cir. 2011)).

In addition to evaluating minute-level intraday stock price movement, Ms. Van Allen and her team also performed a close review of the total mix of information that was available to the public during the applicable time, including more than 6,650 news events and 104 analyst reports that were published regarding Nikola between June 4, 2020 and February 26, 2021. Ex. 14, p. 8. This review allowed Ms. Van Allen to determine "market commentary reflecting the consensus reaction to (or *absence* of a reaction to) the Alleged Misstatements." *Id.* p. 2.

As a result of her evaluation of (1) minute-level intraday stock price movement of Nikola stock, and (2) market commentary regarding Nikola, Ms. Van Allen concluded by opining that "I find that the Alleged Misstatements and Alleged Corrective Disclosures correspond to a lack of price impact or confounding information that explains the price movements in Nikola Common Stock. The economic evidence therefore indicates that the market did not respond to—or view as material—the Alleged Misstatements." *Id.* p. 100.

---

[6] *See, e.g.,* Figures 4-14 contained in Ex. 14, Report of Laurel Van Allen at pp. 30 (6/8/20); 35 (6/9/20); 40 (8/3/20); 43 (8/10/20); 48 (9/8/20); 59 (9/21/20); 66 (9/23/20); 72 (10/16/20); 78 (11/30/20); 87 (9/10/20); 96 (2/26/21).

**32.**    As noted above, the materiality of the overlapping Challenged Statements was previously determined in the context of Milton's criminal trial.

**<u>Response</u>:** Disputed. The only record that evidences what was determined by the jury in the Criminal Case is the jury verdict form that it returned. That verdict form merely indicates guilty or not guilty with respect to each of the four counts with which Milton was charged. Ex. 1. The verdict form does not indicate or even reflect any particular statement(s) the jury determined to be material. Plaintiffs claim in SOF No. 32 that "the materiality of the overlapping Challenged Statements," *i.e.*, as purportedly summarized in Plaintiffs' Ex. 1 table, "was previously determined in the context of Milton's criminal trial." That is simply not the case. Tellingly, Plaintiffs do not identify a single purported misstatement that the jury "previously determined" to be material. Instead, all that can be determined from the verdict form is that Milton (inconsistently) was convicted of three out of four counts, with no specific statements identified.

1    DATED December 3, 2025.

2
                                    HATCH LAW GROUP PC
3                                   By: */s/ Adam M. Pace*
                                    Brent O. Hatch (*pro hac vice*)
4                                   Adam M. Pace (*pro hac vice*)
                                    Tyler V. Snow (*pro hac vice*)
5                                   22 E. 100 S., Suite 400
                                    Salt Lake City, UT 84111
6                                   (801) 869-1919
7
8                                   WALLIN HESTER PLC
                                    Troy A. Wallin (No. 023522)
9                                   Chad A. Hester (No. 022894)
                                    1760 E. Pecos Rd. #332
10                                  Gilbert, AZ 85295
                                    (480) 240-4150
11
12                                  *Attorneys for Defendant Trevor Milton*
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

## CERTIFICATE OF SERVICE

2

3        I hereby certify that on December 3, 2025, this document was electronically

4    transmitted to the Clerk of the Court using the CM/ECF System which will send

5    notification of such filing and transmittal of a Notice of Electronic Filing to all CM/ECF

6    registrants.

7                /s/ Adam M. Pace

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28