**WO**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

Daniel Borteanu, et al.,

Plaintiffs,

vs.

Nikola Corporation, et al.,

Defendants.

No. CV-20-01797-PHX-SPL

No. CV-20-01819-PHX-SPL (cons.)
No. CV-20-02123-PHX-SPL (cons.)
No. CV-20-02237-PHX-SPL (cons.)
No. CV-20-02374-PHX-SPL (cons.)

**ORDER**

Before the Court are four Motions for Summary Judgment: (1) Lead Plaintiffs and Certified Class Representatives George Mersho and Vincent Chau's Motion for Partial Summary Judgment (Doc. 316); (2) Defendant Jeffrey Ubben's Motion for Summary Judgment (Doc. 328); (3) Defendants Kim Brady and Mark Russell's Motion for Summary Judgment (Doc. 331); and (4) Defendant Trevor Milton's Motion for Summary Judgment (Doc. 333). Defendants Brady and Russell, Ubben, and Milton all filed Responses to Plaintiffs' Partial Motion for Summary Judgment. (Docs. 344, 351, 353). Plaintiffs responded to all three Motions filed by Defendants. (Docs. 341, 343, 349).

Also before the Court are Defendants Russell and Brady's *Daubert* Motion to Exclude the Opinions of Plaintiffs' expert Dr. Zachary Nye (Doc. 330) and Defendant Ubben's Joinder in that Motion. (Doc. 336). Plaintiffs responded in opposition to Defendants Russell and Brady's Daubert Motion (Doc. 347) and moved to strike Defendant Ubben's Joinder. (Doc. 355). All Motions are fully briefed and ripe for review. The Court

now rules as follows.[1]

**BACKGROUND**

This is a private securities class action brought by Plaintiffs (Lead Plaintiffs and Certified Class Representatives: Vincent Chau and George Mersho) on behalf of all investors who purchased the common stock of Nikola during the period June 4, 2020, through February 25, 2021. (Doc. 129 at 6). This action is against Nikola and several individuals associated with the company: (1) Chief Executive Officer Mark Russell; (2) Chief Financial Officer Kim Brady; (3) Jeffrey Ubben, a member of Nikola's Board of Directors; and (4) Nikola's founder and former Executive Chairman, Trevor Milton. (*Id.* at 6–8).[2] The action has since been stayed against Defendant Nikola, pending the completion of Nikola's bankruptcy proceedings. (Doc. 278).[3]

Nikola is a publicly traded Delaware corporation with its headquarters in Arizona. (Doc. 129 at 20). Nikola designs and manufactures electric vehicles and their components. (*Id.* at 23). Plaintiffs filed their initial Complaint on September 15, 2020, and subsequently their First Consolidated Amended Class Action Complaint ("FCACAC") (Doc. 95) on January 24, 2022. (*Id.* at 5). On February 2, 2023, this Court dismissed that complaint for failure to state a claim. (Doc. 126). Plaintiffs then filed a Second Consolidated Amended Class Action Complaint ("SCACAC"), which remains the operative document. (Doc. 129).

Plaintiffs allege that Defendants violated §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder, by misrepresenting numerous aspects of Nikola's business and operations. (*Id.* at 6–8). Plaintiffs allege that these misrepresentations inflated Nikola's stock value. (*Id.* at 19). According to Plaintiffs,

---

[1] Because it would not assist in resolution of the instant issues, the Court finds the pending motions are suitable for decision without oral argument. *See* LRCiv. 7.2(f); Fed. R. Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

[2] Plaintiffs' claims against Defendants Britton Worthen, Steve Girsky, and Steven Shindler were dismissed. (Doc. 157).

[3] The orders entered in the matter of Nikola's bankruptcy are currently on appeal in the District of Delaware. (Doc. 376).

when the falsity of these misrepresentations came to light, Nikola's stock value dropped dramatically, causing significant losses and damages to the class members. (*Id.* at 17–18).

The SCACAC alleges that "[w]hile Defendants misrepresented numerous aspects of Nikola's operations, the fraud can be broken down into nine categories of misrepresentations." (*Id.* at 7). Plaintiff alleges that Defendants misrepresented:

> "first, that Nikola had developed a fully operational 'zero-emissions' tractor trailer truck powered by hydrogen fuel cell technology—the Nikola One;
>
> second, that Nikola had, in hand, over 14,000 purchase orders for its trucks, which represented 2 to 3 years of production and billions in revenue;
>
> third, that Nikola was producing hydrogen at a fraction of the cost industry experts believed was possible and that Nikola was in the process of establishing a nation-wide network of hydrogen refueling stations, which could reliably dispense and produce inexpensive hydrogen for the Nikola One and Nikola's other vehicles to operate on;
>
> fourth, that Nikola had developed, using its own technology, a fully operational pick-up truck called the Badger, for which pre-orders had sold out;
>
> fifth, that Nikola had developed all of its vehicles' critical components 'in-house,' including a proprietary 'game-changing' electric battery, which exceeded the range of then-existing electric batteries;
>
> sixth, that the cost of owning and operating Nikola's vehicles was significantly less than the cost of owning and operating a traditional diesel powered vehicle;
>
> seventh, that commercial 'assembly line' production of the Nikola Tre BEV truck had already been completed in Ulm, German[y], and that Nikola had binding orders in hand for its BEV trucks;
>
> eighth, that Nikola's headquarters was completely 'off-grid' with solar panels on the roof producing 18 megawatts of energy a day; and
>
> ninth, that Nikola owned seven natural gas wells that were used as backup to Nikola's solar hydrogen production."

(*Id.* at 9). For each of these categories, the SCACAC alleges specific statements made by

different Defendants at varying times. Defendant Milton's alleged misstatements primarily occurred via Twitter and during various interviews he conducted. The other Defendants' alleged misstatements primarily occurred in certain SEC filings that they signed, and during other interactions with the media. All these alleged misstatements can be imputed to Defendant Nikola. Plaintiff also alleges that the Individual Defendants, Defendant Milton, and Defendant Ubben participated in a scheme to defraud investors by promoting these alleged misstatements.

On January 6, 2025, the Court certified this matter as a class action pursuant to Federal Rule of Civil Procedure 23(b)(3) on behalf of:

> all those who purchased or otherwise acquired Nikola Corporation securities during the period June 4, 2020 through February 25, 2021, and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of Nikola during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Nikola's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

(Doc. 224 at 27). In November 2025, the parties filed their respective Motions for Summary Judgment, the Motions that are presently before the Court.

## **LEGAL STANDARD**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Material facts are those facts "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute of material fact arises if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The party moving for summary judgment bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together

with affidavits, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material. *Anderson*, 477 U.S. at 250. In other words, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts," and, instead, must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

When considering a motion for summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must view the factual record and draw all reasonable inferences in the nonmovant's favor. *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002). The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

## DISCUSSION

The Court will first consider Lead Plaintiffs' Motion for Partial Summary Judgment. (Doc. 316). Plaintiffs' Motion only concerns the claims against Defendant Milton. (*See id.*). Therefore, the Court will first assess Plaintiffs' Motion and Defendant Milton's Motion. Then it will turn to Defendant Ubben's Motion (Doc. 328) and Defendant Russell and Brady's Motions (Doc. 330, 331).

### I. PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

As stated above, Plaintiffs' Motion centers only on the claims against Defendant Milton, arguing that he should be precluded from re-litigating his liability for securities fraud based on collateral estoppel. Defendants Ubben, Russell, and Brady also filed responses to Plaintiffs' Motion for Partial Summary Judgment. (Docs. 344, 351). Because Plaintiffs concede that they have not moved for summary judgment against the other three

Defendants. (Doc. 358 at 2; Doc. 361 at 2). Therefore, the Court will not consider the argument in those Defendants' Responses or Plaintiffs' Replies to them.

**A. Collateral Estoppel**

Lead Plaintiffs argue that Defendant Milton is liable for the § 10(b) securities fraud claim based on collateral estoppel, highlighting three prior proceedings against him: his criminal conviction, the arbitration award entered against him, and Nikola's bankruptcy proceedings.[4] (Doc. 316-1 at 11). In response, Defendant Milton argues that the issues in those proceedings are not identical to the issues here, and even so, the application of collateral estoppel would be manifestly unfair in these circumstances. (Doc. 353 at 4–5). The Court will consider whether collateral estoppel should apply based on any of the three prior proceedings, beginning with the criminal conviction.

The doctrine of collateral estoppel or issue preclusion prohibits relitigation of an issue of fact or law that has been decided in earlier litigation. *Parklane Hosiery Co. v. Shore, 439 U.S. 322*, 326, n.5 (1979). "[O]ffensive nonmutual issue preclusion . . . prevents a defendant from relitigating the issues which a defendant previously litigated and lost against another plaintiff." *SEC v. Stein*, 906 F.3d 823, 828 (9th Cir. 2018) (internal quotations omitted). Additionally, it is "well established that a prior criminal conviction may work an estoppel in favor of the Government in a subsequent civil proceeding." *Emich Motors Corp. v. General Motors Corp.*, 340 U.S. 558, 568 (1951). To find that collateral estoppel applies based on a prior criminal conviction, the Court must find that: "(1) the prior conviction was for a serious offense; (2) the issue at stake in the civil proceeding is identical to the issue raised in the prior criminal proceeding; (3) there was a full and fair opportunity to litigate the issue at the prior trial; and (4) the issue on which the prior conviction is offered was actually litigated and necessarily decided at trial." *Stein*, 906 F.3d

---

[4] The Court will begin its analysis with the criminal conviction. Because the Court will find that Defendant Milton's criminal conviction for securities fraud prevents him from litigating his civil liability, the Court will not assess the preclusive effect of the arbitration or bankruptcy proceedings.

at 828 (citing *Ayers v. City of Richmond*, 895 F.2d 1267, 1271 (9th Cir. 1990)).

As to the second prong, four factors are used to determine whether issues are identical:

> (1) Is there a substantial overlap between the evidence or argument to be advanced in the second proceeding and that advanced in the first?
>
> (2) Does the new evidence or argument involve the application of the same rule of law as that involved in the prior proceeding?
>
> (3) Could pretrial preparation and discovery related to the matter presented in the first action reasonably be expected to have embraced the matter sought to be presented in the second?
>
> (4) How closely related are the claims involved in the two proceedings?

*Id.* at 828–29.

**1. Evidence in Criminal Case**

Lead Plaintiffs argue that Defendant Milton's conviction for securities fraud, in violation of 15 U.S.C. §§ 78j(b), 78(ff) and 17 C.F.R. § 240.10b-5 and for wire fraud collaterally estop him from challenging his liability for the securities fraud claim in Count One. (Doc. 316-1 at 13; Doc. 317 at 2–3, ¶ 4). A criminal indictment against Defendant Milton was unsealed on July 28, 2021, charging Defendant Milton with two counts of securities fraud and one count of wire fraud. (Doc. 318-4). The superseding indictment in the criminal case, returned on June 22, 2022, alleged that Defendant Milton violated 15 U.S.C. §§ 78j(b), 78(ff) and 17 C.F.R. § 240.10b-5 by "(a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in a scheme to defraud investors in Nikola through false and misleading statements regarding the company's product, technology, and business development." (Doc. 318-5 at 2–3). Defendant Milton was charged with two counts of securities fraud and two counts of wire fraud. (Doc. 318-5).

The Government's evidence at the four-week trial "focused on 'four big categories'

of Defendant Milton's misstatements: that the Nikola One was 'fully functioning;' that 'his company was producing hydrogen;' that Nikola had binding 'orders for his trucks;' and that Nikola 'had built the badger truck.'" (Doc. 360 at 11 (citing Doc. 360-2 at 8–9; Doc. 360-3 at 4–5)). As to the first category of misstatements regarding the Nikola One, evidence was presented at trial that Nikola misrepresented through a press release that "Nikola One truck achieves zero emissions" with a quote from Defendant Milton stating in part, "to have the ability to achieve true zero emissions is revolutionary for the worldwide trucking industry." (Doc. 318-6 at 3–6). There was also evidence presented of Defendant Milton stating that the Nikola One was fully functioning and "not a pusher," when the truck was not fully completed or functioning. (Doc. 318-6 at 25, 31). Evidence of the "Nikola One in Motion" video was also presented, which depicted the Nikola One truck as if it was fully operational and driving, when it had been towed to the top of a hill and was rolling down the hill. (Doc. 318-6 at 35–36, 37–41).

As to the second category of misstatements regarding the company's production of hydrogen, evidence was presented regarding Defendant Milton's statements that Nikola had reduced the cost of hydrogen from $16 per kilogram to below $4 per kilogram. (Doc. 319-2 at 10, 29, 33; Doc. 320–9 at 15–16, 21–22, 26, 27, 30; Doc. 321-8 at 16–17; Doc. 322-6 at 6, 8–9, 13). There was also evidence presented of Defendant Milton's statements and the company's press releases about Nikola's development of hydrogen fueling stations and use of federal electricity transmission lines. (Doc. 319-2 at 10, 15–16, 18–22, 30–31; Doc. 320-9 at 12–13).

Next, there was evidence presented that Defendant Milton misrepresented the number of binding orders for Nikola products. For example, evidence was presented that Defendant Milton stated in an interview that there was a "five-year backlog of production" for orders. (Doc. 319-2 at 26). In addition, there was evidence that Defendant Milton stated on a podcast that there were "billions and billions of dollars in orders" when, in reality, there were no binding contracts, only nonbinding reservations. (Doc. 319-2 at 32; Doc. 320-1 at 15; Doc. 321-8 at 20–21).

The last major category of misstatements relates to the Badger pickup truck. There was evidence of a press release for the Badger truck, which stated that it would be available in fuel-cell electric or battery-electric, could accelerate from zero to sixty miles per hour in 2.9 seconds, could generate 906 horsepower, 980 pounds of torque, and had an estimated 600-mile range. (Doc. 320-1 at 17–20). Evidence was presented of Defendant Milton's tweets, which stated that the "[s]pecs" for the Badger truck were "dead on" and a prototype was "already" produced, when in fact there was not a physical prototype. (Doc. 320-1 at 21, 44). Other evidence related to Defendant Milton's tweets about the hydrogen trucks producing drinking water. (Doc. 320-1 at 45–53).

**2. Jury Verdict**

The Court instructed the jury on the elements of all the counts in the indictment. (Doc. 323-4 at 8–26). As to Count One, Securities Fraud under Title 15, the Court instructed the jury that "Count One alleges that from November 2019 through September 2020, Mr. Milton devised a scheme to defraud investors in his company, Nikola, through false and misleading statements regarding the company's product, technology, and business development." (*Id.* at 9). As the Court instructed, Count One required proof of the following elements:

> First, that in connection with the purchase or sale of securities, Mr. Milton did any one or more of the following: (1) employed a device, scheme, or artifice to defraud, or (2) made an untrue statement of a material fact or omitted to state a material fact which made what was said, under the circumstances, misleading, or (3) engaged in an act, practice, or course of business that operated, or would operate, as a fraud or deceit upon a purchaser or seller; Second, that Mr. Milton acted knowingly, willfully, and with an intent to defraud; and Third, that in furtherance of the fraudulent conduct, there occurred at least one use of any means or instruments of transportation or communication in interstate commerce, or the use of the amils, or the use of any facility of any national securities exchange.

(*Id.* at 10). The jury found that Defendant Milton was guilty as to Count One, securities fraud under Title 15, and as to wire fraud under Counts Three and Four. (Doc. 323-4 at 53). The jury found that Defendant Milton was not guilty as to Count Two, securities fraud under Title 18. (*Id.*). The Court sentenced Defendant Milton to 48 months on each count

to be served concurrently, followed by three years of supervised release on each count served concurrently. (Doc. 323-5 at 101).

**3. Civil Claims**

Here, in Counts One and Two of the SCACAC, Plaintiffs bring claims under §10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5. (Doc. 129 at 291). As stated above, Plaintiffs have summarized the alleged violations through "nine categories of representations": (1) "Nikola had developed a fully operational 'zero-emissions' tractor trailer truck powered by hydrogen fuel cell technology—the Nikola One"; (2) Nikola had "over 14,000 purchase orders for its trucks, which represented 2 to 3 years of production and billions in revenue"; (3) Nikola's hydrogen production and refueling stations; (4) "Nikola had developed, using its own technology, a fully operational pick-up truck called the Badger, for which pre-orders had sold out"; (5) Nikola developed "all of its vehicles' critical components 'in-house,'" including an electric battery; (6) the cost of owning Nikola's vehicles would be less than a traditional diesel powered vehicle; (7) "that commercial 'assembly line' production of the Nikola Tre [battery-electric vehicle ("BEV")] truck had already been completed in Ulm, German, and that Nikola had binding orders in hand for its BEV trucks; (8) Nikola's headquarters had solar panels on the roof that produced 18 megawatts of energy per day; (9) "Nikola owned seven natural gas wells that were used as backup to Nikola's solar hydrogen production." (Doc. 129 at 9).

Section 10(b) of the Exchange Act prohibits using or employing, "in connection with the purchase or sale of any security ... [,] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). "To implement Section 10(b), the SEC prescribed Rule 10b-5, which makes it unlawful:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which

> they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

*In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 699 (9th Cir. 2021) (citing 17 C.F.R. § 240.10b-5). "The elements of a private securities fraud action under Section 10(b) and Rule 10b–5 are: '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1206 (9th Cir. 2016) (citing *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804 (2011)).

**4. Analysis**

Defendant Milton does not dispute that the prior conviction was for a serious offense or there was a full and fair opportunity to litigate the issue at the prior trial. (*See* Doc. 353). Having compared the evidence in the criminal case with the issues in this civil action, the Court finds that the issues on which the prior conviction is offered were actually litigated and necessarily decided at the criminal trial. The next question here is whether the issue at stake in the civil proceeding is identical to the issue raised in the prior criminal proceeding. To that end, the Court will consider the four factors used to determine whether an issue is identical: substantial overlap in evidence, application of the same rule of law, the scope of pretrial preparation and discovery, and the relationship between the claims. *Stein*, 906 F.3d at 828–29.

**a. Substantial Overlap in Evidence**

First, there is substantial overlap between the evidence and argument advanced in the criminal case and the current proceedings. Both causes of action are based on the "same fraudulent scheme": Defendant Milton's misrepresentations regarding Nikola's zero-emissions vehicles and the technology behind them. *See Stein*, 906 F.3d at 830. As is described above, this private securities fraud action is based on nine categories of statements, while the criminal prosecution was based on only four: that the Nikola One was

fully functioning, Nikola's hydrogen production, the Badger having been built, and the backlog of orders. This action is also based, in large parts, on those misrepresentations. (Doc. 129 at 9–13).

Defendant Milton argues that because the Complaint here "is based on a much broader scope of alleged conduct and much larger number of alleged misstatements than was at issue in the indictment," collateral estoppel does not apply. (Doc. 353 at 11). Defendant Milton is correct that the SCACAC also includes allegations relating to misstatements on which evidence was not presented at the criminal trial, including misstatements surrounding Nikola's production of vehicle components and the vehicles themselves, the overall cost of ownership of a Nikola vehicle, Nikola's use of solar panels, and Nikola's ownership of gas wells. (Doc. 129 at 14–15). But the fact that the civil complaint includes additional facts on top of those litigated at trial does not mean that collateral estoppel cannot apply. The focus of the inquiry is whether the *issues* were previously litigated. *SEC v. Heart Tronics, Inc.*, SACV 11-1962 JVS (ANx), 2015 WL 13343180, at *4 (C.D. Cal. Feb. 18, 2015). "The presence of allegations in the Complaint that were not previously litigated cannot defeat the summary judgment motion when the SEC is arguing that at a minimum the issues decided at the criminal proceeding establish [Defendant's] civil liability." *Id.* Therefore, although there are additional factual allegations presented in the civil complaint, there is still substantial overlap between the evidence and argument in the criminal case and the civil proceedings.[5]

**b. Rule of Law**

Second, the new evidence and argument involve the application of the same rule of

---

[5] Defendant also argues in that the criminal case involved "a more expansive [time] period" than this case, and one third of the alleged misstatements on which evidence was presented during the criminal trial "occurred before the Class Period in this case." (Doc. 353 at 11 n.5). Indeed, Plaintiffs' claims are also based, in part, on statements made before the beginning of the class period, dating back to July 1, 2016, as the Court explained in its February 2, 2023 Order. (Doc. 126). This further shows the overlap of evidence in the two cases.

law as the conviction in the criminal proceedings. In the criminal case, Defendant Milton was found guilty of securities fraud under 15 U.S.C. §§ 78j(b) ("Section 10(b)), 78ff, 17 C.F.R. § 240.10b-5 (Rule 10b-5), and 18 U.S.C. § 2. (Doc. 323-4 at 53; Doc. 318-5 at 3). Plaintiffs bring civil claims in this action under the same cause of action, Section 10(b) and Rule 10b-5. (*See* Doc. 129). Thus, the same rule of law applies. *See Cartmill v. Sea World, Inc.*, No. 10cv361-CAB (DHB), 2012 WL 13175846, at *6 (S.D. Cal. July 15, 2012) ("The same rule of law will be applied in both cases because Plaintiff's claims of constitutional violation . . . are both based on 42 U.S.C. section 1983); *SEC v. Alexander*, 115 F. Supp. 3d 1071, 1080–81 (N.D. Cal. 2015) ("Defendants' criminal convictions for violation Section 10(b) and Rule 10b-5 therefore estop Defendants from denying liability as to Plaintiff's 10(b) and Rule 10b5 claims in the instant [civil] action."); *SEC v. McCaskey*, No. 98 CIV. 6153 (SWK), 2001 WL 1029053, at *3 (S.D.N.Y. Sept. 6, 2001) ("With respect to the S.E.C.'s claim involving Section 10(b) and Rule 10-5, the fact that [Defendant] allocuted to these very offenses in his criminal prosecution has a binding estoppel effect against him in the instant civil action.").

Defendant Milton also asserts that the "jury received only a general question on the verdict form of whether Mr. Milton was guilty of Count One," which did not "identify any specific statements or acts by Milton that formed the basis for the jury's findings on any count." (Doc. 353 at 12–13). But the fact that the jury returned a general verdict form does not mean that the Court cannot determine whether collateral estoppel applies. "[W]hen a jury returns a general verdict a court may determine what was necessarily decided by the criminal judgment 'upon an examination of the record, including the pleadings, the evidence submitted, [the jury instructions], and any opinions of the court." *Heart Tronics*, 2015 WL 13343180, at *3. Through its examination of the record here, the Court determines that the same rule of law applies.

On a similar note, Defendant asserts "that the elements and legal standards of the criminal charges in the indictment are not the same that Plaintiffs are required to prove for their private securities fraud claim under Section 10(b)." (Doc. 353 at 11). Specifically, he

argues that "the jury in the Criminal case was not instructed . . . about a need to find reliance by investors on false or misleading statements of material fact allegedly made by Milton, or the need to show that Milton's statements caused economic loss, or loss causation for the damages that Plaintiffs seek in this action." (*Id.* at 13). The parties' arguments about the element of reliance will be addressed later in this Order. As to loss causation, Plaintiffs argue that Judge Ramos, who presided over the criminal trial, already found that Defendant Milton's false statements caused investor losses, and that finding should be given preclusive effect. (Doc. 260 at 17–18).

During the sentencing hearing, the Honorable Judge Ramos stated, "[I]n terms of calculating the guidelines, as I determine, I do find that the government met the standard by a preponderance of establishing the loss." (Doc. 323-5 at 92). He further explained, "I am relying on the testimony that was provided during the trial, and I'm relying on the incontrovertible fact that on September 9, the company was worth one figure and on September 10, it was worth a much lower figure." (*Id.* at 93). Plaintiffs summarize the evidence presented at trial stating that both the Government and Defendant Milton provided evidence of Nikola's stock price to argue whether there was loss as a result of the misstatements. (Doc. 317 at 3, ¶ 7). During the trial, Defendant Milton offered expert testimony that "the statements at issue by Mr. Milton" did not cause Nikola's stock price to move during the public period. (Doc. 322-9 at 15). The Government, on the other hand, submitted testimony from Special Agent Penland who did not "look into what caused the price movements" but testified about "observations of the movement" with respect to certain of Defendant Milton's misstatements and the Hindenburg Report. (Doc. 322-9 at 7–9).

As Plaintiffs point out, Judge Ramos raised this issue during sentencing with respect to the loss amount calculation. (Doc. 323-5 at 90–93). He found that "in terms of calculating the guidelines," the Government "met the standard by a preponderance of establishing the loss," which the Government estimated to be $600 million. (*Id.* at 91–92). Judge Ramos reached this conclusion after argument was heard from both sides on the

issue of loss calculation. (Doc. 323-5 at 5–26). During the argument, the Court noted the decline in value after the Hindenburg report and Nikola's press release, stating that "it's a significant diminution in market capitalization for a $16 billion company, and to suggest that no loss resulted seems untenable. And, by the way, that's what the jury concluded, right? Because Mr. Ferrell presented his findings to the jury. He said there was no loss. And the jury clearly, as they were entitled to, determined that there was a loss." (*Id.* at 15). Judge Ramos accepted the Government's estimation of loss for the purposes of the guidelines range calculation. (*Id.* at 26).

Defendant Milton argues that it is improper to give preclusive effect to statements made during sentencing. (Doc. 353 at 14). "[F]indings made in a criminal sentencing proceeding ordinarily should not have preclusive effect in a subsequent civil case." *Maciel v. C.I.R.*, 489 F.3d 1018, 1024 (9th Cir. 2007). To determine whether findings may have preclusive effect, the main inquiry "is whether the parties had a full and fair opportunity to litigate the merits of the [the issue] during the sentencing hearing." *Id.* at 1023 (internal quotations and citation omitted). To that end, the Court must consider whether "procedural opportunities unavailable in the first action . . . could readily cause a different result in the second action" and "the parties' incentives to litigate" the issue in the sentencing hearing. *Id.* (internal quotations and citations omitted).

Judge Ramos made the findings above during the sentencing hearing to support the loss calculation. Although the Judge heard oral argument on loss and ultimately found that the Government supported its loss calculation by a preponderance during the sentencing hearing, the Judge's determination referenced the evidence presented at trial, including Defendant Milton's expert testimony that there was no loss causation. In other words, though the Judge made these findings explicitly on the record during sentencing, the findings were based in part on evidence presented during the trial. It appears that loss causation was litigated both at trial and at sentencing, where Defendant Milton had an incentive to litigate the issue because it impacted the length of the sentence imposed. In addition, Defendant does not argue that there are procedural opportunities that he was not

afforded during the criminal trial that would cause a different result, and none are apparent. (Doc. 353 at 14–15). Judge Ramos's findings illustrate that loss causation was litigated at trial, so the Court does not find that the issues are not identical because of the need to prove loss causation in the instant case. Thus, the Court does not agree with Defendant Milton's argument that the difference between elements in the criminal and civil claims means that the same rule of law does not apply. *See Alexander*, 115 F. Supp. 3d at 1080–81; *McCaskey*, 2001 WL 1029053, at *3.

**c. Pretrial Preparation and Relationship between the Claims**

Lastly, the scope of pretrial preparation and discovery in the criminal proceeding, as well as the relationship between the claims, support the conclusion that the issues are identical. The criminal case involved the same fraudulent scheme as this case, and there is a large overlap in facts. Thus, the "pretrial preparation and discovery related to the criminal proceeding could 'reasonably be expected' to have embraced the issues sought to be presented in the [plaintiffs'] civil case." *Stein*, 906 F.3d at 830. There are no significant issues presented in Plaintiffs' private securities fraud claim that would fall outside the scope of preparation for the criminal securities fraud charges. In addition, as the Court has already discussed, the claims are closely related. They are based off of largely the same conduct by Defendant Milton. The main difference here is that Plaintiffs bring claims to recover for their losses, whereas the criminal case penalized Defendant's conduct.

**d. Conclusion**

All four factors weigh toward a finding that the issues in the criminal case and the instant case on which summary judgment is being sought are identical. Having found that the prior conviction was for a serious offense, the issues are identical, there was a full and fair opportunity to litigate the issue at the criminal trial, and the issue was actually litigated and necessarily decided at that trial, collateral estoppel applies based on the criminal conviction. However, the Court will still consider whether issues of fairness should prevent the application of collateral estoppel.

**5. Potential Shortcomings and Unfairness**

Defendant also argues, and the Court must consider, whether "potential shortcomings or indices of unfairness" preclude the application of collateral estoppel. (Doc. 353 at 16–18). These considerations include determining whether:

> (1) "the plaintiff had the incentive to adopt a 'wait and see' attitude in the hope that the first action by another plaintiff would result in a favorable judgment" which might then be used against the losing defendant; (2) the defendant had the incentive to defend the first suit with full vigor, especially when future suits are not foreseeable; (3) one or more judgments entered before the one invoked as preclusive are inconsistent with the latter or each other, suggesting that reliance on a single adverse judgment would be unfair; and, (4) the defendant might be afforded procedural opportunities in the later action that were unavailable in the first "and that could readily cause a different result."

*Syverson v. Intern. Bus. Machines Corp.*, 472 F.3d 1072, 1079 (9th Cir. 2007) (citing *Parklane*, 439 U.S. at 330–31). Defendant argues that the application of collateral estoppel would be unfair because of the general jury verdict form, the fact that he was acquitted of securities fraud under Title 18, judicial economy, and the Presidential pardon of his criminal conviction. (Doc. 353 at 16–18).

First, the Court has already addressed why the general verdict form does not prevent the application of collateral estoppel. The Court has carefully considered the issues necessarily decided in the previous outcome, as well as the evidence presented in the criminal case, and does not find that collateral estoppel is unfair on that basis. Second, Defendant argues that he should not be estopped from litigating the securities fraud claim under Title 15 in this case because he was not found guilty of securities fraud under Title 18 in the criminal case. (Doc. 353 at 17). He asserts that the difference in verdicts "raises serious concerns about what the jury actually decided." (*Id.*).

The Court must consider whether inconsistent judgments suggest that "reliance on a single adverse judgment would be unfair." *Syverson*, 472 F.3d at 1072. But here, there are not two disparate judgments before the Court; only one criminal case in which Defendant Milton was convicted on one count of securities fraud and acquitted on the other.

Even so, the Court does not find that the acquittal on securities fraud under Title 18 makes the application of collateral estoppel unfair. Though Defendant raises doubt about "what the jury actually decided," it is clear that the jury determined that Defendant Milton was guilty under Count One. With no additional argument before it, the Court is not inclined to speculate as to why the jury found Defendant guilty on one count versus another. The jury found Defendant Milton guilty for securities fraud under Title 15. That he was not found guilty on another count does not mean it is unfair to apply collateral estoppel.

Third, Defendant Milton argues that collateral estoppel would be prejudicial because the claims cannot be completely resolved through its application, and leaving issues disputed would risk prejudice and confusion. (Doc. 353 at 17). In light of the analysis above, the Court does not find that the application of collateral estoppel would lead to an "unfair windfall" nor will any claims be left partially resolved. To the extent that reliance through collateral estoppel, the Court still finds that Plaintiffs are entitled to summary judgment on reliance, as will be explained in the next section. Thus, the Court finds that the risk of future confusion is minimal here.

Fourth, Defendant argues that the "full and unconditional pardon that Milton received from President Trump on March 27, 2025 provides an additional basis" to decline to apply collateral estoppel. (Doc. 353 at 17). President Trump granted Defendant Milton a full and unconditional pardon, which states that Defendant Milton was granted clemency "[f]or those offenses against the United States individually enumerated and set before me for my consideration and remission of any and all fines, penalties, forfeitures, and restitution ordered by the court." (Doc. 354-2 at 2). The President has the "Power to grant Reprieves and Pardons for Offenses against the United States, except in Cases of Impeachment." U.S. CONST., Art. II, § 2, cl. 1. But pardons do "not erase a judgment of conviction, or its underlying legal and factual findings." *United States v. Arpaio*, No. CR-16-01012-001-PHX-SRB, 2017 WL 4839072, at *1 (D. Ariz. Oct. 19, 2017) (citing *United States v. Cromwell*, 374 F.3d 790, 794 (9th Cir. 2004)). "[T]he granting of a pardon is in no sense an overturning of a judgment of conviction by some other tribunal." *Nixon v.*

*United States*, 506 U.S. 224, 232 (1993). Instead, an absolute pardon "releases the wrongdoer from punishment and restores the offender's civil rights without qualification." *Pardon*, BLACK'S LAW DICTIONARY (12th ed. 2024).[6] Though the pardon releases Defendant Milton from the punishment associated with his criminal conviction, there is no authority before the Court supporting a finding that the full and unconditional pardon at issue here erases the issue litigated and determined by the jury in the criminal case.[7]

Having considered the fairness factors and Defendant Milton's arguments, the court does not find that it is unfair to apply collateral estoppel to the Section 10(b) claim against Defendant Milton.

**B. Reliance**

Next, Plaintiffs argue that they are entitled to summary judgment on the element of reliance against Defendant Milton. (Doc. 316-1 at 24–28). The parties have extensively briefed the issue of reliance. Even though the Court has already found above that collateral estoppel applies, the Court will still address the parties' arguments as to reliance.

Plaintiffs assert that the Court has already found at the class certification stage that Plaintiffs are entitled to a presumption of reliance under a fraud-on-the-market theory, and that the undisputed evidence shows that the misrepresentations affected the market price and they would not have bought or sold the stock had they known about the fraud. (*Id.*). Indeed, in its January 6, 2025 Order on Class Certification, the Court found that Plaintiffs are entitled to a fraud-on-the-market presumption of reliance. (*See* Doc. 224). The

---

[6] Defendant argues that President Trump's statements at a press conference relating to the pardon show that the pardon was based on innocence. (Doc. 353 at 17; Doc. 354-3 at 2). Those statements do not change the law as summarized above nor the language of the pardon itself, and the Court has not been presented with authority empowering it to consider such statement in this analysis.

[7] Plaintiffs ask the Court to give preclusive effect to the Bankruptcy Court's determination that the presidential pardon does not establish Defendant Milton's innocence. (Doc. 316-1 at 22–23). Having independently determined that the Presidential Pardon does not negate the legal and factual issues litigated and decided at the trial, the Court need not decide whether to give preclusive effect to the Bankruptcy Court's findings on this subject. (*See* Doc. 326-1 at 11–15).

presumption is founded on the theory that "in a modern and efficient securities market, the market price of a stock incorporates all available public information. Therefore, any person who trades shares relies on the integrity of the market price." *No. 84 Emp.–Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 947 (9th Cir. 2003) (Tallman, J., dissenting) (citations omitted).

In order to demonstrate that the presumption applies in a given case, Plaintiffs must show "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268 (2014) ("Halliburton II"). The parties contested the third factor, whether the stock was traded in an efficient market. Upon review, the Court found that Nikola stock traded in an efficient market through the Class Period and that Plaintiffs were, therefore, entitled to a presumption of reliance. (Doc. 224 at 22). Further, the Court found that Defendants did not rebut the presumption at that stage. (*Id.* at 25).

Now, Defendant Milton argues that Plaintiffs are not entitled to summary judgment on reliance because "[i]t is just a presumption, and Milton is entitled to present evidence at trial to rebut it." (Doc. 353 at 18). Specially, Defendant Milton asserts that he "has developed new evidence" through retained expert Laurel Van Allen that rebuts the presumption of fraud-on-the-market reliance by showing that "the market did not respond to—or view as material—the Alleged Misstatements." (*Id.* at 19). Defendant Milton states that Ms. Van Allen's report includes "an exhaustive analysis of intraday stock price movement," which the previous expert at the class certification stage did not do, and analyzes the "market commentary regarding Nikola." (Doc. 354 at 55–56).

"Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance." *Basic Inc. v. Levinson*, 485 U.S. 224, 248 (1988). "[F]or example, if a defendant could show that the alleged

misrepresentation did not, for whatever reason, actually affect the market price, or that a plaintiff would have bought or sold the stock even had he been aware that the stock's price was tainted by fraud, then the presumption of reliance would not apply." *Halliburton II*, 573 U.S. at 269. Here, Defendant Milton's new expert report appears to challenge price impact. The Supreme Court has observed that "[i]n most securities-fraud class actions . . . the plaintiffs and defendants submit competing expert evidence on price impact." *Goldman Sachs Grp., Inc. v. Arkansas Teacher Retirement Sys.*, 594 U.S. 113, 127 (2021). To rebut a presumption, a defendant must do more than "merely . . . offer evidence that, if believed, would support a finding of a lack of price impact." *Id.* at 125 (internal quotations and citations omitted). Instead, a defendant "must in fact sever the link between a misrepresentation and the price paid by the plaintiff—and a defendant's mere production of *some* evidence relevant to price impact would rarely accomplish that feat." *Id.* at 125–26 (internal quotations and alterations omitted).

Here, Defendant Milton has not provided evidence sufficient to establish a genuine dispute of material fact and rebut the presumption of reliance established at class certification. Defendant Milton suggests that Ms. Van Allen's intraday stock price movement analysis and assessment of market commentary regarding Nikola during the class period support her conclusion that the market "did not respond to—or view as material—the Alleged Misstatements." (Doc. 354 at 56). But Defendant Milton does not make efforts to explain how the findings in the expert report actually sever the link between the misstatements and the market price.[8] (*See* Docs. 353, 354). The United States Supreme Court has instructed that a defendant must do more than merely point to an expert position supporting their stance to rebut the presumption. *See Goldman Sachs*, 594 U.S. at 125–27. Having offered no other arguments as to why Plaintiff is not entitled to summary judgment

---

[8] Defendant cites to Figures 4–14 in the report without explaining how they show that the market did not respond to the alleged misrepresentations. (Doc. 353 at 19, n.8). Defendant also cites to the report and the expert report in full. (*Id.* at 19). It is not the role of the Court to look through the reports and search for information that creates a dispute of fact.

on the issue of reliance, Defendant has not provided evidence to show that there is a genuine dispute of material fact as to the element of reliance. Because Plaintiffs have shown that there is no genuine issue of material fact as to their showing of fraud-on-the-market reliance and Defendant Milton's inability to rebut the presumption, they are entitled to summary judgment on the issue of reliance.

## II. DEFENDANT MILTON'S MOTION FOR SUMMARY JUDGMENT

In his Motion for Summary Judgment, Defendant Milton moves for summary judgment on the claims against him under Section 10(b), Section 20(a), and Rule 10b-5, because Plaintiffs cannot prove loss causation. (Doc. 333). Having already determined that Defendant Milton is collaterally estopped from challenging the Section 10(b) claim, the Court will not address Defendant Milton's loss causation argument. In addition, Defendant Milton does not make any arguments unique to the other claims against him—he only argues that they should be dismissed because the Section 10(b) claim fails. Accordingly, the Motion for Summary Judgment will be denied.

Having granted Plaintiffs' Motion for Summary Judgment and accordingly denied Defendant Milton's Motion for Summary Judgment, the Court will consider the remaining Defendants' Motions for Summary Judgment.

## III. DEFENDANT UBBEN'S MOTION FOR SUMMARY JUDGMENT

Defendant Ubben first argues that the claims against him are barred by the statute of limitations, and therefore, he is entitled to summary judgment. (Doc. 328 at 10–17). Defendant Ubben identifies the three alleged misstatements attributed to him, which surround the stated backlog of fuel-cell electric vehicle reservations, the Badger pick up truck, and the Nikola one. (*Id.* at 8). These statements were included in the June 15, 2020 and July 17, 2020 Form S-1 Registration Statements submitted to the SEC. (*Id.*).

In his Motion to Dismiss, Defendant Ubben argued that the claims against him are barred by the statute of limitations, and he reiterates those arguments now on summary judgment. In the Motion to Dismiss, Defendant Ubben asserted that the claims against him are based on statements made before April 3, 2021, the operative date for the statute of

limitations. (Doc. 157 at 9 (citing Doc. 142 at 8–9)). Plaintiff claimed that they did not discover the requisite facts for stating a claim against him until the derivative complaints were unsealed on April 4 and 14, 2022. (*Id.* (citing Doc. 148 at 6)). Drawing inferences in favor of the nonmoving party, the Court determined that it was possible Plaintiff was not aware of Defendant Ubben's involvement until the complaints were unsealed. (*Id.*). Now, Defendant Ubben asserts that "subsequent discovery definitively disproves this 'possibility.'" (Doc. 364 at 6).

**A. Legal Standard**

Under 28 U.S.C. § 1658(b)(1), plaintiffs have "2 years after the discovery of the facts constituting the violation" to bring a claim. The United States Supreme Court has clarified this language stating that "the limitations period in § 1658(b)(1) begins to run once the plaintiff did discover or a reasonably diligent plaintiff would have 'discover[ed] the facts constituting the violation'—whichever comes first." *Merck & Co. v. Reynolds*, 559 U.S. 633, 653 (2010) (quoting § 1658(b)(1)). Whether plaintiffs should have discovered the requisite facts may be decided as a matter of law only when "uncontroverted evidence irrefutably demonstrates plaintiff discovered or should have discovered the fraudulent conduct." *Kramas v. Security Gas & Oil Inc.*, 672 F.2d 766, 770 (9th Cir. 1982), cert. denied, 459 U.S. 1035.

In *York County on Behalf of County of York Retirement Fund v. HP, Inc.*, the Ninth Circuit held that awareness of potential misstatements by company executives was insufficient on its own to show that a plaintiff should have "discovered" their claim for statute of limitations purposes. 65 F.4th 459, 468 (9th Cir. 2023). In that case, plaintiffs brought securities fraud claims based on allegedly fraudulent statements by company executives which occurred more than two years before they filed their claim. *Id.* at 461. The court held that simply because the plaintiffs were aware of the statements did not necessarily mean they were aware of their potential falsity. *Id.* at 467 ("Without additional information, these statements seem like standard assurances to shareholders; they could not form the basis of a claim for securities fraud."). Thus, for the purposes of "discovering"

their claim, the plaintiffs required additional information, and the statute of limitations had not yet begun to run. *Id.* The Ninth Circuit explained that there are two ways to show that a claim is barred by § 1658(b)(1). *Id.* "First, [the defendant] can show that [the plaintiff] could have pleaded its claim based solely on things that it knew or should have known prior to the critical date." *Id.* Second, in the alternative, the defendant can show that the evidence that arose after the critical date "provided no information necessary to [the plaintiff's] claim." *Id.*

**B. Analysis**

Plaintiff filed their SCACAC on April 3, 2023, which makes April 3, 2021, the outer limit of the statute of limitations. (Doc. 129). Defendant Ubben argues that he is entitled to summary judgment "because Plaintiffs had the information necessary to plead their claims more than two years before the SAC was filed." (Doc. 328 at 11). He makes three arguments in support of this assertion: (1) the unsealed derivative lawsuits did not contain new information; (2) Lead Plaintiffs testified at a deposition that they did not learn anything new based on the derivative complaints; and (3) Plaintiffs had sufficient information to bring claims against Defendant Ubben prior to April 3, 2021. (*Id.* at 11–12). Through all these arguments, Defendant Ubben asserts that Plaintiffs had enough information to plead the claims against him prior to April 3, 2021.

First, Defendant Ubben asserts that the Board meeting minutes, which were revealed when the derivative complaints were unsealed, do not "provide any information on 'what Ubben knew' with respect to the three alleged misstatements presently before the Court." (Doc. 329 at 2; Doc. 328 at 12–14). On the other hand, Plaintiffs assert that they could not have pled scienter as to Defendant Ubben until the Board meeting minutes were revealed when the derivative complaints were unsealed. (Doc. 343 at 13–14). However, in response, Plaintiffs do not argue that there is any evidence in the Board minutes related to Defendant Ubben's misstatement about the backlog of fuel-cell electric vehicle reservations. (Docs. 343, 345). Therefore, Defendant Ubben has shown that nothing in the minutes was necessary to plead the claim against him regarding that alleged misstatement.

Defendant Ubben also asserts that there were no new facts about the Nikola One in the Board meeting minutes, and Plaintiffs do not cite evidence to show that Defendant Ubben was made aware of a lack of plans for the Nikola One at the April 9, 2020 Board meeting. (Docs. 328, 364). Plaintiffs cite to the Court's Order on the Motions to Dismiss for the premise that "without the Board minutes," they could not have pled that "Ubben was made aware of the lack of production plans for the Nikola One on April 9, 2020" or that "the Badger was a concept only." (*Id.* at 14). In their controverting Statement of Facts, Plaintiffs cite to the SCACAC (Doc. 129) for the premise that the unsealed derivative complaints revealed new facts about Defendant Ubben's knowledge. (Doc. 345 at 2). But Plaintiffs do not actually cite any evidence in the record to support the assertion that Defendant Ubben learned about "the lack of production plans for the Nikola One" at the April 9, 2020 Board meeting. (Doc. 343 at 14).[9] Thus, Defendant Ubben has shown that the Board meeting minutes did not provide new information necessary to the claim against him regarding the Nikola One.

The only evidence Plaintiffs do identify in the Board meeting minutes is that at the April 9, 2020 Board meeting, there was a "'Nikola Badger' update stating that '[w]ithout an OEM partner, the Company will discontinue Badger development' and that Nikola 'plans to rely on 3rd party engineering firms to build the Alpha trucks." (Doc. 345 at 2–3) (citing Doc. 329-3 at 38). The notes state the following as to the Nikola Badger: "Continuation of the project depends on Nikola finding an OEM partner" and "without an OEM partner, the Company will discontinue Badger development." (Doc. 329-3 at 38). But Defendant Ubben points out that this information was "explicitly disclosed in the Forms S-1," which were signed by Defendant Ubben and had long been publicly available. (Doc. 364 at 7) (citing Doc. 111-1 at 91 ("At this time . . . we do not expect to develop

---

[9] Plaintiffs do not dispute Defendant Ubben's Statement of Fact Number 4, which states that the "April 9, 2020 Board meeting materials and unsealed complaints state that the Nikola Board learned that Nikola did not expect to have any physical hydrogen infrastructure built or operational until after September 30, 2020." (Doc. 345 at 3).

production plans for the Badger unless we enter into a strategic partnership with an established OEM.”)). Given that this information was already available, it is unclear how any information in the meeting minutes was necessary for Plaintiffs to plead their claim against Defendant Ubben with respect to the misstatements about the Badger. Therefore, Plaintiffs have not controverted Defendant Ubben’s showing that nothing in the minutes was necessary to plead the claims against him.

### C. Conclusion

In sum, at the Motion to Dismiss stage, the Court found that Defendant Ubben had not shown that “Plaintiff was on notice” of the claims, in part because “it [was] possible that Plaintiff was not aware of Defendant Ubben’s alleged involvement until the derivative complaints were unsealed.” (Doc. 157 at 10). But now, on summary judgment, Plaintiffs have not controverted Defendant Ubben’s showing that nothing in the derivative complaints and meeting minutes was necessary to support the claims against him. Defendant Ubben also argued that Plaintiffs had sufficient information to bring claims against Defendant Ubben prior to April 3, 2021 and that the Lead Plaintiffs admitted that they did not discovery anything new from the unsealing of the complaints. Having found that the unsealed derivative complaints “provided no information necessary” to the claims against Defendant Ubben, the Court need not address those arguments. Therefore, Defendant Ubben is entitled to summary judgment because the claims against him are time-barred.

## IV. DEFENDANTS RUSSELL AND BRADY’S MOTION FOR SUMMARY JUDGMENT

Next, Defendants Mark Russell and Kim Brady move for summary judgment on all of Plaintiffs’ claims against them. (Doc. 331). First, they assert that the Section 10(b) claims against them fail based on a maker liability theory because Plaintiffs cannot show falsity, scienter, or loss causation. (*Id.* at 2–10). Defendants Russell and Brady also argue that Plaintiffs cannot prevail on a scheme liability theory as to them. (*Id.* at 13–16). Finally, they argue that Plaintiffs cannot establish control person liability against them. (*Id.* at 16–

19). The Court will address each argument in turn.

**A. Section 10(b) Claim**

**1. Falsity**

Defendants Russel and Brady assert that Plaintiffs cannot prove that the statements in the Analyst Day content or the SEC filings were false or misleading when made, in light of all the information available to the market. First, as to the Analyst Day video and presentation, Defendants assert that the statements made were not misleading in context because there were "simultaneous and consistent disclosures explaining that the headquarters facility was a storage and dispensing station, not a production site." (Doc. 331 at 4). In the Analyst Day video, Defendant Russell is shown in the demonstration hydrogen station stating that the Nikola Two truck "uses hydrogen fuel cells and that 'the only byproduct of this exchange is water which is what we started with when we made the hydrogen.'" (Doc. 332 at 8). The truck in the video had already been fueled, and Defendants assert that the video was staged to demonstrate fueling, including a shot where Dale Prows was "holding a nozzle at the truck's fueling port." (*Id.*). Defendants assert that the fueling station stored and dispensed hydrogen, though "it experienced downtime," and the tour for the analysts "made clear the site was a storage and dispensing station only," and it was not used for production of hydrogen. (*Id.*). Defendants also highlight that "[c]ontemporaneous SEC filings made clear that it did not expect the planned hydrogen fueling stations 'to be operational until 2022 or later.'" (Doc. 359 at 3).

In response, Plaintiffs assert that Defendants' statements, including Defendant Russell's statement that "we made the hydrogen," were misleading because Defendants did not produce hydrogen, and even the disclaimer that the demonstration station only stored and dispensed hydrogen was false. (Doc. 341 at 14). In addition, Plaintiffs argue that the statements were particularly misleading in light of Defendant Milton's claims that Nikola produced hydrogen. (*Id.* at 12).

"Generally, 'whether a public statement is misleading, or whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact.'" *SEC v.*

*Todd*, 642 F.3d 1207, 1220 (9th Cir. 2011) (citing *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995)). "Accordingly, resolving an issue as a matter of law is only appropriate when the adequacy of the disclosure is 'so obvious that reasonable minds [could] not differ.'" *Id.* (citations omitted). Considering the "context surrounding the statement," including the "total mix" of information available to the market described by the parties, *Sneed v. Talphera, Inc.*, 147 F.4th 1123, 1131 (9th Cir. 2025), the Court cannot find as a matter of law that the statements during the Analyst Day presentation and video were not misleading.

As to the SEC filings, Defendants Russell and Brady argue that their statements in the SEC filings were accurate. Specifically, they assert that the statements regarding hydrogen production were forward looking statements, indicating that Nikola "intend[ed]" to develop hydrogen fueling stations and produce hydrogen. (Doc. 331 at 4). In addition, Defendants Russell and Brady explain that the June 2020 Form S-1 clarified that the Nikola vehicles were "still in the early stages of development" and the Nikola One production plans were to be announced in the future after the refueling infrastructure was developed. (*Id.* at 5). The June and July 2020 Form S-1's also indicated that the Badger production plans would not be developed without an OEM partner and that the backlog of 14,000 truck reservations were "nonbinding, cancellable expressions of interest with revenue projections based on assumptions." (*Id.*).

The Court cannot find as a matter of law that the statements relating to Nikola One production, the backlog of 14,000 non-binding reservations, and the Badger were accurate and not misleading. As Plaintiffs point out, the Nikola One was represented as one of Nikola's "Zero-Emission Product Offerings." (Doc. 341 at 13; Doc. 331-5 at 84). Defendants argue that the June 2020 Form S-1 "made clear that '[p]roduction plans for the Nikola One will be announced once we have established a robust refueling infrastructure.'" (Doc. 359 at 4 (citing Doc. 331-5 at 85)). But even so, a reasonable jury could find that the fact that the Nikola One was advertised as a product offering with production plans to be announced, was misleading or false, rather than a forward-looking statement.

Similarly, it is possible a jury could find that the information in the SEC filings about the "backlog of over 14,000 FCEVs non-binding reservations" was misleading. (Doc. 331-5 at 89). Defendants assert that the SEC Filings emphasized that the "non-binding reservations" were cancellable and even stated that "[b]ecause all of our reservations are cancellable, it is possible that a significant number of customers who submitted reservations for our trucks may cancel those reservations." (Doc. 359 at 4–5 (citing Doc. 331-5 at 19–20, 89)). But in describing the "Customer Backlog," the June 2020 S-1 also stated that "Nikola believes a significant portion of the existing backlog will be converted into binding orders, once we have fixed production dates for the FCEV trucks as the majority of the order book represents large corporate customers with over 100 or more trucks reserved." (Doc. 331-5 at 89). In light of all these facts, the Court cannot find as a matter of law that the statements in the S-1 about the backlog of non-binding reservations were clearly disclosed as cancellable expression of interest," and therefore were not misleading. (*See* Doc. 359 at 5).[10]

As to the Badger, the Court also cannot find as a matter of law that the statements were not false or misleading. Defendants assert that the June and July Form S-1's disclosed that the Badger production plans would not be developed without an OEM partner. (Doc. 331 at 5). However, the Badger was included in the June S-1 filing as one of the "Zero-Emission Product Offerings," described as "an advanced zero-emission FCEV/BEV hybrid pickup truck," "[u]nlike anything on the market." (Doc. 331-2 at 87). Further, the S-1 filing explained that the Badger "is designed to target and exceed every electric or fossil fuel pickup in its class." (*Id.*). As Defendants assert, the June 202 S-1 also stated that "[a]t this time, we . . . do not expect to develop production plans for the Badger unless we enter into a strategic partnership with an established OEM." (*Id.*). This statement could be interpreted to mean that a prototype or some kind of development existed and it would be ready to

[10] Indeed, Defendants describe the backlog as "cancellable expressions of interest" in their briefing, but do not point to any place in the S-1 filing where they were described as expressions of interest, rather than as reservations. (*See* Docs. 331, 359).

move forward with production once an OEM partnership was established. Defendants also argue that the Badger is described in the S-1 filings as "an 'advanced' pickup concept." (Doc. 359 at 5 (citing Doc. 331 at ¶ 11; Doc. 331-2 at 86–87; Doc. 331-5 at 82–85)). But the cited evidence does not actually describe the Badger as a "concept"; the SEC filings described the Badger as a "an advanced zero-emission FCEV/BEV hybrid pickup truck" that "is designed to target and exceed every electric or fossil fuel pickup in its class" even though Nikola "[did] not expect to develop production plans for the Badger" unless they partnered with an OEM. (Doc. 331-2 at 87; Doc. 331-5 at 85). Defendants Russell and Brady do not meaningfully respond to Plaintiffs' assertion that "at the time the June 2020 S-1 was signed, the Badger pickup truck did not exist aside from a computer-generated rendering of a pickup truck" (Doc. 341 at 16). (*See* Doc. 359). The Court cannot find that no reasonable minds could differ as to whether the statements about the Badger in the SEC filings were misleading.

For these reasons, Defendants Russell and Brady are not entitled to summary judgment based on the falsity element.

**2. Scienter**

Defendants Russell and Brady argue that Plaintiffs cannot prove scienter, and they are therefore entitled to summary judgment. (Doc. 331 at 7). First, they assert that the record establishes a good faith reliance on professionals and that Defendants Russell and Brady followed "rigorous disclosure controls." (*Id.* at 8). Specifically, Defendants state that "Nikola's SEC filings, earnings materials, and major press releases underwent multiple levels of review, including review by Nikola's Chief Legal Officer and outside counsel and incorporated detailed cautionary language on reservations, OEM dependencies, timetable uncertainties, and infrastructure contingencies." (Doc. 332 at 4). They also highlight that the Analyst Day video remarks were scripted. (Doc. 331 at 8). However, Defendants' general assertions that they relied on professional judgment do not establish undisputed good faith or lead the Court to find that "there is no plausible inference to be drawn that Defendants did anything with scienter." *In re REMEC Inc. Secs. Litig.*, 702 F. Supp. 2d

1202, 1238 (S.D. Cal. 2010); *see also Provenz v. Miller*, 102 F.3d 1478, 1489 (9th Cir. 1996) ("Generally, scienter should *not* be resolved by summary judgment."). This is especially true where these Defendants argue, in part, that they relied on each other's professional judgment.[11] In addition, Plaintiffs have presented "significant probative evidence" relevant to intent in the Response, and argue that "nothing in the cited evidence actually shows what processes or personnel Brady and Russell relied on." (Doc. 341 at 20, 17–19).

Second, they argue that the Form S-1 and other SEC filings "disclosed the necessary information," and therefore "cut sharply against any inference that Mr. Russell or Mr. Bray intended to mislead investors." (*Id*. at 8–9). Disclosures of adverse information can negate an inference of scienter. *See In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1425 (9th Cir. 1994) ("The detailed risk disclosure in the Debenture Prospectus negates and inference of scienter"). But for the reasons stated above in the Court's analysis of falsity, the disclosures in the Form S-1's are not so clear as to negate a finding of scienter. Third, Defendants Russell and Brady argue that scienter cannot be proven based on Mr. Milton's statements. (*Id.* at 9). Indeed, "a plaintiff must 'plead scienter with respect to those individuals who actually made the false statements.'" *Blake v. Canoo Inc.*, 807 F. Supp. 3d. 1061, 1083 (C.D. Cal. 2025) (citing *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 745 (9th Cir. 2008)). Even so, Defendants Russell and Brady do not explain on which claims they would be entitled to summary judgment based on liability for Defendant Milton's statements. (Docs. 331, 332).[12]

---

[11] In the Statement of Facts, Defendants write that Defendant Russell, as CEO, "ensured that press releases and public filings were vetted by legal, finance, accounting, and himself[.]" (Doc. 332 at 7, ¶ 20). As to Defendant Brady, they assert that "[w]hen Mr. Milton's public comments raised concerns, Mr. Brady escalated issues to the CEO, the Chief Legal Officer, and the board[.]" (*Id.* at ¶ 22). Defendant Russel was Nikola's CEO and Defendant Brady was Nikola's CFO. (*Id.* at 2–3, ¶¶ 3–4). In addition to asserting that they worked with legal counsel and the Board of Directors, Defendants also appear to argue that they relied on each other's professional judgment, an argument that is not persuasive.

[12] They state in their Reply that "Plaintiffs' reliance on Chartcast and similar episodes

Fourth, Defendants Russell and Brady point out that they "did not sell during the Class Period," which undermines an inference of fraudulent intent. (*Id.* at 9–10). In Response, Plaintiffs assert that Defendants "Russell and Brady were precluded by the lock up agreement from selling shares in Nikola during the Class Period," and their compensation was rooted in awards of Nikola shares. (Doc. 341 at 21). Defendants do not dispute the lock-up agreement was in effect during that time. (Doc. 359 at 7–8). The fact that Defendants Russell and Brady did not sell stock during the Class Period, due to the lock-up agreement, is a fact that should be weighed by the jury. This fact alone, however, does not establish that Defendants Russell and Brady are entitled to summary judgment on scienter, especially considering that they were contractually prevented from doing so.

Having addressed each of Defendant Russell and Brady's arguments as to scienter, the Court concludes that they are not entitled to judgment as a matter of law as to this element.

**3. Loss Causation or Damages**

Next, the Court will address Defendants Russell and Brady's contention that Plaintiffs' Section 10(b) claim fails because Plaintiffs cannot prove loss causation. "To prove loss causation, plaintiffs need only show a causal connection between the fraud and the loss, by tracing the loss back to the very facts about which the defendant lied." *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) (internal citations and quotations omitted). "To establish loss causation in a fraud-on-the-market case, the plaintiff must show that after purchasing her shares and before selling, the following occurred: (1) 'the truth became known,' and (2) the revelation caused the fraud-induced inflation in the stock's price to be reduced or eliminated." *In Re Bofi Holdings Sec. Litig.*, 977 F.3d 781, 789 (9th Cir. 2020) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)). The standard for loss causation is "likened" to proximate cause. *Id.* "The

---

therefore does not supply intent . . . for statements they did not make and did not control." (Doc. 359 (citing Doc. 342 at ¶¶ 30–32)). They still do not explain how this means that they are entitled to judgment as a matter of law.

most common way for plaintiffs to prove that 'the truth became known' is to identify one or more corrective disclosures." *Id.* at 790. Under the "materialization of the risk approach, adopted by some circuits, [there is] loss causation where a plaintiff shows that 'misstatements and omissions concealed the price-volatility risk (or some other risk) that materialized and played some part in diminishing the market value' of a security." *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1120 (9th Cir. 2013) (citing *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 176–77 (2d Cir. 2005)).

Defendants make five arguments in support of summary judgment as to loss causation: (1) Plaintiffs do not identify any corrective disclosures that revealed "new, fraud-related information about any statement by" Defendants Russell or Brady; (2) the 2020 Form 10-K, signed by Defendants Russell and Brady, revealed the inaccuracy of Defendant Milton's misstatements but cannot be considered a corrective disclosure as to them; (3) Plaintiffs' expert cannot disaggregate confounding information; (4) if Plaintiffs assert materialization of risk, the theory fails because the alleged risks were disclosed; and (5) Plaintiffs' damages model is defective because it does not "isolate[] any incremental price inflation attributable to statements or conduct by Mr. Russell or Mr. Brady, as distinct from Mr. Milton's personal statements or other news." (Doc. 331 at 10–13).

First, Plaintiffs respond that their expert has identified several corrective disclosure dates and separated the fraud-related and non-fraud-related factors, and these findings contradict Defendants' expert's findings. (Doc. 341 at 23). As to corrective disclosures, Plaintiffs argue that the information in the SEC filings did not constitute a valid disclaimer. (*Id.* at 24). The Court has already determined that is a question for the jury. Related to this point is Defendants' fourth argument that, "to the extent Plaintiffs assert materialization of risk[,] . . . that theory fails" because "the alleged risks—including the timing, cost, and feasibility of hydrogen stations; the nonbinding nature of reservations; and the development timelines for vehicles—were disclosed all along." (Doc. 331 at 12). The Court has already addressed this argument in its evaluation of falsity, and again, it cannot

determine as a matter of law that the alleged risks had already been disclosed.

Plaintiffs also state that they identify disclosures "that partially corrected Russell and Brady's particular statements and the materialization of risks their misstatements concealed." (Doc. 341 at 24). Specifically, they state that the Hindenburg Research Report (Doc. 330-2 at 46–47) and Defendant Milton's indictment (Doc. 330-2 at 123–24; Doc. 129-2 ¶¶ 2, 76) "partially corrected [Defendants] Russell and Brady's particular statements and the materialization of the risks their misstatements concealed." (Doc. 341 at 24). Defendants argue that these disclosures "bundled Milton-specific allegations, short-seller opinions, investigation headlines, and skepticism of hydrogen power with topics unrelated to any statement by Mr. Russell or Mr. Brady." (Doc. 359 at 8).

Defendants' assertion that there is no loss causation because the materials also focus on Defendant Milton's statements is unavailing. "[A] corrective disclosure need not consist of an admission of fraud by the defendant or a formal finding of fraud by a government agency." *In re Bofl Holding, Inc. Sec. Litig.*, 977 F.3d at 790. A corrective disclosure may "come from any source" and "need not reveal the full scope of the defendant's fraud in one fell swoop." *Id.* In addition, it "need not precisely mirror the earlier misrepresentation." *Id.* (citation omitted). Instead, it "is enough if the disclosure reveals new facts that, taken as true, render some aspect of the defendant's prior statements false or misleading." *Id.* In light of this law, Defendants have not shown that Plaintiffs cannot prove any sort of causal connection between the alleged fraud by Defendants Russell and Brady and the loss.

Defendants' second argument is that the Form 10-K does not constitute a corrective disclosure because it did not reveal any fraud. Indeed, "[r]evelations that are not 'corrective' cannot form the basis for a corrective disclosure." *In re NVIDIA Corp. Sec. Litig.*, 825 F. Supp. 3d 1047, 1072 (N.D. Cal. Mar. 25, 2026) (citing *In re FibroGen Sec. Litig.*, No. 21-CV-02623-EMC, 2024 WL 1064665, at *12 (N.D. Cal. Mar. 11, 2024)). Plaintiffs assert that their expert "determined he could not disaggregate fraud related losses related to the 2020 Form 10-K, but the admissions made in the document are relevant" to Defendants Russell and Brady's liability. (Doc. 341 at 24). Because Plaintiffs do not appear

to characterize the Form 10-K as a corrective disclosure, this argument does not entitle Defendants Russell and Brady to summary judgment.

In Defendants' third and fifth arguments, they assert that Plaintiffs cannot disaggregate confounding information and Plaintiffs' damages model is defective. (Doc. 331 at 11–12). Specifically, as to the third argument, they assert that "Plaintiffs' expert does not bridge the gap between market reactions to Mr. Milton's personal statements, unrelated third-party events, and any statement actually attributable to Mr. Russell or Mr. Brady." (*Id.* at 11). Defendants Russell and Brady set forth the same argument in their *Daubert* Motion, and it is fully addressed in the Court's resolution of that Motion. And as to the fifth argument, Defendants Russell and Brady state that "Plaintiffs offer no reliable methodology that isolates any incremental price inflation attributable statements or conduct by Mr. Russell or Mr. Brady, as distinct from Mr. Milton's personal statements or other news. (*Id.* at 12). Again, Defendants ask the Court to consider the same argument in the *Daubert* Motion, and it is addressed there. At base, these stated deficiencies in the expert analysis do not show that it is undisputed that a depreciation in stock value could not have resulted from Defendant Russell and Brady's misrepresentations.

For all these reasons, Defendants Russell and Brady have not shown that they are entitled to summary judgment on loss causation. Having addressed all of Defendant Russell and Brady's arguments on maker liability, the Court will next address whether they are entitled to summary judgment on the claims against them based on scheme liability.

**B. Scheme Liability**

Next, Defendants Russell and Brady argue that Plaintiffs cannot establish scheme liability under Rule 10b-5(a) and (c) against them. (Doc. 331 at 13–16). Under Rule 10b-5, it is unlawful "[t]o employ any device, scheme, or artifice to defraud" or "[t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(a)–(c). "A defendant may only be liable as part of a fraudulent scheme based upon misrepresentations and omissions under Rules 10b–5(a) or (c) when the scheme also

encompasses conduct beyond those misrepresentations or omissions." *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1057 (9th Cir. 2011). "[T]o be liable as a primary violator of § 10(b) for participation in a 'scheme to defraud,' the defendant must have engaged in conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme." *Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040, 1048 (9th Cir. 2006), *vacated on other grounds*, *Simpson v. Homestore.com, Inc.*, 519 F.3d 1041 (9th Cir. 2008).

Defendants Russell and Brady argue that Plaintiffs cannot prove that they committed any deceptive act, beyond the misstatements in the public disclosures and Analyst Day presentation. (Doc. 331 at 14–15). Instead, Defendants Russell and Brady assert that the record shows "sustained efforts to cabin official disclosures within rigorous review processes and to maintain accuracy." (Doc. 331 at 14 (citing SOF 8-18, 20-21)). Specifically, they assert that they had no control over Defendant Milton's personal social media activity, but state that nevertheless, Defendant Russell "proposed a process for pre-clearing Mr. Milton's posts through general counsel and attempted to route Mr. Milton's statements through legal, but Mr. Milton resisted and 'largely ignored' the recommendation." (Doc. 332 at 3 (citing Doc. 331-3 at 20–22)).

The cited evidence shows that Defendant Russell communicated with Defendant Milton, before and after the company went public, about all of Defendant Milton's personal social media posts being reviewed by Nikola's general counsel to ensure accuracy. (Doc. 331-3 at 20–21). However, Defendant Russell testified at his deposition that Defendant Milton "largely ignored that." (Doc. 331-3 at 22). Defendant Russell also testified that he, Defendant Brady, and Britton Worthen "were very focused on making sure that our securities filings went through the proper process and that everybody signed off on them," and also testified that they "tried to do the same thing with any press release." (*Id.* at 19). Defendant Russell also testified that, although they tried to prevent Defendant Milton from "having direct access" to the company's social media, "he quickly got it back." (*Id.*). Defendant Russell, however, did not "view it as part of [his] job responsibility as CEO to

monitor or manage [Defendant] Milton's social media activities," nor his statements podcasts or interviews, as Defendant Milton "was [his] boss." (*Id.* at 57–59). Defendant Brady similarly confirmed in his deposition that the information in SEC filings, earnings calls, and press releases "went through a vetting process at the company" and was reviewed by "legal or other people." (Doc. 331-4 at 28).

Defendants have not provided detailed evidence about any internal or external review processes. They cite to Defendant Russell's deposition in which he testified about explaining to Defendant Milton how "careful" the company was with press releases, explaining, "where I'm involved, where legal is involved, where financed is involved, where accounting is involved." (Doc. 331-3 at 11–12). Defendants also assert that Defendant Russell followed a "rigorous sign-off process and extended that rigor to press releases." (Doc. 332 at 7). The evidence cited is that "everybody signed off." (Doc. 331-3 at 19). In addition, Defendant Brady testified that he was responsible for "accuracy of financial reporting" and assisted with Nikola's SEC filings in verifying "all the company numbers as well as the explanation of those numbers." (Doc. 331-4 at 15). He also confirmed that he, "along with Nikola's counsel, Mr. Worthen, and outside counsel" was responsible for ensuring the accuracy of those filings. (*Id.* at 16).

In response, Plaintiffs assert that Defendants Russell and Brady "executed a plan to take Nikola public on a wave of manufactured hype aimed explicitly at retail investors" by "deliberately assign[ing] Milton the lead role on soliciting retail investors," "diffus[ing] potential whistleblowers with false reassurances," and corroborating Defendant Milton's "false narrative." (Doc. 341 at 26). Essentially, they argue that Defendants Russell and Brady knew of Defendant Milton's "propensity for making false statements, [and] they empowered, encouraged, and rewarded him for making false claims that attracted additional investors." (*Id.* at 27).

Plaintiffs cite evidence that Defendants Russell and Brady "attempted to suppress outside as well as inside concerns about [Defendant] Milton's misstatements." (Doc. 342 at 19, ¶ 36). First, the evidence shows that Defendants Brady and Russell did not respond

to employee Elizabeth Fretheim's concerns about Defendant Milton's misrepresentations about the company on the TeslaCharts podcast, which was posted to Nikola's Twitter feed. (Doc. 342 at 18, ¶ 32 (citing Doc. 342-5 at 2, Doc. 342-11 at 2–3, Doc. 342-22 at 3–5). Ms. Fretheim informed Defendants Russell and Brady, as well as the Chief Legal Officer, that the podcast would remain posted to the Twitter account "unless they instructed that it would be removed." (Doc. 342-22 at 3). She contacted Defendant Russell about the podcast four times in total, but he never directed the marketing team to remove the podcast. (*Id.* at 4–5). In addition, Mr. Prows discussed the representations in the podcast with Defendant Brady, who stated that "he was addressing it with Trevor." (Doc. 342 at 28 (citing Doc. 342-16 at 51–52). Defendant Russell never gave any direction to remove the podcast. (Doc. 342 at 18, ¶ 33 (citing Doc. 342-7 at 36)).

Plaintiffs also provide evidence that Defendant Russell exchanged encouraging messages with Defendant Milton after he made misrepresentations on interviews. (Doc. 342 at 18–19, ¶ 35). Specifically, Defendant Russell texted Defendant Milton: "Just caught your CNN interview. You have always had a gift for battle in the war of ideas . . . . But you have clearly worked and focused yourself to a whole other level. So cool for me to see it," after an interview in which Defendant Milton stated that Nikola produced its own hydrogen and the Nikola One could drive. (Doc. 342-40 at 28). Plaintiffs also cite that Defendant Russell emailed Defendant Milton: "Wow. I don't see how that could have gone better. Very well handled, Mr. Chairman," after an interview in which Defendant Milton stated that "Nikola One unveiled in 2016 was the 'first zero-emissions' truck 'available to the market.'" (Doc. 342 at 19, ¶ 35 (citing Doc. 342-42 at 2)).

As to communications with people outside the company, Plaintiffs cite an email thread, wherein an investor asked Defendant Brady about Defendant Milton's statements, writing: "The more work I do, the more inconsistencies I see from your Chairman. I need to understand the dynamic here. If this continues, I assume the Board or the SEC will put restrictions on his public statements." (Doc. 342-15 at 3). Defendant Brady emailed Defendant Russell saying the investor "is becoming a bit of a pain in the behind," "he is

tracking was Trevor is saying on social media," and the investor "would prefer that Trevor stops hyping and we announce when we actually have something to announce." (*Id.* at 2–3). Second, Plaintiffs cite testimony by Defendant Brady that he called the Hindenburg report "a short seller hit job" and "a character assassination on Trevor Milton." (Doc. 342-13 at 4).

Based on a review of the evidence and the law surrounding scheme liability, the Court cannot determine that Defendants Russell and Brady are entitled to summary judgment. The heart of Defendant Russell and Brady's arguments is that they attempted to control, but ultimately had no sway over, Defendant Milton's public statements. Instead, they assert that they followed official processes to verify information as best they could, in spite of Defendant Milton. Plaintiffs characterize their actions differently, asserting that Defendants Russell and Brady strategically allowed Defendant Milton to misrepresent Nikola's products and capabilities, knowing that he tended to "misstate facts."[13] (*See* Doc. 342 at 17–18, ¶ 29; Doc. 342-7 at 2–3 ("In situations where he was trying to persuade somebody, he would sometimes exaggerate, sometimes misstate facts."); Doc. 342-33 at 6 ("I was also aware at the time Mr. Milton not being specific enough and explaining things in generalities.")).

In light of the case law provided by the parties, the Court cannot say as a matter of

---

[13] Defendants argue that this theory of scheme liability holds them liable for Defendant Milton's misstatements, which they argue that they had no control over. (Doc. 331 at 15–16). But Plaintiffs' theory appears to be that Defendants Russell and Brady allowed and even encouraged Defendant Milton to make misstatements, meaning their own conduct is at issue, not just Defendant Milton's statements. And as to scienter, Defendants restate the same arguments they asserted, and the Court rejected, under the Section 10(b) elements test above. (Doc. 331 at 15). As to scheme liability, the Court notes that, "[s]ince liability under Rule 10b-5(a) and (c) turns on the 'principal purpose' of a defendant's actions or course of conduct, the issue is necessarily wrapped up with the issue of scienter." *Adbo*, 2021 WL 616324, at *11. The Court does not find that Defendants have shown they are entitled to judgment as a matter of law on scienter for scheme liability. Defendants also reiterate their arguments as to loss causation (Doc. 331 at 15), and the Court does not find that they are entitled to summary judgment for loss causation on scheme liability for the same reasons.

law that a reasonable jury could not find that Defendants Russell and Brady's actions amounted to deceptive conduct. *See, e.g.*, *Abdo v. Fitzsimmons*, No. 17-cv-01232-TSH, 2021 WL 616324, at *13 (N.D. Cal. Feb. 17, 2021) ("A reasonable jury after hearing this evidence could conclude that under these circumstances, by delegating authority to the Company to make disclosures and representations and then failing to check that Fitzsimmons and others were not again making misrepresentations to investors, the ODs consciously ignored a substantial risk[.]"). As to deceptive conduct, "[t]he fact that some of these alleged acts are closely connected to the alleged misrepresentations and omissions . . . does not mean that Plaintiffs' scheme liability claim is a mere recast of their misrepresentation claim." *In re Galena Biopharma, Inc., Sec. Litig.*, 117 F. Supp. 3d 1145, 1194 (D. Or. 2015); *see also Superintendent of Ins. of N.Y. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 10 n.7 (1971) ("We believe that § 10(b) and Rule 10b-5 prohibit all fraudulent schemes . . . whether the artifices employed involve a garden type variety of fraud, or present a unique form of deception. Novel or atypical methods should not provide immunity from the securities laws."). Even more, granting summary judgment on this issue would mean weighing the evidence both sides have provided, which is a duty reserved for the jury. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."). For all these reasons, the Court will deny Defendants Russell and Brady's Motion for Summary Judgment as to scheme liability.

**C. Control Person Liability**

Lastly, Defendants Russell and Brady argue that Plaintiffs cannot establish control person liability under Section 20(a). "Under Section 20(a), a defendant employee of a corporation who has violated the securities laws will be jointly and severally liable to the plaintiff, as long as the plaintiff demonstrates a primary violation of federal securities law and that the defendant exercised actual power or control over the primary violator." *City of Dearborn Heights Act 345 Police & Fire Retirement Sys. V. Align Tech., Inc.*, 856 F.3d

605, 623 (9th Cir. 2017) (internal quotations and citations omitted). "[W]ithout a primary violation of federal securities law, [a plaintiff] cannot establish control person liability." *Id.* (internal quotations and citations omitted). However, a plaintiff "need not show that the defendant was a culpable participant in the violation." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). Instead, a plaintiff must show that "the defendant exercised actual power or control over the primary violator." *Id.* But "a defendant is entitled to a good faith defense if he can show no scienter and an effective lack of participation." *Id.* "Whether [the defendant] is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Howard*, 228 F.3d at 1065 (citing *Kaplan v. Rose*, 49 F.3d 1363, 1382 (9th Cir. 1994)).

First, Defendants Russell and Brady argue that there was no primary violation of securities law. (Doc. 331 at 16). The Court has already addressed and rejected this argument in its analysis of the Section 10(b) claim above, having found that Defendants are not entitled to summary judgment on that claim. Next, Defendants Russell and Brady argue that Plaintiffs cannot show control over the alleged conduct, because "the alleged misstatements that propel Plaintiffs' theory are Mr. Milton's personal social media posts and interviews." (Doc. 331 at 17). Plaintiffs assert in response that Defendant Milton's statements should be attributed to Nikola, which would make Defendants Russell and Brady liable as control persons over the company's statements. (Doc. 341 at 28). "[A] corporation is responsible for a corporate officer's fraud committed 'within the scope of his employment' or 'for a misleading statement made by an employee or other agent who has factual or apparent authority.'" *In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476 (9th Cir. 2015). For questions of control person liability, "[t]he dispute comes down to the identity of the primary violator" because even if a defendant did not control the corporate officer's statements, the defendant may still control the company's statements. *In re Apple Inc. Secs. Litig.*, No. 19-cv-02033, 2020 WL 6482014, at *14 (N.D. Cal. Nov. 4, 2020).

Defendants Russell and Brady do not address whether Defendant Milton's misstatements may be attributed to Nikola, and if so, whether Defendants Brady and Russell are liable as control persons over the company. Accordingly, the Court finds that they have not met their burden on summary judgment in showing that they are entitled to judgment as a matter of law. Defendants next assert that they are entitled to summary judgment based on their good faith defense because no jury could find that they induced the acts constituting the violation. (Doc. 331 at 18–19). Plaintiffs respond that disputed facts regarding Defendants' scienter preclude summary judgment on this issue because Defendant Russell "'stood to benefit' from Milton's misconduct and failed to adequately supervise Nikola as CEO" and Defendant Brady's "knowledge and willingness to turn a blind eye to Milton's misconduct preclude the possibility of summary judgment." (Doc. 341 at 30–31).

A defendant "may assert a good faith defense by 'proving the absence of scienter' and a failure to directly or indirectly induce the violations at issue." *Everex Sys.*, 228 F.3d at 1065. Defendants Russell and Brady's briefing does not establish that there is no genuine dispute of material fact as to scienter. (Doc. 331 at 18–19). Therefore, they are not entitled to summary judgment on the Section 20(a) claims based on the good faith defense. For all these reasons, Defendants Russell and Brady have not shown that they are entitled to summary judgment based on control person liability.

### D. Conclusion

The Court will deny Defendants Russell and Brady's Motion for Summary Judgment. (Doc. 331). The Court cannot determine as a matter of law that Defendants Russell and Brady are not liable under maker liability, scheme liability, or control person liability. The evidence submitted must be weighed by a jury. The Court will next address the Motion to Exclude Plaintiffs' expert witness, Dr. Nye.

## V. DEFENDANT RUSSELL AND BRADY'S *DAUBERT* MOTION AND DEFENDANT UBBEN'S JOINDER

Defendants Russell and Brady filed the instant Motion to Exclude Opinions of Dr.

Zachary Nye, Ph.D. (Doc. 330). Plaintiffs responded to the *Daubert* Motion (Doc. 347), and Defendants Russell and Brady filed a Reply (Doc. 357). Defendant Ubben filed a Joinder in the Motion (Doc. 336), and Plaintiffs moved to strike Defendant Ubben's Joinder (Doc. 356). As an initial matter, the Court will consider the Motion to Strike. Plaintiffs argue that Defendant Ubben's Joinder in the Motion to Dismiss should be stricken because the Joinder is essentially an untimely Motion to exclude the expert, in which Defendant Ubben asserts additional arguments on top of those in Defendant Russell and Brady's Motion. (Doc. 355 at 2–3). In its discretion and in the interest of justice, the Court will deny the Motion to Strike and consider the arguments in Defendant Ubben's Joinder.[14]

**A. Legal Standard**

Federal Rule of Evidence ("FRE") 702 permits parties to file motions to exclude to ensure relevance and reliability of expert testimony. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152–53 (1999). FRE 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The Rule imposes on the trial courts a gatekeeping obligation to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). "Whether the expert is appropriately qualified, whether her testimony is relevant, and whether her testimony is

---

[14] Plaintiffs write that if the Court does consider the Joinder, the arguments therein "fail for the same reasons stated in Lead Plaintiff's Opposition to Defendant Russell and Brady's Motion. (Doc. 355 at 3). The Court will certainly address those arguments in accordance with the Joinder.

reliable are all distinct inquiries under Rule 702." *Contreras v. Brown*, No. CV-17-08217-PHX-JAT, 2019 WL 2080143, at *1 (D. Ariz. May 10, 2019).

The proponent of the expert evidence has the burden of proving the expert's testimony is admissible under FRE 702 and the *Daubert* standard. *Grant v. Bristol-Myers Squibb*, 97 F. Supp. 2d 986, 989 (D. Ariz. 2000). "When an expert meets the threshold established by Rule 702 as explained in *Daubert*, the expert may testify and the jury decides how much weight to give that testimony." *Id.* When the expert does not meet the threshold, the Court may prevent him from providing testimony. *See Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013) ("Basically, the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable.").

In the securities litigation context, multiple federal courts have responded to attacks on an expert's cause-and-effect study by noting that "Defendants' arguments contesting the validity of plaintiffs' expert's conclusions based on his market model may be presented at trial." *In re Montage Tech. Grp. Ltd. Sec. Litig.*, No. 14-cv-00722-SI, 2016 WL 1598666, at *10 (N.D. Cal. Apr. 21, 2016); *see also Hayes v. MagnaChip Semiconductor Corp.*, No. 14-cv-01160-JST, 2016 WL 7406418, at *7 (N.D. Cal. Dec. 22, 2016). So long as the Court determines that each expert's opinion is sufficiently relevant and reliable under *Daubert*, it is the jury who must decide what weight to afford conflicting testimony between those experts. *See Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010); *Wyler Summit Pshp. v. Turner Broad. Sys.*, 235 F.3d 1184, 1192 (9th Cir. 2000) ("Weighing the credibility of conflicting expert witness testimony is the province of the jury."); *Lewert v. Boiron, Inc.*, 212 F. Supp. 3d 917, 924 (C.D. Cal. 2016) ("In making this preliminary [Rule 702] assessment, the court should not weigh conflicting expert testimony or attempt to determine whether the conclusions are correct.").

**B. Discussion**

Defendants Russell and Brady move under Federal Rule of Evidence 702 to exclude the testimony of Plaintiffs' expert, Dr. Zachary Nye, "regarding loss causation and

damages as set forth in his 2025 merits report, 2025 rebuttal report, and related testimony." (Doc. 330 at 1). Defendants Russell and Brady set forth three main arguments for why Dr. Nye's opinions fail under Rule 702: (1) Dr. Nye "adopts Plaintiffs' allegations as narrative and offers legal conclusions," (2) the event-study framework is not reliable or replicable because it "relies on ex post analyst and media commentary, studies the wrong information, and employes a biased regression analysis," and (3) Dr. Nye does not attribute any inflation or damages to Defendants Russell or Brady specifically, as he admits that he cannot connect the inflation "to any specific Defendant or statement." (*Id.* at 1–2). Defendants Russell and Brady assert that in Dr. Nye's report, he relates alleged inflation to "a set of 'corrective' events across multiple topics" but does not disaggregate "non-fraud firm-specific information" or connect inflation to specific statements or Defendants. (*Id.* at 2). They also argue that the rebuttal report "extend[s] forward-looking control periods 120 days beyond additional 'impact dates,' revis[es] exhibits, and claim[s] multi-topic 'materialization of risk' disclosures can supply inflation without disaggregating unrelated firm-specific news or allocating inflation by statement or speaker." (*Id.* at 3).

Plaintiffs respond that "Dr. Nye performed an event study via a standard regression analysis to determine whether the alleged corrective disclosures identified in the Complaint caused measurable stock price reaction." (Doc. 347 at 9). They also assert that Dr. Nye's event study approach has been widely accepted as reliable. (*Id.* at 7).

Much of Defendant Russell and Brady's argument centers on Dr. Nye's failure to account for how each statement may be tied to each individual defendant or to account for inflation on a statement-by-statement basis. Defendant Ubben also argues that the report should be excluded because it will not assist in determining what damages are attributable to Defendant Ubben specifically. (Doc. 336 at 2). The Court will address this argument up front. Just because the expert report focuses on the misrepresentations as a whole does not mean that the methodology is unreliable or the report will not assist the triers of fact. Indeed, it is impracticable to expect Dr. Nye to determine which misstatements may be attributed to each Defendant. With respect to Defendants Russell and Brady specifically, it

has not been determined as matter of law which misstatements they may be liable for, with respect to control person liability or scheme liability. Thus, it does not make sense to exclude Dr. Nye's testimony because he should have provided a defendant-by-defendant calculation. Instead, the fact that some amount of inflation is not tied to any specific Defendant might go to the weight of the evidence or the relevance of the expert testimony to certain issues. But it certainly does not mean that Dr. Nye's report will not assist the trier of fact in determining loss causation the loss to Plaintiffs.

As to the argument that Dr. Nye should have calculated the value of inflation resulting from every specific misstatement, Defendants do not provide authority to show that Dr. Nye's regression analysis is unreliable because it does not delineate price impact for each statement. Defendants Russell and Brady reiterate that the report is unreliable because it does differentiate between statements but provide no case law to support that specific assertion. (*See* Docs. 330, 357). Plaintiffs further highlight that "the statement-by-statement and defendant-by-defendant allocation proposed by Defendants would be impossible" because it "would require a separate inflation calculation for every possible combination of actionable misrepresentations." (Doc. 347 at 15). For all these reasons, the Court rejects Defendant Russell and Brady's argument that Dr. Nye's report should be excluded because its analysis is not calculated based on each statement and each Defendant. Defendants have not shown that the regression analysis methodology is unreliable for that reason, and it will still assist the trier of fact.

Defendants Russell and Brady next assert that Dr. Nye's report is deficient because it takes Plaintiffs' allegations as truth for the purpose of defining corrective events. (*Id.* at 3–4) (citing Exh. A ¶¶ 6, 9, 21, 26, 28). The cited paragraphs in Dr. Nye's report cite statements that he was "retained by Counsel for Lead Plaintiffs to opine" on materiality, proximate cause, and per-share damages (Doc. 330-2 at 5–6, ¶ 6), that he was asked to assume Plaintiffs' allegations as true (*id.* at 6, ¶ 9), that Defendants "allegedly staged deceptive events an 'doctored videos' to falsely portray the Nikola One as fully operational" (*id.* at 14, ¶ 21), that Plaintiffs assert that Nikola misrepresented the status of

the hydrogen production and stations (*id.* at 17–18, ¶ 26), and Plaintiffs allege that Defendants' public statements about the Badger were false (*id.* at 19, ¶ 28).

Defendants appear to take issue with Dr. Nye's report being premised on the allegations in Plaintiffs' Complaint. But this is not grounds to exclude the Complaint. Indeed, Dr. Nye clarifies in the report that he is being asked to assume as true Plaintiffs' allegations and opine on materiality, proximate cause, and damages. (*Id.* at 5–6, ¶¶ 6, 9). To require Dr. Nye to independently investigate all the facts at issue in this matter far exceeds the role of a testifying expert. Defendants Russell and Brady have not shown that reliance on Plaintiffs' allegations is grounds to exclude the expert opinion.

Next, Defendants Russell and Brady argue that the event study analysis is flawed. (Doc. 330 at 4–6). Specifically, Defendants argue that Dr. Nye "rationalizes observed returns with subjective, after-the-fact analyst and media commentary," uses an earnings-day paradigm without accounting for media topics, and employs a "biased regression specification," which "fails to account for the high volatility in Nikola's stock price immediately following the SPAC merger."[15] (Doc. 330 at 4–5).[16] These one-sentence arguments are not fully explained and simply cite to multiple paragraphs of Defendants' expert's report. (*Id.*). To the extent Defendants believe that Dr. Nye's evaluation of analyst commentary, impact dates, and the impact of the SPAC merger led to inaccurate conclusions, Defendants can use their own expert's findings to challenge those of Dr. Nye. As to the forward-looking control periods, Plaintiffs explain that the control period "used to estimate the regression equation is the 120 trading days immediately following the

---

[15] Defendant Ubben similarly argues that Dr. Nye's "forward-looking control period with lower volatility—rather than a backward-looking or 'centered' approach—mechanically increases the likelihood that company specific returns on alleged corrective disclosure dates will be statistically significant[.]" (Doc. 336 at 3).

[16] Plaintiffs highlight that Defendant Russell and Brady's Motion "consists almost entirely of single sentence conclusory assertions of law" and urges the Court not to develop the parties' arguments on their behalf. (Doc. 347 at 10–11). The Court will not do so, and will assess to the best of its ability the argument that Defendants have set forth.

impact date." (Doc. 330-2 at 138, ¶ 178). Plaintiffs cite to the expert report, which states that an estimation window prior to the event window is the most common choice, (*id.* at 139, n. 444, 445), but an estimation window after the event window is also acceptable as one of three "general choice[s]." (*Id.* n. 446). Plaintiffs also note that the Class Period in this case begins on the first day Nikola went public, so "there are no trading days before the beginning of the Class Period that could be used for the estimation window before the event window." (Doc. 347 at 10, n. 5). The Court finds that the expert's choice of estimation window may be litigated at trial, but it does not make the report inadmissible.

Next, Defendants Russell and Brady argue that Dr. Nye's loss causation framework is invalid because it "attributes entire company-specific returns on multi-topic dates to alleged 'revelations,' while acknowledging other firm-specific information—regulatory actions, executive departures, third-party partnerships, and order-flow news—without rigorously distinguishing between the two categories of information." (Doc. 330 at 5).[17] Specifically, they argue that the impact dates are based on events involving Defendant Milton or third-party actions, which are not tied to Defendants Russell and Brady, and that Dr. Nye does not distinguish between "loss caused by alleged fraud [and] loss caused by other news surrounding the company." (*Id.* at 5–6).

"A loss causation expert's analysis may be unreliable if that expert fails to consider factors other than a defendant's alleged misstatements that might have contributed to changes in the company's stock price." *City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*, 3:21-cv-00762-WQH-MSB, 2026 WL 1651463, at *16 (S.D. Cal. June 8, 2026). Plaintiffs respond that Dr. Nye did distinguish between fraud-related information and non-fraud-related information, as he assessed news about Nikola that was disclosed on the corrective event dates, finding in one instance that "contemporaneous adverse disclosures unrelated to the alleged fraud" required declines from certain dates to be

---

[17] Defendants Russell and Brady cite large portions of Dr. Nye's report to exemplify where he fails to distinguish between categories of information. (Doc. 330 at 5 (citing Doc. 330-2 at ¶¶ 55-96, 97–142, 155–66, 167–75)).

excluded form the estimate for price inflation. (Doc. 347 at 17). It appears from the report that Dr. Nye did account for non-fraud-related losses.

Next, Defendants Russell and Brady argue that Dr. Nye's expert testimony will not assist the jury in determining damages because, if any allegedly false statement is determined to be true, "Dr. Nye's undifferentiated, backwardized inflation analysis cannot be mapped to the set of actionable statements remaining for the jury." (Doc. 330 at 6). They further explain that "[a] single, indivisible inflation analysis that cannot be reallocated by statement or speaker cannot assist the jury in determining damages 'attributable, if all,' to Mr. Russell or Mr. Brady." (Doc. 330 at 6) (citing *In re REMEC Inc. Secs. Litig.*, 702 F. Supp. 2d 1202, 1274–75 (S.D. Cal 2010); *Siqueiros v. Gen. Motors LLC*, No. 16-cv-07244-EMC, 2022 WL 74182, at *8 (N.D. Cal. Jan. 7, 2022).[18] Plaintiffs respond that Dr. Nye's methodology consisted of "analyzing the stock price declines following the alleged corrective disclosures, measuring inflation, and then working backwards to determine the level of inflation at the start of the Class Period." (Doc. 347 at 13). Plaintiffs also argue that the "removal of a single misrepresentation would not impact the inflation on day one of the Class Period" because many of the misrepresentations maintained the inflation in Nikola's stock price. (Doc. 347 at 15); *see also In re Vivendi, S.A. Secs. Litig.*, 838 F.3d 223, 260 (2d Cir. 2016) ("Vivendi's 'price impact' argument, if successful, would at most imply that Plaintiffs could not establish reliance with respect to some of the fifty-six relevant misstatements. But that would not render Nye's testimony wholly irrelevant to loss causation or damages; nor it would transform Nye's calculation of actual inflation into the product of unreliable principles or methods."). The Court agrees that the fact that not all of the misstatements may be attributed to Defendants Russell and Brady does not mean that the report is unreliable and should be excluded.

Finally, Defendants Russell and Brady argue that the "model implies negative or zero 'true value' for Nikola's stock on certain dates and censors those values to zero,

---

[18] These cases do not appear to discuss whether inflation analyses should be divided by statement or speaker.

creating artificial volatility disconnected from any disclosure." (Doc. 330 at 6). Defendant Ubben also argues that the true value being estimated as zero is a flaw in the model. (Doc. 336 at 3). Plaintiffs explain that Dr. Nye "censors those values to zero" because "(i) as equity, common shares of a publicly traded company cannot have a negative value, and (ii) federal securities laws cap the amount of recoverable damages at the price paid for the security." (Doc. 347 at 22). In the report, Dr. Nye explains that "[u]nder the commonly employed out-of-pocket method proposed herein, artificial inflation in Nikola stock on any given day of the Class Period is, by definition, limited to the price an investor actually paid to purchase/acquire Nikola stock." (Doc. 330-2 at 134, ¶ 172). Dr. Nye explains this theory further, stating that "the price of a corporation's stock can never be less than zero in an efficient market" so it is "impossible for price inflation to exceed the 'actual price' paid." (*Id.* at n. 443). He summarized this point in his deposition by stating "you can't lose more than the amount of money you put in, and that stocks can't have a negative value, by virtue of their limited liability." (Doc. 347 at 23 (citing Doc. 330-3 at 35–36)). The Court does not find that this methodology "contradict[s] basic finance or rel[ies] on mechanical censoring." (Doc. 357 at 9). The Court does not find that the zero values provide a basis to exclude the report.

**C. Conclusion**

For the reasons stated above, the Court will deny Defendant Russell and Brady's Motion to Exclude and Defendant Ubben's Joinder. Plaintiffs have shown that Dr. Nye's report, more likely than not, is helpful, based on sufficient facts and date, and the product of sound and reliable methods. Defendants Russell, Brady, and Ubben have not shown otherwise. Instead, the results reached by Dr. Nye, as well as the persuasiveness of his conclusions, will be litigated at trial. Therefore, Defendants Russell and Brady's Motion to Exclude Opinions of Dr. Zachary Nye, PH.D (Doc. 330) and Defendant Ubben's Joinder in the Motion (Doc. 336) will both be denied.

**<u>CONCLUSION</u>**

Having considered all the parties arguments, the Court rules as follows. The Court

will grant Lead Plaintiffs' Motion for partial summary judgment. The Court has determined that Defendant Milton's criminal conviction for securities fraud precludes him from challenging his liability for the securities fraud claim in Count One. Having determined that collateral estoppel applies, the Court will accordingly deny Defendant Milton's Motion for Summary Judgment. Next, the Court will grant Defendant Ubben's Motion for Summary Judgment because the claims against him are time-barred. The Court will deny Defendant Russell and Brady's Motion for Summary Judgment because they have not shown that they are entitled to judgment as a matter of law on any of the claims against them. Finally, the Court will deny Defendant Russell and Brady's Motion to Exclude Plaintiffs' Expert Dr. Nye, as well as Defendant Ubben's Joinder in that Motion.

Accordingly,

**IT IS ORDERED** that Lead Plaintiffs and Certified Class Representatives George Mersho and Vincent Chau's Motion for Partial Summary Judgment (Doc. 316) is **granted**.

**IT IS FURTHER ORDERED** that Defendant Trevor Milton's Motion for Summary Judgment (Doc. 333) is **denied**.

**IT IS FURTHER ORDERED** that Defendant Jeffrey Ubben's Motion for Summary Judgment (Doc. 328) is **granted**.

**IT IS FURTHER ORDERED** that Defendants Kim Brady and Mark Russell's Motion for Summary Judgment (Doc. 331) is **denied**.

**IT IS FURTHER ORDERED** that Defendants Kim Brady and Mark Russell's *Daubert* Motion to Exclude the Opinions of Plaintiffs' expert Dr. Zachary Nye (Doc. 330) and Defendant Ubben's Joinder in that Motion (Doc. 336) are **denied**.

**IT IS FURTHER ORDERED** that Lead Plaintiffs' Motion to Strike Defendant Ubben's Joinder in the Motion (Doc. 355) is **denied**.

Dated this 8th day of September, 2026.

Honorable Steven P. Logan
United States District Judge